# 26-943-cr(L), 26-944-cr(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals
*for the*
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RACHEL CHERWITZ, NICOLE DAEDONE,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS RACHEL CHERWITZ & NICOLE DAEDONE

ALEXANDRA A.E. SHAPIRO
ALICE BUTTRICK
CHRISTOPHER JOHNSON
WILLIAM TAYLOR
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants Rachel Cherwitz & Nicole Daedone*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................ v

INTRODUCTION ........................................ 1

JURISDICTIONAL STATEMENT ........................................ 3

ISSUES PRESENTED ........................................ 4

STATEMENT OF THE CASE ........................................ 5

A. OneTaste's Spiritual Basis, Orgasmic Meditation, And Other Teachings ........................................ 7

B. OneTaste's Founding, Growth, And Maturation ........................................ 9

C. The Alleged Victims Testified They Were Voluntary And Willing Participants In The Activities At Issue ........................................ 11

1. Background, Initial Involvement, And Courses/Programs ........................................ 12

2. Orgasmic Meditation ........................................ 13

3. Volunteering And Working For OneTaste ........................................ 14

4. The Alleged Victims Chose To Move Into Communal Residences With Strict Rules And A Monastic Lifestyle ........................................ 16

5. At The Time, The Witnesses Expressed Positive Feelings About OneTaste Publicly And To Daedone And Cherwitz ........................................ 17

6. The Witnesses Were Completely Free At All Times To Leave OneTaste ........................................ 18

D. The Government's Purported Evidence Of Coercion ........................................ 19

1. The Government's Theory Was One Of "Psychological" Harm ....................19

2. The Evidence Showed That The Alleged Victims Voluntarily Participated In Sexual Activity The Government Alleged Was Forced Labor ....................21

3. Much Of The Government's Other Evidence Was Salacious But Also Reflected Voluntary Conduct....................24

4. The Evidence Did Not Support The Government's Allegation Of Financial "Coercion"....................26

E. Rule 29 Motions And Verdict....................27

SUMMARY OF ARGUMENT....................27

STANDARDS OF REVIEW ....................31

ARGUMENT ....................31

I. CHERWITZ AND DAEDONE ARE ENTITLED TO ACQUITTALS BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SHOW THEY AGREED TO OBTAIN ANY "FORCED" LABOR FROM ANYONE....................31

A. No "Serious Harm" Was Used To Force The Alleged Victims To Perform Work For OneTaste ....................32

1. The "Harm" Here Does Not Remotely Approach What This Court And Other Courts Have Required To Establish Forced Labor ....................35

2. The Government's "Brainwashing" Theory Fails ....................43

B. The Forced Labor Statute Should Be Narrowly Construed To Avoid Constitutional Problems Illustrated By The Convictions....................44

1. Applying §1589 To Appellants Raises Serious Vagueness Concerns....................45

2. Applying §1589 To Appellants Would Create Serious Freedom of Speech, Religion, And Association Problems .......... 48

II. THE CONVICTIONS VIOLATE THE FIRST AMENDMENT .......... 49

A. This Prosecution Targeted Appellants' Speech, Beliefs, And Associated Expression .......... 49

B. Appellants' Speech, Ideas, And Spiritual Practices Are Protected By The First Amendment .......... 53

1. The Prosecution Violates Freedom of Speech And Religion .......... 53

2. The Prosecution Violates Freedom of Expressive Association .......... 56

C. The Convictions Cannot Withstand Strict Scrutiny .......... 58

III. APPELLANTS WERE DENIED A FAIR TRIAL ON THEIR FIRST AMENDMENT DEFENSE .......... 59

A. Background .......... 60

B. The District Court Erroneously Refused To Instruct The Jury On The First Amendment .......... 62

C. The Instructional Errors Prejudiced Cherwitz And Daedone .......... 64

IV. THE FORFEITURE AWARD AGAINST DAEDONE WAS UNLAWFUL .......... 65

A. Background .......... 65

B. The Entire OneTaste Sale Price Was Not Forfeitable As Proceeds Or Under An Instrumentality Theory .......... 67

1. Proceeds .......... 67

2. Instrumentality .......... 70

C. The Forfeiture Award Was Unconstitutionally Excessive ....72

V. THE DISTRICT COURT ERRONEOUSLY REFUSED TO HOLD A *KASTIGAR* HEARING TO INVESTIGATE THE GOVERNMENT'S IMPROPER USE OF PRIVILEGED MATERIALS ....75

A. Background ....76

1. The Government Built Its Case Using Stolen Privileged Material....76

2. The Government Concealed Its Misconduct And Misrepresented How It Handled The PRA And The Images ....78

B. A *Kastigar* Hearing Is Required To Determine The Scope Of The Government's Misconduct....81

1. Appellants Diligently Pursued Their Privilege Claims....83

2. The Materials Were Privileged ....84

3. Daedone and Cherwitz Were Privilege-Holders....86

4. Common-Interest Privilege Also Applies ....87

CONCLUSION....88

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Austin v. United States*,
509 U.S. 602 (1993) ........................................................................71

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) .................................................................. 55, 58

*Boy Scouts of America v. Dale*,
530 U.S. 640 (2000) .................................................................. 56, 57

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ............................................................... 53, 55

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) .................................................................. 53, 58

*Clark v. Martinez*,
543 U.S. 371 (2005) ........................................................................45

*Cohen v. California*,
403 U.S. 15 (1971) ..........................................................................53

*CompassCare v. Hochul*,
125 F.4th 49 (2d Cir. 2025) ..............................................................57

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
879 F.3d 462 (2d Cir. 2018) ..............................................................31

*Emp. Div. Dep't of Human Res. of Ore. v. Smith*,
494 U.S. 872 (1990) ........................................................................54

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ........................................................................48

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026) .....................................................................56

*Headley v. Church of Scientology Int'l*,
687 F.3d 1173 (9th Cir. 2012) ...................................................... passim

*Honeycutt v. United States*,
581 U.S. 443 (2017) .......... 67, 69, 70

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) .......... 57

*Immediato v. Rye Neck Sch. Dist.*,
73 F.3d 454 (2d Cir. 1996) .......... 33

*In re Auclair*,
961 F.2d 65 (5th Cir. 1992) .......... 87

*In re Cnty. of Erie*,
473 F.3d 413 (2d Cir. 2007) .......... 84

*J.W. Goldsmith, Jr., Grant Co. v. United States*,
254 U.S. 505 (1921) .......... 71, 72

*Jouppi v. Alaska* (25-246) .......... 73

*Kastigar v. United States*,
406 U.S. 441 (1972) .......... 30, 75

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) .......... 53

*Kolender v. Lawson*,
461 U.S. 352 (1983) .......... 48

*Koon v. United States*,
518 U.S. 81 (1996) .......... 31

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 58

*Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n*,
584 U.S. 617 (2018) .......... 54

*McDonnell v. United States*,
579 U.S. 550 (2016) .......... 48

*McNeill v. United States*,
563 U.S. 816 (2011) ........................................................................71

*Muchira v. Al-Rawaf*,
850 F.3d 605 (4th Cir. 2017) ........................................................... passim

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
819 F.2d 875 (9th Cir. 1987) ..............................................................57

*RAV v. City of St. Paul*,
505 U.S. 377 (1992) ........................................................................59

*Reynolds v. United States*,
98 U.S. 145 (1878) ........................................................... 54, 55, 58

*Skilling v. United States*,
561 U.S. 358 (2010) ........................................................................48

*Snyder v. United States*,
603 U.S. 1 (2024) ............................................................................48

*Taylor v. Salvation Army Nat'l Corp.*,
110 F.4th 1017 (7th Cir. 2024) ................................................ 34, 39, 42, 58

*Tegete v. Maryknoll Sisters of Saint Dominic*,
2023 WL 2504744 (S.D.N.Y. Mar. 14, 2023) ............................ 37, 41, 56

*Texas v. Johnson*,
491 U.S. 397 (1989) ........................................................................53

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981) ........................................................................54

*United States v. Allen*,
127 F.3d 260 (2d Cir. 1997) ..............................................................62

*United States v. Awad*,
598 F.3d 76 (2d Cir. 2010) ................................................................72

*United States v. Bajakajian*,
524 U.S. 321 (1998) ........................................................... passim

*United States v. Ballard*,
322 U.S. 78 (1944) .................................................... 54, 58

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) .................................................... 84

*United States v. Bradley*,
390 F.3d 145 (1st Cir. 2004) .................................................... 37

*United States v. Calimlim*,
538 F.3d 706 (7th Cir. 2008) .................................................... 36, 43

*United States v. Callahan*,
801 F.3d 606 (6th Cir. 2015) .................................................... 36, 37, 45

*United States v. Caronia*,
703 F.3d 149 (2d Cir. 2012) .................................................... passim

*United States v. Ceballos*,
340 F.3d 115 (2d Cir. 2003) .................................................... 32

*United States v. Chastain*,
145 F.4th 282 (2d Cir. 2025) .................................................... 31

*United States v. Chaudri*,
134 F.4th 166 (4th Cir. 2025) .................................................... 32, 36, 45

*United States v. Cuervelo*,
949 F.2d 559 (2d Cir. 1991) .................................................... 31, 80, 83

*United States v. Dann*,
652 F.3d 1160 (9th Cir. 2011) .................................................... 36, 59

*United States v. Daugerdas*,
892 F.3d 545 (2d Cir. 2018) .................................................... 67

*United States v. DeFonte*,
441 F.3d 92 (2d Cir. 2006) .................................................... 85

*United States v. Dennis*,
843 F.2d 652 (2d Cir. 1988) .................................................... 86

*United States v. Dove*,
916 F.2d 41 (2d Cir. 1990) ....................................................................62

*United States v. Durham*,
825 F.2d 716 (2d Cir. 1987) ................................................... 62, 63, 64, 65

*United States v. Elias*,
154 F.4th 56 (2d Cir. 2025) ........................................................... 31, 67, 70

*United States v. Ginsberg*,
758 F.2d 823 (2d Cir. 1985) ........................................................... 82, 83

*United States v. Gonzalez*,
144 F.4th 396 (2d Cir. 2025) ....................................................................82

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................................................ 49, 55

*United States v. James*,
151 F.4th 28 (2d Cir. 2025) ................................................... 30, 65, 67, 69

*United States v. Kalu*,
791 F.3d 1194 (10th Cir. 2015) ..............................................................37

*United States v. Kaziu*,
559 F. App'x 32 (2d Cir. 2014) ..............................................................55

*United States v. Kozminski*,
487 U.S. 931 (1988) ................................................................ 33, 44, 45

*United States v. Landji*,
2021 WL 5402288 (S.D.N.Y. Nov. 18, 2021) ............................................82

*United States v. Lanier*,
520 U.S. 259 (1997) ...............................................................................46

*United States v. Leech*,
24-cr-658 (S.D.N.Y.) ...............................................................................82

*United States v. Luong*,
125 F.4th 147 (4th Cir. 2025) ..................................................................37

*United States v. Mackey*,
143 F.4th 129 (2d Cir. 2025) ........................................................ 31, 32

*United States v. Pedroza*,
750 F.2d 187 (2d Cir. 1984) ...............................................................65

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006) ........................................................ 63, 64

*United States v. Raniere*,
2022 WL 17544087 (2d Cir. Dec. 9, 2022) ................................. 45, 46

*United States v. Raniere*,
55 F.4th 354 (2d Cir. 2022) .......................................................... 45, 46

*United States v. Sabhnani*,
599 F.3d 215 (2d Cir. 2010) ........................................... 35, 36, 45, 71

*United States v. Schwimmer*,
892 F.2d 237 (2d Cir. 1989) .................................................. 81, 83, 87

*United States v. Schwimmer*,
924 F.2d 443 (2d Cir. 1991) ........................................................ 75, 81

*United States v. Shackney*,
333 F.2d 475 (2d Cir. 1964) ...............................................................33

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017) ...............................................................64

*United States v. Stevens*,
559 U.S. 460 (2010) ...................................................................... 53, 56

*United States v. Tate*,
2017 WL 374480 (W.D.N.C. Jan. 25, 2017).........................................71

*United States v. Torres*,
604 F.3d 58 (2d Cir. 2010) .................................................................33

*United States v. Toure*,
965 F.3d 393 (5th Cir. 2020) ........................................................ 36, 45

*United States v. Toviave*,
761 F.3d 623 (6th Cir. 2014) ....................................................................32

*United States v. Valle*,
807 F.3d 508 (2d Cir. 2015)............................................................ 32, 33

*United States v. Viloski*,
814 F.3d 104 (2d Cir. 2016)............................................................ 73, 74

*United States v. Voigt*,
89 F.3d 1050 (3d Cir. 1996) ............................................................ 81, 82

*United States v. Zhong*,
26 F.4th 536 (2d Cir. 2022) ................................................ 28, 34, 37, 45

*West Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ..........................................................................3, 54

**Statutes**

18 U.S.C. §1589 ........................................................................... passim

18 U.S.C. §1594 ........................................................................... passim

18 U.S.C. §3231 ..................................................................................3

28 U.S.C. §1291 ..................................................................................4

**Other Authorities**

DOJ Manual 9-13.420 .........................................................................77

Eugene V. Gallagher,
*Compared to What? "Cults" and "New Religious Movements,"*
47 History of Religions (2007-08) ......................................................47

Fed. R. Crim. P. 12, Advisory Committee Notes to 2014 Amendment ...................83

James T. Richardson,
*Definitions Of Cult: From Sociological-Technical To Popular-Negative*,
34 Review of Religious Research (1993) ..........................................47

USSG §5E1.2(c)(3) .......... 74

Victims of Trafficking and Violence Protection Act of 2000,
H.R. Conf. Rep. No. 106-939 .......... 59

# INTRODUCTION

This unprecedented forced labor prosecution raises serious questions under the Due Process Clause and the First Amendment. Suppose a charismatic political or religious leader persuades a person to adopt unorthodox ideas or engage in legal but non-mainstream behavior. The person likes the ideas, joins an organization espousing them, and accepts lower pay than she could otherwise make because she wants to support the organization's mission. She also chooses to participate in unconventional social and sexual activity consistent with the community's principles, but later regrets her involvement and leaves the organization without consequence. That is what the evidence showed in this case. It was plainly not "forced labor." Yet Appellants Nicole Daedone and Rachel Cherwitz are now serving substantial prison terms for a crime they did not commit.

Appellants led a company called OneTaste. Daedone was its founder and CEO, and Cherwitz was its head of sales. OneTaste advocated unconventional practices intended to improve people's physical, mental, and spiritual wellbeing and push their emotional and sexual boundaries. These practices were derived from Buddhist and other religious traditions. OneTaste openly advertised its beliefs and practices—including its emphasis on "orgasmic meditation" and non-mainstream views about sexuality. Through the 12-year period at issue, OneTaste had hundreds of employees, independent contractors, and volunteers. Hundreds

more people attended OneTaste classes or events, voluntarily participated in its "orgasmic meditation" and other practices, and found meaning in them.

The government alleged that just nine of these people were forced-labor victims. Those individuals, like many other OneTaste employees and customers, were well-educated, well-to-do Americans. They sincerely believed in OneTaste's teachings, voluntarily chose to participate in its activities, live in communal housing based on its principles, and work as volunteers and employees. They were always free to leave (all eventually did). They either never told Daedone or Cherwitz they were unwilling to perform the allegedly coerced labor or simply chose not to perform it without consequence. The conduct proven at trial does not remotely meet the requirements for a forced labor conspiracy. The convictions should be reversed.

