# 26-943-cr(L), 26-944-cr(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RACHEL CHERWITZ, NICOLE DAEDONE,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

**Volume II of VII (Pages A-289 to A-576)**

ALEXANDRA A.E. SHAPIRO
ALICE BUTTRICK
CHRISTOPHER JOHNSON
WILLIAM TAYLOR
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants*
*Rachel Cherwitz & Nicole Daedone*

**TABLE OF CONTENTS**


**Page**

District Court Docket Entries in *United States v. Cherwitz et al.*, No. 23-cr-146 (DG) (E.D.N.Y) ........ A-1

Indictment, filed April 3, 2023 (Dkt. 1) ........ A-77

Excerpts of May 3, 2024 Pre-Trial Conference Transcript ........ A-85

Declaration of Adam Goldberg, dated May 31, 2024 (Dkt. 287-2) ........ A-89

Declaration of Joanna Van Vleck, dated August 1, 2024 (Dkt. 287-1) ........ A-91

Excerpts of September 27, 2024 Pre-Trial Conference Transcript ........ A-96

Government Letter Supplementing Record, filed October 7, 2024 (Dkt. 163) ........ A-106

Excerpts of November 15, 2024 Pre-Trial Conference Transcript ........ A-108

Declaration of Paul Pelletier, dated December 20, 2024 (Dkt. 287-5) ........ A-113

Joint Requests to Charge, filed December 9, 2024 (Dkt. 223) ........ A-120

Joint Letter Supplementing Requests to Charge, filed April 16, 2025 (Dkt. 326) ........ A-192

Joint Letter Supplementing Requests to Charge, filed May 24, 2025 (Dkt. 389) ........ A-211

Excerpts of February 26, 2025 Pre-Trial Conference Transcript ........ A-220

Excerpts of Trial Transcript ........ A-225

**Government Exhibits**

GX56: Photo of Front of Reese Jones Townhouse........................................................ A-1389

GX57: Photo of Side of Reese Jones Townhouse........................................................ A-1390

GX58: Photo From Deck of Reese Jones Townhouse........................................................ A-1391

GX59: Photo From Deck of Reese Jones Townhouse........................................................ A-1392

GX60: Photo of Inside of Reese Jones Townhouse........................................................ A-1393

GX826: March 2011 OneTaste Organizational Chart ......................................... A-1394

GX853: Summary Chart of Nicole Daedone Reported Wages And Income Received from OneTaste .......................................................... A-1396

GX856: Summary Chart of Select Individuals Reported Wages Received from OneTaste ......... A-1397

GX862: Summary Chart of Rachel Cherwitz Reported Wages And Income Received from OneTaste .......................................................... A-1398

GX1013: September 21-23, 2008 Emails from Reese Jones And Bryan Franklin................ A-1399

GX1045R: September 27-28, 2011 Emails from Michelle Wright And Robert Kandell......... A-1403

GX3120: How to OM Manual........................... A-1407

GX3147: OneTaste Fear Inventory Manual ........ A-1420

GX3164: Plan to Fulfillment – OneTaste Curriculum Slideshow....................................... A-1422

GX3212R: July 10, 2008 Darshan Transcript ..... A-1429

GX3224: OneTaste Coach And Trainer Association Code of Conduct, Signed January 12, 2013 .......... A-1446

GX3234: OneTaste Coaching & OM Training Program Packet .......... A-1452

GX3500RW12: OM Residential Living Handbook .......... A-1465

GX3608: OneTaste Resignation of Nicole Daedone, Effective March 3, 2017 .......... A-1470

GX3743: Employment Agreement of Lianna Lifson .......... A-1471

GX3767: OneTaste – Rachel Cherwitz Separation Agreement And Release, Signed May 14, 2018 .......... A-1485

GX3768: Employment Agreement of Rebecca Halpern .......... A-1496

GX3772: Employment Agreement of Michelle Wright .......... A-1513

GX3875 (produced in native format): August 23-25, 2013 Video of OneTaste Coaching Program – Nicole Daedone Lecture .......... A-1521

GX3879 (produced in native format): February 21-24, 2013 Video of OneTaste Coaching Program – Beast Exercise .......... A-1522

GX4056: OneTaste Inc. Stock Purchase Agreement, Dated March 3, 2017 .......... A-1523

GX4513AR: July 10-12, 2015 Text Messages Between Michal Neria and Rachel Cherwitz .......... A-1579

GX4514AR: June 8-11, 2015 Text Messages Between Michal Neria And Rachel Cherwitz .......... A-1585

**Defense Exhibits**

DX1AB: OneTaste Code of Conduct, Dated February 20, 2014 ........ A-1589

DX1AN: October 2006 OneTaste Release of Liability Form ........ A-1597

DX1BG: 1080 Folsom Handbook ........ A-1600

DX1BS: October 2013 OneTaste Employee Handbook ........ A-1602

DX1X: OneTaste Coach Association Code of Conduct, Dated April 22, 2011 ........ A-1629

DX3AR: Photo of Michelle Wright And Others ........ A-1632

DX3AS: Photo of Michelle Wright And Audrey Wright ........ A-1633

DX3AZ: Photo of Michelle Wright ........ A-1634

DX3DU: Photo of Michelle Wright And Others ........ A-1635

DX3DW: Photo of Michelle Wright And Others ........ A-1636

DX3DY: Photo of Michelle Wright And Eric Swanson ........ A-1637

DX3EA: October 1, 2013 Chat Log Between Nicole Daedone And Michelle Wright ........ A-1638

DX3Z: Photo of Michelle Wright And Others ........ A-1639

DX4A4: Photo of Inside of Center ........ A-1640

DX9FD1 (produced in native format): Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend ........ A-1641

DX9FD1T: Transcript of Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend .................... A-1642

DX11EP (produced in native format): Video of Michal Neria and Misha Safyan...................... A-1643

DX11FS: 2013 Coaching Program Sales & Business Dev. Guide........................................... A-1644

DX11R: OneTaste Refund Policy And Release, Signed December 27, 2014 ................... A-1652

DX12AI: Photo of Anthia Gillick, Michelle Wright, And Aubrey Fuller................................. A-1657

DX12BY: OneTaste Coach And Trainer Association Code of Conduct And Release (September 2013) ............................................... A-1658

DX12Q: Photo of Rachel Cherwitz and Anthia Gillick ..................................................... A-1666

DX13BA: Photo of Margaret Pixley And Others ................................................................ A-1667

DX13K: Photo of Margaret Pixley...................... A-1668

DX20AE: OneTaste Release of Liability Form, Signed September 8, 2012 ........................ A-1669

DX20AW: Photo of Dana Gill, Lianna Lifson, And Others ............................................. A-1671

DX21AL: Photo of Rebecca Halpern And Chelsea Hunter .................................................. A-1672

DX21AM: Photo of Rebecca Halpern And Others ................................................................ A-1673

DX21AN: Photo of Rebecca Halpern And Others ................................................................ A-1674

DX171-1: Photo of Rebecca Halpern And Others ........ A-1675

DX21AP: Photo of Rebecca Halpern, Margaret Pixley, And Chelsea Hunter ........ A-1676

DX21AQ: Photo of Rebecca Halpern And Others ........ A-1677

DX21AS: Photo of Rebecca Halpern And Others ........ A-1678

DX21J: OneTaste Release of Liability Form, Signed September 8, 2012 ........ A-1679

DX21L: Rebecca Halpern Financial Agreement And Cancellation Policy re Coaching Program (January 2013) ........ A-1681

Memorandum And Order Denying Rule 29 Motion, dated August 11, 2025 (Dkt. 429) ........ A-1683

Letter Motion for Forfeiture of Property, filed December 10, 2025 (Dkt. 481) ........ A-1688

Order Granting Forfeiture Motion and Preliminary Order of Forfeiture, filed March 18, 2026 (Dkt. 504) ........ A-1699

Excerpts of Daedone Sentencing Transcript, dated March 30, 2026 ........ A-1710

Cherwitz Judgment, filed March 31, 2026 (Dkt. 523) ........ A-1714

Daedone Judgment, filed March 31, 2026 (Dkt. 521) ........ A-1721

Cherwitz Notice of Appeal, filed April 10, 2026 (Dkt. 528) ........ A-1728

Daedone Notice of Appeal, filed April 10, 2026 (Dkt. 529) ........ A-1729

**FILED UNDER SEAL**

Declaration of Joanna Van Vleck, dated June 1, 2024 (Dkt. 127-1) .......................... A-1730

Declaration of Mitchell Aidelbaum, dated July 31, 2024 (Dkt. 141-1) .......................... A-1734

Declaration of Kevin Williams, dated August 1, 2024 (Dkt. 113-3) ...................... A-1741

Declaration of Rachel Caine, dated August 1, 2024 (Dkt. 113-5) ...................... A-1747

Government Opposition to Defendants' Motion to Dismiss, filed August 15, 2024 (Dkt. 118) ...... A-1751

Filter Team Letter Supplementing Government Opposition to Motion to Dismiss, dated August 15, 2024 (Dkt. 127) ................................ A-1790

Defendants' Reply In Support of Motion to Dismiss, filed September 6, 2024 (Dkt. 141) ...... A-1798

Government Letter Supplementing Record, filed September 20, 2024 (Dkt. 154) .................. A-1825

FBI 302, filed September 20, 2024 (Dkt. 156-1) ............... A-1829

FBI Notes, filed September 20, 2024 (Dkt. 156-2) ............... A-1833

Q And then yesterday you talked about sort of expectation around appearance. Do you recall that testimony?
A Yes.
Q And so did you have to engage in personal care and grooming consistent with that?
A Yes. Absolutely.
Q And who would pay for that?
A I did.
Q And then yesterday you also testified about extensive text message chains that you were on in connection with your job?
A Uh-huh.
Q Did OneTaste provide you with a phone?
A No.
Q Did you provide yourself with a phone?
A Yes.
Q Okay. And did OneTaste pay your phone bill?
A No.
Q Did you pay it?
A I would -- my parents paid it at the time.
Q And then what about Bikram yoga? Who paid for your Bikram yoga, your daily Bikram yoga classes that you were attending?
A I am not a hundred percent sure on that. I feel like it's possible OneTaste paid for that, but I don't recall.

THE COURT: The last comment I will sustain the objection to.

Go ahead. Ask your next question.

Q Are you familiar with an individual named Beverly Daedone?

A Not really. No.

Q During the time you worked at OneTaste, what, if any, observations did you make about whether Ms. -- the defendant Nicole Daedone's mother had a job at the company?

A I was not aware of that.

Q Yesterday when --

MS. FARRELL: I'm trying to be mindful of Your Honor's admonition.

Q I asked you why you didn't leave.

A Uh-huh.

Q One of your response was you were scared to lose your friends; do you recall that?

A I do.

Q Why were you scared that leaving a job would cause you to lose friendships?

A Because this job was extremely different from a regular job in that a typical job, you know, you can, you know, oh, I got a different job at a different company, but, you know, I'll just -- like let's go out for coffee on Friday.

This was not that case where I knew that if I left,

that these -- that my friends would not be able to speak to me, and I would not be able to speak to them, in large part.
Q What is that judgment based on?
A I'd seen it happen to other people who had left before me, and they were, you know, talked about as --
MS. COHEN: Objection, Your Honor.
THE COURT: I will let her continue the answer.
MS. FARRELL: Thank you.
THE COURT: Overruled.
A They were talked about as though they were now the outsiders and the muggles, and the people who were not a part of the inside community, and talked about in a very negative light. And I'd seen people say, you know, like, well, don't talk to so and so because --
MS. COHEN: Objection, Your Honor.
MS. BONJEAN: I'm going to object to the -- no foundation.
THE COURT: She's just said she saw something. She's allowed to continue.
Overruled.
MS. BONJEAN: By whom?
THE COURT: You can -- excuse me, Ms. Bonjean.
You may continue.
Q Who did you observe giving directions don't talk to this person who's left OneTaste?

A Should I name specific names?
Q Yes.
A A person who comes to mind readily is Christina Berkley, who was a member of the OneTaste community and an employee of the company, as far as I know, prior to when I got there. And there was a lot of -- because she was also in New York and also still engaging in OM practice in her own way, there was a lot of tension there. And I heard from Rachel and others, you know, like she's a really bad influence. Do not engage with her. Do not talk to her. She's crazy. Like, absolutely not.
Q And so just to be clear, Christina Berkley was the person who was being shunned?
A Correct.
Q And who was the person directing her to be shunned?
A What I want to say is everyone, but, specifically, I mean, I know that I was told that by Rachel, and then also by other leadership in New York. So that was -- I remember being told by the leaders at the time at New York, Rafael and -- Rafael Martinez and Gina Lombardo, their message was sort of like --

MS. BONJEAN: Objection to the hearsay.

THE COURT: Go ahead, Ms. Farrell. Do you want to respond to the objection?

MS. FARRELL: It is not sort of a -- what those people said we're not offering for the truth of the matter,

but rather the fact that it was said.

THE COURT: Overruled. She may answer.

A When I was coming in as a volunteer, Gina and Rafael, who lead New York at the time, explained to me about this really tense relationship with Christina Berkley, and they warned me, like, don't tell anybody that, you know, if you go to an OM circle with Christina, like that's a big no-no in OneTaste. So don't let that get back to Rachel, don't let that get back to Nicole, don't let that get back to whoever other leaders were.

Q So circling back to you, how did all these discussions about Christina Berkley and others being muggles and shunned, how did that affect your decision whether or not you could leave OneTaste?

A It was abundantly clear to me that if I were to really leave, that I would not -- that that would be a very permanent decision and that I would not be welcomed back with open arms.

Q All right. Switching gears answer, you testified yesterday that sex was the outlet for everything.

What, if any, relation did that have on your sales job?

A There was discussion in sales meetings about sort of how much sexuality to use when you were selling to somebody, and there were mixed messages. So at some points, kind of earlier on, the messaging was like, yes, use your sexuality, be really

Q And at what point was it at its worst?
A Definitely around the time that we spoke of yesterday, with the virus and the demonstration.
Q And what was the sum of events that brought you to the place where you felt disconnected from reality?
A There was a very distinct turning point in my working relationship and my professional relationship with Rachel. Prior to that turning point, we were really friendly and had a really -- what I felt was an extremely close relationship and friendship, and I felt as though, you know, she liked me and I liked her, and even if there were difficulties, that would be okay. And then the turning point occurred when we were on a trip together in Miami.
Q So I think I'm asking a bit of a different question.
A Okay.
Q My question is, what is the sum total of experiences that you had that made you feel disconnected?
MS. COHEN: Objection, Your Honor. This has been asked and answered.
THE COURT: Overruled.
A The sum total of what had me feeling disconnected?
MS. COHEN: Yes.
A I -- on sum level, I knew somewhere in there that I had been, you know, carefully, gently brainwashed over time, and -- but even that little amount of knowing that wasn't

enough. Because I was fully in it and brainwashed. And so that's the disconnection from reality that I'm trying to describe. I didn't see the world as it really was anymore, I saw it through only through the lens of OneTaste.

MS. BONJEAN: Objection. I'm going to move to strike that answer based on our prior motions related to that terminology.

THE COURT: Overruled.

Q In what way did what you just described impact your provision of services and labor for OneTaste?

A Because I had this warped understanding of what was real and what was normal, I did things in my work that I would never do otherwise. You know, just -- even just having these sexual experiences as a part of my day-to-day work, like I didn't -- because it happened slowly over time. I didn't realize how kind of crazy that was. It just -- it kind of snuck up on me, and then it felt normalized.

MS. FARRELL: I would like to show the witness Government Exhibit 3501-20. And this is only for the witness, please.

THE COURT: You said 20?

MS. FARRELL: Yes.

Q Do you recognize this document?

A Yes.

Q And what is it?

THE COURT: Thank you. Is there cross-examination, Ms. Cohen?

MS. COHEN: Yes, your Honor, thank you.

THE COURT: Go ahead. I'll give you a minute to get set up.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good morning, Ms. Halpern.

A Good morning.

Q Yesterday and today you testified about a lot of events, I just want to make sure I understand the timing. I just want to do a brief overview of that with you if that's okay.

A Sure.

Q You testified you first went to OneTaste event I think you were living in San Francisco at the time, correct?

A Correct.

Q And that was in late 2010?

A I believe it was in that ballpark of 2010, 2011.

Q You went to what was called the Turn On event, right?

A Yes.

Q That was the foundation of everything, of what OneTaste was about, you learned about that at the event, correct?

A Yes.

Q And certainly you learned about OM at that point,

right?
A Yes.
Q And then you went to a few events after that, correct?
A Yes.
Q And then you left to, you said you stopped going to things at that point regarding OneTaste for about a year; is that right?
A Right.
Q And then you moved to New York in 2012?
A Right.
Q Early 2012 is that about, right?
A I think so.
Q You started to take OneTaste classes at that point, correct?
A Yes.
Q You also took a second OM class, I believe that was in New York?
A Yes.
Q In June 2012 you signed up for the coaching program, right?
A Uh-huh.
Q That was what we've been referring to as CP5. That just means, all these coaching programs, the one you're in is a number, right, but they are very similar?
A Correct.

Q And three months into that, in November of 2012, you decided you wanted to switch into the CP6 class, correct?
A Correct.
Q And then around that time, maybe, you talked about when you moved into the Morellino around that time; is that fair?
A Uh-huh.
Q Late 2012. Then the CP6 course started in February 2013?
A Right.
Q That continued for ten months, right?
A Uh-huh.
Q That brought us, that brings us to November 2013, right?
A Sure.
Q And you testified today that you started sales, I forgot to mention, sometime in August 2012 summer of 2012?
A I think June or July, yes.
Q But you also testified in October of 2013 you signed an employment agreement with OneTaste as a salary employee, right?
A Right.
Q Then in December of 2013 you moved back to San Francisco?
A Yes.
Q And then in February 2014 you testified that you left

OneTaste, correct?
A It was March, yes.
Q March, okay. That was after you were fired from OneTaste, correct?
A Yes.
Q Now I'm going to go back. I wanted to get that out so we have the time frame.
You grew up in Westchester; is that right?
A That's right.
Q As a kid you grew up in theater?
A Uh-huh.
Q You were in theater in high school?
A Yes.
Q Your family is fourth generation in the Broadway advertising business?
A Yes.
Q You're also a singer, right?
A Uh-huh.
THE COURT: If I can ask the witness, you're sort of saying uh-huh. But just say yes or no if it's a yes or no question.
THE WITNESS: Sure thing.
BY MS. COHEN:
Q I'll repeat that. You're also a singer, right?
A Yes.

Q And in fact, you've been a performer your whole life?
A On and off.
Q You're also a college graduate?
A That's right.
Q And you testified today you later got your Masters in social worker?
A That's right.
Q Before you went to OneTaste you were a yoga instructor?
A Yes.
Q You did both yoga and meditation?
A Right.
Q And you actually lived in and worked in a yoga community?
A I did.
Q That's sort of living with other people, correct?
A Yes.
Q In a similar way that people lived together at OneTaste, correct?
A Similar in someways.
Q You also said that you originally heard about OneTaste through a man you met on OK-Cupid?
A Yes.
Q That's a dating website, right?
A Yes.
Q You didn't know this person you met.

A Okay.
Q You is said you testified something in his profile that intrigued you about OneTaste, right?
A That's right.
Q You decided you wanted to try orgasmic meditation, correct?
A I don't know if I knew that term then, I don't recall exactly what it said in the profile.
Q Something intrigued you, you knew it wasn't regular meditation.
A Again, I don't know exactly that it was on the profile that intrigued me. It could have said meditation on it, but I'm not 100 percent sure.
Q Certainly you ended up going to this first class, correct?
A Yes.
Q Right away you knew it was orgasmic meditation, right?
A Yes.
Q In fact, you told the Government in previous meetings with them that you were instantly hooked, correct?
A That's right.
Q You were excited about it?
A I was.
Q You went on your own to this event?
A I went with that person that I met on OK-Cupid.

Q No one forced you to go, correct?
A No, they did not.
Q Then after you went there, you went back and signed up for an intro to OM course, correct?
A Yes.
Q Again, there was no confusion as to what was going on here. You actually signed up for the OM course where you then saw a demonstration; is that right?
A That's right.
Q You weren't surprised by the demonstration, correct?
A I was surprised by the demonstration, but I did have prior knowledge that it was going to be happening.
Q You knew what orgasmic meditation was at that point, right?
A I never seen it in-person, but I knew about the concept certainly.
Q But to do it, you knew there was a stroking of a women's genitals, correct?
A I did, yes.
Q You went to that event, correct?
A I did.
Q You received at that time an OM basic manual, which I think we looked at yesterday. Do you recall that?
A I do.
Q Can we bring that up, Government Exhibit 3120. This is

was happening with it.

(Video played.)

MS. COHEN: Sorry.

(Video stopped.)

MS. COHEN: Can you go back a little bit further? 24:20.

(Video played; video stopped.)

MS. COHEN: 24:10.

(Video played; video stopped.)

MS. COHEN: Okay. That's okay. We'll move on.

BY MS. COHEN:

Q Do you remember this demonstration, Ms. Halpern?

A Yes.

Q And during that demonstration, they were screaming at each other similar to what we saw yesterday, correct?

A Right.

MS. COHEN: Okay. Now if we could go forward to 27:16.

(Video played.)

MS. COHEN: Can we pause for one minute.

(Video stopped.)

Q What Rachel was just saying now, safe words, you know about that, right?

A I do.

Q And that, before any kind of exercise, that instruction

was provided, right?
A In the coaching program, yes.
Q And green means I'm all in, right?
A Right.
Q Yellow means I'm having some reservations, but I'm okay?
A Mm-hm. Yes.
Q And the reason for that, right, is because these exercises and the things that you did at OneTaste were meant to push your boundaries, right?
A Correct.
Q So, for example, if you're at the gym and you're working with a trainer, right, you want that trainer to push you, correct?
A Right.
Q And you're paying for that, right?
A Right.
Q In fact, sometimes you don't feel like continuing those exercises, but you do, correct?
A Right.
Q So this is a similar concept, right?
A Within the coaching program, yes.
Q If you are at the gym and not feeling well and you say stop, then, of course you stop, correct?
MS. FARRELL: Objection, Your Honor.
THE COURT: Overruled.

Q Or you're able to stop, right?
The trainer would, if you're saying I absolutely have to stop, you would expect your trainer to stop, correct?
A At the gym, sure. Yes.
Q And when you say red, that is what that means: Stop and don't do anything further. Correct?
A Correct.
MS. COHEN: Can you continue.
MS. FARRELL: I'm sorry, can I just have what that timestamp was? I missed it.
MS. COHEN: Oh, sure. That was starting at 27:16.
MS. FARRELL: Thank you.
(Video played.)
MS. COHEN: So we can pause at that point.
(Video stopped.)
Q So no one in the class said that they were red, correct?
A No.
I shook my hand like -- like, sort of.
Q That wasn't my question.
A Oh, excuse me.
Q Yeah.
No one said they were red, correct?
A Correct.
Q She said, "Is there anyone who is not a green?" And a couple of people raised their hands, correct?

program that had a -- I didn't count, but a lot of people were there at that program, correct?
A Correct.
Q And tons of people did not work for OneTaste in that group, right?
A True.
Q And, in fact, you may not -- do you remember everyone in that group?
A It's possible that I don't remember everybody.
Q And some of those people took that class and never took anything again, correct?
A That I don't know.
Q There were no requirements to work for OneTaste if you took a class, correct?
A Correct.
Q But it was important to find out what your desires were so that OneTaste could help you get them, correct?
Let me rephrase that. So the coaching program could get you there, correct?
A Yeah, that was -- that was the idea of the coaching program.
Q And in this desire contract, you had a desire that -- to be a walking clit and feel every stroke. You wrote that, right?
A I don't remember specifically, but that's probably --

yeah. I mean, sure.
Q You also wrote about how you like attention, correct?
A Again, I don't remember specifically but, that sounds possible, yeah.
Q You wrote how you could be manipulative, correct?
A I am not looking at any of this, so I don't know.
Q So you don't remember?
A No, I don't recall specifically.
MS. COHEN: Let me pull up, just for the witness, DX 21-AG.
Q Do you recognize this, Ms. Halpern?
A Yes, I do.
Q And if you go down to --
MS. COHEN: If you go down to the...
Keep going. Okay.
Q And in that first paragraph, does that refresh your recollection as to whether you said you could be both -- you could be manipulative, right?
A In No. 1?
Q Well, actually, let's start with the -- that you like attention, in No. 1.
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q Just take a look at the document and see if it refreshes your recollection as to whether you --

Q 4.

THE COURT: To yourself.

MS. COHEN: Yes.

THE WITNESS: Okay.

A Yes. Okay.

Q Does that refresh your recollection?

A Yes.

Q And you wanted to be a popular girl, correct?

A That's part of what it says.

Q And you wrote this, right?

A I did.

Q These are your words, correct?

A They are.

Q You also have told the Government in the past that everyone wants to be like Rachel, right?

A That everyone in OneTaste wanted to be like --

Q Like Rachel, right?

A Like Rachel, yeah.

Q Everyone wanted to be on sales, right?

A I mean, not technically. But, I mean, I wanted to be on sales, certainly.

Q And that's because sales had a higher status of community, right?

A That's how it felt to me.

Q And you cared about status, right?

A I did.
Q You cared about that from the very beginning, correct?
A I think so.
Q In fact, you have described your relationship with Rachel as a love-hate, right?
A Yes.
Q You described that at times you felt like her cub, correct?
A That's right.
Q And she called you her little cub, right?
A That's right.
Q And she was teaching you; isn't that right?
A That's right.
Q And when you first got there, you wanted to be taught, correct?
A I did.
Q You wanted to dress like her, right?
A Yeah.
Q And you also wanted to lead, correct?
A I did.
Q And you pushed yourself to be a leader, right?
A Yes.
Q And you and Rachel, is it fair to say, often butted heads, right?
A Yes.

would use the video to impeach her.

THE COURT: She hasn't said that she didn't say it or did say it. She doesn't remember and she's crediting what you are telling her. I am going to sustain an objection to that.

Next question.

Q Okay. So at some point, as we said, you wanted to change to be in CP6, correct?

A Yes.

Q And you wanted to be in CP6 so badly that you wrote to both Rachel -- you wrote about it to Rachel, right?

A Yes.

Q And to Amy Jones; is that right?

A I believe so, yes.

Q And who is Amy Jones?

A She was someone who lived in the San Francisco OM house and also managed the San Francisco OM house. Managed like the food and the rent and things there.

Q And you told her that you wanted to be in CP6, in all caps; do you remember that?

A Yes.

Q You were very excited?

A I was.

Q And you took a long time to think about this, didn't you?

A I believe so.

Q And, in fact, you had complained about the issues with CP5, right?
A Yes.
Q And you felt that if you didn't do CP6, you might regret it for the rest of your life, correct?
A I don't recall specifically saying that, but that sounds like how I felt at the time.
Q So that's how you felt, right? If you didn't do CP6, you would regret it, correct?
A That's how I felt at the time.
Q That's how you felt at the time.
And you loved, in fact -- not only did you love the coaching course, but you loved coaching, right?
A I did.
Q And coaching hours became your favorite time of the week, right?
A That's sounds true.
Q In fact, you said that you would do it all day if you could, right?
A Again, these are things that were from a long time ago that I don't specifically remember saying, but that seems like how I felt at the time.
Q And in addition to the desires contract, you also had to fill out an application for the coaching program, correct?
A Yes.

Q And in the application, it asked you why you wanted to coach others in OM and the OneTaste method, right? Do you recall that?
A Yes.
Q And you believed that sexuality is something that needs to be talked about, right?
A Yes.
Q You believed that OM is a practice that connects a human being in a way that is different from anything else you had experienced, right?
A Same thing. I don't remember specifically writing or saying that, but that is probably close to how I felt at the time.
Q In fact, you said you had grown so much through OM and the OneTaste method that you wanted to share what you learned so far and allow others the same privilege, right?
A I don't know what you are reading from.
Q You don't remember writing those words?
A I don't.
MS. COHEN: Okay. Let me show Defense Exhibit 21-N, just to the witness. Page 10.
THE COURT: I'm sorry, I don't think I have N.
MS. COHEN: "N" as in Nancy.
THE COURT: Yes, I heard you, I just don't think I have it.

MS. FARRELL: I don't think I have it either.

THE COURT: Does the government have it?

MS. FARRELL: I don't see it in this pile, Your Honor.

THE COURT: All right. While you are getting that, go on to the next topic.

MS. FARRELL: Your Honor, I would just have a standing objection to when the witness answers "I don't know," there's a proper procedure --

THE COURT: Correct.

MS. FARRELL: -- to refresh.

THE COURT: But it requires a document, and none of us have it right now. So we are going to wait for the document, and she will go through the procedure.

Next question.

Q And in addition to -- you posted often about how much you loved the coaching program, correct?

MS. COHEN: Sorry, Your Honor. I might have had the wrong --

THE COURT: Maybe your team can help you. I think Mr. Robotti is trying. If you need a minute, that's fine.

MS. COHEN: That's fine.

THE COURT: Go ahead.

Q You posted often about how you loved coaching, correct?

A Yes.

Q And you posted about -- you wanted to live in this place, right?
A Yes.
Q And you wanted to live life feeling this beautifully worked, stretched full of love, and electric and orgasmic, right?
A Again, I don't know. I don't specifically remember that post.
Q But you don't dispute that you posted about how much you loved it?
A I posted in general, yes.
Q About how much you loved the coaching program, correct?
A I did love the coaching program.
Q You also loved to sing, right? You said you were a singer?
A That's right.
Q And you sang sometimes at OneTaste, right?
A A little bit.
Q And you wanted to be famous, you said, so that you could tell the entire world about OM, right?
A I don't specifically remember saying that, but that -- I mean --
Q Are you testifying you didn't say that, or you don't remember?
A I don't remember.

MS. COHEN: Sorry. There's some exhibits that might be missing. I hope you have this one. DX 21-U, just for the witness.

THE COURT: I do.

Does the government have it?

MS. FARRELL: Yes.

Q And when you are done reading, you can just look up.

A Can you make it a little bigger?

Q Sorry. Just the top part.

A Okay. I've got it. Can you repeat your question?

Q Sure.

Does that refresh your recollection as to whether you wanted to be famous so that you could tell the entire world about OM?

A That's not what this says.

THE COURT: The question is, does looking at what Ms. Cohen has handed you refresh your recollection about the question she asked you, not -- she's not asking you about what this document says.

