# 26-943-cr(L), 26-944-cr(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RACHEL CHERWITZ, NICOLE DAEDONE,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

**Volume III of VII (Pages A-577 to A-866)**

ALEXANDRA A.E. SHAPIRO
ALICE BUTTRICK
CHRISTOPHER JOHNSON
WILLIAM TAYLOR
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants*
*Rachel Cherwitz & Nicole Daedone*

**TABLE OF CONTENTS**

**Page**

District Court Docket Entries in *United States v. Cherwitz et al.*, No. 23-cr-146 (DG) (E.D.N.Y) ........ A-1

Indictment, filed April 3, 2023 (Dkt. 1) ........ A-77

Excerpts of May 3, 2024 Pre-Trial Conference Transcript ........ A-85

Declaration of Adam Goldberg, dated May 31, 2024 (Dkt. 287-2) ........ A-89

Declaration of Joanna Van Vleck, dated August 1, 2024 (Dkt. 287-1) ........ A-91

Excerpts of September 27, 2024 Pre-Trial Conference Transcript ........ A-96

Government Letter Supplementing Record, filed October 7, 2024 (Dkt. 163) ........ A-106

Excerpts of November 15, 2024 Pre-Trial Conference Transcript ........ A-108

Declaration of Paul Pelletier, dated December 20, 2024 (Dkt. 287-5) ........ A-113

Joint Requests to Charge, filed December 9, 2024 (Dkt. 223) ........ A-120

Joint Letter Supplementing Requests to Charge, filed April 16, 2025 (Dkt. 326) ........ A-192

Joint Letter Supplementing Requests to Charge, filed May 24, 2025 (Dkt. 389) ........ A-211

Excerpts of February 26, 2025 Pre-Trial Conference Transcript ........ A-220

Excerpts of Trial Transcript ........ A-225

## Government Exhibits

GX56: Photo of Front of Reese Jones Townhouse ........ A-1389

GX57: Photo of Side of Reese Jones Townhouse ........ A-1390

GX58: Photo From Deck of Reese Jones Townhouse ........ A-1391

GX59: Photo From Deck of Reese Jones Townhouse ........ A-1392

GX60: Photo of Inside of Reese Jones Townhouse ........ A-1393

GX826: March 2011 OneTaste Organizational Chart ........ A-1394

GX853: Summary Chart of Nicole Daedone Reported Wages And Income Received from OneTaste ........ A-1396

GX856: Summary Chart of Select Individuals Reported Wages Received from OneTaste ........ A-1397

GX862: Summary Chart of Rachel Cherwitz Reported Wages And Income Received from OneTaste ........ A-1398

GX1013: September 21-23, 2008 Emails from Reese Jones And Bryan Franklin ........ A-1399

GX1045R: September 27-28, 2011 Emails from Michelle Wright And Robert Kandell ........ A-1403

GX3120: How to OM Manual ........ A-1407

GX3147: OneTaste Fear Inventory Manual ........ A-1420

GX3164: Plan to Fulfillment – OneTaste Curriculum Slideshow ........ A-1422

GX3212R: July 10, 2008 Darshan Transcript ........ A-1429

GX3224: OneTaste Coach And Trainer Association Code of Conduct, Signed January 12, 2013 ................................................ A-1446

GX3234: OneTaste Coaching & OM Training Program Packet.................................................. A-1452

GX3500RW12: OM Residential Living Handbook ......................................................... A-1465

GX3608: OneTaste Resignation of Nicole Daedone, Effective March 3, 2017 .......... A-1470

GX3743: Employment Agreement of Lianna Lifson................................................................ A-1471

GX3767: OneTaste – Rachel Cherwitz Separation Agreement And Release, Signed May 14, 2018..................................................... A-1485

GX3768: Employment Agreement of Rebecca Halpern................................................ A-1496

GX3772: Employment Agreement of Michelle Wright................................................. A-1513

GX3875 (produced in native format): August 23-25, 2013 Video of OneTaste Coaching Program – Nicole Daedone Lecture .................. A-1521

GX3879 (produced in native format): February 21-24, 2013 Video of OneTaste Coaching Program – Beast Exercise .................. A-1522

GX4056: OneTaste Inc. Stock Purchase Agreement, Dated March 3, 2017 ...................... A-1523

GX4513AR: July 10-12, 2015 Text Messages Between Michal Neria and Rachel Cherwitz ...... A-1579

GX4514AR: June 8-11, 2015 Text Messages Between Michal Neria And Rachel Cherwitz ..... A-1585

## Defense Exhibits

DX1AB: OneTaste Code of Conduct, Dated February 20, 2014 .............................................. A-1589

DX1AN: October 2006 OneTaste Release of Liability Form .................................................. A-1597

DX1BG: 1080 Folsom Handbook ...................... A-1600

DX1BS: October 2013 OneTaste Employee Handbook ......................................................... A-1602

DX1X: OneTaste Coach Association Code of Conduct, Dated April 22, 2011 ........................... A-1629

DX3AR: Photo of Michelle Wright And Others ............................................................... A-1632

DX3AS: Photo of Michelle Wright And Audrey Wright ................................................... A-1633

DX3AZ: Photo of Michelle Wright .................... A-1634

DX3DU: Photo of Michelle Wright And Others ............................................................... A-1635

DX3DW: Photo of Michelle Wright And Others ............................................................... A-1636

DX3DY: Photo of Michelle Wright And Eric Swanson ........................................................... A-1637

DX3EA: October 1, 2013 Chat Log Between Nicole Daedone And Michelle Wright ............... A-1638

DX3Z: Photo of Michelle Wright And Others .... A-1639

DX4A4: Photo of Inside of Center ..................... A-1640

DX9FD1 (produced in native format): Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend ........................................................... A-1641

DX9FD1T: Transcript of Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend .................... A-1642

DX11EP (produced in native format): Video of Michal Neria and Misha Safyan...................... A-1643

DX11FS: 2013 Coaching Program Sales & Business Dev. Guide........................................... A-1644

DX11R: OneTaste Refund Policy And Release, Signed December 27, 2014 ................... A-1652

DX12AI: Photo of Anthia Gillick, Michelle Wright, And Aubrey Fuller................................. A-1657

DX12BY: OneTaste Coach And Trainer Association Code of Conduct And Release (September 2013) ............................................... A-1658

DX12Q: Photo of Rachel Cherwitz and Anthia Gillick ..................................................... A-1666

DX13BA: Photo of Margaret Pixley And Others ................................................................ A-1667

DX13K: Photo of Margaret Pixley...................... A-1668

DX20AE: OneTaste Release of Liability Form, Signed September 8, 2012 ........................ A-1669

DX20AW: Photo of Dana Gill, Lianna Lifson, And Others ............................................. A-1671

DX21AL: Photo of Rebecca Halpern And Chelsea Hunter ................................................... A-1672

DX21AM: Photo of Rebecca Halpern And Others ................................................................ A-1673

DX21AN: Photo of Rebecca Halpern And Others ................................................................ A-1674

DX171-1: Photo of Rebecca Halpern And Others ........ A-1675

DX21AP: Photo of Rebecca Halpern, Margaret Pixley, And Chelsea Hunter ........ A-1676

DX21AQ: Photo of Rebecca Halpern And Others ........ A-1677

DX21AS: Photo of Rebecca Halpern And Others ........ A-1678

DX21J: OneTaste Release of Liability Form, Signed September 8, 2012 ........ A-1679

DX21L: Rebecca Halpern Financial Agreement And Cancellation Policy re Coaching Program (January 2013) ........ A-1681

Memorandum And Order Denying Rule 29 Motion, dated August 11, 2025 (Dkt. 429) ........ A-1683

Letter Motion for Forfeiture of Property, filed December 10, 2025 (Dkt. 481) ........ A-1688

Order Granting Forfeiture Motion and Preliminary Order of Forfeiture, filed March 18, 2026 (Dkt. 504) ........ A-1699

Excerpts of Daedone Sentencing Transcript, dated March 30, 2026 ........ A-1710

Cherwitz Judgment, filed March 31, 2026 (Dkt. 523) ........ A-1714

Daedone Judgment, filed March 31, 2026 (Dkt. 521) ........ A-1721

Cherwitz Notice of Appeal, filed April 10, 2026 (Dkt. 528) ........ A-1728

Daedone Notice of Appeal, filed April 10, 2026 (Dkt. 529) ........ A-1729

**FILED UNDER SEAL**

Declaration of Joanna Van Vleck,
dated June 1, 2024 (Dkt. 127-1) .......................... A-1730

Declaration of Mitchell Aidelbaum,
dated July 31, 2024 (Dkt. 141-1) .......................... A-1734

Declaration of Kevin Williams,
dated August 1, 2024 (Dkt. 113-3) ...................... A-1741

Declaration of Rachel Caine,
dated August 1, 2024 (Dkt. 113-5) ...................... A-1747

Government Opposition to Defendants' Motion
to Dismiss, filed August 15, 2024 (Dkt. 118) ...... A-1751

Filter Team Letter Supplementing Government
Opposition to Motion to Dismiss, dated
August 15, 2024 (Dkt. 127) ................................ A-1790

Defendants' Reply In Support of Motion to
Dismiss, filed September 6, 2024 (Dkt. 141) ...... A-1798

Government Letter Supplementing Record,
filed September 20, 2024 (Dkt. 154) ................... A-1825

FBI 302,
filed September 20, 2024 (Dkt. 156-1) ............... A-1829

FBI Notes,
filed September 20, 2024 (Dkt. 156-2) ............... A-1833

Q You didn't view it that way then?
A It started off in my mind, like, with -- especially with my upbringing, woo, this is a little bit woo and I was still a little bit excited about it and it was taught to us that asking for OM was like asking for a cup of tea. So it really took the sex and that sexual charge out of it.
Q Right. That's OneTaste, isn't it?
A The normalization --
Q Of OMing, yeah, is the central core tenet of OneTaste, right?
A Yes, OM is definitely a core tenet of OneTaste, yes.
Q They never hid it from you; right?
A Correct.
Q That's frankly all they ever talked about; right?
A Yes.
Q You're getting that message pretty regularly, yes?
A About OM being a tenet, yes.
Q Your power comes from OM, right?
A That was one of the things that they said about OM, yes.
Q And even up until March of 2013, you were OMing regularly for your own practice; correct?
A Yes, I was OMing pretty regularly up until I left.
Q And my point is up until you left, you viewed OM as a practice that was beneficial to you; right?
A Yes.

right?
A I did not. That wasn't the question.
Q Right. Well, you -- but you didn't say anything to indicate I have no intentions of stroking Ken, right?
A Correct.
MS. BONJEAN: Okay. We can take that down.
Q You testified also, I believe, another example yesterday was you were asked or directed, I don't remember which word you used, to either OM with or have some type of experience with a fellow named Antonios; is that right?
A I was told to make sure that he stayed in the coaching program.
Q Okay. And who told you that exactly?
A I don't have a specific recollection of who it was.
Q All right. And that person, whoever it was, didn't say I want you to go OM with him, right?
A No.
Q That person didn't say, I want you to go do a make-out session with him, right?
A To my memory, no.
Q Okay. So this person is like, we want to keep this guy as a customer, correct?
A My interpretation of what was asked of me is essentially do what you need to do to keep him in the coaching program because -- with the implication of we want

to keep him as a customer.
Q That was your interpretation, but nobody told you expressly what to do, right?
A There was no one saying, go suck his cock.
Q Right. I mean, no one said go make out with him, no one said go talk to him -- well, let me go one by one.
No one said, go make out with him, right?
A I don't recall if that was specified or not.
Q No one said, go suck his cock, correct?
A I'm pretty certain that those words were not used, correct.
Q Right. No one said, go OM with him, right?
A Those words definitely not used, correct.
Q No one gave you any explicit instruction other than try to keep him in the program, correct?
A My recollection is of I was -- it was requested of me to make sure he stayed in the program, yes.
Q And the program, you understand, was a product that had been -- I mean, it was an actual -- this was a business, you understood that, right? OneTaste was a business.
A Yes, OneTaste is a business.
Q Okay. And the coaching program was a product of that business, correct?
A Yeah.
Q Okay. So whoever -- we don't know who it is, but

whoever it was that asked you to try to keep him in the program was saying, keep this customer in the program because we want to keep our customers, right? Fair?
A I think that's a fair statement, yes.
Q And your interpretation was go do something sexual with him, right?
A It was the implication.
Q Okay. Can you give me -- well, strike that.
You drew from that to go suck his cock?
A That was part of it.
Q But that sexual act itself was a sexual act you chose to do, right?
A I'm -- I'm struggling with the word choice. Probably no surprise.
Q No surprise.
A And I -- I think that there is a limit in choice when coercion has been underlying everything.
Q Okay. I know -- I'm asking you really -- I'm not asking you for the psychobabble. I'm asking you, in the moment --
MS. GUPTA: Objection.
THE COURT: Sustained.
Q I'm asking you, in the moment, did you make the choice about what sexual activity you were going to go do with Antonios?

A It didn't feel that way to me.
Q In the moment it didn't feel that way?
A It felt like what was being asked of me was to go do sexual acts with him to keep him in the program.
Q Even though no one told you to go do sexual acts, it felt that way?
A Correct.
Q And it felt that way and you just went and did it, right?
A Yes.
Q You didn't walk out the door and say, heck no, correct?
A Correct.
Q You didn't call up your family and say come get me, right?
A Correct.
Q You didn't call up your sister and say, you know, can -- can -- I'm going to get a ride to your house, I'm coming there right now, right?
A Correct.
Q You didn't even object when the person told you to keep him in the fray, right? Or keep him in the program.
A I don't recall. I doubt I did.
Q Okay. You didn't say anything to the person who was supposedly giving you this direction like, I object to this, I don't want to do it, and I'm not going to do it. You said

nothing along those lines.
A I didn't have the capacity to.
Q Right, because you -- you were already -- well, strike that. We're not going to go backwards. Let's keep going. I know that's your testimony.
Mr. Robotti touched on some of this, but I want to ask you a couple of questions about your testimony that -- I think the testimony was along the lines of that the message that you got from OneTaste is that if you were anywhere else other than OneTaste, you would lose your orgasm, or something of that nature, right?
A The -- I believe what I said and my memory of the way that it was taught to me was if you -- if I was to leave and go to, say, the island that my friends wanted to go to in Clear Lake, that it was a waste of my time and I would be undoing all of the hard work to cultivate my power in orgasm.
Q So your friends at OneTaste gave you this kind of, you know, wild idea, right, that if you go do things elsewhere, you're not staying focused on this community and what the community is all about, right?
A Yes.
Q Okay. And yet you did exactly that. Throughout your time at OneTaste, you went to a myriad of places unassociated with OneTaste, right?

A My -- my time at OneTaste was not devoid of extracurricular activities.

Q Right. So you were working outside of OneTaste, correct?

A On occasion, yes.

Q Right. They didn't kick you out when you were working outside of OneTaste, right?

A Correct.

Q You had colleagues wherever you worked, right? Guys that worked in the kitchen, women that helped wait tables, these were people that were not associated with OneTaste, right?

A Correct.

Q You had bosses in your other jobs, right?

A Correct.

Q And these people are all people you developed relationships with, or could have, correct? Friendships.

A I -- yes, I could have. I didn't connect that much with any of them until the church job.

Q You -- we've already established you vacationed with your friends and your family from time to time, right?

A There were a few vacations in there, yes.

Q You went home for the holidays, right?

A Occasionally, yes.

Q Went home for Thanksgiving, correct?

A Occasionally.
Q Even moved out of Folsom to go move in with a romantic partner on at least one occasion. Was it one or two?
A I believe it was just once, if I'm remembering correctly.
Q You actually left the residential place and went and moved in with a boyfriend, correct?
A Correct.
Q And was that boyfriend someone associated with OneTaste?
A He was very supportive of OneTaste.
Q All right. But he wasn't -- he wasn't part of the community, right?
A Correct.
Q Okay. So the actual person who is your romantic partner, your boyfriend, you're living with him, he's not even associated with OneTaste, right?
A He had -- he had learned OM, but he was not involved with OneTaste, especially to the extent that I was, correct.
Q He didn't take the coaching program, right?
A Correct.
Q He didn't take courses, right?
A Correct.
Q He worked outside of OneTaste, right?
A Correct.

Q Women OM'd with other women?

A It was -- it was not encouraged until you were well developed in your OM practice, and yes, women OM'd with other women.

Q Fair to say, though, that the sexual activities that you now look back at, whether it was OMing or make-out sessions, I'll say, with some of the participants, at the time, you did not communicate to Nicole Daedone, Rachel Cherwitz, or anyone at the upper staff of OneTaste that you did not want to participate in those activities, correct?

A I never overtly said I don't have the capacity to do this, or I don't want to do that.

Q Okay. And that was true also for your relationship with Reese Jones, right? Meaning you didn't communicate your -- that you didn't want to have sexual relations with Mr. Jones, right?

A I -- I never said I don't want to do this.

Q In fact, there were aspects of it, you know, you enjoyed, according to you, correct?

A I believe my testimony was it was not devoid of pleasure. I did not enjoy it, though.

Q Okay. But you agreed to it?

A I did.

Q And even as of September of 2012, you very much wanted to stay connected to OneTaste, right?

A Can I have more context, please?
Q Yeah, sure. It wasn't a great question.
You wanted to be a certified coach and an OM coach, right?
A I -- I do remember seeking certification, yes.
Q Okay. And you wanted to integrate OM into the church community, right?
A My -- yes. My original vision was to focus on sexuality within the church. I had not -- I was unable to pull apart and unmarry all of the things that I had learned.
Q All right. You wanted to free people's orgasm, especially in the normative communities; housewives and families, right? And I'm talking September of 2012, not now. Right?
A That sounds like a fair statement of what I was hoping to do back then, yes.
Q And you wanted to have the freedom to travel and teach about OM in different cities and in different languages all over the world. That was what your vision was for yourself in September of 2012, right?
A I don't recall the traveling, and I don't know why anyone would not want to travel. That sounds delightful for anyone, I think.
Q Agreed. But you wanted to travel to spread the mission of orgasmic meditation in that time period, right?

A Yes.
Q Okay. You testified on direct examination, of course, about this -- this sham marriage you entered into. I'm not going to talk about that too much. But you remember that testimony, right?
A I do.
Q You agree that, you know, lots of people go into debt, right? Like, I don't know a percentage, but many people are in debt?
A Yes. Consumerism is a problem.
Q Right. And not everyone crosses the line and breaks the law, right?
A Correct.
Q Now, you testified that I think sometime in 2013 you were off to new things. But while you were still at OneTaste, you were applying for graduate positions -- graduate school positions, right?
A I don't recall applying, like actually submitting the application until after I left OneTaste. I remember submitting my application at the very last minute before the deadline hit. But that being -- and I also remember saying in my cross-examination yesterday that the -- they call it the discernment process in the church, and the discernment process, which is different than the application process, is very long. So I had to, like, talk to my pastor and read a

podcast showed how far you had deviated from your values. What did you mean by that?

A I -- I look back at it and I don't understand how I got to the place that I was at where I was like, yeah, I get to have sex with strange men, from what I heard on the audio yesterday. That's not -- that's not who I am, and it just shows that I had been -- it had -- that had been normalized, because that part of me had been celebrated and embraced so much and I was given all of this positive reinforcement around having sex and being a sexual person, and even an overly sexual person because I got off on every stroke. And so when that part of me was celebrated, I was like, oh, yeah, I'm gonna to keep leaning into that, and it ended up causing a lot more harm than it did good. It was not freeing, in fact, in hindsight.

Q Now, you testified about engaging in sex work. Approximately what time period was that in?

A If I had to give my best general guess, it was from about the time that I started at OneTaste, because in my mind I had to start paying more for courses. And there's definitely a peak of how many clients I would see that dropped off maybe two years. Again, I'm horrible at guesstimating, but maybe about two years. But I do know that I continued to see one particular client who I mentioned yesterday, Stan, up until I left.

Daedone would have known about the fact that you were going to be dating Reese Jones before you actually went out with Reese?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

MR. ROBOTTI: Form. Knowledge of defendant.

MS. BONJEAN: Foundation.

THE COURT: One moment, please.

I'm going to sustain it as to form.

Q Do you have an understanding of why Nicole Daedone was informed that you would be dating Reese Jones?

MS. BONJEAN: Still objection.

THE COURT: Sustained.

Q Now, you testified again about your audition on both direct and cross-examination. Who ultimately invited you to the concert for your audition with Reese Jones?

A Yia Vang.

Q And you testified that Nicole Daedone was present at that audition, correct?

A She was.

Q Now, you testified on cross that you viewed it as a good opportunity to be Reese Jones's handler. Why did you view it as a good opportunity?

A I had been out of the 1080 building, even though I was still involved since my apartment was right across the

street. And when I moved back in, I felt like I had to prove myself to them again because I had left.
Q Did you believe you would prove yourself by agreeing to be Reese Jones's handler?
MR. ROBOTTI: Objection. Leading.
THE COURT: Overruled.
A I hoped that I would, for sure, yes.
Q Whose approval were you seeking?
A The core staff; Nicole's, Rachel's, Rachael's, Yia's.
Q You testified on cross-examination that you ultimately lived in a mansion with Reese for a period of time. What did you have to do to live in that mansion?
A I had to cook him breakfast, I took him for walks and hung out with him, and then I would sexually service him.
Q What sexual service?
A We would occasionally OM, and I would perform fellatio, or I would fist him.
Q I'm sorry, what was the last part?
A Fist him.
Q What does that mean?
A I would put my entire hand up his anus.
Q Did you want to engage in that activity?
A No.
Q And you testified that you kept your room at 1080 where you continued to pay rent. Did you want to keep that room?

A Are you referring to the part in my journal where it said that I would live there, or is that a different --
Q No. Sorry. We can take down this exhibit. I am just referencing your cross-examination yesterday.
A Okay. Can you repeat the question, please?
Q Yes.
You were asked on cross-examination whether you wanted to live at Reese Jones' house, and you responded that it was complicated.
What did you mean by that?
A I wanted to prove myself and be accepted into this community that I felt like I was on the outskirts again, once again.
Q You testified on cross that you had said you loved Reese Jones. What did you mean when you said that?
A It's really easy to love a person without wanting to be romantically involved with them or loving them in the way that you would a romantic partner. And that's what I meant. Like, he's a very loveable person.
Q Did loving him mean you wanted to perform sex acts on him?
A No.
Q So why did you do that?
A Because I was asked to, and it was -- I felt like it was expected of me so that I could prove that I was worthy of

being in this community that, you know, I thought were my people.

Q Who, ultimately benefited, if anyone, from the fact that you sexually serviced Reese Jones?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

MR. ROBOTTI: Foundation.

THE COURT: Sustained.

Q Did anyone benefit from your sexual services to Mr. Jones?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Q You testified that when you did finally leave OneTaste and move out of 1080, Reese Jones offered you money to stay with him, and you said no, correct?

A I did.

Q Why did you say no?

A I was done. I had been working in therapy around everything that was going on and the manipulation and if it felt good for me, and I just wanted to start cutting more and more ties, and that was a very direct tie. I wasn't interested in the money. I wanted a life with Rob.

Q Now, you testified on cross-examination that Aubrey

Fuller advised you not to be with Rob Bakhshai.
Who else at OneTaste advised you of that?
A Rachel Hemsi, Yia Vang, and Nicole Daedone.
Q And you testified on cross that you were very upset about Robert and the manipulation behind the scenes. What manipulation behind the scenes were you referencing?
A From my perspective, there was -- like every time I would talk to Yia about, you know, my relationship with Rob and the issues, like the next day after having a conversation with Yia, Rob called me and was like Yia called me and offered me a job in Vegas. It just seemed to -- it was too coincidental, too convenient for it not to be intentionally manipulative.
Q And was there a time when Rachael Hemsi encouraged you to try 30 days monogamy with Reese instead of Robert Bakhshai?
A Rob really wanted to try out monogamy. He was really pushing for it. And I kept getting the outside reinforcement that, Dana, you can't be in a relationship, you can't -- like, monogamy kills you. Like all of these things. You will lose all of the power that you've cultivated.
And so my therapist had posited, like what if you just did 30 days of monogamy. Surely that won't be an issue. And when I suggested I wanted to try it, it became -- it became explosive, from my perspective. And Rachael Hemsi kept pushing Reese. Like, oh, you can't -- don't do it with Rob. He's selling goo. I don't think that he would be good for

Q Either way, it's a crime?
A Lying to immigration officials?
Q Lying to the government officials, correct?
THE COURT: Sorry. Pose the question again.
MR. ROBOTTI: Yes, Your Honor.
Q It is a crime to lie to government officials --
MS. GUPTA: Objection.
Q -- correct?
MS. GUPTA: Calls for a --
THE COURT: Sustained.
Q You were asked about some communications that you had with Rachael Hemsi and Yia Vang about Reese Jones; do you recall those?
A Yes.
Q Specifically about text messages that you provided to the government in this case?
A Yes.
Q Do you remember telling Ms. Hemsi that your experience with Reese Jones was awesome and that you loved making out with him?
A I have a vague recollection of it, yes.
MR. ROBOTTI: Can we show just for the witness on the Elmo -- I just got this, Your Honor. Apologies. I only have one copy unless the government has --
THE COURT: What's the number?

MR. ROBOTTI: It's Government Exhibit 4520-B.

THE WITNESS: I have it.

MS. GUPTA: Your Honor, we had passed up a copy to you earlier.

Q You have it in front of you, ma'am?

A What page are you looking at?

Q I am looking at -- if we are using the bottom set of numbers, page 3.

Does that refresh your recollection that on December 14, 2012, you told Ms. Hemsi that it was -- that last night with Reese Jones was awesome, I loved making out with him?

A Yes.

Q And turning to page 5 of the same document, do you recall on December 23, 2012 that you said "things with Reese are really good," to Ms. Hemsi?

A Yes. I do see that here. Yes.

Q And now turning to your messages with Ms. Vang. This is Government Exhibit 4519-A.

A I don't know that I have that in front of me.

MR. ROBOTTI: Do you have an extra copy?

MS. GUPTA: Yes.

THE WITNESS: Thank you.

Q Now, do you recall, ma'am, on December 13, 2012, and I am looking at page 4, do you recall telling Ms. Vang that your experience with Reese was great the evening before?

A Yes. He had come to my talk at church around technology and religion.
Q And did you recount that you had had an interesting conversation with him?
A Yes.
Q And turning to page 5, do you recall on the same date that you told Ms. Vang, I'm excited to be with Mr. Jones?
A Yes. I see that here.
Q And do you recall at various points when Ms. Vang asked if you could go see Mr. Jones, that you said that you were too busy with work?
A I do remember getting busy with work, especially at the end of my time when I started to feel more and more pulled away from this job.
Q So specifically on December 18, 2012, and I am looking at pages 7 and 8, Ms. Vang asked you if you were going up to the house, and you said, no, I'm still working?
A Yes. I see that.
Q So you told Ms. Vang no; is that correct?
A I'm still working. Yes.
Q And you weren't staying at Mr. Jones' house every night, correct?
A Most nights, but not every night. Correct.
Q And you recalled on redirect examination that you said you were annoyed that you had to keep paying rent at 1080; is

Q And, specifically, I'm going to be asking you to look at the middle of the page, of the page 3 of that document, and see if that refreshes your recollection about whether there was a written code of conduct as it relates to the OneTaste teachers, leaders, and representatives.
A It does not.
Q Okay. You can put it aside.
Now, you testified that you auditioned to be Reese Jones', I don't know what, servicer, handler, girlfriend, it is unclear, but one of those things, right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q You were auditioned for whatever role you were playing for Mr. Reese, right?
A Yes.
Q No one told you that you were auditioning for some role, though, right?
A No one ever used those exact words, "you are auditioning," no.
Q You interpreted it that way, but no one said you were going to go addiction for this position, right?
A No one ever said those words. Correct.
Q In fact, you just were asked to go along on an outing that he happened to be at, correct, like a concert?
A That's not how I remember it.

Q Were you asked to go to a concert that he was attending with other people that you affiliated with at OneTaste?
A It was a concert with Nicole and Reese and Yia.
Q And you were invited to that event, correct?
A Yes.
Q And then after that event you ultimately ended up playing some -- having some relationship with him, right?
A Yes.
Q Okay. Now, you agreed to have that relationship with him; fair?
A I did.
Q Okay. And you didn't have to cook breakfast for him, but you did, correct?
A It -- that's not the way it felt.
Q Well, you didn't tell anybody you didn't want to cook breakfast for him, right?
A I'm pretty sure I told Maddie that I didn't understand why I had to do all of those things.
Q Okay. But you didn't tell anybody that, you didn't tell Nicole, you didn't tell Yia, you didn't tell Reese, hey, I don't want to cook breakfast for you, I'm not coming over to cook breakfast for you anymore, right?
A It was not within the realm of my abilities.
Q So that's a no, you didn't communicate that to anybody?
A No.

Q You didn't -- more importantly, you didn't communicate that to Ms. Daedone or upper staff of OneTaste, right?

MS. GUPTA: Objection. Asked and answered.

THE COURT: Overruled.

A I never overtly said that, no. I was still seeking --

Q That's a no, right?

A -- acceptance.

Q I am just asking, did you say those words?

A I never said those words.

Q Okay. And you also didn't tell Mr. Daedone, Mr. Cherwitz, or anybody at the upper staff of OneTaste that you didn't want to take him on walks, right?

A I never used those words.

Q And you also didn't tell Ms. Daedone or Ms. Cherwitz or anyone in the upper staff of OneTaste that you didn't want to fist him, right?

A The question is specifically to the upper staff --

Q Yes.

A -- not to someone like Maddie?

Q No. I am not talking about complaining to your friends. I'm saying, you didn't report that to Nicole, Rachel --

MS. GUPTA: Objection.

Q -- or anyone in the upper staff at OneTaste?

THE COURT: Sorry. There was an objection?

MS. GUPTA: Yes, Your Honor. As to form.

THE COURT: Sustained.
Q You didn't report your distaste with sexual activities with Reese to Ms. Daedone or anyone in the upper staff of OneTaste, right?
A Correct.
Q Okay. And even when you journaled -- and this journal that's been marked as 2-W, you've looked at the whole -- you've looked at the journal?
A I don't have a copy of it, but I have looked at it before.
Q Okay. I will bring it up, if you need it. But I only have a couple questions. This was a journal you wrote for yourself, right?
A Yes. It was my way to work out things that I was working through in therapy.
Q This was a private writing to yourself, right?
A Correct.
Q You weren't writing it so, you know, you could -- for any -- because you knew you were going to give it to the federal government some day, correct?
A Correct.
Q All right. And the government had you look at an excerpt from it, which has been marked as 911-B, just for identification. And you were asked a question on redirect about you saying -- you writing that the relationship with

Reese was sort of -- it was sort of arranged and not completely organic, right?
A I do remember that. Yes.
Q You did reference it as a relationship, though, right?
A I mean, we have a relationship.
Q Do we?
A It depends. We have -- we are talking to each other.
Q So that's what you meant, like the relationship of just talking with one another, rather than like fisting someone?
A We definitely had a deeper relationship than you and I do.
Q I hope so.
But the way you described it was, it was sort of a range and not completely organic. You didn't call it like I auditioned to be his handler, right?
A I wasn't there in my processing and therapy yet. I was still working through what was going on. It took a while to uncover that.
Q Right.
And that's what I'm getting at. And I understand that. It is only later that you sort of thought of it that way, as an audition to be his handler, right?
A It's not that I thought of it that way later. It is that I did a lot of work in therapy on myself and on the things that had happened in my life and the choices that I had made

in my life as well.
Q Correct.
And you also were asked on redirect about writing, "it does feel a little like a job sometimes." You referenced it, it feels a little bit like a job, correct?
A I was starting to unearth that aspect of it in therapy. Yes.
Q You didn't write, you know, this is a job I am not being paid for, and I'm being a handler, and I really don't want to be part of this? You didn't express that?
MS. GUPTA: Objection.
THE COURT: Overruled.
Q That wasn't the sentiment of your expression. You just said it feels a little bit like a job, right?
A Yeah. I hadn't gotten all of the way through my therapy.
Q Right.
And this was a journal you wrote to yourself, for your own benefit, correct?
A Yes.
Q All right. You testified about how you felt that people at OneTaste and the upper echelon, as well as Nicole, had discouraged your relationship with Robert, right?
A Yes.
Q And you thought they discouraged your relationship with Billy, and there were other -- those were like two examples

that you provided over the course of your examination, right?
A Yes.
Q Isn't it true that Nicole and other people at OneTaste were concerned about the high risk men you dated?
A I don't know what you mean by high risk men.
Q Well, didn't you write to yourself in your private journal, why do I always invest in high risk men?
A I don't recall that. If I had to make a guess, high risk men were what -- the language around OneTaste from the core staff was they were men who would pull me back into sleep, as they would talk about it.
Q Like Malechai, who was assaulting you?
A No.
Q Okay. That's a high risk man, right?
A Not in the context of what they were talking about. And yes.
Q But he is a high risk man, correct?
A I would say so. I have not made good choices in the past.
Q You were dating someone who was HIV positive, right?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q And Robert, himself, was involved in sex work, correct?
MS. GUPTA: Objection.
THE COURT: Sustained.