The forced labor statute was enacted to implement the Thirteenth Amendment's prohibition on slavery and involuntary servitude. Its scope is correspondingly narrow. Here, however, the theory was not that OneTaste used any improper physical or legal restraints or violence, but only that its *spiritual ideas* were so persuasive that they overwhelmed otherwise competent adults' free will. As the government explained early in the trial:

> [O]ur theory of the case is that the defendants…taught [the alleged victims] basically to consent to everything and to be willing to engage in certain sexual activities…they would have viewed as something they

> wouldn't consent to, but they did so because they were taught this was a philosophy or a religious practice that was good for them, and if they continued to do it they would reach enlightenment. A-260-61.

That cannot be a legally valid or constitutional application of the statute. It is not up to prosecutors to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The First Amendment protects the expression of ideas, including controversial or unpopular ones, and the free exercise of all religions, not just mainstream ones. Many people may dislike OneTaste's ideas and practices. The First Amendment protects them nonetheless.

Serious legal errors also contributed to the miscarriage of justice here. The district court refused to give legally correct instructions prohibiting conviction based on Appellants' speech and beliefs and barred them from arguing their First Amendment defense to the jury in closing. The court also entered a grossly disproportionate forfeiture award against Daedone. And the government unconstitutionally used stolen privileged documents to build its case and concealed its misconduct for years.

The convictions should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Judgment was entered on March 31, 2026. SPA-17, 24. Cherwitz and Daedone each filed notices

of appeal on April 10, 2026. A-1728-29. This Court has jurisdiction under 28 U.S.C. §1291.

## **ISSUES PRESENTED**

1. Whether Cherwitz and Daedone are entitled to acquittal because the evidence was insufficient to prove they agreed to extract any forced labor, and because the forced labor statute should be construed to avoid serious First and Fifth Amendment problems.

2. Whether Cherwitz and Daedone are entitled to acquittal because the criminalization of their protected spiritual beliefs, speech, and expressive association violates the First Amendment.

3. Whether the district court erroneously deprived Cherwitz and Daedone of a key defense by refusing to instruct the jury on the First Amendment and barring defense closing arguments on that subject.

4. Whether the forfeiture award against Daedone exceeded the district court's statutory authority and violated the Eighth Amendment.

5. Whether the district court committed reversible error by failing to hold a *Kastigar* hearing to probe the extent of the government's violation of Appellants' Fifth Amendment rights and resulting taint to the prosecution.

## STATEMENT OF THE CASE

Cherwitz and Daedone appeal from a judgment of conviction and sentence entered by the United States District Court for the Eastern District of New York (Gujarati, J.) following a jury trial.

OneTaste was a wellness organization that offered courses, workshops, retreats, coaching, and other programming to individuals interested in improving their physical, mental, and spiritual wellbeing through various beliefs and practices, including orgasmic meditation ("OM"). The indictment charged Cherwitz and Daedone with one count of forced labor conspiracy pursuant to 18 U.S.C. §1594(b) based on their leadership of and roles in OneTaste from 2006 to 2018.

The government's theory at trial was that Cherwitz and Daedone used "brainwashing," "shunning," and other psychological tactics to coerce nine former employees and volunteers—out of hundreds—into performing work for OneTaste. *See*, *e.g.*, A-1231-55. The defense was that Daedone and Cherwitz never tried to force anyone to provide any labor or services for OneTaste. On the contrary, the alleged victims acted voluntarily throughout their time at OneTaste and were always free to decline any requested labor or sexual contact or leave if they wished (which they all eventually did, without any significant consequences). The alleged victims' main concern was not a threat of violence, but a loss of status and

community should they stop working. Appellants argued that pedestrian consequence was not sufficient to create the slavery-type conditions the forced labor statute prohibits.

Appellants also contended OneTaste had a First Amendment right not to associate with people who did not share their beliefs. And they argued that the sincerely held spiritual beliefs and teachings they expressed to others at OneTaste, including the alleged victims, were squarely protected by the First Amendment. The district court prohibited Appellants from making these arguments to the jury in closing and refused to instruct the jury on the First Amendment.

At the same time, however, the government directly attacked Daedone and Cherwitz's spiritual beliefs, belittling them as insincere and contrived for legal cover. A-1232-33. And despite paying lip service to not "asking [the jury] to convict on ideas," the government told the jury Appellants' beliefs and speech were inherently criminal. It argued Daedone was "on trial because she, Rachel Cherwitz…and others used aspects of her teaching[s] to force OneTaste employees to provide labor." A-1387-88.

In sum, the trial turned in large part on whether Appellants' beliefs were valid and whether they had a right to decide whom to associate with.

### A. OneTaste's Spiritual Basis, Orgasmic Meditation, And Other Teachings

OneTaste was centered around OM—a meditative and spiritual practice that involves stroking a woman's genitals. OM was not sex. The practice had specific rules (e.g., stroking ends at 15 minutes and should not be used in exchange for or as a prelude to sexual activity) and procedures (e.g., woman removes only her pants), which were taught to all students and laid out in a written manual. A-1409-11, 1414, 1416.

OM was derived from a preexisting technique called "deliberate orgasm." Daedone viewed deliberate orgasm as antiquated and male-oriented, and thus transformed it into a "more open, free-er[,]" and female-centered practice akin to meditation or yoga. A-955-58, 998. OneTaste taught that OM could lead to significant benefits if repeated over time, such as greater human connection, enhanced attention, and other forms of physical and emotional wellbeing. A-642, 1408-09, 1417. Several studies have recognized some of these benefits. *See* Dkt.171 at 26-28 (citing and describing studies).

OM was premised on express, ongoing consent. The OM manual noted it was "always acceptable" to either ask for consent or decline to participate, and emphasized the need for "safeporting" throughout the OM—i.e., strokers speaking their intended actions before taking them, to give their partner an opportunity to decide whether to continue. A-1414, 1416.

OM and many of OneTaste's other concepts and teachings were rooted in spirituality. Daedone is a devout practitioner of Buddhism. The name OneTaste originated from a Buddhist aphorism, and OM incorporated Buddhist principles. A-998, 1001, 1114. Daedone also drew on other religious traditions including Hinduism. *See, e.g.*, A-964. Unsurprisingly, at least one alleged victim felt "OneTaste had reconnected me to my faith." A-509-10.

Daedone, Cherwitz, and others at OneTaste understood orgasm not only as sexual climax but also as the "energy in the body" and "life force" that "powered you," had a "connection to God," and provided a "pathway to your spiritual enhancement." A-251, 764, 856, 967-68, 1119. OM was thus a "spirituality generating practice" that allowed practitioners to "tap into something deeper and greater," "discover[] the answers that live deep inside of [them]," and gain "access to what [they] want in life as a whole." A-415, 642, 1454. Practitioners sought "spiritual enlightenment." A-611-12. OneTaste also believed in the existence of a "fourth dimensional" spiritual plane that enabled connection to a higher power, and that was distinct from the terrestrial, "third dimensional" realm. A-389-90, 694.

Daedone frequently spoke about these and other concepts during OneTaste courses and programs and in other settings. She admitted her ideas were provocative and unorthodox, that she was drawing on her own spiritual beliefs, unique perspective, and personal experience, and that listeners could accept or

reject her teachings as they saw fit. As one government witness testified, Daedone "repeatedly told you, you don't have to follow [her teachings]; this is my experience, but you don't have to make it work for you and maybe it doesn't." A-1185-86. If anyone believed these or other concepts were distasteful or went too far, they had no obligation to act on them. Each witness was a "person with free will." A-673; *see also, e.g.*, A-391.

To be sure, Daedone was a highly magnetic and charismatic speaker, and many chose to believe in her ideas. One witness described her as "so smart and so tapped in and radiant," and someone who "just knew so much and had this way of seeing that was so accurate." A-416. Another came away from a Daedone lecture "pretty amazed" by her: it was "like she had mapped her entire psyche." A-1078-79.

### B. OneTaste's Founding, Growth, And Maturation

Daedone cofounded OneTaste with Robert Kandell in 2004. A-987.

In its early years, OneTaste was a close-knit startup that offered courses, workshops, yoga classes, and massages, and operated a bookstore and café in a San Francisco "urban retreat center." A-962, 999-1000, 1002-03. OneTaste also relied heavily on funding from Kandell and, later, an investor named Reese Jones. A-960-61, 969. Jones, who was also Daedone's romantic partner, believed in

OneTaste and invested roughly $800,000 in cash between 2007 and 2011. A-969, 1016; *e.g.*, A-1399.

Cherwitz arrived at OneTaste in 2007. A-963. She was motivated, dedicated, and adept at management. A-1040-42. Cherwitz formed a close relationship with Daedone and worked her way up the OneTaste ranks to head of sales. A-981, 1041-42. Cherwitz would thus oversee the business line that became OneTaste's focus and finally enabled it to turn a profit by 2012. A-971, 979-80, 1018. Cherwitz put "everything she had" into sales and worked extremely hard. A-983.

Importantly, OneTaste's business was distinct from the broader OM practice community that formed around it. A-1012-14; *e.g.*, A-252-53. Some participated in OneTaste by just attending events or courses, while others elected to work for the business in sales or other capacities. A small minority of the most dedicated participants chose to move into communal residences with like-minded OM practitioners. *E.g.*, A-893-94. Notably, a number of these houses weren't even run by OneTaste, but by enthusiastic community members. A-1011.

Over time, OneTaste became more structured as it outgrew its startup phase, matured into a profitable business, and gained widespread attention following a *New York Times* article, and a TED talk by Daedone in which she was "very up front" about OneTaste's focus on "female orgasm." A-941-43, 978, 1015-16.

OneTaste implemented codes of conduct, handbooks for employees, and ethics committee policies for relationships between coaches or other staff and clients. A-1019-27, 1446-47, 1589-92, 1602-1630. OneTaste also expanded to new locations, including New York, Boulder, and Las Vegas. A-984-85, 1076-77.

In 2017, Daedone resigned and sold the company for $12 million. A-1470, 1523-24, 1527. Cherwitz left OneTaste one year later. A-1485.

### C. The Alleged Victims Testified They Were Voluntary And Willing Participants In The Activities At Issue

The heart of the government's case was testimony from the alleged forced labor scheme's nine purported victims: Anthia Gillick, Christina Berkley, Dana Gill, Lianna Lifson, Lyndsi Keves, Margaret Pixley, Michal Neria, Michelle Wright, and Rebecca Halpern. They all told very similar stories.

Each of these witnesses admitted to acting willingly and voluntarily throughout their experiences with OneTaste—from when they initially became involved to when they ultimately decided to leave, which they could have done whenever they wished. They chose to keep working for OneTaste and engage in the activities at issue because they believed deeply in OM and associated practices, sought to earn approval from Cherwitz and Daedone and enhance their status within the group, and feared leaving behind their friends, mentors, and other aspects of the OneTaste community.

*1. Background, Initial Involvement, And Courses/Programs*

These nine witnesses were mature and highly educated. They all had undergraduate degrees, several had one or more master's degrees, and one was pursuing a PhD. A-257, 455-56, 511-12, 627-28, 707-09, 749, 838, 914-15, 1108-09.

The witnesses were all attracted to what they learned about OneTaste and its teachings. None were deceived or manipulated about the group's ideas and practices. After initially hearing about OneTaste through friends, romantic partners, or acquaintances, they listened to lectures from Daedone or attended introductory "TurnOn" or other similar events that disclosed OneTaste's OM practice and related topics. They then enrolled in beginner courses like How to OM or Intro to OM. A-300-02, 408-09, 475-76, 491-494, 512-13, 629-32, 685-92, 780-84, 839, 884-88, 940-45, 1078, 1082, 1113-15.

These witnesses later chose to sign up for the Coaching Program and other more advanced offerings like Mastery and the Nicole Daedone Intensive—not because they were coerced in any way, but because they were intrigued by and voluntarily decided to delve deeper into OneTaste's teachings. For example, one wrote, "[f]ucking hell, I'm so excited for Mastery," and that she "couldn't remember being such a resounding yes." A-362-64; *see also, e.g.*, A-310-12, 754, 926, 1140-42. They even signed waivers acknowledging the course content was

controversial and that they would accept or live by any OneTaste concepts or ideas solely using their own free will. The waivers disclaimed any connection to psychotherapy or other therapeutic teachings. *E.g.*, A-917-21, 1653-54, 1664-65, 1669-70, 1679-80. Course participants were also taught to use safe words, providing a clear mechanism for objecting to disagreeable or uncomfortable content: green ("I'm all in"), yellow ("I'm having some reservations, but I'm okay"), and red ("[s]top and don't do anything further"). A-303-05, 1035-36; *e.g.*, A-1522 at 27:15-53 (before a group exercise, Cherwitz asks, "Safe words? Do we all agree to use them? Green, yellow, red?").

### 2. *Orgasmic Meditation*

All the alleged victims wholeheartedly embraced OneTaste's core practice: orgasmic meditation. They made OM part of their daily routines in communal residences and proactively sought out OM partners, including people they didn't know well or at all. *E.g.*, A-547, 654, 785, 867-70, 1466-67. Several participated in OMs up to three to five times per day. A-420, 496, 817, 1083. Two witnesses even continued to engage in OM or similar practices after leaving OneTaste. A-449-50, 473-74, 563. The witnesses were especially enthusiastic about "projecting orgasm" during public OM demonstrations or "demos." A-283-84, 480, 618-19, 740-41, 653-54, 1174.

They testified that they believed in OM and its capacity to improve their physical, emotional, or spiritual wellbeing. *E.g.*, A-586-87, 643-44, 740, 800, 922. OM made one of them "taste[] freedom." A-812-14. Another wanted to "shout from the rooftops about OM." A-315. Yet another aspired to "free people's orgasm…in the normative communities" and travel around the world to "spread the [OM] mission." A-586-87.

*3. Volunteering And Working For OneTaste*

The nine witnesses all eventually decided to work or volunteer for OneTaste (or related businesses). In doing so, several chose to quit jobs as teachers, in medical offices, or in other sectors. A-328-31, 412, 633, 872-76, 910.

Many started off volunteering with OneTaste, doing event setups, cleanups, and other work. *E.g.*, A-258-59, 537-43, 840, 909-10. Some had "work-trade" arrangements, whereby they chose to work for OneTaste in exchange for rent and food at a communal residence, or to pay for tuition for OneTaste courses. A-1028-30, 1394-95.

Some eventually became personal assistants for Daedone or Cherwitz. *E.g.*, A-468, 616. These were coveted roles that brought these individuals closer to OneTaste higher-ups and the "inner circle" they inhabited. A-431, 607, 965.

By far the most common role was working on the sales team under Cherwitz—as a salaried employee, on commission, or both. *E.g.*, A-695, 851,

1471-72, 1477, 1496-97, 1513-14, 1519. Like the personal assistant positions, sales was a high-status position. A-308.