THE WITNESS: Okay.

Q Just about what you were feeling at the time.

A I don't remember wanting to be famous, in particular. I don't -- I did want to sort of shout from the rooftops about OM. I was very excited.

Q In fact, you wanted to be a famous pop star, right?

A I don't remember feeling that way, and that's also not what this says.
Q If you were a famous pop star, you would use that vehicle to shout from the rooftops about OM, correct?
MS. FARRELL: Objection, Your Honor.
THE COURT: Basis? Is it a time frame basis or something else?
MS. FARRELL: Form of the question and also the timing.
THE COURT: All right. I am going to sustain it to the form of the question, but you may ask about this topic.
Q In April of 2013, while you were in CP6 -- that was when you were in CP6, right?
A Yes.
Q And during that time, you posted about how much you loved it, right?
A I did.
Q And you posted about you were walking down the street singing, right?
A Yes.
Q And you got a flash, that if you became a famous pop singer, you would tell the entire world about OM, right?
A Yes. That's -- yes. That's close.
MS. COHEN: You can take that down.
Q And you thought that the courses at OneTaste made you a

better person, right?
A I really felt that way, yes.
Q In fact, it made you feel -- you began to live unconcealed? You said that, right?
A Yeah. That was common in the parlance of the time, yes.
Q And, in fact, you posted that, right?
A Again, I don't specifically recall these Facebook posts, but it characterizes how -- I did feel that way at the time.
Q And the other thing that it did is instead of molding yourself around other people, you expose yourself and don't worry if they like you? That's something you said as well, right?
A I don't specifically recall saying that, but it is the same answer to all of these.
Q That's how you felt, right?
A Can you repeat it?
Q Instead of molding yourself around other people, you expose yourself and don't worry if they like you?
A That sounds -- yeah. I assume I felt that way. Yeah.
Q Those are things that you were learning from the coaching program, correct?
A I would say so.
Q Now, you testified that you moved into the Morellino house, right?
A Right.

Q Vulnerability, being vulnerable, was another very important thing at OneTaste, correct?
A Yes.
Q And you don't get to check out from the house for a week without telling your house manager and housemates what is going on, right?
A That is what it says.
Q And that's because the point of the OM house was to stay connected, right?
A That was one of -- yeah. Yes.
Q And when you went to move in there, you knew that everyone shared a room, right?
A I did.
Q Even Rachel Cherwitz shared a room, correct?
A Correct.
Q And, in fact, you knew going in that people shared beds as well?
A I did.
Q And you chose to do that, right?
A Yes, I did.
Q In fact, you could have had your own bed at your own apartment, right?
A Absolutely.
Q And staying connected, the rules go on to say, means that even in the face of the most uncomfortable realization, you

right?
A Yes.
Q And you felt that while you were -- that's, again, why you did OMing, correct, one of the reasons?
A Correct.
Q And, in fact, as it says here, we recommend Bikram. And that's yoga, right?
A Correct.
Q And the reason they recommend Bikram is because you sweat out all of the impurities you build up, right?
A That's what it says.
Q And the OM house rules include that because the purpose of moving in here and to getting deeper in this practice is helping you establish your goals, right?
A Yes.
Q Because that's what you signed up for, right?
A Yes.
Q Okay.
MS. COHEN: If we can go to the next page, to fear inventory.
BY MS. COHEN:
Q Before we look at this, you testified yesterday about fear inventory and how it came from Alcohol Anonymous? Do you remember that?
A Yes.

Q And that was a part of the food plan at the house, right?
A It was.
Q But you could also go outside and get whatever you wanted to eat, if you did, correct?
A If we had money, we could.
Q And you -- again, part of OneTaste, the orgasmic meditation, the yoga, as we just talked about, was keeping healthy and achieving your goals, correct?
A Yes.
Q And you said that if you had money, you just said.
Now, as I said before, your parents, your father was Broadway advertising, right, is his --
A At the time.
Q And you lived in Westchester, correct?
A Correct.
Q It's an affluent area, correct?
A It is.
Q And your parents actually paid for your cell phone, correct?
A They did at the time.
Q And you told your parents about OneTaste, correct?
A I did.
Q And you, in fact, in visiting them one time, you told your dad about it, right?
A I did.

Q And he didn't -- he wanted sort of on a need to know basis; is that fair too say?
A No, not exactly. It was -- I don't know where you are going. Go on.
THE COURT: Next question.
MS. COHEN: Sure.
BY MS. COHEN:
Q Do you remember posting about your visit with your father?
A I don't remember that.
Q Do you remember that your father -- you provided -- your father wanted to know how your weekend at OneTaste was; do you remember that?
A I remember many conversations with my father. I don't remember that specific.
Q Do you remember posting about it to the OneTaste community?
A That seems entirely possible. I don't remember that detail.
Q Okay. Just showing you for -- just to the witness --
A Thank you.
Q -- DX 21-Z.
If you could just take a look at this, Ms. Halpern, and let me know if it refreshes your recollection.
THE COURT: Can you read that well enough? It is a

bit blurry.

THE WITNESS: Yeah, it is. Okay. Thank you.

MS. COHEN: I can provide copies, if you need it.

THE COURT: What's the question?

MS. COHEN: Does she remember talking to her dad about OneTaste.

A I do remember talking to him.

(Continued on the next page.)

BY MS. COHEN:
Q Do you remember that you told him that you were happy?
A At that time, yes.
Q You also told your mom about it, right?
A I did.
Q You told her more details than your father, correct? Just if you remember, if you need it --
A It seems so.
Q And back in 2013, February of 2013, you had already testified, this is when you started the coaching program, right?
A Yes.
Q And when you told your parents about your feelings about OneTaste you were in-person, correct?
A We had many conversations over a longer period of time.
Q Because you visited them, right?
A I did.
Q You could call them anytime, right?
A Around this time, absolutely.
Q In fact, your parents were paying for your cellphone, right?
A They were.
Q You could text with them, correct?
A I could.
Q In fact, when you filled out your employment

application you had to list their address and phone number, correct?
A That sounds possible. It listed their address as my own or?
Q As an emergency contact.
A Oh, sure, that sounds possible, sure.
Q You did that, right?
A That's a detail I don't specifically remember, but I feel like I would put them as my emergency, yes.
Q I'll show you just for the witness DX 21-E. If you could zoom into the --
A Yes.
Q Does that refresh your recollection as to whether you supplied their information to notify them in case of emergency?
A Yes, I did. Thank you.
Q In fact, after -- when you left OneTaste in February of 2014, you went to live with your parents, right?
A I did.
Q Now, you testified on direct examination this morning that you also volunteered, correct?
A Correct.
Q And by volunteered, that means you wanted to do the work, correct?
A Yes.

Q And in fact, you sent an email about the kind of work that you wanted to do to people who could give you the work, correct?
A I don't know what email that would be.
Q Do you recall sending emails about the type of work you wanted to do?
A It's just a little too general for me to know exactly.
Q Do you recall -- you actually requested to work back of house, right?
A Emailing somebody who worked at OneTaste to ask?
Q Just at any point. You volunteered to be back of house, right?
A I think so.
Q You volunteered to do welcome emails, right?
A I think so.
Q You want to do sales, you volunteered at the beginning, right?
A I'm not sure, but that seems possible.
Q In fact, you also wanted to send a newsletter, right?
A That's not something I particularly recall, but sure.
Q Showing you what has been marked as Defense Exhibit 21-AE, just for the witness. If you can zoom in on that.
And Ms. Halpern, when you've had a chance to review it, let me know.
A Okay.

Q Does this refresh your recollection that you wanted to send the newsletter?
A It does, thank you.
Q You also talked about on direct examination your schedule. Do you remember that testimony?
A Yes.
Q You said that it was grueling hours, correct?
A Yes.
Q Once again, you chose to work at OneTaste, right?
A I did.
Q You talked about having to wake up early, right?
A Yes.
Q And that's around 7:00 a.m.?
A Roughly, yes.
Q And you had to OM in the morning, right?
A That's right.
Q And in addition to OMing, you would do your fear inventory, right?
A Yes.
Q And the morning obligations also included meditation, right?
A Yes.
Q And it also included sharing your fears with other people, correct?
A Sharing your fear inventory?

Q Fear inventory, correct.
A Correct.
Q And then ripping it up, correct?
A Yes.
Q These were a part of your schedule required, right?
A Yes. I mean, some of them were sort of more or less enforced or more important than others, but yes.
Q Because it was, again, the goals that we read about in the OM house handbook, the goals to get more connected, correct?
A Right.
Q To overcome your fears or concerns within you that are preventing you from being empowered, correct?
A Yes.
Q So again, this is what you were signing up for, correct?
A It was.
Q And then part of this day was there going to Bikram, right?
A Yes.
Q Because in order for OneTaste to achieve the goals that you wanted to go in, this is what OneTaste thought -- excuse me, withdrawn. This is what OneTaste advised would bring you to those goals, correct?
A Yes.

Q You were working when you first were -- you first signed up for the CP5 in the summer of 2012, you were working for your father at that time, correct?
A Yes.
Q And you worked in the family business, right?
A I did.
Q And you were the advertising account manager, correct?
A Yes.
Q And you made more money than you could make at OneTaste, right?
A That's right.
Q But you hated that job, right?
A Hate is a strong word. I was bored by it. It wasn't my thing.
Q Well, you -- one second.
A I believe that I at one time said I hated it, that's fine.
Q When you joined CP5, your father actually fired you, right?
A He was very mad.
Q And then he hired you back, right?
A Maybe. I'm a little fuzzy on that timeline, I'm not sure.
Q You don't remember describing it as one of the most painful experiences with another person?

A No, that I remember. I remember the fight we had, certainly.
Q In the summer of 2012?
A Yes.
Q But then you continued to work for him, right?
A I didn't think so, but maybe.
Q Showing you just for the witness what has been marked for identification as Defense Exhibit 21-V.
Ms. Halpern, when you've had time, just look up. This is to refresh your recollection to the fact that your father rehired you back.
A No, it does not. Is there more underneath? Okay.
Q Does that refresh your recollection?
A Yes, it does. Thank you.
Q So your father hired you back, right?
A Seems so.
Q You can take that down.
You would describe your father as hyper-volatile, right?
A I did describe him that way.
Q That job made you feel frightened and trapped, correct?
A That's how I felt at the time.
Q You also, I think you said this before, you felt that it was boring, right?
A I did.

Q And thankless, right?
A Uh-huh.
Q You know this is a case about forced labor, right?
A Yes.
Q You're aware of that, right?
A Yes.
Q And you're testifying for the Government because you claim you're a victim of forced labor, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. COHEN:
Q Forced labor is a situation where you can't leave, correct?
MS. FARRELL: Objection.
THE COURT: Sustained.
The jury will take the legal instructions from the court.
Next question.
BY MS. COHEN:
Q When you left the job with your father -- you eventually left the job, correct.
A I did.
Q And that was about May of 2013; is that correct?
A Sure.
Q When you left that job, your father berated you again,

right?
A Yes.
Q He called you a fool, right?
A Sounds right.
Q He told you he wasn't going to pay for your phone any more, right?
A Sounds right.
Q He tried to force you to stay with him, correct?
A I think he was more just upset that I was leaving.
Q You left any way, correct?
A I did.
Q You know how to do that, right?
A I do.
Q You, in fact, are a person who has options, correct?
A I do.
Q When you didn't like working for your father you left, correct?
A I did.
Q When did you didn't want to work in New York any more you went to San Francisco, right?
A I had to ask for permission for that.
Q You had to ask for permission to move to a different office in San Francisco, right?
A Yes.
Q And that was granted, right?

MS. FARRELL: May we -- given that timing issue and the likelihood that the witness will need to stay here another night, we need to speak to her about that logistical issues.

THE COURT: Okay. Five minutes everybody. We're adjourned.

(Brief recess.)

THE COURT: Everyone may be seated.

The Government can get the witness. And Mr. D'Agostino can get the jury.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated.

We'll resume with the witness.

CROSS-EXAMINATION

BY MS. COHEN:

Q You testified that you could leave but didn't -- you were afraid of losing your friends. Do you recall that?
A I do.
Q In fact, there had been other people at OneTaste that were there and left and came back, right?
A Yes.
Q And you also testified about, we talked before about healthy eating, right?
A We did.

OneTaste with people, right?
A Yes.
Q The friendships. And you had a lot of friendships, right?
A Yes.
Q And you had fun with these people, correct?
A Absolutely.
Q Showing you for identification what has been marked as Defense Exhibit 21-AP, just to the witness -- this one can you redact except for the top?
Ms. Halpern, do you recognize this photograph?
A Yes.
Q And what is this?
A It's a picture with myself and two friends.
Q You recognize yourself. Do you recognize the other two friends?
A I do.
Q And who are they?
A Chelsea Hunter and Margaret Pixley.
Q Is this a photograph that you posted?
A Yes.
Q And was that posted in July of 2013?
A That's what it says here.
Q Is this a fair and accurate depiction of the photo that you posted on that date?

A Yes.

MS. COHEN: Your Honor, at this time we would offer -- Government Exhibit -- Defense Exhibit 21-AP.

THE COURT: Just the photograph?

MS. COHEN: And the top part, as that was from this witness.

MS. FARRELL: That's fine. We don't object.

THE COURT: Government Exhibit 21-AP is admitted as redacted, so it will only include the photograph and the first blurb on the top.

MS. COHEN: Thank you, your Honor.

BY MS. COHEN:

Q This was the photograph we were just discussing?

A Yes.

Q These are Chelsea Hunter and Max Pixley, these are your good friends, right?

A I was -- they were both my roommates at the Morellino.

Q You seemed to hesitate there. They were your good friends?

A I was definitely good friends with Chelsea Hunter. I was a little bit less with -- I'm assuming they go by Max now, with Max Pixley.

THE COURT: Let me stop you. I misspoke.

Defense Exhibit 21-AP is admitted as redacted.

(Defense Exhibit 21-AP, was received in evidence.)

BY MS. COHEN:

Q Sorry, Maxine Pixley at the time. You had said Maxine, sorry.

MS. FARRELL: Objection.

A They changed their name since I knew them. I knew that person as Margaret Pixley.

Q Margaret, I'm sorry. You're right.

That's the person you remember as Margaret Pixley?

A Correct.

Q And you said you were friendly, she lived in the Morellino?

A That's right.

Q You would describe your relationship with Chelsea as closer than Margaret?

A Yes.

Q You called her Pixley, everyone called her Pixley?

A Or Pix.

Q And do you remember the purpose of this post?

A It just says: Intentional polka dots synchronicity. We were all just wearing polka dots.

Q Right, you all showed up in polka dots.

A Correct.

Q And you posted this, correct?

A Yes.

Q You were all in CP6 at the time?

A Correct.
Q I'm also going to show you what has been marked for identification only, Government Exhibit --
THE COURT: Defense.
Q Defense Exhibit AL. If you can just redact the bottom, where the thumbs up is and downwards.
THE COURT: There are two thumbs up. You mean the blue one?
MS. COHEN: Yes, just the blue one.
BY MS. COHEN:
Q Do you recognize this photo, Ms. Halpern?
A Yes.
Q What is this photo?
A It's a photo of myself and Chelsea Hunter.
Q Did you post this photo?
A Yes.
Q Does this fairly and accurately depict the photo that you posted?
A Yes.
Q That was in July of 2013?
A Yes.
MS. COHEN: Your Honor, I would also offer Defense Exhibit 21-AL.
MS. FARRELL: No objection.
THE COURT: As --

MS. COHEN: No, just the still.

THE COURT: I think you're going to want to give it a different name then. Maybe AO-1 and maybe stamp --

MS. COHEN: And stamp it separately.

THE COURT: So 21-AO-1 is admitted -- and no objection from the Government?

(Defense Exhibit 21-AO-1, was received in evidence.)

MS. FARRELL: No objection.

MS. COHEN: For the purposes of today, even though it will be remarked, I'll ask that the still be published to the jury.

THE COURT: Yes.

MS. COHEN: Okay.

BY MS. COHEN:

Q Fair to say you're laying down in this photograph together?

A It looks like it.

Q And Ruwan is the one that you claim Rachel told you to go have a make out with, correct?

A Correct.

Q And your testimony was that you had never been with Ruwan before, correct?

A I don't think so.

Q Now, it's fair to say the Morellino and other places at

OneTaste, hooking up or making out with people was part of a regular day life, correct?
A It was.
Q And in fact, it was -- beyond the OM practice, sort of the point was exploring sexuality as well, correct?
A It was part of the point, sure.
Q In fact, these homes like the Morellino, essentially people were fairly young who lived there, correct?
A It was a wide range of ages. We were certainly all young.
Q A lot of the people we looked at today were also young?
A Yes. Again, there was a wide range of people who participated.
Q In the Morellino, it's fair to say there were people in their 20s, correct?
A Yes.
Q And people in their 30s?
A Yes.
Q And all living together, correct?
A Correct.
Q And you testified I think on direct, there were about 12 to 15 maybe people living there?
A Yes.
Q All of those people were around those ages, correct?
A I believe -- yes.

Q At the time that you claim Ms. Cherwitz told you to make out with Ruwan, and you Ruwan had been arguing, correct?
A I don't recall.
Q You don't recall that you had been bickering with Ruwan for a little bit at that point?
A No.
Q And you testified yesterday, in fact, that when people were upset and not working things out, that was a way to release, was to go make out with someone, for example?
A Yes.
Q And in fact, you told people to have sex, correct?
A I'm not sure.
Q You told Rob Kandell that you told two people to have sex, correct?
A I'm really not sure.
Q Showing you just for identification, for the witness only, Defense Exhibit 21-F, as in Frank.
THE COURT: I don't have that either.
MS. FARRELL: I don't have that.
THE COURT: We don't have it.
MS. COHEN: We'll sort these out tomorrow.
THE COURT: I can see it on the screen. 21-F?
MS. COHEN: Yes.
BY MS. COHEN:

Q Ms. Halpern, when you've had a chance, does that refresh your recollection that you told two people to go and fuck?

A I don't specifically remember sending this email, but it seems, it seems like a real email for sure.

Q And the reason you told these two people to have sex was because -- you can take it down -- because you felt the energy being sucked out of the room by their tumescence?

A That's what it said.

Q And by tumescence, that's sort of the stuff going on inside, the negative energy, correct?

A It could mean negative energy. It could mean pent-up sexual energy. It had a broad definition.

Q And so because you felt that, you told them to go have sex, correct?

A That's what it said there. I don't recall sending that, but sure.

Q While they were having sex, you made two sales, right?

A That's what it said.

Q Despite telling these two people to go have sex -- withdrawn.

That was in December of 2013, correct?

A I don't know.

Q Let me pull that back up to see if that refreshes your recollection.

Q And that was correct, right?
A Yes.
Q In fact, you also wrote a message to Rachel in that, correct?
A I did.
Q Right?
And you said that there were so many moments, right?
Again, I'm just asking if you remember this.
A I haven't read that part.
Q If you need it, we'll -- you could go back to the first, the -- sorry, the last --
A I got it here. It's okay. Thank you.
Q Second to last.
A Okay.
Q Okay. And you told her -- you talked about how there were a lot of memories, moments between the two of you, right?
A Yes.
Q And you described all the hugs, right?
A Yes.
Q All the cries, right?
A Yes.
Q All the spats?
A Right.
Q Right?
And as you testified before, you did -- you had a

lot of spats with her, right?
A For sure.
Q All the ridiculous jokes, right?
A Yes.
Q And you told her that it was a welcomed challenge and a deep privilege caring for her, right?
Take your time.
A Yes, it was.
Q And you said "you're my family," right?
A That's how I felt.
Q And when you went to San Francisco in December of 2013, you were welcomed with open arms, right?
A Yes.
Q In fact, the people in San Francisco worked to surprise you, right?
A I'm not remembering that right now.
Q Do you remember that they got you your favorite foods?
Do you remember that?
A I don't exactly remember that, but that sounds nice.
Q They got you -- they had your favorite songs ready when you came.
Do you remember that?
A I don't, actually.
Q Do you remember that they were -- they had your favorite scents?

BY MS. COHEN:
Q Do you remember making that video?
A Yeah.
Q And, in fact, that video was something that you and your friends came up with on your own, right?
A I'm not sure, but yeah, probably.
Q And it was something you were posting about, right?
A Right.
Q And you were hoping to get people to come to the TurnON event, correct?
A Yeah. Exactly.
Q And that's because posting about fun things and women in nice dresses could potentially bring people in, right?
A Right. That's the idea.
Q You talked about, on direct examination, that OneTaste, that it put you -- it depleted all your funds, is what I think -- I'm not quoting you exactly, but --
A Sure.
Q What you were trying to say, you didn't have money when you left, right?
A Right.
Q When you decided to take these courses, you thought a lot about it, right? I think we already established that.
A Right.
Q And you thought about how you were going to pay for these

courses, right?
A Right.
Q And, in fact, as you said, you thought about it so much that you canceled the CP5, tried to cancel it at first or worked it out, correct?
A Right. And then moved to CP6.
Q And you went to CP6?
A Right.
Q And in CP6, in fact, you said you decided to pay for it with your own money, right?
A Yeah, through the -- through my salary.
Q Because you didn't want to be in debt, right?
A Right.
Q And, in fact, you told individuals at OneTaste that you looked at your income and saw places that you could shave it off, right?
A Um, I don't remember saying that, but that sounds right.
Q Okay. I'll come back to that.
And as I think we established, but just at the time that you were looking at it and trying to shave off, you were still working for your father's company at that point, right?
A Um...
Q That was in October/November of 2013? I'm sorry, 2012?
A Again, I don't specifically recall this exchange or post or whatever, but around that time period I was figuring out

how to pay for the coaching program.
Q Right.
And you were still working with your father, correct?
A I think so.
Q Yeah, because we -- in fact, we looked at the post -- sorry.
We -- I refreshed your recollection from a -- I believe it was March 2013 earlier -- we could pull it back up -- in which you talked about how you didn't like your job, right?
A Okay. Yeah, sure.
Q Now, we've seen a lot today about that you were posting, correct?
A Yes.
Q And you said, you know, you wanted to tell the world about OneTaste, you weren't hiding, right?
A That's right.
Q No one was, right?
A Um...
Q I shouldn't say that.
There was nothing in the dark that was hidden. It was very much -- people posted all the time?
A Yeah, a lot, a lot of...
MS. FARRELL: Sorry. I was objecting.

THE COURT: Oh, I'm sorry. I didn't hear you.

MS. FARRELL: No, no, it's okay. We interrupted each other.

Objection to the form of the question.

THE COURT: Okay.

MS. FARRELL: You don't have the real time?

THE COURT: No, but it's fine. I heard you.

Overruled.

Q You're aware that other people posted, correct?
A Sure. Absolutely.
Q In fact, they posted pictures of you, right?
A Yeah.
Q And they posted pictures from events at OneTaste, right?
A Yeah, of course.
Q And you also posted on -- there was an OM hub, right?
A Yes.
Q And you would post on there as well?
A Yes.
Q And that was for the OM community to see, only for the OM community, right?
A Correct.
Q And you would post your feelings on there, right?
A Yes.
Q And how you felt in a particular time --
A Yes.

Q -- that you were posting, right?
A Sure.
Q It could have been related to an OM, correct?
A Sure.
Q Or could have just been generally how you were feeling, right?
A Right.
Q In fact, in August of 2013, you posted about why you chose to be at OneTaste, right?
A I don't specifically recall. But I posted all the time about OneTaste, yes.
Q Well, you talked about -- you said you choose to be here because you want to change and grow.
Do you remember that?
A Not specifically, but sure.
Q You've also said that you chose to be there because your decisions were your own and no one else's, right?
A Again, I don't remember this specific -- like, this particular thing that you're looking at.
Q Well, do you remember stating that?
A Not exact -- no.
Q So let me just show you to refresh your recollection.
A Thank you.
MS. COHEN: I'm showing you what has been marked as Defense Exhibit, for identification, 21-AT, just to the

witness. T, as in Tom.

Your Honor, let me know if you don't have it.

THE COURT: I do have it. Thank you.

MS. COHEN: If you could just zoom in on the first post.

Q Let me know when you've actually had time to review it.

A Yes. It's an unusual format for a post.

Q Does it refresh your recollection though, even though the format may be different, of writing -- of saying these words?

A It's the same thing where I don't specifically recall posting this, but it looks true.

Q Do you have any reason to think that this -- that you didn't make those statements?

A No, I -- I don't think so.

MS. COHEN: You can take it down.

Q And that's because you did choose to be at OneTaste, because you wanted to change and grow, right?

A Absolutely.

Q And your decisions to do that were your own, right?

A To stay?

Q Yes.

A Um... Hm, I think that's a complex answer. I think it's a combination of really truly wanting to be there and also not knowing how else to be at that point, not knowing what could be next.

Q I'm just asking not to rationalize.

I'm just asking, you said at the time, in August 2013, that you chose to be here, meaning OneTaste, because you knew -- because -- sorry.

You chose to be here because your decisions were your own and no one else's. Those were your words, right?

A Again, I don't recall specifically saying that, but that seems like something I posted.

Q And you also chose to be at OneTaste because you wanted to know what true power felt like. That's another one of your reasons, right?

A Yeah.

Q And you also chose to be there because you wanted to be an adult, correct?

A Yes.

Q And you, in fact, admitted that you are responsible for what happens in your life, right?

A In this post?

Q You've said that, correct?

A I don't -- same thing. Like, I don't specifically recall saying that, but that seems like something I could say.

MS. COHEN: Okay. Well, we can bring this up. Defense Exhibit 21-AT.

And just zoom in so the witness can see it.

A I'm sorry, can you repeat the question?

Q Yeah. I was saying, you've said that -- sorry, I lost my place.

You said that you wanted to be responsible, I said, for what happens in your life.

A That's what it says here.

Q And you have no reason to -- these are your words, correct?

A Again, I don't really remember posting this, but I have no reason to believe that it was something else.

MS. COHEN: You can take that down.

Q And another reason you chose to be at OneTaste was because you wanted to conquer your stories, right?

A Sure, yes.

Q Your patterns, right?

A Yes.

Q And your -- what you call your virus, right?

A Yeah, I noticed that.

Q And that's because that was a common term that was used at OneTaste?

A It was term that was certainly used.

Q And you used that about your own issues that you had, correct?

A I did.

Q And, in fact, you posted often about how much OM changed your life, right?

A It did.
Q And in September of 2013, as we already established, you were in CP6, right?
A Right.
Q And we looked at some videos. Well, you looked at one of the videos today, from February of 2013. That was the beast exercise.
A Right.
Q And we looked at some videos yesterday of Nicole. And that was around August of 2013, right?
A Yeah, I think so.
Q And, again, the course continued until November of 2013, right?
A Right.
Q And you attended another lecture with Nicole in September of 2013, right?
A I don't know which lecture you're referring to.
Q Well, it was one in which you told Nicole, in front of the class, about how much OM had changed your life.
Do you recall that?
A Not specifically. I don't know which thing this was.
Q Are you saying you don't recall or you don't -- you didn't -- you didn't say that?
A I don't recall.
MS. COHEN: One moment, Your Honor.

Q And this is Hamza, who we spoke about before, correct?
A Correct.
Q And do you remember who the other person is?
A Lea Mendelson.
Q Now, as an employee of OneTaste that's in sales, you had to meet certain sales numbers, right?
A Right.
Q And, in fact, if you didn't meet those numbers, you were put on probation, right?
A Yes.
Q And, in fact, I think it's already in evidence. I can show it to you if you need it. But in the employment agreement it sets forth the fact that you have to make these sales numbers, right?
A Right.
Q And it also sets forth the -- that you agree to go on probation if you're not performing at standards, right?
A Right.
Q And if you fail to meet those standards, you could be fired, right?
A Right.
Q And you were at -- you could be fired at any time. It says that in the employment agreement, correct?
A Yes. It was at will, yes.
Q At will, right.

And, in fact, at one point you were put on probation, correct?
A Yes.
Q And Robert Kandell put you on probation, right?
A That's right.
Q And that's because you weren't making the sales, right?
A That's right.
Q In fact, you testified on direct that you weren't very good at sales, right?
A That's right.
Q Sales, it's a hard job, right?
A Yeah. It wasn't for me.
Q Yes, it wasn't for you.
Some people are good at it and some people aren't, correct?
A Totally.
Q And it's a job that required you to really pound the pavement and push, right?
A That's right.
Q And that's in any sales job, correct?
A Correct.
Q And, in fact, you admitted even to OneTaste people, to Rob, that you were bad at sales, right?
A Yes.
Q And that you had tried for a year, but it didn't work out

for you?
A Yes. And I requested to be moved to other positions because of that.
Q And while you were working at OneTaste, you also were doing mushrooms at that time, right?
A Um, I wouldn't say I was doing them. There was one time that we did, yes.
Q And drugs weren't permitted at OneTaste, right?
A Not on premises.
Q In fact, doing mushrooms is typically cause for termination at many jobs, right?
A I mean, not if you're -- not if you're not in the -- not at your job. No, certainly not when you're working. But we were -- we were not in the job space.
Q But Rachel knew that you had done shrooms, right?
A Yes, she did.
Q In fact, you talked to her about it, right?
A Yeah.
Q And you weren't terminated because of that, right?
A No.
Q And Rachel, you said, was a tough boss, right?
A Yes.
Q She demanded improvement, correct?
A Right.
Q And, in fact, you know, we -- fair to say that, as you

right?
A To some extent, yeah.
Q And they will celebrate, lots of people bringing cakes or things like that for people's birthdays, right?
A Sure.
Q People posted those pictures, right?
A Sure.
Q And after you left OneTaste, you weren't prohibited from speaking with anyone, right?
A I was not technically prohibited in some formal way, no.
Q In fact, you still kept in touch with people from OneTaste, didn't you?
A A little bit in the beginning, yeah.
Q And you saw OneTaste people, correct?
A There was a small handful of times where I saw a few individuals.
Q And one of those individuals was Ruwan, right?
A That's right.
Q And, in fact, you continued to post after you left OneTaste, right?
A Just generally online?
Q Yes.
A Yeah.
Q And, in fact, OneTaste people commented on your posts, right?