Q And isn't it true that Nicole reinforced that there were certain men that you were associating with that weren't good for you, like any friend would, correct?
A I don't think it was friendly.
Q Okay. And, lastly, you referred to what happened to you at OneTaste as coercion, right? Do you remember your testimony about that?
A Yes.
Q Okay.
A I think so.
Q Okay. This coercion that told you to doubt your inner voice, I think is something you said. Does that sound right?
A That sounds about right.
Q But you testified over and over, you didn't communicate that you didn't want to do these things to Nicole, meaning these sex acts, correct?
A I never communicated overtly. I did communicate through my fear inventory the struggles that I was going through and the trauma that I had already endured.
Q Okay. But you didn't read your fear inventories to Nicole, regardless, right?
A Not that I remember.
Q Okay. But you didn't expressly, in words, tell anybody in the upper staff of OneTaste, including Nicole, that you didn't want to engage in the activities that we have discussed

those self-development classes.
Q So after you heard Nicole Daedone speak at this lecture, what happened with respect to your involvement with OneTaste?
A At that point, OneTaste was headquartered in San Francisco, and I was living in San Francisco, and I just thought like this seems cool. I will go check it out. So I went to one of their like TurnON events and then signed up for their How to OM class.
Q And what is a TurnON event?
A I now understand it to be this kind of what we would call lead generation event. So very free or low cost event that people could come to. They would typically have a few of the coaches at the front of the room who would facilitate different like communication games, and then they'd like pitch you on a class at the end.
Q And what is the How to OM course?
A I think that was a two-day course where we would learn the basics of orgasmic meditation, and then at the end you'd have an opportunity to have an OM.
Q And how were you supporting yourself financially at this time when you first became involved with OneTaste?
A I was still working at the chiropractic clinic.
Q Who was leading these initial courses that you attended that you just testified about?
A I believe the facilitators at my How to OM class were

MS. BENSING: We can take that down. Thank you.
BY MS. BENSING:
Q Do you remember approximately how much the winter retreat cost?
A It was upwards of $2,000.
Q At or after the winter retreat what, if any, additional financial investment did you make in OneTaste?
A Oh, I was pitched on the coaching program at the end of the retreat and although I didn't, like, sign up while I was there, I think a few days later I signed up to become a coach with OneTaste and that was about, like, a $15,000 program.
Q And what is a coaching program?
A So, it was this idea that you were going to become one of the coaches for OneTaste. You would be able to be a relationship coach, teach other people how to OM and I, at that point, thought it would be a good step for me professionally. So, I signed up for it.
Q And I think you testified it was about $15,000. How did you pay for that?
A So, my best friend's mother financed it for me.
Q What was the name of that coaching program?
A I was enrolled in the Coaching Program 6, so it was a sixth of these programs that they had done.
Q How was it referenced?
A CP6.

A We would often work there in the morning. We would circle up and start our work for the day. A lot of the work was happening out of the living room. So, we were constantly in and out of all of the apartments. And I had duties in the other apartment as well like cleaning Nicole's room before and after she left town.
Q And what did -- this is the penthouse room for Nicole?
A Yeah.
Q What did your duties of cleaning her room entail?
A I would, you know, do the laundry, make the bed, like, clean the bathroom, wash the windows, set everything up for her. I mean, I would -- it was kind of, like -- like, there were times when Nicole had sex in that room and I would be cleaning up, like, used condoms.
Q Why did you provide these services for Nicole Daedone?
A I mean, Nicole was our -- our leader in many ways and we -- it was seen in that capacity to be an honor to take care of Nicole and it was just part of what I understood to be my job.
Q What, if any, other OneTaste homes in New York were you aware of?
A So, at some point some people formed an OM community in Brooklyn and there was -- this one I will mention is not OneTaste-affiliated, but Ravi and Ayries were living down the street from the Morellino in an apartment.

A I was when I first started taking classes there. In San Francisco I was dating someone when I first got involved.

Q And what happened?

A It had been a monogamous relationship and at that time it was fairly openly discouraged in OneTaste. It was felt that if you were a serious practitioner cultivating your orgasm, that being in that kind of relationship was closing you off to your potential and it was just -- eventually I left that relationship.

Q And who taught you that you should close -- discouraging monogamy?

MS. BONJEAN: Objection to the foundation. Assumes facts.

THE COURT: Sustained.

BY MS. BENSING:

Q Who taught you what you just described in your previous answer?

A I remember it specifically coming up with my coach, Amy Jones, who was the coach that was assigned to me while I was in CP6 and it was not only coming from her. That was -- that was just part of the doctrine at OneTaste at that time.

MS. BONJEAN: Objection.

MS. COHEN: Objection.

THE COURT: Sustained.

BY MS. BENSING:

Q When you were in CP6, did you learn the teachings of OneTaste?
A Yes. They were -- like, we were there to learn the teachings so that we could spread the teachings.
Q And what, if anything, did you learn as part of your participation in CP6 about being in a committed relationship?
A I'm not sure I have, like, one exact memory teaching about that. I think they would just describe a lot of attention was put on expanding our definitions of relationships and expanding our definition of orgasm and connection. And, so, there was -- we were often -- I was often encouraged to essentially just be open for what we would have called orgasm anytime, anywhere, with anyone.
Q I want to ask you about some phrases. Are you familiar with the phrase "golden handcuffs"?
A I am.
Q What is that?
A It's a bit like gilded cage. So the way that it was used to pertain to me and my sex life was that if you thought -- if you thought that it was only worth having sex with people that you were attracted to interested in or even liked as a human being, that you were somehow being too precious about guarding your sex and that was a limiting belief.
And so you were -- your golden handcuffs were essentially that, like, you were limiting your own power by

you were at OneTaste?
A I remember I had a hard time even talking to anyone who wasn't, like, a OneTaste member. I became so -- this was just our vocabulary every day and how we would speak to one another. And these concepts and these teachings reshaped my own understanding of the world I was living in and made it -- I mean, it's funny, I'm thinking that when I left, it was really -- it took me a long time to get those words out of my vocabulary and learn to just, like, talk like a normal person again.
Q Are you familiar with the concept of aversion practice?
A Yes.
Q What is that?
A So aversion practice was essentially you would practice doing something you did not want to do or something you perhaps felt gross or wrong about. But by engaging in it, the teaching was that you could reclaim more of your power. So if you wanted to be an advanced-level practitioner, you'd be able to put yourself in a situation that you did not want to be in and still find a way to get off.
Q And was aversion practice something you were taught at OneTaste?
A Yes.
Q By who?
A Nicole Daedone and -- I mean, it was just part of -- as

were at OneTaste?

MS. COHEN: Objection.

THE COURT: Sustained.

Q Well, you testified earlier that you were sometimes asked to OM with people; is that correct?

A That's correct.

Q I want to ask you about the practice of orgasmic meditation. In brief, what was it?

A 15 minutes of clitoral stroking.

Q While you were involved with OneTaste, under what circumstances did you participate in orgasmic meditation?

MS. COHEN: Objection.

THE COURT: Overruled.

A Both in my -- in the morning practices in my own practice, and then there were times where we would help prospective either coaching clients or prospective, like, leads, essentially, people we were trying to sell courses to who might be getting a trial of OM, and there were times when I was both asked to be stroked and to stroke those people who were potential clients of OneTaste.

Q Did you always want to?

A I don't -- I think what I wanted, to me at that time, was irrelevant.

Q Explain what you mean by that.

A It was my -- I was on a pathway to try to be an

advanced practitioner, and so the way to get the practice was by OMing more, and whether or not, like, I wanted to have any particular OM, I would do it for what I believed was my own personal growth and spiritual enlightenment.

MS. BENSING: If we could please pull up Government Exhibit 267, which is in evidence.

(Exhibit published.)

Q Do you recognize this person?

A Yeah. That's Mark Gottlieb. He was a resident at the 1080 apartment.

Q What, if anything, happened with respect to you and Mark Gottlieb?

MS. BONJEAN: Objection. Foundation.

THE COURT: Overruled.

A The first OM that I had that I didn't want to have was with Mark Gottlieb.

Q What do you mean OM that you had that you didn't want to have?

A It was in the morning practice at San Francisco, and Mark was an older guy and he was -- like, he grossed me out a little bit. He wasn't -- like I was still very early in my time at OneTaste, and he wasn't exactly the person I would have wanted to touch my genitals. And because I had made this commitment to becoming a coach and to growing my own practice, it was -- I wish I could remember who I had

that conversation with, but I remember that morning being like, I don't know that I want to do that OM --

MS. BONJEAN: Objection.

THE COURT: Sustained as to the conversation.

Q Do you remember raising with somebody at the time that you didn't want to OM?

A Yes.

Q Okay. Are there any other occasions where you OM'd when you did not want to?

A Often.

Q Do you recall any specific instances?

A There was the OM I was asked to do with Eli Block, in which I was asked to stroke him.

Q You mentioned Eli Block earlier.

MS. BENSING: I want to pull up Government Exhibit 242, which is in evidence.

(Exhibit published.)

Q Who is this?

A That's Eli.

MS. BENSING: We can take that down.

Q What happened with Eli?

A Rachel told us that we were going to have an OM together, that it was time for me to own that part of my practice. Eli and I did not get along. We did not have a good relationship and we did not work well together. And so

my understanding was we were being given this assignment to kind of get over that.

Q Sorry. Who gave you the assignment?

A Rachel.

Q Rachel Cherwitz?

A Cherwitz.

Q At the time that Rachel Cherwitz assigned you to OM with Eli Block, what was his position at OneTaste?

A I wish I could remember everyone's job title. He was definitely senior to me in the organization. He was one of the leaders in San Francisco, he was one of the head coaching. I have no idea what his job title was.

Q What happened after Rachel assigned you to OM with him?

A We did it. We had an OM where I stroked him, and it was really uncomfortable for the whole -- I think it was uncomfortable -- it was definitely uncomfortable for me, and I believe it was for him as well.

Q How did that make you feel?

A Just confused.

Q And what do you mean by that?

A I think I felt shame at the time, actually, because I did not get off in that OM and I was not finding it pleasurable. The whole point of, like, if you were stroking a man was that you were supposed to be garnering pleasure out of the experience, and I think I was so indoctrinated at

that point that I felt like I was doing something wrong because I didn't like it.

Q When you say that you stroked him, what do you mean?

A He was the strokee, so he took his pants off and laid -- typically, the teaching was you didn't OM on a bed, you only OM'd in a nest. But we didn't have any space in the house, so we were OMing on that, like bunkbed upstairs in the apartment I lived in. It was like 15 minutes of basically just holding his flaccid cock in my hand because neither of us were enjoying the experience.

Q Why did you participate in this if you didn't want to?

A I would have done anything that Rachel told me to do at that time.

Q Why?

A I honestly believed at that time that she had my best interest at heart, and if she was giving me some sort of assignment, it was for my own spiritual growth and development.

Q Are there any other occasions where you OM'd when you did not want to that you can recall?

A I'm remembering right now an occasion where Jim Quick came to the house, and he was somebody who was a powerful entrepreneur and had a lot of money and he was one of these big names that we were going to maybe bring into OneTaste. So I was told that I would be the strokee --

thing you're asking me to do. I just always was going to do what they asked me to do.
Q What was expected of you as Rachel's assistant? What work did you perform?
A It's interesting because it wasn't really all that sales related, but it was essentially making sure that Rachel had everything she needed at all times and was well set up to close clients. And then the other piece that changed when I started working more directly with Rachel was that I was expected to report to her more often, and she asked me to send her daily updates about all of the members on our team. So essentially, to provide report from my vantage point to the dynamics in the house or to report on the activities of my teammates and what they were thinking, doing, and how they were acting.
Q And how did that make you feel?
A I felt like I was a snitch, I guess. It made me feel gross -- like there's dirty, gross, wrong feeling inside thinking about that.
Q And did you do it nonetheless?
A I did.
Q Again, why?
A I don't know what I imagine the retaliation to have been if I had said no, I'm not going to report on my coworkers, but it just felt like I couldn't say no to that.

Q And so how much did you pay?
A I paid the early bird amount.
Q Did you participate in orgasmic meditation during the mastery course?
A Yes.
Q Are there any occasions that you can recall?
A I think it was like a weekend, a month for five months, and at the beginning of every day and then I think most days when we would come back from lunch as well, there would be a few rounds of OMs.
Q And are there any OMs that you participated in with respect to the mastery course that you did not want to participate in?
A There was an exercise that we did that was a prostate massage where I was the stroker, and that was an example of a 15-minute male stroking experience that I also was -- that I was not that interested in doing.
Q And what is a prostate massage?
A So prostate, in male anatomy, can be accessed through a man's rectum. So I had gloves on and was partnered with somebody and inserted my fingers inside his ass.
Q And so that differs from a male OM?
A Yes. Because I was not stroking his penis at the time.
Q Why did you participate in the prostate massage when you didn't want to?

A I think I was really bought into the idea at the time that doing these like aversion practices or doing these -- like expanding my OM practice was something that was ultimately going to benefit me like spiritually and personally in my own path towards enlightenment.
Q And at this point in time when you participated in the mastery course, were you living in New York?
A Yes.
Q So living at the Morellino that you have already testified about?
A Yes.
Q And were you also still working for OneTaste?
A Yes.
Q Did you perform any work at the Mastery?
A I did work to like set it up. Like during the day when the class was in session, I was not working. But like between the weekends there was a lot of work going on behind the scenes to make this course happen and I was responsible for that work.
Q Are you familiar with the term "demo"?
A Yes.
Q And how was that word used at OneTaste?
A So the demo is presented as the pinnacle of an OM practice. It was essentially -- typically it was the classic like clitoral stroking 15-minute OM, but it was at a much

higher level because it was done to demonstrate the full breath and depth of orgasm. So the idea was you'd have like -- typically in our practice no one's sitting there like observing you, but in a demo it's -- you are putting on a show, basically. And so everyone in the room is captivated, they are feeling sensations in their body, they are along for the ride, and it was something that very masterful practitioners did as part of their like initiation, into being an advanced practitioner of clitoral stroking.

Q And I think you testified that you had to do a demo at the end of CP6?

A That's correct. That was our graduation.

Q So a demo was required to graduate?

A Yes. They would say the demo is your graduation.

MS. BENSING: I want to show the witness only, please, what's been marked as Government Exhibit 1442, which I believe is tab 25, Your Honor, in the Court's binder.

And if we can pull this up for the witness.

Q Can you see this in 1442?

A I can.

Q And what is this?

A This is an e-mail from Yia Vang to the Mastery class with introducing Nicole's notes on a demo.

Q And did you receive this e-mail?

A Yes.

clear who wrote it.

MS. BENSING: The witness has testified, Your Honor.

MS. BONJEAN: No.

THE COURT: Sustained.

You can ask a different question on this.

MS. BENSING: Sure.

BY MS. BENSING:

Q When this was given to you, who -- and we can refresh your recollection if you need it, but what was this represented to you as?

A It was clearly stated both in the e-mail I received and at the top of this document that this is an excerpt from Nicole Daedone's notes on doing a demo.

Q And had you heard Nicole Daedone lecture about demos?

A I had.

Q What did Nicole Daedone say in lectures about demos?

A It was something very sacred to Nicole. She would share about her own experience doing a demo. I think that was in her book as well. We would often do -- there were times when I was working for OneTaste and even before when Nicole would do demos and be stroked. And it was a bit of a -- it was a way to -- it was a lead generating event, meaning, we would try to sell classes after people would come and see a demo. Like they'd come, they'd see someone get stroked, have a 15-minute orgasm, be really impressed by what that was.

see here in Government Exhibit 2604 have on you with respect to your participation in demos?
A I mean, I held it as something highly sacred. This was part of like, I think, one of the things that was calling me in OneTaste was like my spiritual unfolding, or that was part of what kept me involved in the organization. And I think these sorts of teachings were things that really spoke to me, and ways in which I would glorify my own participation in these practices.
MS. BENSING: We can take that down, please.
Q Did there come a time where you did a demo?
A I did.
Q Why?
A It was my Mastery graduation. Everyone in the class did a demo.
Q And who is your demo partner?
A Jeff Ridenour.
Q And who is that?
A Jeff is a friend of mine who lives in -- well, I met him first in the San Francisco OM community.
Q And how did it come about that Jeff was going to be your demo partner at the end of your course?
A I would say there was -- so Jeff had deep feelings for me that were not reciprocated on a romantic level, but he and I were good friends and often stroking partners when I was back

in San Francisco. He was probably one of the people I had practiced with the most. And because -- he was also someone who represented aversion practice for me.

Q What do you mean by that?

A Jeff is not someone I'm physically attracted to. He's much older, not really in great health, not someone that I personally have sexual or romantic feelings for. And I never wanted to have sex with Jeff and I never did. But that was often pointed to by my coach and other people who would coach me at OneTaste as an area that --

MS. BONJEAN: Objection to the hearsay. And foundation.

THE COURT: Sustained.

Q Did coaches or your superiors at OneTaste talk to you about Jeff Ridenour?

A Yes.

Q And was that as part of the aversion practice that you just testified about?

A Yes.

Q And what would they coach you on with respect to participating in demos or OMs with Jeff Ridenour?

MS. BONJEAN: Objection.

THE COURT: Sustained. Sustained.

Q So you've already testified that Jeff Ridenour ended up being your demo partner, correct?

A Yes.
Q How did that come about?
A I was told that the highest --
MS. BONJEAN: Objection to the --
A -- form of play --
MS. BONJEAN: -- hearsay. And the foundation.
THE COURT: She's can continue, and then you can renew your objection, if you still have one.
BY MS. BENSING:
Q You can finish your answer.
A I was told that the highest form of play or the highest way to demonstrate my skills in a demo would be to do it with Jeff because that was where there was the most unpotentiated energy.
MS. BONJEAN: Same objection. That's hearsay --
THE COURT: Okay. Sustained. Sustained.
MS. BENSING: Your Honor, may I just make a record that it's not for the truth, but the effect on the witness.
MS. BONJEAN: We further make an objection on foundation --
THE COURT: Sustained. Sustained.
You can ask a different question.
BY MS. BENSING:
Q Why did you end up doing your demo with Jeff Ridenour?
A I was trying to demonstrate my skills as an OM

practitioner, and Jeff was someone I was -- I was comfortable with Jeff, and I was friends with Jeff, and I believed that if I could show that I could get off with Jeff, I would be proving myself in some way.

Q In what way?

A That I could have a 15-minute orgasm with someone that I don't find myself sexually attracted to.

Q And how was that demo experience for you?

A Honestly, it was a little bit of a letdown because I think I had built the demo up to be such a pivotal moment in my practice, and I had trained for it, and I was proud of myself to get up there and do it, but the fact that there were so many people in the OneTaste Mastery program all doing demos that day, I think everyone was just -- had been sitting around watching demos all day. Like, it didn't feel special, it didn't feel like what I had built it up to be in my mind. It just felt like an OM on a stage in front of 50 people watching me get stroked.

Q And how did that make you feel?

A I will say, like debased in some way, because I wanted the demo to be something like special, sacred, holy, and it just kind of felt like a production line of people, you know, getting their, like, moment to shine.

Q I want to show you Government Exhibit 4609.

MS. BENSING: Just for the witness, please.

good job cutting my hair, so I had gone to a hair salon and got even more of my hair cut off. And I was coming straight from the hair salon to this event, and it was the first time everyone had seen me with that short hair.

Q And what, if anything, did cutting your hair represent to you?

MS. BONJEAN: Objection to the relevance of that.

THE COURT: Overruled.

Q You can answer.

A I didn't want to be like this female object anymore. I wanted to look in the mirror and felt like I looked like myself, and I didn't want to try to look like -- I feel like there was a way we were supposed to try to look to be attractive at the time, and I was rebelling against that.

Q At the time that you were involved in OneTaste, what pronouns did you use?

A She/her.

Q And what pronouns do you use now?

A They/them.

Q Did you continue to work for OneTaste after October -- after Halloween of 2013?

A Yes. I left in December of that year.

Q And why did you continue to work even after you were at this place mentally?

A I had virtually nowhere to go to. Like my whole life was

OneTaste, right? My job was OneTaste, my house was OneTaste, my income was OneTaste, my friends were OneTaste. Like leaving OneTaste meant leaving everything. I had given up literally everything in my life, and my whole existence was wrapped up in this. And so to like leave the organization meant like cutting my losses, essentially, and moving on.
Q Even after the Mastery program, did you enroll in another OneTaste course?
A OMX happened at some point when I was working there. I think it was concurrent with Mastery, and even though I was helping to put on the event, I bought my ticket to it and worked the event that I paid to be at.
Q Are you familiar with the course called the Nicole Daedone Intensive?
A Yes.
Q Did you sign up for that course?
A I did not. But my friend Jeff Ridenour put down -- the course itself was pitched to us at the end of the orgasmic Mastery, and you would have an opportunity to be in this intensive, this coaching intensive with Nicole. It was $20,000 a person to be in it. And somehow my friend Jeff had put down -- had been encouraged to put down a $10,000 deposit on a credit card with money he didn't have for my enrollment in this class.
Q And I think you testified earlier that you did meet with

things that had always interested me, like art history and ceramics. And I just kind of focused on building my life up from literally ground zero.

MS. BENSING: May I have one second, Your Honor?

THE COURT: Yes.

(Pause in proceedings.)

MS. BENSING: I have no further questions. Thank you.

THE COURT: Ms. Cohen, any cross-examination?

MS. COHEN: Yes, thank you.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good afternoon.

A Hi.

Q You indicated that you like to be called Max. Is it okay if call you Max?

A Absolutely, yes.

Q I'm Celia Cohen. I represent Rachel Cherwitz.

A Okay.

Q So, I want to go back and talk a little bit about how you first came to OneTaste and a little bit about your background and I understand from your testimony you had a difficult childhood, sorry about some of that -- I mean, all of that.

So you struggled in your childhood but you ultimately put yourself through college?

A I did, yeah.
Q And when you were in high school you raised money to go abroad to Denmark?
A Yes, I was working two jobs in high school and did some fundraising as well for that.
Q It's clear you're a very hard worker; right?
A Yes.
Q And, in fact, you ultimately became a doctor; is that right?
A Yes.
Q And you graduated -- was it 2011, maybe?
A Yeah, I got my BA.
Q From college in 2011. And you were 21 at that time or 22?
A 22.
Q 22 when you graduated, right? And your first job was at a chiropractic clinic in San Francisco?
A My first job after graduation.
Q After graduation?
A Because I had started working at 14.
Q To pay for all of that, right?
And at the clinic you worked after college, what did you do there?
A I was -- my job title was chiropractic assistant, but I sat at the front desk. I basically was the secretary. Helped

people get checked in, insurance, just like admin assistant stuff.
Q As an admin assistant, you would do lots of jobs around the office there?
A Yeah.
Q Ultimately during that first year when you were working after college, you went to a Mama Gena's School course in New York; right?
A Uh-huh.
Q I guess that was -- the course was several months; is that right?
A I think it was about five months.
Q And similar to some of the courses that you testified about today at OneTaste, you had to fly for the weekend to New York for those classes; correct?
A That's right.
Q And you had to pay for those class; is that correct?
A That's right.
Q And Mama Gena's School of Womanly Arts is a women's empowerment course; right?
A Yes.
Q And, in fact, Mama Gena had written a book called *Pussy*; right?
A Yes. She has now, but at not at time, yes.
Q At the end of that graduation that's when you heard

Nicole Daedone speak for the first time; right?
A Correct.
Q And she spoke about women's sexuality; correct?
A Yes.
Q About empowering women right?
A Yes.
Q And she spoke with orgasmic meditation?
A That's right.
Q And that interested you; right?
A Yeah, absolutely.
Q You wanted to explore your sexuality; correct?
A Yeah, I did.
Q And become -- more empowerment, sexuality it's all part and parcel of the same thing at the time; right?
A Yeah. I was interested in feminism and for me that was, like, a radical form of feminism that I was interested in.
Q So you want back to -- well you went back every weekend, but when the class was over you were still living in San Francisco; right?
A Exactly, yeah.
Q You decided to learn more about OneTaste at that point; right?
A That's right.
Q And you went to a how to OM class?
A Yes.

Q And during that class, you learned more about what orgasmic meditation meant; right?
A Yes.
Q And from the very beginning you learned about the nest; right?
A Yes.
Q And you learned that the woman would be clothed only from the waist up during the OM?
A Yes.
Q And you basically learned what it was all about specifically; right?
A I did.
Q And at the end of the class they give you a manual; right?
A Yeah, I'm certain they did. I don't really recall that, but it sounds right.
Q And you said that there was -- I think you said Rob Kandell and Joanna --
A I believe those were the leaders.
Q Would Maya Gilbert have been there?
A Yes.
Q And you knew her from college?
A I did.
Q And so did that also add to anything the OM class for you in your mind? Did that make it more interesting or is it just

a fact that --
A I don't know if it made it more interesting. I think Maya actually tried to sell me the how-to OM class. So she approached me after a TurnON event and maybe tried to sell me books like How to OM or personal coaching with her. Those are two of the offers that we discussed, but I did not agree to pursue a coaching relationship with her and so, if anything, by the time I enrolled in the How to OM class and she had not made that sale, I felt a little awkward around her.
Q You actually went to a TurnON event and then the OM circle; right?
A Yes.
Q Just clarifying that you went to a TurnON and then to the OM circle; right?
A Correct.
Q And after that you began to attend these OM circles; right?
A Yes.
Q And you would go there and do it two times in the morning, right; the OM circle?
A Yes, I would go before work.
Q And you usually had a partner that you were showing up with?
A There would be someone else from the community that I would meet there and typically I would have the first OM

A Yes.
Q And you also had your family friend that paid for this class, right?
A That's right.
Q And at first when you first started, you were working at the chiropractic clinic; right?
A Yes.
Q And a couple of minutes in, though, you decided you wanted to quit your job; right?
A I did.
Q And nobody told you to quit your job, right?
A Nobody told me to quit my job.
Q You actually wanted to get hired by OneTaste; right?
A Yeah. I was more interested in being -- the idea of working for OneTaste was more exciting and interesting to me than the idea of working at the chiropractic clinic.
Q Of course, you could have continued to work at the chiropractic clinic, but you made the choice to quit at that time?
A I did.
Q Now, you testified on direct that Rachel told you to come to New York. Do you remember that?
A I do.
Q But, in fact, you were asking to go to New York at the beginning; right?

A That's not how I remember it.
Q You don't remember Rachel saying that -- how intense New York City was and to really think about that?
A I think we had talked about me moving to New York because I had been in New York so much and I had community there and the coaching program was there and the City was really taking off, so I had an interest in going to New York. I did.
Q And do you remember having -- she asked you to write something about why you wanted to go to New York, to make sure you wanted to go?
A I don't recall that.
Q In any event you decided to go?
A Yes.
Q And you testified -- or, sorry. Strike that.
You didn't want to just move to New York City. You wanted to move into the Morellino; right?
A I was moving to New York to take a job for OneTaste so when you worked for OneTaste you lived in the OM house. That was just part of the package.
Q In fact, there were people who worked for OneTaste that didn't live in an OM house; right?
A Nobody that was, like, really inner circle was not living in an OM house.
Q Because you wanted to be in the inner circle?
A I did.

(Continuing.)

BY MS. COHEN:

Q Max, if you could just take a look at this email exchange and let me know when you've had a chance to review it.

A I have had a chance.

Q Okay. And I just want to ask you some questions about that.

Does this refresh your recollection that you requested to move into the Morellino in May of 2013?

A Yes, this refreshes my memory.

Q And, in fact, you specifically asked that -- ideally, you asked to share a room/or rent a bed, right?

A Yes, I wanted to -- I think financially that worked out better for me. And honestly, I don't think anyone had a private room there anyway.

Q But you knew -- you knew that there weren't really private rooms there. Did you not know?

A I knew that there were not private rooms.

Q Okay. So you knew what you were signing up for at the time, right?

A Yes.

Q And, in fact, do you remember that Kim didn't get back to you right away and that she was working on some redefining the move-in rules. Does that refresh your

Q Yeah, yeah, right? And this is because you're agreeing to move into a house with people you don't know that well, right?
A Yes.
Q And you were agreeing to share a bed with someone you don't know, right?
A I agreed to that.
Q And you took that step because you were wanting to do the things that OneTaste had to offer, right?
A Yes.
Q And part of that was pushing boundaries, right?
A Yes.
Q I mean, let's face it, not everybody would move in and it's not for everybody, right?
A Sure.
Q And when one moves in to a house with people they don't know, problems arise, correct? Well, let me rephrase that.
When you don't know someone and you live with them, you can often have arguments, right?
A It was not --
MS. BENSING: Objection.
THE COURT: Overruled.
A It was not surprising that there was friction in the community.
Q Right. In fact, in a community that's focused on

orgasm and sexuality, it would also, I imagine, create a lot of jealous between people, right?
A That was an aspect of some people's experience.
Q And people wanted to be in the inner circle, as you said, right?
A Yes.
Q And so there was a lot of competitiveness between people, right?
A That's true.
Q And in the Morellino, they say you'll likely be up against your demons, right?
A Yes.
Q Because again, you're signing up to get your boundaries pushed, right?
A Yes.
Q Okay. And then the reason they have these rules, it explains, is that these rules of play help us remember, right, that we're coming into the house, you're coming in fully by your own volition, right? And being ready to take responsibility for your own experiences, right?
A That's right.
Q And that was important for everyone moving in to know that, correct?
A Yes.
Q Okay. Another thing, if we can go to the next

paragraph, another requirement was that everyone in the house stay connected no matter what. Do you see that?
A Yes.
Q And you talked about, on direct examination, about having to be on these text chains, right?
A Yes.
Q And that was actually a requirement of living in the Morellino, correct?
A Staying connected at all times was part of what was expected as someone living in the house and someone working for OneTaste.
Q Right. And the reason why the Morellino said that you have to stay connected is because of the process by which you're going through at OneTaste, right? Let me -- that was confusing.

I mean, it describes, it says:

Usually when we get angry, confronted, embarrassed, or rejected, we disconnect.

That's typical. That happens with people, right? You don't want to face things, you're embarrassed and you don't want to communicate with someone. That happens a lot, right?

MS. BENSING: Objection to the form.