In many ways, this work was like any other sales job. The team aimed to meet daily goals for selling courses. A-756, 852, 980. It generated leads at TurnOn events, other introductory gatherings, or by word of mouth, and collected information about those leads in SalesForce—a software platform used by numerous organizations. A-270-71, 605, 940-41, 1045, 1056-57, 1087. It used sales techniques recommended by outside consultants. A-878, 1046, 1124-25. It targeted individuals who had a preexisting interest in OneTaste—not those with sexual or other trauma. A-1048-49. And although Cherwitz could be a tough and demanding boss at times, her hard-driving style was no different from that of numerous managers across the corporate sphere: driven by a strong dedication to the business and a desire to see it succeed. A-981-82.

In all these roles, the witnesses sought to impress Cherwitz and Daedone, gain a higher status among their peers, and further dedicate themselves to OneTaste and the surrounding community. As one witness testified, she was "completely in 100 percent" on OneTaste and "completely focused on the mission and totally ready and willing to do anything." A-432. And the "closer I was to whatever it was that was required by the [OneTaste] system and by what Nicole wanted or

needed, the closer I'd be able to come in to work to be close to her." A-433-34; *see also, e.g.*, A-308-09, 429, 1086.

#### 4. *The Alleged Victims Chose To Move Into Communal Residences With Strict Rules And A Monastic Lifestyle*

All nine individuals decided to move into communal residences in San Francisco, New York, or other locations. A-262, 359-60, 775, 1004-06. When doing so, they left their own apartments or willingly chose a commune over other more conventional living arrangements. *E.g.*, A-267-68, 495, 652, 711, 841-42, 1128-29.

Before moving in, they were well aware what the monastic lifestyle in these communal homes entailed. They went through application and vetting processes and were given handbooks spelling out strict rules. *E.g.*, A-381-84, 460, 715-16, 1129-32, 1600-01, 1465-69. Some had even lived in OneTaste communal residences on either a part-time or visiting basis before moving in full-time. A-476-77, 786-87, 865. Two previously lived or worked in similar yoga communities. A-382-83, 779-80.

Accordingly, no one was surprised that residents were required to share rooms and beds, forgo drugs and alcohol on the premises, and stay in contact with other residents via text or Google groups. *E.g.*, A-385-86, 635, 854-55, 1600, 1465-68. Nor did they balk at daily OM and other practices such as yoga, journaling, sitting meditation, and the Alcoholics Anonymous-based "fear

inventory" exercise—which involved cataloging one's fears and reading them to someone else. *E.g.*, A-843-45, 1466-67, 1601. They knew about all these aspects of communal life in advance, and willingly signed up for them to deepen their involvement in the OneTaste community. For example, one testified she moved into an OM house to be in OneTaste's "inner circle." A-634. Some even chose to live on a more "intense" floor of the residence with more committed practitioners. A-570-72, 716, 788, 818-19.

#### 5. *At The Time, The Witnesses Expressed Positive Feelings About OneTaste Publicly And To Daedone And Cherwitz*

Throughout their experiences with OneTaste, the alleged victims routinely expressed enthusiasm and joy about OneTaste, its courses and programs, and OM. They also communicated their genuine affection and warmth for Daedone and Cherwitz.

Many did so in posts to public social media channels or an internal chat board—both potentially visible to Daedone and Cherwitz. *E.g.*, A-313-17, 346-51, 399-400, 464, 466-67, 643-47, 728-29, 814-16. Others told Daedone or Cherwitz about their positive feelings directly, both in person and in writing. *E.g.*, A-520-23, 760-65, 808-09, 834-36, 932-36, 1178, 1403, 1638, 1642. For example, Gill told Cherwitz "how helpful the [OM] practice had been for [her]" and the many "wonderful and helpful things about the practice." A-520-21. In a similar vein,

Keves told Daedone she was "having more fun than I can remember having [before]" and "fe[lt] stronger and more confident and sexy." A-1642.

Contemporaneous photos further reinforce that during their time at OneTaste, the witnesses were happy and were enjoying their experiences in the community. *E.g.*, A-333-34, 655-57, 742-43, 791-93, 810-11, 1179-80, 1676, 1667, 1671, 1639, 1632, 1666.

*6. The Witnesses Were Completely Free At All Times To Leave OneTaste*

All the witnesses testified that staying at OneTaste was a voluntary choice and that they could have left or quit their OneTaste jobs whenever they wished. A-279, 465-66, 527, 673, 718-19, 822, 882, 939-40, 1107. Neither Daedone, Cherwitz, nor anyone else at OneTaste forced them to remain, or tried to isolate them from the outside world. They all had phones and internet access, and were free to hold outside jobs, take vacations, or spend time with non-OneTaste friends and family. *E.g.*, A-323-24, 525-36, 720-22, 1145.

For example, Halpern testified that she "[a]bsolutely" chose to be at OneTaste because she "wanted to change and grow." A-348. Other witnesses testified similarly. *See*, *e.g.*, A-673 ("Q: Your participation in the New York community was a decision you made all on your very own, right? A: Yes."); A-722 ("Q: And you chose, based on whatever suggestions you received, to spend your time at OneTaste, correct? A: Correct."); A-798 ("Q:…[N]o one forced you to do

work-trade; correct? A: No. Q: No one forced you to move into [communal housing]; correct? A: No. Q: You wanted to be there; correct? A: I did."); A-884 ("Q: So you understood when you signed up for OneTaste that it was a sexual wellness company, correct? A: Yes. Q: That's the reason you went there, right? A: Yes."); A-1107 ("Nicole or Rachel were [not] stopping me from leaving.").

These individuals chose to stay to maintain their ties with the community and the sense of status, purpose, and direction OneTaste had given them. *E.g.*, A-279, 308-09, 448, 510, 625-26, 704, 777, 1086, 1107. That is, their fears about leaving OneTaste were just the ordinary consequences of moving on from a job or other professional or religious community.

### D. The Government's Purported Evidence Of Coercion

#### *1. The Government's Theory Was One Of "Psychological" Harm*

The forced labor statute requires proof that labor was coerced through force, physical or legal restraints, or threats thereof; "serious harm," "threats of serious harm"; or a scheme intended to cause a person to believe she would suffer serious harm if she didn't perform the labor. 18 U.S.C. §1589(a). Lacking any evidence of actual or threatened force, physical or legal restraints, the government sought to prove the statutorily-required "serious harm," "threats of serious harm," or related scheme in the form of psychological manipulation and other tactics such as ostracization and fear of losing social status within OneTaste. For example, one

witness testified, "[i]t was abundantly clear to me that if I were to really leave…that would be a very permanent decision and…I would not be welcomed back with open arms." A-293. Another testified:

> Q:…You testified that one means of using manipulation for the promotion of labor was use of threats. What did you mean by that?
>
> A: We believed that…your power, your path to God was through your orgasm, was through your practice, through your attention and loyalty to the organization. You could fear losing that. You could fear losing that social status. It was kind of, like, a high school clique situation gone bad, and you could lose, you know, being closer to the cool kids, you could be outcasted, you could lose position. There was just a—there was a lot of social pressure to do what the organization wanted you to do.

A-977. Other examples include the following:

- "[O]ne of the primary ways in which we were…driven to do the things that were asked of us was through fear tactics....[P]rimarily the threat of ostracization, like professionally and socially." A-748;
- "It was all about me. And it was me alone, no one would talk—it was…one of these experiences of…just humiliation and shame and being shunned and oh, no." A-446;
- "I was fully in it and brainwashed….I didn't see the world as it really was anymore, I saw it through only…the lens of OneTaste." A-295;
- "[T]here were a lot of things that I wouldn't have done...without...brainwashing." A-403;
- "Q: [The government] want[s] to be very clear. What was the trauma? A: The brainwashing." A-484.

Indeed, a big fear was not being forced to stay and continue working, but instead being asked to *leave*:

> I was…kicked out [of one event]. One of the biggest fear[s] was to get kicked out of the group, to be told that you are not worthy of being here, or that they don't want you. So to be ostracized and also humiliated…I felt like everybody knew that I did something wrong. I also felt really anxious. I felt cut off from everybody.

A-860.

#### 2. *The Evidence Showed That The Alleged Victims Freely Consented To Sexual Activity The Government Alleged Was Forced Labor*

The government also presented evidence that Daedone tried to keep Jones happy by assigning three female "handlers" (Berkley, Gill, and Wright) to live with him part-time, bring him food and, most salaciously, sexually service him.[1]

All three, however, admitted they knew what this role entailed and agreed to it willingly—even enthusiastically. Wright testified it was "a high honor of a position to be offered," and Gill stated she was "excited" to take it and that she did so to "prove [her]self" to and earn the "approval" of Daedone and Cherwitz. A-551, 589-90, 830-31. Berkley had "*no issues* using all of [her] skills to please Jones." A-453 (emphasis added). "There w[as] no bait and switch. [Berkley] knew what [she was] signing up for." A-469; *see also* A-468, 585, 598-600.

---

[1] Cherwitz was not involved in directing sexual interactions with Jones.

Neither Berkley nor Gill ever objected to sexually servicing Jones. Gill "never said I don't want to do this" or "report[ed] [her] distaste with sexual activities with Reese" (or with others) to Daedone, Cherwitz, or any other senior staff member. A-585, 600, 604. Wright did not object "until the very end"—and then disassociated from Jones but kept working and living in the OneTaste community. A-770, 826-29.

These witnesses also seemed to genuinely enjoy their time with Jones. Wright testified she appreciated spending alone time with her romantic partner (who was also serving as Jones's handler at the time) while living in Jones's posh San Francisco townhouse. A-411, 820-21, 1389-93. Gill had a "crush" on Jones, found him "[c]harismatic" and "super interesting," had "a lot of fruitful conversation[s]" with him, and on one occasion stated that "last night with Reese Jones was awesome, I loved making out with him." A-548-50, 594-96. Berkley had fun spending a weekend alone with Jones, when he lavished her with dinner and expensive clothes. A-436, 471-72.

The government also presented evidence of OMs or other sexual activity that Daedone, Cherwitz, or other OneTaste leaders supposedly directed. Once again, the evidence belied the prosecution's theory that any sex was coerced.

For example, Wright testified Daedone told her to do "whatever it takes" to persuade the Zappos CEO to endorse OneTaste. A-771-74. Yet even if this

ambiguous instruction suggested sexual services, Wright admitted she willingly agreed and never objected. *See id.* Likewise, Pixley "did not tell [Cherwitz] no" when she was asked to OM with a high-priority client. A-659-60. There were other similar instances when the alleged victims didn't object and voluntarily consented to sexual activity with current or prospective clients, or for other purposes. *E.g.*, A-507-08, 612-15, 617-18, 661-65, 696-97, 1098-1100. When, by contrast, Berkley decided to end a relationship Daedone suggested she have with another "VIP" client, there were no consequences. *See* A-421-26, 461-63.

In some instances, the testimony about these episodes strained credulity. Gill testified on direct that Cherwitz instructed her to engage in sexual activity with a man named Antonios to persuade him to remain enrolled in the Coaching Program. A-504-05. But Gill backtracked on cross, conceding she didn't remember who gave the instruction. A-578-81. And Antonios testified he didn't even consider leaving the program until months after Gill approached him, and that Gill had "initiated" the encounter after previously telling peers she wanted to have sex with him. A-1196-1207. Similarly, Lifson testified Kandell, the OneTaste cofounder, asked her to engage in sexual activity with a man who was considering dropping out of the Coaching Program. A-698-700. But Kandell didn't recall making this request, and even if he did, Lifson admitted she didn't object to it. A-733-34, 1063-64.

### 3. *Much Of The Government's Other Evidence Was Salacious But Also Reflected Voluntary Conduct*

Halpern claimed Cherwitz stroked her without permission during an OM demonstration. A-283-86. But the evidence strongly suggested otherwise. As Halpern admitted, an OM demo was "kind of an honor," "a really prestigious thing" and "felt like an important part of my work." A-283-84. And she participated in this particular demo in her capacity as a resident in the New York commune, where she and others were OMing daily. A-1466-67. So there was no reason for Cherwitz to believe Halpern did not consent, and Halpern didn't communicate her objection to Cherwitz clearly. Halpern "d[id]n't know if [she] said anything" when Cherwitz asked her to do the demo, and testified that she ultimately agreed to it and was "faking" her approval. A-285-86.

Similarly, Gillick testified about an exercise during a course in which a guest teacher invited students to reenact scenes of a past trauma. A-1091. Gillick voluntarily chose to engage in this exercise, reenacting a prior sexual assault she had experienced for her own therapeutic purposes. A-1091, 1158-59. Gillick admitted she was "very honored" to partake in this exercise, thought to herself, "it's gonna earn me brownie points," felt an "incredible high" afterward, and called it an "epic" experience. A-1092-93.

Several witnesses also testified that Daedone and Cherwitz supposedly pressured or manipulated Gillick, Neria, Keves and others into getting engaged or

married; and that Cherwitz supposedly directed Gillick and her friends to have sex with a number of different men during a prescribed time period. A-891-92, 951-52, 1101-02, 1160-62, 1169-71. Yet these were merely community trends or practices in which Gillick, Neria, and Keves willingly participated.

Take Gillick, for example. She testified that when she would hear Daedone or Cherwitz talk about these kinds of trends, she would "often start doing it…that day if I could." A-1095. Thus, for the sex trend, Gillick and others "were…constantly like: Oh, like had a hot makeout with this person." A-1102. Similarly, Gillick herself suggested she get engaged to another community member. A-1105 ("I was, like, well, should we [get engaged]?...seriously, I think we should."). Gillick was frank that she "wanted to get married." A-1171-72.

Finally, the government elicited extensive testimony about Daedone or Cherwitz discouraging or disapproving of monogamous romantic relationships. *E.g.*, A-414, 442-44, 592-93, 752-53, 906. But the alleged victims knew OneTaste's culture was all about pushing sexual boundaries and bucking conventional relationship norms. *E.g.*, A-337-38, 608-09, 636-37, 730, 757, 937-38. It was obvious from the start that OneTaste was far from an ideal place to maintain a traditional monogamous relationship. They nevertheless decided with eyes wide open to immerse themselves in this community.

Moreover, it is a massive stretch to suggest any of this evidence involves "labor." During these incidents, the alleged victims were not performing sales, back-of-house, assistant, or any other type of work for the OneTaste business. They were merely choosing to participate in the OneTaste community in various ways.

#### *4. The Evidence Did Not Support The Government's Allegation Of Financial "Coercion"*

The government argued that its witnesses were financially coerced because they were charged tuition for certain advanced OneTaste courses and programs and supposedly underpaid for their work. A-1255-57. But the witnesses knew what the courses cost—sometimes tens of thousands of dollars—and voluntarily decided to take them and pay for them. At least some courses had generous refund policies. *E.g.*, A-1143-44, 1652, 1681-82. In other instances, romantic partners or friends paid the tuition. A-498-99, 606, 889-90, 923-24. Some witnesses had well-off families who provided significant financial safety nets. One had an Aspen-area home and an expensive 3,000-square foot San Francisco loft, and another was living rent-free in her sister's Soho apartment. A-915-17, 1080-81, 1181. Even those who paid for courses themselves through payment plans, work-trade arrangements, by opening up credit cards, or going into debt knew the terms and willingly agreed to them because they wanted to take the courses. *E.g.*, A-343-44, 371-77, 455, 574-75, 806-08, 863-64, 929-31.

As for wages, the employees chose to accept lower pay than they might otherwise have earned because they wanted to work for OneTaste. One abandoned her doctorate education and separated from her husband and his second income, fully aware that these decisions could "put [her] into poverty." A-458.