A Sure.
Q And they were positive posts, right?
A I don't know specifically which posts. But I'm sure there were positive posts, yes.
Q And people from OneTaste were still following you, correct?
A That's right.
Q And they were still happy for you, right?
A That's right.
Q In fact, there was a picture you posted of you and your mother on Mother's Day.
Do you remember that?
A I don't, but that sounds nice.
Q I can show it to you. But my point is, people commented on that post.
Do you remember that?
A I don't specifically, no.
MS. COHEN: Okay. Well, let me just refresh...
21-CW, just for the witness.
And you can leave in all the comments. This is just for the witness.
Q And just take a look at that, Ms. Halpern, and let me know when you've had a chance to read it and if it refreshes your recollection.
A Yes. I believe that's maybe an Instagram post of mine.

MS. COHEN: You can take that down.
Q Does that refresh your recollection whether people from OneTaste were commenting on your post?
A I can see two names of OneTaste people.
Q And Eli Block commented on your post, right?
A Yes.
Q Yia Vang commented on your post, right?
A That's right.
Q And there were others. We can't see who they were, right?
A Yeah, I don't --
Q We don't know if they're OneTaste or not, but other people did comment on your post?
A Right.
Q And you also texted with Rob Kandell after you left, correct?
A I don't know when you're referring to, but I remember speaking with him after he had already left as well.
Q It was maybe your birthday.
Do you recall receiving a text message ever from him on your birthday?
A Not specifically. But that sounds like something that -- you know, happy birthday.
MS. COHEN: Well, I believe this is already -- is Government Exhibit 3501-16 in evidence?

MS. FARRELL: No.

MS. COHEN: No. Okay.

If we could just show that just to -- yes, just to the witness.

Yes, sorry. 3501-16, just to the witness.

THE COURT: I don't think I have it.

MS. COHEN: Oh, you don't have it?

Okay. Oh.

THE COURT: But you could just put it up for me, too.

MS. COHEN: Yeah. Yeah.

Q I'm just drawing your attention to the bottom half, Ms. Halpern.

THE COURT: Sorry, am I supposed to be looking at an Excel spreadsheet?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay.

MS. COHEN: And again, this is Government Exhibit 3501-16, but it's not in evidence and we're not seeking to admit it.

A Sorry, what was the question?

Q Does that refresh your recollection as to whether Mr. Kandell and you texted after you left OneTaste?

A Yes.

MS. COHEN: You can take that down.

had met with the Government, right?
A Obviously, yeah.
Q But you became aware of that over the years, correct?
A Yeah, of course.
Q And, in fact, you met with the Government to prepare for your testimony yesterday, right?
A Sure, yes.
Q And while you were on direct, you continued to meet with them, correct?
A Like, on direct in this trial?
Q Yes.
You met with them on breaks yesterday?
A To discuss logistics, like the hotel and things like that. We didn't discuss the case.
MS. COHEN: Just one moment, Your Honor. I'm about done.
(Pause in proceedings.)
Q Oh, one other question.
You testified on direct about another OM house, as you called it, in Brooklyn, I believe?
A Yes.
Q And in addition to The Morellino and the Brooklyn OM, there were other OM houses, as they were called, correct?
A Yes.
Q And you also testified that the Brooklyn OM house had --

you weren't should if it had staff there, right?
A It was like -- it was starting to open up while I was there.
Q But those OM houses aren't necessarily a OneTaste property, correct?
A Yeah, that's complicated because there was a time when the sort of business model shifted a little bit and there started to be these affiliate houses.
Q And by "affiliate houses," putting aside the business -- affiliate houses mean people who practice OM get together and live in an OM house, correct?
A That's my understanding.
Q And they model their ways around the OneTaste ideas and way of living, correct?
A That's right.

(Pause in proceedings.)

THE COURT: Do you have more questions, Ms. Cohen?

MS. COHEN: I think not, Your Honor. I just -- I'm sorry, I just want to make sure before I end for the day.

And, actually, if my...

(Pause in proceedings.)

MS. COHEN: One moment, Your Honor.

(Pause in proceedings.)

MS. COHEN: Your Honor, I think I only have a couple of questions, but at this late hour, if we can just finish the

Q And were you helping out in OMX as well?
A I was working the event.
Q You were working the event.
And this is a photo of you working, correct?
A Correct.
Q Now, in September of 2013, you posted about, on the OM website, that OM has changed your life, right?
A No specific memory, but I posted all the time.
MS. COHEN: Let me show you what has been marked for identification, only for the witness, 21-DA.
Just take a moment.
THE COURT: The Government has it?
MS. FARRELL: Yes.
THE COURT: It was handed to me today, so perhaps you have it today, too.
MS. FARRELL: I have it, Your Honor.
MS. COHEN: I'm not seeking to admit it.
THE COURT: But I still need to be able to see it.
MS. COHEN: Yes, sure.
THE COURT: So does the Government.
By MS. COHEN:
Q Does that refresh your recollection that you said OM has changed your life?
A Yes. This looks like my sort of speaking voice.
Q And that before OM, you were never content and always

lonely; is that what you said?
A That's what I wrote.
Q And that OM taught you to stay connected no matter what, which is all you ever wanted in the first place but didn't think you could have, right?
A That's exactly how I felt.
Q And that was September of 2013, right?
A Mm-hm. Yes.
Q And then at that same time, you testified on direct examination again the day before yesterday, that you took the Mastery class.
Do you remember that?
A Yes.
Q And you talked about the Mastery class being more hardcore sexual.
Do you remember that?
A I don't know if I used that word, but sure. Yeah, that sounds right.
Q Talked about male OM?
A Right.
Q You talked about maybe anal plugs?
A Not plugs. But yes, I remember.
Q Well, we can pull up the testimony.
But you described that there's a lot more sexual nature in the Mastery class, correct?

A Correct.
Q And you signed up for that in September of 2013, correct?
A Not specifically remembering, but that's about right, sure.
Q Well, showing you what has been marked for identification as 21-D, as in dog, B as in boy.
And after you've looked at that, let me know.
A Yes.
Q And does that refresh your recollection that you had signed up around the time of September 2013?
A It just says that I'm excited for Mastery.
Q Well, my question was that you signed up in September of 2013, around that time?
A I -- that sounds about right. I don't know exactly.
Q I guess, sorry, I should say maybe not exactly when you signed up, but that by the time of September 2013, you were excited for Mastery; is that fair?
A Yes.
Q And, in fact, you were so excited, you wrote, "Fucking hell, I'm so excited for Mastery," right?
A I was.
Q And that you also couldn't remember being such a resounding yes, right?
A I was.
Q And you knew what Mastery was about, correct?

A I had an idea, yeah.
Q And you also posted, thanking, "thank you for creating a course that answered my call," correct?
A Yes. That's what I said.
Q Okay. Now, in November of 2013, you graduated from the CP6 class -- course, correct?
A Yeah. Yes.
Q And again, that was a ten-month course?
A It was.
Q And that takes a lot, right? A lot of work in that course? You do a lot?
A Certainly.
Q And at graduation, you make a graduation speech, correct?
A Oh, yeah. Yeah, I remember that.
Q And I'm going to show you what has been marked for identification.
MS. COHEN: If we could bring up the laptop.
Oh, sorry, if you could go help her. Thanks.
DX 21-B, as in boy, U.
THE COURT: I don't think I have that.
Did you say 21-BU?
MS. COHEN: Yes.
THE COURT: B, as in boy?
MS. COHEN: B, as in boy.
I also have a transcript of it.

right?
A I assume so.
Q And in February of 2014, you posted that you love this life, right?
A I did.
Q And that the weekend at the Mastery program, you were listening to lectures and it hit you that you were pioneers, right?
A That's how I felt.
Q And being someone out in the world who talks openly about sexuality is rare; you felt that, right?
A I did.
Q And that you were sitting at a TurnON and you heard certain words, charged words, right, and that was exciting, right? That struck you?
Do you remember that?
A I don't specifically remember, but that -- yes, that's all of the concepts. That's how I felt.
Q And you said simply by being who you are, you are giving other permission -- people permission to be who they are, right?
A That's how I felt.
Q And that simply by stroking or being stroked, that you show other human beings that intimacy is something that we all want, right?

A Yes.
Q And that was right before you left OneTaste, right?
A Yeah, absolutely.
MS. COHEN: No further questions, Your Honor.
THE COURT: Ms. Bonjean, do you have cross-examination?
MS. BONJEAN: I do.
THE COURT: Go ahead. I'll give you a minute to set up.
THE WITNESS: Is it possible to take a really quick break? Just, like, a minute.
THE COURT: Yes.
A five-minute break, we'll take.
THE WITNESS: Thank you.
THE COURT: Mr. D'Agostino, you can bring the jury out.
Five minutes, really, for everybody.
(Jury exits.)
(Recess taken.)
THE COURT: Okay. We're going to bring both the witness and the jury back.
(Witness resumes the stand.)
(Jury enters.)
THE COURT: Everyone may be seated.
Ms. Bonjean, you may start your cross-examination.

company that sells courses regarding self-help, correct?
A Correct.
Q How many of the people that you attended that event with, if you remember, went on to work for OneTaste?
A Oh, that I don't know.
Q Any of them that you can recall?
A I'm -- I, I don't know.
Q Do you know if any of the people that you attended that TurnON event with actually ended up joining the OneTaste community in an OM house?
A I'm not sure.
Q And you would agree, of course, if what -- this TurnON event didn't resonate with you, you were free to leave and go about your business?
A Absolutely.
Q All right. And then about a month later, while in San Francisco, you took an introductory course about OneTaste and OMing, right?
A That's right.
Q And at that course you watched an OM demonstration; you testified to that?
A Correct.
Q And correct me if I have this wrong, but it was exciting, right?
A Sure. Yes.

Q Now, do you recall, that introductory course that you took in San Francisco, approximately how many people participated in it?
A It's a little bit small. Maybe eight. I'm not exactly certain.
Q So a fairly intimate class?
A Correct.
Q How many of the people that you took that introductory course with in San Francisco ended up working for OneTaste?
A That I'm not sure.
Q Can you recall anybody who did?
A I don't remember anybody I took it with.
Q Okay. What about -- how many of those people, if you recall, ended up joining an OM house?
A Not sure.
Q Can you remember anyone?
A No.
Q Fair to say that people who took the introductory course could go off on their own journey as it related to OneTaste, right?
A Right.
Q Some people could get more immersed, correct?
A Correct.
Q Some people walked away after an introductory course and said that is not for me, right?

A Right.
Q Now, after that introductory course in San Francisco, I think you said you moved to New York pretty quickly, right?
A Yes.
Q And we're still in -- just for the timeline, we're still in 2011?
A Yes.
Q But you were from New York. Do I have that right?
A That's right.
Q Were you just living in San Francisco for -- prior to that?
A Yeah, I had been there for a little while before that.
Q Got it.
Were you working there?
A I was.
Q What type of work were you doing in San Francisco?
A I was teaching yoga and working at the gym where I taught.
Q Okay. What type of gym was it?
A It was one of those big ones. It was a JCCSF.
Q Okay. Did it sell courses?
Did they sell memberships at the gym?
A Memberships, yes.
Q People would come in and come for a tour and a sample class and then there would be some pitch to sell them a gym

meant to go, correct?
A That's how it's meant to go. Certainly.
Q And at the bottom there of OM etiquette, at the -- another --
MS. BONJEAN: Do you want to go to that one, Keith, the bottom one, please. Thank you.
Q And it warns: Be careful not to use OM in exchange for something or as to preclude to something or the -- I'm sorry.
My apologies. I can read.
Or as a prelude to something or contingent on something. Each person engages in OM for its own experience.
Right?
A That's the rule when it's followed.
Q Right.
Well, that's the rule as set forth in the book, right?
A That's what it says.
Q In the world, people, I guess, don't always follow rules. But I'm asking specifically about the tenet of OM, right?
A Yes. That's what it says in the book.
Q It's not just what was said in the book, that's what was taught, correct?
A Absolutely.
MS. BONJEAN: You can take that down. Thank you.
Q I want to turn a little bit to your interactions with

Q Because that's what the coaching program is.
A Exactly.
Q You also really wanted to get immersed into the community at a deep level, fair?
A Right.
Q And in June of 2012 when you were considering the coaching course, the simple math told you you really can't afford it, right?
A Right.
Q But you went ahead and did it any way, correct?
A Right.
Q I know you testified on direct examination, I think you sort of blamed Rachel for that by saying that, you know, she kind of suggested there is always a way to afford it.
MS. FARRELL: Objection to the form.
THE COURT: Sustained as to the form.
BY MS. BONJEAN:
Q Did you testify, quote, that Rachel told you there is always a way to make it happen. Right?
A Yes.
Q And at this point you've been away from OneTaste for a whole year, right?
A Right.
Q And you understood that that sort of attitude, you can always make something happen, is just not unique to

OneTaste, right?
A I don't know what exactly -- I'm confused. Can you rephrase?
Q I'll rephrase, happy to.
Sometimes people want to buy things they can't afford, correct?
A Sure.
Q Sometimes people buy cars they can't afford, right?
A Yes.
Q Go on vacations they can't afford?
A Sure.
Q They make it happen by putting it on credit cards?
A They do.
Q People borrow money sometimes?
A People do.
Q They do layaway plans, correct?
A Right.
Q Sometimes they save money first before they go buy it, correct?
A Yes.
Q So there are ways to buy things that you really can't afford in the moment, not just a OneTaste coaching course, but all types of other services and products and so forth, correct?
A Yes.

Q And Ms. Cherwitz told you that OneTaste accepted credit cards, right?

A Right.

Q She suggested maybe your parents can give you the money or something like that, right?

A Right.

Q That was a hard no for you.

A Right.

Q She said also we can offer you a payment plan?

A Yes.

Q And she came up with some ideas for how you can afford it, correct?

A Yes.

Q This isn't just a sales tactic in OneTaste, those are sales tactics that are used in all types of context, right?

A I assume.

Q Have you ever bought a car?

A Yes.

Q So sometimes sales tactics by car salesmen can be pretty intense, right?

A I've been lucky enough not to experience that, but yes.

Q Have you ever gone on a vacation where someone tries to sell you a condo?

A No.

Q Okay. But you signed up with the understanding

eventually of a payment plan, right?
A Right.
Q But also you really want to do it.
A That's right.
Q It's not just that Rachel had ideas for you, but you would agree when you really want to do something in your head you're like I want to make this happen, right?
A Right.
Q When it sinks in you're like, I wish I didn't buy those $500 shoes, right?
A Sure.
Q So at some point it kind of sank in like, oh, my gosh look at this payment plan, I don't know how I'm going to afford this, correct?
A Yes.
Q You still wanted to do the program but you were concerned about your ability to pay for it?
A Right.
Q So you wrote some emails to Rob and Rachel about your concerns?
A That's right.
MS. BONJEAN: Counsel, is Government Exhibit 3501-03 in evidence?
I'm going to ask that you look at Government Exhibit 3501-three in evidence.

THE COURT: Give me a moment. I'm not sure that it is. I don't believe it is.

MS. FARRELL: It is in evidence.

THE COURT: Sorry.

MS. FARRELL: 3501-03.

THE COURT: 03 or 30?

MS. BONJEAN: 3501-03.

MS. FARRELL: I believe it is.

THE COURT: I'm not sure it is. Give us a moment, please.

Yes. Go ahead.

MS. BONJEAN: Thank you.

BY MS. BONJEAN:

Q I think we looked at 3501-03 previously. Ms. Halpern, these were these email exchanges you provided to the Government, correct?

A Yes.

Q You didn't provide them in this format though, right?

A No.

Q I'd like to go to page four of this document. We can pull out the first paragraph, please. Thank you.

Are you able to see that okay?

A Yes, thank you.

Q That makes one of us. This is sort of post-freak out, right?

A Yes.
Q And you communicated with Rob and Rachel that when you actually looked how the numbers were broken down, it was a little bit much and it was an aggressive financial plan, right?
A Yes.
Q You said: I will not take out a loan and I will not borrow. Right?
A Right.
Q In fact, you never did, correct?
A I didn't borrow from a credit card or from a family member.
Q Right. You said these are very real boundaries. You were clear what your boundaries were?
A Correct.
Q And you also were clear on the sales pitch, right?
A Right.
Q You said: I know you've heard this sob story before. And then you even quote them, you're almost like, you know the game, right?
A Right.
Q I know stepping into the fear that masks my desire, I've heard it all before?
A Right.
Q Doesn't change the fact that I really can't afford

this.
A Exactly.
Q And then down you said: I felt like I was panicked or manipulated. But in the end you said: I really do want to take this course, though. Correct?
A Yes.
Q You wanted to talk to them about some other alternatives?
A That's right.
Q And I want to learn and grow through OneTaste so bad but I need to go through my own pace. Please meet me there.
A Yes.
Q You were pretty good at asserting yourself, right?
A Yes.
Q You can take that down.
You did ultimately negotiate even a fairly deep discount for yourself, correct?
A I was a little confused yesterday about what the prices actually were; but yes, I did get a discount I believe.
Q Right. The price was 12 grand and you got it for I think we looked at it -- let's look at DX21L in evidence, if we could. In the end your full tuition was a little over half that, correct?
A There were different prices for different people not advertised.

Q I'm going to ask you some questions about it, okay?
A Sure.
Q Okay. If you need to look at any portion of it again, let me know to refresh your recollection.
A Okay, thank you.
Q You were fairly exuberant on that?
A I really was.
Q You got on the stage, you gave Rachel a hug and a kiss, right. And at one point you started to put your shoes back on she says, you don't have to put your shoes on come on up here, right?
A Right.
Q You told the audience a story about how you were so excited --
MS. FARRELL: Objection.
THE COURT: Basis?
MS. FARRELL: I think the question is hearsay. I think she can ask the questions about what happened.
THE COURT: Sustained.
MS. BONJEAN: I can't lead?
THE COURT: Are you asking her -- ask the question again.
MS. BONJEAN: Okay.
BY MS. BONJEAN:
Q You got on the stage, right?

A Yes.
Q And you told the audience a story about how Rachel -- you ended up signing up for CP5?
MS. FARRELL: Objection.
THE COURT: Objection overruled.
A Correct.
THE COURT: Continue.
MS. BONJEAN: Thank you.
BY MS. BONJEAN:
Q And you talked about this freak out that you had that we've already talked about on direct examination, right?
A Yes.
Q And you told the audience that you actually closed your bank account so your check would bounce, right?
A That's right.
Q And everybody laughed about that, correct?
A Yes.
Q Including Rachel?
A Yes.
Q And you also said basically she didn't even have to sell that hard, right?
A That's right.
Q You used the word "hard stroke," that's sort of OneTaste language, right?
A Correct.

Q And you joked about, I think you said, hard stroke. And you said, no, that's a lie. She didn't even have to hard stroke me. Right?
A That's right.
Q You meant by that, she didn't have to do much of a sell, a hard sell?
A Exactly.
Q Because you were so excited about the program.
A I absolutely was.
Q You freaked out, you canceled, you closed your account so the check would bounce, right?
A That's right.
Q And then you went back and put another deposit down, right?
A Yes.
Q And then Rachel joked, you closed yourself?
A She said what?
Q You closed yourself, like you closed the sale on yourself.
A I didn't hear about that part, but sure.
Q But that's how it went down, right?
A Yes.
Q Now, we looked at a lot of pictures yesterday -- strike that.
At some point you did not believe that you were sort of

Q You knew that beforehand, correct?
A Yes.
Q It was sort of, everybody kind of knew, like, the Morellino was like an intense place to go live in community with other people, right?
A Right.
Q One of the reasons it was so intense is because you're living with the sort of executive people or some of them the executive staff of OneTaste, right?
A Right.
Q In fact, it's the building where the founder of OneTaste occasionally comes and stays?
A Right.
Q These are the people that are the most committed to the life of OM and the life of OneTaste, correct?
A Right.
Q And that's the community you wanted to live in.
A Yes.
Q And these are the people that believed wholeheartedly in this philosophy of life, right?
A Yes.
Q You had to apply to live in the Morellino, correct?
A Correct.
Q To be clear, the Morellino was not just an OM house for employees, right?

A Right.
Q I mean, it may be that most of the people who lived in the Morellino ultimately got even further immersed by working for OneTaste, but it wasn't a precondition to living in the Morellino, correct?
A Correct.
Q And whether you were an employee or not, there were rules to living in the Morellino, fair?
A Yes.
Q This was a place where -- it was competitive to get into the Morellino, wasn't it?
A I'm not sure.
Q But this was sort of -- it was a private kind of club in a way, you had to apply?
A Right.
Q And there were specific criteria for membership, correct?
A Yes.
Q Insofar as you had to share the interests and values of the people who were living there, correct?
A Right.
Q You've also lived in like a yoga ashram, right?
A Yes.
Q I don't know if I said that correctly. But it's called ashram?

A Yes.
Q That's a yoga community, correct?
A Yes.
Q When you join a yoga ashram, the expectation is that you have the shared belief in yoga and you'll do yoga, correct?
A Right.
Q You don't join a yoga ashram to lay in bed and play video games, right?
A Correct.
Q This OM house was not terribly different insofar as people applied to live in one of the OM houses because they wanted to immerse themselves into the OneTaste community?
A That's right.
Q The application process was to ensure that whoever was applying sort of was a fit, right?
A Right.
Q And by a fit, I mean to make sure that whoever was living there wanted to live a life that was rooted in the practice and philosophy of OM, right?
A Right.
Q And you not only believed in that, but you were a fit for that, correct?
A Yes.
Q At the time, correct?

A Yes.
Q You also moved there to live alongside people who sort of had the same outlook and philosophy, correct?
A Yes.
Q But you would agree, I think we talked a little about this, living in community presented challenges, right?
A Absolutely.
Q That would be really any where, whether it's OneTaste or any other come community, living amongst people that closely is a challenge.
A Of course.
Q We looked at a document yesterday, I'm going to ask, it's in evidence, I'm going to ask that we pull it up, it's Government Exhibit 3500-RW-12. We looked at some of this. I'm going to try really hard not to do a repeat.
This section regarding: Stay connected no matter what. Do you see that?
A Yes.
Q Part of staying connected wasn't just because that was an important value of the community, but also I'll point you directly to the sentence that says: You don't get to check out from the house for a week without telling your house manager and house maids what is going on. Right?
A Yes.
Q Because the community wanted consistency, right?

fear inventories and put them or through them in the garbage, right?
A Yes.
Q Nobody came around and collected them?
A No.
Q The purpose was to write it down for yourself get it out and tell somebody else?
A Yes.
Q It's not only that you did fear inventories, everybody did fear inventories, correct?
A Yes.
Q That included Rachel and Nicole this did fear inventory, right?
A Yes.
Q They were walking the walk, right?
A Yes.
Q Some the questioning on direct examination from the Government centered on the lack of privacy in a community, right?
A Yes.
Q You didn't move into this commune expecting too much privacy, did you?
A No.
Q You were moving into a commune where you were going to share a bed with somebody, right?

A Right.
Q So it wasn't an expectation that you would have all this time without other people in your space, right?
A That's very context-dependent, but generally yes.
Q Let's talk about this context. In this context you weren't really expecting privacy even before you moved in, right?
A In general, no.
Q If you wanted privacy you could have stayed with your roomies and had your own bedroom, right?
A Correct.
Q Also, living in such close proximity to people you knew their business, right, that's just sort of the nature of living in that type of proximity with someone?
A That's right.
Q There is a whole other layer or your experience as well, you actually started working for OneTaste while you're also living in community, correct?
A Correct.
Q Those are actually two different things, fair?
A Yes.
Q So we had this complexity where now you're actually living with your bosses and your colleagues, correct?
A Right.
Q And I think you said on direct, that creates some very

blurred lines, doesn't it?
A Exactly, yes.
Q So like, when you're cleaning up after the group meal, is that a job for OneTaste or is that because you're part a community that you chose to part of?
A Right.
Q Hard to figure those things out, correct?
A Yes.
Q It feels like you're working 24/7, but in reality you're also living there, correct?
A That's different at different times. That's not -- the expectations of an employee and the expectations of someone living in the Morellino are different, even though they both live in the Morellino.
Q Okay. So when you cleaned up after -- when you cleaned up after the group meal at dinner time, was that work or was that just part of your responsibilities in living in a commune?
A That was just cleaning up.
Q Okay. Of course could you have lived in the Morellino and worked outside of OneTaste?
A Yes.
Q As some people did; is that fair?
A Yes.
Q Some people went to their nine-to-five and still lived

Q You taught the same terms and concepts that OneTaste coached you to teach, correct?
A Yes.
Q And some of these terms came from other self-help style curriculums, right?
A I'd say so.
Q Like, for example, 12-Step programs?
A Right.
Q And some of the terms were unique to OneTaste because, of course, OneTaste is unique?
A Yes.
Q The term "TurnON," okay, correct me if I'm wrong, "TurnON" means something more than just getting sexually aroused or horny, right?
A Correct.
Q TurnON is really about something called the state of flow, fair?
A Yes.
Q And the state of flow is not something unique to Nicole Daedone or OneTaste, this is a principle that is used really widely, correct?
A Yes.
Q As a yoga instructor that is that's a term that's used in yoga, fair?
A Sometimes, yes.

Q So when you did the beast exercise, it was sort of like trying to tap into that primal voice and release it, right?
A I think that's the idea.
Q We talked about the third and fourth dimension. Again, this is not a concept that originated with Ms. Daedone either, right?
A As far as I know.
Q This is also actually a 12 step concept, correct?
A I wasn't aware of that.
Q Okay. That's fair.
But the third dimension, as you described, is sort of this physical world that constrains us, right?
A Yes.
Q The world that we need to live in that has social order, right?
A Yes.
Q And then the fourth dimension is more of the spiritual world, correct?
A Right.
Q And it goes beyond the physical and sort of like what your connection is to this higher power, right?
A Right.
Q And this is not just, again, in the context of OneTaste, but for anyone who has any spiritual views, they may -- they connect you on sort of a different dimension than in the

physical world, right?
A Sure.
Q Okay. We talked about -- I think you talked on direct about sort of aversion practice; do you remember that?
A I do.
Q And that's another sort of, say, a practice that was utilized in the context of OneTaste, right?
A Yes.
Q Again, not a practice they developed; fair?
A I don't know.
Q Okay. And aversion practice is, again, just dumbing it down, is partially about challenging your views about what your -- what you're averse to, right?
A Right.
Q I look at an oyster, it looks disgusting. But maybe if I give it a try, I'll like it, right?
A Sure.
Q And part of OneTaste's teaching was to challenge your preconceptions about things, right?
A Yes.
Q And that was specifically true to relationship; fair?
A Yes.
Q So if you're someone who's like, I only want to marry someone who's rich and handsome and six feet tall, and someone says to you, hey, but this other guy likes you. Oh, no, he's

A Yes, she does not.
Q She doesn't want to, correct?
A Correct.
Q And she has communicated that, right?
A Yes.
Q And she's not saying you don't have to identify yourself as a victim, she's saying that doesn't work for me, right?
A I disagree.
Q Well, are you -- did she go over and make you identify as something?
A No, she did not physically walk over and make me identify as something.
Q Right.
You have free thought. You can identify the way you want, right?
A She's the leader of an organization, talking about her ideas and teaching them.
Q Right. Right.
And there's a lot of controversial figures in life who have unusual ideas, right?
A That is true.
Q You don't have to adopt all of them, do you?
A You do not.
Q Okay. That's called free will, right?
A That's what it's called.

an hour and 20 minutes of this, but it's your testimony that she said "and you should -- and you should adopt my perspective"?

A I don't know if she said that, those words or not, but I do know that the implication is that she's teaching a course, right, and so the ideas are we're absorbing these ideas and trying them out in our own way.

Q Right. And you don't just accept everything anyone's ever told you in the context of a course, right?

A No.

Q I mean, you were an educated woman back in 2013. You had a college degree, right?

A I did.

Q When you went to your college courses, you didn't agree with every single thing your college professors told you, correct?

A No. They were also not forcible with me at all.

Q Well, Ms. Daedone wasn't forcible with you either, right?

A Disagree.

Q Well, what did she do to force you?

A There was no physical force. There was no her standing in a doorway physically blocking me. These are all ideas. These are all --

Q You're saying --

A -- words.

Q -- she forced you by ideas? Is that your testimony?
A It's an interesting way to put it.
That's how brainwashing works, to me.
Q Okay. You went to a course that you signed up for, right?
A Freely. Yes.
Q A course you desperately wanted to participate in, right?
A Absolutely.
Q You sat there and listened to someone tell you about the way she processes her own, quote-unquote, trauma, right?
A Which are beautiful ideas.
Q Right. They are beautiful ideas.
And you decided to interpret it the way you wanted to, correct?
A Correct.
Q And that's your idea of force?
A That is not my idea of force. The force happens outside of the coaching program, when it's real life in living and working there.
Q Okay. We're focused on these words, though.
A Okay.
Q You testified that her words caused you harm, right? Do you remember you testifying to that?
A That's my belief.
Q Okay. And you didn't have to follow any of her words,

right?
A No one was physically --
Q It's a yes or no.
A -- making me do that.
THE COURT: Let her answer the question.
Q You didn't have to, right?
A I'm sorry, I didn't have to what?
Q You didn't have to buy into her teachings or beliefs, right? No one forced you to?
THE COURT: Just ask one question at a time, please, and let her answer.
What is the one question you want to ask, Ms. Bonjean? There were two there.
Q No one required you to say "I adopt this perspective that Ms. Daedone told me of this coaching program," right?
A I don't agree because there were -- I mean, we saw all this paperwork of actually agreeing to follow these ideas. So it's more muddy than that.
Q In fact, you signed the exact opposite in Defense Exhibit 21-J. Do you want to look at it again?
A Where am I looking?
Q You're looking at the assumption of risk and about -- yeah. We will just -- I will just -- why don't you read the fourth bullet point out loud.
A That while sponsors believe that the content of the

course to be valuable, sponsors do not guarantee it will solve any particular issue or problem I may have. I, alone, will decide and accept responsibility for how and what purpose I apply the content of this course.

Q Okay. Read the next one.

A That I may not agree with all the content of the course and accept that possibility.

Q And how about the next one?

A That the participants in the course may come from diverse backgrounds and hold belief and opinions different than mine.

Q How about the next one.

A That certain participants may make statements or take actions that I disagree with or find offensive.

Q And let's just do one more.

A That certain participants may disagree with or find offensive statements I make or actions I take.

Q Okay. So you assumed the risk, you signed that document, and laid out here is an acknowledgment that you might hear some ideas that really challenge your belief systems, right?

A I have no problem with this or any of the ideas.

Q I'd ask that you just answer the question, okay?

A Uh-huh.

Q You signed this document, which acknowledged that during the coaching program you might hear ideas that challenged your belief systems, right?