THE COURT: Sustained.
Q What do you think that means: Usually when we get

angry, confronted, embarrassed, or rejected, we disconnect?
A I think that's human behavior at times and it was what we were there to try to -- we were trying to do something different. We were trying to stay connected.
Q Exactly. Because if you don't want to connect with these people, again, you wouldn't move in there, right?
A Right.
Q And part of the reason you wanted to move in there is because you wanted a sense of community, right?
A I did.
Q And you wanted a sense of belonging, right?
A I did.
Q And, in fact, OneTaste, for a while when you were there, gave you that sense of belonging, right?
A I don't know that I ever truly felt like I belonged, but it did give me community.
Q Okay. Well, you testified on direct that you had a lot of friends there, right?
A I'm not sure that I did, to be honest. I don't -- I had a lot of acquaintances. I was connected to a lot of people, but I actually felt like I had precious few friends at OneTaste.
Q Okay. Well, one of the reasons you were there, though, was to try and get more friends, get part of a community, right?

A Yes. I wanted -- I wanted to belong to a community.
Q And you understood that that was a reason why at the Morellino, they wanted its residents to stay connected, correct?
A Yes.
Q And you agreed to let other people know when your feelings were hurt, right?
A Yes.
Q When you're mad, right?
A Yes.
Q And when you loved them, right?
A Yes.
Q And they wanted you, you know -- if you're just not keeping communication with people, you're not being connected and part of community, right?
A Yeah, you couldn't -- you couldn't disappear or not be available. You had to be open for connection.
Q Right. Because that was the point of it, correct?
A Yeah.
Q All right. Now, the next paragraph --
MS. COHEN: Your Honor, could I just get my water?
THE COURT: Yes, of course.
Q The next paragraph, use safe words. And what are safe words?
A I think the common example is green, yellow, red. I

course. Do you remember that?
A I don't know what you're referring to, to be honest.
Q Okay. Well, I'll come back to that.
But a container is sort of the parameters of where we're going to be, right? So if you have an OM, there's certain parameters by which you practice in, right?
A Yes.
Q And safe porting is another sort of word. Do you know what that means?
A Yes. The way it was taught to me in the How To OM class is someone might tell you, like, I'm going to touch your thighs now, I'm going to touch your pussy now, and that was -- those are examples of safe porting.
Q Yes, okay.
So getting back to the handbook, the handbook, as we said, lays out these safe words that allows you to play, right? That's what it says.
A It says Rules of Play, yes.
Q That the house is a place for us to play, right?
A Yes.
Q And that's because at the house, you're going to regularly be doing OM practice, right?
A Yes.
Q So let's go to Be Responsible For Your Own Journey, on the second page. And the rules also tell you, make it clear

A I don't, but that rings true to me that I was not at OneTaste for the sex.

Q Right. In fact, we talked about how OMing was more meditative than sex; right?

A Yes.

Q And, in fact, sex really had nothing to do with it?

A Sex had nothing to do with -- well, OMing I view as a sexual practice, but it's also an attention and spirituality generating practice and I did at that time hold it as separate from sex, which would not be in such a strict container.

Like, the 15 minutes of kind of this ritual of OMing or what the practice was defined to be was something that was a little more contained than, like, just a sexual act.

Q And do you remember in the posts at this time talking about how important it was to realize that although sex may sell, that's not what we're offering. Do you remember that?

A Again, I don't remember the specific posts but that sounds -- that sounds like my beliefs at the time and sounds like something that I would have said at the time.

Q Okay. All right, so, turning -- and turning to -- we were just talking about how it wasn't sex to you. In fact, in the end of March you also talked in a post about how everybody except you were sleeping with everybody. Do you remember that?

A I don't remember posting about it, but I remember feeling

A It reads to me, and I believe my intention at the time, was to make an OM event for people who also had interest in the kink community.
Q So, that's April. Now, in June, as we said, you then moved into the Morellino and you continued to post; correct?
A Yes.
Q And in June 20th, you actually -- you posted about all of people that are struggling in their lives in all different ways and how for them, for the struggles in life, you choose this path. Do you remember posting about that?
A I don't specifically remember. I'm sorry, I'm not trying to be difficult, but I don't specifically remember any of these.
Q Okay. Can you take a look at DX-13-AF, as in Frank?
A (Reviewing.)
I remember this.
Q As soon as you're done.
A Go ahead.
Q So in that post -- actually, in your words what were you trying to convey in that post?
A I think it's a little bit of a -- it's a little bit of a poetic post for me. It's kind of -- it's a little bit of a word dump, but I felt inspired at the time about my involvement in OneTaste and I'm not really sure what I was trying to convey here, but it's kind of like there's room for

a lot of people. A lot of different kinds of people could find a benefit through the OM practice.
Q And even those that you felt who, were, like what you called the lost cause, right, you included people like that; right?
A I did.
Q And that's for you, for them, and you also said for us, meaning I guess the community; is that fair?
A Yes.
Q And that you choose this path. Do you remember saying that?
A I do.
Q And in July, again we're now still at the Morellino. In July 13th, do you remember you were now halfway through CP6 at this point; right?
A Yes.
Q And you remember posting that you were living the life of your dreams. Do you remember that?
A No, but it probably happened.
Q So, take a look at DX-13-AH.
A (Reviewing.)
I remember this post.
Q Okay. And so, in fact, you did say you were living the life of your dreams at the time; right?
A I say that in this post.

Q And you were also at the time full of awe and gratitude so much that your heart was bursting; right?
A Yes.
Q And you felt at the time that you were surrounded by friends who were way seekers and world changers; right?
A Yes.
Q And that they loved you unapologetically despite their ability to see straight through your core; right?
A Yes.
Q And that's how you felt at the time; right?
A Yes.
Q And, in fact, you felt so much this way that you actually put this same post on the regular Facebook -- your regular Facebook as well. Do you remember that?
A I don't, but --
Q Well, take a look at DX-13-AN. Let me know if you recognize this as the same --
A Yes. This is the same post on my main page.
Q On your main Facebook page?
A Yes.
Q Once again telling everyone that you were living the life of your dreams; right?
A Yes.
Q And in August 8th you reiterated this fact when you were going to the OMX event. Do you remember that?

A I do.
Q And you brought a friend with you to the OMX event; right?
A Yes. My best friend from San Francisco who I had been living with before I moved to New York.
Q And your best friend that wasn't involved in OneTaste; right?
A Correct.
Q And in this post you -- you talked about how you were packing your bags for OMX; right?
A Yes. Am I allowed to look at it?
Q Yes.
A Yes, I say this in this post.
Q And, in fact, once again you reiterated that you have the greatest life; right?
A Yes.
Q And you didn't just say that; in fact, you emphasized each word with a period, right: The. Greatest. Life. Do you remember posing that?
A This is a post from me that says that. I would like to include that at that time working for OneTaste --
Q I just asked you if you had written that at that time.
A Yes, I did.
Q And those were your feelings that you posted on your regular Facebook page at that time; correct?

A Correct.

Q Okay. Now let's go back now a little bit and talk about when you started working for OneTaste and that was -- well, when you first moved to New York City you were -- you were volunteering at the beginning; right?

A My understanding was that I was working for OneTaste.

Q Well, in fact, when you first met with the Government, you told them that you first were a volunteer. Do you remember that?

A Yes, please.

MS. COHEN: So I'm going to walk up, Your Honor, to the witness.

THE COURT: Yes.

(Counsel approaches.)

Q MPI-1 --

THE COURT: Excuse me?

MS. COHEN: 3500-MPI-1 and I'm just going to focus on the second page, third paragraph, second sentence.

A In the sense that I wasn't getting paid when I first moved to New York I was volunteering at these events.

Q Okay. So you -- you packed up all of your stuff and moved across the country at this point, right?

A Yes.

Q And you didn't have any employment agreement in hand; right?

A That's right. It was a verbal agreement.
Q And you had -- this was not your first job; right?
A No.
Q In fact, we already talked that you worked at the chiropractic clinic?
A That's right.
Q And even though you were only a recent graduate, you actually had jobs since you were fourteen; right?
A That's right.
Q And despite not, I guess you would say, ironing things out, you moved across the country to move into the Morellino, right?
A Yes.
Q And you told the Government at the time that -- you are saying now, but you did tell the Government at the time that you were volunteering at the beginning?
A That's what's written here, yeah.
Q And after a brief period of time Rachel, offered you a job and you began working; right?
A Yes.
Q And you also said that you weren't getting paid at first when you started working, right?
A That's right.
Q And you know that Rachel is not the one at the company that determines who gets paid, you know that; right?

A I knew she wasn't the one that could put me on payroll.
Q Right. And that was Rob Kandell; correct?
A I didn't know that -- well, I had worked with Yia to get put on staff officially sign the documents when Yia came to New York and I had understood that Henry Debusmann in San Francisco was involved in getting me on-boarded as well. I didn't know if Rob Kandell was ultimately responsible for that.
Q But it was someone other than Rachel that actually had to get the employment agreement for you; right?
A Right. Rachel was in sales. It wasn't her job to do the hiring job for new employees.
Q But Rachel really liked you; right?
A I don't know if that's true or not.
Q And Rachel, in fact, was helpful in making sure that you got paid, right?
A I don't recall Rachel helping me in that regard.
Q You were -- okay.
So, eventually you received a W-2 and you got paid for work; correct?
A Yes.
Q And your work day, you talked about yesterday, started with your OMs; right?
A Those were morning practices. I mean --
Q Right. So those weren't part of the work. That was part

of you're in the Morellino, you want to get into your practice and so OMs were what you did on a daily basis in the morning; right?
A Yes. And all of the employees would always do all of the morning practices together, but I think it's fair to say that our morning practices were not the labor we were doing for the company. It was the work we were putting into ourselves so that we can show up in the way we wanted to show up at work.
Q Right. And that was the whole purpose of living in the Morellino; right?
A Yes.
Q And, again, in a similar way you would then do your fear inventory; right?
A Yes.
Q Again, that's part of the practice for you to achieve your goals; right?
A Yes. It was one of the -- one of the practices we used.
Q And meditation also in the mornings sometimes?
A Yes.
Q And then of course you would have breakfast at some point?
A Yes.
Q And then you would go to Bikram, right?
A Yes.
Q And then after that you would start your work day; right?

A I think that -- yeah, that's fair.
Q Around 11-ish; is that fair?
A It varied day-by-day, but the morning practices did take up quite a bit of -- quite a few hours every morning.
Q And you -- you had -- you described long hours. You know, I assume you had long hours as a -- as a doctor as well; right?
A I do work long hours.
Q And those hours as a doctor don't -- withdrawn.
In the Morellino, as we said, people were -- in addition to OMing in the morning there was a lot of OMing going on; right?
A Yes.
Q It would be -- you could walk in and there would be OMing at any time of the day; correct?
A Yes.
Q And it was regular that people would ask others to OM; correct?
A Yes.
Q And, in fact, it happened every day; right?
A That's correct.
Q And you testified that there was no privacy at the Morellino; right?
A Yes, that's correct.
Q But once again you knew that moving in; correct?

A I knew that.
Q And you could have stayed in San Francisco in your own apartment; right?
A I could have chosen not to move -- well, I could have stayed in San Francisco. I could have made different choices, but I did of my own free will move into the Morellino knowing that there was going to be very little, if no privacy.
Q And your -- your family friends paid for your rent; right?
A In the beginning before I started earning money, but that was uncomfortable because I had told them that I was moving to New York to take this job and then they were like, why do you need us to pay for your rent, aren't you working there and I was like, I am, but I haven't gotten paid yet.
Q But then you got paid and you paid your own rent; right?
A Yes.
Q And, of course, as you said Rachel Cherwitz was your boss; right?
A Yes.
Q And she was a boss of others who lived at the Morellino; right?
A Yes.
Q And you talked about those others yesterday, right?
A Yes.
Q And you also said that Rachel was grooming you, right?

Q Okay. So let me come back to that. For some reason I don't have the cite to that.

But let me ask another question about that.

You felt it was prestigious to do an OM demonstration, correct?

A That's correct.

Q And that's -- and then you actually posted on the OM hub, in November of 2013, about the OM demonstration; do you remember that?

A Not specifically, but I'm -- again, I --

Q Let me see if I can refresh you.

A -- have no reason to believe it's not true.

Q Sure.

MS. COHEN: So can we bring up what's been marked just for the witness as Defense Exhibit 13-BP. And go to page 3.

This is very small, so I think it might be more helpful for them to blow up. Go down where it says 7454.

Q Can you just take a look at -- do you recognize your e-mail there?

A I do.

Q And this was an OM post you made?

A Yes.

Q Does this refresh your recollection about telling people that you had a desire to do a demo?

A Yes. Thank you.
Q And that your desire included getting on a massage table, butterflying your legs open, and projecting orgasm into a room of many, many people? Do you remember that?
A Yes.
Q And that's how you felt at the time, right?
A Yes.
Q And OMing, as we said, you didn't get to do a demonstration all the time, but every day, day in, day out, you were OMing on multiples time, right?
A That's right. It was a daily practice for me.
Q And, in fact, at one point when you were in -- I believe it was in Philadelphia, you posted on the OM board asking if anyone wanted to be your OM partner, right?
A Yes. We were -- one of the things we were trying to do is what we call light up Philadelphia as a city. They were struggling to get turn out at their events. So one of the times the people from the New York community went out to Philly to be present at one of their TurnON events. And because I didn't live there and I didn't know anyone there, I was looking for a partner for an OM circle.
Q And that would have been someone you didn't know, correct?
A Correct.
Q Okay. You also testified yesterday when we started, when

packing your bags up? We will bring it up.
A You said the video was posted in August?
Q Yes. I can bring it back up.
A It is okay.
Q I think the date was August 3. And then this DX 13-AQ. And this was posted August 8?
A Okay, yes.
Q So that was around that time, correct?
A Yes.
Q And showing you what has been marked for identification as DX 13-BA. This will appear on your screen. It is a photo.
THE COURT: BA, you said?
MS. COHEN: "B" as in "boy," "A" as in "apple."
Q Do you recognize this photo?
A I do.
Q Do you recognize yourself in it?
A Yes. I'm hard to see in it, but I'm in the very back.
Q You are in the back. Yes.
And do you recognize others in it?
A I recognize Becky and Peter and Michelle Wright, and I think that's the guy we used to call Chirp, and someone whose name I don't know.
Q And this is from September 2, 2013; is that right?
A Yes.
Q Is it a fair and accurate depiction of the photograph you

have seen before?
A Yes.
MS. COHEN: Your Honor, we are going to offer this when we redact the information that is on the -- the words on the side.
THE COURT: So you are just offering the picture?
MS. COHEN: We're just offering the picture at DX 13-AQ, and we will redact that now for the jury --
THE COURT: Wait. I'm sorry.
MS. COHEN: I'm sorry. I misread it.
THE COURT: BA, right?
MS. COHEN: BA, yes.
THE COURT: But it looks like there's still some text there that's not redacted.
MS. COHEN: Yes. If you can redact all that.
And we will supply the Court with a redacted --
THE COURT: Okay. So you are offering Defense Exhibit 13-BA, only the photograph.
MS. COHEN: Correct, Your Honor.
THE COURT: Any objection?
MS. BENSING: No.
THE COURT: Defense Exhibit 13-BA, only the photograph, is admitted.
(Defense Exhibit 13-BA, only the photograph, received in evidence.)

MS. COHEN: We can publish that. If you can just blow it up so the jury can see.

Maybe -- well, I guess, turn down the lights a little just for the moment. Sorry. We can see better.

Q Okay. And certainly the picture up there, it's better on the screens, right, but you're the one in the back, right?

A Yes. I am the one in the back on the left.

Q And any recollection of where you were going at this point?

A I don't recall. We're in the car doing some sort of OneTaste something.

Q Okay. And that was September 2, and then after in September -- around September 2013, you also testified how you went and helped out at CP7, right?

A Yes.

MS. COHEN: And you can keep the lights down for this because I'll need it.

We can take this one down, and can we show just to the witness, DX 13-K, as in "kite."

A This is a post I did to my main Facebook page.

THE COURT: Sorry. 13-K?

MS. COHEN: I can hand one up.

THE COURT: The description is different. That's fine. Go ahead.

MS. COHEN: Okay.

THE COURT: The description on your list was different.

MS. COHEN: Oh.

THE COURT: This is just a photograph with some text at the top, correct?

MS. COHEN: Yes, Your Honor.

THE COURT: Okay. Go ahead.

Q This was a post that you made, correct?

A Correct.

Q And is this a fair and accurate depiction of both the photo and the post from September 11, 2013?

A It is.

Q And you recognize yourself as having made that post?

A Yes.

MS. COHEN: Your Honor, at this time we offer Defense Exhibit 13-K into evidence, both the photograph and the text, not -- to show this witness' state of mind at the time.

MS. BENSING: No objection. If the Court was ready for me.

THE COURT: Yes. Defense Exhibit 13-K is admitted.

(Defense Exhibit 13-K received in evidence.)

MS. COHEN: If you can just publish that for the jury. Thank you.

Q And in this post -- you posted this on your regular

Facebook page, correct?
A Correct.
Q And this was when it looks like --
A Yeah.
Q And you say, and it looks like you are on your way to San Francisco at that time, right?
A Yes. This is a photo from my -- I took it in the airplane.
Q Okay. And you described it as when work is play, right?
A Yes.
MS. COHEN: Okay. You can take that down.
Q And you talked yesterday -- you testified yesterday about there were certain times that you didn't want to OM, right?
A Yes.
Q And sometimes that could just be you're not in the mood, right?
A Yes.
Q No different than if whatever passions you have, sometimes you're not in the mood for those, correct?
A Correct.
Q And you already testified you OM'd with people you didn't know a lot, that was typical, right?
A That was typical.
Q And you testified about a man named Jim Kwik, who Rachel brought over to the Morellino, right?

A Yes.
Q And you testified that Rachel asked you to OM, correct?
A Rachel told me that I would be the strokee in his first OM.
Q And you didn't tell her no, that you wouldn't do it, right?
A I did not tell her no.
Q So you didn't -- and you're telling us now you didn't want to, but you didn't express that, correct?
A I did not express that at time.
Q And you testified that you did this because it was what everyone was doing, right?
A Yes.
Q And you also testified that OneTaste pushed your boundaries to help your practice, correct?
A Correct.
Q And after all, you were living in the Morellino to get those boundaries pushed, right?
A Yeah. To grow, and at the time pushing my boundaries was part of how I thought my growth was happening.
Q And at one point you had previously -- in fact, you told the government this before, I believe you testified to it as well, that what would happen if you didn't do this. You said you weren't sure what would happen, right? Do you remember that?

A Yeah. I do remember -- I still feel that way. Like I don't know what would have happened, if I said no.
Q And you suggested that you would at least get extra hard feedback if you didn't want to do it, right?
A Yes.
Q You also said that Eli came -- Eli Block came in at one point to do a male OM with you. You said that yesterday, right?
A Yes. Rachel Cherwitz directed Eli and myself to have a male OM.
Q But, actually, Rachel never told you to OM with him, you just assumed that, right?
A I believe she told me that I was going to stroke Eli.
Q Okay. Well, you told the government about this incident on two different times when you met with them; do you remember that?
A Yes. It has been years, so, yeah.
Q And I can refresh your recollection, if you need it. You told them about it in August of 2018, right?
A Yes.
Q And in that time, you did not say that Rachel told you to do this; do you remember that?
A No. I don't remember that, to be honest.
Q Well, I will show you in a second, but you also talked about this with the government at another time, and you did

not tell them that Rachel told you that you had to OM with him. Do you want me to show you those two times?

A That would be helpful. Thank you.

MS. COHEN: So MPI-1 --

THE COURT: 3500, you mean?

MS. COHEN: Sorry. 3500-MPI-1 and 3500-MPI-22.

Q Max, you already have the first one. So for the first one, it would be page 6, and for the second one, which I will bring up -- sorry. Just lost my place. It is at page 6.

A Okay. I read the first one, let me take a look at the second one.

Okay. Go ahead.

Q Okay. And you never told the government before that Rachel told you to OM with Eli, correct?

A It doesn't say that in this document. And I will just -- I am happy to admit that a lot of this happened a long time ago and my memory of the time is not perfect.

Q And, in fact, that's true, because when you first met with the government, you said that Eli told you you were going to do this, but then the second time you said that you couldn't recall if it was a male or female OM, right?

A Yes. I had forgotten that I had -- I had like blocked it out of my memory that I stroked Eli. And then when they were like, wait, they like prompted me -- or I don't want to say prompted. But they were like, I had essentially forgotten by

the next time I talked to them that that experience had even happened. And then when I noticed that they were surprised by what I was saying, it triggered a memory for me that I had kind of pushed down and then I did recall after that point that it had been a male OM. I had completely forgotten for a period of time that like I had even stroked Eli.

Q Okay. So you're saying the government prompted you, is that what you're saying?

A No. I did say that word, but I think that's an unfair representation. It was more that they were asking about that experience, and because they were asking me about it, it made me reflect more on it and reflect more on this period of time that I had kind of like forgotten or not like -- a lot of this stuff is stuff I put very -- like I was trying to put it behind me. I don't have a -- like remembering details from this long ago is, I think, difficult for like imperfect human memory.

Q But in 2018 it prompted you, you talked about male OM in 2018, that it was a male OM, right?

A Yes. And I recall now that that experience did happen, and it was a male OM.

Q Even though you also told them that you weren't sure if it was a male OM or female OM, right?

A I think I had just forgotten that it happened, and so I was like -- there weren't a lot of male OMs that I did, so I

had just forgotten that it happened, and I assumed we were talking about a time when Eli was stroking me. Because that was much more common that I would be the strokee, and I had just forgotten about the instance in which I stroked him.
Q Okay. And you and Eli were also in the Mastery class together, right?
A I was in the Mastery class. I don't recall if he was a student in that class.
Q Okay. And that's where male OM was introduced in the Mastery class, right?
A It was something I knew about before then, but that was one of the things that did get covered in the Mastery class.
Q And that was a more intense class, Mastery class, right?
A All of the classes in were intense.
Q Yeah. I should have clarified. More intense in terms of sexual -- learning about different sexual acts. Male OM, it's more about sex, you would say, than the coaching program?
MS. BENSING: Objection to the form of the question.
THE COURT: Sustained.
Q Well, you testified yesterday that the mastery class had more sex focus?
A That's true. It was applying the principles of OM to different sexual acts.
Q And that was the last class that you signed up for, right?

A Correct. OMX happened in the middle of it, but that was the last like multiple months-long -- OMX was a weekend. So that was like the last months-long course that I took at OneTaste.

Q And getting back to the Eli point, is that you also told the government you didn't -- you did it, you participated in the OM with Eli because you didn't want to cause trouble, right?

A That's fair. Yeah. That's correct.

Q Because OMing was what you did day in and day out, right?

A Usually with me, as the strokee. But, yeah, it was part -- it was a practice of mine.

Q And, in fact, the Mastery class, you continued to take that class after you left OneTaste, right?

A Yes.

Q And, in fact, the Mastery class also had a strict policy around STI testing, right?

A Yes.

Q And that's sexually transmitted --

A Infection.

Q Infection. Thank you.

And during your Mastery class, because people didn't bring their tests with them, they weren't allowed to engage in that in person, correct?

A Myself and many of the other members who lived at the

government -- the defense, sorry. The defense offers Defense Exhibit 13-BE.

THE COURT: Photo only, right?

MS. COHEN: Photo yes, photo only.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 13-BE, photo only, is admitted.

(Defense Exhibit 13-BE so marked.)

MS. COHEN: Okay. Can we just publish that. Can you zoom in there, just to the photo.

Q And you said this was at the Morellino, right?

A Yes.

Q Okay. Now, you said, we already established you started working for OneTaste in June of 2013 and resigned in November, on November 4, 2013, right?

A Yes.

Q And so you worked for OneTaste for a total of about five months, right?

A Yes.

Q And you testified that you, you decided you didn't want to work there and you had to make a quick escape plan.

Do you remember testifying about that?

A Yes.

Q But, in fact, you stayed working for another two weeks,

right?
A Yes.
Q And you didn't stop being involved with OneTaste, right?
A No.
Q In fact, you continued to live for maybe a short stay at the Brooklyn OM house, right?
A If you can call a week, a week and a half visit living.
Q Yes.
A I was still interested in being -- it was my whole community. Like everyone I knew, everyone that I was connected to when I left, it was, like, I left everyone who had been my family for that time, and so leaving was a big adjustment.
So there were, there were times after I had quit working for OneTaste that I did volunteer to do back of house and I did go to events and I did, you know, continue having some friendships with people for a period of time.
Q Because they were people you felt genuine love for, right?
A Yes.
Q And when you say "back of house," that's working to help in the sort of back while events are going on, right?
A Yes.
Q And that allows you to hear everything that's going on even though you're not partaking in the course?

Q You had a job that was outside of OneTaste?
A Yes.
Q And you were availing yourself of OneTaste events and courses, to the extent it worked for you, right?
A Yes.
Q Now, one of the messages that Nicole Daedone gave that resonated with you was, I think you said yesterday, sort of a radical feminism, right?
A Yes.
Q And you were looking for a radical feminist message, fair?
A It resonated with me and it was true to my own, yes, I think that's fair.
Q Okay. You were a self-identified feminist at the time, right?
A Yes.
Q And you found this sort of radical message inspiring, right?
A I did.
Q And it is radical, can we agree?
A I agree.
Q Okay. And it was new, right, to you?
A OMing was new to me, yes.
Q And her teachings were kind of new ideas, fair?
A Yeah. There were some Buddhist threads of thought and

different -- I was being exposed to new teachings that I had not come across anywhere else.

Q And this was, this was far beyond the Gloria Steinem philosophy, right?

A What do you mean by that?

Q Do you know who Gloria Steinem is?

A I do.

Q So this was a more radical view -- she was proposing a more radical view of feminism than, say, Gloria Steinem's teaching?

MS. BENSING: Objection.

THE COURT: Sustained as to foundation.

Q Had you read a fair amount of feminist literature before you were introduced to Ms. Daedone's teachings?

A Yes. I went to a women's college, and my best friend was a women's studies major.

Q So you had a fair amount of familiarity with the body of literature and, that existed prior to Ms. Daedone, for instance, publishing her book in 2011, right?

A I had a, yes, I was familiar with feminist works before I became familiar with OneTaste.

Q Okay. Did you read Ms. Daedone's book "Slow Sex"?

A I did.

Q When did you read it in the course of your experience with OneTaste?

A That's correct.
Q That was, that was of your own volition, fair?
A That's fair.
Q And it was you who really pursued Ms. Howerton about getting into the Morellino in New York, right?
A I did, I did send e-mails to Kim Howerton expressing my desire to move into the Morellino.
Q And those e-mails, you provided e-mails to the government in the last few years, right?
A Yes.
Q Okay. These are e-mails that they asked you to go look for, and you did searches and you produced what you could find, right?
A Yes.
Q Okay. And there were no e-mails you came up with where anyone from OneTaste was begging you to come to New York, right?
A No.
Q No --
A That's right.
Q That's correct, correct?
A That's correct.
Q Okay. In fact, you sent multiple messages saying, hey, you know, can I, you know, can I give up my apartment, I'm ready to come, that type of message, right?

A Yes, we saw yesterday two e-mails that I had sent.
Q Right. Now, you testified also yesterday that you went there with an understanding that you had an actual job lined up, right?
A That was my understanding.
Q Okay. Did you, were you able to find any e-mails where you actually got a job offer from OneTaste prior to moving?
A No, and I don't believe that -- first of all, I had not kept a lot of the documents from that time so, but, no, I don't have like an offer of employment in an e-mail from that time.
Q Right. You don't even have like a message in an e-mail saying, hey, you have a job waiting for you, right?
A That's right.
Q But your recollection is somebody at some point said there's a job for you, is that, as I understand it?
A Yes.
Q So without any employment contract, you nonetheless moved to New York, right?
A Yes.
Q And you did so to fully immerse yourself into the OneTaste community?
A Yes.
Q You could have moved into an apartment, right, with like anybody?

Q Tammy Delever lived at the Morellino home, Morellino residence, right?
A She was there for a period of time when I was there, yes.
Q She lived there, correct?
A I don't recall, to be honest.
Q Okay. What about Joseph Teskey or Teskey, he also lived in the Morellino home, right?
A I know he stayed there for a period of time. I have, I'm not sure if he was ever an official resident or not.
Q Do you remember having an interview with U.S. Attorney's Office and members of the FBI on August 8, August 6th of 2018?
A Yes.
Q Okay. And do you recall telling the members of the government that these individuals, Teskey and Emunah, lived in the communal home?
A Yes. They were, they were definitely, Emunah definitely did, and Joseph was staying there for a while. So I guess you could say he was living there.
Q And was it your understanding that Joseph worked for OneTaste?
A That was not my understanding.
Q Okay. So he lived in the Morellino and didn't work for OneTaste?
A There were, yes, there were people who lived at the Morellino who did not work for OneTaste.

Q Okay. And assuming, and I think your answer was, well, we all mutually enforced each other's participation.
Do you remember that?
A Yes.
Q Your participation in the New York community was a decision you made all on your very own, right?
A Yes.
Q All right. And I know you can't speak for anybody else, but there was no one, including Ms. Daedone, Ms. Cherwitz or anyone on the upper executive staff, that indicated to you that you were mandated to participate in the New York community, correct?
A That's correct.
Q And at any day, through whatever period of time that you lived there, you could have walked out the door and not come back, correct?
A Yes, and eventually that's essentially what I did.
Q Right, but you could have done it at any point leading up to the time when you actually did it, right?
A Yes. I'm a person with free will.
Q Okay. In fact, you testified that the first time that you did an OM that you didn't want to do was actually in San Francisco, right?
A Yes.
Q That was with this Mark Gottlieb guy?

A That's, that's true.
Q And Ms. Daedone would come give lectures or presentations during the course of the coaching program, right?
A Yes.
Q And during one of Ms. Daedone's lectures, during the coaching program, she asks students -- tell me if you remember this -- to guarantee that they would use the green-yellow-red during the program?
A I do remember that.
Q Okay. She also told the students, yourself included, I can't be responsible for your internal experience because I don't know it. Right?
A Yes.
Q Only you know it, correct, that's what she said?
A I believe that to be true.
Q And she also told the group, yourself included, I'll never have you in a place where you don't have the capacity to say green-yellow-red, right?
A Yes.
Q She even asked, is there anyone here who does not agree to use green-yellow-red, do you remember that?
A Not specifically, but I take no issue with that.
Q Would --
A I think that is a fair and accurate representation.
Q Okay. I don't want to pull out videos unnecessarily, but

moment, correct?

Let me withdraw that and give you a more precise question?

It's not anything you shared with Rachel, right, in the moment?

A I think I was just a little bit frozen.

Q Right. You didn't say, you didn't say this is unacceptable, I'm not going to be part of this, or anything of that nature, right?

A No. I wish I had.

Q You have regrets, right?

A Part of the human experience.

Q You also testified about a coaching experience you had with Nicole where you were telling, and this wasn't a word I would use, but you said my sob story, right?

A Yes.

Q But that sob story was really your traumatic childhood, correct?

A My memory of what I was talking about before the coaching is not perfect. That's what I recall. It's possible that -- I don't have a perfect memory around what I was sharing beforehand, but I do remember the coaching that she gave me.

Q And in hindsight, you look back and you feel this is pretty mean spirited or cruel or something of that nature?

A I don't actually think it was mean spirited or cruel. I

just think she was trying to ask me to, like, transmute something into, transmute something heavy and intense into humor, and it was not something I was capable of doing. I don't -- yes.
Q Understood. But you knew that that was, that was a philosophy of Nicole's, correct?
A Yes. It was an application of her teachings.
Q Better way to put it. That's why you have a doctorate.
It was, it was no secret that Ms. Daedone preached this idea of turning these negative, dark, traumatic experiences into something more positive, right?
A That's true. I think the whole reason I really was involved at OneTaste was for this, the training and what we would call like the alchemy of it, sort of take this traumatic past that I had and to somehow transmute it and to find power and find myself from that.
Q Right. And she taught that because she did it for herself, right?
A Yes.
Q She shared her very dark childhood experiences with people, correct?
A Yes.
Q And so she would teach, hey, this worked for me, you should try this out, right?
A Yes.