### E. Rule 29 Motions And Verdict

Appellants moved for a judgment of acquittal after the government rested and renewed their motions after the close of all evidence. A-1191-92, 1208; Dkt.401. The district court denied the motions. A-1195, 1209.

The jury convicted Appellants on the lone forced labor conspiracy count. Cherwitz and Daedone then filed a post-trial Rule 29 motion, which the court also denied. Dkt.417; SPA-1-5.

Cherwitz and Daedone were subsequently sentenced to six-and-a-half and nine years' imprisonment, respectively. SPA-18, 25. The district court also ordered Daedone to forfeit the entirety of her $12 million proceeds from the 2017 sale of OneTaste. SPA-6-16.

## SUMMARY OF ARGUMENT

I. The evidence was legally insufficient to show Cherwitz or Daedone agreed with each other or anyone else to extract any forced labor. The nine alleged victims were mature, well-educated individuals who acted voluntarily throughout their experiences with OneTaste, chose to believe and live by various OneTaste

practices and concepts, and could have stopped working or left whenever they wished. Instead, they opted to stay to avoid disassociating with OneTaste and being shunned by its adherents. Yet these are merely the adverse but legitimate consequences of leaving a professional or religious community, which is insufficient to satisfy the forced labor statute. *United States v. Zhong*, 26 F.4th 536, 550 (2d Cir. 2022).[2] The evidence here is a far cry from the serious coercion, exploitation, and intolerable working conditions evident in typical forced labor cases. Instead, it highly resembles other decisions in which courts have dismissed forced labor claims as a matter of law, even under a lower burden of proof. *See, e.g.*, *Headley v. Church of Scientology Int'l*, 687 F.3d 1173 (9th Cir. 2012) (O'Scannlain, J.).

Interpreting the forced labor statute to cover Appellants' conduct—what the government labeled "brainwashing"—would also raise serious First Amendment and Fifth Amendment concerns. The Court should construe the statute to avoid these constitutional problems and enter a judgment of acquittal.

II. If the statute is not narrowed to its constitutional scope, its application here violates Cherwitz and Daedone's First Amendment rights to free speech, free exercise, and expressive association. The government procured these convictions

[2] Unless otherwise noted, all citations omit internal citations, quotation marks, and alterations.

based on Appellants' speech and beliefs, arguing this protected expression was inherently criminal, and attacking the practices and concepts of OneTaste itself. Its theory of the case was that Daedone's and Cherwitz's teachings were the "means" through which they coerced the alleged victims into engaging in unconventional sexual conduct and other labor. In other words, "the government clearly prosecuted [Appellants] for [their] words"—their speech and beliefs. *United States v. Caronia*, 703 F.3d 149, 161 (2d Cir. 2012). Another premise was that "psychological" harm flowing from the fear of being rejected or criticized by others in the group was sufficiently "serious" to coerce labor or services. But the constitutional right of free association protects individuals' rights to associate with others who share their ideas and beliefs, and to not associate with those who disagree with the group's views. The prosecution was thus categorically forbidden by the First Amendment and cannot survive strict scrutiny even if that applies.

III. If the Court does not enter a judgment of acquittal, it should order a new trial in which the jury is instructed on the First Amendment defenses and permitted to hear argument on those defenses. Cherwitz and Daedone were entitled to instructions directing the jury not to convict them based on their protected speech and beliefs, and explaining that they had a constitutional right to shun individuals who left OneTaste. But the district court rejected these requested instructions and misled the jury into believing it could treat Appellants' speech and

beliefs as inherently criminal means of extracting forced labor. Those errors eviscerated a core defense and deprived Cherwitz and Daedone of a fair opportunity to respond to the prosecution's theory of "serious harm."

IV. If the Court upholds the convictions, it should vacate and remand the forfeiture award against Daedone and direct the district court to exclude any property not either obtained through, or used to commit, forced labor. *See United States v. James*, 151 F.4th 28, 48 (2d Cir. 2025). The $12 million award represented OneTaste's total sale value. At most, however, the labor provided by the nine alleged victims represented only 2% of the total work performed for OneTaste. Forfeiting the entire sale value was thus extremely overbroad and grossly disproportional under the Eighth Amendment. *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

V. The government violated Appellants' Fifth Amendment rights by using a privileged and highly sensitive memorandum to build its case. The government failed to segregate the memorandum through a filter team or notify Appellants or other privilege holders for years, while secretly using the document as a roadmap to revive a dormant investigation. At a minimum, this Court should remand the case and order the district court to hold a hearing, pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), at which the government must prove that its

trial evidence was derived from legitimate, independent sources rather than Appellants' privileged communications.

## STANDARDS OF REVIEW

Evidentiary sufficiency, First Amendment challenges, jury instructions, and the legal validity of forfeiture orders are reviewed de novo. *United States v. Mackey*, 143 F.4th 129, 139 (2d Cir. 2025); *Caronia*, 703 F.3d at 160; *United States v. Chastain*, 145 F.4th 282, 292 (2d Cir. 2025); *United States v. Elias*, 154 F.4th 56, 65 (2d Cir. 2025). Rulings on outrageous government conduct are reviewed de novo. *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991). The refusal to hold an evidentiary hearing is reviewed for abuse of discretion. *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 467 (2d Cir. 2018). An error of law is an abuse of discretion "by definition." *Koon v. United States*, 518 U.S. 81, 100 (1996).

## ARGUMENT

### I. CHERWITZ AND DAEDONE ARE ENTITLED TO ACQUITTALS BECAUSE THE EVIDENCE WAS INSUFFICIENT TO SHOW THEY AGREED TO OBTAIN ANY "FORCED" LABOR FROM ANYONE

To convict Cherwitz and Daedone of forced labor conspiracy under 18 U.S.C. §1594(b), the government had to prove they agreed to violate the forced labor statute, 18 U.S.C. §1589. But the evidence was insufficient to show that the object of the alleged agreement was forced labor within the meaning of §1589, as

opposed to labor provided voluntarily and without compulsion. If §1589 were construed to cover the labor at issue here, it would be dangerously overbroad, creating due process and First Amendment problems. To avoid those problems, this Court should interpret the statute narrowly, as limited to labor extracted based on true "serious harm."

If the statute is so construed, the evidence was necessarily insufficient on the conspiracy charge, because the government failed to prove Cherwitz and Daedone "knowingly joined and participated" in a "joint enterprise for an unlawful purpose"—namely, to obtain forced labor. *Mackey*, 143 F.4th at 139. Likewise, under the correct, narrow interpretation of §1589, the evidence could not have been sufficient to establish that Appellants harbored the requisite intent to "commit the [forced labor] offense[]." *United States v. Ceballos*, 340 F.3d 115, 123-24 (2d Cir. 2003); *see also United States v. Valle*, 807 F.3d 508, 515-16 (2d Cir. 2015).

### A. No "Serious Harm" Was Used To Force The Alleged Victims To Perform Work For OneTaste

The forced labor statute was enacted to implement the Thirteenth Amendment's prohibition against slavery and involuntary servitude. *See, e.g.*, *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014); *United States v. Chaudri*, 134 F.4th 166, 187-88 (4th Cir. 2025) (Berner, J., concurring). It therefore does not criminalize "all bad employer-employee relationships" or difficult working conditions. *Muchira v. Al-Rawaf*, 850 F.3d 605, 620 (4th Cir.

2017). Instead, it targets only extreme, highly coercive circumstances—i.e., modern "forms of compulsory labor akin to African slavery." *United States v. Kozminski*, 487 U.S. 931, 942 (1988). In other words, the statute prohibits conduct that leaves the worker with no "choice between continued service and freedom." *United States v. Shackney*, 333 F.2d 475, 485-86 (2d Cir. 1964) (Friendly, J.). *Accord Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454, 459-60 (2d Cir. 1996).

A substantive violation requires evidence that a defendant knowingly obtained labor by one or a combination of four prohibited means: (1) force, physical restraints, or threats thereof, (2) "serious harm or threats of serious harm," (3) abuse or threatened abuse of legal process, or (4) schemes intended to cause a person to believe that if they did not work, they would suffer serious harm or physical restraint. 18 U.S.C. §1589(a).[3]

To prove a defendant conspired to violate the statute, the government must also prove that she acted knowingly or intentionally. *See Valle*, 807 F.3d at 516; *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). These scienter requirements significantly narrow the statute's reach. *See Muchira*, 850 F.3d at

---

[3] The government charged Cherwitz and Daedone with conspiring to violate §1589(b), which prohibits "knowingly benefit[ting]" from a venture that has provided or obtained forced labor. A-81 at ¶12(b). A conviction under §1589(b) requires an underlying violation of §1589(a). Accordingly, if the government failed to prove a conspiracy to violate §1589(a), its proof was necessarily deficient as to the §1589(b) object too.

620, 622; *Taylor v. Salvation Army Nat'l Corp.*, 110 F.4th 1017, 1031 (7th Cir. 2024).

The government did not allege that any actual or threatened force, restraints, or abuse of process were used in this case. Its theory focused instead on subsections (a)(2) and (a)(4)—it argued Appellants sought to extract the alleged victims' labor through serious harm, threats of serious harm, or a related scheme.

Section 1589(c)(2) defines "serious harm" as harm "sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." In other words, the government had to show that Appellants knowingly or intentionally agreed to use serious harm sufficient to compel a reasonable person in the alleged victims' position to keep working "against their will and in order to avoid such threats of harm." *Zhong*, 26 F.4th at 560-61; *Muchira*, 850 F.3d at 620. Importantly, the "adverse but legitimate consequences incident to an employment relationship," such as losing colleagues, friends, or other aspects of a professional community, do not suffice. *Zhong*, 26 F.4th at 550; *Headley*, 687 F.3d at 1180; *Taylor*, 110 F.4th at 1031.

The evidence does not come close to meeting these requirements.

#### 1. *The "Harm" Here Does Not Remotely Approach What This Court And Other Courts Have Required To Establish Forced Labor*

a. Cases upholding forced labor convictions, in stark contrast to the evidence at this trial, involve extremely coercive conduct and circumstances that compel victims to work against their will and leave them with no reasonable means of escape. "Typically…forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent vulnerable victims from leaving and to keep them bound to their captors." *Muchira*, 850 F.3d at 618-19.

Unlike the alleged victims here, true forced labor victims are functionally unable to leave or stop working because they fear violence to themselves or family members, threats of deportation or imprisonment, or financial ruin—not shunning or having to repay a debt they chose to incur because they wanted to take an expensive course. In *United States v. Sabhnani*, for example, two Indonesian domestic servants were required to work extremely long hours and subjected to severe food deprivation, repeated physical abuse, and death threats, among other excruciating conditions. The employer warned one of the workers that if she tried to escape, the employer would "falsely report to the police that [the worker] had

stolen food and jewelry and…have [the worker] sent to prison"; and told the other that "if she ran way, the police would shoot her." 599 F.3d 215, 224-30 (2d Cir. 2010). Similarly, *United States v. Dann* involved a Peruvian housekeeper who was forced to sleep on the floor, not paid for two years, and repeatedly warned she would be sent back to Peru. "That threat alone…could constitute serious harm to an immigrant." 652 F.3d 1160, 1164-66, 1172 (9th Cir. 2011).

Likewise in *Calimlim*, a Filipino nanny was kept hidden from outsiders, denied medical care, had her passport confiscated, and threatened with deportation, imprisonment, and arrest. The nanny "did not have an exit option:…she could not freely work for another employer in order to escape the threatened harm." 538 F.3d 706, 708-10, 712 (7th Cir. 2008). And in *United States v. Chaudri*, a Pakistani housekeeper had her immigration documents taken away, was subjected to grueling manual labor and physical abuse, and was repeatedly threatened with deportation. 134 F.4th 166, 174-76 (4th Cir. 2025). In *United States v. Toure*, a Guinean nanny was "frequently beat[en]...with a belt, an electrical cord, a bottle, even a spoon," had her passport and visa confiscated, and was told the police wouldn't help her. 965 F.3d 393, 396-98 (5th Cir. 2020). Another example is *United States v. Callahan*, where a cognitively impaired young woman was required to sleep on a concrete floor with filthy blankets, denied food until her work was complete, and

forced to beat her daughter on camera to provide blackmail material for her "employer." 801 F.3d 606, 613-16 (6th Cir. 2015).

Forced labor cases outside the domestic servitude context involve similarly extreme conduct. For example, in *United States v. Luong*, a Vietnamese nail technician was saddled with a phony $180,000 debt, physically abused, and threatened with jailtime if she didn't pay. 125 F.4th 147, 150-52 (4th Cir. 2025). In *Zhong*, Chinese nationals were housed in residences locked from outside, had their passports and visas confiscated, and were subjected to other oppressive conditions. 26 F.4th at 545-47. In *United States v. Kalu*, Filipino nationals were shunted into different nursing roles than promised and threatened with deportation and financial penalties. 791 F.3d 1194, 1198-99 (10th Cir. 2015). Or consider *United States v. Bradley*, where Jamaican laborers were falsely promised certain wages and lodging, had their passports confiscated, and were threatened with violence if they fled. 390 F.3d 145, 148-49 (1st Cir. 2004).

b. By contrast, none of the employees or volunteers here were restrained by force or threats of legal process, or physically abused in any way. Nor were they "young, inexperienced, or brought to this country illegally," or in any other way "vulnerable." *Muchira*, 850 F.3d at 620; *accord Tegete v. Maryknoll Sisters of Saint Dominic*, 2023 WL 2504744, at *10 (S.D.N.Y. Mar. 14, 2023).

Instead, they were all well-educated individuals who had legal status in the U.S., access to cellphones and other electronic devices, and freedom to interact with friends and relatives. All admitted they could have gone whenever they wished. They made voluntary choice after voluntary choice to remain at OneTaste rather than leaving. There was no objectively reasonable basis for any of them to fear that they would suffer any "serious" harm if they refused to do any work or perform any service. The only harms they potentially faced were what would happen at any other job or religious group: they might fall out of favor with their bosses (Cherwitz and Daedone), lose status in the community, have to give up their colleagues and friends, or be asked to leave and turn over a new page in life.

For example, Halpern testified she cared about status "from the very beginning," and that she feared leaving because "there were these very real friendships with people that were so important to me, and I didn't want to lose those." A-279, 308-09. Gillick feared not earning "brownie points" or "accolades" or being a "star student" in the eyes of her superiors. A-1086, 1098, 1152. Berkley "really wanted to please [Nicole], wanted to be...a really good student, like a really good girl." A-429. Similarly, Pixley testified that her "whole existence was wrapped up" in OneTaste, so "leav[ing] the organization meant…cutting my losses…and moving on." A-625-26. Wright likewise explained that OneTaste "was my world…my reality…my community…like, everything." A-777. And

Gill testified OneTaste was her "entire support network," and she "didn't feel like I had any other options available to me." A-510.

By definition, however, these were just the "adverse but legitimate consequences" of ceasing work and leaving a job or community. Cases such as *Headley* and *Taylor*, discussed *infra* in subsection c, illustrate the point. None of this would have compelled any "reasonable person" in the same position to stay. *See* §1589(c)(2).[4]

c. We are unaware of any other case in which similar alleged harms have been held sufficient to satisfy §1589. On the contrary, multiple courts, including the Seventh and Ninth Circuits, have rejected claims of forced labor as a matter of law when presented with conduct comparable to—and more onerous than—the present case.