A Yes.
Q That's kind of one of the things that you signed up for when you got involved in OneTaste, right?
A Certainly.
Q And you've even acknowledged here that Ms. Daedone's speech was a little more complex than just like rape is good, victim's not good, or anything like that, right?
A Of course.
Q Okay. Now, you can put that aside if you want.
I assume you believe in the proposition that in this country we should be able to express controversial ideas, right?
A I do.
Q Now, you discussed your --
MS. BONJEAN: I don't know, Your Honor, if you want to put the lights up. I'm done with the --
THE COURT: Yes, I think we should. Thank you.
Q So you testified about how things came to a point and you wanted to -- you wanted to stay involved with OneTaste, but you wanted to go back to -- you wanted to go to San Francisco, right?
A Right.
Q And you testified yesterday, I think it was yesterday, that, you know, you were welcome back and they -- Justine Dawson was pretty helpful, right?

that it?

MS. BONJEAN: Yes. Correct.

THE COURT: Go ahead. 21-DI. And you want to just show it to the witness.

A If you can zoom in.

Q Yes. I will do my best, and I have a paper copy in case. You can --

A Great. Thank you.

Q And let me know when you have had a chance to read through it.

A Okay.

Q She never said "I release you," did she?

A Yeah, it was a misquote. What I was remembering --

Q Hold on.

A Oh.

Q She never said that, right?

A Right. What she said was "I will release your" -- "I will reset your compass." That's what I was remembering as "release."

Q Right.

She said, I will -- she didn't say "I will reset your compass." That's not what she said, right?

A It says: I will reset your compass. Toward the bottom.

Q What did she say before that?

A Thank you for your service. It has been much

appreciated. I will reset your compass. Best of luck.
Q And you told her you loved her, didn't you?
A It's because I did.
Q And she said maybe your purpose is music, right?
A She did.
Q She said, maybe it's not orgasm, maybe it's music, right?
MS. FARRELL: Objection, Your Honor. Hearsay. The defendant's statements.
THE COURT: Sustained.
MS. BONJEAN: I didn't even hear the basis.
MS. FARRELL: Hearsay.
THE COURT: Hearsay as to the defendant's statement. But you can ask another question.
Q It was actually a very lovely exchange, wasn't it?
A I don't know that I would characterize it that way.
Q Well, she wished you well, right?
A Yes.
Q She basically and generally said --
MS. FARRELL: Objection, Your Honor.
MS. BONJEAN: Well, I mean, Your Honor, it's contradictory to what she testified to.
THE COURT: You can ask questions. Continue. Overruled. Continue.
Q She thanked you for your work at OneTaste, right?
A Yes.

Q She asked you to share what you were feeling, right?
A Yes. She said, what shifted in you.
THE COURT: Well, I don't want the witness reading from something that's not in evidence. But you can certainly ask her the questions.
Q Just if you -- just answer my questions.
I am speaking generally because I can't quote directly from it.
A Uh-huh.
Q But would you agree that she asked you, like, what's going on? How are you feeling? Or what -- you used the word "shifted," but she asked you about what was going on for you, right?
A Right.
Q She gave you some words of encouragement, didn't she?
A I don't know exactly what you are referring to.
Q She told you to use your energy in another way, right?
A She said maybe -- yeah. Maybe that's the way to go, kind of thing.
Q And that was your passion for music, correct?
A Yeah.
Q And you basically said, I still have orgasm in my bones forever, right?
A There's a lot here. Yeah. Perhaps.
Q You said you never wanted to lose that, right?

A I did -- yeah. I didn't.
Q Okay. And you said, I love you, right?
A And I did.
Q Okay.
MS. BONJEAN: You can take that down.
If I can have one second, Your Honor.
THE COURT: Yes.
(Short pause.)
MS. BONJEAN: I have nothing further.
THE COURT: Any redirect examination?
MS. FARRELL: There is, Your Honor. If I may just have a moment.
THE COURT: Yes.
(Short pause.)
MS. FARRELL: Sorry, Your Honor. I want to pull up a copy of that exhibit we just saw, for the witness, please.
THE COURT: Defense Exhibit 21-DI?
MS. FARRELL: Correct.
THE COURT: Okay.
MS. FARRELL: Thank you.
THE COURT: Just for the witness, right?
MS. FARRELL: Yes.
REDIRECT EXAMINATION
BY MS. FARRELL:
Q So I just want to ask you a few follow-up questions about

Q Switching gears.

You testified you were happy? On cross.

A Yes.

Q You also testified that you were brainwashed?

A Yes.

Q How do those two things work together?

MS. BONJEAN: Objection. That calls for an expert opinions, I guess, but I think it's objectionable.

THE COURT: Sustained.

Ask your next.

Q So same premise, but I want to be clear that I'm asking from your perspective.

MS. BONJEAN: Same objection.

THE COURT: Overruled.

A Yes, I think those, those things are inextricably linked. Because I was -- I mean, I was so happy. Like, I loved it there. I loved my friends. I loved -- I loved Rachel. I loved Nicole. And so the happiness was real. And all those videos, like, that's what's making me emotional looking at it. It was nice. Like, I had a great time.

And what was -- the reason I left was not because I didn't agree with any of it or that the -- you know, what I signed was incorrect or anything like that. The reason I left was because I couldn't -- I couldn't withstand the berating and the sexual abuse and the emotional abuse and the

psychological abuse that was happening behind closed doors; that is not included in any of the things that I signed. That's the brainwashing.

So the happiness is part of the brainwashing. Right? Like, it's -- that's -- because people don't stay in places where they're not happy.

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection.

THE COURT: I'm going to sustain just the last comment.

Ask your next question.

MS. FARRELL: Thank you, Your Honor.

Q The sexual abuse and other -- I'm sorry, I don't recall exactly what your testimony was, but the --

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection, Your Honor.

MS. FARRELL: I'm just trying to follow up on her answer, Your Honor.

THE COURT: Just ask the next question.

Q The negative things that you just listed, how, if at all, did that affect your provision of labor and services for the company at the time that you were there?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Let me just think on that for a second.

It's just, it's such a big -- it's just all kind of linked together.

I -- I mean, I think in some ways I was less able to do my job well because I was, you know, in those moments where things were really bad. I was so confused and unhappy. So that took away from, you know, being able to do my job. And also, at the same time, like I -- I started to emulate those things as well. Like, I started to -- you know, I definitely looked at what Rachel was doing, for example, and trying to kind of be like that because that's what I thought we -- you know, that's what we were kind of supposed to do.

Q And did what you described as, quote, brainwashing affect your willingness to provide work?

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Absolutely.

Q In what way?

A Because there were a lot of things -- there were a lot of things that I wouldn't have done that I -- that I don't believe to be ethical, that I wouldn't have done without that, what I'm calling, brainwashing.

Q You were asked questions about your prior job at the gym.

A Mm-hm.

Q And whether being at OneTaste was like the gym; is that

embraced. You enjoyed it, right?
A There were many OMs that I enjoyed and many that I did not.
Q And you now look back and you regret your time, at least in part, at OneTaste, right?
A That is a big oversimplification.
Q Is that a yes?
A No.
Q So you don't regret it?
A No, I actually don't regret it.
MS. BONJEAN: Okay. No further questions.
MS. FARRELL: Nothing further.
THE COURT: Okay. The witness is excused.
THE WITNESS: Thank you.
Thank you, Your Honor.
(Witness steps down.)
THE COURT: Government, call your next witness.
MR. FERN: The Government calls Christopher Hubbard.
THE COURT: Sir, you can just walk up here.
(Witness takes the stand.)
THE COURTROOM DEPUTY: Please step up. Remain standing. Raise your right hand.
(Witness sworn/affirmed.)
THE COURTROOM DEPUTY: Please be seated.
State your full name for the record. Spell your

MS. BONJEAN: Same objection.
THE COURT: Overruled.
Q You can answer.
THE COURT: You can answer. "Overruled" means you can answer.
THE WITNESS: Okay.
A Eventually, one of the ways that it was -- Nicole described it and we all described it was it was a sex cult. We said that in public.
Q And what did you take that to mean?
A Honestly, mostly, it was -- my -- how I took it to mean, it was mostly just a way to get a rise out of the people that we met.
Q In what way?
A It's kind of a controversial statement.
Q Do you see Rachel Cherwitz in the courtroom today?
A Yes, I do.
Q Can you describe her by an article of clothing that she is wearing?
A Yeah. She's got a black blazer on.
MR. FERN: Your Honor, I ask that the record reflect that the witness has identified the defendant, Rachel Cherwitz.
THE COURT: Yes.
Q Mr. Hubbard, did there come a time when you began living

A Repeat the question, please.
Q You were not forced to commit any labor against your will, correct?
A That's a hard one to answer. There were definitely things I did I wasn't particularly keen on.
Q Okay. The question was, you were not forced to commit any labor against your will, correct?
A Give me a second to go back and try to think this through.
THE COURT: That's fine. Take a minute.
THE WITNESS: Thank you.
THE COURT: Are you ready to answer, sir?
THE WITNESS: Yes, I am.
THE COURT: Okay. Go ahead. You can answer the question.
A I don't have any memories of being forced to do any specific actions against my will.
Q And, in fact, you said on direct examination that you were able to say "no" to Nicole Daedone; is that correct?
A No, I said that I had said "no."
Q Well, isn't it true that you told the government that you often said "no" to Nicole Daedone, correct?
A I don't recall saying that.
Q Do you recall saying to the government that people at OneTaste wanted you out of the community because you could say

Q And, in fact, during that interview, you were laughing and talking about how much fun you were having?
A Yes.
Q And how beneficial the practice had been for you?
A I'd have to watch the video again, but along those lines.
MR. ROBOTTI: Your Honor, defense moves into evidence Defendant's Exhibit 16-L.
MS. BENSING: Objection. Improper impeachment --
THE COURT: Sustained.
Q You testified about the scenes on redirect examination; is that correct?
A Did we just talk about scenes?
Q A moment ago you mentioned the scenes that we've discussed during your testimony, correct?
A Oh, yes, yes. Thank you.
Q All those scenes were consensual; is that right?
A It's my understanding, yes, they were.
Q And they were all with adults, correct?
A Absolutely.
MR. ROBOTTI: Thank you.
THE COURT: Any recross-examination by Ms. Bonjean?
MS. BONJEAN: Yes, Your Honor. Just a couple of questions.

Q And what was your husband's first name at the time?
A David.
Q What, if anything, did you do for work when you first moved to San Francisco?
A While I was waiting for my green card, I was volunteering at animal shelters. And then when I got it so I could work after we got married, I ended up as a doctor's assistant at a veterinary clinic.
Q How did you first hear of OneTaste?
A I was at work, and this woman, one of my coworkers brought a flier that someone at a bar had given her the night before, and it was for a party called the Gypsy Nights Party, and on the flier, it said: And there will be a demonstration of a women in orgasm for 15 minutes. So she brought the flier to work to sort of have us laugh at it because it was, like, ha-ha, how funny and ridiculous, and instead I was like, oh. And I went on the website and I liked what I saw on their website, and so I went home and I was, like, hey, honey, want to go to a thing? And we went.
Q And did you go?
A We did, yeah.
Q Describe what happened in those first few weeks after you heard about OneTaste and you attended that initial event.
A The event was really interesting. I thought that that

demonstration would be someone faking it, and it wasn't. So I was really interested. And so then he and I began to explore the other offerings that they had on their calendar. So we went to something called In Group at the time, which was this evening of these communication games, and it was really fun. We instantly were welcomed.

We went to a course, or I went to the course -- we both liked the courses -- and learned the practice, the orgasmic meditation practice. Both of us found -- we had -- we were looking to open up our relationship, but we didn't know how. We didn't have any friends who did that and we didn't know what to do with that. But here, there were these conversations around sexuality and relationship that were really interesting and helpful. And so we both, in our going there to different events, found people that we found interesting, and so we began to have sexual relationships and experiences with other people. We opened up our relationship, yeah.

Q I want to show you what's in evidence as Government Exhibit 272.

MS. BENSING: And this can be for both the witness and the jury, please.

(Exhibit published.)

THE COURT: If we could clean the lines on there, as well, or the arrows.

Q And people shared it?
A Yes.
Q What about bathrooms?
A There were two toilets and two sinks and a bunch of shelves for toiletries.
Q And, again, did everybody share those?
A Yes.
Q When you moved into the Warehouse, did Nicole Daedone live there?
A No.
Q And where did she live, to your knowledge?
A She lived with her partner in his townhouse in a different area part of town.
Q Which partner is that?
A Reese Jones.
Q And that's the individual you testified earlier that you performed sexual acts on?
A Yes.
Q I want to show you Government Exhibit 284. Who is this?
A Reese Jones.
Q I want to show you Government exhibit -- by the way, when you arrived at OneTaste, was Reese Jones already involved with OneTaste?
A Yes.
Q What was his role?

A I know that he was investing in OneTaste. I don't know how much, or I didn't at the time, but he was always there. He was often there with Nicole.
Q I want to show you Government Exhibit 56. Do you recognize this?
A Yes. That's his townhouse.
Q And that's where Nicole was living at the time that you were living in the Warehouse?
A Yes.
Q Where was this house located?
A I think it was Russian Hill, at the top of Russian Hill.
Q I want to show you Government Exhibit 57. What is this?
A The townhouse.
Q I want to show you Government Exhibit 60. What is this?
A The living room and kitchen in the townhouse, and the view.
Q The townhouse where Reese Jones and Nicole Daedone lived?
A Yes.
Q We can take that down. Thank you. Ms. Berkley, are you familiar with the phrase research partner?
A Yes.
Q What is a research partner?
A It's someone that you're typically sharing a bed with and you're doing some kind of research into something to do with sexuality or relationships. So it could be your actual

there full time. Yeah.
Q When you first moved into the Warehouse on a temporary basis, how many nights per week did you stay there?
A I think it was three.
Q And do you recall, approximately, when you moved into the Warehouse full time?
A I think it was around December, maybe.
Q Did there come a time when your husband left San Francisco?
A Yes. He went on to become a professor. I stayed back and we ended up separating and divorcing.
Q During the time when you were living at the Warehouse part time, did you still have a job?
A Yes.
Q What was that job?
A At the veterinary clinic as a doctor's assistant.
Q Did there come a time when that changed?
A I eventually quit that job and ended up working at OneTaste.
Q Approximately, when?
A I don't remember exactly, early to mid 2007.
Q And you said you quit your job at the vet clinic and began working for OneTaste?
A Yes.
Q So you just testified about how in the space of just a

few months you moved into this community, you left your husband, and you left your job. Why?
A It was -- there was such a strong pull. There was so much there that was of interest to me, and I was learning so much. And previously I was training to be a therapist. And there was so much that I was learning about people, and this living experience without any privacy really allowed me to see like who people are.

There's like this experiment of like leave any conditioning at the door and try stuff and see who you really are, and being in that was like wow. And the relationship that I had with Isaac was really intense, and so there was that.

And the feeling of being surrounded by people who were like all my best friends at the same time was just so powerful for me, because I had never had that experience, that it felt like there's something going on here that's really unique and really special and I can't get that anywhere else in the world that I could think of.

So I kind of had to decide for myself what would I regret more, not taking the opportunity to learn everything I could learn in this environment and feel all these feelings I never felt before or not, go off and be a professor's wife sort of life.
Q At the time that you immersed yourself into this

order to be able to participate and continue to participate and not get kicked out, basically.

Q What happened when it came time for you to be presented in this way?

A I was the last one left. So it was like my high school nightmare. It was awful. Everyone had made it past. No one had gotten kicked out and I was the last one left. And I went to the front and it was that my research partner, Isaac, who at that point I was very connected to and infatuated with, in love with, we weren't to be together if we wanted to continue because I was falling asleep and giving up my power in that relationship.

And somehow it was deemed that that relationship was not right or good for the community, and so we had to be apart and I had to agree to that.

Q Let me pause you there, because there's a couple of phrases you used I want to ask you about. First of all, I think you testified already that Nicole Daedone was generally leading this meeting. Was she also leading the part with respect to you?

A Yes.

Q And you said that the discussion around you was that you were falling asleep. What does that mean?

A That my energy and attention was on the happy coziness of being within a partnered relationship and not on my purpose or

something to do with the system, with OneTaste, or whatever it is, other than being in this relationship, and that just having a comfortable life, a happy life wasn't being on your spiritual path. So you weren't waking up. You were falling asleep.

Q Who taught this spiritual path?

A Nicole Daedone.

Q What was the spiritual path that she taught?

A Well, there was a way to tap into something deeper and greater than through this practice called orgasmic meditation, that the pursuit of finding our own power was very important, that going down into difficult situations was where you found that power, kind of this figure eight.

Go down and have difficult experiences and you make it through that and then you become more powerful and then you come up and you have bright enlightening experiences and you come back down. It was in the down that there was more focus.

Q And at this point in time when they had this thumbs up, thumbs down meeting, approximately, how long had you been involved in the OneTaste community?

A Four to six months.

Q At that point in time how did you view Nicole Daedone?

MS. BONJEAN: Objection. Vague.

THE COURT: Sustained.

Q At that point in time how did you view Nicole Daedone,

vis-à-vis the spiritual teachings that you're talking about?
A She was so smart and so tapped in and radiant, and really opened me to so much more that was possible for me to experience and have in life and be.
She was like, to me, a not quite like an enlightened person, but like so advanced and who just knew so much and had this way of seeing that was so accurate I never experienced from anybody else before, where she could just know something deep about you that was like how did you even see that, wow. So yeah it was amazing. She was amazing.
Q You testified that in this meeting she indicated to you that you were falling asleep or giving up your power. What does giving up your power mean?
A Putting my attention with someone else or somewhere else and using my energy and productivity and sort of life force energy for the benefit of being close to somebody, or somebody else other than myself.
So my locus, my center of knowing and being and doing what I want moves from me to somewhere else, in this case being Isaac, my partner.
Q You testified already that the concept of falling asleep meant that you weren't contributing enough to I think you used the phrase the system. What is the system?
A I don't know if it's called that anymore, but at the time the system referred to the OneTaste organization but sort of

was that after you had moved out of the Warehouse?
A Yes.
Q Where were you living at that time?
A New York.
Q We'll come back to that. In the other instances that you testified with respect to pressure being there, who conveyed that pressure to you?
MS. BONJEAN: Objection to the vagueness of that question and the foundation.
THE COURT: Sustained.
Q Well, you testified with respect to the time period you and Isaac being together, correct?
A Yes.
Q What, if anything, did you feel whether or not you could be in a relationship with him?
A There were times when it felt fine and there were times when I felt like I was doing something wrong.
Q The times you felt like you were doing something wrong, who was making you feel that way?
MS. BONJEAN: Objection. Assumes.
THE COURT: Sustained.
Q Who, if anyone, was making you feel that way, Ms. Berkley?
A Nicole, and then people in the community.
Q And what, if anything, did Nicole say to you about your

relationship with Isaac?
A Different things at different times. Thought I was falling asleep and giving up my power to him. There was a time when I was working as her assistant where I wasn't able to put enough attention on her because of that, relating to Isaac, and also that this wasn't a place for those kinds of relationships. If people wanted to do that, they could do that somewhere else.
Q You testified about this a little bit earlier, but at this point in time when this thumbs up, thumbs down meeting happened, did you still maintain a community outside of OneTaste?
A No.
Q Why not?
A All of my interests had just shifted from my friends and activities and the co-workers I didn't have anymore. But even while I was with my co-workers, still had my job, all I'd talk about was OneTaste. I stopped having things in common with them and they'd start coming at me with concern that I was in a cult and I would say no, you don't know what you're talking about. This is amazing. I kind of lost them.
I just ended up on a completely different track than what they were interested in. The real interesting people were all the people at OneTaste. So the husband went away, the friends went away. I couldn't talk to my parents because

A I don't.
Q You testified that you were making approximately 1,600 a month?
A That's right.
Q What expenses did you have at this time?
A Rent was 800, and then I don't remember if food was included in that or not. And then clothes, toiletries, anything, entertainment I would have to pay for, laundry. And then if I wanted to take a course as a participant I would pay for the course, as well.
Q Did you accrue any debt at this point in time?
A Yes.
Q What was that?
A I ended up with like 20 or 30,000 in debt.
Q To who? What kind of debt?
A Credit card.
Q What did your average day look like during this time period when you first began working for OneTaste?
A We would wake up at 7:00 and walk -- at the Warehouse and walk over to the Center. Then we would have our morning practice, which was to OMs and the withholds, and then breakfast and then start the day, whatever the day's business was to be done.
And then over the course of -- there would be lunch at some point, and then most evenings there was something

A Yes.
Q What were some of those?
A I did demos for sort of educational purposes, and then in courses when they needed -- there wasn't an equal number of men and women participants, and so people who were supporting in the back would jump in and have OMs with people. Personally, I would be OMing three to five times a day. So I would have my own OMs.
THE COURT: Ms. Bensing, it's about 12:30. If you're going to switch to another topic, we can take the lunch break now. If not, we can go 10 to 15 minutes more, but I don't want to go much more than that.
MS. BENSING: Can I ask two follow-up questions on this?
THE COURT: Go ahead.
Q We'll discuss this more later. What impact, if any, did participating in these OMs during courses come to have on you?
A Over a really extended period of time of doing that and with more intensity, as I ended up being more involved as a teacher, it just got to where I got really tired of that but I didn't want to have any of my own. Even after I left OneTaste, I was just done with it.
Q Was that also the case at the end of your time at OneTaste?
A I was 70 percent of the way there, let's say.

partner that they could come and have sleepovers with at the Warehouse.

Q And who assigned research partners?

A Nicole.

Q Nicole Daedone?

A Yeah.

Q At some point during your time at OneTaste, did you become familiar with an individual named Brian Bert?

A Yes.

Q And was that when you were living at the Warehouse?

A Yes.

Q Who is Brian Bert?

A He was someone who came in who was a VIP. I don't remember why exactly. I think he had a podcast or some sort of audience or networking connections or something like that.

Q What happened with respect to Brian Bert?

MS. BONJEAN: Objection to vagueness.

MS. BENSING: I can rephrase, Your Honor.

THE COURT: I will sustain that, and you can ask the next question.

Q What, if any, interactions did you come to have with Brian Bert?

A I got a phone call from Nicole Halpern one day, and she was very like happy, and was like we have this great idea for you. We thought of something really great for you. And I was

very excited. I was like, oh, what is it? And she said, we think it would be amazing if you were Brian Bert's --

MS. BONJEAN: Objection.

MS. COHEN: Objection, Your Honor.

THE COURT: Basis?

MS. COHEN: Hearsay.

THE COURT: Sustained.

MS. BENSING: Your Honor -- okay.

Q I think you already testified to this, Ms. Berkley, but who did Nicole Halpern report to?

A Nicole Daedone.

Q Okay. And was that the case when you came to know Brian Bert?

A Yes.

Q And at that point in time, what happened with respect to Brian Bert? How did he first come to your attention?

A I might have seen him at one of the events, so I knew his name, so I knew who he was. But then on this phone call, I was -- it was suggested to me that I be his research partner.

Q And who suggested that to you?

A Nicole Halpern.

Q Did you understand that request to encompass sexual activity?

A Yes.

Q Why?

A Because as a research partner, the person -- that would imply that they're going to be sharing my bed. And he was a VIP, and I noticed the way that Reese was being treated so I understood that that's what that meant, to make this person have a good time.

Q What did you say?

A I said no.

Q Why did you say no?

A I wasn't interested in him, and I didn't want to do that with someone or be in that kind of situation.

Q And at this point in time, were you dating Isaac?

A Yes.

Q So was this before that thumbs up, thumbs down vote that you testified about earlier?

A I don't remember.

Q Okay. What happened after you said no?

A Nothing happened for a couple weeks, or a week or something, and then there was a community, another community just community course. I believe it was at Stinson, and it was this really great course, and in the buildup of it, there came a moment near the end of the course where Nicole had this really rousing, inspiring thing she said, which was like, oh, it was like wonderful. And then she said, who wants to be part of that, or who wants their freedom or their power or something. I forget exactly what it was.

And I raised my hand really fast, and another girl did, too. Our hands shot up in the air. Like, we do.

And Nicole turned to look at me, and it was like silence in the room. And she said something to the effect of, well, then you'll take the research partners that are suggested to you.

And it was a shock, and it was in front of everyone, and I was doing it wrong, and I am obviously failing, was what I was feeling and thinking. And I don't want to let her down, and I am obviously not on my path, and also totally embarrassed and humiliated, everybody's watching. So I felt like all of this pressure to say -- to change my mind.

Q And let me stop you there.

When you said that Nicole said this to you, which Nicole?

A Daedone.

Q When Nicole said, well, then take the research partners we suggest to you, what did you understand her to be referencing?

A Brian Bert.

Q How did you react to this?

A I don't remember in the class, in that moment, but, afterwards, when the class broke, I was very like inside embarrassed, kind of wanted to hide, and then also was like, okay, how do I do this. I do really want to be on my purpose,

I do really want this awakening that's available here. I have given up all this stuff in my life, now this is it, and I trust her completely. So what do I need to do on the inside to figure out a way to say yes to this, and I guess there's something to learn here that I don't know about, so take the opportunity and find a way to say yes. And, also, I want to be a good student, and I want her approval. And not like I want to play a big game.

So I changed -- I called Nicole Halpern, and I said that I would do it.

Q You just testified that at that point in time you had given up all this stuff in your life. What do you mean by that?

A My friends, my family, my husband, my job.

Q So what happened with Brian Bert?

A The day came for our first night together, and I remember being in a car, parked on the street with Isaac, and he was crying. He was upset, we were together at the time, that I was going off to do this thing with somebody else, that was set up in this way.

And I was like convincing him. It's like, no, this is good, this is for me to learn and be my purpose. And just having faith that this was for a good reason. And then I went to dinner with Brian Bert and tried to be a good representative. You know, like try to be like pleasing and

interested in him, and finding within myself some way to find something with him that I was attracted to, and like really just be nice.

And halfway through dinner he was being how he was being, and I just couldn't go through with it. I just broke my facade kind of thing where I was like -- I was like I just became me again, my actual self. And I said to him, would you like some coaching? Some like feedback and advice on how to date women and how to talk to women so that you could really know in your life how to do that.

And so he relaxed and was like, yeah, totally. And so then we had like a regular -- the genuine connection that would was there was, I am like, okay, I can teach you how to be with women in that way. And then it was clear that we weren't going to go to my bed that night, and then that was done.

Q So did you end up sharing a bed with Brian Bert?
A No.
Q You testified that you agreed to this because you wanted to be in your purpose. What do you mean by that?
A At that time, my purpose was OneTaste's purpose. Like it was -- it had become whatever is best for OneTaste and getting OM into the world is what my life is for and about. So, yeah.
Q And so why would -- why was going on this date with Brian Bert within your purpose?

A Because that would support the organization to have whatever the resources were that Brian Bert could bring with him.
Q Are you familiar with the phrase "white rabbit"?
A Yes.
Q What is that?
A That's someone in the community, usually a woman, who's young and attractive, and turned on, and very alluring and playful and seductive, or just feels really interesting, who is at community events and courses and around, that's almost like allure, kind of the white rabbit in Alice in Wonderland. So sort of people will follow into the rabbit hole kind of thing.
Q Ms. Berkley, having lived in the Warehouse, did you have knowledge of other research partner assignments at OneTaste?
A Yeah. There was one where Ken Vanosky --
MS. BONJEAN: Objection. This is nonresponsive. I think it called for a shorter answer.
THE COURT: Overruled.
Q You can answer, Ms. Berkley.
A Ken Vanosky had a number of research partners. Like more than two. I don't remember how many more than two. Three or four.
Q And who? Who do you recall?
A I remember Alisha being one, and then I'm not sure of the

rest. Nicole Halpern, Rachel Cherwitz. I don't know if there's somebody else.

Q When you say Alisha, who are you talking about?

A Alisha Price.

MS. BENSING: Can we pull up Government Exhibit 205, which is in evidence.

Q And who is this in Government Exhibit 205?

A Alisha Price.

MS. BENSING: We can take that down. Thank you.

Q Ms. Berkley, you have testified about some of your experiences getting involved in the OneTaste community. What, if any, impact did these experiences have on your psychological state when you were living in the Warehouse?

MS. BONJEAN: Objection. Calls for expert response.

THE COURT: Overruled.

A I was -- at that time, I was really committed and focused, like single-minded focused on the only things that were interesting and I wanted to do in my life were the things that were going on here.

I was really attempting to fit in to what was required of somebody who is on their path in the way that was prescribed by the philosophies there. I was having fun and researching a lot of things.

I was starting to like just fit a certain kind of way of being that was very -- like there's one way of being

that was the ultimate way of being, and I was trying really hard to be that kind of way of being. And anything inside my own mental thoughts that were outside of that I would work with myself to find a way that what everyone else was saying around me, that seemed likes truth. But I felt like that's maybe not quite true.

I would do all kind of gymnastics on the inside to figure out a way that that was true, because I really believed that, ultimately, like just Nicole knew everything and was right and cared and was some like more ascended than most people. And so I really wanted to please her, wanted to be like just a really good student, like a really good girl. Like just really wanted her attention and interest and to learn. Just very eager to learn.

Q You testified earlier that you worked in the massage studio at the front desk at the center.

Did there come a time when you took a different position within OneTaste?

A Yes.

Q What was that?

A I became Nicole's assistant.

Q How did you get that role?

A I was at the front desk, it was in the evening. I was at the front desk, and Rob came to me and asked me to come on over, and Nicole and Reese were sitting at a table in the

middle of the sort of lounge space.
Q I'm just going to stop you. When say Nicole and Reese, which Nicole?
A Nicole Daedone --
Q Okay. Go ahead, please.
A -- and Reese were sitting at the table.
And I kind of knew that something was up with her previous assistant, so I knew that position was sort of open. So as I was -- Rob was calling me to that table, I was thinking, like, could this be? Like, really? No?
And got to the table and was offered the position. Told that it was of interest to them that I be their assistant.
Q And what, if anything, did Nicole Daedone say to you when offering you the position?
A How good are you at sucking cock.
Q And who else was there for that?
A Reese Jones was there. I believe Rob was there.
Q What happened next?
A We talked about the position -- I said I was good at it.
We talked about the other elements of the position, I believe, and then I became her assistant.
Q Who was -- you mentioned an assistant before you. Who was Nicole Daedone's assistant before you?
A Alisha Price.