Q And some of these, these applications, which is what you said, they didn't feel great in the moment; it didn't actually work for you, right?
A That's an example of a time that I just -- it didn't, it kind of fell flat with me. I wasn't able to apply it in that moment in a room full of people.
Q And you didn't. That was okay, correct?
A We just moved on to the next thing.
Q And it sounded like you were disappointed that she didn't come over and, like, hug you and stroke you and, like, you know, give you some reassurance. Maybe I'm misinterpreting that.
A No, I never expected that kind of treatment from Nicole.
Q That's not, that's not what she would have done, right? You knew that about her?
A No. That's not what our relation, our coaching relationship was about. It's not about her caretaking me.
Q Right. I mean she was -- in layperson's terms, she was very much a tough love kind of person, correct?
A Yes.
Q And after the coaching program, you, I think you did go through the graduation piece of it, right?
A I was there for graduation weekend, yes.
Q And that was the demonstration, right?
A Do you mean the --

this?
A This is the bathroom of the Warehouse.
Q And this was a shared bathroom?
A That's correct.
MS. BENSING: Okay, we can hit play.
(Video played.)
MS. BENSING: We can pause here at the end.
(Video paused.)
Q Do you see the curtains in the video right now?
A Yes.
Q Where does that lead into?
A That leads into the main room of the Warehouse.
MS. BENSING: We can take that down. Thank you.
Q Mr. Kosley did you video record any events at a property on Stinson Beach?
A I did.
Q Whose property was that?
A I don't know who is the owner, but it was -- Reese Jones -- it was Reese's place.
Q And what event or events did you take video for there?
A It was a demo of orgasmic meditation.
Q Approximately what year did this demo occur at Stinson Beach?
A I believe that was 2008.
Q What was the demo at Stinson Beach?

A It was meant to -- it was a demonstration of orgasmic meditation where Nicole was the person being stroked in the demo. It was just meant to sort of -- there were some investors and --

MR. ROBOTTI: Objection to what it meant.

THE COURT: Sustained.

BY MS. BENSING:

Q Well, you were asked to work at that event; correct?

A Yes, I was.

Q And you were asked to video record the event?

A Yes, I was.

Q What was your understanding of the event that was being video recorded?

A That it was --

MS. BONJEAN: Foundation.

THE COURT: Overruled.

Q You can answer.

A It was meant to sort of as a coming out of orgasmic meditation.

Q And for what purpose?

A For the purpose of interesting investors and/or media that were present.

Q And you testified that Nicole Daedone participated in that demo?

A Yes.

Q And did you still have videographer roles at this time?
A Occasionally, but mostly I was running production by this point.
Q And were you one of the people who were running this taboo NYC course?
A Yes, I was presenting and teaching in this course.
MS. BENSING: Your Honor --
Q Oh, and I think you testified this is a fair and accurate copy of that course syllabus?
A Yes.
MS. BENSING: The government moves to admit Government Exhibit 3086 into evidence.
MR. ROBOTTI: Judge, objection. Irrelevant on this foundation and cumulative and 403.
MS. BONJEAN: Objection. Relevance. Foundation.
THE COURT: I'm going to sustain the objection on this foundation.
Q Well, Mr. Kosley, let me ask you this.
Are you familiar with the story of Ephesus?
MR. ROBOTTI: Objection. Relevance.
THE COURT: Overruled.
Q You can answer.
A I am familiar with the story that Nicole told about Ephesus or Ephesus, I don't quite remember.
Q What is the story that Nicole told about Ephesus?

A She would tell a story about how there was a temple in a place called Ephesus and the men would come back from war and go to the temple and the priestesses of that temple would, quote, unquote, "fuck the war out of them."
Q Are you familiar with priests or priestesses of orgasm?
A Yes, that was something we had for a while while I was at OneTaste.
Q When approximately?
A Around 2014, 2015, I believe.
Q And what are priests or priestesses of orgasm?
A They were participants or members of OneTaste who had shown sufficient devotion or commitment to the path of orgasm that they were sort of inducted as priests or priestesses of orgasm.
Q And who held the induction ceremony -- did you attend the induction ceremonies?
A I attended and I was inducted as one of the priests of orgasm.
MR. ROBOTTI: Objection to relevance.
THE COURT: Overruled.
Q Who conducted the priest or priestesses of orgasm ceremonies?
A Nicole and Rachel and the leaders of OneTaste.
MS. BENSING: We can take that down.
Q Did there come a time when Reese Jones stopped investing

morning.

THE COURT: Got it. Thank you.

Q Now just looking at the highlighted portion there at 15:15:28.

Does that refresh your recollection about a conversation with Yia Vang at the time?

A I still don't recall the specific conversation, but -- the exact words, what happened.

Q So do you recall that Yia Vang did say that they would hire you back if you got into a treatment program?

Is that correct?

A Yes. I don't remember -- I didn't work a program at that time, but I do remember committing to being sober.

THE COURT: Can you just give me the line number you were asking about, please.

MR. ROBOTTI: Yes, Your Honor. It was 15:15:28.

THE COURT: Thank you.

Q And ultimately, OneTaste did hire you back; is that correct?

A Correct.

Q And so they gave you a second chance in 2014, right?

A Yes.

Q And at the end of 2014, you then violated the OM container with the student; is that correct?

A Sure.

Q And as a result of that, Eli Block banned you from OM group practice; is that correct?
A I don't recall being banned from OM group practice, but perhaps that was how it was characterized.
Q Okay. So you recall that there were -- there was a conversation about the fact that you violated the container, right?
A Yes, I remember getting a talking-to about it.
Q And violating the container means you touched a student in a sexual way that the student found inappropriate, right?
A It was a sexual practice.
Q And the student complained about the fact that you had stuck a finger in her anus without consulting her, right?
A I don't recall the specifics of the incident.
Q Okay. But you do recall that there was a discussion about you breaking the container, right?
A Yes.
Q And OneTaste gave you another chance after that, right?
A I don't recall.
Q Well, you weren't fired at that time, correct?
A No, I don't believe so.
Q Okay. So then in March of 2016, you relapsed with cocaine again, right?
A Yes.
Q And you drove a OneTaste vehicle while you were high; is

**LIANNA LIFSON,** having been previously duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BENSING:

Q Good morning, Ms. Lifson.

A Good morning.

Q Are you familiar with an organization called OneTaste?

A Yes, I am.

Q What is OneTaste?

A OneTaste is a wellness organization, I would say, that was based on the practice of orgasmic meditation.

Q Approximately when did you first become involved with OneTaste?

A 2008.

Q How old were you then, approximately?

A 24.

Q Approximately how long were you involved with OneTaste?

A Six years.

Q So until about what year?

A 2014.

Q Did there come a time when you worked for OneTaste?

A Yes.

Q At a high level, what kind of work did you provide?

A I was a coach and a facilitator and I also did production. I was a city lead as well.

Q In what?
A In education.
Q Approximately when did you obtain your master's?
A 2006.
Q And where were you living at that point in time?
A I was living in New York.
Q When did you first hear of OneTaste?
A When I was living in New York, here.
Q What happened?
A I went to a lecture that Nicole did Downtown.
Q And what do you recall about that lecture?
A I remember her talking about what was then called the warehouse space, that they were doing, like, sexual spirituality. I thought it sounded very San Francisco.
Q How did you hear about that lecture in the first place, that you heard Nicole Daedone speaking at?
A My partner at the time.
Q You mentioned your partner at the time. Please describe that relationship to the jury.
A It was tumultuous and abusive at times. I had met him when I was 18 and he was 30.
Q And in what way was it abusive, at a high level?
A Sexually.
Q What did you do after -- did you -- when you heard Nicole speak at that lecture, did you become more involved in

OneTaste at that time?
A No, I didn't.
Q What did you do after you finished grad school?
A I moved to San Francisco.
Q And approximately what year was that?
A That was 2008.
Q What did you do in San Francisco?
A I taught high school.

(Continued on the next page.)

(Continuing.)

DIRECT EXAMINATION (Continues)

BY MS. BENSING:

Q And did you move to San Francisco for that job?

A Yes, I did.

Q When you moved to San Francisco, where did you live initially?

A I lived in a small basement apartment.

Q What, if any, community did you have in San Francisco when you moved there?

A Very little.

Q What do you mean by that?

A I was living with a friend of my -- my dad's old friend's son, but I didn't really know him before that. And I didn't know anybody in San Francisco.

Q And what about your family, did you have strong family support at that time?

A My parents were going through a very messy divorce, so they were sort of wrapped up in their own stuff.

Q What, if any, relationship did you develop with drugs and alcohol at that point in time?

A I started using both pretty heavily on the weekends.

Q So you've testified earlier that you got involved with OneTaste in approximately 2008.

Was that when you were living in San Francisco?

A Yeah. It was shortly after I moved to San Francisco.
Q What happened?
A I went to a party that was like a send-off Burning Man party.
Q Let me just pause you there.
What is Burning Man?
A Burning Man is a desert festival that happens every year in August.
Q Okay. Go ahead.
A And I met Kal Holczler there and he invited me to an INGroup. And I was like: But I don't have any friends here. And he was like: You do now.
MS. BENSING: I'd like to pull up for everybody, I believe this is in evidence, Government Exhibit 213.
(Exhibit published.)
MS. BENSING: And if we can pull it up for the jurors as well. Thank you.
(Exhibit published.)
BY MS. BENSING:
Q Do you see this on the screen in front you, Ms. Lifson?
A Yes, I do.
Q And who is here in Government Exhibit 213?
A That's Kal.
Q And you testified that Kal invited you to what kind of event?

A An INGroup.
Q What is an INGroup?
A An INGroup was a introductory event to OneTaste.
Q And what happened at the INGroup that you went to?
A There were three games that were played. It's like an introductory game where you went around the room and you said a word after a prompt.
And then there was Hot Seats was the second game where you went up in front of the room if you were called on, and people from the room asked you questions.
And then the third game was called Intimacy is where somebody would say something if they noticed something about somebody else.
Q And at the time that you attended this INGroup, what did you understand the purpose of these games to be?
A Like just an evening of connection, something to do that was different than go to a bar.
Q Did there come a time when your understanding of the purpose of those games changed while you were at OneTaste?
A Yes.
Q In what way?
MS. BONJEAN: Object to the foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q Well, at some point did you take, as already testified,

did you take on a sales role at OneTaste?
A Yes.
Q And as part of that sales role, did you, yourself, conduct these games?
A Yes.
Q And so what was the purpose of these games when you were conducting them?
A To identify people who you could then sell stuff to, to find their places where -- to have them -- sorry. To have them have some sort of an experience, and then to also see places where they were vulnerable so you could then use that to sell them courses.
Q And who trained you in sales, Ms. Lifson?
A Rachel Cherwitz did.
Q Based on your experience at OneTaste, including your sales experience, what kind of information did you attempt to gather at these initial recruitment experiences?
A Say, like, what they -- what they needed. Like, were they unhappy in their marriages, did they have a confidence issue. You learned how to read clothing and body language, and you wanted to just -- you wanted to see what it was that they felt dissatisfied with.
Q Why?
A Because then you could use that information to sell them things.

Q And sell them specifically what kinds of things?
A Courses, coaching, whatever the offerings were at that that moment.
Q On behalf of OneTaste?
A Uh-hum.
Q And is that a yes?
A Yes, sorry.
Q Who, if anybody, do you remember meeting with in the OneTaste community at that first INGroup that you attended?
A I think it was led by Rachel Cherwitz and Robert Kandell.
Q And I'd like to show you and everybody what's already in evidence as Government Exhibit 221.

(Exhibit published.)

Q Do you recognize this person?
A Yes.
Q And who is this?
A That is Robert Kandell.
Q What was his role in the organization at that time?
A He was the co-founder with Nicole, and then he was also the production lead. He did finances. He did all of the -- the nitty-gritty stuff.
Q And was that the case throughout your time period with OneTaste?
A Yes, it was.
Q What happened after you attended that initial INGroup,

did you participate in more OneTaste events?
A Yes, I did.
Q What kinds?
A At first I just participated in weekend courses, and then I became more involved and participated in bigger classes as well.
Q Describe your involvement in OneTaste over the next period of time.
MS. BONJEAN: Objection, foundation.
THE COURT: Sustained.
BY MS. BENSING:
Q What happened next, Ms. Lifson, with respect to your involvement with OneTaste?
A Sure. I went to a couple of weekend classes while I was still working my job as a teacher and I slowly became more invested. Because I didn't have any friends outside of the organization, the people who I met at those weekend courses became -- became my only friends in San Francisco.
Q Who in the OneTaste community became important to you?
A Sure. Aubrey Fuller, Jennifer Slusher, Dana Gill, Michelle Wright.
MS. BENSING: If we could pull up for everybody what's in evidence as Government Exhibit 292.
(Exhibit published.)
Q Who is this?

A I started to see -- I saw the same thing more and more, and eventually I started treating her in the same fashion.
Q How did your involvement in OneTaste progress after the Body Course?
A It progressed. I think I took another class called The Leadership Training Program next, which was like a longer weekly class. And then I -- I took a break from OneTaste courses for a little while.
Q How come?
A I just lost interest. They were in a transitionary point. They were moving from the warehouse to 1080 at that moment, and I don't think they had a lot of offerings. But also I was just like, just focused on teaching. I was focused on other things.
Q And when you say transitioning from the warehouse to 1080, what are you referencing?
A The people who lived at OneTaste had lived in the -- in a warehouse on Russ Street, and then they were moving to take over a single-room occupancy hotel, which was 1080.
Q What happened with respect to your teaching job?
A I was generously laid off.
Q What do you mean by that?
A I was -- that was a really hard job and I was not really up for the task in a lot of ways. It was a -- so I had a hard time with student engagement especially. And after two years

me at that time.
Q Okay. Did you talk to anybody about -- at OneTaste about your finances?
A Yeah, I did. I definitely talked to some senior staff members. I don't remember who specifically.
Q And what was your takeaway from those conversations?
MS. BONJEAN: Objection, hearsay.
MS. BENSING: Your Honor, it's not for its truth.
THE COURT: Overruled.
BY MS. BENSING:
Q What was your takeaway from those conversations?
A That I shouldn't worry about it, that the money will come later. That, like, we deal in the fourth dimension and money is a third-dimensional problem, so it's really not that big of a deal.
Q And what was your understanding of what the third dimension was?
A Third dimension is the world that we live in here, the concrete world, but that we were sort of like working on a higher plane.
Q And so, what's the fourth dimension?
A That higher plane.
Q When you lived in 1080, approximately how many people lived there?
A Around 40.

were made. So sometimes you wouldn't go to bed until 12:00, 1:00 in the morning, even though you weren't selling anything at midnight. Nobody was buying an OM course at, you know, 1:00 a.m., but it had it be that you slept very little.

Q And again, who set those expectations?

A Rachel Cherwitz did.

Q Did there come a time where you stopped being paid by commissions only?

A Yes, there was.

Q What happened?

A I started to make more money on commissions. OneTaste started offering some bigger-ticket items and all of a sudden our paychecks became decent paychecks. Probably something between, I don't know, 2- and $3,000 a paycheck. For a very short period of time, though. And once those paychecks started to become larger, they put us on salary.

Q Okay. And when you say "they put us on salary," who are you talking about?

A The executive team at OneTaste. So Nicole Daedone, Rob Kandell, Rachel Cherwitz, Joanna Van Vleck.

MS. BENSING: I would like to show the witness only what has been marked as Government Exhibit 3743.

And Your Honor, if I can just hand a copy, a hard copy up to the witness.

THE COURT: Yes.

(Exhibit published.)
Q Who is this?
A This is Eli Block.
Q And I think you testified earlier that you worked with Eli Block in Boulder?
A Yes, I did.
Q What was his role at OneTaste?
A He was a salesperson.
Q When you were working with Eli in Boulder, how did he recruit people into OneTaste?
A In Boulder, he would go to events and try and recruit people in.
Q Any other ways?
A Yeah. Previously, in San Francisco, he would go on OKCupid and get dates with people and then bring those dates to events and recruit people in that manner.
Q Were you directed to participate in orgasmic meditation with Eli Block?
A Yes, I was.
Q By who?
A I don't recall.
Q Did Rachel Cherwitz direct you to participate in orgasmic meditation?
MS. COHEN: Objection.
MS. BONJEAN: Objection. Leading.

THE COURT: Sustained on the leading.

MS. BENSING: Oh.

Q Any instances that you can recall of participating in orgasmic meditation with Eli Block?

A Yes.

Q Where?

A Our OM circles or home, both.

Q And did that happen in Boulder?

A Yes, it did.

Q Who, if anybody, directed you to engage in orgasmic meditation with Eli Block in Boulder?

A Rachel Cherwitz did.

Q Did she tell you why?

A It was supposed to help cement our relationship so we were working as a team.

Q And did you do it?

A Yes, I did.

Q Why?

A Because I was supposed to.

Q Besides you and Eli Block, did you work with any other OneTaste members in Boulder?

A Alisha Price.

Q I would like to show you what's already in evidence as Government Exhibit 205.

(Exhibit published.)

would get less overdraft fees.
Q Did anything happen with respect to that bank account when you were living in Boulder?
A Yeah. He drew it down significantly.
Q You testified that you were in a poor financial condition after you got involved with OneTaste.
Did this contribute to it?
A This, it definitely didn't make it better, but it was already -- I was already defaulted on my loans long before he drew down on my bank account.
Q Did you ultimately stop sharing a bank account with Chris Kosley?
A Yes, I did.
Q Approximately when?
A When I was living in New York, after I left Boulder. I'm not sure of the year.
Q I think you testified earlier that when you were living in Boulder --
MS. BENSING: We can take that down.
Q When you were living in Boulder, you sometimes traveled back and forth to San Francisco; is that correct?
A That is correct.
Q For what purpose?
A To participate in Coaching Program 5.
Q And what was Coaching Program 5?

A It was a -- there was a monthly immersion and it was the program that I signed up for before I was offered the Boulder position.
Q Did you also perform any kind of work while you were traveling back to San Francisco?
A I did occasionally perform sexual labor.
Q And what kind of sexual labor?
A There was a participant who was going to drop out of the course, or that they thought was in danger of dropping out of the course, so Robert Kandell asked me to engage in sexual activity with him so he can stay and continue making his coaching program payments.
Q So what happened?
A I did as I was asked and he continued to stay in the program.
Q And when you say you did as you were asked, what do you mean?
A I engaged in sexual activity with the client.
Q And how did that come about?
A I brought him up to the room I was using at 1080.
Q And then what happened?
A And then I performed oral sex on him.
Q Did he remain in the program after that?
A Yes, he did.
Q How do you know?

A Because I continued to attend -- I continued to attend immersions.
Q How did that make you feel, Ms. Lifson?
A It made me feel like I was doing my job.
Q In what way?
A That I was contributing positively to the company.
Q In what way?
A That I was in the -- OneTaste's words: That I was using my orgasm to continue to help the awakening of this gentleman.
Q And who taught you that?
A Nicole Daedone.
Q When you were living in Boulder, did Nicole Daedone ever visit Boulder?
A Yes, she did.
Q And did you make arrangements for her visits prior to her arrival?
A Yes, I did.
Q What kind of arrangements?
A I would rent Airbnb for her to stay in and then we would always fill the fridge with very specific groceries before she got there.
Um... Yeah.
MS. BENSING: I would like to show the witness what has been marked as Government Exhibit 1120.
And, Your Honor, could I hand up a hard copy?

opened that day. Nobody had talked to her about the shift in management. So, I was just told not to -- not to show up. And -- yeah, I don't know what happened with the yoga studio after that.
Q And what happened to you?
A I was told to -- I think I was given lead production of New York. But shortly after that I was fired.
Q Okay. So, what happened?
A That time is really hazy. I remember that I was given a production role, and then I was -- I was heavily criticized for everything that I was doing during that time. And I had this -- this feeling that I was about to be fired. A lot of people were being let go at that time. And then I was.
Q And why is that time hazy for you?
A I think it's just the lack -- the lack of sleep. Also, it was a long time ago.
Q Did you, ultimately, get fired from OneTaste?
A Yeah, I did. I got let go from that position, but they told me I could, basically, continue living in the OM house, continue coaching, and then work my way back up into the organization if I desired.
Q And did you view this as the loyalty test you testified about earlier?
A Correct.
Q Do you remember approximately when you were let go?

A May of 2014.
Q Okay. So you'd been at -- in New York for approximately five or six months?
A Correct.
Q Did you have to sign any paper work to be able to leave?
MS. BONJEAN: Objection to the leading.
MS. BENSING: Oh.
THE COURT: Overruled.
BY MS. BENSING:
Q You can answer.
A Yeah, I was asked to sign an NDA.
Q Okay. And did you receive any kind of severance?
A I received, I think, $1500 in severance.
Q Okay. Is there something that might refresh your recollection?
A Yes.
MS. BENSING: If I can pull up for the witness only what's been marked as Government Exhibit 825.
And if you can just zoom in on the top half. Sorry, the top half of the page.
BY MS. BENSING:
Q Okay. And if you can just read that, Ms. Lifson, and let me know if that refreshes your recollection about how much you received when you left.
A Yes, it does.

Q Okay. And approximately how much?
A I received $1500 of severance, and then $600 for -- excuse me -- back wages.
Q And you just testified that you signed an NDA. What is an NDA?
A A non-disclosure agreement.
Q And what is that?
A It says that I wouldn't talk about anything that happened at OneTaste.
MS. BENSING: You can take that down. Thank you.
BY MS. BENSING:
Q You testified at the very beginning of your direct examination that you were originally from Westchester?
A Correct.
Q When you lived in New York, what, if any -- did you have family in town?
A Yes, I did.
Q What, if any, impact did that have on you?
A It made it easier for me to take some space after I was fired and then eventually leave the organization for good.
Q And what do you mean by that?
A I had some very close family friends that I was able to go stay with and sleep and clear my head. And it became clear to me that it was time for me to move on. And then I was able to visit with my mother and get a loan from her so I could

have some money to restart my life.
Q Where did you go after you left OneTaste?
A I went to Los Angeles, California.
Q Did you continue to have some involvement with OneTaste after you left?
A I lived -- briefly after I left I -- I continued to coach for OneTaste.
Q And how come?
A Because I -- I needed the money. I wasn't really ready to let it go. I didn't know what I was going to do next.
Q And what happened with respect to that involvement?
A I ended that arrangement when I was pressured to sell a Mastery course to a client.
Q How difficult, if at all, was leaving OneTaste?
A It was the hardest thing I've ever done in my life. And I have two toddlers, which is also pretty hard. But leaving OneTaste was harder.
Q And what made it so difficult?
A It was my whole identity. It was -- my whole self had really become invested in it. It wasn't just leaving a job, it was leaving a job, it was leaving a home, it was leaving all of the friends I had made for the past six years. I didn't know what I was going to -- who I was gonna be after that.
Q What was the aftermath like of leaving OneTaste for you?

A It took a really long time for me to get myself together again. Even like, I started off working part-time time, and then slowly I was able to work full-time again.

There was a lot of figuring out what ideas were mine, what ideas weren't mine. What -- who I wanted to be inside of relationships. Yeah. It was a lot. It was -- it was -- I was very unmoored for a while.

Q And what do you mean when you say, when you testify trying to figure out which ideas were or were not your own?

A Well, you know, there's a lot of very specific language used inside of OneTaste. So you tend to adopt those mindsets as you're around it. It -- it becomes part of who you are.

So, I had to figure out which of those things I actually believed and which of those things were just told to me so I would comply with the program.

Q Ms. Lifson, are you familiar with the location called The Land?

A Yes, I am.

Q What is The Land?

A The Land is a piece of land that, I believe, OneTaste purchased after I left the organization.

Q Have you been to The Land?

A Yes, I have.

Q Approximately when?

A About three years after I left OneTaste, that would be in

2017.
Q Why did you go to The Land in 2017?
A I was staying in Mendocino on a small farm still, I would say, trying to get my life together after OneTaste. And they were having an event there at the same time, very close to where I was living. And I wanted to go and get some closure and see my old friends.
Q And what do you mean by "closure"?
A I think I wanted to see what it looked like from outside, what the organization looked like, what it felt like.
Q And what happened when you -- did you -- did you go to that?
A I did.
Q And by the way, you mentioned the word Mendocino. What is that?
A It's a county in California, northern California.
Q So what happened when you went to The Land?
A I saw some people that I knew. I met with Nicole Daedone. I noticed the tension in the people that were working there still, and I -- yeah, I really cemented the fact that I had made the right decision to -- to leave.
Q You mentioned that in that 2017 visit to The Land you spoke with Nicole Daedone.
What did you speak about?
A We spoke about her lawsuit with Robert --

AFTERNOON SESSION

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge DIANE GUJARATI entered the courtroom.)

THE COURT: You can bring the witness in.

(The witness entered the courtroom.)

THE COURT: You can come back up.

(The witness resumed the stand.)

(Pause.)

(Jury enters.)

THE COURT: Everyone may be seated.

And, Ms. Bonjean, I believe you were about to start your cross-examination.

MS. BONJEAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Lifson.
A Good afternoon.
Q My name is Jennifer Bonjean, and I represent Ms. Daedone.
You grew up in Westchester, New York, is that right?
A That's correct.
Q Okay. And you graduated college in what year?
A Which college?
Q Well, you attended two, right?
A I attended three colleges actually, yeah.

Q Okay. Did you earn a Bachelor's degree at some point?
A Yeah, I earned a Bachelor's from Smith College in two-thousand-and -- oh, I feel nervous -- 2006.
Q Okay.
A And then I graduated from NYU in 2008.
Q That was a graduate program, right?
A Correct.
Q But you actually started college at Colorado College, right?
A That's correct.
Q And when did you start Colorado College?
A Two-thousand-and -- I took a semester off in between high school and college, so winter of -- it was 2003.
Q Okay. And you transferred out of Colorado College, right?
A Correct.
Q And that's because you molested one of your friends, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Were you accused of molesting one of your good friends?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Why did you leave Colorado College?
MS. BENSING: Objection.

THE COURT: Sustained.
BY MS. BONJEAN:
Q You transferred to Smith, is that right?
A That's correct.
Q Okay. By the time you transferred to Smith, you had already commenced a serious drug and alcohol problem, right?
MS. BENSING: Objection, relevance.
THE COURT: Sustained.
Q In 2007 you were a graduate student at NYU, is that right?
A That's correct.
Q And you testified that you attended a lecture or a speech of Nicole Daedone's, correct?
A That's correct.
Q What were you studying at NYU?
A I was studying education, English education.
Q Okay. And your family was still close in Westchester County?
A That's correct.
Q And this speech you attended of Ms. Daedone's was sexual spirituality, right?
A As I recall.
Q And it resonated with you, right?
A I thought it was interesting.
Q But you did not become associated with OneTaste at that

A Yeah, I see it.
Q Okay. Now, having had an opportunity to look at this document, does it refresh your recollection about whether or not you told the FBI that fortunately you had an education and challenged things often, so you were not as easily manipulated?
A Yes.
Q You recall saying that?
A I -- I see that it is written here and it sounds like something I may have said.
Q Because you have called yourself sort of a rebel, right?
A I was -- yeah.

(Continued on the following page.)

BY MS. BONJEAN: (Continuing)
Q Yeah. You were someone who did challenge the status quo, right?
A I would say so. Well, in the beginning.
Q Correct.
And your education gave you some of the skills to challenge what felt right and what felt wrong, right?
A I would say in the beginning, before I became an employee there.
Q Okay. Certainly at the beginning you had the capacity to make your decisions all on your very own, right?
A I -- I decided to move into OneTaste on my own, correct.
Q And, in fact, you did so after conducting your own research on the place, right?
A I did.
Q In fact, you even thought, ey, this might be an unusual place to go. I think you even thought it feels a little culty, but I'm still going to sign up anyway, right?
A That is correct.
Q And that was something you -- that was a conclusion you drew before you even moved into 1080, right?
A Um, yeah, I thought I could handle it.
Q You thought -- in fact, you told the FBI that you actually Googled it and you knew that OneTaste was B.S., but you didn't have anything better going on, so you moved in,

right?
A I don't think I used those words.
Q Okay. I'm going to have you look at LL-2. I think -- is it still there, ma'am, in your hands?
A Yeah.
Q Okay. I'm going to have you look at the third page of that document, if you could.
A Okay.
MS. BONJEAN: And the third paragraph on that page, if you could pull that out just for the witness.
A Yeah, I don't -- I don't recall -- I don't recall putting it in those terms.
Q Okay. So you don't remember tell -- do you remember telling the FBI that you knew OneTaste was B.S.?
A I don't.
I do remember telling them that I Googled it. And I did Google it beforehand and read some scathing reviews of OneTaste.
Q Right.
And notwithstanding what you read, you decided: I'm going to still get involved. Right?
A I did.
Q And you testified on direct examination that OneTaste was responsible for --
MS. BONJEAN: You can take that down, by the way.

Q Okay. But you did lose your job, right?
A I did lose my job, but I -- I had -- I got a new job within three months of losing my job.
Q Okay.
A So that wasn't -- didn't cause financial hard -- like, a significant amount of financial hardship at that time.
Q And you told the Federal Government though you needed help, that's why you moved in to 1080, right?
A I -- I was definitely looking for the support that 1080 provided.
Q Okay. Let's talk about 1080 for a second.
1080 was an OM community, right?
A Correct.
Q And there were certain responsibilities that came with living in a OneTaste communal setting separate and apart from working there, right?
A Sure.
Q And 1080 had a second floor and a third floor living situation, right?
A Correct.
Q Did you live on the second floor or the third floor?
A I lived on the third floor.
Q Okay. And the third floor was an immersion program, wasn't it?
A Um, it shifted what it was at a variety of times, I would

say.

Q Well, it wasn't just a place to rent. It was a commitment to the OneTaste community, right?

A Yes, it was.

Q It wasn't a place where you expected to have a lot of freedom -- or a lot of privacy, right?

A It was not a place where you expected to have a lot of privacy.

Q Right.

And there were expectations about OMing, right?

A There were expectations about OMing.

Q Right.

It was a core tenet of OneTaste, right?

A Correct.

Q So when you moved in there, you understood that you were going to be living amongst people who shared a viewpoint about the benefits of OMing, right?

A Correct.

Q There were expectations that you would commit certain hours of service to OneTaste businesses, right?

A I don't recall.

Q There were expectations that you would have sort of meetings with your fellow resident members and people who were I guess staff at OneTaste, right?

A Yeah, I don't recall either.

Q Okay. And you went there because you wanted to experience what it was like to be immersed in OneTaste, right?
A I went there I think because many of my friends had moved into OneTaste, because the food program really appealed to me, because I thought it could be a healthy place for me to live.
Q And there was an application process, wasn't there?
A Um, I don't recall what the application process was.
Q Well, not everybody could just move in. You had to have some experience with taking OM classes, right?
A Um, I don't remember.
Q Would something refresh your recollection, you think?
A Sure. Yeah.
Q I'm going to have you look at Defense Exhibit 3-CY.
MS. BONJEAN: I think you should have this, Your Honor.
MS. BENSING: I think I might need a copy.
THE COURT: Thank you. I have it.
Do you need it, Government?
MS. BENSING: I do need a copy.
Q Ms. Lifson, I'm going to have you look at the second page of this document.
A Sure.
Q And if you could peruse that and let me know when you've had a chance to look it over.
A Yes, I've had a chance.

Q Okay. And then if you could look at the third page. Just if you could look there as well.
A Mm-hm.
Q And do you see in the middle of the page, specifically review there.
A Yes.
Q Does this document refresh your recollection about whether or not there was a program application procedure for the San Francisco's living center?
A Yes, it does.
Q Okay. And there was, right?
A Yes.
Q And part of the application process was that you had to have taken a Foundations course and have some OM training, right?
A Yes.
Q Okay. And also, do you remember that there was a second-floor program as well?
A Yes, I do.
Q In fact, the second-floor program wasn't as intense as the third-floor program, right?
A No, it wasn't.
Q So you could have chosen to be on the second floor, but you chose to be on the third floor, right?
A Yes, I did.