In *Headley*, for example, the Ninth Circuit granted summary judgment for the defendant, a church, on forced labor claims based on working conditions far more coercive and tightly controlled than those at OneTaste.[5]

[4] And the evidence that the witnesses reasonably feared these consequences would actually transpire is mixed at best. These individuals often kept in contact with Daedone, Cherwitz, or others in the OneTaste community, and attended OneTaste gatherings or events even after "leaving." *E.g.*, A-355-58, 450-51, 564-66, 667, 705-06, 734-38, 823-25, 1164-68. A few also continued volunteering or participating in the community. *E.g.*, A-667, 704, 734.

[5] Section 1589 is both a crime and a civil cause of action.

Two individuals entered the church's evangelical order, which imposed a stringent, mission-driven lifestyle: having children was prohibited; mail was censored; phone calls were monitored; ethical infractions were harshly punished; and there were concerted efforts to locate and retain departing members. 687 F.3d at 1174-75, 1177. The two individuals worked more than 100 hours per week and faced physical abuse and other severe discipline for work issues. *Id.* at 1176. One was forced to clean human excrement from a pond with his hands, and the other was forced to live off protein bars and water for six to eight months. *Id.* There were extensive security measures in place that posed significant barriers to leaving: a perimeter fence, motion detectors, and alarms at the working base; security or church personnel posted and cameras installed at their homes; escorts assigned for travel; times when they were restricted to the working base; and discipline for those who even discussed leaving. *Id.* at 1177.

Despite this highly surveilled and grueling working environment, the Ninth Circuit held the two individuals' labor had not been obtained "by means of" serious harm or threats thereof. *Id.* at 1179 (citing §1589(a)). Instead, they "voluntarily worked for the [order] because they believed that it was the right thing to do, because they enjoyed it, and because they thought that by working they were honoring the[ir] commitment." *Id.* at 1179-80. The court emphasized that, despite the many security measures, the two individuals had "innumerable opportunities to

leave." *Id.* at 1176, 1180. And while they feared losing contact with each other, friends, or family, this was just an "adverse but legitimate consequence[]" of leaving. *Id.* at 1180.

*Headley* is directly on point. Like the two *Headley* plaintiffs, the employees and volunteers at issue here voluntarily chose to work for OneTaste because they believed in it, not because they were forced. Like the two *Headley* plaintiffs, the OneTaste individuals could have left whenever they wished. Like the two *Headley* plaintiffs, the OneTaste individuals feared leaving not because of some objective harm that would be inflicted on them if they tried to leave, but rather because they didn't want to sever ties with their OneTaste peers and the broader OneTaste community. If anything, the OneTaste employees had far less to fear, as they faced none of the extensive security measures and other impediments to leaving present in *Headley*, and were instead explicitly told they could leave whenever they wished. *E.g.*, A-1107.

Other courts have similarly rejected forced labor claims involving comparable facts.

In *Tegete*, for example, a court in this Circuit granted summary judgment against a Tanzanian woman who brought a forced labor claim against a Catholic order she worked for as a missionary and community volunteer. 2023 WL 2504744 (S.D.N.Y.). The woman had cellphone and internet access, could travel

domestically and abroad, was visited by friends, was always free to stop working and leave, and testified she was not "forced to provide her labor, but [rather]…wanted to continue pursuing her call to service." *Id.* at *9-12. The court emphasized that the *Tegete* plaintiff "successfully left…the first time she tried to do so"—just like the witnesses here. *Id.* at *12.

Likewise, in *Taylor* the Seventh Circuit dismissed a forced labor claim brought by two participants in the Salvation Army's work rehabilitation program who feared the "serious harm" of losing their very livelihood: food, clothing, and shelter. 110 F.4th at 1031. The court held these were "legitimate consequence[s]" of leaving the program, and the two workers remained "free to leave" and obtain other jobs whenever they wished. *Id.* at 1021-22, 1031, 1034.

So too in *Muchira*, where the plaintiff's forced labor claim failed despite her suboptimal working conditions as a housemaid. Those were insufficient because she always remained free to "terminate her employment and walk away," had "virtually unfettered" cellphone and internet access, and thus objectively should not have felt "psychologically imprisoned in a forced-labor situation." 850 F.3d at 621-22.

If evidence and allegations analogous to the present circumstances was not sufficient as a matter of law in these civil cases, it cannot possibly satisfy the beyond a reasonable doubt standard required for a criminal conviction.

### 2. *The Government's "Brainwashing" Theory Fails*

Lacking any evidence of actual serious harm, the government invented a novel theory to explain why its witnesses remained at OneTaste and performed work they later regretted. It reframed OneTaste's spiritual and other beliefs and teachings as psychological tactics to indoctrinate, manipulate, groom, and otherwise "brainwash" these individuals. *E.g.*, A-1231-38, 1251-55. This nebulous and malleable theory poses obvious due process and First Amendment problems. If a person is moved by a religious leader's ideas to take a vow of poverty and devote her life to God, working long hours as a minister for only food and lodgings, has the religious leader violated §1589? Surely not, as discussed in greater detail at *infra* Point II.

But even apart from these constitutional concerns, the allegedly coercive tactics are all just ways to persuade people to adopt a particular set of beliefs or ideas. When Daedone or Cherwitz spoke to the alleged victims about OneTaste's concepts and practices, they weren't knowingly or intentionally causing or threatening any serious harm, as §1589 requires. *See, e.g.*, *Calimlim*, 538 F.3d at 711; *Muchira*, 850 F.3d at 620, 622. They were merely teaching a group of willing listeners who voluntarily chose to accept and believe in Daedone's ideas "very deeply," and who repeatedly expressed their enthusiasm and joy about these concepts and other topics—including to Daedone and Cherwitz themselves. A-

1182; *see supra* pp.17-18. The contemporaneous evidence thus resoundingly refutes these witnesses' hindsight claims that they were in fact being psychologically harmed and traumatized by these teachings.

As these individuals testified, they all had "free will" and the wherewithal to accept or reject these ideas. A-391, 673. OneTaste "felt like a choice" to them, and there were "never any…bars on leaving" if they no longer believed in its practices. A-453, 1107. In fact, "[Daedone] frequently said...even in sales pitches" that if OneTaste's ideas didn't resonate with you, "[g]et away from this. Run." A-1107. In the same vein, when one witness said she was leaving, Cherwitz responded: "okay, love," and took no action to restrain her. A-1107. Daedone told another departing witness: "[b]est of luck." A-397-98. This is hardly what one would expect from a forced labor conspiracy.

### B. The Forced Labor Statute Should Be Narrowly Construed To Avoid Constitutional Problems Illustrated By The Convictions

The government's extraordinary theory of psychological coercion threatens not just nontraditional groups like OneTaste, but any organization, movement, or religious body espousing ideas or beliefs a prosecutor disagrees with, or finds troubling. Such a boundless theory risks "delegat[ing] to prosecutors and juries the inherently legislative task of determining what type of coercive activities are so morally reprehensible that they should be punished as crimes"—including "a political leader who uses charisma to induce others to work without pay or a

religious leader who obtains personal services by means of religious indoctrination." *Kozminski*, 487 U.S. at 949.

This Court should avoid the serious Fifth and First Amendment concerns presented by narrowly interpreting the forced labor statute to exclude coercion based on "brainwashing," "shunning," and other similar psychological tactics, especially when the government uses those terms to challenge the validity of spiritual beliefs, as it did here. *See Clark v. Martinez*, 543 U.S. 371, 380-82 (2005) (explaining canon of constitutional avoidance).

*1. Applying §1589 To Appellants Raises Serious Vagueness Concerns*

The government's brainwashing theory is hopelessly vague.

As discussed, the statute ordinarily applies to slavery-like fact patterns that do not remotely resemble this case. The types of "psychological" coercion courts have held to be sufficiently serious to satisfy §1589 are far afield from the nebulous concept of brainwashing: intense surveillance, near-complete disconnection from the outside world, and other methods of instilling control over and dehumanizing the victims. *See, e.g.*, *Sabhnani*, 599 F.3d at 226-27; *Callahan*, 801 F.3d at 614-16; *Toure*, 965 F.3d at 397-98; *Chaudri*, 134 F.4th at 175-76; *Zhong*, 26 F.4th at 546. Even *United States v. Raniere*, the lone prosecution in this Circuit that bears surface-level similarities to this case, is in fact highly distinct and involves far more coercive conduct. The victims there—including a minor—were

physically branded and required to post sexually explicit and other highly sensitive "collateral," which could be released if they didn't perform certain sexual services and other labor. In fact, these victims were literally referred to as "slaves" who had "masters." 55 F.4th 354, 358-59 & 2022 WL 17544087, at *1-2, 5 (2d Cir. 2022). That bears no resemblance to the spiritual, consent-based practices OneTaste espoused.

Courts cannot "apply[] a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Yet this prosecution has stretched the forced labor statute beyond recognition to cover completely innocuous behavior. How could Cherwitz or Daedone have known the government would later claim they were "indoctrinating" or "grooming" by merely communicating ideas and concepts, however controversial or outside the mainstream, to willing and eager listeners? A-1231-35.

The government also argued at trial that Appellants "manipulated" people by "[l]ove-bombing" them, playing an "in/out game," and "direct[ing] people past their comfort zones." A-1236-38. Witnesses defined lovebombing as "putting a lot of attention" on a person to make them feel special. *E.g.*, A-976. The in/out game was about the social pressures to "be[] closer to the cool kids" in the "inner circle." A-965-66, 977. The government might as well be criminalizing a high-

school lunch table. And pushing someone past their "comfort zone" is what bosses, leaders, and coaches do every day to help people grow and overcome new challenges.

The government elicited highly inflammatory testimony identifying OneTaste as a "cult" and argued it was somehow wrong for Daedone to attempt to suppress "cult" references in OneTaste Google searches. A-481, 903, 1106, 1223, 1264. But "cult" is a hopelessly indeterminate term. As Kandell testified and as many others have observed, it could apply to everything from veganism to CrossFit to the Catholic Church. A-994-95. *See, e.g.*, Eugene V. Gallagher, *Compared to What? "Cults" and "New Religious Movements*,*"* 47 History of Religions 205, 212 (2007-08) ("'[C]ult' has acquired an impressive elasticity"). One sociologist has noted the "growing use of the term cult as a catch-all to refer to any new and unusual groups which had engendered animosity among some interest groups," and called for the term to be "disallowed in legal proceedings where involvement in an exotic religious group is an issue." James T. Richardson, *Definitions Of Cult: From Sociological-Technical To Popular-Negative*, 34 Review of Religious Research 348, 351, 355 (1993).

Finally, the government targeted certain OneTaste terminology, including "[M]uggles" (outsiders, drawn from the Harry Potter term for non-magic humans) "the [M]atrix" (an alternate reality), and "tumescence" (pent-up energy). A-1232.

References to popular movies and analogies to common physiological phenomena are standard ways of communicating among people of like mind and social awareness. No one was psychologically coerced by using these terms.

If this and other amorphous, ill-defined "brainwashing" evidence can support a forced labor prosecution, the statute plainly invites "arbitrary and discriminatory enforcement" and lacks the requisite "definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Accordingly, this Court should adopt a narrow construction to avoid these due process vagueness problems. *See*, *e.g.*, *Snyder v. United States*, 603 U.S. 1, 15-17 (2024); *McDonnell v. United States*, 579 U.S. 550, 576 (2016); *Skilling v. United States*, 561 U.S. 358, 402-09 (2010). These vagueness concerns are even more acute here because constitutionally protected speech is involved. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

2. *Applying §1589 To Appellants Would Create Serious Freedom of Speech, Religion, And Association Problem*s

Point II explains why applying the forced labor statute to Appellants' protected speech, religious beliefs, and associated expression would violate the First Amendment. But at the very least, even if the Court declines to find the statute unconstitutional as applied, it should construe the statute narrowly to exclude "brainwashing," shunning, and the like to avoid these constitutional

problems. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 781, n.3 (2023); *Caronia*, 703 F.3d at 162.

## II. THE CONVICTIONS VIOLATE THE FIRST AMENDMENT

The forced labor statute cannot be applied to Appellants' conduct without violating their constitutional rights to free speech, free exercise, and expressive association. Accordingly, a judgment of acquittal is warranted.

### A. The Government Targeted Appellants' Speech, Beliefs, And Associated Expression

This prosecution directly attacked Daedone and Cherwitz's spiritual beliefs and concepts, and the speech used to communicate them.

In its opening statement, the government argued its witnesses worked for OneTaste to avoid being "spiritually ruined" and because they were taught it was the "way to enlightenment" and the "path to freedom." A-227-28. Shortly thereafter, the government summarized its case against Cherwitz and Daedone as an attack on their teachings: "our theory of the case is that the defendants…taught [the alleged victims] basically to consent to everything and to be willing to engage in certain sexual activities that even at the time they would have viewed as something they wouldn't consent to, but they did so because they were taught this was a philosophy or a religious practice that was good for them, and if they continued to do it they would reach enlightenment." A-260-61.

Consistent with this theory, the government proceeded to introduce extensive evidence about Appellants' protected ideas, including those likely to inflame and alienate the jury.

The government introduced a video and related testimony of an August 2013 lecture in which Daedone explained how she rejected the conventional victim-perpetrator dichotomy in favor of a more fluid, less static understanding of these identities. A-1521 at 10:00-10:31. More controversially, Daedone told listeners that "the real way to deflect rape is to turn on 100%, because then there's nothing to rape." *Id.* at 20:45-56. This "turn on" concept referred not only to sexual arousal, but also a state of power or flow. A-264-65, 388, 913. Thus, as a government witness explained, Daedone was explaining how to "us[e] my own power to try and deflect bad things from happening." A-263-65.

Similarly, the government asked several witnesses about "aversion practices"—i.e., participating in something to which one was averse. This concept draws from different disciplines including Buddhism and mindfulness. Dkt.450 at 12. It was sometimes applied in the context of OMs or sexual encounters, where one was encouraged to "turn a no into a yes" and "g[e]t off on every stroke." A-501, 588, 610. All of this was fully in keeping with OneTaste's philosophy of confronting challenges and pushing boundaries.

The government also elicited testimony about how these and other related teachings purportedly "brainwashed" its witnesses, including by somehow causing them to engage in various types of non-mainstream sexual conduct.

For example, Pixley testified she came to believe "doing these [sexual] aversion practices or…expanding my OM practice was something that was ultimately going to benefit me…spiritually and personally in my own path towards enlightenment." A-618. Similarly, Lifson testified that "I think that the language and the philosophy and the ideas, like, get into your brain….And when certain types of language w[ere] being used all of the time and the ideas were being impressed upon me consistently, I began to conform more and more to the ideals of the organization, leaving…my own ideas behind." A-745. Wright understood that "everything we were doing was for our own growth spiritually, emotionally, energetically, and that saying no to anything that was asked of us was like saying no to your own growth and your own power." A-767-68.

Halpern claimed she had been "gently brainwashed over time," had a "warped understanding of what was real and what was normal," and as a result "did things in my work that I would never do otherwise"—like having "sexual experiences as a part of my day-to-day work." A-294-95. Berkley claimed the "trauma" she experienced at OneTaste was "[t]he brainwashing." A-484. Neria

even testified Daedone's ideas were "like a religion." A-899-900. *See also, e.g.*, A-273-75, 482-84, 500-02, 611-12, 755, 911.