Q Was that the same individual who we just looked at in Government Exhibit 205?
A Yes.
Q What happened to Alisha Price?
MS. BONJEAN: Objection to the vagueness.
THE COURT: Yes. Sustained.
Q At that point in time, what had happened to Alisha Price that she was no longer Nicole's assistant, to the extent that you know?
A I don't know what happened.
Q And based on your own personal observations, what were Nicole Daedone and Alisha Price's relationship like?
A They were very close. They were -- Alisha was very -- in the same way that I was really interested in Nicole's approval and teachings, in that way she had a similar devotional kind of respect for her or relationship with her. Yeah. It was very close, and then something happened and then it became less close.
Q What did it mean to you be Nicole Daedone's assistant?
A It was extraordinary. It was like the top training opportunity, like, possibility. It was like being close to the sun. It was just -- it was such an amazing, yay, wow, this is going to be great thing.
Q And as a practical matter, what did it mean for your life?

A I would go to morning practice every day, like usually I am living in the Warehouse, but then after that I would spend the rest of day attending to all of the different things that Nicole needed to have happen in her world.

So I was -- the training was in orgasmic -- not so much the orgasm practice, but in how to pay really, really exquisite attention on somebody else's needs, and almost to the point of being able to anticipate them, sort of like a, you know, like you would at a three star Michelin restaurant kind of thing, quality of care and attention.

And then, also, being in kind of heightened levels of stress that one would think is beyond their capacity in order to be able to build the capacity to have attention and stay conscious and perform under a lot of pressure, to just get stronger and more powerful.

Q At that time when you took the role of Nicole Daedone's assistant, what kind of psychological state were you in?

MS. BONJEAN: Objection to the vagueness. Foundation. And relevance.

THE COURT: Overruled.

A I was completely in 100 percent in the OneTaste -- yes to everything OneTaste was about and wanted from me, and was completely focused on the mission and totally ready and willing to do anything.

Q And what are the ways in which you were brought to that

place?

MS. BONJEAN: Objection to the vagueness of that.

MS. COHEN: Yeah.

THE COURT: Sustained.

Q So you testified at that moment in time that you were completely into OneTaste and saying yes.

What are the specific ways that got you to that place?

A I had now had a lot of experience with the initial -- kind of that way, where like the people here were so friendly to me, like so kind, and so much warmth, and so much vulnerability, and we were having so much -- I was accepted and I belonged.

There were these experiences that were like these sort of peak experiences where I had to get on board or else I'd be kind of shunned or kicked out of the community. And so then I had started like -- I was no longer critically thinking on my own. I was just formed -- like making myself be a yes in order to be able to keep doing this really meaningful work that I was doing, that I did see bring tremendous positive things to me. So the learnings, the teachings, there were some that extraordinarily good. So I was growing, I was waking up, I was more powerful, I was more aware, I was more turned on. But there was like no room for anything outside of -- in order to get closer in -- how do I put this.

The closer I was to whatever it was that was required by the system and by what Nicole wanted or needed, the closer I'd be able to come in to work to be close to her. And so over a period of a year and a half or two years of doing that, and having that kind of behavior reenforced in a positive way, it just became that that was now the default.

Q When you were working as Nicole's assistant, were there set hours?

A No.

Q How many hours per day? What was your -- what was that job expectation in terms of hours?

A I was on call 24/7.

Q How many days a week?

A Seven.

Q Were you paid the same as before?

A Yes.

Q What were some of your duties as Nicole Daedone's assistant?

A There was -- I had -- in the morning, I'd go to Whole Foods and I would get food for Reese. There would be things like picking up dry cleaning, and cleaning her room, and making sure she and Reese had the food that they needed, and going doing errands, and booking travel, picking up food, doing dishes. Whatever was sort of needed around the house. And then whatever she needed, as she was moving through the

was already being treated like this VIP and all sorts of different sexual scenes and experiences were created for him. And so I understood that him being happy and pleasured in a sexual way was important to the system, the purpose of OneTaste.

Q Were you physically attracted to Reese Jones?

A No.

MS. BONJEAN: Objection. Relevance.

THE COURT: Overruled.

A No.

Q So why did you agree to do this, Ms. Berkley?

A Because I believed her completely, trusted her completely, that this was part of my training and was part of me growing and becoming more powerful, and because I wanted her approval. And because it was -- I didn't think that I would be able to be in this training position, top training position if I didn't do it. So it was fine.

Q What, if any, other services did you provide to Reese Jones while serving as Nicole Daedone's assistant?

A I would -- a few times we went to a different -- I think it was a sexological body worker, a different person who gives massages of a sexual nature. So he'd be on a massage table, and this other person would be massaging him, and then ultimately stroking his cock and leading these breath work exercises so that would amplify the orgasm, and I'd be also

time in the New York Center, and he was coming out to -- he came out to San Francisco to see her demo, and they were going to spend, I think it was Easter weekend -- it was over three days, two or three days, and I think it was around Easter, together.

Q When you're referencing "the demo," are you referencing that Stinson Beach demo?

A Yes.

Q And so what happened?

A So a little while before that, she said to me -- I don't know, like a week or two weeks before that was going to happen, she mentioned to me that she was thinking of seeing if I wanted to do something or suggesting to me to do something, where I would be there with Reese sort of taking her place in a different way than I was with him up until that point while she went to be with OM for the two or three days. It was a different scenario. Like, I'd kind of be the woman for the house kind of thing for three days.

Q And what do you mean by that? What was different about that than you had been doing previously?

A I'd be sleeping in her bed, I would be with him 24/7. It would be more like being his girlfriend than just seeing him in the mornings and stroking him. So we would -- we went to dinner, we went shopping, we drove around, we talked. It was a very different being with him completely

figure out what to do, and I was like, well, I have another -- I have skills as a personal assistant now that are really good, and I kind of got curious because I was also doing the sexuality part.

So I went on Craigslist back when they had erotic services on Craigslist, and I looked up to see if this was a thing, and it was. There was an ad for a very personal assistant. So that was just like, oh, okay, that was a sideways step into that. So I was, like, curious to see what that was, so I went for an interview. I had the sort of interview about the administrative part of the job, and then the guy was like, well, you know, if I was going to offer you the job, I have to really review you, so -- wink wink. And so I had sex with him, and it was fun, and he paid me a few hundred dollars.

And then it was like -- I left and I was like, well, I could do that, but then why would I -- I don't really want to spend the rest of the seven hours of the day doing assistant work if that was fun; I can just do that. And so then I started to explore on Craigslist to see what being an escort could be like.

Q And did you begin working as an escort?

A I did.

Q How, if at all, did your time at OneTaste impact your decision to work as an escort?

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Well, why did you decide to work as an escort? Apart from the financial reasons.

A So there was the -- so there was that, but there was -- it was -- I realized, like, this was a really amazing opportunity for me to continue some research that I had already started around the principle of being able to get turned on by any stroke, which was one of the main principles at OneTaste when I was there. So I had been researching that on my own because I knew it applied in the orgasmic meditation practice, so that's real, and I had done some other research to see if that applied to sexuality; like, regular sex.

And then I wanted, like -- but it was still within my research that I was doing, still within the context of people who were trained and in this practice and still were all my friends. So here it was like, oh, I have this sample of -- opportunity to have this sample of totally random people from all walks of life to see if this principle applied in the world, because if the purpose of the mission is to spread orgasmic meditation and the teachings of it and principles of it, sure, they all work within the context of our bubble, but do they actually help people in the world. And so it was sort of really exciting

Q Did you stop working as an escort?
A Yes.
Q And approximately when was that?
A I don't remember the date specifically.
Q Is there something that would refresh your recollection?
A Yes.
MS. BENSING: Could we please pull up 3500-CB-10 for the witness only.
A May of 2009.
MS. BENSING: Okay. We can take that down.
Q When you got back involved with OneTaste, what role did you have?
A When I got back involved, I was support staff. I was helping out in the back of the room and then slowly starting to get opportunities to teach a little bit here and there.
Q Was that significant to you, the opportunity to teach?
A Yes.
Q Why?
A Because it was an opportunity to begin to share and to sort of let the material that I had learned about and experienced and sort of become in the depth and really good at, to share it with others. It was also a totally new skill in and of itself that I was a little bit scared and then found my footing. And so I felt I was more in my

power, really confident to now be able to teach others, and it made me really happy to do so. I also felt like I was supporting the organization by doing that. Like, I was helping it with its purpose, which was my purpose even more than just setting up chairs and stuff like that. So it was great.

Q And what happened next in terms of your job responsibilities?

A After about, like, a year -- I don't know, timing is strange -- but after a while, the leader of the New York Center sort of switched over twice, and it just kept not taking off and making sense, so they had decided to shut it down. I had decided that I didn't want to go back to San Francisco, so I said that I would run it by myself. I wanted to stay and I wanted to run it on my own.

Q Approximately when did you start running the New York Center?

A I don't remember exactly.

Q And is there something that would refresh your recollection?

A Yes.

MS. BENSING: If we can pull up for the witness only 3500-CB-10.

Q Just let me know if this refreshes your recollection.

A Yeah, August of 2009.

Q Did you take on any --
A Sell everything that was sold. I was the only salesperson. So I'd run events during the week, and then there would be a training course, training weekend, where people could learn how to OM. So then I'd sell from whatever the event was, whoever came, to see who would want to go further and then learn OMing and do that. And then from the OMing classes, then there were other workshops also -- they had started doing coaching programs, so enrolling people into the coaching programs.
Q What, if any, interactions did you have with Rachel Cherwitz during this time period with respect to sales?
A There was this one call I remember. So Ken Blackman came out to teach a course with me, and we did a great job, it was a great course. We needed to enroll from that course into the upcoming coaching program. So afterward, the course happened, and then I set up conversations, sold however many enrollments I managed to enroll. I wasn't very good at sales at that time.
So when I reported to Rachel Cherwitz how much -- how many people signed up for the coaching program, that was definitely a lower number than she wanted. So she called me, we had this phone call, and it was really intense; that's not good enough, we need more, go get more, do whatever you need to do. Like, pressure. I don't remember

A There was one coaching program weekend where he was -- he flew out -- we flew out together. He and I had started really seeing each other, we were really connected, and he was helping me with teaching and he was very well trained in the stroking practice. I was very, very into him, very infatuated, totally in love. We flew out, he was in the program, and that weekend it was made clear to me that this was not approved of and I needed to -- basically, I need to choose between this relationship or being at OneTaste.

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q So you testified that you came out for --

MS. BENSING: Just to clarify, Your Honor, it was to the last part --

THE COURT: No, it was to the answer.

MS. BENSING: Okay.

THE COURT: I'm sustaining the objection to the question. You can ask a different question.

MS. BENSING: Thank you, Your Honor.

Q So you testified that you were flying back and forth between New York and San Francisco. Did Vladimir come with you on one of those occasions?

A Yes.

Q And did you have a conversation with anybody from OneTaste with respect to your relationship with Vladimir?

Without getting into the contents of the conversation yet.
A Yes, with Yia Vang.
Q Who was Yia Vang? What was Yia Vang's role at that time?
A She was one of the core members. I don't remember if she was still Nicole's assistant or not.
Q And as one of the core members, who did Yia Vang report to?
A Nicole Daedone.
Q What, if anything, did Yia Vang relate to you with respect to your relationship with Vladimir?
MS. BONJEAN: Objection under Rule 801(d)(2)(E).
THE COURT: Response?
MS. BENSING: Your Honor, I think we've established the agency prong.
MS. BONJEAN: Objection on that ground, as well as hearsay.
THE COURT: Sorry. You reference, Ms. Bonjean, (d)(2)(E), correct?
MS. BONJEAN: Yes. I wasn't sure what the proposed exception was, but I'm just objecting on hearsay grounds.
THE COURT: Okay.
Government?
MS. BENSING: Your Honor, we submit that we've

established the agency prong, and if not, we would request it under the prong after that subject to connection.

THE COURT: Admitted subject to connection. Objection is overruled.

Q You could answer.

A She relayed to me that I'm going to need to choose -- there's going to come a time soon where I'm going to need to choose between this relationship and OneTaste.

Q And what, if any, impact did that have on you at that point in time?

A It was awful. It was shocking and awful and horrible and stressful and, like -- it was, like, something like existential fear. Also, what? After all -- like, I've been running this by myself out here, holding this entire New York office alone, and really? Like, the threat to have to choose, again, about a relationship or being kicked out of this place that I've done so much -- like, put my heart and soul and absolutely everything into and believed so completely in and have given so much for, and somehow my commitment was being, I don't know -- it was existentially -- not traumatic, but existentially stressful, like, ah, what's going to happen to my life. And also the stress at, oh, no, do I have to not be with this partner that was really lighting me up and I really was falling in love with. Yeah, it was very stressful.

Q Did there come a time, when you were flying back and forth between New York and San Francisco for this coaching program, where you attended a lunch with Nicole Daedone and others?
A Yeah, that weekend.
Q The same weekend?
A That same weekend, yeah.
Q And what happened?
A There was a lunch that we all went to, all the people that were working production, the core members. I live away, I live far away, and so every time I'd come for a weekend, it was also an opportunity to, like, see my best friends in the whole wide world who were like my family now. It was bizarre. As we got into the cars, no one would talk to me. No one was talking to me or looking at me, like making eye contact.
When we got to the place where we were eating, I was just sort of standing by myself, and everyone was sort of talking with each other and completely ignoring me like I was being shunned.
And then the lunch happened and we were eating our food, I'm sitting at the table eating, everyone is talking and having fun, et cetera. At one point, Nicole told a story or used a metaphor about something to do with something related to me and how I was being in this

relationship sort of as a teaching tale and that it was wrong how I was being with it, in front of everybody. It was all about me. And it was me alone, no one would talk -- it was, again, one of these experiences of, like, just humiliation and shame and being shunned and oh, no.

Q Did there come a time, around this same time period when you were flying back and forth, that you had a conversation with Nicole Daedone about Rachel Cherwitz?

A Yes.

Q What was that conversation?

A Rachel had come out to -- every now and then somebody would be sent out to New York to spend a little bit of time with me just to sort of resource me a little bit so I wouldn't be alone the whole time. So Rachel Cherwitz had come out for a little while. In that time, because of the space, there was something about New York because it wasn't in the pressure-cooker mothership, it was just me, I had had some conversations with Rachel that were really touching, and I felt her sharing with me about her past life and about things that were true for her that were outside, like they weren't kind of the OneTaste persona version of her, it was more her her, and I really felt for her.

And the next time I saw Nicole after that in person, we were in a parking lot, and because I believed that we're in a place where we're here to help each other

and we're also here teaching others through this coaching program how to help each other, help others and also ourselves, I asked Nicole, you know, there's this thing with Rachel that I sense inside that's -- however I described it, and how -- how can I help her? And Nicole kind of did a stunned kind of look and then took a pause for a moment, and then she said: You know the thing about Rachel, and I'm like, what? She's going to teach me what I can do to help her and I'll learn something. And she goes: She's loyal. And that was a serious crack for me.

Q When you say that was a serious crack for you, what do you mean?

A In my mind at that moment, the only two reasons she would make that -- she would say that --

MS. BONJEAN: I'm going to object to the speculation of the defendant's intent in saying something.

THE COURT: Sustained.

Q Did that comment contribute to your eventual decision to leave OneTaste?

A Yes.

Q Approximately how long after that conversation with Nicole did you end up leaving OneTaste?

A Six months maybe.

Q I'm sorry, how many?

A Six months, something like that.

Q Why did it take so long to leave?
A After spending years in that environment, everything I had was there, and the idea of leaving everyone that understood anything about me, Nicole, who was still -- I held in such extremely high esteem and I just loved, loved, all of -- this is where my job was. This is where I lived. This was my purpose. What gave my life meaning and purpose was all here. And so -- and then all of my thinking was very much about everything here is good and everyone here is good and we know what we're doing, and we're on the right track to enlightenment and everyone outside of here isn't.
And so outside of the bubble, there was this very heavy in/out dynamic, and so the people were kind of -- we would call them muggles. I think that term maybe came after me. But we would have judgmentalness about people outside of this bubble, and so what was out there was, like, maybe well-meaning people, but that didn't understand or get it. So there was not going to be anywhere to go to where anyone would understand anything about me. All of my previous relationships were gone. What would I do for a living because this was -- I wasn't going to be an escort again because I was complete with that experience.
So it was just, like, an impossible thought to start off with, and then slowly beginning to, like, really? Like, it felt -- it was, like, psychologically impossible.

MS. BONJEAN: Yes, Your Honor. I will begin.

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Berkley.

A Good afternoon.

Q My name is Jennifer Bonjean and I represent Nicole Daedone. You were actually associated with OneTaste for about seven years; isn't that right?

A I don't believe it is.

Q Well, you need to look back at your timeline. We can do that. But you remember, I think you testified you started taking classes and went to your first event in about August of 2006, right?

A Right.

Q And you left OneTaste in December of 2010, right?

A Yes.

Q But then you continued to contract with them; isn't that right?

A I don't know what that means.

Q Well, do you remember having an arrangement with them where you would get paid after 2010 for bringing in business?

A I don't remember that, but that could be true.

Q Okay. Well, why don't we -- I'm going to have you take a look at Defense Exhibit -- one second. Let's look at -- let

me ask you this. Do you remember continuing to have OM circles up until 2013?
A Yes.
Q And --
A Although I changed the name of them eventually.
Q You started a competing business, right?
A No.
Q You started practicing and teaching OM, correct? Do you remember that?
A Yes, that is what that was. The competing with them description of it was not accurate.
Q Well, it involved stimulating a woman's clitoris, the practice?
A Yes, yes.
Q We're going to come back to that and go through the timeline a little bit. Let me ask you this. You certainly were there at OneTaste either working or participating in a direct way since August of 2006 to the end of 2010; is that right?
A Yes.
Q December of 2010, right?
A Yes.
Q That's over four years at a minimum, correct?
A Yes.
Q Then you did maintain your relationship with people at

OneTaste past that, correct?
A Very lightly. I don't really remember that, but I think that's probably true but very lightly.
Q Would you consider living in Maya Gilbert's grandfather's loft maintaining a connection with someone from OneTaste?
A Yes. She's the only person that I remember staying in contact with.
Q So you were concerned about losing your friends, but you actually lived in a beautiful Manhattan loft of one of your friend's family members after OneTaste, correct?
A Yes, and that was through him because I knew that it would be available the following year.
Q Right. But again, my point is this was a relationship that you made through Maya Gilbert, who was someone associated with OneTaste, right?
A Yes.
Q A friend, right?
A She had been a friend, yes.
Q And she stayed a friend of yours for years, correct?
A I really loved Maya.
Q Is that a yes?
A Not for years, for a little bit of time.
Q Do you remember communicating with her as far as 2017?
A I know she reached out at some point to see me, and then I didn't see her, but she did reach out. I don't know when

that was.
Q And you communicated with her in 2017, right?
A I don't know.
Q I'm going to back up a second. We'll get to that. I want to ask you some other questions. We're going to shift gears for a second. Over the past three years you have been interviewed by the FBI and a cadre of Assistant United States Attorneys in connection with this case, correct?
A Yes.
Q In fact, let me ask it this way. Do you know how many times you've been interviewed by a member of the U.S. government?
A No.
Q Does it sound correct that you have been interviewed by them on almost a dozen times?
A Yeah.
Q And some of those interviews lasted hours, correct?
A Yes.
Q And isn't it true, Ms. Berkley, that the alleged trauma that you felt from being a part of OneTaste was not as a result of any sexuality practices?
A That's true.
Q And isn't it true that you explored a lot and never felt any shame or that bad things happened to you with OneTaste sexually, right?

A There were some OMs I would rather not have had when I was helping out in courses, but other than that, no.
Q You told the U.S. government, U.S. attorneys, as well as the FBI that you never felt any shame or that bad things had happened to you with OneTaste sexually, correct?
A Yes.
Q And in connection with Reese Jones, isn't it true that you had no issues using all of your skills to please Jones?
A That's true.
Q Isn't it true, Ms. Berkley, that you had no regrets about OneTaste and would do it again; OneTaste felt like a choice?
A True.
Q You never felt pressured to pay for courses; isn't that correct?
A I don't remember.
Q Well, do you recall giving an interview, one of the interviews, with members of the federal government, including Special Agent McGinnis, Special Agent Daniel Schmidt, and Assistant United States Attorney Gillian Kassner, and Assistant United States Attorney Lauren Elbert on February 8, 2023?
A Do I recall that meeting?
Q Yes.
A I don't know what that specific one was.
Q Okay.

A But I did meet with individuals.
Q And would anything refresh your recollection about the meeting and the contents of that meeting?
A Yeah, if you have something.
MS. BONJEAN: May I approach, Your Honor?
THE COURT: Yes. Let me know what you're giving her.
MS. BONJEAN: 3500 CB-3.
THE COURT: Okay.
Q Ms. Berkley, I'm going to ask that you turn to the third page, there's three of six, and to the second full paragraph, if you would, and just read that paragraph to yourself when you get there.
THE COURT: I'm going to need this, as well.
MS. BONJEAN: I'm sorry, Your Honor?
THE COURT: I need it as well. You can put it on the screen for me.
MS. BENSING: Your Honor, I believe the government provided your deputy with a copy of all the 3500 for this witness.
MS. BONJEAN: I have paper copies.
THE COURT: I'll go with this. Thank you.
MS. BONJEAN: May I proceed, Your Honor?
THE COURT: Yes.
BY MS. BONJEAN:

Q You recall telling the FBI agents and U.S. attorneys that you never felt pressured to pay for courses?
A Which paragraph did you want me to read?
Q It's the second full paragraph, on page three of six.
A Okay. I don't recall saying that, and that's what it says here.
Q Okay. Would you agree that you never felt pressured to pay for courses?
A I don't remember feeling pressured.
Q You can put that aside. Thank you. Isn't it true that you learned self empowerment from OneTaste?
A Yes.
Q Now, you became acquainted with OneTaste I think you said in 2006 when you were living with your husband in San Francisco. Do I have that correct?
A Yes.
Q And you were about 27 or 28 years old, right?
A That's right.
Q And you already had a bachelor's degree from the University of Montreal, right?
A McGill University.
Q McGill University. My apologies. It's a very prestigious school in Canada. Would you agree?
A Yes.
Q You studied finance and pre-med?

A Microbiology and immunology.
Q Microbiology and immunology; is that right?
A Yes.
Q And after you moved to San Francisco, you were studying to get your doctorate in psychology; is that right?
A I was going to apply to get into a program, to get a doctorate in psychology.
Q And your husband at the time was a scholar, correct?
A Yes.
Q What was his area of expertise?
A Economics.
Q And you described how you became acquainted with OneTaste by a co-worker bringing a flyer for an event that was called Gypsy Nights, right?
A That's right.
Q And it advertised or indicated that there was going to be a demonstration of an OM, right?
A Yes.
Q And at this time you were looking to find intimacy with your husband?
A Yes.
Q You wanted to be more sexually adventurous with him, correct?
A Yes.
Q And this event piqued your interest because you thought

perhaps this might be a vehicle to obtain that, correct?
A Yes.
Q And so you went to the event, right?
A That's right.
Q Fair to say nobody at that event pushed you to buy future courses or come to sign up for any expensive courses, right?
A That's right.
Q But you learned at this event that OneTaste taught meditation and communication between couples, right?
A Yep.
Q And it was kind of all about intimacy building, right?
A Yes.
Q It had a mindfulness, an eastern philosophy type of influence, right?
A I didn't know that at that event, but it does have that.
Q Now, after going to this class or this event, you became extremely interested in OneTaste, right?
A Yes.
Q It resonated in you in some way, fair?
A Yes.
Q That was about you, something in you, correct?
A Yes.
Q Wasn't anybody else that was saying you should go to these things; there was something about that event that was interesting to you, correct?

Q And isn't it true that you weren't worried about this little excursion because you could always get another job, right?
A I don't remember that. I'm not sure what you're asking.
Q Do you remember telling the federal agents and federal government that you weren't worried about this excursion because you always could get -- could leave and get another job?
A I don't remember telling them that.
Q Is that accurate?
A I don't remember thinking that. So it's possible that I thought that.
Q Let me ask you this. You were consciously aware that leaving your husband would put you into poverty; isn't that right?
A Yes.
Q So you knew when you left your life with David and you quit your vet job and you moved into this Warehouse that it would put you into poverty?
A Yes.
Q And you did it nonetheless, correct?
A Yes.
Q Now, you testified that you stopped speaking to your parents but no one told you to do that, right?
A No.

Q And in fairness, I think you would agree that your parents were Romanian immigrants, right?
A Yes.
Q Probably would not be cool with the fact that they immigrated here so you could join the Warehouse, right?
A Yes.
Q Probably made a lot of sacrifices so you could get that very fancy education you got at McGill, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Well, there were sacrifices made so you could attend college and get this college degree, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A They worked hard. I don't know if they made sacrifices. They worked hard.
Q You didn't talk to them because that would have been a disappointment to them that you joined this Warehouse to explore your sexuality, right?
A Yes.
Q Fair to say they were conservative types?
A Yes.
Q Now, OneTaste offered a number of -- strike that. Let me ask you this. Do you remember having to fill out an application to join the Warehouse?

A I don't remember that.
Q You testified, I think, that not anybody could just walk into the Warehouse and say I want to live here. Right? There was a vetting process?
A Yes.
Q And part of the vetting process was to make sure that whoever was joining the Warehouse shared the same vision and mission or values as the people living in the Warehouse. Right?
A Yes.
Q I mean it's a community of people, right?
A It is.
Q And it's with an intense -- it was an intense process, right?
A It was.
Q And one of the purposes of joining the Warehouse was to, as you said, sort of research sexuality, correct?
A Yes.
Q And for you that also meant researching people?
A Yes.
Q You had a specific interest in this already before you even got there, right?
A That's true, yes.
Q Now, you worked at the massage parlor there?
A Yes.

Warehouse, right?

MS. BENSING: Objection.

THE COURT: Overruled.

A That's not across the board true. So I did not see it that way. Some people -- it was for people to experience how they wanted, following their desire of what they wanted. So some people, like you mentioned, were monogamous.

I saw that as an example of a possibility. So, therefore, being in a relationship with somebody and being with that person mainly to me matched what was possible in this community.

Q And some research partners there didn't have to be any sex at all, right?

A That's right.

Q Now even after you had this -- again, I'm using the word scolding, but sort of this statement from Ms. Daedone about taking a research partner, you still didn't take Bert as your research partner, did you?

A That's right.

Q You went to dinner with him, right?

A Yes.

Q And halfway through your meal you said I cannot do this, right?

A That's right.

Q You said I'm not going to do this, correct?

A Yes.
Q And then instead you said listen, can I tell you something about your dating skills and kind of gave him some advice, right?
A Right.
Q And he accepted that advice and it sounds like it ended being a learning experience for both of you, right?
A I don't known what it was for him. For me it was my self preservation kicked in and it was what it was.
Q Right. And nobody forced you to be with Bert, did they?
A There was a lot of psychological pressure put on me to be with him.
Q Apart from Ms. Daedone saying if you want to really be, go to the next level, you should take our advice about research partners. I think that's what you testified to, right?
A I should, something like that.
Q Apart from that one statement, what was the big psychological pressure to be research partners with Bert?
A It was that one statement but it was the entire sort of psychological feel there that over time had an affect on me. That up down vote, for example.
Q Let's stick on Bert for a second.
THE COURT: Let her finish the answer and then you can ask the next question. I don't think she was done.

A That had a cumulative affect that doing what Nicole wanted was, and everyone around was watching, was like it wasn't just that one statement. It was a cumulative experience over time.
Q I'm asking specifically about Bert. Apart from her passing comment about you wanted to take this intense experience at OneTaste to the next level, you know maybe you would have taken our suggestion about this one research partner.
Apart from that statement, was there anything else that anybody said to you that put pressure on you to be with Bert?
A During that specific time that day or --
Q Anytime.
A Not that I remember.
Q And despite that experience, you stayed on at OneTaste, right?
A Yes.
Q You also stayed on seeing Isaac, even though allegedly you were told not to, right?
A Yes.
Q At one point you were asked, I think you -- do you remember being at Stinson Beach, I think at one point, and being suggested or asked to give a professor of some type a massage and you declined. Do you remember that?

A Yes.
Q You said no and Daedone said okay. Do you remember that?
A Yes.
Q And do you recall writing journal entries about your time at OneTaste back in 2007?
A I remember not in particular, but I may have. I know there was a chat board. I don't know if that's what you're referring to.
Q Tell us what that is.
A Online on their web site there was like a chat forum where people would write their thoughts and feelings about things in a public forum. It was sort of like Facebook before Facebook.
Q That was something you did?
A Yes.
Q And do you remember writing on that chat board extremely positive things about being in the community?
A Yes.
Q And you were very excited in March of 2007 to be part of the community, right?
A Yes.
Q You were embracing all the intensity of it, fair?
A Yes.
Q You understood what the intensity of it was, right?
A No.

Q Well, you understood you were going to sleep in beds with other people, correct?
A Yes.
Q You understood that its purpose was to explore sexuality in a way that you had not previously, right?
A That's right.
Q You understood after being there for sometime some of the exercises that were part of living in the Warehouse, right?
A I don't know what you mean by exercises. Do you mean morning practice?
Q Well, morning practice was OMing, right?
A OMing and withholds.
Q I would call that a practice. What would you call it?
A A practice.
Q I think I said exercise, but fair enough. So morning practice involved OMing and withholds, right?
A Yes, that's right.
Q These are all things you got acquainted with very quickly, correct?
A Yes.
Q You enjoyed those things, right?
A Sometimes. Often.
Q Well, like anything, I guess sometimes you didn't enjoy it but you voluntarily did it every morning, right?
A Yes.

Q You didn't walk out the door, correct?
A Yes.
Q The door wasn't locked, fair?
A Yes.
Q You had your phone, correct?
A Yes.
Q You had a computer, right?
A Yes.
Q Did you do yoga?
A No.
Q Did you meditate apart from OMing?
A Not really. Not at the time.
Q Isn't it true that you were clearly and fiercely committed to OneTaste in 2007, and you announced I'm ready, I'd like the red pill, please. Do you remember saying that?
A I don't remember saying that.
Q Do you know what the red pill means? What's meant by that?
A It's from the Matrix. So sort of to keep life as being what it normally is, or take the red pill in the sense of waking up.
Q Would anything refresh your recollection about whether you posted that publicly?
A Something could.
Q I would ask just for the witness, please, 23-AF.