Q And also part of the commitments of living in the 1080 Folsom, San Francisco residence was to commit a certain amount of hours to service of OneTaste, right?
A Yes, it was.
Q And also to, again, engage in the practice of OM on a regular basis, right?
A Yes, it was.
Q Now, you testified on direct examination that -- I think that you believed that either research partners were specifically assigned by Ms. Daedone. But that wasn't the case, right?
A I don't think I said that on direct examination.
Q Okay. In fact, there were research partners who were suggested, perhaps, but nothing was mandated, right?
A I never had research partners, so I don't think that's pertinent to me.
Q Research partner and roommate, you see as different?
A I do see that as different, yeah.
Q But Ms. Daedone never said you have to share a room with a particular person, right?
A I was not instructed by Nicole to share a room with anybody, no.
Q But you weren't instructed by anyone that you had to share a room with a particular person, correct?
A Um, I don't remember how forcefully it was recommended.

I know that it was strongly recommended to share space sometimes with people that you didn't want to.
Q When you first went to 1080 Folsom in 2010, you shared a room with who?
A Oh, gosh. I don't remember who I shared a room with when I first moved in. Or if I -- I may have had a single room. I'm sorry, I don't remember.
Q So you could have had a single room at 1080, right?
A Yeah. It's more expensive.
Q Okay. And you also could have told anyone at OneTaste that you didn't want to share a room with someone, right?
A Um, yes, there was -- yeah.
Q And I think you testified at some point there was a roommate or a partner, whatever word you want to use, that you were not particularly keen on. But you never told anybody that, right?
A I don't recall.
Q In fact, at one point your dad even visited; isn't that right?
A I don't remember my dad ever coming to the residency.
Q Do you remember him coming to a course or a class?
A He did not come to a course. He went to a lecture once.
Q Okay. Lecture/course.
So he came and heard Ms. Daedone speak, right?
A He did when she was in New York.

Q Oh. That was in New York, not in San Francisco, right?
A Correct.
Q And his recommendation was this is not good, get out, right?
A Correct.
Q And you didn't take it, correct?
A I did not.
Q But at any point you could have called him up and said, you know what, this is not working for me anymore, I want to come home, and your family would have taken you back, right?
A Um, yeah, they probably would have.
Q Now, you testified on direct examination that -- about how much money you made at OneTaste, right?
Do you remember that line of questioning?
A Correct.
Q Isn't it true that your first salaried job at OneTaste paid you around $50,000 a year?
A Not to my recollection.
Q Again, I'm going to look at LL -- the document that says 3500 LL-2. It's in front of you. If you need me to come over and find it for you, I can. Otherwise, we'll pull it up.
And we'll go to the second page and fourth paragraph down.
A Which document is that? The one in front of me? I'm sorry.

A I don't remember.
Q You testified that you worked as a cook at OneTaste when -- shortly after you moved into 1080 Folsom, right?
A I think it was about eight months after I moved in.
Q Okay. And you really liked that job though, right?
A I did.
Q And you were able to support yourself and live as you pleased at that time, right?
A Yeah, I had a variety of jobs and that was one of them.
Q Okay. Now, you also, when you were working -- strike that. I'm sorry.

When you were living at 1080 Folsom, there were times when you worked outside of OneTaste, right?
A Correct.
Q Tell the Ladies and Gentlemen of the Jury what jobs you held after you moved into 1080 Folsom.
A I did some freelance, like writing with -- I was helping somebody edit their self-help book.

And then I also had the job in Sausalito where I went and helped somebody write a novel.
Q So you had colleagues outside of OneTaste, right?
A I had clients outside of OneTaste, yeah.
Q You had clients outside of OneTaste, right?
A Correct.
Q You weren't just living, working at 1080 Folsom around

the clock, right?
A No.
Q Nobody stopped you from leaving to go do your work elsewhere, correct?
A They did not.
Q You had a phone that you could use to do your business, right?
A Mm-hm.
Q Yes?
A Yes.
Q You had a computer, I assume?
A I -- I did.
Q You had friendships outside of OneTaste?
A They were becoming fewer and fewer, but I still had some.
Q And that was your choice though, right?
A That was, I would say, the circumstances that I was living in.
Q Nobody stopped you from having friends that weren't associated with OneTaste, right?
A Um, living at OneTaste made it harder to have friends outside of OneTaste, but nobody was physically stopping me from having friends.
Q Nobody was even telling you that you couldn't have friends outside of OneTaste, right?
A Um, people would say that when you hung out with people

outside of OneTaste, the -- the verbiage that they would use would be an "energy leak."
Q Okay.
A So they would say that those people are energy leaks and that you're taking energy away from the inside of the organization and that it was better to date people, friend people, sort of like hang out with people inside the organization.
Q Okay. So some people inside the organization told you it's better to have friends in the organization than outside, right?
A Yeah.
Q Okay. But they didn't tell you you couldn't have friends outside, right?
A Um, no. But they -- they suggested to spend my energy inside.
Q You were a grown woman, right?
A Correct.
Q You weren't in high school, fair?
A Fair.
Q And you chose, based on whatever suggestions you received, to spend your time at OneTaste, correct?
A Correct.
Q Now, at some point you decided you wanted to do this coaching program, correct?

MS. BENSING: I'm looking.

THE COURT: I don't think I have it.

MS. BENSING: I don't think I have it either.

THE COURT: If we could put it on for the witness and the Court and the parties. Thank you.

MS. BONJEAN: Yes, Your Honor.

Can we use the ELMO on this one, Your Honor?

THE COURT: Let me just make sure that we could do it without publishing it yet.

MS. BONJEAN: Oh.

THE COURT: I think that's fine.

Q Do you see that, Ms. Lifson?

A Yeah, I do.

Q Okay. You have the paper copy as well, right?

A I do.

Q Okay. So again, as of October 25th of 2010, you were -- you had everything you asked for, correct?

A I, I see that I wrote that on this paper. I don't -- I don't think it was totally true, but I -- yeah, I see that I wrote that here.

Q Right.

So your words at the time were that you were thrilled with your life, right?

A Those seem to be my words at the time.

Q Right.

And only now, 15 years later, are you saying that's not really what you were feeling back then, correct?
A Um, I think that -- I don't -- I think if you asked me two months later, I wouldn't have been feeling the same thing. I think that's probably what I felt in that moment, but like, I -- like, probably a month after this I broke up with the person that I had been seeing and I, I -- there's -- there's some issues with this.
Q Okay. But you --
A Yeah.
Q You sent an e-mail to a number of people expressing your deep gratitude for what OneTaste had brought to you, right?
A Yeah, it appears so.
Q Okay. And among those things was financial stability, right?
A Yeah. Which is -- which is super interesting that I put that on there.
Q Yes.
And also, you were excited about the opportunity to be a leader at OneTaste?
A Yes, I was.
Q You were also in a relationship with a woman that you really liked, right?
A Yes, I was.
Q And you had friends and mentors that you enjoyed and were

learning from?
Yes?
A Yes.
Q And you were also not immersed, really, in OneTaste entirely. You still had a job outside of OneTaste, right?
A Yeah. I was still working at the synagogue.
Q Right. Okay.
And you were working with kids, correct?
A Yeah. I was a youth director.
Q And you were, you know, happy about teaching them and exploring God with them?
A I enjoyed aspects of that job.
Q And fair to say that you really felt that you had a number of blessings and had a lot to be grateful for at the time? And again, we're talking about in October of 2010.
Right?
A Correct.
Q Now, when did you say you moved to Boulder?
A I moved to Boulder, gosh, in May of...
Q 2012?
A Yes.
Q Okay. And that was an opportunity to be a director of OneTaste in Boulder, right?
A Correct.
Q And that was an opportunity to create a whole nother

OneTaste program in another city, right?
A Correct.
Q And you were pretty excited about that?
A Correct.
Q When did you start dating Chris Kosley?
A While I was still in San Francisco.
Q I'm sorry?
A When I still lived in San Francisco.
Q So this is before you went to Boulder?
A Correct.
Q Okay. So I want to focus in on the time when you were still in San Francisco, before you went to Boulder.
You took -- you continued to take courses at OneTaste, right?
A Yes.
Q You continued to live at 1080, right?
A Correct.
Q You took the coaching program, right?
A Yes.
Q You were OMing regularly, correct?
A Correct.
Q It was a practice that was working to your satisfaction, right?
A Early on it was.
Q Well, even before you went to Boulder it was, right?

A Yeah. I would say while I still lived at 1080 it was.
Q You didn't tell anybody that you were dissatisfied with the practice of OM, correct?
A Not that I recall.
Q You certainly didn't tell Ms. Daedone or Ms. Cherwitz or anyone in the upper management of OneTaste that you did not like what OneTaste was offering, right?
A No.
Q You were pretty excited about -- in getting even more immersed in the program there because you wanted to be a teacher and a coach, right?
A That was the path that I was on.
Q Okay. At some point you became -- you started teaching Mastery courses.
Do you remember that?
A Um, yes.
Q Okay. And can -- do you remember when you started teaching Mastery courses?
A I don't remember. I'm sorry.
Q Okay. Was it before you went to Boulder?
A No. It was after I went to Boulder.
Q Did you teach any courses before you went to Boulder?
A No.
Q So in and around May of 2012, you moved to Boulder.
Did you move with Chris Kosley at that time?

A No. I moved with Eli Block.
Q Okay. And the agenda was to create this program in Boulder much like there was one in New York and one in San Francisco, right?
A Correct.
Q And you were excited to participate in that project, fair?
A That is fair to say. Yes, I was.
Q And like many startups, there's not always initial financial returns on something like that, but the hope is that in the future you can turn something into a financial success, right?
A Correct.
Q Okay. And isn't it true that when you -- in May of 2012, when you arrived in Boulder, you posted publicly that you were extremely excited about joining the Boulder community on behalf of OneTaste?
A Um, I -- I don't recall.
Q Do you remember posting publicly that you were grateful for the opportunity?
A I don't specifically remember, but that does sound like something I would have posted at the time.
Q And you also said that you loved the work deeply.
Do you remember that?
A I don't remember specifically.

Q Okay. Again, would anything refresh your recollection?
A Sure.
Q This is Defendants' Exhibit 20 A, as in apple, T as in Tom.
MS. BONJEAN: Can I use this? This won't publish, right?
THE COURT: No, you're fine.
Q Okay. I'm having you look at Defendants' Exhibit 20-AT.
MS. BONJEAN: Just for the witness.
Q Let me know when you've had an opportunity to look at that, Ms. Lifson.
A Yes.
Q So fair to say that you publicly announced how excited you were to be coming to Boulder and starting the program there, right?
A Yes.
Q And that you were deeply -- you loved the work deeply, correct?
A That is what I stated.
Q And that was after you graduated from the coaching program that you took in San Francisco; is that right?
A That's correct.
Q Now, speaking of the coaching program in San Francisco, there was a ten-week course, right? I'm sorry, ten-month course?

A Yeah.
Q And, in fact, the document that you signed says, "I understand and acknowledge and agree to each of the following."
The first bullet point there says that the content of the course is controversial.
Do you see that?
A I do.
Q And, in fact, it is, right?
A Yes.
Q And you assume the risk of taking a course that has controversial subject matter, right?
A Yes.
Q And then the second bullet point says that not all the activities occurring in the course are known and foreseeable, right?
A Yes.
Q OneTaste was sort of known for pushing boundaries; that's kind of what you signed up for, right?
A Yes.
Q The third bullet point says that "any concepts, notions, ideas, suggestions, and recommendations from sponsors and anyone acting on behalf of sponsors that I accept and/or apply to my life I do of my own free will."
Do you see that?
A Yes. (Continued on the next page. )

not to OM with clients. So the expectations of the job description of a coach was different.
Q Well, coaching is coaching clients, right?
A Coaching is coaching clients, not being stroked by clients.
Q Okay. And you chose to be a participant in the OM practice with clients in Boulder?
A I was instructed to be part of the OM practice with clients in Boulder.
Q What do you mean "instructed"?
A I mean that OM packages were sold specifically for Eli, my partner, out there to coach and for me to be the strokee.
Q Yes, but you were the director of Boulder, you were the one selling the packages?
A Rachel Cherwitz came out and sold those packages.
Q Okay. You were the director of the program, am I wrong?
A I was the director of the program, but for that specific instance when that occurred, Rachel Cherwitz was selling those packages.
Q You didn't tell Rachel Cherwitz: I don't want to be the director of Boulder anymore?
A It wasn't that I -- I just didn't want to have to OM with clients.
Q I understand. But you never communicated that to Ms. Cherwitz?

A I did not communicate that.
Q Was she supposed to read your mind since --
MS. BENSING: Objection.
THE COURT: Sustained.
Q -- since you had --
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q All right. How long were you the director of OneTaste Boulder?
A About two years.
Q Okay. So, for a full two years you were building OneTaste Boulder, correct?
A Correct.
Q And during this time you were also teaching Mastery classes, right?
A Correct.
Q And could you tell the ladies and gentlemen of the jury what a Mastery class was?
A It was a weekend immersion in New York that was about mastering the tenets of OneTaste, best as I can remember.
Q OneTaste?
A Of sexuality and OneTaste, yeah.
Q Okay. Did it involve more high level types of sexual behavior?

BY MS. BONJEAN:
Q Ms. Lifson, you recounted an event on direct examination related to Rob Kandell telling you to engage in some sexual activity with somebody that was going to be leaving the coaching program?
A Correct.
Q What was that person's name?
A I think it was Toby, but I'm not totally sure.
Q Okay. And you didn't tell Rob Kandell that you didn't want to go have a hookup or a makeout session with this guy, right?
A I did not. But Rob Kandell was my boss at the time.
Q I understand, but you didn't tell him: Hey, I don't want to, I don't want to do a hookup with this guy; right?
A I did not feel comfortable telling him that at that moment.
Q And --
A He was my -- my boss.
Q Right. Well, you -- but you -- that was sort of something that you had done probably countless times in the past, right?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q How many times do you think you did a hookup with someone

as part of OneTaste?
MS. BENSING: Objection.
Q I mean --
THE COURT: Overruled.
A I mean, like, under my own volition, I had hooked up with a lot of people at OneTaste.
Q Okay. And whether you felt it or not, did you say: Hey, Rob, this is crossing a line here, I'm not doing that; you didn't say that, right?
A I did not.
Q Okay. And did he -- did he -- isn't it true that you previously told the federal government that it was actually you and Jenny Slusher that went and hooked up with this guy?
A Yes.
Q Okay. You didn't mention that it was with somebody else on direct, but is it correct that it was with Jenny Slusher?
A Yeah, I think it was with Jenny Slusher.
Q Now, even after you parted ways with OneTaste, you continued to stay associated with the company, right?
A Briefly I coached for them afterwards.
Q You coached for them.
What did you coach?
A I did relationship coaching.
Q You did relationship coaching.
You went -- you socially associated with members or

people in the community, right?
A I did.
Q You went to weddings, right?
A I went to one wedding, yes.
Q Who got married?
A Rachael Hemsi.
Q Okay. So you went to Rachael Hemsi's wedding, right?
A I did.
Q And you had a good time, correct?
A I -- it was -- it was an interesting experience.
Q You posted about it, correct?
A I think somebody else posted a picture of me on social media about it.
Q All right. And then even two years later you went to a reunion for OneTaste on The Land, correct?
A I did.
MS. BONJEAN: And let's pull out, if we could -- one second.
(Pause.)
MS. BONJEAN: One second. Here it is. This is Defendants' Exhibit 28-D.
If I may, Your Honor?
THE COURT: Yes.
BY MS. BONJEAN:
Q Do you recognize the people in that photograph?

A I do.
Q Do you remember taking that picture?
A I do.
Q And does the other -- are you able to identify all four people in that photograph?
A I am.
Q And who are they?
A It's Maya Gilbert, Maddie Carl, Aubrey Fuller, and myself.
Q Okay. And does it fairly and accurately represent what the four of you looked like at the OneTaste reunion in 2017?
A It does.
MS. BONJEAN: At this point, Your Honor, we would move that exhibit into evidence.
THE COURT: Okay, there's also text. Are you moving the text or just the picture?
MS. BONJEAN: Oh, no not -- no. Not yet.
THE COURT: Just the picture?
MS. BONJEAN: Oh, the text on there. Yes, I would be moving the text. I can lay some more foundation if the Court would prefer.
THE COURT: Go ahead.
BY MS. BONJEAN:
Q Do you recognize the date that is depicted on that photograph?

A Yes.

Q Okay. Does that -- does that date accurately reflect when the reunion was, when that picture was taken?

A Correct.

MS. BONJEAN: Okay. So, at this juncture, Your Honor, I would be moving both, the picture with the text on the side, into evidence.

MS. BENSING: No objection.

THE COURT: Okay. Defendants' Exhibit 20-AD is admitted.

(Defendants' Exhibit 20-AD was received in evidence.)

MS. BONJEAN: I think I gave all my copies away.

THE COURT: I can give my back.

MS. BONJEAN: Yes, sorry.

(Exhibit published.)

BY MS. BONJEAN:

Q Ms. Lifson, can you tell the ladies and gentlemen of the jury who is depicted in this exhibit?

A Maya Gilbert, Maddie Carl, Aubrey Fuller and myself.

Q And this was, again, a OneTaste reunion in 2017, right?

A Correct.

Q And, in fact, after this reunion, you texted Rachael Hemsi and said: I'm -- I'm glad I went.

Do you remember that?

A I don't remember that, but it's very possible.
Q Okay. And you were glad you went, right?
A It gave me some closure.
Q And you enjoyed being with your friends, fair?
A Yeah. There are people that I -- I deeply loved that I met at OneTaste.

MS. BONJEAN: One second.

(Pause.)

MS. BONJEAN: I have nothing further.

THE COURT: Okay.

Is it Ms. Cohen or Mr. Robotti?

MS. COHEN: Ms. Cohen.

THE COURT: Cross-examination.

Okay. Why don't we start for a few minutes and then we'll take a break.

MS. COHEN: Okay.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good afternoon, Ms. Lifson.
A Good afternoon.
Q My name is Celia Cohen, I represent Rachel Cherwitz. I just want to ask you a few additional questions.

You testified when you started out on direct examination about OMing, and you referred to it as a sexual act.

A Yep.
Q And when you went out there to be the director of the Boulder office, you knew that when you were selling a product, part of selling is to demonstrate to others what the product is, correct?
A I didn't realize I would have to OM with clientele when I -- when I left for Boulder. I probably should have because I saw people doing it in 1080, but I had not done that before and I -- I didn't really realize that was gonna be part of my job.
Q Well, actually going back. We were talking a second ago about Intro to OM.
You did take Intro to OM eventually, correct?
A I did.
Q And that's where you learned what in detail the OM practice was all about, correct?
A Correct.
Q You may have heard about it, but that's where you really see it, right?
A Yes.
Q And in order to see if OneTaste is right for people, they have to know what it is about, correct?
A I don't know if they need to be doing live demonstrations of OM to know what it's about. I know that that's how they did it, but whether or not it was a necessity, I think it was

probably more of a titillation, to be honest.
Q Well, the OM practice was sold as a meditative practice, correct?
A That's how it was sold.
Q And, in fact, you testified on cross-examination just now about all of the positive aspects of orgasmic meditation, correct?
A That is correct.
Q In fact, you posted about them, right?
A Yes.
Q And you told others about the benefit of orgasmic meditation, correct?
A Correct.
Q And at these demonstrations at an OM circle, the people teaching that class are explaining how this is a beneficial practice, correct?
A Correct.
Q It is not -- no one is saying it's anything about sex, correct?
A That's not what they're saying.
Q Right. And you -- you -- you watched these demonstrations, right?
A I did.
Q And you watched many demonstrations over the course of your time at OneTaste, correct?

A Correct.
Q And, in fact, doing an OM demonstration within OneTaste is a prestigious thing to be asked to do, correct?
A Correct.
Q And, in fact, that's what people at OneTaste believed, correct, that it was a prestigious act, correct?
A Correct.
Q And, in fact, you never told Rachel Cherwitz you believed otherwise, correct?
A Correct.
Q And you never told Nicole Daedone you believed otherwise, right?
A That's right.
Q And you met -- sorry.
You had a lot of friends, you became friends with a lot of people at OneTaste, correct?
A Correct.
Q You were friends with Michelle Wright, right?
A Yes.
Q You were friends with Dana Gill, correct?
A Correct.
Q You were friends with Jenny -- sorry?
A Slusher.
Q Slusher, correct, Jenny Slusher?
A Yes.

MS. COHEN: And if we could just publish that then to the jury.

(Exhibit published.)

Q Okay. And 2011 was -- you had been --

A I was living at 1080 and working in the kitchen.

Q As a cook, right?

A As a cook, correct.

Q And fair to say going to Disneyland costs money, correct?

A Correct.

Q And you also went out with your friends. You went to baseball games, correct?

A Correct.

MS. COHEN: Once again, just for the witness.

Q Do you recognize this, these photographs?

A I do.

Q And what are they?

A That's of me and Dana at a baseball game.

Q And does the date refresh your recollection about when that would have been?

A That's May 12th, 2011.

Q And was this posted by you or by Dana?

A It looks like it was posted by Dana.

MS. COHEN: Your Honor, at this time the Defense moves Defense Exhibit 20-AW into evidence.

THE COURT: Is it AN or AW?

MS. COHEN: AW.

Did I say AN before? I'm sorry. It looked like N, but it was --

THE COURT: It's a W?

MS. COHEN: It's a W, I believe, yes.

Sorry, Your Honor.

THE COURT: It's okay.

And you're offering it with the text as well?

MS. COHEN: Yes. For context.

MS. BENSING: No objection.

THE COURT: Okay. So Defense Exhibit AW is -- I'm sorry, 20-AW is admitted.

(Defense Exhibit 20-AW received in evidence.)

MS. COHEN: If you could publish that to the jury.

(Exhibit published.)

Q And that's you and Dana?

A Correct.

Q Do you know who the other people are?

A Yeah. That's Chris Kosley, me, Dana Gill and Chris Nisi.

Q And is that someone affiliated with OneTaste as well?

A No. That was a friend of Chris Kosley's.

Q And then you're at some kind of game?

A Yeah. We're at a baseball game.

Q Baseball game. Yeah. Okay.

All right. And we talked -- you talked before about

A I do.
Q Just directing your attention to the top right-hand side of the screen, what dates did that release of liability form cover?
A The weekend of 9/7/12 to 9/9/12.
Q So an approximately two-day period?
A Correct.
Q Was your involvement in OneTaste longer than two days?
A Yes, it was.
Q And what role, if any, did consent play outside of this two-day period of the coaching program?
A Very little.
MS. BONJEAN: Objection to form.
THE COURT: Overruled.
Q You can answer the question.
A Okay.
Yeah, I don't think anybody read these before they signed it. The -- it wasn't really about consent. It was more about pushing your own boundaries.
Q And what role, if anything, did these waiver of liability forms play outside of the coaching program?
A No role.
Q What role, if anything, did consent, the concept of consent play outside of the coaching program?
A I would say that the value system was such that you were

supposed to move towards things that weren't comfortable for you, which is part of what had me question whether or not I was doing the right thing. It's very distorting, that idea. So it's like even if you didn't want to do something, you were supposed to move towards it.

Q And what was that practice called?

A It was called, like, moving towards resistance.

Q You were asked about your education and whether or not you were easily manipulated. On cross-examination.

Do you recall that?

A I do recall.

Q Were you manipulated at OneTaste, Ms. Lifson?

A I absolutely was.

Q In what ways?

A I think that the language and the philosophy and the ideas, like, get into your brain. It's like I thought when I moved in that I could handle it, that I could continue to keep my autonomy and be a part of OneTaste at the same time, sort of, like, take what I liked and leave the rest. But the reality was that the culture was too strong for me to fight. And when certain types of language was being used all of the time and the ideas were being impressed upon me consistently, I began to conform more and more to the ideals of the organization, leaving, I would, say my own ideas behind.

MS. BENSING: I have no further questions.

A Primarily, the head of sales.
Q Do you see Nicole Daedone in the courtroom today?
A I do.
Q Could you identify her by an article of clothing she's wearing or where she's seated?
A She's wearing a beige shawl.

MS. GUPTA: And, Your Honor, we would ask that the record reflect that the witness has identified the defendant Nicole Daedone.

THE COURT: Yes.

BY MS. GUPTA:
Q Do you see Rachel Cherwitz in the courtroom today?
A I do.
Q And can you identify her by an article of clothing she's wearing or where she's seated?
A She's wearing a gray suit jacket.

MS. GUPTA: And, Your Honor, again we would ask that the record reflect that the witness has identified the defendant Rachel Cherwitz.

THE COURT: Yes.

Q Ms. Wright, what was your involvement with OneTaste?
A I was a staff member, an OM trainer, a coach. I was the city lead of Las Vegas for a time. I was the student coordinator of the coaching program.
Q And when, approximately, were you at OneTaste?

A 2010 to '14.
Q How old were you when you joined OneTaste?
A I believe I was 24.
Q Did you provide any labor or services to OneTaste while you were there?
A I did.
Q At a high level, what labor or services did you provide?
A I was a coach. I was an OM trainer. I was a teacher. I was a leader of the Las Vegas branch. I was a -- the director -- sorry, the student director of the coaching program.
Q In addition to the work that you just mentioned, did you perform any sexual services while you were at OneTaste?
A I did.
Q At a high level, what kinds of sexual services?
A Primarily, I was, I guess, what you would refer to as the handler of Reese Jones.
Q What does it mean to be a handler?
A I guess to take care of a particular person.
Q And what do you mean by "take care of"?
A I was assigned to provide specific sexual services to him on a regular basis, as well as make him food, keep him company, like attend particular events with him, live part-time in his home.
Q What kind of sexual services?

MS. BONJEAN: Objection to the form and the foundation.

THE COURT: Sustained.

BY MS. GUPTA:

Q You referred to fear mongering. Can you describe what you meant by that?

A I would say like one of the primary ways in which we were, like, as staff and community members, that we were driven to do the things that were asked of us was through fear tactics.

Q What kind of fear tactics?

A Um, primarily the threat of ostracization, like professionally and socially. Like the threat of being put down. Like quite often publicly in front of a lot of other people, in front of colleagues and friends. Being just like shamed in -- in different ways about, like, you know, our inability to do certain things or show up in a certain way or, you know, hold a certain emotional state.

Q Did Nicole Daedone contribute in any way to the harm that you just described?

MS. BONJEAN: Objection, Your Honor.

THE COURT: Overruled.

A Yes.

Q How?

A In my experience, Nicole was always orchestrating

Q And what was your childhood like?
A Largely positive. I mean both my parents were very loving and supportive. I got great grades. I had lots of friends. I played sports. I loved to play in the woods. I had pets.
I would say, I mean a family not without its challenges, but largely loving, positive.
Q And what were some of the challenges?
A My dad is an active alcoholic, so that was definitely something that has and continues to impact, I would say, my emotional life.
Q Did you attend college?
A Yes.
Q What degree did you obtain?
A A Bachelor of Fine Arts.
Q And what did you do after college?
A Initially, I went to Sedona, Arizona, and I started to formulate like a arts therapy program for a private school there. And I was also studying yoga and on Ayurveda.
Q How did you first learn about OneTaste?
A Through my partner at the time, Madelyne Carl.
Q I'd like to show you what's in evidence as Government's Exhibit 261.
(Exhibit published.)
Q Who is this?

A That's Maddie.
Q And how was Maddie connected to OneTaste?
A Initially, through Aubrey Fuller.
Q I'd like to show you now Government Exhibit 262, which is also in evidence.
(Exhibit published.)
Q Who is this?
A Aubrey Fuller.
Q And what was Aubrey Fuller's connection to OneTaste at the time?
A At the time, she was living at 1080. I know she was taking the -- the pilot coaching program. I don't know if she was working for them yet. I'm not sure.
Q And where were you living at the time that you first became involved in OneTaste?
A In Sedona, Arizona.
Q Were you working at the time?
A Yes.
Q What was your financial situation?
A I mean it wasn't great, it wasn't terrible. But I was like someone fresh out of college who didn't really have a robust career yet.
Q What was the first OneTaste event that you attended?
A A TurnON in San Francisco.
Q And what is a TurnON?

A A TurnON is their primary, like, public-facing event that's used as a funnel to bring people into other courses and classes.
Q And when, approximately, did you attend your first TurnON event?
A Maybe 2008, '9, something like that.
Q What did you do at the event?
A I mostly sat in the back row.
Q Was there a sales pitch?
A Yes.
Q Who conducted the sales pitch?
A I believe it was Rachel Cherwitz.
Q And what was your initial reaction to the TurnON event?
A It was mixed. I mean I think it was like, edgy and exciting and intriguing and, like, I had kind of -- I had never been around a group of people quite like that, so there was a part of me that was intrigued. And I was also very intimidated.
Q After the TurnON event, did you stay involved with OneTaste?
A Not initially, no.
Q So then how did you become involved in OneTaste later?
A A couple years later, Maddie and I moved to the Oakland area and she had started to get involved. I think she had taken a class. And then eventually I went with her and we

like a group. It was like a giant shower where you group showered with many people. Like there was, like, four or five showerheads in one room.

Q Approximately how many people lived there?

A 75, I think.

Q And what was the sleeping arrangement?

A Um, it depended on the room size that you had. But a lot of people shared a room with somebody else in -- in one bed.

Q Did you share a room?

A I did, yeah.

Q Did you share a bed?

A I did.

Q With who?

A I -- the first person I can remember is Louie Buhl, but I can't -- there was probably somebody else.

Q And who, if anyone, decided the room assignments?

A Them. I don't know exactly -- I mean I think Rachael Hemsi, she was primarily the overseer of 1080. I don't -- I don't know who exactly made those decisions, though.

Q Do you know why you didn't share a bed with Maddie if you were in a relationship?

A They were pretty clear they did not want us to have a room together. They thought that, like, kinda from the get-go they were pretty against our relationship and thought that we were a distraction to each other.

Q Who is "they"?
A I'm just saying "they," to refer to OneTaste as an entity. Like --
MS. BONJEAN: I'm going to object.
A That is just my experience.
MS. BONJEAN: I'm going to object to the reference of the organization as the --
THE COURT: Overruled.
BY MS. GUPTA:
Q Can you recall who specifically did not want you to be in a relationship with Maddie?
A I mean I could name every single head staff member. It was my experience that all of the people that ran the business and the residents, which were at the time, essentially, the same thing, like I would regularly receive feedback and comments to that degree.
Q And what was your understanding of why the OneTaste leadership disapproved of your relationship with Maddie?
MS. BONJEAN: Objection, foundation, form.
THE COURT: Sustained as to form.
Q Did you have any understanding of why OneTaste leadership did not approve of your relationship with Maddie?
A The understanding I had was that we were a distraction to each other. Like, they would often use the word --
MS. COHEN: Objection, again, Your Honor, in terms

just CP3 Distance Learning Program. Something like that.
Q And what does the 3 in CP3 indicate?
A That it was the third coaching program.
Q Who were the instructors?
A Nicole, Rachel, Rob, Ken, Yia. Alisha, maybe.
Q And you testified earlier that it cost around $12,000; is that right?
A Yes.
Q Did you have that much money to spare?
A No.
Q So how did you pay for it?
A Through trade. Just through the work that I was doing for them.
Q And why did you participate in the coaching program?
A It was kind of like the ticket into everything. Like, if you were anyone who is anyone in that community, you had done that program.
Q What do you mean it was "the ticket into everything"?
A Um, essentially it was like, at the time, their highest level of training. And if you had that level of training, you had more opportunities.
Q After you completed the coaching program, did you immediately become a coach?
A No, not immediately. I had a certain number of, like, practicum hours I had to complete.