In its summation, the government belittled Appellants' ideas as an insincere sham, declaring OM was not "actually spiritual" and claiming Daedone and Cherwitz had "personally connected spirituality to OMing to protect themselves" and so that others would follow these teachings. A-1232-33. It repeatedly attacked OneTaste's belief in a spiritual "fourth dimension." A-1224, 1232, 1259-60. It played Daedone's victim-perpetrator lecture for the jury, and claimed she espoused these and other concepts to further her ulterior motive of "us[ing] sex for sales." A-1234. It contended Appellants "indoctrinated" government witnesses into believing "[Daedone's] teachings were the path to enlightenment and spiritual growth," and "groomed" them using concepts like aversion practice, turning a no into a yes, and getting off on every stroke. A-1222, 1233-34. The government's summation was such a frontal attack on Appellants' protected beliefs that they moved for a mistrial—which the district court summarily denied. A-1314-18.

The government continued piling on in rebuttal, telling the jury that "[i]t is not okay to teach your employees that…if they stray from the pa[th] set by OneTaste and by Nicole Daedone, they will be spiritually ruined." A-1384. The government also reiterated that its theory was that Appellants' very beliefs were criminal. It said Daedone was "on trial because she, Rachel Cherwitz…and others

used aspects of her teaching[s] to force OneTaste employees to provide labor." A-1388.

### B. Appellants' Speech, Ideas, And Spiritual Practices Are Protected By The First Amendment

#### *1. The Prosecution Violates Freedom of Speech And Religion*

The government may not prosecute people for speech like Cherwitz's and Daedone's teachings "because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010); *see also, e.g.*, *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026); *Cohen v. California*, 403 U.S. 15, 18-19 (1971). Prosecutors may not use the fact that a person's ideas are unpopular or rejected by the majority to criminalize them, as occurred here. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Moreover, the religious speech at issue here is "doubly protect[ed]" by the Free Exercise Clause. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022). That Clause's protections apply to all religions, not just mainstream ones. It is well-settled that the Free Exercise Clause protects spiritual beliefs and practices—like Daedone's Buddhism-based views and rituals—that may not be popular, "acceptable, logical, consistent, or comprehensible to others." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (Santeria

adherents practiced animal sacrifice); *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981) (Jehovah's Witness idiosyncratically refused to work directly on military armaments); *Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n*, 584 U.S. 617, 649 (2018) (Gorsuch, J., concurring, joined by Alito, J.) (collecting cases). The framers knew of the "varied and extreme views of religious sects," and nonetheless "envisaged the widest possible toleration"—including of beliefs "which are rank heresy to followers of the orthodox faiths." *United States v. Ballard*, 322 U.S. 78, 86-87 (1944) (believers in the highly esoteric "I Am" movement).

In sum, as the Supreme Court has repeatedly explained, "no [prosecutor], high or petty, can prescribe what shall be orthodox in…religion, or other matters of opinion." *Masterpiece Cakeshop*, 584 U.S. at 638 (quoting *Barnette*, 319 U.S. at 642).

The free exercise problems posed by this prosecution are particularly acute because the government attacked Cherwitz and Daedone's religious beliefs themselves—not just religiously motivated conduct. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp. Div. Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990). Criminal laws, therefore, "cannot interfere with mere religious

belief and opinions." *Reynolds v. United States*, 98 U.S. 145, 166 (1878); *accord, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983).

Yet here, the government convicted Appellants by arguing that their beliefs were criminal brainwashing tools. The government made clear it viewed these ideas to be the "means" by which Daedone and Cherwitz obtained "labor" from the government's witnesses. It even described its theory in nakedly speech-and-religion based terms as targeting Appellants' "teachings." A-260-61, 1388; *see also, e.g.*, A-227-28, 1222, 1233.

This prosecution did not just involve the "evidentiary use" of speech or beliefs to prove mens rea. *United States v. Kaziu*, 559 F. App'x 32, 35 (2d Cir. 2014). Speech was "itself [deemed] the proscribed conduct." *Caronia*, 703 F.3d at 161 (overturning conviction). Nor does this case involve speech "integral" to unlawful conduct—a narrow unprotected category that applies to speech "bear[ing] a close causal connection to some separately unlawful conduct," not regulations of "speech as speech" like this prosecution. *Compare Chiles*, 146 S. Ct. at 1026 (conversion talk therapy doesn't satisfy exception), *with Hansen*, 599 U.S. at 783 (soliciting unlawful immigration does).

If this prosecution is constitutional, forced labor cases can be brought against virtually any other religious or spiritual institution that employs individuals who believe in its doctrine—including churches, synagogues, ministries, faith-

based relief organizations, and many other entities. Many of the adherents of those religions, like the purported victims here, may fear the consequences of disappointing spiritual leaders and losing their communities. The only limiting principle would be the government's "promise[] to use [its brainwashing theory] responsibly," but "[t]his prosecution is itself evidence of the danger in putting faith in…prosecutorial restraint." *Stevens*, 559 U.S. at 480. The Court need look no further than the civil plaintiffs that have already (unsuccessfully) brought these types of claims. *See Headley*, 687 F.3d 1173 (Church of Scientology and related corporate entity); *Tegete*, 2023 WL 2504744 (Catholic order).

*2. The Prosecution Violates Freedom of Expressive Association*

The convictions also infringe Appellants' rights to expressive association. *See, e.g.*, *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ---, 146 S. Ct. 1114, 1122 (2026); *Boy Scouts of America v. Dale*, 530 U.S. 640, 647-48 (2000).

The government made clear its prosecution was an indictment of OneTaste's culture and practices itself—i.e., the basic means by which Appellants engaged in protected expressive activity with their peers. It targeted OneTaste's "rituals, language, and philosophy," argued to the jury that they should not be "normalize[d]," and contended that "OneTaste does not get an out because it's OneTaste." A-1220, 1384. Like other religious groups, however, OneTaste is

entitled to "special solicitude" by the First Amendment, and is entitled to further the "collective expression and propagation of shared religious ideals." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring, joined by Kagan, J.).

The government also suggested that it was a means of serious harm, and criminal, for Cherwitz, Daedone, and other OneTaste leaders to stop associating with people who chose to leave the community and no longer pursue its mission. A-1235. But whether as a matter of free exercise or expressive association, OneTaste is "entitled to stop associating with someone who abandons it." *Headley*, 687 F.3d at 1180; *see also Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 880-83 (9th Cir. 1987). Indeed, the entire purpose of the free association right is to guarantee people the right to associate with like-minded people and to *not associate* with others who don't share their ideas or belief. "Forcing a group to accept certain members may impair the ability of the group to express those views…that it intends to express." *Dale*, 530 U.S. at 648.

In any event, disassociation is perfectly legal for *any* mission-based employer or organization, so long as it does not tread impermissibly on anti-discrimination law. *See Dale*, 530 U.S. at 656 (holding Boy Scouts of America could exclude homosexual scoutmaster on expressive associational grounds); *CompassCare v. Hochul*, 125 F.4th 49, 60-61 (2d Cir. 2025) (recognizing mission-

based employers can assert expressive associational claims related to employment decisions). Even outside the First Amendment context, an organization is entitled to stop associating with those who choose to leave it. *E.g.*, *Taylor*, 110 F.4th at 1031 (holding Salvation Army could warn participants that leaving would "result[] in the cessation of the benefits of the program" and that it could "stop providing food, clothing, and shelter to someone who no longer wishes to participate").

### C. The Convictions Cannot Withstand Strict Scrutiny

The criminalization of Cherwitz's and Daedone's religious beliefs is clearly unconstitutional, regardless of what interest the government invokes. The Free Exercise Clause is an "absolute prohibition against governmental regulation of religious beliefs." *Bob Jones University*, 461 U.S. at 603. As the Supreme Court has repeatedly explained, regulation "targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533; *see also*, *e.g.*, *Ballard*, 322 U.S. at 86 ("freedom to believe" is "absolute"); *Reynolds*, 98 U.S. at 166 ("Laws… cannot interfere with mere religious belief and opinions….").

Even under strict scrutiny, however, the convictions would have to be reversed. They do not advance any legitimate interest, much less an interest of the "highest order" in a narrowly tailored manner. *Lukumi*, 508 U.S. at 546; *Mahmoud v. Taylor*, 606 U.S. 522, 565 (2025).

As explained above, the forced labor statute is designed for cases where individuals are held "in a condition of servitude" or "modern-day slavery." *Muchira*, 850 F.3d at 617; *Dann*, 652 F.3d at 1169; Victims of Trafficking and Violence Protection Act of 2000, H.R. Conf. Rep. No. 106-939 at 101. This prosecution involves nothing of the sort, and thus does not serve any of the interests that motivated the statute's passage—let alone in a narrowly tailored way. The only interest advanced is a flatly illegitimate one: suppressing Appellants' unpopular speech, beliefs, and associations "because of disapproval of the ideas expressed." *RAV v. City of St. Paul*, 505 U.S. 377, 382 (1992).

## III. APPELLANTS WERE DENIED A FAIR TRIAL ON THEIR FIRST AMENDMENT DEFENSE

Cherwitz and Daedone should be acquitted as a matter of law because the evidence was insufficient to establish a forced labor conspiracy, and because the government's theory of "harm" violates the First Amendment. But even assuming a reasonable jury could have rejected these arguments, a new trial would be necessary, because the district court deprived Appellants of any meaningful opportunity to present their First Amendment defense to the jury. It did so by refusing to instruct the jury on two critical points of First Amendment law and then precluding Daedone and Cherwitz's counsel from arguing their First Amendment defenses to the jury in closing.

### A. Background

Cherwitz and Daedone moved *in limine* and again during trial to preclude and strike evidence and argument about their protected religious beliefs and practices. Dkt.171 at 8-10; Dkt.381 at 1-3. The court denied the motions but suggested it was open to addressing the obvious First Amendment issues with the government's case by entertaining a proposed jury instruction. A-109-12, 758-59.

Appellants therefore proposed two different First Amendment jury instructions. *First*, to address the abundant evidence and argument about their teachings and religious beliefs, they requested the court instruct the jury that:

> You have heard evidence about certain spiritual beliefs, philosophies, teachings, and practices. The defendants are not on trial for their views, and you cannot consider such evidence in determining whether the government has met its burden. Specifically, the First Amendment guarantees to all persons in the United States the right to freedom of speech, freedom of religion, and freedom of association. Because of these constitutional guarantees, no one can be convicted of a crime simply on the basis of her beliefs, her expression of those beliefs, or her associations. Thus, in considering whether the government sustained its burden of proof, you may not consider any personal feelings you might have about such beliefs, teachings, and practices or the defendants' religion or spirituality.

A-211-12.

*Second*, in light of the extensive testimony about witnesses fearing being shunned if they left OneTaste, Cherwitz and Daedone requested the court also instruct that:

> in consideration of whether the Defendants conspired to make threats of serious harm to any individual, you should consider whether such alleged threats were covered by the First Amendment to the Constitution, which permits individuals who no longer wish to associate with someone, to lawfully make that choice to not associate. For example, "shunning"—i.e., threats of being cut off from one's religious or spiritual community—is protected by the First Amendment to the Constitution. Shunning is an adverse but legitimate consequence of leaving one's religious or spiritual community and does not constitute serious harm.

A-215-16; *see also* A-156-57, 206.

The court summarily rejected both proposals at the charge conference. A-1210-11, 1216-17. It ruled categorically: "I am not instructing on the First Amendment," and emphasized the instructions would include "nothing…about the First Amendment." A-1213, 1216. The court also prohibited defense counsel from referring to Daedone's and Cherwitz's constitutional rights in their closing arguments. *See* A-1211-12. As a result, the jury was kept in the dark about one of Appellants' core trial defenses.

### B. The District Court Erroneously Refused To Instruct The Jury On The First Amendment

The district court should have instructed the jury on two key points of First Amendment law that bore directly on two central issues at trial: whether the OneTaste philosophies could constitutionally be considered legally cognizable means of causing or threatening "psychological harm," and whether the government witnesses' fears of losing their OneTaste friends and other aspects of the community constituted "serious harm." As Appellants repeatedly argued, their views and beliefs were protected by the First Amendment and could not themselves constitute the coercion required to satisfy the forced labor statute. Likewise, OneTaste had a constitutional right to stop associating with those who decided to leave.

Cherwitz and Daedone were entitled to instructions supporting these theories of defense because there was plainly "some foundation in the proof" for them. *United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990); *see also United States v. Allen*, 127 F.3d 260, 265 (2d Cir. 1997); *United States v. Durham*, 825 F.2d 716, 718-19 (2d Cir. 1987). Indeed, as discussed, the alleged victims themselves offered extensive testimony supporting these defenses. Under these circumstances, the conviction should be overturned if the instruction was legally correct, supported a defense theory that would result in acquittal, and was not otherwise

presented in the charge. *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). All these requirements are easily met here.

*First*, both proposed instructions were correct for the reasons explained in Point II.B. In fact, this Court overturned a conviction based on the same First Amendment principles in *Caronia*. There, the district court's instructions suggested a misbranding conspiracy conviction would be appropriate based solely on the defendant's speech promoting a pharmaceutical drug's off-label use. As in this case, the jury wrongly understood the defendant's speech to be "by itself, determinative of his guilt." 703 F.3d at 161.

*Second*, the First Amendment theories of defense, "if believed, justifie[d] an acquittal." *Durham*, 825 F.2d at 719. The government's entire case would have collapsed without its primary theory that Cherwitz and Daedone brainwashed the alleged victims through OneTaste concepts and ideas that supposedly caused or threatened psychological harm. *See* A-1231-38, 1251-55. Even the government's theory of financial coercion was predicated on government witnesses purchasing expensive courses because they wanted to delve deeper into these teachings. A-1255-59. Similarly, being shunned and disassociated from the OneTaste community was the only real "harm" the government's witnesses feared if they left OneTaste.

*Third*, the other jury instructions "did not touch upon or make reference to [Appellants'] theory in any way." *Durham*, 825 F.2d at 719. The district court categorically rejected any First Amendment language. A-1213, 1216.

### C. The Instructional Errors Prejudiced Cherwitz And Daedone

The government cannot prove beyond a reasonable doubt that the district court's failure to give the proposed instructions did not contribute to the verdict. Accordingly, the instructional error requires a retrial. *See*, *e.g.*, *Quattrone*, 441 F.3d at 179; *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017).

The government's proof and argument overwhelmingly focused on establishing that Cherwitz and Daedone's beliefs and speech were the means by which witnesses worked for OneTaste against their will. Without appropriate instructions, the jury did not know Appellants could not be convicted based on these views, or that jurors' personal disapproval of them could not properly influence the verdict. To the contrary, the jury was led to believe there was nothing unconstitutional about deeming OneTaste's teachings inherently criminal.

Nor could Appellants have raised the First Amendment to the jury themselves, because, as discussed, the government successfully moved to preclude them from doing so. A-1211-12. Thus, the government was free to repeatedly assail Cherwitz and Daedone's protected teachings in summations, whereas Appellants were prohibited from presenting their best argument in response.