MS. BENSING: Your Honor the government would request a copy of this.
MS. BONJEAN: We're handing it. If you could pull out the bottom.
A I can't tell what the top right corner says. Okay.
Q Does this refresh your recollection about whether you publically announced that you wanted to be red pilled?
A I don't remember, but I believe that this is accurate. If you found it on the chat board, then it is accurate.
Q Do you remember feeling that way?
A I remember feeling extremely excited to be there.
Q And this was after about four months of being there?
A Yes.
Q Now, at some point you realized you didn't really want to work in the massage studio, right?
A I don't remember that.
Q You said your fingers hurt, on direct examination. Do you remember that?
A I didn't do massage, massage but I still -- I couldn't do actual massage, but I could run the massage studio. It was very different. So I took my name off the list of directory of people if they wanted massages. So I was no longer one of the massage therapists available, but I was still running the massage studio.
Q You didn't want to do massage, right?

A Right.
Q And you eventually were asked to be Ms. Daedone's personal assistant, right?
A I don't remember asking.
Q You were asked.
A Oh, I was asked.
Q Right.
A Yes.
Q And that was a top tier job within the community, correct?
A Yes.
Q And that was something that you were excited about, right?
A Yes.
Q That was something you wanted to do, correct?
A Yes.
Q And you were actually asked whether you wanted to be an assistant to Ms. Daedone in the presence of Rob Kandell; is that right?
A I believe so.
Q And Reese Jones was there as well, right?
A Yes.
Q And you testified that Ms. Daedone asked you something along the lines of how well do you suck cock, or something like that?

A That's right.
Q What did you say?
A That I was good at it.
Q So you understood at that point that part of the job of being an assistant was to service or pleasure Reese Jones, right?
A Yes.
Q And as you said earlier, you were absolutely okay with using your skills in that way, right?
A In that context, yes.
Q Yes. I think you would agree that if you weren't okay with that she would have found somebody else, if they wanted to, to take up that role, right?
A Yes. Do you mean the training position or do you mean just the stroking part?
Q That was part and parcel, right?
A Yes.
Q The two went hand in hand, correct?
A Yes.
Q There were no bait and switch. You knew what you were signing up for, correct?
A Yes.
Q And understanding what you were signing up for, you took that opportunity, correct?
A Yes.

Q Now, you testified that you worked like 24/7, right?
A I was on call 24/7.
Q You were on call, but you didn't work 24/7, correct?
A Correct.
Q And you actually enjoyed that position as the assistant, fair?
A Yes.
Q In fact, you were excited about it, correct?
A Yes.
Q And it's one of those experiences that you tell people was some of the cool, crazy shit you've done, right?
A Yes.
Q It was not a bad experience, correct?
A Correct.
Q And at one point you -- strike that. On direct examination you recounted for the jury a situation where Ms. Daedone went away for a weekend with a different love interest of some type, right?
A Yes.
Q And she said something along the lines of, go all in, have at it, right, while I'm away?
A Yeah. It was more than once than that but yes, she said go all the way in.
Q She said go all the way in?
A Yes.

Q You interpreted that to mean like this is going to be something more than just my task of stroking Reese Jones in the morning, right?
A Yes, it was a different exploration.
Q You were excited about that?
A Yes.
Q And during that week end you said you felt like you were queen of the manor, lady of the manor?
A Lady of the house.
Q Lady of the house?
A I was sleeping in her bed and using her shower. It was just him and me and it was really fun.
Q And you liked him too, correct, meaning --
A Yeah. As a person, yes.
Q You liked him as a person, right?
A Uh-huh.
Q He was extremely interesting, correct?
A Yes.
Q Very smart?
A Yes.
Q Charming?
A He was someone I enjoyed spending time with.
Q During that weekend he took you shopping, right?
A Yes.
Q He spent a few thousand dollars on you, correct?

A I think like two, maybe. I don't remember how much but it was more than one.
Q Did you tell the federal government it was about three?
A Maybe.
Q That was nice too, right?
A Yes.
Q And then at some point Ms. Daedone returned from wherever she was at, correct?
A Yes.
Q And you felt like you wanted to maintain your lady of the house role, right?
A I didn't know what I was supposed to be doing or what had shifted. So it wasn't clear. I wasn't -- I didn't want to take over her role. I was -- like I didn't know what my role would be or if it would be different than the service sort of position just that. If she wanted to pull me back from that or not, I didn't know.
Q You worked as her assistant, right?
A Yes.
Q This one weekend you kind of weren't working as her assistant, so when she returned you weren't sure am I still the assistant, right?
A Something like that.
Q And --
A I knew I was her assistant. I just didn't know if and

THE COURT: Sustained.
Q You testified earlier that you didn't think you had as much time associated with OneTaste as I had suggested in the first part of this cross-examination.
Do you remember that?
A Yes.
Q Okay. And if you accept as true that you were still getting commissions in 2013, that would say you were associated with OneTaste for about seven years, right?
MS. BENSING: Objection.
THE COURT: Overruled.
A That -- if -- like sending somebody there because they were interested in the material, I wasn't working there. It was, like, a slow process of figuring out my relationship to OneTaste, and there were -- if there were people that were interested from this, I can guess at what I was doing by sending them there because that's where they could get the learning they were looking for, and I don't remember doing that a lot. Like, if it -- I just don't remember.
Q Do you remember getting a W-9 as late as September of 2013?
A No.
Q Now, it is true that you also did create something called the Orgasmic Collection, correct?
A The Orgasm Collective.

Q Orgasm Collective, my apologies. Right?
A Yes.
Q Tell the ladies and gentlemen what the Orgasm Collective was.
A It was a community -- I guess a community -- it was people who were trained in stroking from wherever they may have been trained in stroking, whether that was at OneTaste or other places where people learn how to do this practice or something similar to it, stroking practice, as it's been taught for much longer than OneTaste has existed. So anyone who was trained in any stroking, there would be biweekly -- every other Monday I would have -- we'd gather and do the practice together, and every now and then I'd also do a how-to -- I changed the name from OMing to GOing, I changed the practice a little bit to explore a little more connection with it. So I trained others in the stroking practice and that they could come to the biweekly sessions.
Q And you changed the name from OMing to GOing, correct?
A That's right.
Q What does go stand for?
A Gateway orgasm.
Q Gateway orgasm. But this wasn't any type of competing business, correct?
A Like, what she was doing was so big and she was, like, who she was. I wasn't trying to be that and compete with

just wanted to follow up on that. You testified on both direct and cross-examination about learning about OneTaste, about going to see a demonstration about someone giving an orgasm, right?
A Yes.
Q And at that time, you were actually having -- your intimacy, you said, was off with your husband at the time, right?
A That's right.
Q And so that was appealing to you, right?
A Yes.
Q And you made that choice to go and watch that and see if you were interested in something more, right?
A Yes.
Q And, in fact, you were, correct? You became interested after that first demonstration?
A Yes.
Q And then you went to further OneTaste events, right?
A Yes.
Q And you took an introduction to OMing, correct?
A Yes. Well, it was called something else, but yeah.
Q But that was the idea, right?
A Yes.
Q Because really the whole point, one of the main things, besides getting close to people and connection, was the

OMing practice. I mean, if you didn't like OMing, you weren't going to go there, right?
A That's true. Are you asking -- can you ask that question again?
Q Yes. Sorry, that was confusing.
You wouldn't go to OneTaste if you didn't like the OM practice, correct?
A Correct.
Q Right. And it was very open. You knew what it was right at the beginning, correct?
A Yes.
Q And you made that choice to continue with OneTaste, right?
A I did choose to continue with OneTaste.
Q And then you liked it so much, that you decided to move into the Warehouse, right?
A Yes.
Q And you were aware before you moved in that you would be sharing a bed, right?
A Yes.
Q And you were aware that people swapped beds often, right?
A Yes.
Q And you were aware that there were communal showers, right?

A Yes.
Q And you made that choice to move in there, right?
A I did.
Q And, in fact, you didn't even move in there fully at the beginning. You did sort of a trial basis to see if you liked it, right?
A Yes.
Q And because of that trial basis, you decided to move in full time, right?
A Yes.
Q And that was a choice that you made?
A Yes.
Q And that choice was based on your experience in the Warehouse, right?
A It's more complicated than that. There -- there was a covert influence campaign going on that I was unaware of. And so there was influence along with what I felt I wanted -- that contributed to what I felt I wanted.
Q Whether or not you're looking back now saying -- whatever it was, I'm just simply asking you, you did have the choice whether to move in or not, correct?
A Yes.
Q And this was at the beginning, right?
A Yes.
Q And you knew about the research partners, right, right

away?
A Yes.
Q At some point you also said that your husband got a job as a professor in San Diego, right?
A In Michigan.
Q Oh, in Michigan, I'm sorry. I don't know where I got that --
A It was between the two.
Q Oh, okay. So he ended up taking the one in Michigan, right?
And you thought a lot about the decision, about what to do at that point, right?
A Yes.
Q And you said you didn't want to be a professor's wife, right?
A That's right.
Q But you could have moved with him and had been a professor's wife, right?
A Yes.
Q And you would have been part of his salary, right?
A We would be in the same household, so --
Q Yes. And you could have gotten a job there, right?
A Yes.
Q But you chose to stay instead, correct?
A Yes.

Q And then at some point you said you quit your job at the veterinary clinic, correct?
A Yes.
Q And that was another choice that you made, right?
A It was.
Q And another choice that you said you made was at some point you wanted to be all in at OneTaste, right?
A Yes.
Q And, in fact, there were some people who weren't all in, right?
A Yes.
Q And those people could come and go and take courses, right?
A Yes.
Q And they might not have been on what you called sort of the inner circle, right? They might not have been close to Nicole. But you could have done that, right?
A Been more on the outside?
Q Yes.
A Yes.
Q But you wanted to be on the inner circle, right?
A Yes.
Q And, you know, sort of you mentioned about being in high school and high school bullies. Sometimes being with the popular people might not be a good choice, but you want

possible.
Q Yes.
A Yeah.
Q Yes. And, in fact, OM demonstrations were somewhat of an honor within that community, correct?
A That's right.
Q And when you were there, you talked about the inner circle, and you also talked about being a part of something, right? You felt you were a part of something.
A Yes.
Q And you felt accepted, right?
A Yes.
Q And that was important to you, correct?
A Yes.
Q And then later on, you also testified both on direct and cross about at some point you were doing work as an escort --
A That's right.
Q -- to make extra money. And Nicole Daedone contacted you and said it's either OneTaste or the escort, you can't do both, right?
A That's right.
Q And you made the choice then to stay at OneTaste, right?
A That's right.

something messed up here, and there was also a large part of my mind or being that didn't want to see that, and still was so -- but this is so -- it was so good. And so it was very confusing. And so the process of slowly coming to terms with what was true and how actually -- I still loved the people. It wasn't like it turned off immediately. I still loved the people there, I believed in the practice there. I wanted to believe that it was like a good place. The pressure and humiliation was like not okay.

But like, slowly, I -- as I was separating from it and started to get my legs under me and the world, realized, oh, no, really, this is actually a cult.

And the people -- there were a couple people even who were going in to the coaching program, for example, who asked me to like key keep an eye on them.

MS. BONJEAN: Objection to the hearsay.

THE COURT: I think she's finished answering the question you asked. So I am going to strike that last comment. And if you have another question for this witness, you can ask it.

MS. BENSING: Thank you, Your Honor.

Q You were asked a lot of questions on cross-examination about choices, and I think you testified that OneTaste felt like a choice. What do you mean by that?

A There was -- it's like consent and informed consent.

MS. BONJEAN: I am going to object to the analogy of the legal -- partially a legal term.

THE COURT: Overruled.

A So it is like saying yes, but you don't know all of the facts of what you are saying yes to, and some of what was happening or what was going on was this covert influenced setup of this -- the way the whole system was setup, that was pulled where you didn't know, like, yes, you were waking up, but then there is this like secret little hook that all that power that you were awakening was for the system. Nobody said that. And so it was like you weren't consenting or saying yes or choosing, fully knowing all of the things that were going on that were happening at the same time to influence what your choice would be.

All the psychological tools that were being used so that, you know, not everybody, but some people were more vulnerable to, that would kind of become more and more brainwashed in this way, where they became these carbon copies of whatever the core way of being was supposed to be.

So the yeses were -- felt like yeses, felt like choices, but there's gas lighting and suggestion and humiliation, and this idea of don't be a victim, this idea of get turned on by any stroke, and this is the way to enlightenment.

MS. BONJEAN: Object to this long narrative at this

point.

THE COURT: It is responsive. Overruled.

Q You can finish your answer.

A You know, in here is like we know what's good, and if it doesn't feel that way to you, it is just because you're not awake enough yet, but this is the way. And so with the, you know, games, the don't be a victim, get turned on by any stroke, you start finding ways on the inside to be a yes and to make the choices in order to be able to wake up because you believe -- I believed completely, that they -- that what Nicole was teaching and saying was true, and that she really cared, and that she really was tapped in. And everyone else also was being in that way where we ended up policing each other --

MS. BONJEAN: Objection to her speaking about other people's --

THE COURT: Overruled.

A Like I policed people. Like you -- for their benefit. For their benefit.

And within that environment, your own thinking and your idea of like your own desire, like go for a vacation with your friends, or wanting to be a research partner with someone, there were some things that were like, yeah, go for your desire. And then there were some things that were like, nope, there's something wrong with your desire, and if you do

do that, then you are going to get somehow punished, shunned, threatened to be shunned, however, humiliated, scolded.

So then it's like, oh, my actual desire that came from me was off, but this desire that is in alignment with what OneTaste wants is good and right and rewarded. And because it felt so good with all that love and attention and approval and belonging and the love bombing, it like -- and the outside world became smaller and smaller with connections becoming less and less, that it became an imperative on the inside to find the yes and keep going. Because -- and there was benefit to a lot of it, too. So there's also that kind of like confliction in the mind because these things actually did bring benefit. So if some of them did, even this other stuff that doesn't actually feel so good, there must be a way that it does. Yeah.

Q You were asked on cross-examination whether the alleged trauma was as a result of any sexuality practice, and you testified it was not?

A That's right.

Q I want to be very clear. What was the trauma?

A The brainwashing.

MS. BENSING: I have no further questions.

THE COURT: Any recross-examination.

MS. BONJEAN: Yes.

THE COURT: Go ahead, Ms. Bonjean.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q You were a 28-year-old woman with a bachelors degree when you got involved with OneTaste, right?

A Yes.

Q And according to you, you were brainwashed by Ms. Daedone's ideas, right?

A No, that's not accurate. By the actions and system she set up.

Q So some love bombing, right?

A That's part of it.

Q Love bombing, like middle schoolers get love bombed? Kind of like that kind of love bombing?

MS. BENSING: Objection.

A I don't know what that is.

THE COURT: Yes. Sustained.

Q Love bombing, when people give you lots of love, right?

A It's an extreme version of people putting a lot of attention and affection and positive regard on you outside of what would be ordinarily called for within that context.

Q Right. And you ate it up, right?

A Totally.

Q Okay. You got scolded? That's another form of this big pressure that was put on you, right?

A I was shamed and humiliated publicly.

I have to find a way within myself that I suppress my own natural ideas and instincts and intuitions and figure out how I do want whatever it is that all of the things being presented are what I want.

Q Okay. So we got love bombing, we got scolding. Can you give me another example of humiliation other than the thumbs up, thumbs down?

A The Brian Bert example.

Q The Brian Bert example where she said maybe next time you'll take our suggestion for a research partner? Is that the one?

Is that a yes? Is that the one you are --

THE COURT: She needs to be able to answer, Ms. Bonjean. Give the witness the chance to answer before you ask the next question.

A Yes. The context of that experience was --

MS. BONJEAN: Judge, I would ask for an answer to my question. I didn't ask for a narrative.

THE COURT: Excuse me. She was answering your question.

Why don't you just pose a question now.

Q Okay. Were you referencing the scenario where Ms. Daedone said publicly, maybe -- if you really want to be so with our organization, maybe next time you will accept our research partner or the suggestion of a research partner? Is

that the incident you are talking about?
A Those are not the words she used, but that's the instance that I was talking about.
Q Okay. You testified about it already.
A Yes.
Q That's the -- that's what I'm trying to get at, right?
A Yes.
Q Okay. So we have the Mr. Bert example. We have the thumbs up, thumb down. We have general love bombing.
What else was a humiliating experience over the course of your seven years there that made you feel brainwashed?
A Oh, gosh. There were -- I don't remember specific ones. I remember that existing and pressure and gas lighting that were occurring to some regular degree, and the closer in the concentric circles, the more of that was happening.
Q Can you give me one factual example that you haven't already provided?
A There was, at the beginning, certain -- close to the beginning of when I was there, there was this -- in group night, where there was a communication game that we played regularly. And at the time I think I was living there part-time. And everyone was there, and there's a game that we play called hot seats. And do you guys -- I don't know if everyone knows what hot seats are or if I need to explain it.

Q There was some testimony about it. You can go on.
A Okay. So there's hot seats. So I was on the hot seat, and the question came why -- something like why haven't you moved in full-time yet. And I hadn't -- I was just like part-time. And so I started saying, well, something -- well, so the question came, why haven't you moved in full-time yet. And then I started to speak saying, oh, well, because David -- and then I wasn't able to finish my sentence, and I was taken off the hot seat immediately.
And the whole room sort of was in this uproar of like, whoa. And that moment was really exciting and thrilling, but it was at my expense because of the insinuation that -- I'm still not aware that I want to move in fully and leave my husband.
And I was remember thinking, like, do I want to leave my husband? These people are so nice to me. Everything that I am being taught is so valuable. Maybe they're seeing something I don't see. Okay, maybe I want to leave my husband. No, I don't. And then I would -- but the suggestion was dropped in, in this extremely intense psychological moment, in front of everybody.
Q That was part of the brainwashing, right?
A Yes.
Q And you did, indeed, leave your husband and stayed for the next six years, right?

and the programs ran smoothly. So you would be setting -- you would set up for the course, you would also make sure that there is tea and snacks available. And then during the course itself, you would usually be texting with various people to make sure that the people who are running it were well taken care of and had the support that they needed. So I would, like, run and get lunch for someone, for example, or whatever was needed in the moment.

Q In addition to back-of-house, did you perform any other labor or services for OneTaste?

A Yeah. It varied depending on the season of my time at OneTaste. But I did some PR and marketing stuff, I would do lead generation. I'm pretty sure I got involved -- actually, I know I got involved in sales, though I sucked at it. And then I was also involved in courses, but that wasn't work necessarily.

Q In addition to performing the tasks that you just described, did you perform any sexual services while you were at OneTaste?

A Yes.

Q And at a high level, what kinds of sexual services did you perform?

A I would OM with clients. I had a strap-on on me for a cock sucking demonstration at one point, and then I also serviced Reese Jones.

Q What, if anyone, directed you to perform the sexual services that you just described?
A Any of the core team for the OM partners. It was usually for newer complaints.
MS. BONJEAN: Objection to foundation.
THE COURT: Overruled.
Q Were you paid money to perform any of the forms of labor and services that you just described?
A I -- to my knowledge, I never received a check. It was payment in kind.
Q I want to take a step back and start at the beginning.
First, where did you grow up?
A Southern California.
Q Can you describe the kind of upbringing that you had?
A Yeah.
I was raised in a very loving household that was also very conservative. My parents had very traditional values and patriarchal values, and any deviation from what my father, who was the head of the household, said was okay was -- it wasn't allowed, right? So I had to stay within those patriarchal systems of family values. And that also meant that any authority figure was never challenged. If you -- if they said you jump, then you say how high.
Q And how was sex treated in your upbringing?
A It wasn't -- it wasn't really talked about. Sex was

something that you only did in the context of a marriage, and that part of me was -- had to be very suppressed in my young childhood and adult life.

Q In your view, did your upbringing later affect your experience in OneTaste?

A Absolutely.

Q How?

A I wasn't able to -- I didn't have the capacity within myself to challenge authority. So if someone who was my superior suggested something about my identity, I listened to them because I was a lost young adult. My brain wasn't fully developed. Yeah.

Q Did you attend college?

A I did.

Q What did you study?

A English and French in undergrad.

Q What did you do after completing your undergraduate education?

A I did a little bit of work, and I moved to Hawaii to do a whole lot of nothing, and then I moved back to the mainland because my mom had gotten sick, and that's when I ended up getting -- and then I found some is very rowdy friends, and that's when I ended up finding OneTaste.

Q And when, approximately, did you first learn about OneTaste?

A Late 2009, if I had to make my best guess.
Q How old were you then, approximately?
A 25, if I'm remembering correctly.
Q And how did you first learn about OneTaste?
A My friend, Aubrey Fuller, told me about it. She had been living at 1080.
Q And at that time that you first learned about OneTaste, where were you living?
A I was living with my boyfriend at the time, Malechai.
Q And how were you supporting yourself at that time?
A I had no job. I had just lost my job because it was right after the economic crash of 2008 and I had been teaching.
Q What was your financial situation at the time?
A Dismal.
Q What was the first OneTaste event that you attended?
A It was a TurnON event.
Q What is a TurnON?
A It's a space where they play games, as they call it. You kind of go around and -- I'm forgetting what they called that first game. But you would, like -- you know, if my sex was a kitchen item, what kitchen item would it be, right? And everyone would go around and answer that question.
The main thing that I remember from TurnON is what they call the Hot Seat.

Q What was Hot Seat?
A It was where one person was brought up to the front of the room to sit on a chair, and people could ask, one at a time, any question that they wanted. I mean, you could pass on the Hot Seat, but it was -- it was poo-poo'd to pass.
Q Did you end up in the Hot Seat at any point?
A I did.
Q Did you share anything about yourself?
A I did.
Q What did you share?
A I don't recall everything that I shared. The one main memory that I have from that TurnON is Rachael Hemsi -- we were talking about my family life and my upbringing, and she asked me if I had a good relationship with my mom, and I said, yes, I have a great relationship with my mom. And she looked very confused, and then I was dismissed from the Hot Seat.
Q Did you share your strict upbringing at that time?
A I did.
Q Who else from OneTaste, in addition to Rachael Hemsi, attended the event?
A Rob Kandell and Rachel Cherwitz. Those are the only -- like, of the core team, those are the only ones I remember in my mind.
Q After enrolling in the TurnON event, did you attend any

additional OneTaste courses?
A I did. I signed up for the coaching -- the first coaching program pretty shortly thereafter, to my memory.
Q What was the coaching program?
A It was -- I don't even remember how long it was supposed to be, but it met monthly and it had a three-tier system of relationship coaching, OM coaching, and something else that I don't remember at the moment.
Q Who, if anyone, signed you up for the coaching program?
MS. BONJEAN: Objection to the form of that question.
THE COURT: Overruled.
Q You can answer.
A Thank you. I keep forgetting.
I mean, Rachel Cherwitz was the salesperson in that moment.
Q Approximately how much did the coaching program cost?
A $20,000.
Q And you mentioned earlier that your financial condition at the time was dismal, so what was the plan for how you were going to pay for the coaching program?
A I didn't necessarily have a plan. I knew that I wanted to sign up for it, I was very excited about it, and I'm pretty sure it was a $20 bill. I gave her something in that moment, and it was the only money that I had to my name in

Q You mentioned 1080 a few times. What is 1080?
A 1080 was the primary residence for OM in San Francisco at 1080 Folsom Street.
Q Did there come a time when you moved into the residence?
A Yes.
Q Where was it located?
A 1080 Folsom Street in San Francisco.
Q Can you describe how you came to live at 1080?
A Yeah.
I was living with my boyfriend at the time, Malechai, and I had just signed up for the coaching program, and I did not realize it at the time, but Malechai was heavily addicted to narcotics and came home loaded one night and started a fight with me and started throwing things at my head. So when I -- when he passed out, I packed up my stuff and moved out.
That next day I called Rachel Cherwitz, because she was my main point of contact, and I was like I don't know what to do, I don't know where I'm going to go, and she was like come here, you can come live at 1080, which was a huge relief because I had no idea where I was going to be going.
Q And when, approximately, did you move into 1080?
A If I am remembering correctly, early 2010, probably,

And then come back for dinner because there was usually a communal dinner and then hang out with Aubrey in the evening usually.

Q You mentioned morning practice. What is that?

A Where we would get together. People would come down from their rooms at 1080. Some people would come in from their private homes if they were living off site and practicing and we would have group OM.

Q How frequently did you OM while living at 1080?

A Again, it depends on the season. And if I had to average it I would say about five times a day.

Q Did anyone direct you to OM that frequently?

A Yeah, I remember Justine Dawson telling me that she --

MR. ROBOTTI: Objection, hearsay.

MS. BONJEAN: Join.

BY MS. GUPTA:

Q Without getting into the content of any of your discussions, who directed you to OM --

THE COURT: I'm going to sustain -- I'm going to sustain the objection.

Ask the next question.

BY MS. GUPTA:

Q Without getting into the content of your discussions, who if anyone, directed you to OM that frequently?

MR. ROBOTTI: Objection.

Q Did your relationship with people outside of OneTaste change once you were involved with OneTaste?
A Very much so.
Q How?
A It started off, like, people who, in my life, like my parents and close friends would voice concern for my involvement in OneTaste and eventually because spending any time outside of OneTaste would negate or deplete the orgasm that I had cultivated.
I ended up cutting ties with most family and friends because they were not supportive of it and it really created a silo for me.
Q Did you socialize at all while at OneTaste?
A Of course.
Q With who?
A People from OneTaste. Occasionally, I would go on, like, a trip to go see my family because they desperately wanted to stay connected with me.
But for the most part, it was socializing with OneTaste people, Aubrey, Maddie and Michelle were probably my best friends.
Q And what types of outings would you go on?
A We'd go to tea at Samovar Tea House. We'd go to dinner. We'd go to Dolores Park and do lead generation.
Q Did you post on social media while you were at OneTaste

of some of your social outings?
A Of course.
Q What social media?
A Facebook and eventually Twitter.
Q And why did you post on Facebook and Twitter?
A Because everybody does. And with Twitter, Rachel Cherwitz told me to create an account because I was doing sales and I hated posing on Twitter, but I had to force myself to.
Q While you were living at 1080, did you sign up for any additional OneTaste courses?
A Yes.
Q What courses?
A I cannot recall all of them. I know I went through their various OM -- leveled OM courses. I signed up for a third -- the third coaching program, as well. And -- and then, I was also in the Valentine's Day course towards the end of my time with OneTaste.
Q Approximately how much did each of these courses cost, to the best of your recollection?
A The OM courses, to my recollection, were around 150 each and I -- if I am remembering correctly, there were four of them.
The third coaching program was cheaper than the first one. It was 10,000 and I cannot remember how much the

Valentine's Day course is. I didn't pay for it.
Q Who paid for it?
A My boyfriend at the time, Amjad.
Q Approximately how much, in total, did you spend on OneTaste courses?
A Maybe 30,000.
Q Why did you sign up for more and more OneTaste courses?
A In part because I was excited about the stuff that I was learning and it was also expected to keep growing and learning because that's how you cultivated more orgasm and stepped into your power.
Q Who, if anyone, taught you that?
A Aubrey, Rachel, Mia, Rachael.
Q You mentioned two Rachels (sic), are you referring to Rachel Cherwitz and Rachael Hemsi?
A I am.
Q Did signing up for these courses affect your financial state?
A It did.
Q How?
A I -- I didn't have the job at Lilia Bell's for all that long in my memory. I -- I didn't work there the whole time I was OneTaste. And so I ended up doing a lot more sex work because it was more flexible and I could make a lot more money in a shorter period to be able to pay for my course work.

Q And you also mentioned that you had engaged in sex work to pay for OneTaste courses.

Did you tell anyone other than Aubrey Fuller that you were using sex work to pay for OneTaste courses?

A Yes, I was not shy about it.

Q Who did you tell?

A I told Rachael Hemsi because we had a conversation about it in the kitchen. I told Justine Dawson. I told Rachel Cherwitz. I told Rob Kandell. I told Ken Blackman.

Q I want to turn now to discuss some of the OneTaste courses that you took.

Were Nicole Daedone and Rachel Cherwitz involved in teaching OneTaste courses?

A Yes.

Q Can you generally describe OneTaste teachings regarding the classes of OM in the four courses that you mentioned?

A Like, describe OM?

Q Describe what the courses taught about OM.

MS. BONJEAN: Objection, vague.

THE COURT: Sustained.

BY MS. GUPTA:

Q In OneTaste courses and lectures that you attended, did Nicole Daedone ever discuss enlightenment?

A Yes.

Q What, if anything, did she teach about enlightenment?

A Enlightenment was brought about by pushing past any barriers that you have around sex and sexuality, you know, "turn a no into a yes," or, you know, if there's someone that you're repulsed by push through it because that repulsion is keeping you from being free.
Q What did you understand "turn a no into a yes" to mean?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A In hindsight it was like --
MS. BONJEAN: Objection to the "hindsight."
THE COURT: Sustained.
BY MS. GUPTA:
Q At the time, what did you understand "turn a no into a yes" to mean?
A To push through your repulsion. To push -- and say yes to things that you may not want to do so that you can be freed.
Q Did Nicole Daedone ever describe any myths to you?
A Yes. There was a myth of some sacred prostitutes that lived off of the isle -- off of an island in Greece, if I'm remembering the location correctly, who would -- apologize for my language -- "fuck the war out of men."
Q What did that mean to you?
A It was an analogy for the ways in which we could -- we, as women, could alchemize and change the anger of men in sex

into something positive. Like the women were the catalyst for that change.

Q Did Nicole Daedone ever say how that myth connected to OneTaste?

A It was -- it was one of the roles that -- and tasks that was given to me. Certainly, I don't recall how -- outside of that, how it was connected to OneTaste.

Q What do you mean it was the task that was given to you?

A I was given the task to fuck the war out of men.

Q Who gave you that task?

A Nicole.

Q Did Nicole Daedone ever use the term sexual alchemy?

A Yes.

Q What did she say?

A Similar concept. It was taking all of -- like, if you -- there's a -- like you couldn't get raped because you would take that anger from whoever the rapist was and get so turned on that you could turn it into something loving and positive, which I thought was bananas that women can't get raped.

Q Did you agree with that concept?

A Absolutely not.

Q Had you ever been a victim of sexual assault?

A I have.

Q Did you share that with anyone at OneTaste?

A Yes.