Q How many hours?
A Oh, a hundred, over a hundred, I can't remember.
Q And were you paid for those coaching hours?
A No.
Q Did you eventually become a coach?
A Yes.
Q And what did you coach?
A I mean, our training was to be coaches in the realm of sex and relationship communication, energetics, OM. So anything within that realm.
Q I want to discuss now some of the topics and the courses that you took.
In the OneTaste courses that you took, did Nicole Daedone ever discuss enlightenment and freedom?
A Yeah.
Q What, if anything, does she teach about that?
A She talked a lot about how, like, freedom was the capacity to follow one's desire without -- like with no ambitions or with no -- yeah. So, I think like a lot of it was talked about through the lens of sexuality, through the capacity to -- that enlightenment was or freedom was, like, our ability to -- or anyone's ability to, like, have all the sex they wanted, like have -- you know, like, go after any desire that could have possibly arisen with nothing in the way.

coaching packages or some of the bigger programs, like the coaching program or we had -- eventually we had other, like larger programs.
Q Were there any sales goals?
A Yeah. We had a daily goal every day at some point. Not initially, but eventually.
Q And who set those sales goals?
A I believe it was Nicole. I mean Rachel was usually the person who was transmitting that information to us, but my guess is Nicole was the person setting those things.
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q Did you have other jobs for OneTaste while you were on the sales team?
A Yes.
Q Which jobs?
A I was a staff coach. I was a staff OM trainer. I was a cook in the kitchen at the residence. I ran some of the TurnON events. I did production for a good amount of the events and courses.
Q Were you paid a salary?
A Not initially.
Q And you were eventually paid a salary?
A Once I started running the Vegas branch, I believe, was

A Yes.
Q In what context?
A The same context.
Q Prior to joining OneTaste, had you and your girlfriend Maddie been in a monogamous relationship?
A I would say we were semi-monogamous. We were technically open, but not really practicing.
Q Did that change when you were in OneTaste?
A Dramatically.
Q In what way?
A The culture was such that, like, if you were moving in and, like, participating in this community, you were expected to participate in the social/sexual experiment. So, I think pretty immediately we both started interacting sexually with other people in the community.
Q Were you ever instructed to engage in sexual acts with potential clients or VIPs?
A I would say not VIPs, to my memory. Like, definitely for courses, but yeah, that's my best answer I can give you to that.
Q Sorry, you said not for VIPs.
Were you ever instructed to engage in sexual acts with potential clients?
A Maybe you can phrase that another way. I'm not quite sure how to answer that.

THE COURT: Okay. But you're fine with Mr. D'Agostino just telling them that?

MS. COHEN: Oh, yes. I think either -- yes, I think that's fine.

THE COURT: And, Ms. Bonjean.

MS. BONJEAN: We're fine. I do think it needs to be conveyed.

THE COURT: Somebody is sick and so we have to wait.

MS. COHEN: Yes.

MS. BONJEAN: Yes.

THE COURT: And we will be back tomorrow.

MS. COHEN: Yes.

THE COURT: Okay. I think that's what Mr. D'Agostino will convey, that we are not -- you know, thank you all for coming today, being here. We are not going to be having trial today because a juror is sick. We will see everyone tomorrow.

Okay. We'll do that.

Let me -- actually, Mr. D'Agostino, could you go take care of that now just because I do feel badly that they came here on time and these folks are waiting.

There is a couple of other issues to take up.

So, two motions were filed last night, one by defendants and one by the Government.

Defendants' motion to strike certain evidence and

argument, which was filed at ECF Number 381 is denied. I referenced the topic of jury instructions recently. In addition, the Government mentioned that it would not oppose a jury instruction with respect to defendants' espoused belief. To the extent that any party seeks a jury instruction, that party can propose one in a joint filing.

The other motion filed last night was the Government's motion to admit certain evidence, namely financial evidence. That motion is filed at ECF Number 382. I need to spend more time with that motion. And again, it was filed last night. And I will address that at a later time, recognizing that the Government has anticipated that the evidence it is seeking to elicit from witnesses and through exhibits could come as early as Friday. So, I will revisit that issue now with the benefit of more time today.

Is there anything else right now that we need to take up?

It sounds like the parties have to talk to each other about a few things .

MS. BENSING: Your Honor, I just wanted to flag for the Court that we have passed up a binder to the Court for a witness who I anticipate will testify this week, Robert Kandell.

THE COURT: Yes.

MS. BENSING: There are a large number of exhibits

**MICHELLE WRIGHT**,

previously called as a witness by the Government, and duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

DIRECT EXAMINATION (Continues)

BY MS. GUPTA:

Q Good morning, Ms. Wright.

A Good morning.

Q The other day you testified that you attended OneTaste courses and lived in 1080.

As part of attending OneTaste courses and living in 1080, were you sometimes assigned to complete written work product?

A I'm not sure what you mean.

Q Were you sometimes assigned to, for example, send e-mails to 1080 or to the staff in response to a particular assignment?

A Yes.

MS. GUPTA: I'd like to show the witness only Government Exhibit 1045-R. And if we could just zoom in a bit.

Q Ms. Wright, do you recognize this?

A I do.

Q And just looking at the top from the "from" line, is that your e-mail address?

A It is.
Q What is this?
A It is a list of desires.
Q And who did you send this e-mail to?
A To OT Core, to Nicole Daedone and to the OT Residence.
Q What is OT Core?
A It was the Google group e-mail for the executive staff.
Q And what is OT Residence?
A The e-mail group for the residents of 1080 Folsom.
Q And on what date did you send this e-mail?
A September 28th, 2011.
Q What was the purpose of sending this e-mail, without getting into the substance?
A I believe we were prompted to share a list of our desires with the community.
Q And did you review this exhibit prior to coming to court today?
A I have seen it, yes.
MS. GUPTA: And I'll just ask Ms. Bosler to flip through to the second page of this document.
BY MS. GUPTA:
Q And, Ms. Wright, looking at the bottom from the "from" line, is that the same e-mail that we just saw on page 1?
A Yes.
Q And is there a response there from someone?

A Oh, yes. I do see that. Yes.
Q Who responded?
A It looks like Robert Kandell.
MS. GUPTA: And if we could just go to the third page, please. Apologies. The next page, the fourth page. Thank you.
BY MS. GUPTA:
Q And is this, again, your e-mail with another response?
A Yes.
Q And do you see a redaction there on page 4?
A I do.
Q Is this a fair and accurate depiction of an e-mail you sent in September 2011?
A It is.
MS. GUPTA: And, Your Honor, we would move to admit Government Exhibit 1045-R.
MS. COHEN: One moment, Your Honor.
THE COURT: Sure.
You have this, right?
MS. COHEN: Yes, yes.
THE COURT: All right.
MS. COHEN: Yes, sorry.
THE COURT: No, take your time.
(Pause.)
MS. COHEN: Your Honor, we -- it depends on what

this is being offered for, but if it's not offered for the truth of the matter I think we have no objection.

MS. GUPTA: That's correct, Your Honor, it's not being offered for its truth, just the fact that it was sent.

THE COURT: Okay. So Government Exhibit 1045-R is admitted.

(Government's Exhibit 1045-R was received in evidence.)

MS. GUPTA: Thank you, Your Honor.

Could we please publish?

(Pause.)

MS. GUPTA: I'm sorry. Do the jurors have it on their screen? I just want to make sure.

THE COURT: I think you just need to give it a minute.

MS. GUPTA: Okay. Thank you.

(Exhibit published.)

THE COURT: I think everyone has it is now.

MS. GUPTA: Thank you.

BY MS. GUPTA:

Q So, Ms. Wright, can you read the subject line of this e-mail?

A "Desire."

Q And can you just generally describe what this e-mail contains?

A It's a list of desires that I wrote.
Q And why did you send a list of desires to OT Core, Nicole Daedone and OT Residence?
A I don't have a super clear memory of this, but my best guess, based upon the context, is that, you know, we were prompted as community members to share a list of our desires with each other.
Q And why did you want Nicole Daedone to know your desires?
A I can't really remember specific to this time period, but my -- my guess is that --
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MS. GUPTA:
Q What is your belief as to why you would have sent this to Nicole Daedone?
MS. BONJEAN: I'm going to object to the "would have."
THE COURT: Yes, sustained as to the form of the question.
Q So, directing you just to the middle of this list, you wrote here: "I have a desire to fully get on my orgasm's ride without hesitation or thought."
What did you mean by that?
A In that world, the word orgasm is synonymous with like qi or life force.

So, my best sense of that is to be in alignment with my energy and my desires.
Q And then just two down from that you wrote: "I have a desire to 100 percent support the business by being a total yes to service."
What did you mean by that?
A Essentially, to do whatever was asked of me at that time.
Q And why did you say that?
A I think because to me that meant I was succeeding in that world, in that context.
Q And now directing you to the very bottom of the e-mail. You wrote: "This is a list born out of a struggle between truth and comfort, pleasure and enjoyment, the girl and the woman. Thank you for being a living witness."
What did you mean by that?
A It sounds like I had some conflict about some of the things I was writing. And the girl and the woman, I guess would reference to parts of me that were maturing or that I was working on. Yeah.
Q What was your psychological state at the time that you wrote this?
MS. BONJEAN: Objection.
THE COURT: Overruled.
Q That means you can answer.
A Gotcha. Sorry.

I think probably a mixture of excited and afraid --
Q What -- oh, I'm sorry to interrupt.
What was that?
A I said intimidated. Probably a mixture of excitement, fear and intimidation.
Q What did you fear?
A Not doing it right, I guess, is the best way to describe.
MS. GUPTA: We can take that down. Thank you.
BY MS. GUPTA:
Q Ms. Wright, were you at any point at your time in OneTaste involved in any OneTaste film?
A Yes.
Q What films?
A We made a series of, like, educational sex videos, and I was in one of -- one of those videos.
Q What video were you in?
A I believe it was called Slow Sex or How to Fuck. I honestly don't remember exactly the title.
Q And what were you doing in the video?
A I was having sex.
Q With who?
A Andreas Panosyan.
Q Were you attracted to Andreas?
MS. BONJEAN: Objection.
THE COURT: Overruled.

BY MS. GUPTA:
Q That means you can answer.
A Um, no, not in that way.
Q Who, if anyone, directed you to appear in this film?
A It was a whole group of people running that operation, but I remember Rachel being the person who, like, specifically invited me to come out and do that.
Q Rachel who?
A Cherwitz.
Q And where was the video filmed?
A Los Angeles.
Q Who, if anyone else, from OneTaste was there during the filming of the video?
A The two female directors and producers that we were working with, and I think Nicole was there. I honestly can't totally remember.
Q How did you feel about appearing in this video?
A Mixed, nervous. Like I had to and I didn't really want to.
Q And why did you feel that you had to do it?
A Because that was just the nature of the game in that reality. Like saying no -- I guess the best way to describe it is my training was that everything we were doing was for our own growth spiritually, emotionally, energetically, and that saying no to anything that was asked of us was like

saying no to your own growth and your own power.

So, I think I often felt a sense of, like, if I came up against a boundary or if I came up against a place where I didn't want to do something, I was always questioning myself and never really had a clear sense of: Oh, I should listen to what I feel. Like I was -- I was trained to question that thing in order to push beyond fear. Because fear was considered, like, the enemy or the limitation.

Q Who, if anyone, at OneTaste trained you to think that way?

A I would say all the core staff members, like throughout their teachings in different contexts.

Q And who specifically from the -- from the core staff?

A Rachel, Rob, Yia, Ken, Nicole, Alisha.

Q Do you know what became of the video that you appeared in?

A Honestly, no.

Q Now, you testified the other day that at some point you became Reese Jones's handler.

Who was Reese Jones?

A Reese was Nicole's partner and he was a silent investor in OneTaste.

Q I'd like to show you Government Exhibit 284, which is already in evidence.

Who is depicted here?

Jones?
A I would say at least several days a week, maybe three or four, just depended, like, if he was out of town or home.
Q Did you want to perform these sexual services for Reese Jones?
A No.
Q Why did you?
A Similar to what I described earlier, like the -- the training I had was to say yes no matter what. And that if you had the capacity to say yes and, like, find enjoyment, so to speak, in something, even though you were afraid or you didn't want to or it disgusted you or whatever, that, like, that made you more powerful.
And so, in my mind, one, I was pleasing Nicole, which was, I think, kind of like the ultimate thing you could do. And two, I felt very afraid of the repercussions of saying no.
I mean I would say throughout my entire time working for them, saying no to anything that was asked of me was generally met with, like, shaming and disapproval and kind of like being put in the doghouse socially and professionally. And, you know, this task was considered a VIP task, right. So, it was a big deal to be offered this. It meant that we had risen on the ladder. And saying no to something of that nature was in -- basically, like death, I think, to that -- to

my position in that world.
Q Did you ever express to Nicole Daedone during this time that you did not want to engage in these sexual acts with Reese?
A Not until the very end, I think. For most of the meat of the experience I did not.
Q And why not?
A For the same reasons I just described; the fear of repercussions, the fear of not having her approval; the fear of losing my position there and, like, losing my sense of safety and being cared for and being liked.
Q For approximately you how long did you service Reese Jones during this time?
A I think it was about a year. It's hard to remember exactly.
Q During this time did you ever report to Nicole Daedone about what you were doing with Reese Jones?
A Yes.
Q What would you report?
A I think at times she would just text me and ask me how -- how he was or what he said or if there was anything of note to report about how he was doing.
Q Did you report to Rachel Cherwitz at all during this time about what you were doing with Reese Jones?
A At times, yeah.

of lead generation, so going out to different public places and events to try and meet new people and invite them to our events.
Q Who were you reporting to during this time?
A Various different people. Rachel for sales. Nicole a good amount. Those are -- primary people, there were -- like I definitely was always checking in with other staff members for -- depending upon what the subject matter was.
Q And you said you would report to Rachel for sales and then also Nicole.
What would you report to Nicole regarding?
A Nicole had specific interest in me meeting Tony Hsieh, who was the founder and CEO of Zappos, and their headquarters was in Las Vegas. So, part of why she wanted to open a branch there is because she wanted his endorsement of OM and the organization.
MS. GUPTA: I'd like to show the witness only Government Exhibit 414.
BY MS. GUPTA:
Q Do you recognize this?
A Yes, that's Tony Hsieh.
Q Is this a fair and accurate depiction of Tony Hsieh?
A It is.
MS. GUPTA: Your Honor, we would move to admit Government Exhibit 414.

THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 414 is admitted.
(Government's Exhibit 414 was received in evidence.)
MS. GUPTA: Thank you.
(Exhibit published.)
BY MS. GUPTA:
Q Ms. Wright, who was Tony Hsieh?
A He was the founder and CEO of Zappos.
Q Did Nicole Daedone give you any instructions during this time with respect to Tony Hsieh?
A She did. She said: Go get 'em, like at all costs, whatever it takes. Get him to -- like, basically, her goal was for him to do a private OM training session with her and have a powerful experience of the practice, and then endorse the company publicly.
Q What did you understand "go get 'em" and "do whatever it takes" to mean?
A I mean so much of my training throughout my time at OneTaste was about using my sexuality in order to magnetize things to myself. So, in order to make something happen or get someone to do something or... yeah.
So, it was -- it was clear that if sex was required in order to complete the task, that I was to do that.

MS. BONJEAN: Objection.
A It didn't necessarily have to be that.
THE COURT: Just hold for a moment, please.
THE WITNESS: Sorry.
THE COURT: Basis?
MS. BONJEAN: Foundation.
THE COURT: I am going to overrule that.
You can continue to answer.
A So yeah, I mean at that time my understanding of by any means necessary was, like, use all of your training, which could be sexual.
Q And what was that training?
A You know, as coaches we were trained a lot to be able to read people's energy and body language and, like, get someone to open up and connect and -- you know, manipulate is a strong word, but on some -- in some instances I would say that was applicable.
And, yeah, as I mentioned before, some of that training was about using your sexual magnetism in order to make something happen.
Q What, if anything, did you do in response to Nicole Daedone's instructions?
A I started to, like, meet people who worked for him and find out where he hung out. I went to bars where I knew he would be. I eventually started a conversation with him. I

think I eventually -- we had dinner or drinks or something. He invited me at one point to, like, a Broadway show. We had lunch a few times. I went to his house at one point.
Q Did you engage in any sexual acts with him?
A I did.
Q What sexual acts?
A We, basically, just made out. It wasn't anything super extreme.
Q Did you want to make out with him?
A No.
Q So why did you?
A Because Nicole said by any means necessary and that, to me, felt like -- I could feel that he was attracted to me and that all of the advances I had been making to connect with him to him meant I wanted something sexual with him -- even though that wasn't my motive -- but I felt, like, obligated to follow through with that so that I could seal the deal.
Q What do you mean by sealing the deal?
A Getting what Nicole asked of me, to get him to learn how to OM and endorse the company.
Q And did that end up happening?
A I don't know if he endorsed the company. I believe that he did learn how to OM.
Q During this time did Nicole Daedone request information from you regarding your interactions with Tony Hsieh?

MS. GUPTA: We can take that down.
Q What did you do after you left Las Vegas?
A They sent me to Los Angeles to live in the OM house in Los Angeles.
Q Who sent you there?
A Aubrey was the person who gave me the information that that was going to happen, but she's not the person who made that directive.
Q Who did Aubrey report to?
A Nicole.
Q When, approximately, did you move to LA?
A It was the end of 2013.
Q How many people lived in the OM community there?
A In that house? Like maybe ten of us. Something around there.
Q Did you share a room?
A Yes.
Q Did you share a bed?
A Yes.
Q And what was your role in LA?
A At that point I had been stripped of all my titles and heavily demoted socially and professionally, so I was essentially like a community member who was -- continued to require to support and volunteer and help out with the events and odd jobs and whatever needed doing. I mean, I did a lot

of supporting Aubrey in whatever tasks she had.
Q What is your understanding of why you were stripped of your titles and demoted?
A You know, I had started to, as I described earlier, rebel a little bit. And I was also very clearly, like, not very stable emotionally. And yeah, I think that's as much as I can gather. I mean, there was no incident in which I didn't do the work I was supposed to do.
Q Did you continue to perform labor and services for OneTaste while you were in LA?
A I did.
Q What labor and services?
A I helped run all the TurnON events.
I helped run any courses that they had.
At times I would do the orgasmic meditation demonstrations for the courses.
I would do back of house for the courses.
I would help Aubrey with -- you know, Aubrey was personal assistant for Nicole at the time, so I would at times, like, help Aubrey with whatever tasks she had for Nicole.
Q What were some of those tasks that you helped Aubrey with for Nicole?
A Grocery shopping, like, going and doing stuff in her apartment. Just, like, running errands.

Q What would you do in Nicole's apartment?
A I remember, like, cleaning, putting food away. Just, like, yeah, keeping it nice.
Q Were you paid for any of the work that you performed in LA?
A No.
Q Why did you continue to provide labor and services to OneTaste at this point?
A Because at this point, for nearly five years, like, this was my world, this was my reality, this was my community, this was, like, everything. So, you know, even though I had technically been fired, I -- I didn't know how to leave, to be honest. I think I was so, like, traumatized and also deeply attached to -- I mean, that was my community. That was where -- that was everything I knew at that time. So for me, it was kind of unthinkable to leave. And if you were there, you were expected to help and do things. Like, that was just the agreement, that if you were a part of the community, you were going to be of service to it.
Q Who, if anyone, set those expectations?
A Really everyone of the core staff. I mean, that was something that was set and known from the beginning of my time there. Like, any course that I took or anyone who taught me or coached me or mentored me, like, that was the understanding.

Q Who told you that?
A Pretty much everyone. I mean, I think Aubrey at that time was the primary messenger and I know that she was regularly receiving messages from Rachel and Nicole and maybe other people.
Q And what was your understanding of why you shouldn't be speaking to Maddie?
A She had left the organization, she had turned away from the orgasm and God, and that, like, she was -- you know, it was -- I had seen other people leave and this kind of thing, and seeing them talked about in this kind of way. And I was seeing it again here, in which, like, if someone who was really dedicated for a long time left, it was like the ultimate sin. And, like, essentially, that their shift in mindset was considered to be poisonous and they didn't want everyone else in the community to be poisoned by that mentality. And so, I was essentially a threat to the community and the organization, having communicated with her.
Q Do you have any understanding of why Maddie left?
A Maddie was deeply traumatized by --
MS. COHEN: Objection.
MS. BONJEAN: Object to the --
THE COURT: Yes, sustained.
Q Sorry. The question was just do you have an understanding of why she left.

MS. GUPTA: And, Your Honor, just to clarify, was it sustained just to as that last part of the answer?

THE COURT: I think there was only one part of the answer.

Give me one moment.

(Pause in proceedings.)

THE COURT: Yes, as to the last part of her -- the last sentence of her answer, I will strike.

MS. GUPTA: No further questions.

THE COURT: Ms. Cohen, any cross-examination?

MS. COHEN: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MS. COHEN:

Q Good morning, Ms. Wright.

My name is Celia Cohen and I am an attorney for Rachel Cherwitz.

A Good morning.

Q So I just wanted to go back in time for when you first joined OneTaste or first learned about it.

So when you first learned of it, you were living in Arizona, right?

A Correct.

Q And you were dating Maddie at that time?

A I was.

Q And you were living also at that time, at one point, at

yoga ashram?
A I wasn't living there. I was training; like, studying and working there.
Q You said you were working.
And is that when you were dating Maddie?
A Some of that time it was. I think I met her after I had wrapped most of that up, honestly.
Q But you were living in Arizona and dating her around that time; I guess it's fair to say?
A Yes, I was living in Arizona when we first met. Yes.
Q And Aubrey Fuller, who you just spoke about, she was Maddie's childhood friend, right?
A Yes.
Q And that's how you first learned about OneTaste?
A Yeah.
Q And so you and Maddie went to -- even though you were living in Arizona, you went to check it out in California, right?
A Yeah.
Q And you stayed at 1080 for a night or two?
A Yeah.
Q And that time you were about 20, 21?
A Somewhere around there, yeah.
Q Early twenties?
A Yeah.

Q And you had a college degree, right?
A I did.
Q University of Rhode Island?
A Yeah.
Q And I think you were also a masseuse at this time in Arizona?
A No, not yet.
Q Now, when you got to 1080, you testified that you went to a TurnON event, right?
A Yes.
Q And that's where you first met Rachel Cherwitz?
A Yes.
Q And that was where you would be told you learned more about what OneTaste is, correct?
A Yeah.
Q And it was also -- I mean, it was a sales event as well, right?
A Yeah. Mostly, yeah.
Q And right away, as soon as you got there, you learned about orgasmic meditation or you heard about it, right?
A I heard about it, yeah.
Q And as guests at 1080, you sort of got a sense of what 1080 was about in that it was a communal home, right?
A To a degree, yeah.
Q And did you stay in one of the bedrooms there?

A I think we stayed in Aubrey's room. I don't remember super clearly.
Q And then you went back to Arizona after that, right?
A Yes.
Q And after you went back, you and Maddie actually broke up for a little while, right?
A No.
Q You don't -- do you remember telling the Government that you and Maddie broke up for a little while?
I may be...
A Further in the future, but not at the moment you're referencing.
Q Let me see if I can refresh your recollection.
THE COURT: She hasn't said that her memory is faulty. She's answered your question.
So, do you have another question to ask?
Q Did you at one -- before, do you recall telling the Government that you and Maddie had broken up?
A There was a time period in which we were separated prior to my joining OneTaste, yes.
Q Okay. And at that time, Maddie went to Oakland, correct?
A Yes.
Q And at that time, is that the time you attended the Thai massage school?
A Yes. I went to Esalen to study massage and she went to

Oakland.
Q And it was around that time you also went to Burning Man; does that sound right?
A I would say that was a little after. Like, we were together at that time, so I had already left Esalen and come back, had come to -- joined her in Oakland at that point.
Q That was in 2009?
A When we went to Burning Man?
Q Yes.
A I think.
MS. COHEN: I'm just going to show, just for the witness, what has been marked for identification as 3-AQ.
Oh, it should come up on your screen in a minute.
Q Do you know -- do you recognize this?
Is that from Burning Man?
A It is.
Q Does that refresh your recollection as to the time?
A I can't read that image very well. I think it says 2009.
MS. COHEN: Can you just blow that up a little bit?
A Yeah, it says 2009.
Q Okay. So just -- I just wanted to orient ourselves there.
MS. COHEN: You can take that down.
Q Okay. And while you had been I guess at the Thai massage school, at that point Maddie moved or starting getting

involved with OneTaste, correct?
A Yeah.
Q And so you got back together, you decided that you wanted to get involved in OneTaste as well?
A Eventually, yeah. It was not immediately, but yes.
Q And at that time, you attended an intro -- or around that time, early on, you attended an Intro to OM course?
A I didn't, no. I actually was trained to OM as part of the CP1, like, practice training sessions.
Q So -- and was that early on in 2010, do you think?
A I believe so.
Q Pretty early on though, right, you learned how to OM?
A I believe it was in the beginning of 2010.
Q And early on, you learned that that was a core practice of OneTaste, right?
A I did.
Q That was kind of the whole reason that you would -- one would join OneTaste, right?
A No, I wouldn't say that.
Q You joined OneTaste for community?
A That was a big reason, yeah.
Q But if you didn't like to OM, is it fair that you would not join OneTaste?
A OMing was definitely a core practice of what OneTaste did. You were -- like not -- I wouldn't say that's the only

reason someone would join.
Q Well, I guess, yes, you wouldn't move into 1080, certainly, if you didn't want to OM, correct?
A I'm not going to agree that that was my reason for moving in.
Q Well, I'm not asking if it was your reason. I'm just saying, in general, people in 1080 were required to OM, correct?
A Most people in 1080 had a practice of orgasmic meditation, yes.
Q All right. And you described the OMing as a mindfulness practice, right?
A Yeah, it was.
Q And it was essentially a meditation on sensation without a goal. You also described it as that, right?
A Yeah. That is also one thing that it is.
Q And when you got -- when you got back with Maddie, Maddie at that point wanted an open relationship, correct?
A She did.
Q She wanted to explore other people, right?
A Yes.
Q And in fact -- and she moved into 1080 first, right?
A She did.
Q And in fact, you know, if you didn't want to explore other people, it might not be a good place to move into, 1080,

(Continuing.)

CROSS-EXAMINATION

BY MS. COHEN:

Q And you lived at this other place with OM community members rent free; right?

A I believe so.

Q Now, at that time, you also participated in a lot of events at 1080; right?

A Yes.

Q You were there all the time?

A I was there quite often.

Q And you had fun, right?

A Sure. Some of it was fun, yeah.

Q I just want to show you.

MS. COHEN: Just for the witness.

Okay. We can come back to it on the break.

BY MS. COHEN:

Q Okay. So as I already asked you, you knew what 1080 was like before you moved in; right?

A I mean, as much as one can know about something before fully experiencing it. I had an idea of what it was like.

Q And you knew there were several floors within it; correct?

A Yeah.

Q And you knew that people shared rooms; right?

A Yeah.
Q And you knew that people were assigned to rooms; right?
A I didn't know that, no.
Q You knew that once Maddie was living there; right?
A I guess so.
Q And, in fact, you had stayed there before; right?
A Many years prior when we visited, I had stayed there one night.
Q And you knew that if you wanted privacy, it wasn't a good place to move into; correct?
A I -- no, I don't necessarily -- I can't can agree to that necessarily.
Q So you stayed there for a night, you saw that people shared bathrooms; correct?
A I knew that the bathrooms were public.
Q And that you went to visit Maddie there; right?
A Yeah.
Q And you saw where she was living; correct?
A Uh-hum.
Q And you -- let me show you a photo. You saw a similar photo, but I want to show you a different one.
MS. COHEN: DX3-DC, just for the witness.
THE COURT: I'm sorry, 3-DC?
MS. COHEN: Yes.
THE COURT: Okay. So it's not on your list, right?

requirements of 1080?
A I don't, no.
Q But you recognize -- I will ask you, but do you recognize those generally as to the rules and requirements of 1080?
A Yeah.
Q And do you remember that there was a difference between the second and the third floor of 1080?
A I do, yeah.
Q And you moved into the third floor; right?
A Not need immediately, no.
Q The second floor was for -- really less intense; correct?
A I guess that's one way to put it.
Q I mean, if you just -- and you're not fully immersed on the second floor? Is that a fair description?
A The second floor was for -- more for members of the community. It wasn't necessarily -- like the third floor was more for staff members and people who were like part of some of the training, deeper training programs.
The second floor was more like people who didn't necessarily work for the business. Sometimes they had random people off the street renting a room, like it was mixed.
Q Okay. And one of the purposes of the second floor was to support people who were curious about orgasmic meditation; correct?
A I don't know specifically.

Q Well, as you just described, I mean, it's not someone totally immersed in all of the OneTaste programs; right?
A Yeah.
Q And you wouldn't have as many requirements on the second floor as you would on the third; right?
A I guess that's true.
Q For someone who moves into the third floor, that's someone who's more committed to the practice?
A Agreed.
Q Okay. And by committing to the practice on the third floor, you're committing to daily OMs; correct?
A Yeah.
Q And you're committed to taking some of the courses; right?
A Yep.
Q And that was -- do you remember being referred to as the immersion program?
A I'm not sure what you're referencing to.
Q The third floor.
A No, I don't remember that.
Q All right. But you remember that, again, you said you had to OM. You also had to do daily yoga or some kind of program for exercise. Do you remember that, movement?
A Yeah, I remembered the digestive practices were encouraged.

Q And one of the philosophies of OneTaste, especially for those being more immersed into the program, was to push your boundaries; right?
A Yeah.
Q And to explore; correct?
A Yeah.
Q And that's what you signed up for; right?
A Sure. In a way, yeah.
Q Okay. So going back to your first job at OneTaste. You were living in a communal home, so you had to do some work around the house in general; right? I mean, people had to keep their places clean; correct?
A Yeah, it was expected that we would contribute to the community if we lived there.
Q People had different odd jobs, trash, et cetera; right?
A Not really as you're suggesting, but yeah, everyone was expected to contribute.
Q They also did have someone come and help clean, but you had to generally keep the place clean, those who lived there; right?
A You were expected to keep your room clean, is my memory.
Q And another requirement, for example, one night a month, each resident was assigned to wash dishes. Does that refresh your recollection?
A Yeah, I guess, yeah.

Q And there were other rules in the house designed to keep it a safe environment; right?
A I'm not sure what you mean by that.
Q Well, there was no alcohol; correct?
A That's true.
Q No smoking; right?
A A lot of people smoked.
Q Inside the apartment?
A No.
Q I meant inside, right?
It was also a drug-free environment, 1080; correct?
A That's true.
Q And you had to provide notice if guests were going to come; correct?
A Yes.
Q But you could have guests; right?
A I guess. I don't have a large memory of that, to be honest.
Q In fact, you were a guest; right?
A Sure. At one point, I was, yeah.
Q And you chose -- you said at first you moved into the second floor and then you chose to be in the more intense third floor; correct?
A Yeah. Eventually, I moved rooms, yeah. Yeah.
Q Okay. And let me show you what has been marked for

identification as DX 3-Z. I believe you have this?
Do you recognize this photo.
A I do.
Q And what's this photo?
A That is a picture of me and a bunch the women who lived at 1080 that were friends of mine. We all were dressed up.
Q Is this a fair and accurate depiction of a photo of you and these other women at the time when you were at 1080?
A Yes.
MS. COHEN: Your Honor, at this point, the defense offered Defense Exhibit 3-Z.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Okay. Defense Exhibit 3-Z is admitted.
(Defense Exhibit 3-Z was received in evidence.)
MS. COHEN: And I'm showing you another photo -- I'm sorry. I forgot to publish that to the jury.
Q Let me ask you a couple of questions.
So is that you all the way on the right?
A That is.
Q And who are you next to?
A Sasha Hood.
Q And who is next to that?
A Maddie Carl.
Q Next to that?