In any event, "counsel's summations are not adequate to inform a jury of what it should consider a legally valid defense." *Durham*, 825 F.2d at 719. Rather, "it is of some value…to have *the trial judge* clearly indicate to the jury what [Defendants'] theory of the case is." *United States v. Pedroza*, 750 F.2d 187, 205 (2d Cir. 1984) (emphasis added). The district court's instructional errors deprived Cherwitz and Daedone of that benefit and, more broadly, a fair opportunity to present their First Amendment defenses to the jury.

## IV. THE FORFEITURE AWARD AGAINST DAEDONE WAS UNLAWFUL

If the convictions are not reversed or vacated, the forfeiture award should be remanded with instructions for the district court to "exclude from its calculation all [assets]" not obtained from or used to commit forced labor. *James*, 151 F.4th at 48.

### A. Background

The government sought a $12 million forfeiture money judgment against Daedone. This amount represented the entire price of OneTaste's 2017 sale, along with certain bank account funds attributable to the sale (to be credited against the money judgment). A-1688-98. The government invoked two separate theories corresponding to two distinct provisions of §1594—the forced labor conspiracy statute. Under an instrumentality theory, the government claimed the $12 million represented property traceable to "property…involved in…[or] used to commit or to facilitate" a forced labor violation—the property in question being OneTaste

Inc. as a whole. 18 U.S.C. §1594(d)(1), (e)(1)(A). Alternatively, the government argued the $12 million constituted "property…constituting or derived from…proceeds" obtained as a result of a forced labor violation. *Id.* §1594(d)(2), (e)(1)(B).

Daedone opposed forfeiture. Dkt.488. With respect to proceeds, she argued the government relied on speculative and conclusory generalizations about how OneTaste supposedly needed forced labor to attract investments, sustain its operations, and thus ultimately obtain the $12 million sale price. She also pointed out that the alleged victims represented only a tiny fraction of OneTaste's total workforce. *See id.* at 2-5. As for instrumentality, Daedone contended there was no support for the government's extraordinary claim that the entire OneTaste company—as opposed to one or more specific pieces of property—was used to commit or facilitate forced labor. *Id.* at 5-6. Daedone also argued the forfeiture award was unconstitutionally excessive under the Eighth Amendment. *Id.* at 6-7.

The district court granted the government's motion without conducting a hearing, finding the $12 million forfeitable under both theories. SPA-9-11. The court quoted but didn't directly address Daedone's statutory arguments, ignored that the labor in question comprised a trifling amount of the total labor provided to OneTaste, and instead relied heavily on citations to the government's briefing. *See*

SPA-9-10. The court also dismissed Daedone's constitutional argument in a footnote. SPA-10.

### B. The Entire OneTaste Sale Price Was Not Forfeitable As Proceeds Or Under An Instrumentality Theory

Forfeiture is intended to recover a defendant's "ill-gotten gains"—not her "legitimately acquired property." *United States v. Daugerdas*, 892 F.3d 545, 548 (2d Cir. 2018). To that end, forfeiture statutes like §1594(d)(1) & (d)(2) only permit recovery of particular assets "used in or gained from" criminal conduct. *Elias*, 154 F.4th at 62. The property, therefore, must be "tainted" by criminality—whether as an instrumentality or as proceeds. *Honeycutt v. United States*, 581 U.S. 443, 448-49 (2017). If the property is "untainted," it is not forfeitable. *Id.* at 449, 451.

The district court misapplied this bedrock principle of criminal forfeiture law and painted with far too broad a brush in concluding that the entire OneTaste company was forfeitable as both proceeds and an instrumentality.

#### *1. Proceeds*

Even if this Court upholds the verdict, that wouldn't justify treating the whole $12 million as forfeitable proceeds, as the district court seemed to assume. *See* SPA-9-10. Rather, the proceeds calculation must, at minimum, represent a "reasonable" estimate of the funds the trial record shows Daedone actually obtained from forced labor. *James*, 151 F.4th at 47-48, n.6.

The government never even tried to prove that the entire company's value was attributable to the alleged force labor conspiracy. Instead, it emphasized the narrowness of its case, telling the jury it only needed to prove an agreement to extract "[just] one form of labor or service from [just] one victim, any single one." A-1386. If the conviction rested on just one person's work, that would be a miniscule portion of the sum total of labor provided by OneTaste's roughly 150 employees and 300 independent contractors between its 2004 formation and 2017 sale. *See* Dkt.488 at 2; Dkt.473 at 16 n.4. Even counting all nine alleged victims, that would represent at most 2% of the company's 450 workers.[6]

The timeline of these individuals' work for OneTaste further underscores how little they contributed to the $12 million in proceeds from the sale. Six of them worked for OneTaste before August 2014—at which point the company was only worth $2.7 million. *See* A-986, 1553; *see also* A-298-99 (Halpern), 449-50 (Berkley), 511 (Gill), 666 (Pixley), 701-02 (Lifson), 828-29 (Wright), 1397. These six thus could not have had anything to do with the $9.3 million in value OneTaste accrued over the next three years before the sale. Nor did the remaining three alleged victims meaningfully contribute to that amount (or the previously accrued $2.7 million): Neria worked on the sales team for only six or seven months,

[6] This 450 figure is extremely conservative, since it does not account for the hundreds of people who volunteered for OneTaste. *E.g.*, Dkt.69 at 4.

Gillick was an owner of a OneTaste subsidiary and not a staffed employee, and Keves's employment *postdated* the sale. A-851, 883, 908, 1163, 1190.

Moreover, the government made clear before trial that the alleged scheme targeted only these nine alleged victims "and not all individuals associated with OneTaste." Dkt.169 at 2 n.2; *see also* A-78 at ¶6 (alleging Cherwitz and Daedone "obtained the labor and services of *a group* of OneTaste members") (emphasis added).

Despite the alleged scheme's highly limited scope, the district court ruled that OneTaste's entire sales price should be forfeited as proceeds. But forfeiture is about "tailor[ing] to ill-gotten gains." *James*, 151 F.4th at 48. The district court did the opposite, using a machete where a scalpel was needed.

*James* is directly on point. There, the district court ordered forfeiture of the total revenues from the defendant's medical-billing business as proceeds of a health care fraud scheme. As here, the defendant was ordered to forfeit a "much higher amount" not limited to the revenue traceable to his criminal conduct. 151 F.4th at 48. And as here, the government argued the defendant's business was "permeated with fraud," even though trial evidence showed defendant had also earned money in a "completely legitimate" way. *Id.* This Court rejected the government's argument, found the district court's calculation was an overly broad

estimate rather than a tailored and "reasonable" assessment of the forfeitable amount, and vacated the award. *Id.*

*James* was merely another application of the basic principle that forfeitable proceeds must actually "flow[] from," be obtained "as a result of," or otherwise have a link to the crime. *Honeycutt*, 581 U.S. at 448-49, 451 (interpreting analogously worded proceeds provision); *see also, e.g.*, *Elias*, 154 F.4th at 71 (same). This Court should apply this precedent and vacate the district court's blunderbuss award of OneTaste's entire sales price as proceeds.

2. *Instrumentality*

Nor is the $12 million forfeitable as property traceable to an instrumentality of the offense.

OneTaste was a sprawling company with operations in multiple jurisdictions; multiple corporate entities, affiliates, and locations; and substantial intellectual property assets. *See, e.g.*, A-1551-62. Yet according to the government, this whole company was an "instrumentality" for an alleged forced labor conspiracy that targeted only nine of the 450 employees and independent contractors who worked for OneTaste over its 13 years of operations before sale.

This breathtakingly broad reading of what constitutes an instrumentality would eviscerate any requirement to establish that the property at issue was actually "used in" the crime, *Honeycutt*, 581 U.S. at 449, leading to all kinds of

"absurd results," *McNeill v. United States*, 563 U.S. 816, 822 (2011). A multi-billion-dollar global clothing manufacturer would be forfeitable so long as one out of its hundreds of factories employs even one person against their will. So too would a massive chocolate producer whose vast network of cocoa farms happens to include a handful of forced laborers. The same goes for a car manufacturer if just one of the plants in its extensive supply chain assembles a single minor part of the vehicle using coerced labor.

Forfeitable instrumentalities are typically discrete pieces of property that play an identifiable role in the criminal conduct. As the Supreme Court has explained, an instrumentality is the "property actually used to commit an offense and no more," or property that functioned as the "actual means by which the criminal act is committed." *Bajakajian*, 524 U.S. at 333-34 nn.8, 9; *see also Austin v. United States*, 509 U.S. 602, 627-28 (1993) (Scalia, J., concurring in part and in the judgment).

For example, this Court upheld forfeiture of a house in which two domestic servants lived and were forced to work. *Sabhnani*, 599 F.3d at 261-63. A different court ordered forfeiture of phones used in a sex trafficking offense. *United States v. Tate*, 2017 WL 374480, at *1 (W.D.N.C. Jan. 25, 2017). A car used to facilitate the transportation of goods to avoid taxes was also properly forfeited as an instrumentality. *Bajakajian*, 524 U.S. at 334 n.9 (citing *J.W. Goldsmith, Jr., Grant*

*Co. v. United States*, 254 U.S. 505, 508 (1921)). In these cases, the forfeited property was a discrete premise or tool for the criminal conduct.

The government here could not identify any discrete pieces of property and instead resorted to things like OneTaste's "corporate structure," "business identity," and "financial infrastructure." A-1695; Dkt.490 at 3. These are not specific instruments used to obtain forced labor. They are general features of OneTaste's business that themselves encompass multiple physical and intellectual property assets. To the extent any of these hazy concepts could ever be forfeited themselves, they do not come close to justifying forfeiture of the entire business.[7]

### C. The Forfeiture Award Was Unconstitutionally Excessive

The $12 million forfeiture award also violated the Eighth Amendment because it was "grossly disproportional" to the offense's gravity. *Bajakajian*, 524 U.S. at 334. In *Bajakajian*, the Supreme Court held that it would be unconstitutionally excessive to forfeit $360,000 based on a reporting offense with a $10,000 threshold. 524 U.S. 321. The same is true here, largely for the same reasons discussed above that the forfeiture statutes do not authorize forfeiture of the proceeds from the sale of an entire company—or the entire company itself—

[7] Daedone preserves for further review the argument that the forfeiture statute does not expressly authorize a money judgment. *See* 18 U.S.C. §1594(d), (e). This argument is currently foreclosed by Circuit precedent. *See United States v. Awad*, 598 F.3d 76, 78-79 & n.5 (2d Cir. 2010) (per curiam).

where the alleged forced labor involved only nine out of hundreds of employees and independent contractors. The Supreme Court continues to police such excessive and disproportionate forfeiture awards. For example, earlier this year the Court granted certiorari in *Jouppi v. Alaska* (No. 25-246), to consider the need for courts to focus on the gravity of the particular defendant's conduct, as opposed to the gravity of the offense in general, when assessing proportionality. In *Jouppi*, an entire airplane was forfeited based on the illegal importation of one six-pack of beer.

If the Court clarifies that proportionality turns on the gravity of the defendant's conduct rather than the gravity of the offense in the abstract, its decision will provide additional support for Daedone's argument. Although forced labor is a serious offense, forfeiting the entirety of OneTaste's sale value when only a microscopic fraction of its work (2% at most) was "coerced" would be as disproportionate as what occurred in *Bajakajian* or *Jouppi*.

The forfeiture award here would be unconstitutional regardless, under the factors this Court currently uses to assess proportionality. *See United States v. Viloski*, 814 F.3d 104, 110-12 (2d Cir. 2016) (discussing factors).

*First*, the "essence of the crime" was Daedone communicating supposedly coercive teachings about OM and other topics to a tiny group of willing listeners participating in a wellness organization she cofounded and built virtually

exclusively with labor the government never challenged. *Viloski*, 814 F.3d at 110. That makes Daedone far less culpable than other forced labor defendants, who typically recruit vulnerable immigrants into domestic servitude and other highly exploitative employment situations. *See supra* pp.35-37.

*Second*, the "nature of the harm" supposedly caused by Daedone was also relatively minor. *Viloski*, 814 F.3d at 110. The "brainwashing" that allegedly caused nine out of OneTaste's hundreds of employees and contractors psychological harm pales in comparison to the physical abuse, death threats, and potential financial ruin routinely faced by victims of traditional forced labor schemes. *See supra* pp.35-37.

*Third*, for the same reasons, Daedone does not fit into the "class of persons for whom the [forced labor] statute was principally designed"—i.e., serious traffickers and other modern enslavers contemplated by the Thirteenth Amendment. *Viloski*, 814 F.3d at 110.

*Fourth*, the maximum statutory and guidelines punishment included a fine of $250,000. 18 U.S.C. §3571(b)(3); A-1711-13 (citing USSG §5E1.2(c)(3)). That represents only 2% of the $12 million forfeiture award. *See, e.g.*, *Bajakajian*, 524 U.S. at 338, 340 (forfeiture disproportional where, *inter alia*, forfeited amount was many times the maximum fine).

*Fifth*, and finally, a $12 million penalty threatens to "destroy [Daedone's] livelihood" when she is released. *Viloski*, 814 F.3d at 111-12. Daedone is 59 years old and received a nine-year prison sentence. With her reputation and career now in tatters, Daedone has no realistic hope of ever making anything close to $12 million after she re-enters society in her late 60s.

## V. THE DISTRICT COURT ERRONEOUSLY REFUSED TO HOLD A *KASTIGAR* HEARING TO INVESTIGATE THE GOVERNMENT'S IMPROPER USE OF PRIVILEGED MATERIALS

In addition to infringing Appellants' First Amendment rights, the government violated the Due Process Clause by invading the sanctity of their attorney-client privilege, using privileged information to build its case, and then misleading the defense and the district court about what it had done. Such an "intentional intrusion" into the privilege by the government "warrants careful scrutiny" and requires to the government to "demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." *United States v. Schwimmer*, 924 F.2d 443, 446-47 (2d Cir. 1991) ("*Schwimmer II*") (citing *Kastigar v. United States*, 406 U.S. 441, 461-62 (1972)). But the district court gave this intrusion no scrutiny at all. Indeed, the extent to which the prosecution was tainted by this constitutional violation is unknown, because the district court refused to hold a *Kastigar* hearing that would have revealed the facts necessary to determine an appropriate remedy. If the conviction is not reversed or

vacated, this Court should remand and order the district court to hold a *Kastigar* hearing.

### A. Background

#### *1. The Government Built Its Case Using Stolen Privileged Material*

The FBI began investigating OneTaste in 2018, but the investigation made little progress for years. A-1745 at ¶¶16-19. That changed in January 2021, when the FBI obtained a sensitive, privileged risk assessment memorandum ("PRA").

The PRA was prepared in 2017 by senior OneTaste managers, including Appellants, at the request of outside counsel Davis Goldberg & Galper, PLLC ("DGG"). A-94 at ¶¶13-14. The document was created to identify allegations and legal risks faced by the company and its senior executives. A-94 at ¶¶10-12, A-1743 at ¶6. Because of its sensitivity, the PRA was hand-delivered to outside counsel and was maintained on protected OneTaste servers accessible only to senior OneTaste managers. A-94-95 at ¶¶15-16.