Q Who?
A The -- the core staff at 1080. I wanted to -- initially, in my coaching program, I wanted to use everything that I was learning to help counsel survivors of rape victims and rapists themselves because I had previous experience in my undergrad doing that sort of thing and I remember being laughed at.
Q Did these teachings affect your sexual boundaries?
A They did, yes.
Q In what way?
A It taught me that all of the things that I was feeling, all of the red flags and the warnings that my internal dialogue was giving me were not valid and that I needed to dismiss them so that I could become an empowered woman.
Q Was there a particular language that people used at OneTaste that was specific to OneTaste?
MS. BONJEAN: Objection, vague.
THE COURT: Sustained.
BY MS. GUPTA:
Q Are you familiar with the term "the fourth dimension"?
A Yes.
Q How, if at all, was that phrase used at OneTaste?
A It was used to talk about the abstract nature and language that made it really confusing to follow for me. I am not an abstract thinker or an abstract talker. I'm very concrete.

Q Do you recognize this individual?
A Yes. That's Antonios.
Q Is this a fair and accurate depiction of Antonios?
A Yes.
Q What, if any, role did Antonios have with respect to OneTaste?
A He was in the coaching -- the third coaching program with me.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 339.
THE COURT: Any objection?
MR. ROBOTTI: No objection.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 339 is admitted.
(Government Exhibit 339 received in evidence.)
BY MS. GUPTA:
Q While you were at OneTaste, did you ever receive any instructions with respect to Antonios?
A Yes.
Q What was the instruction?
A He was getting ready to withdraw from the coaching program, and I was told to go make sure that he stayed in the coaching program.
Q What did you understand that instruction to mean?
A To make out with him, which was all inclusive of a wide

variety of sexual acts.
Q Who gave you that instruction?
A The head of sales.
Q What was your understanding of why you received that instruction?
A Because he was getting ready to leave, and he was a high paying client.
Q Was he considered a VIP?
A I don't recall.
Q What, if anything, did you do with Antonios?
A I performed fellatio and gave him a handjob.
Q Did you later report what had happened to anyone at OneTaste?
A I did.
Q Did you report this to?
A The head of sales.
Q Why did you engage in these sex acts with Antonios?
A Because I was told to.
Q And you said you were told to by the head of sales. Who was that?
A I believe it was Rachel Cherwitz.
Q Were there any other instances where you were directed to OM or engage in sexual activity with VIPs or other high paying clients?
A Yes.

Q What are some examples?
A During the Valentine's Day course there was this young couple. I think they were from Australia. And Kate, the young woman, was very nervous. Her husband was very into everything that was happening, and she seemed to take a liking to me. So I was told to OM with her. So I ended up stroking her so that she would be a little bit more at ease and have a friendly face in the room.
Q You said someone told you to OM with her. Who was that person?
A Rachel Cherwitz.
MS. GUPTA: If we can show the witness only what's been marked as Government Exhibit 267.
Q Do you recognize this?
A I do.
Q Who is it?
A Mark Gottlieb.
Q And what role, if any, did he have with respect to OneTaste?
A He lived on the second floor.
Q At 1080?
A Yes. Sorry. At 1080.
Q Is this a fair and accurate depiction of him?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government

Exhibit 267.

THE COURT: Any objection?

MR. ROBOTTI: No objection.

MS. BONJEAN: No objection.

THE COURT: Government Exhibit 267 is admitted.

(Government Exhibit 267 received in evidence.)

BY MS. GUPTA:

Q Did anyone while you were at OneTaste direct you to engage in any sexual activity with Mark?

A I was told to OM with him.

Q Who told you to OM with him?

A I don't recall.

Q Why did you? Or, I'm sorry.

Did you, in fact, OM with him?

A Yes.

Q Why did you?

A Because it was asked of me, and it was considered to be liberative and freeing because I wouldn't have OM'd with him otherwise.

Q Why would you not have OM'd with him otherwise?

A Because he's old.

MS. BONJEAN: Objection. Relevance.

THE COURT: Overruled.

Q You can respond.

A Because he's old and I was not attracted to him. I

wouldn't have OM'd with someone like that normally.
Q What is your understanding of why you were directed to OM with him?
MS. BONJEAN: Objection. Foundation.
THE COURT: Sustained.
Q Do you know why you were asked to OM with him?
A I believe it was because he was a high paying client.
MS. GUPTA: Could we go to Government Exhibit 204, which I believe is -- or, I'm sorry, 205, which I believe is in evidence.
THE COURT: Yes, it is.
Q Ms. Gill, who's pictured here?
A That's Alisha Price.
Q Did anyone at any time while you were at OneTaste direct you to engage in any sexual activity that involved Alisha Price?
A I OM'd with her at least once that I remember, and then I was working back of house for a course, and I was asked to get up on a massage table and hold a dildo to my pelvis while she performed fellatio on it.
Q And what was this in the context of?
A In a course.
Q What course, if you recall?
A I couldn't tell you.
Q Do you recall who asked you to do this?

at that point.

Q And at a high level, how, if at all, did your performance of these sexual acts affect your emotional state?

A It reinforced the idea that I had no value outside of my sex.

Q And how, if at all, did your performance of these sexual acts affect your psychological state?

MS. BONJEAN: Objection to that.

THE COURT: Overruled.

A It undermined my ability to trust myself, and it made me wholly dependent on the OneTaste community. I felt like I would lose everything, my life, my -- the only relationships that I had left, and my connection to God, even.

THE COURT: Is now a convenient time, Ms. Gupta, to take a break, or do you have another question or two that would be useful to do now and then take a break?

MS. GUPTA: Your Honor, I have maybe three more questions.

THE COURT: Okay. Then why don't you do that.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q You mentioned your connection to God. Why do you say that?

A Well, I got very involved in church at the end of my tenure. I am currently clergy, an ordained elder, and I

remember journaling about wondering if I would have access to God without OneTaste because OneTaste had reconnected me to my faith.

Q Despite all of the impact that you just described on your emotional and psychological state, did you stay at OneTaste and continue to perform labor and services for the company?

A I did.

Q Why?

A Because that was my entire support network at that point, and I had desperately wanted to feel seen for those parts of me that had been neglected as a young person. I just didn't feel like I had any other options available to me.

MS. GUPTA: Your Honor, now would be a good time for a break.

THE COURT: Okay. The witness may step down.

(Short pause; witness exits courtroom.)

THE COURT: We will take a break until 11:20. Enjoy your break, and don't talk about the case.

I will see you at 11:20.

(Jury exits the courtroom.)

THE COURT: Everyone may be seated.

I want to raise one issue with the parties, and it relates to text messages.

Proper foundation has to be laid before any text message is going to be admitted into evidence. You have given

Q Ms. Gill, you started participating in OneTaste courses in 2009?
A Thereabouts, either late 2009 or early 2010.
Q You left OneTaste in February 2013; is that right?
A Thereabouts, yes.
Q So about four years overall?
A Yup.
Q And at the time you started participating in OneTaste, you were living in San Francisco?
A Yup.
Q And you knew OneTaste practiced orgasmic meditation at the time you signed up; right?
A Yes.
Q And you also knew it was a group informed to improve women's sexuality and women's sex life; right?
A Yes.
Q And at the time you started OneTaste you were in your mid-20s?
A Yes.
Q And so you were an adult; correct?
A Can you define "adult"?
Q Over 18 years old.
A Yes, I was over the age of 18.
Q And you had a college degree at that time?
A I did.

Q A Bachelor's degree in English and French?
A Yes.
Q And that was from UC Santa Barbara, right?
A Yes.
Q It's fair to say you're well-educated?
A I did have a lot of opportunities for higher education.
Q And you came from a family that lived in California; right?
A Yes.
Q And your parents were both employed when you were growing up; correct?
A No.
Q Your father was a police officer?
A Yes.
Q And did your mother work?
A Not until I was older.
Q Okay. At the time you started participating in OneTaste, you wanted to do that; right?
A I -- I found a lot of relief and joy in being celebrated for being a sexual human, yes.
Q So when you decided to move into 1080 and you starting doing the courses, you wanted that; right?
A Yes. I was very, like I said, excited about having that aspect celebrated when it had not been previously.
Q And the first event you went to was called a TurnON

event; is that correct?
A Yes.
Q And then you went to a coaching program; is that right?
A Yes.
Q And you learned more about the practice of orgasmic meditation at those programs; correct?
A Yes.
Q And, so, it's fair to say that you signed up for OneTaste knowing about the practice of orgasmic meditation; right?
A Yes.
Q Now I want to talk about a few things you said on your direct testimony today.
So, you testified today you were trained in sacred prostitution at OneTaste; is that right?
A I was trained to be a sacred prostitute.
Q And you said that that deviated from your principles; is that correct?
A It was a very slow process of deviation and I ended up finding that I had deviated very, very far from my principles and values, yes.
Q So, in 2011, though, you said something different than that; right?
A I have no idea what you're referencing.
Q Did you participate in a podcast with Mygu (ph) in December of 2011?

A Yes, I -- I did participate in a podcast with Mygu (ph).
Q And in that podcast you discussed prostitution; correct?
A Yes, that was the topic of conversation.
Q And in discussing your work as a prostitute you said, "It was one of my favorite jobs ever. I loved having sex and I got paid to have sex with -- this might sound a little weird, with random men and it's very exciting."
Did you say that?
A I -- I don't have a memory of the specifics of what I said in that interview and I do remember saying something along those lines that really just, I think, shows how far I had deviated.
Q The question is whether you said it, yes or no?
A I don't have memory of the specifics of that conversation.
Q Can I show you a document to see if it refreshes your recollection?
A Sure.
MR. ROBOTTI: Your Honor, may I approach?
THE COURT: Yes.
(Counsel approaches.)
MR. ROBOTTI: I'm showing what's Defense Exhibit 2-BI.
BY MR. ROBOTTI:
Q I direct your attention, Ms. Gill to page three and at

Q Okay. Taking a look at that paragraph there, does it refresh your recollection that you said: I quit because I got so advanced in the meditation practice it's basically what got me to end up quitting because I didn't feel like I needed it anymore, either monetarily or for the sexual wakening that I was using it for, so to speak, the sexual growing up. Orgasmic meditation was filling that for me.

Do you remember saying that?

A I do not.

Q You also said that you signed up for a sugar daddy website because your finances were so bad; is that right?

A I did agree to sign up for Sugardaddy, yes.

Q But in 2011 you said something different about why you signed up; is that right?

A I don't recall.

Q Can we turn to page nine and have you read the timestamp for 25:35, the paragraph under that?

A (Reviewing.)

Q And does that refresh your recollection that at the time you made a deliberate decision to become a prostitute; is that correct?

A Can you repeat that question? I'm sorry.

Q At the time you said: I don't know what happened but there was a six-month period. It was in the back of my brain, like, hey you should try it. You might actually get something

out of it. So I went on a sugar daddy website and I got myself a sugar daddy.

Did you say that?

A I don't recall.

MR. ROBOTTI: Your Honor, I believe we would like to play just for the witness a couple of clips at this point and seek to introduce those.

THE COURT: Is it what the paper copy corresponds to?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Which ones are you seeking to play?

MR. ROBOTTI: It will DX 2-BC-7 from 7:41 to 8:21.

THE COURT: Sorry, where is that?

MR. ROBOTTI: That should be on the drive that we handed up to you, Your Honor.

THE COURT: Okay. But where does it correspond on 2-D-1.

MR. ROBOTTI: That would be on page three and the timestamp there is 7:28.

THE COURT: And what's the next one?

MR. ROBOTTI: The next one would be page eight and the timestamp is 23:49. And page nine, 25:35.

THE COURT: And you're asking just to have the witness listen to it?

MS. GUPTA: Your Honor, I would note for the record

I didn't receive these or have the opportunity to listen to them.

MR. ROBOTTI: We did provide them to the Government earlier today.

MS. GUPTA: They were provided at 1:30, so it was when we reconvened and I was questioning the witness and I didn't have an opportunity to listen to it.

THE COURT: You're going to have to move along to something else.

MR. ROBOTTI: I'll move along and come back to it. Thank you, Judge.

BY MR. ROBOTTI:

Q Let's go over the reasons you stayed involved over a five-year period. Is it fair to say that there were many reasons you stayed involved?

A There were a few reasons I stayed involved, yes.

Q And one of the reasons you stayed involved was because you loved the OM practice at the time; is that correct?

A I stayed involved because I found the exception -- acceptance, sorry, of my sexuality very liberating.

Q So you found the practice beneficial?

A At the time I found the practice beneficial, yes.

Q And you thought it helped other people; correct?

A I think that I believed that it helped other people at that time, yes.

Q And you believed that yourself, as you said earlier on direct examination, you called yourself the Mother Teresa of Orgasm; is that right?
A Yes.
Q And you believed that you could help free people from their bondage mostly around sex; is that correct?
A Freeing people from their bondage around sexuality in the way that I had been bound definitely appealed to me and was one of the things that I really began to believe, yes.
Q And that was your view as of January 2013; right?
A I don't recall.
Q Did you write that you believed that you were helping to free people from their bondage mostly around sex in January of 2013?
A I don't know what you're referencing.
MR. ROBOTTI: Could we pull up just for the witness Defense Exhibit 2-W?
(Exhibit published to witness only.)
MR. ROBOTTI: Your Honor, if I may approach I can give the witness a copy.
THE COURT: Sure.
And the Government has it?
MS. GUPTA: Yes, Your Honor.
(Counsel approaches.)
BY MR. ROBOTTI:

Q So directing your attention to page 24 and if you read the first five or six lines there.
A (Reviewing.)
Q Does that refresh your recollection that at the time in January 2013 your view was you could help free people from their bondage mostly around sex?
A I'm trying to think of my words. Give me a moment.
Q Of course.
A You know, I -- I think -- I feel like this is written in my journal and it points to the -- it points more to the manipulation than to what my true beliefs were. I was parroting.
Q So, you kept a private journal in January 2013?
A I did.
Q And did you or did you not write this in January of 2013?
A I haven't looked through the whole thing so I don't know which date this particular bit is.
Q Well, if you flip back to page 22, you can see it's written on January 24, 2013.
A Thank you.
I don't recall the exact dates that I wrote, but I -- again, I think that it speaks to my ability to parrot and -- the ways in which I was manipulated more than anything.
Q Ma'am, I understand that's your view today.
My question is whether you wrote that in January of

2013, yes or no?
A It is in my journal for January 24, 2013.
Q And that's right before you left OneTaste; correct?
A Yes.
Q And during your time at OneTaste, you also posted to the OM Hub; is that right?
A I don't even remember what the OM Hub is, sorry.
Q Do you recall the OM Hub being an internal OneTaste social media site?
A I do not have any recollection of the OM Hub.
Q So you don't recall posing on that site about your beneficial views on the OM practice?
A No.
Q Is it fair to say that you OM'd regularly when you were at OneTaste?
A Yes.
Q Sometimes multiple times per day?
A Yes.
Q With several OMing partners?
A Yes.
Q And as of January of 2013, again the very end of your time there, you believe you had moved and grown a lot over your time at OneTaste; is that fair?
A I had grown a lot the entire time I was at OneTaste.
Q Throughout your time at OneTaste, you told Rachel how

helpful the practice had been for you; right?
A There were a lot of wonderful and helpful things about the practice, yes.
Q And specifically you told Rachel about that, right?
A I would imagine so.
Q Right.
MR. ROBOTTI: And can we show just for the witness Defense Exhibit 2-AC?
(Exhibit published to witness only.)
MR. ROBOTTI: Can we zoom into the header at the top paragraph there?
BY MR. ROBOTTI:
Q Looking at what's on your screen, do you recognize this to be an e-mail from you to Robert Kandell and at that time Rachel Cherwitz?
A That is my e-mail address. I don't remember sending this e-mail specifically.
Q But do you recognize that as your e-mail address?
A I do.
Q And the date there is March 12, 2012?
A Yes.
MR. ROBOTTI: Your Honor, the defense seeks to admit Defense Exhibit 2-AC.
THE COURT: Any objection?
MS. GUPTA: Can I have a moment, Your Honor?

THE COURT: Yes.
MS. GUPTA: I'm just looking it over.
(Pause in proceedings.)
MS. GUPTA: Your Honor, I would object on relevance grounds.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Let me direct your attention to the second page.
MR. ROBOTTI: Can we pull up the second page of Defense Exhibit 2-AC?
Q And just looking at that last paragraph there --
THE COURT: Do you have a hard copy?
THE WITNESS: I do not. Not that I know of.
THE COURT: Do you have a hard copy? It's easier than looking at blurbs at a time.
(Counsel approaches.)
THE COURT: And it's a bit lengthy so let's take a moment to look at it.
A (Reviewing.)
Q Now, is that something you wrote attached to the e-mail?
A I don't have any recollection of writing this.
Q The document is attached to the e-mail you sent though?
A I don't know.
Q And do you recognize this as telling Ms. Cherwitz about the benefits of the orgasmic meditation practice?

A It does appear to be that way.
MR. ROBOTTI: Your Honor, the defense seeks to admit Defense Exhibit 2-AC.
MS. GUPTA: Objection, relevance.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q All right. You were friendly with Ms. Cherwitz; correct?
A Yes.
Q And you shared experiences that you normally practiced?
A Yes.
Q And you shared fear inventories with Rachel; correct?
A Yes.
Q And that's a practice borrowed from the twelve-step programs; correct?
A I -- I was not aware of that.
Q The idea is to name and confront your fears; right?
A It's to -- from my understanding it was to uncover the fears, yes.
Q So to name them and uncover them and help conquer them; right?
A I don't know that I would ever say to help conquer them, but to name them and discover them.
Q Now, at the time you believe those fear inventories helped you; right?
A At the time, yes, I did believe those fear inventories

capacity as some of the other staff were, but I did try to do sales for a little bit.
Q And you said on direct examination you weren't that good at sales; right?
A Yeah, I don't like selling things.
Q But she did give you tips and try to help you out?
A I don't recall.
Q And you and Rachel you bonded over the fact that you had moved into 1080 under tough circumstances; is that fair?
A She was there for me in a very vulnerable moment.
Q And fair to say you sometimes told each other that you loved each other; right?
A Yeah, that was a pretty common practice.
Q And you also loved your life when you were at OneTaste; is that right?
A There were parts of it that I loved, yes.
Q And that's something you said in January 2012; right?
A I don't recall.
Q And up until January 2013, you also felt you loved your life, right?
A There were parts of my life that I loved. There were parts that were very liberating, yes.
Q And just to turn your attention to what's in front of you as Defense Exhibit 2-W at page 18, do you recall that in January 2013 you said, "Damn, aside from the Robert thing,

A Yes.
Q And nonetheless, you felt that you were able to reject mandatory meetings with him; is that correct?
A I don't -- I think that I didn't think twice about whether or not a job that was bringing in income would be an issue for meetings, but, again, I don't have -- that's just an assumption of what might have -- I might have been thinking.
Q So at this time in July of 2012, you got a new job; is that right?
A I don't -- I think -- I think that's when it was. That would make sense in my mind's timeline.
Q And you were working Monday through Friday; right?
A Thirty hours a week, yes.
Q And so you had this other job that was taking time away from OneTaste; is that right?
A Yes.
Q And you indicated to Mr. Kandell that because you had this other job that you were not going to be able to spend as much time at OneTaste; is that right?
A I don't recall that, no.
Q At least over the next month or two until your time got more flexible; is that correct?
A That's what the e-mail says.
Q And you said that you would be there in thought, but you wouldn't actually be there; correct?

A That's what the e-mail says. Again, I don't have any recollection of this e-mail.
Q Okay. So at this time you were able to tell the co-founder of the company that you were not coming to certain meetings?
A Yeah.
Q And at this time you were living at 1080; right?
A I don't believe so.
Q In July of 2012?
A I was not living at 1080, no.
Q Where were you living?
A I was living with my boyfriend Mick because I was pregnant.
Q So there was a time period where you were able to leave 1080 and move in with your boyfriend; right?
A Uh-huh.
Q So you had somewhere else to stay besides 1080, right?
A For that brief period, yes.
Q During that brief period of time he was not involved in OneTaste; is that correct?
A He had a meeting with Rachel and -- I think he learned how to OM, but I don't remember. He knew about OneTaste -- sorry, he knew about OneTaste.
Q But he was not a regular participant?
A I don't believe so, no.

Q And during the time that you lived at 1080 you were free to come and go as you pleased; right?
A Yeah.
Q You had your own key; right?
A Yes.
Q The other residents were free to come and go as they pleased; correct?
A Yes.
Q And people not associated with OneTaste are free to come and visit?
A Some of them. There were restrictions.
Q So, in fact, at 1080 you could have guests stay up to eight days at the residence?
A I don't recall the lengths of time that you could have guests.
Q And your parents came to visit you at 1080; correct?
A They came once for a meeting with Rob and Rachel.
Q And you also had friends stay with you at 1080; right?
A I remember one friend staying with me there, yes.
Q So in May 2010 you had a friend named Hector come and visit you?
A I don't remember when it was, but Hector did come and stay with me, yes.
Q In April 2010, you had a friend named Javi come, right, and visit you, right?

A I do have a friend named Javi. I don't remember him staying with us.
Q And you had a personal phone when you were at 1080; correct?
A I did.
Q And you used that phone to call or text anyone?
A Yes.
Q You had a personal computer?
A Yes.
Q You had access to the internet e-mail; correct?
A Yes.
Q 1080 had a free WiFi?
A I paid for it with my rent.
Q And as part of your rent you did work trade; correct?
A For parts of it, yes.
Q So that's a process where you worked were OneTaste and that money goes towards your rent; correct?
A Yes.
Q And that's what you meant on direct examination of payment in kind; right?
A So some of the -- some of the payment in kind was for caravan retreats and rent and some of the payment in kind was for coursework.
Q And from 1080 you could go to your job, you could go to church, right?

post?
A No.
Q It's fair to say that you went to Chico on August 11, 2010?
A It would appear so, yes.
Q May 11, 2011 you went to a baseball game; is that right?
A Would you refresh my memory.
MR. ROBOTTI: Would you pull up Defense Exhibit 2-C.
A I do remember going to that game.
Q So that was May 11, 2011?
A I don't -- that's what the date says, yes.
Q On October 6, 2011 you told people at 1080 you were going on vacation; right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defense Exhibit 2 H.
(Exhibit published.)

(Continued on the following page.)

(Continuing.)
BY MR. ROBOTTI:
Q On that date, you told people at 1080 that you would be going on vacation, correct?
A I didn't read that. Again, I don't have a recollection of this email, and I do remember going on this vacation.
Q So this was a camping trip to a remote island, correct?
A Yes.
Q And you'd be going with little internet access, right?
A Yes.
Q And that was with non-OneTaste people, correct?
A It was with my family.
Q So you went away with your family in October 2011, correct?
A Yes.
Q And at that point you could have left and never come back to OneTaste if you wanted, right?
A I could have.
Q December -- sorry, January 14, 2012, you went to the beach, right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defendant's Exhibit 2-I.
A That's the island. This is the remote island with little internet access.

Q And so you went to the beach on that day?
A I -- I don't know if the dates are accurate on this one because there was so little internet out there. It may have been posted after I got back.
Q But around that time period, right?
A I would imagine so, but I don't --
Q And February 29, 2012, you went to meet your cousin's baby in Chico; is that correct?
A I don't remember that.
MR. ROBOTTI: Let me show Defense Exhibit 2-K.
A Oh, that was not Chico. That's West Sacramento.
Q So you went to West Sacramento to meet your cousin's baby, correct?
A Uh-huh.
Q And in March 22, 2012, you went back to your alma mater, right?
A Can you refresh my memory, please?
Q Sure.
MR. ROBOTTI: Defense Exhibit 2-L.
Q So this is you on a beach again, correct?
A Yes. I was going down to see my sister, I think. I don't remember why I was -- it's Santa Barbara.
Q So this is your old college, UC Santa Barbara?
A Yes. I was going down to visit my sister who lived there and was also going to school there.

Q All right. So that Disney trip, May 2012 --
A You're really going to have to refresh my memory for that one.
MR. ROBOTTI: Defense Exhibit 2-N.
THE COURT: Just say the letter again.
MR. ROBOTTI: 2-N.
THE COURT: N.
Q Do you recognize this photograph?
A I do.
Q Do you see yourself in there?
A I do.
Q And do you recognize the other people in the photograph?
A I do.
Q And this is May 2012?
A Uh-huh.
MR. ROBOTTI: Your Honor, the defense offers Defendant's Exhibit 2-N into evidence.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defense Exhibit 2-N is admitted.
(Defense Exhibit 2-N received in evidence.)
(Exhibit published.)
Q So here you are visiting Disneyland, right?
A Yes.

Q And your boyfriend at the time is in this photograph, correct?
A Yes.
Q And is he the one in the dark shirt behind you to the right?
A My left looking at the picture, but when I'm in the picture, on my right.
Q You can actually mark on the screen, so --
A Oh, can I touch it?
Q You can. So if you would like to mark and identify him.
A Oh, look at that, there he is. That's him.
MR. ROBOTTI: The witness has identified the man in sunglasses in the middle of the photograph.
Q As we talked about before, you lived with him for a little while, correct?
A Yeah. I don't remember exactly how long.
Q In fact, you had almost left 1080 in 2011 and moved in with him, right?
A I -- I have no idea what you're referencing because I definitely did move in with him and out of 1080. I don't remember exactly when. It was before I got pregnant.
Q Do you recall discussing on that podcast moving in with him in the near future?
A I -- no.

Q But ultimately you did move in with him, correct?
A Yes.
Q And Disneyland is in Anaheim, right?
A Yes.
Q And that's about seven hours from San Francisco where you were living, right?
A Yes.
Q And you were able to do that? You were able to leave 1080 with non-OneTaste people and go to Disneyland, right?
A I was not living at 1080. I was living with my boyfriend at the time.
Q You were still participating in OneTaste at the time, right?
A I was.
Q So you were both living with your boyfriend and travel tog Disneyland at that time, right?
A Yes.
Q Now, on other occasions, such as the 4th of July, you went and visited your parents, right?
A Would you please refresh my memory?
Q Sure.
MR. ROBOTTI: Can we show Defense Exhibit 2-AQ.
THE COURT: Maybe a hard copy is better. It's very small print.
THE WITNESS: How do I get rid of the arrow on the

screen?

THE COURT: Mr. D'Agostino, can you clear the arrow off the display?

Thank you.

Q Does that refresh your recollection that you visited your family for 4th of July?

A No.

Q So looking at your email saying that you're going to visit your family doesn't refresh your recollection?

A It does not refresh my recollection.

Q Do you recall ever visiting your family's house on the 4th of July?

A Ever?

Q During your time at OneTaste.

A I -- I have no memory of it, no.

Q Now, when you went on all these trips, you were able to come back to 1080, right?

A Uh-huh.

Q No one kicked you out?

A Right.

Q Nobody said you're outside of OneTaste forever, you can't come back?

A No, I never heard those words.

Q And you made the choice to come back, right?

A Yes.

Q Each time you left, you made a choice to come back and keep associating with OneTaste, right?

A Yes.

Q All right. So let's talk about some of the things you told the Government.

THE COURT: Let me just stop you for one minute, Mr. Robotti, to let you know that in the next ten to 15 minutes I'd like to take a break. But you tell me when that's convenient.

MR. ROBOTTI: This is the perfect time, Your Honor.

THE COURT: Okay. We will take a break until a quarter after 3:00.

The witness can step down.

(Witness leaves the stand.)

THE COURT: If the jury could just come back to the jury room at 10 after 3:00 so we can really start at a quarter after 3:00, I would appreciate it.

Thank you.

(Jury exits.)

THE COURT: I'll see you at 3:15.

(Court is in recess.)

(In open court; jury not present.)

THE COURT: Okay. We can bring back the witness and the jury.

A At times, yes.
Q Including Rachel Cherwitz?
A Yeah.
Q And Nicole Daedone?
A Yeah.
Q And while you were there, you volunteered to participate in additional activities without being asked. Fair to say?
A Uh-huh.
Q Yes?
A Yes. Sorry. I'm learning.
Q No, I just want to remind you to say yes so I don't have to keep reminding you.
Particularly in your last seven or eight months with the company, you volunteered a lot, right?
A I would say I volunteered the entire time; a lot.
Q But volunteered for specific tasks a lot in your last seven, eight months?
A Again, I -- I don't think that there -- in my mind, there's no difference between the last seven to eight months and the entire time I was there for what I volunteered for.
Q Did you volunteer for specific tasks? Yes or no?
A Yes, I would imagine so. I don't have a recollection of any specific tasks necessarily.
Q All right. Well, how about on April 22, 2012, you

reached out to Aubrey Fuller to ask for more responsibility at OneTaste?

A Can you state the date again, please?

Q April 22, 2012.

A I mean, I don't -- I don't recall that conversation.

Q All right.

A Can you refresh my memory?

Q Sure.

MR. ROBOTTI: Let me pull up Defense Exhibit 2-BG.

THE WITNESS: Sorry, say that again.

MR. ROBOTTI: 2-B as in boy, G as in gopher.

Q Ma'am, does that refresh your recollection that on April 22, 2012, you reached out to Ms. Fuller to ask for more responsibility at OneTaste?

A I have a very vague recollection of this. But again, no specific.

Q Does it refresh your recollection that you said:

I want to plug in and help out at OneTaste?

A That sounds like the language that I would use.

Q And did you -- on that date -- sorry. Withdrawn.

Does it refresh your recollection that you stated:

I've been missing being involved and the ops team keeps popping up for me. I have my job, so I might not be able to help out with every event, but I would love to be on the team and help out as often as possible.

Did you say that?
A I -- I don't have a recollection of it.
Q So would you agree at this time, you were telling people at OneTaste that you want to help out as often as possible?
A That's what I -- yeah, that's what it sounds like from the email.
Q Do you have any reason to believe that you did not write those words at that time?
A No.
Q You recognize your email address, right?
A I do.
Q How about on April 28, 2012, do you recall telling senior people at OneTaste that you wanted to join the PR team?
A No. Could you refresh my memory?
Q Sure.
MR. ROBOTTI: I'll pull up Defense Exhibit 2-AX.
THE COURT: I think it's very hard to see on the screen.
MR. ROBOTTI: I'm grabbing hard copies.
Q Now, ma'am, this is an email sent on April 28, 2012, correct?
A That's what the date says, yes.
Q And this is from you to Justine Dawson, Rob Kandell,

Joanna van Vleck, and Raheli Cherwitz, also known as Rachel, right?
A Yes, that's what it says.
Q And this is an email from you saying: I want to join the PR team. Correct?
A That's what that says, yes.
MR. ROBOTTI: Your Honor, with redacting the two bottom emails, the defense moves to admit this, Exhibit 2-AX, for its effect on the listener.
THE COURT: Any objection?
MS. GUPTA: Objection. Hearsay.
THE COURT: Response?
MR. ROBOTTI: Sorry, Your Honor?
THE COURT: I wanted to know if you had a brief response.
MR. ROBOTTI: Yes, Your Honor.
Not offered for the truth. Offered for the effect on the listener. Goes to intent.
THE COURT: And you're just offering the top portion, right?
MR. ROBOTTI: Just the top portion, Your Honor. Intent and knowledge, Your Honor.
THE COURT: Sustained. But you can ask more questions on this.
Q Now, ma'am, does this email refresh your recollection

that in April of 2012, you said:

I want to join the PR team, exclamation point.

Do you remember that?

A I do not.

Q I recently went to Holistic Health Salon, got some leads, and after having a few conversations and joining the ops team, thought it would be a great way for me to plug in more and further my coaching practice. What are your thoughts and what do you need from me?

Do you remember saying that?

A I don't.

Q No reason to dispute that it's your words or your email?

A No.

Q Is it, in fact, true that in April of 2012 you did want to join the PR team?

A It's -- I don't remember that, and that's what it says on here.

Q Sitting here today, do you have any reason to doubt that that was your intent in April 2012?

A I mean, I have no reason to believe that my intent was to try to reinvest into a community that I felt like I belonged to.

Q These are your words, right? You wrote them?

A It appears that way. Again, I don't recall writing

them.
Q But no reason to doubt it, right?
A Correct.
Q Okay. So at this time period, you're telling the senior leadership of OneTaste that you want to get more involved, right?
A Uh-huh.
Q Correct?
A Sorry, yes.
Q And that's because --
THE COURT: Are you offering this at this time?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: So Defense Exhibit 2-AX, just the top email, is admitted.
Is there going to be a redacted version?
MR. ROBOTTI: Yes, Your Honor. Could we just publish briefly to the jury?
THE COURT: Yes. The top email only.
MR. ROBOTTI: Yes.
(Defense Exhibit 2-AX received in evidence.)
(Exhibit published.)
Q Ma'am, I know you just went through this, but just for the jury, can you please read this email?

A Out loud?
Q Yes, please.
A Okay.

Hi guys. I want to join the PR team. I recently went to Holistic Health Saloon, got some leads, and after having a few conversations and joining the ops team, thought it would be a great way for me to plug in more and further my coaching practice. What are your thoughts and what do you need from me? Cheers, Dana.

Q Thank you.

(Continued on the following page.)

(Cross-examination, cont'd)
BY MR. ROBOTTI:
Q Do you see the "on" underneath your name there?
A I do.
Q And what's on either side of that?
A I should know this, but I do not remember what they're called.
Q I don't either.
A They are fancy parentheses.
Q Okay. So the fancy parentheses on other side. What did you understand those to mean?
A That was a signature that was used among OneTaste, specifically Rachel Cherwitz, from my recollection.
Q And is the meaning of that that you are turned on?
A Yes.
Q And so at this point, in April of 2012, you're telling the senior leadership of OneTaste you are turned on, right?
A Well, so that --
Q Yes or no?
A That's a complicated answer. It is not a yes or no answer.
Q Okay. Let me rephrase.
You included this signal in your e-mail that indicates to the senior leadership of OneTaste that you are turned on?

A It was a -- I had made it a part of my signature. So it was an automatic part of whenever I replied to people.
Q So you are telling everyone that you are turned on at this time?
A Yeah.
Q It's fair to say you were seeking to move up in the company at this point?
A I never saw it as moving up. I was seeking belonging.
Q Getting more involved?
A Uh-huh.
Q Yes?
A Yes. I'm sorry.
Q All right. So on May 2, 2012, do you remember taking on a new research project?
A I do not. No.
Q Okay.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-AG.
Q And this one is very small.
All right. I drew a blue arrow next to ID number 10268.
Can you just review that post, and let me know when you're done.
A I'm done.
Q All right. Now, does that refresh your recollection that in May of 2012 you decided to take on a new research project,

to OM four to five times a day, for at least the next 30 days?
A It does not.
Q Does it refresh your recollection that at that time you believed OM helps fill me up on my orgasm and move through what I'm dealing with hotter and quicker. So you'll be seeing more posts from me about my research on the OM hub?
A Can you, without restating the words that I apparently wrote, can you phrase -- say the question again, please.
Q Sure. Let me break it up.
Does this refresh your recollection that at the time in May of 2012 you believed that OM helps fill me up on my orgasm and move through what I'm dealing with hotter, quicker?
A I believe at that time I had been taught that that's the way that we should be thinking about it. I was very good at parroting.
Q Okay. Did you, in fact, undertake this research project?
A I don't even recall this research project, so I couldn't say.
Q Okay. And did you, in fact, write this post on the OM hub, which was visible to everyone at OneTaste?
A I don't recall. Again, I don't even recall the OM hub.
Q You don't recall posting multiple times to the OM hub during your time there?
A I have no recollection of the OM hub.
Q Now, you had a bunkmate at 1080; is that right?

A I had two different bunkmates at 1080.
Q And one of them was Henry Debusmann, do you remember him?
A I do.
Q I think you spoke about him on direct a little bit?
A Maybe.
Q Was he in Doctors Without Borders?
A That's right. Yes. Thank you.
Q And he was your bunkmate, right?
A Yes.
Q And do you recall reaching out to him on June 10, 2012, asking him to OM with you?
A No.
MR. ROBOTTI: All right. Could we pull up Defense Exhibit 2-AY.
Q Does that refresh your recollection that on June 10, 2012 you reached to Henry Debusmann and asked him to OM with you?
A No. It does not refresh my recollection, and that is a pretty standard request, as far as my practice was concerned.
Q So at this time in mid 2012, seven months or so before you leave OneTaste, you are actively reaching out to people and seeking to do additional OMs?
A Yes. I was still OMing up until I left.
Q And towards the end of that year, you continued to volunteer for things. So do you remember volunteering to play a desire game with your roommates on December 12, 2024?

Q Those were choices you made, right?
A Yes. And the complication lies underneath why I was choosing those.
Q Well, I am not asking you about your regrets now, I am asking you about what you thought then.
A Thought then about what? Can you restate the question?
Q So I understand, ma'am, that you might regret certain things now, right?
A I never said I -- that's also a complicated answer.
Q Okay. So maybe you don't regret anything at OneTaste.
My question is, what did you think at the time when you were asking for more work? You wanted to do that, right?
A Yeah. I wanted to plug in.
Q So it's around this time, at the end of 2012, that you volunteered to start spending more time with Reese Jones, right?
A What was the date you said again?
Q At the end of 2012.
A I would not say that I volunteered, I would say that I asked, that I was asked.
Q Well, before you were asked, you told Rachael Hemsi you had a crush on Reese Jones; do you remember that?
A I do not.
Q You had met Reese Jones a couple of times by then?
A Yeah. He's a -- I had seen him in the back of courses

with Nicole. He's this bright, shiny, happy guy.
Q Charismatic guy, right? Super interesting?
A Absolutely. Yeah.
Q Very good conversationalist?
A Yeah.
Q Fun to talk to?
A Uh-huh.
Q So it's accurate that you had a crush on him at the time, right?
A No. I was -- if I'm remembering correctly this conversation -- it's slowly coming back. I think that it was used more like not like an actual crush, it's like, oh, he's so sweet. I've got like a total crush on him or like -- I don't know.
Q You said that?
A I have a very vague recollection of it.
Q Sitting here today, ma'am, yes or no, you said you had a crush on Reese Jones?
A I have a very vague recollection of it.
Q So the answer is yes?
A Yes.
Q So that's what you told Rachael Hemsi at the time?
A Yes.
Q And you were so existed that you were jumping up and down because you wanted to work with Reese; do you remember that?

A I do not remember that.
Q And it's true that Reese came to one of your talks at your church, right?
A It is.
Q You had a good time with him?
A He contributed to a lot of fruitful conversation.
Q So, yes, you had a good time with him?
A Yes.
Q And it was after that that you started spending time with him at his house, right?
A No. I was already spending time with him at his house when he came to the talk.
Q Okay. And in total, you spent about three months going back and forth to Reese's house; is that fair?
A That sounds about right.
Q And that was until you decided to leave 1080 in February 2013?
A Yeah. The dates are blurry for me when I removed myself, but that sounds about right.
Q All right. And I am not asking about today. I am asking about at that time.
You were happy you had been given the opportunity to work with him, right?
A I was happy to find a way in to a community that I felt like I belonged to and I had removed myself, and I felt very

unstable.
Q You had just spent the last six months telling people at OneTaste that you wanted more responsibility?
A Uh-huh.
Q Right?
A Uh-huh.
Q Volunteering for tasks, right?
A Uh-huh.
Q And when they approached you with this task to work with Reese Jones, you were excited, right?
A I was excited to have an "in" to the community and to being accepted again.
Q This was an important job, right?
A Uh-huh.
Q Reese was an important guy to the company, right?
A Uh-huh.
Q This was someone --
A Yes.
Q -- close to Nicole Daedone, correct?
A Yes.
Q This was a good opportunity for you?
A What do you mean by "opportunity"?
Q The common term of "opportunity." This was something you could take on to move up in the company?
A I didn't see it as moving up in the company. I saw it as

finding a place where I belonged after being celebrated for being a sexual person.

Q So with whatever definition of "opportunity" you would like to use, this was a good opportunity?

A Yes.

Q And when you ultimately lived on and off with Reese, it was a very nice place, right?

A It was.

Q I think we saw some photographs the government showed earlier. We have a couple, I am not going to reintroduce all of them, but let me show you two.

MR. ROBOTTI: Can we pull up Defense Exhibit 16-K.

Q Do you recognize this as Reese Jones' house?

A Yes.

Q And 16-K1?

And are both 16-K and 16-K1 accurate representations of Mr. Jones' house?

A To my memory, yes.

MR. ROBOTTI: Your Honor, the defense moves to admit 16-K and 16K1.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 16-K and 16-K1 are admitted.

(Defense Exhibit 16-K and 16-K1 received in

evidence.)

MR. ROBOTTI: All right. Can we publish -- well, we can publish 16-K1.

Q All right, ma'am. So this is a mansion, right?

A It's a pretty big house.

Q Pretty big house, right?

A Yeah.

Q In San Francisco?

A Yes.

Q And they don't make a lot of big houses in San Francisco, right?

A No, they do not.

Q Right.

So this was pretty cool to go live in a mansion in the middle of San Francisco, right?

A Yeah, it was nice to experience the luxuries of that place every once in a while. Yeah.

Q You were coming from 1080, right?

A Uh-huh.

Q 1080 wasn't bad, it had a lot of amenities, right?

A Uh-huh.

Q But 1080 is no mansion, right?

A No, it is not.

Q So getting to spend a couple months at a mansion, not so bad?

A No, it was very nice.
Q Okay. And that was something you wanted to do, right?
A That's also a complicated answer.
Q Okay. I'm not asking for the lens of hindsight here, right? For the --
A I am not talking about the lens of hindsight.
Q For the person in her mid 20s, being asked if she wants to go live in a mansion, that was an exciting thing?
A That is exciting, yes.
Q Mr. Jones also took you to parties, correct?
A He took me to one.
Q Okay. Nice party?
A It was. I didn't particularly enjoy it. It wasn't for me.
Q Okay. And he paid for things for you, right?
A He paid for very few things, in my memory.
Q Dinner?
A The occasional -- I think -- I remember going to dinner with him once after that party. The most regular thing that he would pay for, I would drive down the hill to a bagel shop and bring back bagels and lox.
Q Okay. And you were paying rent at 1080 at the time, right?
A I was.
Q Which you were unhappy about, right?

A Yes.
Q But you were not paying rent at Mr. Jones' house, right?
A No.
Q So you were living free in the mansion, correct?
A I didn't stay there every single night, but, yes, I was not paying rent there.
Q So you still had a room at 1080, right?
A Correct.
Q Which is one of the reasons you were paying rent there?
A Correct.
Q And we talked earlier about sugar daddies, right?
A Uh-huh.
Q Okay. And you acknowledge that you had a financial relationship with an older man before, right?
A Uh-huh. Yes.
Q And this is before you met Reese, right?
A Yes.
Q You had a sugar daddy?
A Yes.
Q And, basically, a "sugar daddy" is an older rich man?
A Yes. That's a fair summary.
Q Okay. He takes care of a younger woman, known as a "sugar baby" sometimes?
A Yes.
Q Okay. And you sought out the man who was your sugar

Q And you also recall that -- and I think this is with Stan, you learned the skills you used at OneTaste coaching program to help him in his relationship; do you remember that?

MS. GUPTA: Objection.

THE COURT: One moment, please.

(Short pause.)

THE COURT: Sustained.

MR. ROBOTTI: To form or to substance, Your Honor?

THE COURT: Substance. It is sustained.

Q All right. So let's go back to Reese.

So you really liked Reese when you started working with him, correct?

A I liked him as a person. I wouldn't say that I was attracted to him.

Q You thought of him as an experienced player; do you remember that?

A I do not. No.

Q Okay. Do you remember saying that you loved him, in January 2013?

A I do not recall that. I am not surprised by it because I definitely overused the term "love."

Q Do you remember saying that in your private journal?

A No, I don't.

MR. ROBOTTI: Okay. Can we pull up Defense Exhibit 2-W, at page 10.

A Sorry, what page did you say?
Q Page 10. Apologies.
A Thank you.
MR. ROBOTTI: Sorry. This is just for the witness.
Q It actually starts at the bottom of page 9.
All right. Do you recall saying in January 2013 that: I love the more experienced players like Marcus, Keith, Eric, and Reese. I don't fall in love with them like Robert.
Do you remember saying that?
A I do not recall saying it, and I recognize my writing in the journal.
Q Okay. Is that how you felt at the time?
A Yes, with the caveat that love was not what I considered true love, just it was the colloquial term of, oh, I love my shoes, I love my haircut.
Q Sure. There's romantic and nonromantic love, of course, right?
A Yeah.
Q But you're expressing nonromantic love towards Mr. Jones?
A Of course.
Q So fair to say you were friends?
A We were friendly. We didn't become friends until after I started living with him, I would say.
Q So you did become friends when you lived there?
A I think so.

Q And you grew concerned for him when he was sad; is that fair?
A I grew concerned for his state of being, and I felt sad knowing that he was suffering.

THE COURT: Mr. Robotti, we are not so close to the end of the day. I just want to know if you have an estimate of how much longer you have?

MR. ROBOTTI: I think I am going to be done today, Your Honor. Getting there.

THE COURT: Just give me a time frame. Roughly.

MR. ROBOTTI: I think close to 5:30, Judge. Maybe a little earlier.

THE COURT: Okay. Go ahead.

BY MR. ROBOTTI:
Q Okay. Now, do you remember in January 2013 you also believed that it was good that Robert was living in Las Vegas because it allowed you to spend time with your other partners, including Reese?
A I do not recall saying that. Can you refresh my memory?
Q Sure. Pages 17 and 18 of Defense Exhibit 2-W.

Towards the end of the page, does this refresh your recollection that: In some ways it would all be a lot easier if he were here, and in others it is so good that he's not. How would I spend all the time I want to with him, Reese, Ryan, and Paul?

A You're probably sick of it, but, again, no specific memory of this. I do recognize that these are the words on the page.
Q Now, as we talked about a lot today, you had a lot of competing responsibilities, right?
A With --
Q During this time in your life?
A You mean with jobs and stuff?
Q Yes.
A Yes.
Q Okay. And so it was hard to find the time to spend time with Reese and Robert, do your jobs and all your other responsibilities, correct?
A Yes.
Q Now, a couple of weeks after this, as we talked about, you and Robert either break up or talk about breaking up, correct?
A I'm sorry, say that again.
Q February 20, 2013, you and Robert talk about breaking up.
A Is that in my journal that we already went over?
Q We already -- this is what you testified to earlier about.
A Okay. Then, yeah. I am just trying to make sure I am being clear on which one I am testifying to.
Q Sure.

Okay. And it was after that discussion with Robert that you decided to leave 1080; do you remember?
A Can you refresh my memory, please.
Q Sure.
You can look at page 57.
A Turned right to it.
Q Okay. So does this refresh your recollection that it was on or about February 22, 2013 when you decided to leave 1080?
A Yes.
Q Okay. And you found another job and another place to live, right?
A Yes.
Q You found another job with friends as their live-in nanny, correct?
A Yes.
Q All right. That was Sean and Colleen, right?
A Yes.
Q And you told people at OneTaste you were leaving, right?
A I would imagine so.
Q Okay. In response, no one forced you to stay, right?
A No.
Q As you said earlier, no one chained the door shut, right?
A No.
Q When you told people at OneTaste that you were moving out, they just let you go, right?

A Yeah. No one chained me up anywhere.
Q So you told them you wanted to move out, and you left?
A Are you waiting for a response? That was a question?
Q Yes.
A Okay. Sorry.
I would imagine that there was a little bit more conversation and protest, and that's probably a fair statement that I -- after all of that protest, I still left.
Q Do you remember that or you're imagining that to be?
A That's a good question. Probably imagining.
Q You took a job that, actually, you were expected to work more time at, right?
A Yes.
Q You said an extra two nights a month, right?
A Yes. That's what it says.
Q Okay. And when you told Reese that you were moving out, he wished you well, invited you to stay anytime you wanted? Do you remember that?
A He asked me to stay. He didn't wish me well. He asked me to stay and offered money for me to stay there.
Q Did he tell you you were always welcome to stay there for free?
A Yes.
Q Looking at that same page, can you read the bottom, onto the following page to yourself.

A 57 to 58?
Q Yes.
Okay. Does that refresh your recollection that in response to Reese saying that you were welcome to stay there for free, you said: I think I would do it if I didn't feel the need for space from OneTaste?
A I don't recall saying that, and it doesn't surprise me. I would have loved to not have to work extra hours while also not paying rent at 1080.
Q Do you recall saying in your private journal: I really enjoy spending time with him and being around him and talking to him?
A I did enjoy spending time with him. That's true.
Q And after you moved out, you saw Reese again a few times, right?
A I think after I moved out, if I am remembering correctly, I would still go over there every once in a while because he had not yet intoxicated himself.
Q And when you did return and see he was intoxicated, that troubled you, right?
A Of course.
Q Because he -- you cared about him?
A Yeah.
Q And at that point, he begged you to stay, right?
A I wouldn't say he begged me, but he asked me to.

A Because of the manipulation, yes.
Q So it's fair to say that one of the reasons you were so upset was Robert?
A I was upset because of the manipulation in my relationship with Robert. Not Robert personally.
Q Now, you continued to OM after you left 1080, right?
A I believe so. For a short period. If I am remembering correctly, it was only with Robert, but I don't have a whole lot of memory of my OMs after moving out.
Q Well, if we look at Defense Exhibit 73.
A You said page 73?
Q 73, yes. Of 2-X -- Defense Exhibit 2-W. Apologies.
A Okay. I am done reading.
Q So after you left -- does that refresh your recollection that after you left OneTaste, you continued to OM with multiple other partners?
A I don't remember OMing with multiple partners, but it says so in my journal.
Q All right. So after you left 1080, you made plans to move out of the state, right?
A Yes.
Q You moved to New Jersey to go to seminary school?
A Yes.
Q And you ultimately became a pastor, right?
A Yes.

the church's teachings that I disagree with. There are a lot of the church's teachings that I am obviously onboard with. I wouldn't have been ordained otherwise.

Q Okay. But you agreed to no longer be polyamorous because you wanted to be a part of the church?

MS. GUPTA: Objection. Asked and answered.

THE COURT: Sustained.

How much more do you have now?

MR. ROBOTTI: Just five minutes, Judge.

THE COURT: Great. We can keep going then.

BY MR. ROBOTTI:

Q Now, in July 2014, after -- a long time after you left OneTaste, you reached out to Rachel Cherwitz, right?

A That sounds about right. I don't remember exact -- the exact dates, but I do recall reaching out to her, and I believe that's when I ended up going up to New York for that demo.

Q And she was very excited to see you?

A She was.

Q All right. And you thought it was awesome to see her, right?

A It's always -- it's a mixed bag.

Q At that time, you told Rachel it was awesome to see her, right?

A I did tell her that. I believe I told her that.

Q Okay. And you had just spoken to an interfaith minister about OM and God?
A I don't recall that.
Q All right. This will be the last document we look at here.
MR. ROBOTTI: Can we pull up Defense Exhibit 2-BF.
Q I believe you have that in front of you.
THE COURT: Just for the witness, right?
MR. ROBOTTI: Just for the witness, Your Honor.
Q And we will look at page 34. And, also, just take a look at page 35, as well.
A Can you scroll back to the -- I wasn't done reading. Sorry.
THE COURT: Does she have a hard copy? It might be easier. You are welcome to come up and look for it, if you need to.
MR. ROBOTTI: It should be up there.
A Yes. What page?
Q 34, 35.
A Thank you.
THE COURT: What's the question?
MR. ROBOTTI: I was giving her a moment to finish, Your Honor.
Q All right. At that point you intended to put Rachel in touch with a minister and her partner about OM?

A I don't know if I was intending to put her in touch. I was just telling her -- I don't have any recollection of this person, who this person is.

Q Okay. And Rachel responded, I love you so much?

A Yes, she did.

Q It felt so warm and wonderful to see you. Correct?

A Yes.

MR. ROBOTTI: No further questions, Judge.

THE COURT: Any cross-examination, Ms. Bonjean?

MS. BONJEAN: Yes, I do.

THE COURT: Go ahead. You may proceed.

MS. BONJEAN: Thank you.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon. Ms. Gill, correct? Is that the last name?

A Gill, yes.

Q I have seen Gill and Gillport. Gill is right?

A Yes, it is.

Q All right. My name is Jennifer Bonjean, and I represent Ms. Daedone.

You testified today about your upbringing on direct examination; do you remember that?

A Yes.

Q And I think you testified on direct examination, pursuant

Q Okay. But you were just using it because, apparently, it suited you in the moment because you needed a place to stay; is that what you're saying?
A I think that it's more complicated than just that.
Q Okay. You were using OneTaste just to get something out of it, right?
MS. GUPTA: Objection.
THE COURT: Overruled.
A That's not how I feel about it.
Q So you understood then -- let's go the other way.
You understood then that there were expectations of the people who lived in the community at 1080 Folsom; right?
A I did understand that there were certain -- like, again, why would I -- like, why would you move into 1080 if you weren't planning on OMing and immersing yourself in that community and, again, I would still not call it an immersion program.
Q We can quarrel over the word, but the reality is you wouldn't move into 1080 Folsom unless you were embracing a particular tenet that involved OMing; right?
A I was definitely excited about embracing OM, yes.
Q Okay. And that was something that you did every day with the people that lived at 1080 Folsom; right?
A Yes.

Q In fact, I think according to you, at one point you were doing it, what, four or five times a day?
A Yes.
Q You also did yoga with the people who lived there; correct?
A I did.
Q You journaled. That was part of the experience; right?
A I did journal, yes.
Q Everybody journals; right?
A Not everybody.
Q Did Aubrey journal?
A I don't know.
Q There was also a requirement for living there that you did have to contribute service hours to the program; correct?
A I don't remember that.
Q Okay. You could come and go as you pleased, of course, right?
A Yes.
Q I think you said your parents visited at least once; right?
A For a meeting with Rachel and Rob, yes.
Q At least once?
A Yes.
Q And did you have other friends visit where you were living at any point?

A Yes.
Q People outside of OneTaste; right?
A Yes.
Q And part of the requirement or expectation of living at 1080 Folsom was that you would participate in OneTaste courses; right?
A Again, I don't recall it being a requirement and I also know and agree that there was an unspoken expectation.
Q Can you think of anyone who lived there that did not participate in OneTaste activities?
A There were some people who were very minimally involved.
Q So you could have been very minimally involved; right?
A If I had had the capacity to, yes.
Q I mean, you could have been minimally involved, you were there -- well, strike that.

Did you have the capacity to make your choices when you had only been associated with OneTaste for, what did you say, like, a month?
A At that point in my life I was still a very lost individual and I did not have the capacity to -- or the wherewithal to know and make fully informed choices, I think.
Q You came to OneTaste that way; right?
A Damaged, yes.
Q Lost, you said; correct?
A Yes.

Q You entered OneTaste as a lost person, according to you; right?
A Yes.
Q Okay. And you were trying to find some meaning in your life and you entered OneTaste or entered the community there; right?
A Yes.
Q OneTaste had nothing to do with you being lost for everybody reason prior to you coming to OneTaste; right?
A Correct.
Q They're not responsible for that too; right?
A Correct.
Q Nicole isn't at fault for your troubled childhood or whatever it was that made you lost that brought you there; right?
A Correct.
MS. GUPTA: Objection.
THE COURT: Overruled.
A Correct.
Q Okay. And do you recall that the third floor --
The people that lived on the third floor were sort of more -- I'll use the word immersed or you can use whatever word you like, more immersed in the program or the community, than the people on the second floor?
A That is a fair statement.

Q So people who wanted to have their 9-to-5 job and go about their business but maybe wanted to have some connection with this community but didn't want to make it the center of their life lived on the second floor? Does that sound about right?
A Yes, that sounds about right.
Q And that's why there were more boundaries on the second floor. You couldn't walk around naked; correct?
A That seems like it would be an accurate statement. I don't know there were all of the boundaries on the second floor, but that sounds accurate.
Q Logical; correct?
A Uh-huh.
Q And that's why the bathrooms were not sort of an open shower or an open -- like at a gym or something; there was more privacy on the second floor?
A There were stalls in the shower, yes.
Q And the third floor was a little more -- a lot more open; right?
A Yes.
Q And that was for people who -- for -- the people that lived up there were more intensely involved in the community; right?
A For the most part, yes.
Q And that included you eventually; right?

A I believe I moved into the -- onto the third floor immediately.
Q So right out of the gate you were all-in, onto the third floor; right?
A I don't recall it necessarily being like -- when I moved in, necessarily knowing the difference until it was explained to me and, yes, I jumped in with both feet.
Q Okay. Now, part of the program or part of living at 1080 Folsom, as you testified to, was you had to share a room. It wasn't a place where you had private rooms; right?
A Not unless you had money. You were allowed to have your own room, but I didn't have the money to afford my own room.
Q Okay. So there was an option to afford your own room right?
A Uh-huh.
Q And if you had the money to pay for your own room, you would have your own room, but you didn't have the money; right?
A There were a few people who had their own rooms, yes.
Q And you shared a room were a fellow named Henry; right?
A Yes.
Q He was the Doctors without Borders guy?
A Yeah, he was an engineer for them.
Q You testified on direct that you kind of lucked out thanks to the 2010 Haitian earthquake because he had to go

there to work there and save people's lives and, so, you were left without a roommate so you kind of got your own room; right?
A Yes.
MS. GUPTA: Objection.
THE COURT: Overruled.
A Yes. I essentially ended up having my own room because he was gone in Haiti.
Q The coaching program that's separate and apart from the residential living aspect; correct?
A Can you say that again? I'm sorry.
Q The coaching program in which you participated was a separate activity from your living at 1080 Folsom; right?
A In my mind they were married and it was a separate payment and I was making payments to a separate entity, but they were hand-in-hand for me, in my experience.
Q Were you making rent payments, like writing checks or were you just working it off because I heard both?
A I was making rent payments and I was doing payment in kind. It depended on the season.
Q All right. And you know what a d/b/a is; right?
A I do.
Q So Caravan Retreats is who you were writing your rent checks too, right?
A Yes.

Q But they were doing business as OneTaste; right?
A That's how I understood it.
Q And then you could do the coaching program without living there; right? A lot of people did, right?
A Yes, absolutely.
Q Okay. And you really wanted to take the coaching program?
A I was very excited about the coaching program, yes.
Q And you knew you couldn't afford it; right?
A I did.
Q Okay. And you knew how much it cost; right?
A I did.
Q And you didn't wait and save money to take it. You talked to Rachel and said I really want to take it and she said maybe we can try to raise some money or something like that?
A She said, don't worry about it, we'll figure it out.
Q And you did figure it out, you raised some money; right?
A I did, yes.
Q And, in fact, you even borrowed money from boyfriends along the way to take OneTaste courses; correct?
A I don't -- I recall borrowing $800 from one person who I would not consider a boyfriend.
Q Okay. You borrowed money from a friend; is that better?
A Yes.

Q You borrowed money from a friend to take a course, maybe not the coaching program, but you had borrowed money to take courses; right?
A I don't remember why I borrowed the money, whether it was for rent or for a course, but I did borrow $800 from a friend.
Q All right. And you also did not even end up paying off the whole coaching program; right?
A Because I ended up quitting partway through, yes.
Q Usually when you purchase a product and you don't want to use it, you don't necessarily just, you know, not get your money back; right?
A We -- I remember talking to Rob about it and agreed it would end up being a prorated amount. So I would pay for the course work that I went through and not the rest of it.
Q Yeah. So, Rob gave you a break and said, you know, you signed up for this course, you committed to this course. You now don't want to do it so we're not going to hit you with the whole amount; right?
A I don't recall the specifics of the arrangement and, yes, I did not pay for the whole course. I paid for maybe half of it.
Q All right. And then how long after you were living at 1080 Folsom did you start doing the Sugardaddy thing?
A I don't recall. I'm sorry.
Q Okay. You put -- you put up a profile on Sugardaddy;

Bunny or TurnON Fairy; is that right?
A Can you say that again?
Q You testified on direct that you were called these names, TurnON Bunny or TurnON Fairy, right?
A Yes.
Q You never said don't call me that, right? You never said to anybody, don't call me the TurnON Bunny?
A I don't remember ever saying that, no.
Q Okay. And you didn't say don't call me the TurnON Fairy -- did I just repeat that?
A I never said either of those names.
Q You didn't object verbally to anybody, like, I don't like that you're calling me that, please don't call me that?
A Correct.
Q In fact, at the time you sort of embraced the monikers; right?
A I think it's fair to say that I embraced it. I was very excited to be accepted and -- not just accepted but lifted up for being a sexual person.
Q Right. And you testified on direct that you now see OM as a sexual -- all OMing as a sexual service; right?
A I do.
Q But you didn't view it that way back when you were associated with OneTaste between 2009 to 2013-ish?
A Thereabouts, yeah.