A Aubrey Fuller.
Q Next to Aubrey in the middle?
A Kim Howerton.
Q Who is next to her?
A Lianna Lifson, Dana Gill, Maya Gilbert. I don't know who that other person is.
Q And all of these people lived at 1080 with you?
A Everyone except that person on the far left.
MS. COHEN: And let me show you just for the witness Defense Exhibit 3-D, as in David, B, as in boy, DB. Sorry. D, as in David, B, as in boy.
THE COURT: I don't have that one.
Q Do you recognize this photo?
A I do.
Q And where is that photo taken?
A That is the bench outside of 1080.
Q Who are the individuals or do you recognize the individuals?
A Most of them.
Q Do you recognize yourself?
A I do.
Q Is that a fair and accurate depiction of the photo outside 1080?
A Yeah.
MS. COHEN: Your Honor, at this time, defense offers

3-D, as in David, B, as in boy.

THE COURT: Any objection?

MS. GUPTA: No objection.

THE COURT: Defense Exhibit 3-DB is admitted.

(Defense Exhibit 3-DB was received in evidence.)

MS. COHEN: Publish that.

Q And then, Ms. Wright, can you describe, starting on the right with the man in shorts?

A I don't know who that is. Then it's me, Maddie, Dana, Aubrey and James. I can't remember James' last name.

Q Is this around the early days at 1080?

A Yeah.

Q All right. And at 1080, you also had free WiFi; right?

A I have no idea.

Q There was WiFi in the building; correct?

A Yeah, I guess. Yeah.

Q Okay. You used computers in the building; correct?

A I -- yeah. Yeah.

Q And if you missed a meal, they would have a plate reserved for you if you wanted; right?

A If you wanted, yeah.

Q They had quiet hours in the house; right?

A Yeah.

Q And there was a common area known as a -- the chill room on the second floor; right?

A Yes.
Q They had -- and there were no children, of course, permitted; right?
A No.
Q And, you know, when you were living there, as we said, you had a lot of fun. It was kind of like being in college at the beginning; right?
A Yeah, there were a lot of fun things about living there. Sure.
Q In fact, you had indicated previously that, you know, it was sort of like the best party in town. Do you remember telling the Government that?
A I mean, that was a phrase that was often used at OneTaste, so, yeah.
Q You were living with like-minded people in the community; correct?
A Yeah.
Q And you were given your own key to your room for 1080, right?
Oh, sorry, to the outside, you had your own key?
A Not to my room. To the outside front door, yeah.
Q And you could use that whenever you wanted to come and go; correct?
A This is true.
Q And you actually did have a friend. You had a friend

right?
A I did some audio editing as one of my first jobs.
Q And you would do setting up and breakdown for OneTaste event courses; right?
A I would.
Q And you were excited for that work at the time; right?
A I was. Yeah, I liked it.
Q And when you would work -- this is called back of house, right? When you worked at an event, you would not have to pay for the event, but you could hear what was going on; correct?
A I'm not sure what the question is.
Q Did you do back of house?
A I did do back of house.
Q What is back of house?
A Back of house referred to doing like production support for a course or an event. So whatever was physically, you know, required in order to put an event on.
Q And while you were helping doing this back of house, you were able to attend the event for free; correct?
A I mean, that's not how I would describe it, but I suppose that's true. I wasn't paying to work for them.
Q Well, my question is, you got to hear what was going on at whatever event was happening; correct?
A Yeah, that's true.
Q So if there was a course being given where people were

paying for it and you were working back of house, you could listen to the course; correct?
A I mean, the reality is anything that I was back of house for was something I had already done myself. So it's not like I was gaining something for free.
They were -- you weren't invited to do back of house unless you had already taken a course and had that experience and knew how to support it.
Q Okay. Towards the beginning of your time there, though, you were back of house at times; correct?
A At times, yeah.
Q Right. And you may be at courses, but there are different people speaking all of the time; correct?
A Yeah, there were different teachers that taught different events or led different classes.
Q So every word that was spoken was not taught at every class; right?
A No.
Q Now, at this time that you were living at 1080, you could have also gotten a job outside of 1080; correct?
A I could have. Sure. I guess. I mean, I don't think I really had time to.
Q From the moment you worked in there, you went to 1080, you started doing this work; correct?
A What do you mean by this work?

Q You started doing work trade?
A I did, yeah.
Q Okay. And no one forced you to do work trade; correct?
A No.
Q No one forced you to move into 1080; correct?
A No.
Q You wanted to be there; correct?
A I did.
Q And you wanted to do that work; right?
A I did.
Q And, in fact, at one time you did want to get some more outside money and started doing massages out of 1080; correct?
A I did. They allowed me to use one of their office spaces to do massage, yeah.
Q Right. You used the space at 1080 and you didn't pay for that space; correct?
A I don't believe they charged me to use the space, no.
Q And you actually kept time of your -- you kept track of your time working as a masseuse there; correct?
A I did. Although, all of the money I made went to pay for my courses and my room and board. So I didn't get paychecks.
Q Right. Because you wanted to take the courses; correct?
A Yes.
Q And you wanted to live at 1080; right?
A I said that, yeah.

Q But these are thoughts and feelings that no one would know beside you; correct?
A I don't know.
Q All right. And you also wrote that manipulation was your main form of getting what you wanted at the time when you first got there; right?
MS. GUPTA: Objection. Hearsay.
THE COURT: Sustained.
Q Do you remember writing that, manipulation?
A I don't remember writing any of this.
Q And do you remember, though -- does this accurately reflect your feelings on OMing, that you felt that OMing changed your life?
A I did feel that at that time, yeah.
Q And in this story, you wanted to open up how you were feeling; right?
A I'm not sure what you mean by that.
Q Well, you talked about how scary it was, opening up sex to the world. Do you remember that?
A No. I mean, I didn't get to read the entire document, so I'm not sure what you were referencing to.
THE COURT: Maybe you can go back to this document.
MS. COHEN: Sure.
THE COURT: I'm happy to have you do something else and come back to it.

MS. COHEN: Let's do that.
Q In fact, you also -- you spread the world about -- the spread word about OneTaste yourself, around; correct?
A I did.
Q Because you believed in the practice; right?
A I did.
Q And, in fact, at one point in -- and I can refresh your recollection, but do you remember in May of 2011 you sent an e-mail out to the yoga community and Craig's List about the practice of OM? Do you remember that?
A No memory of that.
Q Let me show you DX 3-BN.
THE COURT: Sorry. You faded out when you turned around.
MS. COHEN: Sorry, 3. B, as in boy, N, as in Nancy .
THE COURT: Thank you.
Q And just at the top --
THE COURT: There is no way anyone is going to be able to read that off the screen. It's just too small.
THE WITNESS: Agreed. Thank you.
MS. COHEN: You're welcome.
THE COURT: It's not even easy in hard copy, but we will work with that.
Q Do you recognize your e-mail address at the top?

A Yes.
Q And I know there is a lot of e-mail addresses listed here. But if you look at the top, does it refresh your recollection that this was sent out to the yoga center and Craig's List?
A I do see where it says an e-mail address for a yoga center. I don't know what you mean by Craig's List.
Q Just looking at some of the e-mail addresses, I think we can agree that there is a page and a half of e-mail addresses.
A I'm not sure what that has to do with Craig's List, but there are a lot of e-mails here, yeah.
Q Well, if you go to the top, the very top --
MS. COHEN: Just zoom in.
Q Do you see that it was sent -- you said to the yoga arts. Do you see a Craig's List address there as well?
A There is an e-mail address that says numbers at Craig's List dot org, so that was someone's e-mail address, I'm assuming.
Q Again, it goes all the way down to the next page. This was sent to people beyond OneTaste; correct?
A Yeah. It was. Yeah.
Q Okay. And you wanted to share in this e-mail how the movement had -- of OneTaste had impacted your life; right?
A Yeah.

Q Okay. Now, you described, when you first started testifying --

MS. COHEN: You can take that down.

Q When you first started testifying yesterday, you described Rachel as a friend, right, Rachel Cherwitz?
A I did, yes.
Q And a mentor?
A Yes.
Q And you joined the sales team about a one and a half to two years in; is that right?
A I think so.
Q Okay. And no one forced you to join the sales team; right?
A No.
Q And, you know, you -- you talked about Rachel being the one who taught you how to do sales; right?
A She did.
Q And she was -- she was good at sales; right?
A She was.
Q And she could be a tough boss; right?
A Yeah.
Q But you learned through example; right? Or as an example?
A What's the question?
Q You learned sales tactics through Rachel; correct?

**MICHELLE WRIGHT**,

previously called as a witness by the Government and duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

CROSS-EXAMINATION (Continues)

BY MS. COHEN:

Q Ms. Wright, I want to go back to the story that we were talking about, the long one before the break.

I've put up in front of you two documents, just to refresh your recollection.

Sorry, let me -- you said that you didn't remember the timing of this story. You testified about that, right?

A Uh-huh.

Q And you didn't remember who or what it was for, right?

A I did not, no.

Q Okay. So just --

THE COURT: What exhibit are you talking about?

MS. COHEN: Sorry. We just handed up to Your Honor, I was just about to say Defense Exhibit 3-DR – D as in dog, R as in Robert – and 3-E, as in Edward, A, as in apple.

THE COURT: Thank you.

MS. COHEN: And the witness has a copy of both.

Q Does this refresh your recollection that you sent this story to Nicole Daedone and Robert Kandell?

A I can see that I did. I don't remember.

Q Okay. And -- and as a result of -- of OMing, you also felt that sex and intimacy with men was something you also openly craved at the time, right?

A I mean I had been with men at lots of different points in my life, so I don't think OM was something that showed me that. I -- that is an experience I had at OneTaste.

Q And you felt that opening up your sex not just to men, but to the world, enabled you to gain the world, right, that's how you felt?

MS. GUPTA: Objection, hearsay.

THE COURT: You're asking her how she felt, you're not asking her about any document at this point, correct?

MS. COHEN: Correct.

THE COURT: Yes. Overruled.

A I'm not sure what the question is.

Q Did you feel like you -- by opening up your sex to the world, you gained the world; is that something you felt at the time?

A I -- are you referencing to a particular line in this document?

BY MS. COHEN:

Q I'm just asking you the question: Is that how you felt?

A Do you know what you mean when you say opening up your sex?

I mean does that mean something particular to you?

Q What does it mean to you?
A I guess it means to feel empowered in one's sexuality.
Q And that was actually an important philosophy of OneTaste, correct?
A It was, yeah.
Q And that -- because of that, you felt you gained the world, correct?
A I don't know.
Q Well, you felt that at the time you wrote this document, right?
A Is there a place in here that you're trying to get me to look at that says those words? Because I don't know that that's how I would describe it.
Q Okay. Well, take a look at 10263, the last paragraph of this document.
A It does say those words.
Q And you wrote those words, correct?
A I guess I did.
Q And because of OM, some of the most -- you now felt that you had sensitivity, correct?
Just asking you if you remember whether you felt you had sensitivity because of OM?
A I think I'm unclear. Like, are you asking me to reference this document? Are you asking me just what my general feeling about my experience of OM is?

A It sounds like my voice, yes.
Q And you also -- does it refresh your recollection that you said that we operate by the rules of play rather than the rules of production?
Do you remember that?
A I don't remember any of it. But yes, it says that in the recording.
Q You said that in the recording, correct?
A It is a recording of me talking.
Q And you indicated that -- does it refresh your recollection that you said every person there is there of their own volition because they want to play, right?
A It says that, yeah.
Q Again, you said that --
A Yeah.
Q -- correct?
A Yep, I did say that.
Q Okay. Now, you first signed up -- you signed up for CP3 was the coaching class you took, correct?
A It is.
Q And that was back in November of 2010. Does that sound right?
A That sounds right.
Q And that was a -- about a 10-month program, coaching program, correct?

A I thought it was a year, but it could have been ten months.
Q Yeah, okay, a year, that makes sense.
And that was when you first moved into 1080, correct?
A Yeah.
Q And you didn't have any money at that time, correct?
A No.
Q And you, in fact, signed a --
MS. COHEN: Can we, just for the witness, show --
Q And I'm going to just show you what's been marked for identification as Defense Exhibit 3B, as in boy, H, as in happy.
I can also walk a copy up for the witness.
THE WITNESS: Thank you.
BY MS. COHEN:
Q And on that -- when you -- when you signed up for this class, you received a payment plan.
Do you remember that?
A Yes.
Q And you knew exactly how much the class was going to cost, correct?
A I did.
Q And you signed up for it anyway, correct?
A I did.

Q And OneTaste allowed a payment plan, right?
A They did.
Q And to pay for the course, you were doing work trade, correct?
A Correct.
Q Now, we --
MS. COHEN: You can take that down.
Q -- we also -- you also testified on or took a look at a document that's already in evidence, Government Exhibit 1045-R, as in Ralph.
And this was --
MS. COHEN: This can go to the jury, it's in evidence.
(Exhibit published.)
BY MS. COHEN:
Q And this was a list of your desires, right?
A That's what it looks like, yeah.
Q And you wrote this in September 2011, correct?
A That's what it says.
Q And you sent that to Nicole Daedone, right?
A I did.
Q And you sent it to the 1080 residence, right?
A Uh-hum.
Q And at the time, Rachel Cherwitz was also living at 1080, is that right?

A She was.
Q And so both would have seen this, presumably would have seen this?
Well, you sent it to Nicole and you sent it to everyone at 1080, correct?
A Presumably, she could have seen it.
Q And in this e-mail you talked about the things that you wanted to accomplish, right?
A That's what it looks like.
Q You wanted to teach courses, right?
A Yeah, it says that.
Q You wanted to train others with OM, right?
A Uh-hum.
Q You wanted to help the business flourish?
A Yep.
Q You wanted to own your own branch of the business, right?
A I guess.
Q And you wanted to help plan and design new ways to reach people, right?
A That's what it says.
Q And that was how you felt at the time, correct?
A It sounds like it, yeah.
Q Okay. Now, while you were at OneTaste, you -- while you were living at 1080, we already talked about that you -- you had a lot of fun, right, at the beginning?

A There was fun sprinkled throughout the whole thing, yeah.
Q You had fun. You made -- you made deep friendships, correct?
A I did, yeah.
Q You went out with people from 1080 from time to time to restaurants, right?
A I don't have a lot of memory of that, honestly. We went to the cafe nextdoor sometimes.
Q Well, let's see. Let me just see if I can refresh your recollection.
MS. COHEN: Can we show the witness DX 3-AR?
BY MS. COHEN:
Q Can you see this on your screen?
A Yeah.
Q Do you recognize it?
A Yeah.
Q And what is it?
A It's a picture of myself and Maddie and Dana and Drea and we are -- I believe that's the cafe nextdoor to 1080.
Q And this was from March of 2011?
A That's what it says.
Q Is this something that was posted?
A It looks like a Facebook post made by Aubrey.
MS. COHEN: Your Honor, at this time the defense moves Defense Exhibit 3-AR into evidence.

THE COURT: With or without text?

MS. COHEN: There's nothing substantive, so we'd offer with.

THE COURT: Okay. Is there any objection?

MS. GUPTA: No objection.

THE COURT: Okay. So it's Defense Exhibit -- sorry it's not stamped there, is it?

MS. COHEN: Yes, it is.

THE COURT: Okay. 3-AR is admitted.

(Defense Exhibit 3-AR was received in evidence.)

MS. COHEN: Yes. You can publish that to the jury.

(Exhibit published.)

BY MS. COHEN:

Q And are you -- it's hard to tell in the picture which one is you?

A The one on the right.

Q And the one all the way on the right, okay.

And is that Maddie next to you?

A Yeah.

Q And then who is she, the woman who's kissing her?

A That's Dana.

Q Dana.

And who is the other person?

A Drea.

Q Drea. And you --

Q And that prior to OM, you were throwing all your self care out the window, right?
A That's what it says.
Q You were throwing your social life and skills to the wind.
That's also how you felt?
A That's what it says.
Q But that changed when you found OneTaste and orgasmic meditation, correct?
A If I'm not referencing to this document, I could say that probably a lot of what I'm talking about is about the year prior in which I was with Maddie, before coming to OneTaste, and that I did struggle with a lot of self-care during that time period. I don't think I'm referencing to my entire life.
Q No, not -- that's not what I'm asking.
I'm just saying, in November 2012, at the time, you wrote about the change that happened when you found OneTaste and orgasmic meditation, right?
A Yeah. Yeah, I did. Yeah.
Q And you stayed at OneTaste for -- for years, right?
A A little more than that, yeah.
Q Four to five years, yeah.
And again, you believed in the practice, correct?
A Yeah. Totally.
Q And it made you start to trust other people and your own

body, correct?
A I would say it definitely changed my relationship with my body, yeah.
Q And, in fact, what OM and OneTaste made you realize, that you had experienced what it was like to feel whole and confident without being attached to another person.
Do you remember saying that?
A It sounds familiar.
Q Well, if you take a look at the next page under "what I realized."
THE COURT: Maybe don't read from it, please.
MS. COHEN: Sorry, Your Honor. I didn't mean to.
Halfway through. Yeah.
A What section?
Q Do you see the bold there that's just highlighted?
A Yeah.
Q And the last sentence on the -- in the first paragraph.
A Yeah, that is what it says.
Q And does it refresh your recollection that you now learned what it was like, to experience what it was like to feel whole and confident without being attached to someone else?
Do you remember feeling that way?
A I remember feeling incredibly attached during that time period.

Q But these were your words that you wrote in November 2012, correct?
A They are my words, yeah.
Q And, in fact, you also felt that you had tasted freedom, right?
A I did say that.
THE COURT: Ms. Cohen, just approximately, how much longer do you have?
MS. COHEN: I have probably about another 30 minutes, Your Honor.
THE COURT: Okay. You can keep going.
MS. COHEN: Maybe a little bit longer, but.
THE COURT: Go ahead.
MS. COHEN: Okay.
Q And you posted often on the -- or you posted sometimes on the OM Hub.
Do you remember that?
A Vaguely, yeah.
Q Okay. And you posted about OM being power.
Do you remember that?
A I don't remember that specific post.
Q This document here, I'll hand up a copy. This is Defense Exhibit 3-CA. This is very small. We'll try it, but I think it's better on the screen. I will have her blow it up, but I'll just give a copy just in case.

A Okay. Thank you.
Q I will just refer to specific things and I will zoom in.
A Okay.
MS. COHEN: Okay. So if you could go to the second page and that big -- no, back up. Sorry. The second page of the document.
Can you blow up -- no, stay where you are.
Oh, it's on page 2. I'm sorry, you're right. Page 2. Sorry.
Yeah, the last -- yeah, you got it.
Q Actually, I'm sorry, I should have said, the question, that orgasm was power.
Do you remember writing about orgasm being power?
A It says, "Orgasm is the power that runs" --
THE COURT: Sorry, I ask you not to read from it.
Q Yeah, just what -- does this refresh your recollection that orgasm -- that you wrote that orgasm was power?
A That's not what it says.
Q Or that orgasm was power that ran through your body and awakened you to the truth.
Do you remember writing that?
A Yeah, it says that.
Q And you posted this, correct?
A It says my name. I don't remember it, but yeah.
Q And you also posted about how your OM practice was the

thing that grounded you into the present moment and your body.
Do you remember saying that?
A I see that that's what I wrote.
Q And that OM made you feel deeply connected to the people you love.
Do you remember writing that?
A I don't remember writing any of this, but I see that that's what it says.
Q And you talked -- in terms of OM, OM was something throughout your time that was very important to you, correct?
A Throughout my time at OneTaste?
Q Yes.
A I would say for a good portion of my time there it was very important. There probably came a point at which it was not.
Q And part of that, your practice at OneTaste, was to OM every single day, correct?
A That was the encouragement, yeah.
Q And, in fact, you posted about OMing, correct?
We can go through more.
Right? You posted about that?
A I did, yeah.
Q Yeah.
And we also looked at some writings that you made about how OM changed you, correct?

A We have, yeah.
Q And you didn't use OM as a sexual practice, correct?
A We were instructed not to view it in that way, but that does not mean that it was not sexual.
Q You were there for five years, almost, right?
A That's true.
Q And you OMed on a daily basis, correct?
A Sometimes many times a day, yeah.
Q And you wrote about your feelings at the time and how OM changed who you were, correct?
A It did, yeah.
Q It opened you up, right?
A That's kind of a vague statement. But yeah, it did a lot of things for me, it had a lot of positive effects.
Q It made you more honest, you said?
A I don't -- I don't know if that's how I would describe it today.
Q Well, we looked at some of your prior statements.
It made you feel more compassion, correct?
A I don't know if that's how I would describe it today.
Q I'm not asking you how you would describe it today. I'm asking you how you felt at the time, when you were at OneTaste, about OM.
A I think I felt a wide range of things about it, not all of which I wrote about in Facebook posts and letters to

Q And you're telling them about how you feel now about OneTaste, right?
A I have.
Q And at the time you wrote these stories and e-mails and posts, that was when you were at OneTaste, correct?
A The things you've shown me in the last little while, yeah.
Q And we were just -- I was just saying that it was important for you to be in the inner circle at OneTaste, right?
A I think that was part of what I wanted. And as I said before, I think there were a lot of other things at play that are not visible here.
Q I'm just asking --
A Yes-and.
Q You wanted to at the time, correct?
Is that a yes?
A It's a "yes-and." I think it's a lot more complex than just "yes."
Q You didn't have to move into 1080, correct?
A Nobody held a gun to my head.
Q You didn't have to go on the third floor, correct?
A I didn't have to, no.
Q And people on the third floor were more all-in at OneTaste, correct, as opposed to the second floor?

A That's one way of describing it, yeah.
Q In fact, you could have gotten a job outside of OneTaste at that time, right?
A Ostensively, I didn't really have the time, to be honest. Once I was participating fully in the community, it didn't really afford me the space to go do something like that.
Q When you got to OneTaste, you could have gone out and gotten a job, correct?
A Sure. I could have done anything I wanted.
Q Yeah. You were a college graduate.
You are a college graduate, right?
A I am.
Q You finished -- you spent money on classes to learn how to do massage, correct?
A At that time I had taken one massage course.
Q You ended up doing some massage out of OneTaste, right?
A I did. That was the way that I made money independent of what I was doing for OneTaste.
Q Yeah.
But you could have done that; you could have gone and decided to be a masseuse, correct?
A No. I didn't have a license to practice massage in California, so no.
Q But you could have tried to get that license, right?
A I didn't have the money to do that, honestly. And I was

So, is there another question you want to ask?

MS. COHEN: Okay, well...

THE COURT: Ask your next question.

MS. COHEN: Okay.

Q You told the Government that you were hurt by the fact that Ms. Daedone did not ask you to be a handler for Reese?

A No, I didn't.

Q So let me -- so, okay.

You didn't tell the Government that?

A No, I did not.

MS. COHEN: Let me just show -- can I show the witness and refresh her recollection?

THE COURT: Yes.

Well, she hasn't said there's any faulted recollection. So you can show her something if there's another purpose, but otherwise just move on.

THE WITNESS: It also doesn't say that in this document.

Q You don't remember telling the Government that you felt quite insulted and left out when --

A No.

I just read this and it doesn't say that.

Q So at Mr. Jones' house, at Reese Jones' house, you had your own room there, right?

A Maddie and I had had a room there, yeah.

Q And one of the reasons that you were happy to go there was because you finally had privacy with Maddie, right?

A I wasn't happy to go there. Although, it was a perk to finally have a little bit of privacy, yes.

Q In fact, you told the Government that it was appealing to stay at Reese's because you wanted alone time with Maddie.

Do you remember telling them that?

A I don't remember telling them that it was appealing. I do remember expressing that it was a perk that I got to have some personal space and some time alone with my partner, which was not something that I generally had.

MS. COHEN: Okay. Just for the witness, can we show DX -- oh sorry, not -- wrong one.

THE WITNESS: Can I just comment that this is incorrect? Like, whoever wrote this note, that, I didn't say that.

MS. COHEN: Okay. So you're --

THE WITNESS: "Wright felt quiet insulted and left out," I --

THE COURT: I ask you to not read from the document that's not in evidence.

Please let me finish speaking. Let me finish speaking, Ms. Cohen, and the witness as well.

Do not read from the document unless you're asked to read from it, please.

Q And you never told Rachel Cherwitz about your feelings about staying at Reese's, correct?
A I don't know, honestly.
Q And you spent about six months doing this with Reese, being his handler?
A I think it was longer, but I don't really have a specific memory of dates.
Q And as you said, during the time, you could have -- you could have gone back to your parents at that time, correct?
A That did not feel like an option anywhere inside my reality at that time, no.
Q You wanted to stay at OneTaste at that time, right?
A I think part of me wanted to stay and part of me wanted to run. I think I was full of a lot of confusion and fear. And yes, part of me wanted to be there.
Q And nobody told you you couldn't leave, correct?
A No.
Q Okay. And then you went to Vegas in August of 2012, right?
A That sounds about right.
Q And fair to say that was a promotion, correct?
A That's one way to describe it. It didn't feel like that.
Q I mean, you were running the Vegas -- opening and running the Vegas center, right?
A What I'll say is that it was presented as a promotion and

(Continuing)

CROSS-EXAMINATION

BY MS. COHEN:

Q And you lived there, you said, for eight months.

And you -- and after you left Vegas, you kept in contact with people from OneTaste; correct?

A After I left Vegas?

Q No, after you left OneTaste.

A Some of them, not everyone.

Q You went back in 2015 to -- and you had a picture with the LA team. Do you remember that?

A Went back where?

Q Well, let me see if you think this is an accurate picture, DX-3AH.

THE COURT: Sorry. You faded out again.

MS. COHEN: I'm sorry. A-H.

THE COURT: Thank you.

Q While we're -- do you recognize this photo?

A Yeah, I know all the people in the picture. I don't actually remember that moment, but yeah.

Q Okay. Do you know who then is in this picture?

A It's me, Aubrey, Rochelle, Kim, Maddie, Drea, and Sasha.

Q And this picture was posted sometime in 2015?

A Yeah. It says January 2015.

Q And the person next to you, you said was --

A Aubrey.
Q Aubrey.
MS. COHEN: Your Honor, at this time, the Defense moves Defense Exhibit 3-AH into evidence.
THE COURT: Any objection?
MS. GUPTA: No objection.
THE COURT: Defendant's Exhibit 3-AH is admitted.
(Defense Exhibit 3-AH was received in evidence.)
Q Again, this is after you left OneTaste; right?
A January 2015. Yeah, it is.
Q Okay. And you also hung out with Robert Kandell after you left OneTaste; right?
A I worked for him for a time.
Q And you lived near him for a time?
A I did, yeah.
Q And you lived with other OneTaste people after you left; right?
A I did, yeah.
Q You lived with --
A I will add that they were friends and community members. They weren't like staff.
Q They were people that used to work at OneTaste; right?
A Not all of them, no.
Q You went traveling with Ayries and Ruwan. Do you remember that?

A I did not go traveling with them.
Q Or you went hiking?
A I did take a hike with them.
Q You went to dinner with Rob and Ayries Blanck. Do you remember that, for Rob's birthday?
A I did. I don't remember that specifically, but that sounds familiar.
Q You did have dinner with them?
A Sounds familiar.
Q And you still talked to Rob Kandell; right?
A Very intermittently.
Q You still talk to Dana? She was a friend of yours?
A I've had very, very little communication with Dana over the last 10 years.
Q Still talk to Ayries?
A I haven't had any contact with Ayries.
Q Lianna, are you friends still?
A Lianna and I are close friends, yeah.
Q Just before you went to Vegas, you also drafted your Vegas desire contract. Do you remember doing that?
A I don't.
Q And in that contract, you talk about admissions, things that you wanted to work on, right?
A Uh-hum.
Q And in that Vegas contract, in fact, you said in your

memory of it.
Q Do you recall, though, whether it's this document or any document saying that one of the things in your desire contract was not just desires, but hard nos; right?
A Actually, I didn't read every detail of the document, but I know that that was sometimes a part of these contracts.
Q And one of your hard nos at the time was you're not going to have anyone touch you after you've said no; right?
A It says that.
Q But putting aside what it says, that's the way you felt at the time; correct?
A Yeah.
Q And you expressed that when necessary; right?
A There were a lot of times in which I didn't express that.
Q Okay. But that's sort of on you, right, because you didn't express it?
MS. GUPTA: Objection.
THE COURT: Sustained.
Q Well, you told Ms. Daedone, when according to you, she asked you to have some sexual interaction with Reese Jones, and you told her no; right?
A At the very, very end of my time there, yes, I told her no once.
Q Right, but before, you hadn't told her no?
A For a lot of reasons, I was afraid to say no.

Q I understand. The question is simple: You did not utter the words, I don't want to do that, Nicole. You didn't say that to her?

A For a lot of reasons, I was afraid to say that.

Q So that's a yes? You didn't say that?

A I eventually said it.

Q Right. And when you said it, you still ended up being associated with OneTaste for what, one or two more years?

A No, I don't think so. I think that was very close to the end of my time before I got fired. Yeah.

(Continued on next page.)

(Continuing.)

CROSS-EXAMINATION (Continues)

BY MS. BONJEAN:

Q Well, you went to -- you got fired in October or November of 2013, right?

A From Las Vegas.

Q Correct.

A An then I continued to do things for them from Los Angeles.

Q Right. So this whole, this whole Reese Jones interaction where you said no, happened before October or November of 2013, right?

A I actually don't recall exactly when in that time it was, to be honest.

Q Well, where were you living when it happened?

A I remember that conversation. I remember being in San Francisco for a coaching program immersion. It's -- I was probably still living in Vegas, yeah, because I was still -- I was still an employee, so I was still living in Vegas.

Q All right. So it was before you were fired from Vegas.

So we can agree it happened sometime before what, October, November of 2013, right?

A Sure, yes.

Q And then you did not actually leave or depart OneTaste fully until what was it, July of 2014?

A I -- I still held various roles in the community, so I was fired from specific positions, but I still was like an -- I believe I was still an independent contractor as a coach and an OM trainer, and I was still living in the community houses and --
Q Until when?
A The date you just stated.
Q Okay. So that's my question. That's the date, July 2014 roughly?
A Roughly, yes.
Q Okay. So at some point prior to October 2013 you tell Ms. Daedone: No, I'm not gonna go -- I'm not gonna go mess around with Reese, but you still stayed part of the community until July 2014. We can agree on that, right?
A We can, yeah.
Q Now, -- and you weren't ex-communicated entirely from the community when you said no to Ms. Daedone, right?
A A lot of things happened that dramatically changed my position and experience within the community, but no, I was not immediately ex-communicated.
Q Okay. And you never messed around or had sexual interactions with Mr. Reese ever again, right?
A Not after that, all that, no.
Q After you said no, never again, right?
A That's true.

Q Do you remember -- does it appear to be a Vegas -- when you say it could be Vegas, what makes you think it's Vegas?
A I'm just looking at palm trees and tall buildings, so that could be LA or Vegas.
Q Okay. And would this -- and does this refresh -- let me ask it this way: Does this refresh your recollection of whether you sometimes did socialize poolside in Vegas?
A I guess I did, at least one time, go to a pool, yes.
MS. BONJEAN: Okay. You can put that aside.
Q Now getting back to the Reese arrangement, if you will.
You testified on direct that you understood that when you were approached by Ms. Daedone and I think Reese and -- I don't know if someone else was there. I think it was Ms. Carl, right?
A Yeah, she was present for -- are you talking about the initial conversation about the agreement?
Q Correct.
A Yes.
Q Yes.
You understood that there was sex involved, right?
A I did.
Q Okay. And you also knew that previous people had held that position, correct?
A I did.
Q And then there were people that held it after you,

correct?
A Yeah.
Q And as -- putting aside how you feel about it today, at the time it was perceived as a good position to have within the company, right? At the time.
A At the time, I felt very mixed about it. And within the context of the organization it was, like, a high honor of a position to be offered.
Q Right.
And you, whatever was going through your head at the time, you accepted that position at the time, right?
A Yes.
MS. BONJEAN: Just a couple more points. I'm going to get us done today.
THE COURT: You're fine, Ms. Bonjean. You're fine on time.
Q Do you remember the voiceover that you listened to, that Ms. Cohen had you listen to?
A Yeah.
Q Okay. And I think you said you didn't really remember it?
A I mean, it -- it was obviously me. I didn't really remember making it, yeah.
Q You saw yourself in it, right?
A Yeah.

Q You saw yourself in the video?
A Yeah, correct. Yeah.
Q And we can look at it again, but let me ask you a couple of questions before we do that.
Do you recall being recorded to do a voiceover in July of 2014, or at any point really, for, like, an instructional OM packet?
A Not specifically, no.
Q Okay. And do you recall ever being asked to do voiceovers at all?
A No, not specifically. No.
Q Couple more questions.
Putting aside whether you recall doing this voiceover, do you recall either teaching or being taught that you ask for an OM when you want an OM, that it's not -- you don't treat it -- it's not a doorway?
A Yeah.
Q Okay. And do you remember teaching or being taught that if it's actually something else you want, then ask for that?
A I do.
Q Do you remember teaching or being taught that if the other person says no to an OM, just say thank you?
A I do remember that teaching, yeah.
Q And do you remember teaching or being taught that an explanation isn't necessary?

Q Ms. Wright, just one last question.
Was it Alisha Price that -- did Alisha Price first tell you -- introduce you to the idea of working with Reese?
A Um, no. It was Nicole.
Q Okay. And was Alisha Price the person who was sort of handling him before you?
A I believe so.
Q Okay. So you kind of -- I guess you and Maddie sort of took over for her, right?
A I believe so.
Q Okay. And to be clear, during that period of time, whatever you felt about it at the time, you did not tell Nicole or Rachel, or really anyone in the upper management, that you wanted no part of that, right?
A I did not feel safe to share those feelings.
Q Okay. And when you did share them, you -- there were -- you went about your business and never did it again, right?
A I mean, to be honest, the job was already over by the time I felt the courage to share that, so I -- if you're trying to prove something with that, I'm not sure what it is.
Q Oh, I'm trying to -- I'm not trying to prove anything other than to say that when you did say no, you didn't actually -- you weren't actually in any way forced to go back and do something you didn't want to do, right?
A No, but there were dramatic repercussions for the fact

REDIRECT EXAMINATION
BY MS. GUPTA: (Continuing)
Q And you testified on cross-examination that after those conversations with Nicole where you pushed back on sexually servicing Reese, you had this text exchange; correct?
A Yes.
Q And is there a fair depiction of the text exchange that you had with Nicole Daedone on October 1, 2013?
A It is.
MS. GUPTA: Your Honor, we move to admit Defense Exhibit 3-EA.
THE COURT: Any objection?
MS. BONJEAN: No objection.
MS. COHEN: No objection.
THE COURT: And Defense Exhibit 3-EA is admitted.
MS. GUPTA: Could we publish to the jury.
(Defendant's Exhibit 3-EA received in evidence.)
Q Ms. Wright, given the text is quite small here, could you just read your message here at 11:53?
A A lot of my time here in Vegas and with sales has been this rabid fight with codependence and all of the external crutches I've had for a long time.
I realize that most of my motivations for sales and Vegas in the past were for the external approval of Rachel and you -- and I'm referencing Nicole -- and the Cores, and I had

hit a wall with it, where that fuel was no longer working, and I felt locked in place in terms of my growth into power with the way I was relating to the world and my responsibilities.

When Maddie pulled out, it was like the ultimate crutch getting pulled from beneath me and it's taken everything I have to stay connected and remember who I am.

You have been an unwavering light for me in this process. Like no matter how lost I feel, if I look up and ask you, you are there with so much love and understanding, it almost hurts.

I've been working to hack my way through this tangled ramble of negative associations to sales and Vegas of death and loss and malnourishment of my heart and lack of self love and intense lockjaw determination that actually kept me from getting dressed or leaving my post at the computer ever. All of that has turned into a big ball of resentment and fear that that is the only way it can be and I'm somehow being punished.

I have such an intense love for everyone and this work and you and what we are doing -- and what we are doing, and I get stuck behind my fear of not being able to have it all and do it all and be truly seen in how much love and loyalty I feel. When I get stuck there, I become hard and mean and immovable. Something very deep is cracking in me.

I know a new version of me is rising through the

cracks and she is generous and humble and she loves herself and she looks everyone in the eye as an equal and owns the sight and magic and power that she has to offer.

I'm sorry for making it unpleasurable to hold me --

Sorry.

THE COURT: Take your time.

A -- for you and the whole team. I'm sorry for any wreckage I have caused and the compensation it has taken on everyone's part around me.

I'm sorry if I've hurt your feelings in any way or made you feel unreceived. I want you to know that I am here, and I heard you, and I'm falling into surrender and I love you.

Q Ms. Wright, why does reading this make you emotional?

A I mean, so much of what I said is true. I'm deeply emotional.

I feel the part of me that was struggling so intensely and really truly did feel loyalty and love and dedication to our mission and what we were doing and what I believed it meant, and for Nicole.

You know, like, I think all of my relationships with everyone there were really special.

And I'm crying because of all of the, like, I guess just how much of my heart I put into this and how much I was -- those vulnerabilities were used against me, like how much I

examination about like high school tactics I think is something that Ms. Cohen used and things like that.

And so, I do think that where the statutory requirement, one of the statutory requirements of serious harm that the Government is, obviously, relying on here is psychological harm. And there is a need for these concepts to, at least, be explained to the jury by a licensed professional in that area.

And so I understand that the Court is looking for a very specific proffer, which we didn't provide it today. We can certainly take a look and try to give the Court a better proffer in the morning or whenever is convenient for the Court.

But just on the factual points, it hasn't been one instance of cross-examination. Even on direct examination the victim witnesses have struggled at times to explain the very complicated dynamic that's been going on. Although, they are clear that they suffered psychological harm and abuse.

MS. BONJEAN: I would disagree, Your Honor.

I think the witnesses have gone on and on and on about their own psychological harm. They've self-diagnosed themselves. I mean I think it's, frankly, improper all the way around that they've been permitted to do it. And then to add an expert on there on top of it. I mean -- and then prevent us from even putting witnesses on to talk about the

Q Are you close to your siblings?
A Very much.
Q Did you attend college?
A Yes, I attended Fordham University where I got my BA and MA in English. And then Teachers College where I got my MA in English education.
Q And what did you do for work after that?
A I worked as a teacher, as a middle school teacher.
Q How did you first learn about OneTaste?
A I went to -- in the summer of 2014, I went to a yoga teacher course -- teaching course, and it was a month-long course in New Haven. And the anatomy teacher taught a section for a couple of days about physical, emotional, psychological health, and she mentioned OneTaste and orgasmic meditation as part of her sexual -- sexual health section.
Q And what personally drew you to OneTaste?
A So, when I first heard about it, I -- you know, it -- it stuck in my mind because she spoke about orgasmic meditation and I also thought it sounded very weird. I did not -- I did not feel drawn at that moment.

But I continued working with that person as a coach and when I told her that I never had an orgasm before and that was something that I wanted to experience in my life and I was worried that I would never be able to experience, she -- she really pushed OneTaste as -- as -- as -- as a good solution.

She said that it was revolutionary for women. And she also said that the people in OneTaste speak my language, meaning that they were sensitive, vulnerable people, where I could, like, build friendships and relationships with, where they would understand where I was coming from.

Q So you testified that you became involved in OneTaste in October of 2014.

What was your initial involvement?

A So -- so, I bought an Intro to OM entrance -- when I was, when I was talking to this person when she was coaching me, that's when I decided to go ahead and get the Intro to OM. And before the class took place, I went to a few TurnON events.

Q What is a TurnON event?

A It's an event that OneTaste organized in order to teach the public about orgasmic meditation. So, we would play three games that were supposed to make you feel the same kinds of feelings that you would have during an orgasmic meditation session.

Q Can you briefly describe those games?

A Yes.

So, one game was just, you know, people would say how they feel and you're supposed to say the first thing that came up to your head. So, like, I'm feeling happy, I'm feeling turned on, I'm feeling nervous. The idea was to feel

A No.
Q How did you pay for them?
A My credit cards.
Q Was it the Discover credit card?
A It was the Discover or I had a Chase credit card. Yeah.
Q Now, you mentioned that you were living in New York.
Did there come a time when you moved into a OneTaste communal home?
A Yes.
Q What was your role in OneTaste at that time?
A At that time, I was -- I was a member. I was -- you know, I was a new customer, somebody who was very excited about the practice in OneTaste.
Q And when was that approximately?
A So, I moved in -- in I think towards the end of December 2014.
Q Were you performing any labor and services for OneTaste at this time?
A I was doing like back-of-house. I was helping out however I could, like I -- you know, yeah.
Q And what do you mean by "back-of-house"?
A So I was setting up for events. I was putting chairs out for the -- for the TurnON events. And then when they finished, I would take the chairs away. Like, kind of like whatever needed to be done, you know.

Q Were you paid for any of that labor?
A No.
Q Was there a name for the house that you moved into?
A Yeah, the Brooklyn OM House.
Q And where was that located?
A It was located in Bushwick, in Brooklyn.
MS. GUPTA: I'd like to show the witness, for identification only, Government Exhibit 2.
THE WITNESS: Yes. That's -- that's the Brooklyn OM House.
BY MS. GUPTA:
Q How do you recognize this?
A I lived there for a few months, but I recognize the entrance and the building.
Q Is this a fair and accurate depiction of the Brooklyn OM House that you lived in?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 2.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 2 is admitted.
(Government's Exhibit 2 was received in evidence.)
MS. GUPTA: Thank you.

Can we please publish?

(Exhibit published.)

BY MS. GUPTA:

Q And is this the house that you lived in in Bushwick, Brooklyn?

A Yes.

THE COURT: Can we remove the blue arrows, please? I think there's just a mark.

BY MS. GUPTA:

Q How many people approximately lived at the Brooklyn OM House at the time?

A Approximately, ten.

Q And how did you end up living there?

A So, one of the people who lived there was moving out and I -- I met him, I met him at an event. And so, I -- I took his place. And he was looking for a place to live in Brooklyn. I just moved from the upper westside to Brooklyn. I lived in my new apartment for about a month, and he -- so he lived in my apartment and took care of my dog.

Q And who was that person?

A Ruwan.

MS. GUPTA: Can we show the witness Government Exhibit 286, which I believe is in evidence?

(Exhibit published.)

THE WITNESS: Yes, that's him.

Q That's Ruwan?
A Yes.
MS. GUPTA: Thank you. We can take that down.
BY MS. GUPTA:
Q Did you have your own room at the Brooklyn OM House?
A I shared a room and -- and a bed.
Q You shared a bed as well?
A Yeah.
Q With who?
A With Kora.
Q Did you pay rent?
A Yes.
Q How much was the rent approximately?
A I -- I think it was approximately 850.
Q And I think you mentioned that you were performing some work for OneTaste and weren't being paid by them at the time.
So how were you supporting yourself?
A I was still working as an assistant teacher for a Jewish school in Brooklyn, so that was my income.
Q And what, if any, other expenses did you have in addition to your rent?
A Food. We -- you know, communal -- communal food. We -- and -- and that's it. I had a car at the time, so to -- to get to and back from work. So, those were my expenses.
Q What was your schedule like when you lived in the

Brooklyn OM House?

A So, we would wake up in the morning, early in the morning. And before I left for work, we would do the practices, meaning that we would do two orgasmic meditation sessions, usually with -- with two different partners. And then we would do fear inventory, followed by ten minutes of sitting meditation. Then we would -- then we would break and some people would cook breakfast. Other people would like -- kinda like set up the table or -- or, you know, clean the floor. And then we would eat together breakfast, and I would go to work.

Q And what about in the evening?

A So, in the evening, I would come back. I usually would, if I can make it, I would go to the Center to do -- to the OM circle that started like I believe 5 p.m. and stay for a TurnON event that followed. And then go back to the Brooklyn OM House around, I don't know, either like probably get back around 8:00 p.m., something like that.

Q You mentioned going to the Center.

What was that?

A So, that was where the sales team worked during the day. And that's also where all the events were taking place. It was a new center, I'm sorry, that just started around that time.

They just rented the space around that time. And

so, the sales team would be there throughout the day. And there would also be -- there would -- practices would be held there. So, morning OM circles and evening OM circles, as well as all the Intro to -- not Intro to OM, the TurnON events.

Q Did you have any involvement with the sales team at that time?

A At that time, no.

Q You mentioned doing something called fear inventory.

What was that?

A So, that was -- it was a written -- a written practice that would follow the orgasmic meditation. And it would list resentments and fears that we had. So you would spend time like free -- free writing it. Everybody would, like, sit at a different spot and it was an individual practice. And then you would share. You would -- you would pair up with somebody else in the house. You would read your fear inventory and they would read their fear inventory. And then you would tear it up.

MS. GUPTA: I'd like to show the witness only Government Exhibit 3147.

BY MS. GUPTA:

Q Do you recognize this document?

A Yes. So those -- that's the directions for fear inventory.

Q And how do you recognize it?

A I've seen it before. And that's what I was -- that's the format what I was told to -- to write.
Q Is this a fair and accurate depiction of the fear inventory requirements?
A Yes.
MS. GUPTA: Your Honor, we move to admit Government Exhibit 3147.
THE COURT: Any objection?
MS. COHEN: No objection, Your Honor.
THE COURT: Ms. Bonjean.
MS. BONJEAN: No objection.
THE COURT: Government Exhibit 3147 is admitted.
(Government's Exhibit 3147 was received in evidence.)
(Exhibit published.)
BY MS. GUPTA:
Q Could you just describe this document, please?
A Yes. So it tells you how to write a fear inventory. You're supposed to do it on a daily basis, every morning after an orgasmic meditation session when you're kind of like open and vulnerable. And so, you write:
Dear God or God, I am resentful at... and you fill out a name or a thing. And then you write: Because I have fear that... and then you fill out the rest. And you do it over and over and over again I think for -- I don't know if it

says the time, but I remember it being ten minutes.
And then -- and then you, you know, and then --
Q And if I could just ask you to speak into the microphone.
A Sure.
And then you -- and then you end it at the bottom of the page. You -- you write: God, I ask you to remove these fears and pray only for knowledge of your will for us and your power to carry that out. Thank you.
Q And I just want to direct you to number 9, which is on the second page.
Can you just read that, please?
A If possible, call a neutral person -- in parenthesis -- i.e. someone who will not get triggered by your inventory and read them your list.
Q And did you, in fact, read your fear inventory to people?
A Yes, every time.
Q Was there anyone, in particular, you would read it to?
A No. You would pair up with kind of somebody else every -- every day or, yeah.
MS. GUPTA: We can take that down. Thank you.
Q For those who lived in the Brooklyn OM House, were there any restrictions on what you could do or who you could see?
A Yeah. So you were not supposed to be -- to watch TV. There was no TV. And it was also like alcohol and drug free. So no -- no -- no drinking or drugs.

MS. GUPTA: Your Honor, it's effect on the listener.

THE COURT: Overruled.

A So Misha raised his hand and said: You know, Michal and I have tried to have a few make-out sessions and we -- and it's not going well. I'm having -- I'm not feeling turned on.

And, in fact, he did -- he had, like, erectile dysfunction issues and, you know, he experienced those during our make-outs.

And I also did not feel comfortable during our make-outs and I actually felt grossed out during our make-outs, our initial make-outs.

So he -- and he's, like: I don't know what to do.

So Nicole answered him and told him that he needed to have sex every day for a month.

It was obvious that it was not with me because at that time I lived in New York and he lived in San Francisco.

So, we were not -- and you know, we were kind of -- it was the very, very beginning of our relationship. We were kind of in an open relationship. I wasn't sure that I wanted to be in a relationship with him at that time.

But then, when I heard that she assigned to him to have sex with somebody else every day, I started to feel jealous. Because, you know, he just paid -- I think it was $3,000, or maybe something like that, for Magic School and, you know, if he didn't pay for it, I would not be able to be

wedding?
A Approximately three months.
Q Did you decide to get married at the Nicole Daedone Intensive?
A In some ways, yes.
Q Why did you want to get married at the Nicole Daedone Intensive?
A Because other people got married at the Nicole Daedone Intensive.

Rachel Cherwitz and Hamza Tayeb got married in the Nicole Daedone Intensive. And other people, I believe. I think Maya Gilbert and Eli Block got married in an Intensive, as well as other people that I know got married in an Intensive.

You know, part of it was like you put so much money into it and it was, like, the highest course and it was another reason for celebration. But it was also -- there was -- like to get married in an Intensive showed loyalty to Nicole and to OneTaste.
Q At that time, did you want to show loyalty to Nicole and to OneTaste?
A Yes.
Q Why?
A You know, I think throughout all my time in OneTaste, I, like -- I was having an internal conflict. On the one hand, I

believed in the mission of OneTaste and in Nicole's mission to spread orgasmic meditation. I believed that it was a practice that can heal and also empower women. I thought that it was, like, a feminist organization that cared about women and wanted to change the world for the better. And, you know, I wanted to be part of this group. There was a lot of talk of living in your purpose in OneTaste and that purpose was, you know, OneTaste and Nicole's teachings.

On the other hand, I was also having terrible anxiety attacks and panic attacks and nightmares at night that got stronger and stronger during that time. And so, you know, I was kind of -- yeah, I was really struggling.

Q Who, if anyone, planned the wedding?

A So OneTaste planned the wedding. I had no hand in the actual planning of the wedding.

So the way they set it up, it was like a --

MS. COHEN: Objection.

Q Who specifically at OneTaste --

THE COURT: I sustain the objection.

You can answer this next question.

MS. GUPTA: Sorry.

Q Who specifically at OneTaste planned the wedding?

A I don't know.

Q Who, if anyone, walked you down the aisle?

A Rachel Cherwitz walked me down the aisle.

You said that there came a time when you joined the sales team at OneTaste.

When, approximately, was that?

A So that was approximately January 2015.

Q And what was your title, if any?

A I was a saleswoman. I worked on commission.

Q Were you paid a salary?

A No.

Q How was the commission determined?

A Depending on which course you sold, you'd get a certain amount of money.

Q And how much did you typically make?

A Over my whole time on the sales team, which was about six or seven months, I made a thousand dollars, just about.

Q Which legal entity paid you, if you recall?

A Yeah. OneTaste New York.

Q Were your commissions sufficient to support yourself?

A No.

Q Did you have any outside jobs?

A For a while, before Misha and I -- well, for a while I -- after I quit my job as a teacher assistant in order to work as a saleswoman full time, I worked at the Corners coffee and juice place -- it was just a few blocks, it was a few steps away from the center -- to make a little bit more money.

Q Are you familiar with an individual named

distance between you and your family without getting into the substance of conversations with them?
A They were very worried about me.
Q When you joined the sales team, what was a typical work day like for you?
A We left the OM house early in the morning before 7:00 o'clock and we arrived in the center. We did two orgasmic meditation sessions back to back, followed by fear inventory that we then read to each other, followed by a sitting meditation, and then clean up and service, breakfast, and then we started working as a sales team. We finished the day with, again, another OM circle, two orgasmic meditations, usually followed by TurnON or another event. And then we would go home around nine or 10:00 p.m.
Q How would you describe the sales culture at OneTaste at that time?
A Very competitive, very cut throat. I think it was, the sales culture underlied everything that we did there.
Q Were there sales goals?
A Every day.
Q Who set those sales goals?
A Usually like the sales leader, Rachel for New York and other leaders for the other teams.
Q You had testified earlier that Rachel Cherwitz supervised you how. Would you describe her as a supervisor?

A I think there were two sides to her. Sometimes she was like almost like a best friend or a sister, very warm, physically loving like showing affection, smiling, made you feel like you're special, like she really cared about me and my well-being. Then other times she would get very angry and cold, and would humiliate me in front of others. And usually during those times I felt very -- I wanted to get on her good side again.
Q In what way would she humiliate you in front of others?
A She would yell at me in front of the group.
Q In front of the sales team?
A Yes.
Q Did you ever offer to OM with anyone as part of your work on the sales team?
A I knew that as a sales woman I needed to look very attractive and be turned on and OM with as many as people as possible.
Q Did you ever have any conversations with Rachel Cherwitz about that?
A No, that was kind of the culture that I came into.
Q Did you ever have any conversations with Rachel Cherwitz about you offering to OM with someone for sales?
A Yes.
Q What, if anything, did Rachel Cherwitz say to you during that conversation?

A Yes.
Q Did you also at any point express an interest in leaving the New York sales team?
A Yes, in like September of 2015.
Q Did you at any point move out of the Brooklyn OM house?
A Yes.
Q When approximately was that?
A That was like March, it might have been February of 2015.
Q Where did you move to?
A Into the staff house at 365 First Avenue.
Q What prompted that move?
A I was invited to move in.
Q Who invited you?
A I think at the time it was Ravi Agrawal.
Q Did anyone from the higher-ups in OneTaste live there at the time?
A Yes.
MS. COHEN: Objection.
THE COURT: Can you speak into the microphone?
MS. COHEN: I withdraw it.
THE COURT: Okay. Go ahead.
A Rachel Cherwitz.
Q Were there any rules or restrictions for those who were living at the staff house?
A It was same rules of no TV, alcohol or drugs, and to tell

them about our whereabouts.
Q Did you, in fact, have discussions about your whereabouts with Rachel Cherwitz?
A Yes.
Q Were any of those discussions via text message?
A Yes.
Q I'd like to show the witness for identification only Government Exhibit 4514AR. I can pass up a copy for the witness.
Your Honor, may I approach?
THE COURT: Yes, you may.
Q Do you recognize this?
A Yes.
Q What is it?
A Text messages between me and Rachel.
Q And how do you know it's with Rachel Cherwitz?
A I remember these conversations.
Q Did you review this exhibit prior to coming to court today?
A Yes.
Q Did you at some point provide these text messages to the Government?
A Yes.
Q How did you download these messages in the format that you see in front of you?

constantly. The voice of fear, doubt and resentment for the life that I'm choosing is loud and clear. The problem is that once you have this OneTaste of what is possible, the new realm of relating and orgasm that permeates everything. I'm not willing to let go or go back.

Q I'm going to stop you there.

What do you mean by orgasm that permeates everything?

A So orgasm in OneTaste it's not only like an individual's orgasm but it's the force, it's a life force that permeates everything. In OneTaste like orgasm is more than just, it's more than just a physical feeling, it's like everything that we stand for.

Q If you can just continue starting with: In this in-between phase.

A In this in-between phase I'm asked to make choices. I'm asked to let go of my old values, old ways of relating, and choose to step into a bigger game, over which I have no control. To let the feminine lead and to throw myself in with faith and devotion to God. I'm ready to let go of my co-dependent ways and start to recovery. Since the last Intro To OM, or ITO, this is what happened.

One, I became fat and lazy about making money thinking that I can pay for rent and food with some money I had saved up and the money I was making from the NYC team.

Two, I spent too much time with my family for my sister's graduation, four days, letting them emotionally hit and abuse me for choosing to live my life for orgasm. Our arguments were painful and draining.

Three, I spent too much time processing and thinking about my new relationship with Misha. I got swept up and unconscious in this new kind of relating that I never had before. I got intoxicated on his attention and financial help. It put me to asleep and I get turned off to my surroundings.

Q I'm going to stop you there. What did you mean by: Put me to sleep?

A Meaning that it made me like not be motivated to do things on my own, to be the best sales woman that I could be. It made me, it made me lazy because I got things in an easier way.

Q If you could continue with number four, please.

A Four, I used teacher training and CP, coaching program, immersion as an excuse to not work. I had surface layer thoughts that explained these as training for my purpose. I didn't realize what I, what I didn't realize is that I actually used them as a way to opt out when the energy got high and compression in New York started.

Five, I'm now using mastery and NDI as a way to opt out of New York because I'm not yet unified my purpose with my

desire. I'm relying on those programs to help me figure it out. Help me find my power, although I know that no program can do this for me. I need to choose to live fully now.

Six, I use my stories of insecurities and fears to help keep me small. This is a story of me as a victim, as a broken person who cannot handle this life because it's too overwhelming and difficult. This story is garbage. Life is a game, and the only way to live is to play, be creative, and notice all the subtle messages that God sends our way.

Q I'm going to stop you there. What did you mean: This is the story of me as a victim and the story is garbage?

A I meant that I was saying that I was under conflict. So what I'm talking about here, I'm talking about the conflicts that I was having. I felt, I felt a lot of fear, I felt overwhelmed, I felt like my situation was difficult with Misha and my family, and also trying to make money and trying to make ends meet.

It is a very hard job to be a sales woman of orgasm. You don't make a lot of sales and money. But in OneTaste I learned that, they taught at the coaching program that victim, perpetrator, and bystander are part of the same triangle; they are all part of the same thing. If you're a perpetrator, you're also a victim, you're also a bystander. And so the way to live was to be outside of the triangle.

To be a victim in OneTaste was really was something

that you chose for yourself and was looked down upon. Like you're playing the victim right now was a really bad dis.

Q If you can continue reading through the end of the message.

A What number?

Q I think number seven.

A Seven, I also had an STD scare. And since I was little, my mother always used STDs to threaten me against the dangers of sex. The tests came out negative, and since then I keep on getting yeast infections. I think this is my way of my body telling me that I'm out of alignment and out of purpose.

I use this physical ailments as an excuse to opt out. Every time I concentrate on them, fears come up in my mother's voice that says that sex is dangerous, that this is my fault, that I'm being irresponsible. I wallow in that voice and feel existential anxiety.

I take full responsibility over my feelings, the situation, and not making sales last month. No one is to blame but me.

My addict came out this month and I found ways to get intoxicated and fell out of devotion.

Q I'm going to stop you there. What do you mean: My addict came out this month?

A In one OneTaste, like every time you got lazy and fat, meaning you didn't go for sales, you weren't turned on or

to come back on. And she told me that I couldn't.

Q Why were you feeling anxious and bad?

A I was, you know, I was kicked out. One of the biggest fear was to get kicked out of the group, to be told that you are not worthy of being here, or that they don't want you. So to be ostracized and also humiliated like, I was only one kicked out at that event, so I felt like everybody knew that I did something wrong. I also felt really anxious. I felt cut off from everybody.

Q Did you have any discussions with Rachel Cherwitz about this incident via text message?

A Yes.

Q I'd like to show the witness for identification only Government Exhibit 4513AR. I'll pass up a copy.

Your Honor, may I approach?

THE COURT: Yes.

Q Do you recognize this?

A Yes.

Q What is it?

A It's text messages between Rachel and I.

Q And how do you recognize this?

A I saw this communication before and I remember this interaction.

Q And are these part of the same messages that you provided to the Government?

DIRECT EXAMINATION (Continues)
BY MS. GUPTA:
Q Who taught you about this concept of an infinite game?
A I heard about it from the beginning in, like, the Intro to OM class and just people talking about it. Yeah.
Q And then you said: I get stuck in The Matrix.
What did you mean by that?
A That I get stuck in, like, in my reality, in my -- in my fake reality of problems, you know.
This is all to tell -- this is all lingo. Much of it is lingo that I learned in OneTaste. So, while sometimes I wrote in ways that I didn't fully understand all the concepts, I'm actually -- you know, I'm like, I know some concepts were taken from like all over the place: Buddhism, from The Matrix, from Harry Potter. I just, like, I don't know those -- like I don't know Harry Potter. I haven't watched The Matrix. So for me, I just like heard it and internalized what I thought it meant and -- and, you know, connected my own dots.
Q And why did you use this type of language when you say you didn't fully understand it?
A Because I wanted to -- I wanted to impress Rachel. I wanted her to feel like I knew what was happening to me and what I was doing. And reverse engineering is all about taking responsibility.

In OneTaste we had -- there was a lot of emphasis on taking responsibility for our actions. Like nobody else made you do anything, it's you who -- who messed up. You know, so I wanted to show her that I'm taking full responsibility. That I know what happened to me. That I will never do it again. That she can trust me.

Q Okay. You can just keep reading, please. I think you're at "my ego was hurt."

A Yeah. Sorry. Oh, here we go.

My ego was hurt and I became resentful when I admitted that being a teacher handler was out of my range. This is the first time I did BoH for ITO and did not know how to be a teacher handler. I got resentful that Jenna's system feels so much clearer than mine and that she should actually be teacher handler. In my head I noticed all the voices that said that she didn't even do CP yet and that she is more capable than me.

I got resentful for being called meek because it's true that I get meek when I get knocked out and I abandon myself. I didn't take Rachel's stroke to go for a walk and get clear because my ego was trying to prove that I can handle it when in truth I couldn't, because it was in my way of being in my optimal state.

I was resentful at Misha because I felt like he is better than me. He was on and I was off. My ambient

Q And that's what you believed in when you started there, correct?
A For me it was always about getting in touch with my sexuality, getting in touch with the sensations in my body that, you know, came from genital stroking. So it was never like a meditative practice that had -- that did not have a sexual component.
Q So that's how you viewed it?
A Yeah.
Q From the very beginning?
A From the very beginning, yeah.
Q And OMing, though, wasn't in a bed, right?
A No. It was in a nest.
Q And, in fact, you -- oh, actually, hold off on that for a second.
Okay. And then -- but you -- in any event, you were very into it from the beginning?
A I was very hopeful.
Q And, in fact, after you took the classes, you had asked on multiple occasions about the coaching program, right?
A Oh, I was told about it, yeah, many times.
Q And you yourself inquired about it, correct?
A I think yes, I was interested in CP10.
Q Well, when you -- and you testified on direct examination about Rachel helping you open up a credit card to pay for this

class.
Do you remember that?
A Of course.
Q And you -- your testimony is she suggested that you could open up a credit card, right?
A She told me to open up a credit card.
Q And you were 27 years old at this time, right?
A Yes, I was.
Q And you were a teacher at a school, right?
A Yes, I was.
Q And you had your own apartment, right?
A Yeah. Mm-hm.
Q You were close with your parents at this time, right?
A Yes.
Q And you could have discussed this with them, right?
A I actually told Rachel that I would like to discuss it with my parents.
And she said: They're Israeli. I'm Israeli. I know how Israelis are. I would be happy to speak with them.
But she wanted to make sure that I put a deposit first.
Q But you weren't forced, right?
You weren't forced to sign up for it?
A Well, I was not -- I wouldn't say I was forced, no.
Q You didn't know Rachel that well at the time, right?

was the end of February that you rented out your apartment?
A Yes.
Q And before you moved into the OM house, you had actually stayed there a night or two?
A I believe so, yeah.
Q So you knew what it was like when you moved in, right?
A Yes.
Q And this OM house --
A I mean, I -- can I just go back?
Q Oh, sure.
A I mean, I knew -- I had some notions of what it might be like. I mean, I knew what the house looked like. I didn't know what it would be like to live in that house until I lived there.
Q Yes, in a communal home and what the people were like, et cetera, right?
A Yeah, yeah.
Q But you knew you would share a bedroom, right?
A Yeah.
Q And this OM house was run by the community of people interested in OM, correct?
A Yeah, but it was also -- there was some staffers who also had -- you know, would come in and say how to do things as well. Like, yeah, it was not independent of the staff.
Q But it was in the practice of OM and that was the purpose

of the house?
A Yeah. It was people -- yeah. It was for members who were enthusiastic and really wanted to live a desire-based life -- which is, you know, what OneTaste called it -- who wanted to practice every day together and live in that way together.
Q Right.
And not all those people worked for OneTaste, right?
A No.
Q Okay. All right.
And when you moved in, you received OM house rules.
Do you remember that?
A I don't remember that.
Q I mean, more specifically, OM House Codes of Play.
Does that ring a bell?
A I don't know if I received them.
I heard about, like, a manifesto of the Brooklyn OM house. I -- yeah.
Q Okay. Let me just see if you've seen this before.
MS. COHEN: If we could pull up, for the witness only, Defense Exhibit 1-BA.
I'll bring you the full document as well.
Q Do you recognize this document?
A No.
Q Okay. So you can put that aside.