On January 26, 2021, FBI agents acquired the PRA from a former OneTaste IT contractor, Mitch Aidelbaum, who had stolen the document along with an early outline. Aidelbaum told two agents he had a document he believed had "a lot of bad stuff [OneTaste] did over the years." A-1735 at ¶¶1-2. It was obvious Aidelbaum had no right to share the document, which was created after he left OneTaste and was no longer authorized to access its servers. A-1735 at ¶3, A-1744

at ¶¶10-13. Aidelbaum understood OneTaste did not know he possessed the PRA. A-1735 at ¶3. Both of the documents Aidelbaum provided had filenames containing the phrase "Attorney Client Privilege: Confidential and Privileged," and were marked as privileged. *See* A-106, A-1735 at ¶¶3-4, A-1826-27; Dkt.270 at 2.

Ten months later, in November 2021, the FBI received JPEG images of a PRA draft, which were also clearly marked as privileged, from Kara Cooper, a former OneTaste customer ("Images"). Dkt.97 at 2; A-1743 at ¶¶7-8, A-1749 at ¶12, A-1793-94. Cooper, like Aidelbaum, was not authorized to possess these materials. She obtained the Images from another person associated with OneTaste, who had received unauthorized copies from Aidelbaum. A-114-15 at ¶6, A-1743-44 at ¶¶7-9.

Pursuant to DOJ policy, the agents and prosecutors working on the investigation should have immediately quarantined all these materials for review by a designated filter team. *See* DOJ Manual 9-13.420(D)-(F). Here, however, no such protocol was used until May 2024, after the defense stumbled across the Images when reviewing discovery materials, as discussed below.

In the interim, the government evidently used the PRA to jump-start its dormant investigation. For example, six days after the FBI received the PRA in January 2021, an Eastern District of New York AUSA issued a grand jury subpoena to Aidelbaum for additional OneTaste documents. A-1736 at ¶6. One day earlier,

an FBI agent sent an email with "a bullet point list of information" based on material in the PRA. A-1827; Dkt.261 at 12. Although the government has never disclosed who received that email or how the information was later used, Jencks materials show the FBI likely used the PRA to identify and then interview witnesses it had not previously known about. The first person agents interviewed after they met Aidelbaum was identified on the first page of the PRA. And by the end of 2021, the FBI had contacted at least 20 people named in the PRA, none of whom it had previously interviewed. Dkt.261 at 12. Moreover, during many of these interviews, FBI agents asked witnesses about specific, non-public incidents discussed in the PRA. *Id.* at 12, 15-16.

#### 2. *The Government Concealed Its Misconduct And Misrepresented How It Handled The PRA And The Images*

The government hid its invasion of privilege and its violation of DOJ policy for years by burying the documents and misrepresenting the facts.

The first disclosure the government made relating to any of these documents was on September 18, 2023, when the Images were included among a mountain of other discovery. Its cover letter did not identify the Images as potentially privileged. Dkt.97 at 2. The Images were not text-searchable and were produced together with approximately 400,000 pages of documents. Dkt.113 at 6-7.

On April 20, 2024, in-house OneTaste counsel reviewing discovery to assist defense counsel realized the Images contained privileged material. A-1749-50 at

¶¶12-13. She immediately notified colleagues, who informed defense counsel, A-1750 at ¶14, and, four days later, OneTaste asserted privilege over the Images, Dkt.97 at 2. Only then did the government establish a taint team and restrict the prosecution team's access to the Images. Dkt.97 at 2. Yet even at this point, prosecutors still did not filter or disclose the versions of the PRA it had obtained from Aidelbaum. *See* A-106-07, 1827.

On June 5, 2024, Appellants filed a letter raising the prosecution's misuse of the privileged Images. Dkt.95. On August 1, 2024, Appellants moved to dismiss the indictment and for an evidentiary hearing to determine the "scope of the misconduct and resulting prejudice to the Defendants." Dkt.113 at 20-21. OneTaste separately sought return of the material, filing a Rule 41(g) petition in June 2024. A magistrate judge agreed the material should be returned. The district court reversed, and orally denied defendants' motion at a September 27, 2024 hearing.[8] A-97.

In opposing the June letter-motion, the government said nothing about the PRA obtained from Aidelbaum. Instead, the government represented it had first

---

[8] OneTaste's appeal of that ruling is being heard in tandem with this appeal. *See United States v. Cherwitz*, No. 26-943 (L), Dkt.25.1; *In Re: Petition of One Taste, Inc.*, 25-1721. Separately, Cherwitz and Daedone filed a mandamus petition seeking dismissal of the indictment or a *Kastigar* hearing, which this Court denied. That ruling, however, was premised on Appellants' failure to demonstrate the required "exceptional circumstances," *In Re: Rachel Cherwitz*, No. 25-553, Dkt.41.1, and has no bearing on the merits of their arguments here.

learned about the materials in November 2021 when it received the Images from Cooper. Dkt.97 at 2; A-1756. Appellants subsequently discovered this representation was false and submitted a declaration from Aidelbaum describing his January 2021 disclosure to the FBI. A-1735-36 at ¶¶1-4, A-1806-07. Confronted with this evidence, on September 20, 2024, the government finally admitted it had received the PRA itself from Aidelbaum nearly four years earlier, in January 2021. *See* A-1826-27.

The government made other significant misrepresentations in late 2024. For instance, it initially claimed the Aidelbaum PRA documents were "not sent to the United States Attorney's Office until they were provided to a member of the Privilege Review Team in September 2024." A-1827 at n.2. That wasn't true. As the government ultimately admitted, copies of the PRA had not been filtered and instead were "saved to the United States Attorney's Office's Cherwitz case file." A-106-07. The government did not say when the documents entered the case file, who accessed them before October 2024, or how prosecutors had used the information.

On January 24, 2025, armed with the government's new concession, Appellants again sought leave to move for a *Kastigar* hearing and dismissal based on the government's misconduct related to the PRA. Dkt.261 at 8, 13-16. On

February 26, 2025, the district court orally refused to allow Appellants to file their motion and rejected their renewed request for a *Kastigar* hearing. A-221-24.

### B. A *Kastigar* Hearing Is Required To Determine The Scope Of The Government's Misconduct

Due process precludes the government from obtaining a conviction when it "violates a [defendant's] protected right" and its conduct "reaches a demonstrable level of outrageousness." *Cuervelo*, 949 F.2d at 565. This Court recognizes the government has engaged in sufficiently outrageous conduct and violates due process if it intentionally and prejudicially invades a criminal defendant's privilege. *Schwimmer II*, 924 F.2d at 447; *accord United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996). There are strong indications the government did exactly that. And given its extensive exposure to privileged information, the government bears the burden to "demonstrate" after a hearing that its evidence was "derived from legitimate, independent sources." *Schwimmer II*, 924 F.2d at 446 (citing *Kastigar*). It must be put to its proof, just as it has been in other comparable cases.

In *Schwimmer*, for instance, this Court remanded for a *Kastigar* hearing where the government had accessed materials containing a pre-indictment privileged analysis prepared by a third-party accountant. There, as here, the defendant alleged the government used the privileged materials to identify and prepare witnesses and otherwise assemble its case. *United States v. Schwimmer*,

892 F.2d 237, 242 (2d Cir. 1989) (*Schwimmer I*). This Court remanded for an "evidentiary hearing to determine whether the government's case was in any respect derived from a violation of the attorney-client privilege in regard to confidential communications" and "a determination as to what use was made" of information deriving from those communications "and whether a substantial right of" the defendant "was affected." *Id*. at 245.

Following *Schwimmer I*, other district courts have often held hearings to evaluate claims of government privilege-invasion similar to those at issue here. *See, e.g.*, *United States v. Leech*, 24-cr-658 (S.D.N.Y.), Dkt.54 at 96 (defendant "asserted that the prosecution team accessed privileged documents" in a pre-indictment investigation and "the filter team process was defective"); *United States v. Landji*, 2021 WL 5402288, at *15-17, 28 (S.D.N.Y. Nov. 18, 2021) (government seized privileged material and made inaccurate representations concerning its possession and review of the materials), *aff'd sub nom. United States v. Gonzalez*, 144 F.4th 396 (2d Cir. 2025).

Courts likewise require hearings in other circumstances where the government invades the attorney-client relationship or other privacy rights. In *Voigt*, the Third Circuit held the lower court "should have conducted an evidentiary hearing" where the defendant's "moving papers raised enough of a specter of ethical impropriety" concerning the government's privilege intrusion "to warrant

closer scrutiny." 89 F.3d at 1067 (addressing government's use of defendant's attorney as informant). Similarly, in *United States v. Ginsberg*, this Court held that if the defense credibly alleges the prosecution invaded the Sixth Amendment right to counsel by using "evidence originated in [privileged] communications," a hearing is "require[d]." 758 F.2d 823, 833 (2d Cir. 1985); *see also Cuervelo*, 949 F.2d at 568 (allegations of a Fifth Amendment violation "required" "a remand to the district court for an evidentiary hearing").

Here too, the district court "should have conducted an evidentiary hearing" after Appellants showed the government obtained privileged materials and relied heavily upon those materials to develop its case. *Schwimmer I*, 892 F.2d at 245. Its refusal to do so was premised on multiple legal and factual errors.

*1. Appellants Diligently Pursued Their Privilege Claims*

The district court's primary rationale for denying Appellants' motions was that they were untimely because the deadline for pre-trial motions had passed. A-97; *see also* A-221-22. But it would have been impossible for Appellants to make their motions by that deadline, because the government concealed and misrepresented the necessary facts, which were not exposed until after the deadline had elapsed.

It is indisputable Appellants could not have made a motion as to the documents obtained from Aidelbaum by the January 2024 pretrial motion deadline

without a crystal ball. The government only disclosed it had those documents months later, in September and October 2024. A-106-07, A-1827. A motion that "a party could not have raised on time is not subject" to the deadline for pretrial motions. Fed. R. Crim. P. 12, Advisory Committee Notes to 2014 Amendment. The district court's finding of untimeliness violates the Rule and common sense.

As to the earlier motion, even if Appellants could have discovered the government's possession of the Cooper Images earlier, they did not learn the other critical facts supporting the motion about those Images until later. *Cf. United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (government cannot satisfy a disclosure obligation "merely by providing mountains of documents to defense counsel who were left unguided"). The government didn't reveal until the fall of 2024 that it had obtained the PRA itself, that it had used the PRA in its investigation, or that the PRA was in the prosecutors' case file. Thus, none of the primary factual disputes a *Kastigar* hearing could have resolved were evident from the government's production of the Images.

*2. The Materials Were Privileged*

The district court also ruled the materials were not actually privileged. That is clearly wrong. The attorney-client privilege protects communications "between client and counsel," "intended to be and [that are] in fact kept confidential," and "made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*,

473 F.3d 413, 419 (2d Cir. 2007). The PRA easily met these standards. It was prepared for counsel, at counsel's request, to facilitate the provision of legal advice regarding potential allegations against OneTaste and its senior executives. A-90 at ¶¶6-8, A-93-94 at ¶¶8-14. OneTaste treated the document as highly confidential: it was marked (and titled) "Attorney-Client Privilege," was never emailed, and was kept on protected servers accessible only to senior management. A-94 at ¶15.

In denying Appellants' first motion, which was based on the Images and filed before the government disclosed it had the PRA, the district court held that Appellants "failed to demonstrate that the Purportedly Privileged Document [i.e., the Images] is the document they assert was provided to DGG [OneTaste's outside counsel]." A-98. But even if the Images just showed a draft of the PRA, they would still be covered by the privilege, which extends to an "outline of what a client wishes to discuss with counsel" that is "subsequently discussed." *United States v. DeFonte*, 441 F.3d 92, 96 (2d Cir. 2006). Moreover, in its subsequent ruling, the district court didn't explain why the PRA obtained from Aidelbaum, indisputably the final document provided to counsel, would not be privileged. The court merely "incorporat[ed]" its September privilege holding without further explanation. A-224.

The court also held Appellants failed to "establish[] who authored and/or provided the document to DGG." A-99. This simply ignores unrebutted

declarations establishing the document was generated from a "collaborative effort" by OneTaste's "senior management," including both Appellants. A-94 at ¶14, A-1732 at ¶8.

*3. Daedone and Cherwitz Were Privilege-Holders*

The district court further erred in concluding Appellants lacked standing to assert the privilege. *See* A-99-100.

It is well-settled that "[t]he key…to whether an attorney/client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." *United States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1988). Appellants had the requisite intent and expectation of confidentiality here.

OneTaste engaged DGG to provide legal advice because of "increased negative (and false) commentary about OneTaste *and the senior executives of OneTaste, including Ms. Daedone and Ms. Cherwitz*." A-94 at ¶10 (emphasis added). Van Vleck, then OneTaste's CEO, "discussed with [Appellants] the nature of the engagement" and "that the engagement would be subject to attorney-client privilege and the requests for information by DGG to help it provide legal advice." A-94 at ¶13. The resulting memo addressed topics directly implicating Daedone's and Cherwitz's personal legal exposure. After the memo was created with their input, DGG "continued to advise OneTaste *and its executives including Ms. Daedone*." A-95 at ¶17 (emphasis added). In other words, it is clear that

Appellants intended to use the PRA to obtain confidential legal advice for themselves in their personal capacity.

#### 4. *Common-Interest Privilege Also Applies*

Appellants were also entitled to assert a common-interest privilege in the documents at issue. "Common interest" privilege "protect[s] the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken" by the parties. *Schwimmer I*, 892 F.2d at 243. It preserves "the free flow of information from client to attorney…whenever multiple clients share a common interest about a legal matter." *Id*. Thus, "when more than one person seeks consultation with an attorney on a matter of common interest, the parties and the attorney may reasonably presume that the parties are seeking representation of a common or joint matter." *In re Auclair*, 961 F.2d 65, 70 (5th Cir. 1992).

At minimum, Daedone and Cherwitz enjoyed common-interest privilege with OneTaste as to the PRA, which concerned allegations about both OneTaste *and* Appellants. A-94 at ¶10. Daedone and Cherwitz were told the document would be privileged, and it was the basis for DGG's advice both to them and the company. *See* A-94-95 at ¶¶13, 17.

***

The full extent of the government's reliance on and misuse of privileged materials remains unknown. The court never heard testimony from the agents who took the stolen PRA from Aidelbaum, never required the government to identify who accessed the privileged documents or what they did with them, and never required the government to prove an independent source for its evidence. If this Court does not reverse Appellants' convictions, it should vacate the judgment, remand the case, and direct the district court to hold a *Kastigar* hearing to uncover the full scope of the government's misconduct so an appropriate remedy may be determined.

## CONCLUSION

For the foregoing reasons, the Court should reverse Cherwitz and Daedone's convictions and direct the entry of a judgment of acquittal. If the Court does not reverse, it should vacate the convictions and order a retrial. At minimum, Daedone's forfeiture order should be vacated and the case remanded for a *Kastigar* hearing.

Dated: New York, New York
August 26, 2026

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Alice Buttrick
Christopher Johnson
William Taylor
SHAPIRO ARATO BACH LLP
1140 Ave. of the Americas, 17th Fl.
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
abuttrick@shapiroarato.com
cjohnson@shapiroarato.com
wtaylor@shapiroarato.com

*Attorneys for Defendants-Appellants*
*Rachel Cherwitz and Nicole Daedone*

# CERTIFICATE OF COMPLIANCE

1. The undersigned counsel of record for Defendants-Appellants Rachel Cherwitz and Nicole Daedone certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 19,570 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word, and is therefore in compliance with this Court's Order dated August 21, 2026, permitting Appellants to file a principal brief of up to 21,000 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font of Times New Roman.

Dated: August 26, 2026

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro