# 26-943-cr(L), 26-944-cr(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RACHEL CHERWITZ, NICOLE DAEDONE,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

**Volume IV of VII (Pages A-867 to A-1157)**

ALEXANDRA A.E. SHAPIRO
ALICE BUTTRICK
CHRISTOPHER JOHNSON
WILLIAM TAYLOR
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants*
*Rachel Cherwitz & Nicole Daedone*

**TABLE OF CONTENTS**


**Page**

District Court Docket Entries in *United States v. Cherwitz et al.*, No. 23-cr-146 (DG) (E.D.N.Y) ........ A-1

Indictment, filed April 3, 2023 (Dkt. 1) ........ A-77

Excerpts of May 3, 2024 Pre-Trial Conference Transcript ........ A-85

Declaration of Adam Goldberg, dated May 31, 2024 (Dkt. 287-2) ........ A-89

Declaration of Joanna Van Vleck, dated August 1, 2024 (Dkt. 287-1) ........ A-91

Excerpts of September 27, 2024 Pre-Trial Conference Transcript ........ A-96

Government Letter Supplementing Record, filed October 7, 2024 (Dkt. 163) ........ A-106

Excerpts of November 15, 2024 Pre-Trial Conference Transcript ........ A-108

Declaration of Paul Pelletier, dated December 20, 2024 (Dkt. 287-5) ........ A-113

Joint Requests to Charge, filed December 9, 2024 (Dkt. 223) ........ A-120

Joint Letter Supplementing Requests to Charge, filed April 16, 2025 (Dkt. 326) ........ A-192

Joint Letter Supplementing Requests to Charge, filed May 24, 2025 (Dkt. 389) ........ A-211

Excerpts of February 26, 2025 Pre-Trial Conference Transcript ........ A-220

Excerpts of Trial Transcript ........ A-225

## Government Exhibits

GX56: Photo of Front of Reese Jones Townhouse........................................................ A-1389

GX57: Photo of Side of Reese Jones Townhouse........................................................ A-1390

GX58: Photo From Deck of Reese Jones Townhouse........................................................ A-1391

GX59: Photo From Deck of Reese Jones Townhouse........................................................ A-1392

GX60: Photo of Inside of Reese Jones Townhouse........................................................ A-1393

GX826: March 2011 OneTaste Organizational Chart ......................................... A-1394

GX853: Summary Chart of Nicole Daedone Reported Wages And Income Received from OneTaste .......................................................... A-1396

GX856: Summary Chart of Select Individuals Reported Wages Received from OneTaste ......... A-1397

GX862: Summary Chart of Rachel Cherwitz Reported Wages And Income Received from OneTaste .......................................................... A-1398

GX1013: September 21-23, 2008 Emails from Reese Jones And Bryan Franklin................ A-1399

GX1045R: September 27-28, 2011 Emails from Michelle Wright And Robert Kandell......... A-1403

GX3120: How to OM Manual............................ A-1407

GX3147: OneTaste Fear Inventory Manual ........ A-1420

GX3164: Plan to Fulfillment – OneTaste Curriculum Slideshow........................................ A-1422

GX3212R: July 10, 2008 Darshan Transcript ..... A-1429

GX3224: OneTaste Coach And Trainer Association Code of Conduct, Signed January 12, 2013 ................................................ A-1446

GX3234: OneTaste Coaching & OM Training Program Packet.................................................. A-1452

GX3500RW12: OM Residential Living Handbook ......................................................... A-1465

GX3608: OneTaste Resignation of Nicole Daedone, Effective March 3, 2017 .......... A-1470

GX3743: Employment Agreement of Lianna Lifson................................................................ A-1471

GX3767: OneTaste – Rachel Cherwitz Separation Agreement And Release, Signed May 14, 2018..................................................... A-1485

GX3768: Employment Agreement of Rebecca Halpern................................................ A-1496

GX3772: Employment Agreement of Michelle Wright................................................. A-1513

GX3875 (produced in native format): August 23-25, 2013 Video of OneTaste Coaching Program – Nicole Daedone Lecture .................. A-1521

GX3879 (produced in native format): February 21-24, 2013 Video of OneTaste Coaching Program – Beast Exercise .................. A-1522

GX4056: OneTaste Inc. Stock Purchase Agreement, Dated March 3, 2017 ...................... A-1523

GX4513AR: July 10-12, 2015 Text Messages Between Michal Neria and Rachel Cherwitz ...... A-1579

GX4514AR: June 8-11, 2015 Text Messages Between Michal Neria And Rachel Cherwitz ..... A-1585

**Defense Exhibits**


DX1AB: OneTaste Code of Conduct, Dated February 20, 2014 ............ A-1589

DX1AN: October 2006 OneTaste Release of Liability Form ............ A-1597

DX1BG: 1080 Folsom Handbook ............ A-1600

DX1BS: October 2013 OneTaste Employee Handbook ............ A-1602

DX1X: OneTaste Coach Association Code of Conduct, Dated April 22, 2011 ............ A-1629

DX3AR: Photo of Michelle Wright And Others ............ A-1632

DX3AS: Photo of Michelle Wright And Audrey Wright ............ A-1633

DX3AZ: Photo of Michelle Wright ............ A-1634

DX3DU: Photo of Michelle Wright And Others ............ A-1635

DX3DW: Photo of Michelle Wright And Others ............ A-1636

DX3DY: Photo of Michelle Wright And Eric Swanson ............ A-1637

DX3EA: October 1, 2013 Chat Log Between Nicole Daedone And Michelle Wright ............ A-1638

DX3Z: Photo of Michelle Wright And Others ............ A-1639

DX4A4: Photo of Inside of Center ............ A-1640

DX9FD1 (produced in native format): Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend ............ A-1641

DX9FD1T: Transcript of Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend .................... A-1642

DX11EP (produced in native format): Video of Michal Neria and Misha Safyan...................... A-1643

DX11FS: 2013 Coaching Program Sales & Business Dev. Guide........................................... A-1644

DX11R: OneTaste Refund Policy And Release, Signed December 27, 2014 .................. A-1652

DX12AI: Photo of Anthia Gillick, Michelle Wright, And Aubrey Fuller................................. A-1657

DX12BY: OneTaste Coach And Trainer Association Code of Conduct And Release (September 2013) ............................................... A-1658

DX12Q: Photo of Rachel Cherwitz and Anthia Gillick ..................................................... A-1666

DX13BA: Photo of Margaret Pixley And Others ................................................................. A-1667

DX13K: Photo of Margaret Pixley...................... A-1668

DX20AE: OneTaste Release of Liability Form, Signed September 8, 2012 ........................ A-1669

DX20AW: Photo of Dana Gill, Lianna Lifson, And Others ............................................ A-1671

DX21AL: Photo of Rebecca Halpern And Chelsea Hunter .................................................. A-1672

DX21AM: Photo of Rebecca Halpern And Others ................................................................. A-1673

DX21AN: Photo of Rebecca Halpern And Others ................................................................. A-1674

DX171-1: Photo of Rebecca Halpern And Others ........ A-1675

DX21AP: Photo of Rebecca Halpern, Margaret Pixley, And Chelsea Hunter ........ A-1676

DX21AQ: Photo of Rebecca Halpern And Others ........ A-1677

DX21AS: Photo of Rebecca Halpern And Others ........ A-1678

DX21J: OneTaste Release of Liability Form, Signed September 8, 2012 ........ A-1679

DX21L: Rebecca Halpern Financial Agreement And Cancellation Policy re Coaching Program (January 2013) ........ A-1681

Memorandum And Order Denying Rule 29 Motion, dated August 11, 2025 (Dkt. 429) ........ A-1683

Letter Motion for Forfeiture of Property, filed December 10, 2025 (Dkt. 481) ........ A-1688

Order Granting Forfeiture Motion and Preliminary Order of Forfeiture, filed March 18, 2026 (Dkt. 504) ........ A-1699

Excerpts of Daedone Sentencing Transcript, dated March 30, 2026 ........ A-1710

Cherwitz Judgment, filed March 31, 2026 (Dkt. 523) ........ A-1714

Daedone Judgment, filed March 31, 2026 (Dkt. 521) ........ A-1721

Cherwitz Notice of Appeal, filed April 10, 2026 (Dkt. 528) ........ A-1728

Daedone Notice of Appeal, filed April 10, 2026 (Dkt. 529) ........ A-1729

**FILED UNDER SEAL**

Declaration of Joanna Van Vleck, dated June 1, 2024 (Dkt. 127-1) .......................... A-1730

Declaration of Mitchell Aidelbaum, dated July 31, 2024 (Dkt. 141-1) .......................... A-1734

Declaration of Kevin Williams, dated August 1, 2024 (Dkt. 113-3) ...................... A-1741

Declaration of Rachel Caine, dated August 1, 2024 (Dkt. 113-5) ...................... A-1747

Government Opposition to Defendants' Motion to Dismiss, filed August 15, 2024 (Dkt. 118) ...... A-1751

Filter Team Letter Supplementing Government Opposition to Motion to Dismiss, dated August 15, 2024 (Dkt. 127) ................................ A-1790

Defendants' Reply In Support of Motion to Dismiss, filed September 6, 2024 (Dkt. 141) ...... A-1798

Government Letter Supplementing Record, filed September 20, 2024 (Dkt. 154) .................. A-1825

FBI 302, filed September 20, 2024 (Dkt. 156-1) ............... A-1829

FBI Notes, filed September 20, 2024 (Dkt. 156-2) ............... A-1833

CROSS-EXAMINATION (Continues)
BY MS. COHEN:
Q All right.
A Yeah, I mean I believed, you know, I even learned in the Intro to OM and in the OM Practice Club that OMing every day was very important in order to feel grounded, you know. We were taught it was a way of getting clear, of releasing energy, of -- of -- you know... and so, you know, I really wanted to, I wanted to do it right.
I wanted to, like I said I wanted to, for my body to, I wanted to be able to have an orgasm. I wanted to -- and I just started on, you know, I was like a couple months into this really new world that was exciting. And -- and I was -- and suddenly I was in Israel, you know, in my aunt's house. We didn't leave anywhere, with my family, sitting shiva for my grandfather. And it was like two completely different worlds that did not -- you know, I felt -- yeah, I felt very far away from the Brooklyn OM House and the practice that I found.
Q Okay. And then when you got back, you -- in fact you, yourself, would arrange for OMs often, correct?
A That's what we were told to do. Everybody arranged for their OMs. You know, like we were taught to ask others for OMs.
Q And on these threads, though, it was you often organizing for everyone the OM practices.

Do you remember that?
A No.
Q Do you remember somebody named Malcolm?
A Yes.
Q Okay. And you found Malcolm or you spoke to Malcolm about coming to be a stroker, correct?
A Malcolm was already a stroker in the community. He -- I believe he must have taken the Intro to OM class and I found him on -- I don't remember the first time I met him, but I think it was on the Hub, the OM Hub.
Q And you had privately OMd with him before, right?
A Yeah. He was my first -- he was one of my first OMs. I don't know if my first OM, but one of my first.
Q He was one of your first you said?
A One of my first, yeah.
Q Okay. And you invited him to come over to the Brooklyn OM House. Do you remember that?
A Yeah. But I actually OMd with him before. When I was living in my apartment, I OMd with Malcolm once.
Q Okay. And then when you were if the OM house, you got him to come over?
A Yeah. I arranged for an OM with him, yeah.
Q And do you remember Maurice and Andrew?
A Yeah, I remember Andrew.
Q And do you remember telling the people on the thread that

they were also interested in moving into the house?
A Yeah.
Q Do you remember you told everyone the theme was pussy power? Do you remember that?
A No.
Q If you take a look at 11ET-20, which would be on the screen as well. And it's 5000 --
A Okay.
Q -- is the number at the bottom.
A Yeah. I think there was -- yeah, I think there were open spots in the house. The house was not filled and we were always looking for more strokers, so yes.
Q So, you wanted to entice them to come, is that right?
A Yeah, uh-hum. Uh-hum.
Q And on I think the next day, the next -- well, I'll ask you if you remember this first.
On February 4th, again you're asking somebody in the house to reach out to Malcolm so that you would make sure you had another stroker in the house for the next week.
Do you remember that?
A Where are we talking about? 11.
Q The next one 11ET-21. I think it's on the back. Sorry, on the next page though.
A Oh, yeah.
Q Is that a yes?

A Yes.
Q Okay. And you, yourself, would text with Andrew and Malcolm about coming over to do OMs, correct?
A Right. But I wasn't the only one that OMd with them.
Q Well, yes. I'm --
A Yeah.
Q But you were making these arrangements, right?
A For my OMs with them, yes.
Q And for the house, right?
A For them to come over, yes. Yeah.
Q And actually when you first moved in, it was difficult, the OMs were at 7:00 originally.
Do you remember that, 7:00 a.m.?
A Yeah, uh-hum.
Q And when you were teaching, that was a problem, right?
A Yeah. I would be late to -- to my job if -- if -- yeah. I needed to leave earlier.
Q So you got them to move it to 6:50, do you remember that?
A Yeah. They moved it ten minutes earlier so that I could practice too.
Q Now, you would, as you said, people came over, you went to friends' houses, right, during that time?
A Yes. I went maybe once or twice to a friend's house. At the beginning I went much more. My -- my -- my connections to the outside world were still strong and it took a while for me

to -- to kinda, you know, not talk to my family and not talk to friends, and so....

Q In fact, people in the house, they went out to hear music, right?

A Probably. I don't remember a specific time, but we had a musician in the house. We had, you know, a bunch of very talented people.

Q And you were invited to go hear some music.

Do you remember that?

A I don't.

Q Do you remember going to Castle Spa?

A Yes.

Q As we said, people in the house worked outside of the OM house, correct?

A Some of them, yeah. But when we went to Castle Spa, it was like, you know, we went as -- as a group of OMers. I went once or twice. I think maybe once, yeah.

Q No one was restricting you from leaving, correct?

A No, but I had to keep everybody informed of my plans.

Q Some people had boyfriends or girlfriends outside of the house, right?

A I -- who are other OMers?

Q Yes.

A Yes, who didn't live in the house, but maybe used to live in the house or lived in another house or all were connected

to the OneTaste community, yeah.
Q So is it your testimony no one had a relationship outside of OneTaste in this house?
A I don't remember.
Q And you -- one of the reasons for keeping connections at OneTaste was also part of the philosophy, right?
Connections to individuals were something you were supposed to be doing and wanting to do it to get what you were supposed to get out of the practice, correct?
A Yeah, one -- one of the -- one of the sayings that was -- that I heard from the very beginning is: Staying connected no matter what.
Q And no one -- you had a computer, right?
A Yes.
Q You had a cell phone, correct?
A Yes.
Q In fact, I think you were on your family's plan on the cell phone?
A I'm still on my family plan.
Q Lucky.
And you -- okay. And you were, again, at the beginning still working at your teaching job, right?
A Uh-hum.
Q Okay. Now in December, the end of December, you decided you wanted to quit, right?

A Yes.
Q And that was a decision you made on your own, correct?
A Yeah. I mean I remember telling Rachel that I want to devote -- that I want to become a salesperson and I want to, yeah, to devote my time to orgasmic mediation and OneTaste.
Q But your decision, though, to quit your job had nothing to do with becoming a salesperson, right?
A I wanted to work on the sales. I wanted to work in OneTaste. I didn't -- I never wanted to be a salesperson, but I wanted to be -- I mean, ideally, a teacher of orgasmic meditation, but I understood soon that there were no other jobs really in OneTaste besides sales and technology and stuff like that.
Q Those were the only jobs you were told about?
A Those were the only jobs that I knew, yeah. Like the sales -- everybody -- everybody was in sales, except maybe the one technology guy.
Q That you knew about, right?
A Yeah. Yeah, that I knew about.
Q And you -- the first time you went to the Intro to OM, you met Marissa Ward, right?
A Yes. I don't know if that's -- it might be the first time that we met.
Q Okay. At some point she became a friend of yours, right?
A Yeah. She was a very good friend, yeah.

Q And she lived in the -- she moved into the Brooklyn OM House with you?
A No, we did not live in the Brooklyn OM House together.
Q Okay. But you met her early on, right?
A I met her early on. I think I -- I think I -- the first time I actually saw her she was doing the front desk in an Intro to OM class.
Q Okay. And you messaged with her on -- do you remember messaging with her on December 31st, 2014 --
A I wish I had that kind of memory.
Q -- about you wanting to quit your job?
A I don't remember the conversation.
MS. COHEN: I am going to -- let's bring up just for the witness 11-FF, but I think I'll have to walk a copy up.
Your Honor, this is one that is going to be hard to see, but --
THE COURT: We'll do our best --
MS. COHEN: -- we'll see if the witness can read it.
THE COURT: Okay.
BY MS. COHEN:
Q I won't have you read the whole thing because it's hard to see.
A Okay.
Q I'll try to draw your attention to it.
Ms. Neria, if I could draw your attention to --

well, do you recognize this at all?
A (No response.)
Q Your name in the middle and the date.
A Uh-huh.
Q And if you look at --
A Okay, so got it. So I'm the gray, right.
Q Yes.
A Marissa's the blue.
Q Yes.
A Got it. Okay, so let me -- just give me a second.
Q It's just the top part.
A Yeah. Okay.
Q Okay. And does that refresh your recollection that you told Marissa --
A Yeah.
Q -- on December 31st that you were gonna quit?
A That I'm -- I'm -- yeah, I'm getting my courage up to quit. Yeah.
Q Okay. I just asked you don't read from it because we can only refresh.
A Oh, do you want me to read from it?
Q No, no, I'm sorry. I just want to ask you questions because it's not in evidence.
A Oh, okay. Okay.
Q Yeah, no problem.

And you -- you told her that you were getting up the courage you said to quit, right?
A Uh-hum, uh-hum.
Q And that you had to follow your intuition, that was the reason you were gonna do it, right?
A Uh-hum, uh-hum, yeah.
Q You didn't say anything about working for OneTaste, right?
A But that was -- that was, for me that was the reason. I didn't say anything here, but I wanted -- I quit my job in order to work for OneTaste.
Q Okay. You didn't line up a job at that point with OneTaste, right?
A No. But I believed because I was told in OneTaste where there is a desire, there is a way. I believed that if I made my desire clear to work for OneTaste, I will find a way to work for OneTaste.
Q Okay. And you had just — again, to orient ourselves — November you took the Intro to OM class and this is a little over a month later, right?
A Yeah, I went -- I mean by that time I spent -- you know, I sign up for $12,000 class. Took a bunch of other classes. Left my home. I was deeply in it, wanted to show my commitment, you know. There wasn't -- I had both of my feet like, you know, in the water. I didn't leave one out.

A I mean she -- she would say: I'm the best saleswoman there is.
Q And -- and you felt that she wasn't in it for the money, right?
A I knew that higher-ups and -- were making about $40,000 a year.
Q Right. And as an executive, that's not a lot of money, correct?
A Right.
Q And OneTaste New York, by the way, that was a separate business owned by Ravi, Ravi and Aubrey, correct?
A I wouldn't say that it was a separate business. I think the proceeds went to the same place. You know, but it was -- it was a branch of that business.
Q And you also testified that Rachel was sort of like a mother figure, right?
A Right.
Q And Rachel was actually trying to help you at many times throughout your time there, right?
A She said she'll make me a great saleswoman.
Q And she was giving you advice, correct?
A Yes, but she was giving everybody advice.
Q And she was -- she was intense, correct?
A Very.
Q She could yell at you, right?

A Okay.
Q All right. And you talked briefly about the set-up sales model.
Do you remember that?
A Step up.
Q I'm sorry. Step-up Sales Model.
And that's a sales model that's developed by outside consultants, right?
A Who OneTaste hired during the Coaching Program to teach us about Step-up, yeah.
Q Yes, okay.
And that the goal there is to help people solve the issues that they're facing, right?
A That's a very nice way of putting it.
Q And it's -- the Step-up Sales Model, in fact, was a model used by other companies other than OneTaste, correct?
A The only experience that I have with it is in OneTaste, so I don't know.

(Continued on the following page.)

(Whereupon, the witness steps down.)

We'll come back at five minutes to four. Don't talk about the case. Keep an open mind and enjoy the next 15 minutes.

(Jury exits the courtroom.)

THE COURT: I'll see everyone in 15 minutes.

(Brief recess.)

THE COURT: We can bring the jury out.

(Whereupon, the witness resumes the stand.)

(Jury enters the courtroom.)

THE COURT: Everyone may be seated. Ms. Cohen, you may resume your examination.

MS. COHEN: Thank you, your Honor.

BY MS. COHEN:

Q Ms. Neria, I put -- let me ask you first. I put some other documents up there, but I'll tell you in a second. Do you remember I was asking you that you said your employer was OneTaste New York, correct?

A Yes.

Q And that's who you received your money from, right?

A I believe so.

Q Documents to your left.

A Here?

Q Yes. Can you turn those over. Do you see 11FX?

A Yes.

THE COURT: Basis for objection?
MS. GUPTA: Foundation.
THE COURT: Overruled.
A Not that I'm aware of.
Q All right. Let go back to -- so you talked about your wedding to Misha. Several people told you throughout you're time at OneTaste to slow down. Do you remember that?
A I remember one conversation.
Q Do you remember Courtney Lapovsky telling you to slow down?
MS. GUPTA: Objection to hearsay.
THE COURT: I'll hear you out.
MS. COHEN: Just for the effect on the listener.
THE COURT: Overruled.
A No.
Q You don't remember Courtney Lapovsky telling you that?
A Slow down? No.
Q Do you remember her saying it with respect to your job?
MS. GUPTA: Objection to hearsay.
THE COURT: I'm going to sustain the objection. You can lay down a foundation.
Q Do you remember whether Courtney Lapovsky told you to slow down with respect to your job?
MS. GUPTA: Objection.
THE COURT: Basis?

MS. GUPTA: Same objection, hearsay, foundation.
THE COURT: Overruled.
A It's possible that we had a conversation about it. What I do remember is that OneTaste --
Q I'm asking if you remember Courtney Lapovsky saying. Is your answer no or yes?
A The problem with that question is that I read a Medium post that OneTaste published about me that says that, so I can't tell like what I remember and what I read recently in that medium post.
Q You don't have an independent recollection, that's all I'm asking you.
A Of her saying to slow down --
Q In connection with your job?
A I remember that we talked, that she, that we talked about it. I don't remember the details of the conversation.
Q Okay. And you said that you do remember a conversation with someone who told you to slow down, right?
A Yes.
Q Who was that?
A Guy Shahar.
Q Is that somebody from the OM house?
A The Brooklyn OM house. He said that before I moved into the staff house.
Q He told you that. And as we looked at before, Rachel

A I know that -- I know that --
Q Just yes or no.
A No.
Q It was a group of people who came together as a community to OM based on the principles of OneTaste, correct?
A Correct.
Q You made a decision to move into the OM house within a month of coming into OneTaste, right?
A Right.
Q And within that year, or less than a year time, you took many courses of --
A It was more than a month, it was about two months, but yes.
Q The time that you heard about the coaching program in November of 2014, it was about a little over a month, right?
A At the time, I heard about the coaching program in my intro to OM course.
Q When you decided to leave in September, people were nice to you, correct?
A Yes, at the end; but there was, at the beginning there was some resistance.
Q No one stopped you from leaving, correct?
A I was told that I will regret that decision for the rest of my life.
Q In fact, Aubrey told you -- in fact you told Aubrey you

Q You met before today with the Government over ten times, right?
A Yes.
Q And maybe even 15, does that sound right?
A I didn't count, but I would say somewhere around ten.
Q That was to review your time at OneTaste, right?
A Yes.
Q And your time working there for just under six months, correct?
MS. GUPTA: Objection. Misstates the testimony.
THE COURT: Overruled.
A About my time working there, yes.
Q Which was about March to September of 2015, correct?
A No, I started working there when I left my job in February or.
Q So about six months then, right?
A Yes.
MS. COHEN: Nothing further, your Honor.
THE COURT: Ms. Bonjean, any cross-examination?
MS. BONJEAN: Yes.
THE COURT: Go ahead.
CROSS-EXAMINATION
BY MS. BONJEAN:
Q Good afternoon, Ms. Neria. My name is Jennifer Bonjean. I represent Ms. Daedone.

Q So you never had previously achieved an orgasm, that was the another reason why you were talking to Ms. Heed, correct?
A That was something that I brought into our conversation.
Q And she was the one that introduced you to the OneTaste organization, correct?
A She was the one who told me to sign up for an intro to OM class.
Q She had herself taken an intro class, correct?
A Yes.
Q And she wasn't living in an OM house, right?
A Not -- no, I don't think so.
Q She never worked for OneTaste, correct?
A Not to my knowledge.
Q And sounded like she, according to you, she wasn't even an active member but had some association through her partner, correct?
A Her partner lived in an OM house.
Q So you understood when you signed up for OneTaste that it was a sexual wellness company, correct?
A Yes.
Q That's the reason you went there, right?
A Yes.
Q Because you had not an achieved orgasm, you were trying to explore your sexuality, right?
A I was trying to help myself, yes.

Q Right. So you testified on, I guess on cross or direct I don't remember, that somehow it made you vulnerable. But the reality is, you were looking precisely for an organization that was going to help you connect with your orgasm, right?
A Yes.
Q You wouldn't -- if you're trying to connect with orgasm and sexuality you wouldn't go sign up for a Cross Fit course, right?
A I think that if you want to -- I think that's a vulnerable desire to want to connect to your sexuality and to achieve orgasm; so in that way I was in a vulnerable position.
Q No doubt. But it was still your desire to achieve orgasm.
A Yes, I felt like I was missing something in my life.
Q Understood. And so you were recommended to an organization that helps you do that, right?
A Yes.
Q The practice is literally called orgasmic meditation, right?
A Right.
Q Your first introduction was through a TurnON event, right?
A I already bought my intro to OM, but before that went to -- went to a few TurnON events, that was my first introduction to the people.

Q Was this in October?
A Yes.
Q How many TurnON events did you go to in the month of October?
A Maybe two.
Q Okay?
A Maybe, two or three.
Q All right. Those are events that are designed to tell you about OneTaste, correct?
A Yes, and the practice, yes.
Q And there are also sales pitches, correct?
A Yes.
Q Any reason you went to three?
A You're asking what is the reason?
Q Why did you go to three of them in one month?
A Because I wanted to learn about the practice, and I felt interested in the practice. And I also felt interested in getting to know the people better. When I first walked into an event, people talked to me in a way that I've never been talked to before.
Q So the people at these events were warm, I take it, right?
A They were very warm. They made eye contact. They asked me questions I've never been asked before. They seemed very interested in me and my story.

Q And then you did sign up for this intro to OM. Do you know when you took the intro to OM? Did you say November?
A I believe it was November 6 the class.
Q Again, that's the course that you signed up for, correct?
A Uh-huh, yes.
Q And you had to pay for that one, right?
A Yes.
Q Were the TurnON events free?
A They were free. I think it was a $10 entry.
Q Got it. How long was the intro to OM class that you took?
A It started, it started at either eight or nine in the morning and lasted until 6:00 p.m.
Q So it was a day-long course?
A Yes.
Q And the TurnON events are, what, an hour long?
A An hour and-a-half, something like that.
Q You took a couple of TurnON events that were about an hour and-a-half, then you took the intro to OM in November, right?
A Uh-huh, yes.
Q That was a day-long course. What other courses did you take before you up and moved into the OM house?
A I think I took the communication course, I think. I'm not sure if it was right around the time that I moved or right

before. From my recollection it was like a week or two after the intro to OM.

Q So in fairness, you had taken, you had gone to two TurnON events and took an intro to OM, maybe a communications course before you fully plunged into the OM commune, correct?

A Yes.

Q Of all the people that you went to that introduction to OM course with, how many of them did that?

A A bunch of them became members, but I don't recall anybody from that course moving into the house.

Q Right. You, of course, could have become a community member without moving into the OM house, you agree, right?

A Yes.

Q And you can't identify a single person who took the introduction to OM course and then within weeks moved into the OM house, right?

A I'm sure it happened before, but I don't remember it from those course.

Q And then, you also had just moved into your own studio on the Upper West Side, right?

A No. I lived in that studio for about seven or eight years. I just moved to my own apartment in Fort Greene, Brooklyn.

Q My apologies, okay. So you had just moved into your own apartment in Brooklyn when you switched course and decided to

company. You understood that, right?
A No.
Q It was a sexual wellness company that started in San Francisco. It was a business, correct?
A It was a sexual wellness company that I thought cared about the well-being of women.
Q Okay. Well, you can be a business and care about your customers. Those things can be consistent.
I understand you don't think they are, but they can be consistent, right?
MS. GUPTA: Objection to the commentary.
THE COURT: Sustained. Sustained.
Ask a question, please.
BY MS. BONJEAN:
Q Ms. Neria, did you think it was a not-for-profit company?
A I did not think about what kind of company it was at the beginning.
Q Okay. But you knew -- you knew that the courses that they offered were expensive and you could not afford them, right?
A Right.
Q And Rachel told you: Hey, you're seeing Misha, you could ask him and maybe he will or maybe he won't pay for them, right?
A I wasn't seeing him at the time.

Q So you asked someone to pay for your course that you weren't even seeing?
A Exactly.
Q And why would you do that, because Rachel told you to?
A Yes, and I really wanted to take that course.
Q Okay. And Rachel told you, you know, you could ask, but he could say yes and he could say no, that's what you testified to, right?
A She told me I should ask him and if there is -- if he desires to pay for it, he will pay for it.
Q And he desired to pay for it, right?
A Right. I would have never asked Misha if I was not told to ask Misha.
Q If Rachel told you to jump off a bridge, would you have jumped off a bridge three weeks into OneTaste?
MS. GUPTA: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You took this Magic School course, right?
A Right.
Q And this Magic School Course was kind of a theatrical fun course, wasn't it?
A Fun for who?
Q I don't know, for you. You took it and then you took classes after that?

CROSS-EXAMINATION

BY MS. BONJEAN: (Continuing)

Q Is it your testimony that you only bought the sandals because Joanna liked them?

A And that I felt like I needed to wear something special for my wedding and, yeah, we didn't find a dress.

Q Okay. But in any event, it's not that you were surprised that you were getting married at the end of the Intensive, correct?

A Correct.

Q You testified, I think on direct, that you -- you thought it was somehow a show of loyalty to Nicole to marry Misha.

Do I have that right?

A 100 percent.

Q Okay. Why on Earth would it be a show of loyalty for you to marry Misha?

A Because we're marrying in the name of orgasm. We are having a OneTaste ceremony which means that we are dedicating our lives to the practice of orgasm, to the teachings of OneTaste.

Q But you didn't -- you didn't have to get married at the OneTaste Intensive, did you?

A We didn't have to get married. That's how I saw other people who have gotten married and they were, you know -- and I wanted Misha and I wanted us to be like them.

Q Okay. I mean, it would make sense that people that live in community with each other would get married amongst their community friends and other people in the community, right?
A In very expensive courses?
Q You did it, not me. I mean, I'm asking you.
THE COURT: Sustained.
MS. GUPTA: Objection.
THE COURT: Sustained.
Q No. Ms. Neria, you're the one that chose to do it that way, so I guess --
THE COURT: Is there a question?
MS. BONJEAN: Yes.
THE COURT: Ask the question.
Q Why would you choose to get married in an Intensive if you didn't want to?
A It's not that I didn't want to. It wasn't so clear-cut like that.
Q Okay. You know, Ms. Daedone, of course, as we pointed out, she's not married, right?
A Right.
Q There are plenty of people at OneTaste that were not married, correct?
A Yeah.
Ms. Daedone is always an exception to the rule.
Q Okay. Well, she's actually been married and not married.

She's done both, right?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q There are other people at OneTaste who were not married, right?

A Right.

And there were many people who were married.

Q That were married.

And there were many people, tens of thousands of people who attended courses that didn't go live in an OM house, right?

A You're speaking over the whole history of OneTaste. I don't know those people. I don't know who lived in an OM house and who didn't before I was there. I know only for the less than a year that I was there.

Q Of all the people that took a class with you, how many of them lived in an OM house?

A In CP, many.

Q How many people lived in an OM house that were in those introductory classes you took, whether it's a Valentine's class, the Intro to OM?

A Yeah, those, those classes -- so it's like a funnel, you know? Those classes are more like open to the public and many people take it. And the hope is that those people will sign up for the next course.

Q Right.
A In the next course, like CP, because CP was pitched in the Intro to OM, all of -- like, most of those people lived in OM houses. So, you know, it gets more and more specialized as you go. The more in, the more involved people are.
Q Right. The more involved you choose to get?
A Yeah. Out of every Intro to OM class, you know, there are some people who choose to get more involved.
Q And most of them do not; that's correct, right?
A Probably, right.

(Pause in proceedings.)

THE WITNESS: OneTaste would not exist if --

MS. BONJEAN: Excuse me. There's no question.

Judge, Your Honor, I don't want to speak directly to the witness if there's no question pending.

THE COURT: Okay. So ask the next question.

Q Now, after -- after you got married, shortly thereafter, you actually ended up leaving OneTaste with Misha, right?
A Right. Yes.
Q Not long after, correct?
A Not long at all.
Q Wasn't that hard after all, was it?

MS. GUPTA: Objection.

THE COURT: Sustained.

Q Wasn't that hard to leave.

the back.

Go ahead, Ms. Gupta.

Q Do you recall seeing this document, Defense Exhibit 11-R?

A Yes.

Q And do you recall, I believe it was Ms. Cohen who was going through some of these bullets that are listed here?

A Yes.

Q So if you look to the seventh bullet which states at the end: I alone will decide and accept responsibility for how and for what purpose I apply the contents of this course.

A Yes.

Q You started to say this is the perfect example and then you were cut off.

What did you want to say?

A That this is the perfect example of the kind of language that OneTaste used over and over again, that it's our responsibility, our sole responsibility for the decisions we make, that we're adults, that -- you know, that -- about the, like, victim mindset.

So in that sense, we internalized this idea that whatever was happening to us was our fault and our own doing. That's why every time I reverse engineered, I had to take full responsibility for what had happened to me, even though there were many forces in the OneTaste community that -- you know, that had to do with what happened to me. It wasn't my own

Q You testified on cross --

THE COURT: And I'm going to strike that answer.

MS. BONJEAN: Thank you.

Q You testified on cross-examination that while you were at OneTaste, you had both feet in the water and it felt like a current was taking you.

What did you mean by that?

A It felt like my life got out of my control, that I was being carried away, the current into OneTaste without being able to stop myself.

MS. GUPTA: No further questions.

THE COURT: Any recross? Ms. Cohen.

MS. COHEN: Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MS. COHEN:

Q Ms. Neria, you testified just now on redirect about OneTaste telling you to take responsibility for your actions, right?

A Yes.

Q And when you first got involved with OneTaste and first moved into the Brooklyn OM house, you had friends outside of OneTaste at that time, right?

A Right.

Q You had family right?

A Right.

Q You had a college education, right?
A Right.
Q And you decided in December of 2014, a little over a month after taking the Intro to OM class, that you were going to quit your teaching job, right?
A I'm not clear on the date.
Q We can bring out -- you remember the December 30th --
A Was that at the end of December? Okay.
Q It was at the end of December, right?
A Mm-hm.
Q And, in fact, you had a Master's in teaching, correct?
A Right.
MS. GUPTA: Objection, asked and answered.
THE COURT: Overruled.
A This was not my first teaching position.
Q And you also testified on redirect about the pressure to engage in orgasmic meditation?
A Yes.
Q But when you moved into the One house -- sorry, excuse me.
When you moved into the OM house, you were the one arranging these orgasmic meditation sessions, correct?
A Each person was supposed to arrange their own orgasmic meditation session.
Q And you were reaching out to people outside the house to

join these sessions, correct?
A Right. To people I met in the OPC, the OM Practice Club, and in the community. There was OM Hub, which was a social network created to arrange OMs.
Q So that's a yes, right?
A Yes.
Q And you also talked about dressing like others at OneTaste?
A Right.
Q When you talk about Rachel, dressing like Rachel, you wanted to be like Rachel when you got there, right?
A I was enamored by Rachel.
Q And a lot of people were, right?
A Right. Yes.
Q And you were socializing with all of these people?
A Right. Yes.
Q And you talked about different terms on redirect about stroking and orgasms. You were asked about other terms, as well.
A Mm-hm.
Q Stroking and orgasm, those are the very reasons you went to OneTaste, correct?
A Not stroking. I went -- I went to OneTaste in order to learn how to have an orgasm.
Q Right. And from the first moment you learned about it,

you learned that orgasmic meditation involves stroking, correct?

A Right. Yes.

MS. COHEN: Nothing further, Your Honor.

THE COURT: Ms. Bonjean, any recross?

MS. BONJEAN: Yes.

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q Ms. Neria, you indicated that everybody started -- everybody was wearing, like, the same uniform; is that right?

A That a lot of the women had the same clothes.

MS. BONJEAN: Can we pull up Defense Exhibit 11-FL. I believe it's in evidence, right?

MS. COHEN: Yes.

(Exhibit published.)

Q Fair to say you and your friend here are not even dressed remotely similar to each other, right?

A Yeah. Not every time. But here you can see I am wearing a short black dress. There are many pictures of Marissa wearing short black dresses.

Q Many women in New York wear short black dresses, right?

A And many women in OneTaste wear short black dresses.

Q You wore a lot of short black dresses?

A I had like -- I had a couple.

Q Okay. And I just want to get this straight. It's your

testimony that Nicole's ideas is the reason you did everything that you did for an entire nine months at OneTaste; is that right?

MS. GUPTA: Objection. Misstates the testimony.

THE COURT: Overruled.

A Yes.

Q Okay. So an idea had the power to make you marry someone, right?

A It was like a religion.

Q Okay. An idea that -- you know you can reject ideas; you know that, right?

A Right. Yes.

Q As a teacher, you know that you read things that you don't always agree with, correct?

A Right.

Q And you understood in listening to Nicole speak, that she speaks metaphorically quite a bit, right?

A Nicole is very convincing.

Q My question, ma'am, is do you understand that she speaks metaphorically?

A Not always.

Q You know what a metaphor is right, obviously?

A Of course.

Q You understand that when she tells stories, it's not literal, sometimes there's metaphors involved, correct?

A Many times her stories are very literal.
Q I didn't say it was all the time. I said often she speaks metaphorically. Correct?
A Sometimes. I think like the Greek mythology, there was some metaphor there.
Q Right. She wasn't actually saying there was some men coming back from war that you should fuck the war out of, right?
A No, but when she talked about unconditional sex and having sex with men off of Craigslist, that was not metaphorical.
Q Okay. Well, I don't know what you're talking about right now, but --
THE COURT: So let's sustain that and just ask a question.
MS. BONJEAN: Right.
BY MS. BONJEAN:
Q So when she talked about victimhood, she has her own viewpoints about how victimhood keeps women in stasis, right?
A Right.
Q She chooses to reject the idea that even if something bad happens to you, that you come in and just claim victimhood because it hurts you.
That is her idea, right?
A Well, I think that idea serves her very well.

Q And that's okay. It doesn't have to serve you though, correct?
A It serves her very well as a person who does bad things to people.
Q Okay. I understand that's your opinion.
My question is, is that you did not have to accept that idea for yourself, did you?
A Right.
Q Right. You can wallow in your victimhood all you want, you are entitled to do that; right?
MS. GUPTA: Objection.
THE COURT: Overruled.
Q Right?
A Right.
MS. BONJEAN: Thank you.
THE COURT: And the witness may step down.
THE WITNESS: Thank you.
(Witness steps down.)
THE COURT: We reached the end of the day and I will remind you tomorrow is the day that we're only going to have you here until 3:00 p.m.
So make sure you come on time again tomorrow at 9:15, so we can start at 930. We might take a slightly shorter lunch break, but we'll see. But we will get you out of here at 3:00.

A She was also a leader in the organization.
Q And do you see her here today in the courtroom?
A Yes.
Q Can you please identify her by something she's wearing for the record?
A She's standing with the black-rimmed glasses.
Q And has Rachel Cherwitz ever harmed you?
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A Yes.
Q And at a high level, how did Rachel Cherwitz harm you?
And try to keep it specific to Ms. Cherwitz.
A Emotionally, abusive, verbally abusive.
Q You mentioned OneTaste. What is OneTaste?
A It's a cult where a group of people --
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection.
THE COURT: Overruled.
A -- where they taught something called orgasmic meditation.
Q And what is orgasmic meditation?
A It's where one person strokes the clitoris of another person.
Q Were you involved in OneTaste?
A Yes.

OneTaste curriculum?
A It was one of the practices that they taught but that there was like an overarching kind of theme of classes around spiritual awakening and relationships, intimacy, connection.
Q Was orgasmic meditation a feature of that first event you went to about communication skills?
A No.
Q So when did you -- when was the first time you learned about orgasmic meditation from OneTaste?
A After the communications event, I had signed up for an intro to OM course.
Q How did you come to sign up for the intro to OM course?
A I signed up for it online, actually. Yeah.
Q Was that after you attended that first communications event you described?
A No, I think I actually signed up for it first and then someone called me to tell me about the -- the communications event.
Q So what were your personal views of orgasmic meditation at the time you first joined or started attending OneTaste classes?
A Like upon first hearing about it, it sounded like crazy, something I would not want to do, like that was my initial reaction. But then after watching the Ted Talk, I was curious, and then being at the communications event before the

OM, intro to OM class, it seemed like people are kind and friendly and, so, I started to become more, like, open to the idea.

Q When you became involved at OneTaste, was OneTaste hosting public group OMs at the time?

A No.

Q So you testified that you were at OneTaste for about a year. During your year there, approximately how many OneTaste courses did you end up taking?

A It's hard to keep track of how many. A lot. Probably 20, 20 to 30. There were also all kinds of events in between, you know, like, so, there were official classes or courses. But then there were also just events that I was volunteering at, and then we would support the women's support group, so I was there it seemed like all the time in that year. But some of that time was me taking official courses and some of that time was me volunteering or going to support, like the women's groups, things like that.

Q So following those first two courses -- two classes you described, the communications one and the intro to OM, did there come a time when you signed up for the coaching program?

A Yes.

Q And approximately when was that?

A That was at the intro to OM class.

Q Describe to us how you were -- withdrawn.

A Yes.
Q Once you started dating Rami, were the two of you monogamous?
A Yes.
Q Did you express that you were monogamous to other participants at OneTaste?
A Yes.
Q How, if at all, or what, if anything, was the reaction to your monogamy with Rami?
MS. BONJEAN: Objection to foundation.
THE COURT: Sustained.
Q Did you share with Rachel Cherwitz that you were monogamous with Rami?
A Yeah. Well, there were like women's groups that met every Sunday, and so the women would gather and talk about their experiences and relationships, and so I shared it with, yeah, the group.
Q Did that include Rachel Cherwitz?
A Yes.
Q What was Rachel Cherwitz's reaction to your being monogamous with Rami?
A Just that I was like clingy and it was discouraged, that I was trying to stay in my comfort zone, I wasn't willing to get messy, that kind of thing.
Q Did you ever discuss this with Nicole Daedone?

A I don't -- like, I never really -- apart from being in Nick's coaching circles, I didn't really have conversations with her.
Q Did there come a time you moved into Rami's apartment?
A Yes.
Q What were the circumstances of your moving in with him?
A So there was the month of the coaching program. It was March, and it was like relationship month was the theme. So, we were encouraged to kind of have some sort of like experiment or project or some kind of challenged within a relationship, something that challenged us. And, so, that's what Rami and I did for that. We moved into together as like a relationship experiment.
Q Did someone in the coaching program instruct or encourage you to move in together?
A I don't remember.
Q While you were dating Rami, what, if any, interest did he have in sort of self-help or exploration?
MR. ROBOTTI: Objection. Relevance.
THE COURT: Sustained.
Q During your time at OneTaste, what, if any, experiences did you have with respect to staff members there discouraging you from being involved in other organizations?
A Yeah. So, Rami was often kind of seeking and exploring and wanting to be in different groups or --

MR. ROBOTTI: Objection. Hearsay.

THE COURT: Overruled.

A -- like learning different things.

I remember at one point he was going to Peru for ayahuasca retreat and that, like, the staff of OneTaste was really discouraging of that, like he was getting off path, and -- yeah. That it was often encouraged to like stay in this community.

Q Who specifically discouraged Rami from participating in this trip to Peru, if you remember?

A I don't remember specifically. I remember being told by somebody at OneTaste.

MS. BONJEAN: Objection. Hearsay.

MS. FARRELL: It's okay. There wasn't a question spending pending. I will move on.

THE COURT: Okay. Go ahead.

Q Did there come a time when you became an employee of OneTaste?

A Yes.

Q And approximately when was that?

A It was toward the end of my time there. So I want to say like the end of -- end of -- like late summer, early fall of 2017.

Q If I showed you a document, would that potentially refresh your recollection?

A Yeah.

MS. FARRELL: May I use the ELMO for the witness only, please.

For the witness only, I'm showing what has been marked Government Exhibit 2677.

Q If you could just take a look at this.

A Okay. Yes.

Q So, does this document refresh your recollection about approximately when you became an employee of OneTaste?

A Yes.

Q And approximately when did you become an employee?

A August of 2017.

Q Was it late August or early August, if you know?

A Late.

Q So before you became an employee of OneTaste in August 2017, did there come a time when you began doing work for OneTaste?

A Yeah, I did a lot of volunteer work.

Q Approximately when did you start volunteering for OneTaste?

A I don't remember. Yeah, I'm not sure.

Q In terms of your time, your year there, was it on the earlier side or on the latter side?

A I would say it was on the earlier side, yeah.

Q And what kind of tasks did you perform?

A So, we would like go before an event and set up chairs, cut fruit, get everything kind of organized for the class or the event. Yeah.
Q And at that time, what were you doing for a living outside of OneTaste?
A I had just stopped officially taking care of my nieces, so I was a nanny for my sister. But when I started OneTaste, I had stopped working for my sister.
Q So were you working to earn money at any job at the time?
A No.
Q When you were doing this work, not when you were a technical employee, but when you were doing these tasks for OneTaste, what were your typical hours?
A It would be an all day-event, start early, finish late.
Q Specifically, when, for example, when you say start early?
A One time we were supposed to flyer at like five o'clock in the morning.
Q And then how late would you be volunteering or working?
A It could have been anywhere. From, I think, like even 9:00, 10:00, 11 o'clock at night.
Q And when you were doing this work before you became a paid employee, who was your supervisor?
A I guess it would have been Aubrey Fuller.
Q And during this time, did you ever interact with Rachel

MS. BONJEAN: Objection to --
THE COURT: Yes, sustained.
Q I just want to know what, if anything, you witnessed being taught about monogamy at your early days at One Taste?
A So that was it was an advanced practice.
Q What does that mean?
A So until you were ready for it, that you should be -- you should, like, open up your orgasm, open up your sex, get messy, and, yeah, I was not ready for it apparently.
Q And who taught that?
A One Taste staff.
Q Was there a particular language people at One Taste used?
A Yeah.
Q Are you familiar with the term "aversion" as it was used at One Taste?
A Yes. They talked about something called an aversion practice.
Q What was that?
A People were encouraged to do things that they had an aversion to, like, Om was somebody they found repulsive or have sex with somebody that they weren't attracted to.
Q Are you familiar with the term "victim mindset" as it relates to One Taste?

A Yes.
Q What does that mean?
A There were --
MS. BONJEAN: I'm going to object to the form of that question.
THE COURT: Sustained.
Q What did you learn victim mindset meant from your being a student at One Taste?
MR. ROBOTTI: Objection to foundation.
THE COURT: Overruled.
A It was talked about a lot in courses and communication classes. Just that it was talked about the victim triangle. So you were either a victim, a witness, or a perpetrator.
Q And what did that mean?
A So the victim was somebody who, like, couldn't take responsibility for what was happening to them.
Q And what about the witness and the perpetrator?
A The witness was the observer. So we would often be paired or, like, grouped into three and you would have some sort of, like, scenario. So one person was observing, one person was kind of the perpetrator or, like, giving insights or something and then the victim was the person who if you couldn't --yeah, there was the victim that was labeled as weak or unable to take responsibility for their circumstance.

Q Are you familiar with the term "turned on"?
A Yes.
Q What did that mean in the One Taste context?
A It could many sexually but it didn't -- it wasn't limited to that. It was kind of like a catch-all for, like, if a woman was in her power, charismatic or, yeah.
Q Are you familiar with the term "stroke"?
A Yes.
Q What did that mean?
A Again it could mean like literally stroking the clitoris or they also used it as like if you, you know, people were giving insights or saying something to you that could be considered like a stroke.
Q Was there a One Taste word for the concept of a trend?
MS. FARRELL: I'll withdraw.
A I'm not sure.
Q Did you begin using this vocabulary while you were there?
A Yeah.
Q And how, if at all, did this vocabulary affect your life?
MS. BONJEAN: Objection to that the vagueness of that question.
THE COURT: Sustained.
Q How did your implementing this vocabulary affect your

forgot the question.
Q That's okay.
When was the last time you spoke with Nicole Daedone?
A About -- I believe it was that event where Rami and I got engaged.
Q And what about Rachel Cherwitz?
A It probably would have been after -- like late fall, just before, because Rachel was more around New York.
MS. FARRELL: I have no further questions, Your Honor.
THE COURT: Mr. Robotti?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Okay. Cross-examination.
CROSS-EXAMINATION
BY MR. ROBOTTI:
Q Good afternoon, Ms. Keves.
A Good morning.
Q My name is Mike Robotti, and I represent Rachel Cherwitz. Nice to meet you.
So you're originally from Michigan, correct?
A Yes.
Q And you went to college, correct?
A Yes.
Q Where did you go?

A Michigan State for undergrad.
Q And what was your degree in?
A Elementary education.
Q And you got a master's degree, correct?
A Yes.
Q That was in teaching?
A Yes.
Q And you later got a second master's degree, correct?
A Correct.
Q What was that in?
A Social work.
Q And what year did you move to New York?
A 2012.
Q And you participated in OneTaste from 2016 to 2017; is that correct?
A Yes.
Q Is it fair to say that during that period of time, you had a significant financial safety net in place?
A I don't know how significant, but I had some savings when I began OneTaste, yes.
Q Okay. And your parents were both employed, correct?
A My parents?
Q Yes.
A Yeah.
Q Okay. And your sister, she's an attorney, correct?

A Yes.
Q And her husband, who is your brother-in-law, he's the manager of a hedge fund, correct?
A Correct.
Q And you nannied for your sister's children; is that correct?
A Yes.
Q And you got paid to do that?
A Yes.
Q And you lived there rent free, correct?
A Yes.
Q And that was before you got involved in OneTaste, right?
A Yes.
Q What years did you nanny?
A 2014, I think, to 2016.
Q So that was about two years before you got involved in OneTaste, correct?
A Yeah.
Q And you started at OneTaste while you were still living there, correct?
A Yes.
Q And they lived in an apartment in the SoHo neighborhood of Manhattan; is that right?
A Yes.

Q And did they own that apartment?
A Yes.
MS. FARRELL: Objection. Relevance.
THE COURT: Sustained.
Q And during your time at OneTaste, you also vacationed with them in the Hamptons; is that right?
MS. FARRELL: Objection. Relevance.
THE COURT: Sustained.
Q So is it fair to say that your family had significant resources while you were at OneTaste?
A My sister, yes.
Q Okay. And if you needed to in 2016 or 2017, you could have gotten an Uber and stayed at your sister's place; is that right?
A Yeah.
Q And that's where you lived before, right?
A Yes.
Q I'd like to show you what's been marked for identification as Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC.
MR. ROBOTTI: Your Honor, may I approach?
THE COURT: Yes.
And the Government has all these, right?
MR. ROBOTTI: Yes.
Q Just take a moment and look through those stack of

documents and let me know when you're done.

MR. ROBOTTI: Your Honor, these have been redacted pursuant to the conversation this morning.

THE COURT: Thank you.

Q Now, ma'am, is that stack of documents the consent forms that you signed while you were at OneTaste?

A Yes.

Q And you signed at least seven consent forms; is that correct?

A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC.

THE COURT: Any objection?

MS. FARRELL: No.

THE COURT: Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC are admitted.

(Defense Exhibits 9-EW, 9-EX, 9-EY, 9-EZ, 9-FA, 9-FB, and 9-FC received in evidence.)

MR. ROBOTTI: If we could pull up 9-EW on the screen and publish to the jury.

(Exhibit published.)

MR. ROBOTTI: And if we could go to the first page.

Q Now, ma'am, you reviewed and signed all these forms; is

that correct?
A Yes.
MR. ROBOTTI: If we could zoom in under Assumption of Risk.
Q We're not going to go through all of these, but I'd just like to ask you about a few of them.
So can you see there at the top bullet point: I've reviewed the released parties' literature and am familiar with the sexual nature of the practice of OM?
A Yes.
Q Do you see the third bullet point: Any concepts, notions, ideas, suggestions, and recommendations from the released parties and anyone acting on behalf of the released parties that I accept and/or apply to my life, I do of my own free will.
A Yes.
Q Do you see a couple of bullet points down: The content of the course is controversial?
A Yes.
Q And do you see at the bottom, the last bullet point, that: Certain participants may make statements or take actions that I disagree with or find offensive?
A Yes.
Q And then just on the next page.
MR. ROBOTTI: If we could zoom in at the top.

Q And the second bullet point there: I may choose not to participate in any activity offered in the course. However, if I decide to participate, I do so of my own knowing and free will.
A Yes.
MR. ROBOTTI: We could just move off that screen there.
Q And you initialed right under that, right?
A Yes.
Q All right. And not every consent form has the exact same language, but is it fair to say that all of those forms have the substance of that language in there?
A Yes.
MR. ROBOTTI: I'd like to just pull up 9-EW. I'm sorry, 9-FC.
Q Do you recognize this as a consent form for the June 2017 Intensive? It should also be on the screen right in front of you there.
A Yeah, I don't think -- oh, I see.
Yes.
Q Okay. And just looking at the first paragraph there, do you see that says: OneTaste's work is about putting yourself in an environment where you request go out of control so that you can find out who you really are underneath your identity, so that you can truly play in

life. In order for OneTaste to be able to create this experience for you, you agree to surrender the right to hold anybody but yourself fully responsible for your actions and for your experience, of other people's actions, that you agree to treat this responsibility as yours and yours alone.

Do you see that there?

A Yes.

Q And you signed this form as well, right?

A Uh-huh.

Q So you were repeatedly reminded throughout your time at OneTaste of this type of language in these documents?

A Before each course we signed documents, yes.

Q Right. And you took 20 or 30 courses, you said?

A Around there.

Q And you signed at least these seven forms, right?

A Yes.

Q All right. So I'd like to talk a little bit about the coaching program.

So you did the coaching program from November 2016 to August 2017; is that right?

A Yes.

Q And you didn't start working at OneTaste until August of 2017, right?

A Correct.

Q And you found the coaching program to be very

beneficial at the time, correct?
A Yeah.
Q And you also thought the OM practice was very helpful, right?
A I'm -- I'm sure at the time I did.
Q And you also enjoyed the community aspect of OneTaste; is that correct?
A Yes.
Q And do you recall sending an email on December 29, 2016 describing why you had started participating in OneTaste?
A No.
Q Would it refresh your recollection if I showed you that email?
A Sure.
MR. ROBOTTI: Can we pull up Defense Exhibit 9-A. And if we can zoom in under Why Am I Here.
A Yeah.
Q So do you recall believing at the time: I am here to remember I am powerful?
A Yes.
Q And do you recall believing over time: I had accumulated rules, fears, and beliefs that blocked me from power I knew as a child, that I learned to control, fix, and manage --
MS. FARRELL: Objection, Your Honor.

met him at OneTaste, right?
A Yes.
Q Rami was a wealthy guy, right?
A Yes.
Q And he lived in a high-rise building in Chelsea?
A Yes.
Q And he made a lot of money writing poker games; is that right?
A Yes.
Q And he helped pay off some of your credit card debt; is that correct?
A I don't recall that.
Q And he started paying for your OneTaste programs because he had the resources to do that; is that right?
A Yes.
Q And over time, he paid tens of thousands of dollars for you; is that correct?
A Yes.
Q And that was something that you asked him to do, correct?
A Yes.
Q And you made the choice to ask him to do that?
A Yes.
Q And he made the decision to give you the money?
A Yes.

Q And that was his money, correct?
A Yes.
Q And his choice to do that, right?
A Yes.
Q And your understanding was that he did that because he loved you, correct?
A I -- I guess.
Q So your relationship with Rami moved pretty quickly, correct?
A Yes.
Q You two chose to be together?
A Yes.
Q You were in love?
A I thought I was.
Q At the time you believed you were in love?
A Yes.
Q You went home to meet his parents in June of 2017; is that right?
A Yes.
Q And that was a big deal because he had never brought a girlfriend home, right?
A Yes.
Q He had a traditional Muslim family, correct?
A Yes.
MS. FARRELL: I'm going to object to the

relevance.

THE COURT: Sustained.

Q And you also introduced him to your family, correct?

A Yes.

Q Now, by July 2017 he proposed to you, right?

A Yes.

Q And that was, as you testified earlier, at the Nicole Daedone Intensive, correct?

A Yes.

Q And you were thrilled at the time that he proposed to you?

A Yes.

Q And it was around this time that you decided to sign up for the Lineage program, correct?

A Yes.

Q And Rami also paid for that, right?

A Yes.

Q And that was a longer teaching program over the course of three years, correct?

A Uh-huh.

Q That was broken up into six semesters?

A I don't know. I didn't end up doing it.

Q Okay. But at this point it's fair to say you were all in at OneTaste?

A Yeah.

Q And at this point, is it fair to say that you were finding the OM practice beneficial?
A Yeah, at that point I was.
Q And that you were excited about the opportunity of continuing with these OneTaste courses?
A Yeah.
Q Okay. And so in the summer of 2017, you also decided to move in to 156 Second Avenue in the East Village; is that correct?
A The yes.
Q And that was an apartment where certain OneTaste staff members lived; is that right?
A Yes.
Q And that was organized by OneTaste staff, right?
A Yes.
Q That was not run by the company, correct?
A It was -- I'm not sure.
Q That was a residence that was organized by OneTaste staff members, correct?
A I believe so, yes.
Q To your knowledge, the company was not operating that apartment?
A Not to my knowledge.
Q And you lived there rent free; is that right?
A Rami paid the rent, yeah.

the transcript?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Okay.
THE WITNESS: Okay.
Q So in mid 2017, you'd been OMing for about nine months; is that correct?
A Uh-huh.
Q And do you believe --
At that time, did you believe it had changed your relationships?
A Yes.
Q And at that time, did you believe you had --
You had previously been terrified of people, men in particular?
A Yes.
Q But that the area of your life -- that area of your life had completely shifted as a result of your OM practice?
A Yes.
Q And that you were having much more of a connection and intimacy in your relationships as a result?
THE COURT: Sorry. Are you asking her if that's how she felt or if that's what she said on some video? It's unclear what the question is.
MR. ROBOTTI: I'm asking her if that's how she felt in mid 2017, Your Honor.

THE COURT: Okay. So if you could just pose each question the way you want her to hear it, that would be helpful.

MR. ROBOTTI: Yes, Your Honor.

Q So in mid 2017, did you feel that as a result of your OM practice, you were having much more of a connection and intimacy in your relationships?

A Yes.

Q Now, you met Rachel Cherwitz through the coaching program; is that correct?

A I met her first at the -- at the New Year's Eve retreat. But yes, she was also at the coaching program.

Q Okay. And you really liked and admired Rachel, right?

A That's not how I recall feeling.

Q Okay. Well, in May of 2017, do you recall sending an intake form in which you described your feelings about Rachel?

A No.

MR. ROBOTTI: Can we pull up Defense Exhibit --

Q Would a document refresh your recollection?

A Yes.

MR. ROBOTTI: Can we pull up Defense Exhibit 9-Y.

And if we could zoom in on the bottom third of the page or so.

THE COURT: Sorry, what's the number?

A Yes, that was before.
Q Okay. And today, you're blaming her for your decision to open up a credit card; is that right?
A I'm just recalling the facts, but she suggested I open a credit card and I did it -- but I did it, yes.
Q It was your choice to open the credit card; right?
A I opened the credit card.
Q And your testimony is not that Rachel Cherwitz asked you to open a credit card?
A Correct.
Q And it's not that Nicole Daedone asked you to open a credit card?
A That's right.
Q And you actually thought a lot about how to pay for your courses at OneTaste; correct?
A Did I think a lot about it? I mean, they were expensive, so yeah.
Q During your time at OneTaste, you evaluated your finances; correct?
A Yeah.
Q And you thought a lot about how to come up with a plan for how to pay for those courses; correct?
A Yes.
Q And that's a conversation you had with Marissa Ward, for instance; right?

A Probably.
Q And Marissa Ward was a salesperson at OneTaste; correct?
A Yes.
Q And you talked with her about the fact that you were thinking of applying for a business credit card; right?
A Maybe. Yeah.
Q Right?
And another plan that you had was to try to pay for the courses through your own coaching business; is that right?
A Yes.
Q And you were hoping to get a few clients a month, so that you would be able to use that income to pay for the courses; is that right?
A Yes.
Q So you were thinking through your finances and how to pay for this; right?
A Yes.
Q The only option for you was not to go into credit card debt; correct?
A Correct.
Q And if you did open a credit card, that was a choice you made after carefully thinking about it; right?
A I opened the credit card, yes. I made the decision to do that.
Q It's fair to say you were in charge of your own personal

finances?
A Yes.
Q You were an adult at the time?
A I was.
Q You knew OneTaste was a for-profit company?
A Yes.
Q And you wanted to buy its products; right?
A Yes.
Q And that's because you were excited about the OM practice?
A It's in part, but it was also that was the culture, that was the environment. You just kept buying courses and you had to figure out how to do it.
Q You had to figure out how to do it; right?
A Yes.
Q You looked at your finances and made a careful decision about whether or not to spend the money?
A Yes.
Q Okay. And you also had a significant safety net at the time; right?
A Well, I had spent all of my savings.
Q All right. But if you got into too much debt, you could turn to your parents or your sister or your brother-in-law; is that right?
A Well, their money is not my money. I did get into

Q Before the break, I played for you, or showed a transcript of a February 2017, coaching circle with Nicole; do you recall that?
A Yes.
Q And you remember that coaching circle?
A Yes.
Q And during that coaching circle, you told Ms. Daedone how beneficial your time at One Taste had been; do you recall that?
A Yes.
Q And you said that you had come through the door a little over two months ago and your live was completely different now; do you recall that?
A Yes.
MR. ROBOTTI: Your Honor, at this time, the defense moves Defense Exhibit FD.
THE COURT: Now, that you've given to me I can listen to it.
Is it audio or video?
MR. ROBOTTI: It's an audio recording.
THE COURT: You have it made.
MR. ROBOTTI: FD-1 is a clip of FD.
THE COURT: Let me see if you've given me that.
Okay. Give me a minute then. Just audio, correct.

MR. ROBOTTI: Just the audio, your Honor.

THE COURT: Give me one moment.

(A brief pause in the proceedings was held.)

THE COURT: So tell me, Mr. Robotti exactly, what you're offering. The clip?

MR. ROBOTTI: The clip FD-1 and the transcript which is FD-T or, I apologize, FD-1-T for the affect on the listener, your Honor.

THE COURT: Are you offering the transcript as an aid to the jury or as an exhibit?

MR. ROBOTTI: As an aid to the jury, your Honor.

THE COURT: Any objection?

MS. FARRELL: Yes, Your Honor. Objection on the basis of hearsay and improper foundation.

THE COURT: I'll sustain the objection but I'll allow to you ask some more foundational questions.

EXAMINATION BY

MR. ROBOTTI:

(Continuing.)

Q Now, Ms. Keves, do you recall at this time what you explained to Ms. Daedone?

A You're referring to the clip you had me listen to earlier.

Q Did the clip you listened to a moment ago refresh your recollection?

A I didn't listen to anything a moment ago. There was nothing playing a moment ago.
Are you talking before the break?
Q Before the break.
A Yes.
Q During the coaching circle; do you recall that?
A Yes.
Q Do you recall what you said to Ms. Daedone at that time?
A Yes.
Q And what did you say?
A I was talking about how Om had changed my life and being a part of the organization had changed my life.
MR. ROBOTTI: Based on that foundation, your Honor, we renew our request to admit Defense Exhibit 9FD-1 for the effect on the listener.
MS. FARRELL: Same objection. I don't think she's testified about it. She wasn't even able to hear the clip that they're moving in, she just testified.
THE COURT: Yes, I'm going to sustain it.
Do you want to listen to it again and you can ask more questions.
MR. ROBOTTI: I believe she testified she recalled listening to it before the break.
THE COURT: I know that was a while ago.

MR. ROBOTTI: Can we play for the witness again 9FD-1.

THE COURT: Just the shorter clip, right?

MR. ROBOTTI: Yes.

THE WITNESS: I'm not hearing anything. Nothing.

MR. ROBOTTI: I'm going to approach with the transcript, your Honor.

THE COURT: Sure.

A I hear it now.

(Audio file played for the witness only.)

Q Ma'am, do you recognize your voice on that clip?

A Yes.

Q Do you recognize Ms. Daedone's voice on that clip?

A Yes.

Q And, again, during that clip, did you tell Ms. Daedone how beneficial the practice had been for you?

A Yes.

MR. ROBOTTI: Your Honor, we renew our request to admit Defense Exhibit 9FD-1 for the effect on the listener.

MS. FARRELL: We object to improper foundation.

THE COURT: Overruled. Not Defense Exhibit 9FD-1 is admitted and are you still seeking to admit -- offer the transcript as an aid to the jury.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: So any objection to that?

MS. FARRELL: No, Your Honor.

THE COURT: So Defense Exhibit FD-1, I'm sorry, it's FD-1-T.

MS. FARRELL: 9FD-1.

THE COURT: I'm sorry. Okay. This is a very strange numbering system but we're working with it.

9FD-1-T is admitted as an aid to the jury.

(Defendant's Exhibit 9FD-1-T was marked in evidence.)

MR. ROBOTTI: Can we play that audio clip for the jury?

(Audio file played in open court.)

(Audio file concludes.)

EXAMINATION BY

MR. ROBOTTI:

(Continuing.)

Q All right. Just to be clear, you recognized your voice there at the end as the one saying, Yeah, things are different. I feel really good.

A Yes.

Q Do you also remember before the break that you watched a video of you and your housemates saying, Hi, Rachel?

A Yes.

Q And you saw yourself on in that video?

A Yes.

Q Do you recall that any employee who was improperly dressed will be counseled and may be sent home to change to suitable clothes?
A I don't recall.
Q Okay. Fair to say if you didn't like the dress code policy you could leave and get another job?
A Yes.
Q And you ultimately did that; right?
A Correct.
Q Okay. You testified that you didn't like One Taste's teachings on monogamy; is that right?
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q You testified regarding One Taste's teachings on monogamy; do you recall that?
A Yes.
Q Okay. Fair to say you joined an organization focused on sexual exploration?
A Yes.
Q And after you joined that company, you immediately got into a monogamous relationship; right?
A Yes.
Q And you knew, based on your experience at One Taste, that most people had multiple sexual partners; is that right?

A Yeah.
Q And that was part of the exploration process; correct?
A Yes.
Q And most of the people you were interacting with are Omming with multiple partners; is that fair?
A Yes.
Q So it's no surprise that people within the company may not share the same views as you on monogamy; right?
A Right.
Q And this is the company that you signed up to work with; right?
A That's right.
Q You testified you didn't like working long hours at One Taste; correct?
MS. FARRELL: Objection.
THE COURT: Yes, sustained.
Q You testified that you worked long hours on the sales team at One Taste; correct?
A Yes.
Q And that was something that you did not like doing; correct?
A Correct.
Q Okay. Now, it's true that you were responsible for entering your time while you were at One Taste; right?
A Mm-hmm.

A It says 56 hours, yes.
Q Okay. All right. And you made minimum wage of $10.50 an hour; right?
A Yes.
Q And you didn't did think that was enough money for you?
A I never said that.
Q Fair to say if you didn't like your hours or your wages you could get a different job; right?
A Yes.
Q That's a decision you ultimately made; correct?
A Yes.
Q So can we agree that you were free to come and go as you pleased at One Taste?
A Yes.
Q No one locked you in anywhere; right?
A No.
Q No chains on the door?
A No.
Q If you wanted to leave go to your sister's place in SOHO you could do that; correct?
A Yes.
Q You always had the ability to leave One Taste at any time; right?
A Yes.
Q And when you stayed it was because you chose to stay;

correct?

A Yes.

MR. ROBOTTI: No further questions.

THE COURT: Ms. Bonjean, any cross-examination?

MS. BONJEAN: Yes.

(A brief pause in the proceedings was held.)

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good afternoon, Ms. Keves, my name is Jennifer Bonjean and I represent Ms. Daedone.

You heard about One Taste through your church; is that right?

A Yes. Through somebody at my church, yes.

Q And that's Unity Church?

A Yes.

Q And then, as I understand it, you went and took a course?

A Yes.

Q Was that the Communications Course?

A That was the first one, yes.

Q First Communications Course. Is that something you paid for?

A The first one, no. That was a free event.

Q So this was, like, an introductory event that you could show up for and learn more about the organization; right?

A Yes.
Q And it also had a sales pitch; correct?
A Yes.
Q And I think you said that after you went to the course, you weren't so sure about it; right?
A I mean, yeah, I was still hesitant around the practice.
Q You weren't immediately drawn to the practice of orgasmic meditation; right?
A I had signed for the Intro to Ohm class before I had gone to the Communications Course. So I was, yeah, I was interested to know more, I was curious about it, but I was also hesitant.
Q So let me understand the subsequent. You were recommended to One Taste; right?
A Mm-hmm.
Q And I think some point you said you watched a TED Talk?
A Yes.
Q Is that after you got the recommendation from your friend at the church?
A Yes.
Q Okay. And the TED Talk, these are videos; right?
A Yes.
Q And they there's lots of TED Talks; correct?
A Yes.
Q Have you watched any other TED Talks?

A Yes.
Q Okay. And would you agree that TED Talks are videos from sort of expert speakers from all disciplines; right?
A Yes.
Q Education, business, science, design, art, et cetera?
A Correct.
Q Okay. And the whole concept around TED Talks is bringing new ideas to the public, correct?
A Yes.
Q A lot of the ideas are cutting-edge ideas; correct?
A Yes.
MS. FARRELL: Objection.
THE COURT: Basis.
MS. FARRELL: Just the witness not having personal knowledge.
THE COURT: Overruled.
That means you may answer.
Q You watched TED Talks before; right?
A Yes.
Q You are familiar what the TED Talks are; correct?
A Yes.
Q And you watched Ms. Daedone's TED Talk on YouTube did you say or on some other platform?
A I don't recall.
Q Okay. I may have assumed that, I apologize.

And did you happen to see how many times Ms. Daedone's TED Talk had been viewed?
A I don't recall.
Q Okay. And that after you watched her TED Talk, you were interested in orgasmic meditation or the ideas that she was espousing; right?
A Yes.
Q And to be clear, she stated in her TED Talk that it was about female orgasm; right?
A Yes.
Q There was no secret there, she was very up front about what her subject interest was; correct?
A Correct.
Q Okay. So after you hear Ms. Daedone's ideas about orgasmic meditation, that prompted you to sign up for the Intro to Ohm course; correct?
A Correct.
Q And, again, you didn't do that based on, well, you didn't do it based on a sales pitch because you did it online; right?
A Right.
Q And you did it just based on hearing what you heard from a TED Talk; right?
A Right.
Q A TED Talk that anybody could access on the internet;

right?
A Yes.
Q And then it sounds like before you started the Intro to Ohm course, you went and took this free communication course; is that right?
A Yes.
Q Okay. You wanted to make sure that this was something you were still -- you wanted to learn more; right?
A Well, the phone, somebody calls you before each class and somebody had called me to talk about what I was hoping to get out of the Intro to Om class and let me know about the free Communications Course.
Q Got it. So you signed up online; right?
A Yes.
Q And someone called you up with a follow-up kind of sales call; right?
A Yes.
Q Asked you what you were looking to get out the class; correct?
A Yes.
Q And then said you can always also this free course in advance; right?
A Yes.
Q All right. And you understood that One Taste was a sexual wellness company; right?

A Yes.
Q It was a self-help company; correct?
A Yes.
Q The idea was if you wanted to go there with some desire that correlated with sexual spirituality or sexual exploration or however you want to define it, that was a place you could go; correct?
A Yes.
Q You understood that you weren't signing up for a cooking course, for instance; correct?
A Correct.
Q Okay. And then you attended the Communications Course and that didn't -- that didn't deter you; right?
A Right.
Q And you said the people were nice; right?
A Yes.
Q And then I take it you then took the Intro to Ohm course?
A Yes.
Q All right. And it's based on your testimony that you provided on direct examination you were enjoying the course and you signed up for another course pretty quickly; correct?
A Yes.
Q And do you remember what the next course was that you

signed up for?
A At the Intro to Ohm course, I signed up for the coaching program.
Q That's a more intense program; correct?
A Yes.
Q And you understood that; right?
A Yes.
Q And that's sort of like a, you know, what, six-month ten-month commitment type thing?
A Somewhere in there, yeah.
Q And in the process, you made some friends that you liked; yes?
A Yes.
Q And at what point did you meet Roomy?
A Rami.
Q Rami, sorry?
A I met hem in November.
Q Was that in the coaching course or before?
A I met him in the coaching course. So it was either November or beginning of December.
Q All right. You testified about an interaction you had with Ms. Cherwitz during a New Year's Eve retreat; right?
A Yes.
Q And do you know where in your experience at One Taste in that ten months or whatever it was, 11 months, that

At the very bottom bullet point.
Can you read that?
A That certain participants may make statements or take actions that I disagree with or find offensive.
Q Right. And you assume the risk of that; right?
A Yes.
Q And you understood that these courses could be provoking in that way; correct?
A Yes.
Q And also after -- you can take it down -- and after hearing that, and feeling the way you did, you were perfectly within your right to say this isn't for me, I don't really want to have someone tell me something like that; right?
A Yes.
Q But you didn't; correct?
A Correct.
Q You stuck around for several months longer; right?
A Yes.
Q In fact, you got more involved by working there; correct?
A Yes.
Q And you even moved into the staff house; correct?
A Yes.
Q Also, to be clear, before you again working there, you

were volunteering there; right?
A Yes.
Q And you understood when you volunteer you don't have an expectation of getting paid; right?
A Yes.
Q Okay. So you moved in and I think you stated on direct and on cross that the lines got blurred; right?
A Yes.
Q And you would agree that if you move in with your employers and your co-workers that possible lines could get blurry; right?
A Yes.
Q You understood you were living with your employers and your co-workers; correct?
A Yes.
Q And that's because you were all living in community together; right?
A Yes.
Q It was an unusual setup by at least most normative standards; correct?
A Yes.
Q And you understood that this was unusual; right?
A Yes.
Q You didn't have any friends from your graduate program that were living in that type of environment; right?

A Yes.
Q And as a result, then, your ideals went in different directions, philosophies went in different directions, and you broke up. Fair?
A Yes.
MS. BONJEAN: Give me one second.
Q Oh, one other question about -- you talked about some of the teachings of Ms. Daedone, right?
A Yes.
Q Fair to say that Ms. Daedone has focuses, at least in part, on this idea of victimhood, right?
A Yes.
Q She rejects the idea that you should allow your past as a victim or bad things that have happened to you to define you, correct?
A Yes.
Q And she's very open about that, right?
A Yes.
Q And you were free, as an educated woman, to agree or disagree with that idea, correct?
A Yes.
Q And at the time, you were intrigued by the idea, correct?
A Yes.
Q Okay. Maybe now you don't feel that way, but at the

time you were open to hearing this new approach to victimhood?
A Yes.
MS. BONJEAN: One second.
(Pause in proceedings.)
MS. BONJEAN: I have nothing further.
THE COURT: Ms. Farrell, any redirect?
MS. FARRELL: Yes, Your Honor.
REDIRECT EXAMINATION
BY MS. FARRELL:
Q Ms. Keves, are you testifying here today pursuant to subpoena?
A Yes.
Q We looked at a document, Defense Exhibit 9-Y -- I'm sorry, 9-A, titled Why Am I Here.
MS. FARRELL: I don't know if we can pull that up for the witness only.
Well, that's okay. We don't have to look at it.
Q We looked at 9-A, a Why Am I Here document. You looked at 9-Y, where you listed out three women you have an aversion to and three women that you admire.
Do you know what I'm talking about?
A Yes.
Q Are these documents you prepared on your own, spontaneously, or were you prompted to prepare them?

evidence.

THE COURT: Any objection?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Q And so were you super resistant to opening up your OM practice beyond you and Rami?

A Yes.

Q And did you ultimately agree to open it up?

A Yes.

Q What was that based on?

A Just pressures, outside pressures to open up. But I was -- you know, all the continued conversation around me being too clingy and stifling.

Q And was there a reason you asked to OM with Kenan in particular?

A He lived at the house. He was, I guess, somebody I felt more comfortable with.

Q Ms. Bonjean --

MS. FARRELL: We can take that down.

Q Ms. Bonjean asked you a series of questions about monogamy and then the fact that you got engaged.

Do you remember that line of questioning on cross?

A Yes.

Q And I think earlier you testified there were a number

of couples within OneTaste that got engaged or married; is that correct?
A Yes.
Q Based on your observations, the other couples in OneTaste that were getting engaged or married, were they remaining monogamous with each other as a general matter?
A No. It didn't -- didn't seem that way, no.
Q Okay. What, if any, observations did you make about all of these people getting engaged or married at OneTaste?
MS. BONJEAN: Objection. Relevance.
THE COURT: Overruled.
A Can you repeat the question?
Q Sure.
What did you make of all these people getting engaged or married at OneTaste, but not remaining monogamous, as you just testified?
MS. BONJEAN: Objection --
THE COURT: I'm sorry, I didn't hear you, Ms. Bonjean.
MS. BONJEAN: It's also just a vague question, "what did you make of" it.
THE COURT: Sustained.
Q Did you have any observations about why people within OneTaste were getting engaged or married?
MR. ROBOTTI: Objection.

Q Bottom line, ma'am, you were able to leave OneTaste at any time, correct?
A Yes.
MR. ROBOTTI: No further questions.
THE COURT: I'm going to end unless, Ms. Bonjean, you have a couple of minutes only.
MS. BONJEAN: Yes. Maybe one question.
THE COURT: Okay. Then go ahead.
RECROSS EXAMINATION
BY MS. BONJEAN:
Q Ms. Keves, Defense Exhibit 9-Y which we looked at, which was part of that intake for the Women's Intensive, do you remember looking at that?
A Yes.
Q And those questions that were asked of you about three women you have an aversion to and why and three women you respect and admire and why, you could answer that question any way you wanted to, right?
A Yes.
Q Okay. And no one --
And you answered that on your own computer by yourself, right?
A Yes.
Q Okay. And --
A At the prompting of, you know, this assignment, yes.

please. The witness needs one minute.

THE COURT: Sure. We can't do anything without him, so that's fine.

(Pause.)

THE COURT: And while we're waiting, I know that there were filings over the weekend. I don't think any of them were urgent that we need to deal with them before this witness, but we will address them later.

MS. BENSING: Thank you, Your Honor.

(Pause.)

(Witness enters.)

THE COURT: And, sir, you can just come right up here.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Sir, please step up, remain standing, and raise your right hand.

Do you solemnly swear or affirm that the answers and testimony you are about to give this Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: So help me God.

(Witness sworn/affirmed outside the presence of the jury.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record, spell your last name slowly, and please use the microphone.

when you later formed OneTaste?
A Yes.
MR. ROBOTTI: Objection, leading.
MS. BONJEAN: Join.
THE COURT: Overruled.
BY MS. BENSING:
Q And I'm sorry, what was your answer?
A The answer was yes.
Q In what way?
A We used it as a basis of the foundation of our work and our own practice.
Q And what was the basis of the foundation that you drew from The Welcomed Consensus?
A It was a lot of technology and -- and different ideas about relationships and communication. And they had a practice called deliberate orgasm, which was similar to orgasmic meditation.
Q And what is deliberate orgasm?
A It's a partner practice of stroking a woman's genitals for a set period of time.
Q What was the set period of time with respect to deliberate orgasm?
A It was a little more random. It could be two minutes, it could be an hour.
Q And did that form the basis for orgasmic meditation?

A There were elements of it; the position and other ideas, but just the basis.
Q And you said that there were other concepts that you drew from The Welcomed Consensus outside of deliberate orgasm that you later folded into OneTaste, is that correct?
A Yes.
Q What were those?
A They had a -- viewpoints around communication. They had ideas around relationship. There was certain cause and effect, different -- just all of these different technology that was passed to The Welcomed Consensus that we -- we picked up.
Q And can you give us some examples.
A The Welcomed Consensus idea of call and response, which is the man calls or a man or woman calls and a woman responds. And so, a man would send out an intention, a woman would respond to it -- actually, I'm sorry. The female would call and the man would respond.
Q Okay.
A I'm sorry.
Q And what other kinds of concepts were drawn from The Welcomed Consensus?
A There was a lot about relationships. A lot about following a woman's desire. There was communication techniques, things -- something called withholds.

What do you mean by that?
A The other top people that had been there for several decades were not interested in us taking over the organization. They didn't know us. They didn't like us. And it was not, to them, a good fit.
Q And so, what happened?
A We left after three weeks.
Q And where did you go?
A We went first to the city, and then we went back to California.
Q Did More University engage in deliberate orgasm?
A Yes.
Q In what way?
A It was the practice they taught and the practice that members did with each other.
Q And how, if at all, did deliberate orgasm, as practiced with More University, differ from what later became orgasmic meditation with OneTaste?
A Nicole saw that, one, doing deliberate orgasm was written from a man's perspective from the 1960's, was antiquated and, on some level, male domination of a woman.
She had the idea to rework it from a woman's perspective to turn it more into a practice, more akin to a meditation or to yoga, which led just to a much more open, free-er practice than that.

Q And when did that idea generate?
A Between 2003 and 2004. It kind of evolved over time. The name OMing came -- came in later 2004, but I believe that she was interested in redoing it from 2003.
Q So, after you guys returned from Hawaii, did there come a time where you started OneTaste?
A The name OneTaste is confusing. It is the name of the organization, the corporation we started in 2011.
At the time when we came back from California -- from Hawaii to California, we were looking for different names and different groups. We started one organization whose name just popped out of my head, sorry, that was less sexual and more mind-based.
Q And approximately when did you start that organization?
A We started that in November 2002.
Q And what do you mean more mind-based?
A I wasn't sexuality-based, it was based on different concepts around higher levels of communication and relationship.
Q And what do you mean by that?
A Just the way most people interact is mired with a lot of dishonesty and masks. And so, we wanted to create a practice of more honest and open communication.
Q What happened after you launched this interim practice?
A We had moved to Mill Valley at that point. We ran

several courses. One was called Theater of the Mind, and we taught it two or three times to different friends.
Q And then what happened?
A We realized that it was too head-based. It was too thick. It was too weighty. And then we shifted to going back to our roots around sexuality and communication and formed an organization called The Insight Institute.
Q And what was too thick and too weighty about it?
A People just -- Nicole's concepts were just so complex and so deep, and it was just very difficult for people in a workshop, especially new people, just to come up and follow her -- her lead. And so, we just found out that we were just teaching too intense and heavy concepts, and so we shifted.
Q Too intense and heavy in what way, can you give us an example?
A It's sort of like being in a, you know, really thick math class that you just can't understand the concepts. And so instead of actually trying to understand the concepts, you would just sort of phase out and stop thinking.
So, that was kind of the classes. They were so complex and -- and people would just not confront and not listen.
Q But you testified that this pertained to communication.
So, what kind of concept was so weighty that people couldn't understand it?

A It dealt with people's responsibility about communication. For one, just people being responsible for their communication. Just -- the ideas and the concepts, just people could not bring down to a ground level, practical level.
Q All right. You testified that you returned to a sexuality-based practice.
Did that lead to the origins of OneTaste?
A The first organization was called The Insight Institute. We formed that and taught classes in 2002. And then we merged with an organization called Beyond Education.
When that didn't work out, then we decided to open up The Center. And The Center, itself, was called OneTaste. So that was the first time we used that name.
Q And you just testified about something called The Center.
What is The Center?
A The Center was a building we leased at 1074 Folsom in San Francisco.
Q When did you sign the lease for the center approximately?
A July 2004.
Q How was OneTaste initially funded?
A I had sold my house in San Francisco and I was the initial investor.
Q Were you the only person who contributed money to OneTaste?

A A woman named Allyson Wyenn had put money into The Insight Institute. So, no I was the only person into the corporation that ran The Center, which at that time was called Caravan, Incorporated.
Q Caravan, Incorporated?
A Yes.
Q Approximately how much money did you invest into Caravan or OneTaste?
A $350,000.
Q And you said that that represented the proceeds of a sale of your house?
A Yes.
Q Did Nicole Daedone invest anything in OneTaste?
A No cash value.
Q What was the ownership distribution?
A Of Insight Institute was 40 percent myself, 40 percent Nicole, 20 percent a woman named Allyson Wyenn. Caravan Retreats was 50 percent myself, 50 percent Nicole.
Q Mr. Kandell, at this point in time what was your highest degree of education?
A I had a Master's Degree in biomedical engineering.
Q And prior to meeting Nicole Daedone, what did you do for employment?
A I was a computer programmer.
Q Did there come a time when you stopped working as a

Q How were you paying for rent at The Center?
A How were we paying?
Q Correct.
A We were making some money, but most of the money was funded through me.
Q Through you personally?
A Yes.
Q And how were you making money at that time?
A We were selling courses, workshops. We had a book store. We had a café. We had yoga classes. We had massage.
Q So, did you continue to put in additional money into OneTaste at this time?
A Yes.
Q Did Nicole Daedone?
A No.
Q How did you pay for things at the warehouse?
A We had -- I don't remember exactly where the money came from, but it was either -- it was probably from me, from my reserves.
Q And did Nicole Daedone contribute any money?
A No.
Q When you first moved into The Warehouse, approximately how many people lived there?
A Twenty.
Q Did Nicole Daedone live there?

then strategic is you're thinking how to improve, how to optimize your current processes.

MS. BENSING: And if we could zoom in on tactical.

Q What was the tactical bubble?

A This was all handling the day-to-day needs of the organization.

Q And at the bottom, do you see a dividing line, SF and NY?

A Yes.

Q What does that mean?

A We had a New York office at this point.

Q And who ran the New York office?

A Rachel Cherwitz.

Q And that was as of what date?

A We went to New York in June or July of 2007, and she was running the organization once we got there.

Q Approximately how long had Rachel Cherwitz been at OneTaste at that point?

A She arrived in January 2007.

Q So this is approximately --

A Ten months later.

Q Thank you.

Looking again at tactical, do you see Christina Berkley's name?

A Yes.

Q And what was her role at that time?

A This is a transcript of what we called a darshan which was a group meeting led by Nicole.
Q And did you review this transcript prior to coming to court today?
A Yes.
Q And did you review the redacted version of this transcript at Government Exhibit 3212-R before coming to court today?
A Yes.
Q You testified that this is a transcript of a darshan. What is a darshan?
A Darshan is from other groups on a way of basically speaking, question and answer. It's a teaching process.
Q And who was doing the teaching?
A Nicole.
Q Were you present for this?
A I was.
Q And do you remember the portions of this transcript that are in 3212-R?
A I do.
Q And are they fair and accurate transcription of the darshan?
A Yes.
Q And did the darshan occur on July 10th, 2008?
A Yes.

subtle. It's not like things are falling apart.
A One thing about orgasm is that we all hate -- that we all hate is this one of those things we hare about the in/out game is either you're on or you're off, and we're clear that you're off. We're also not clear about is if it's my responsibility and fault or if it's yours.
Q And let me pause you there.
There was reference to the in/out game.
What is that?
A The way I describe I've always thought about OneTaste is the concept of circles. There was an inner circle, which was Nicole, then there was a second circle which was whoever was close and near her. Then concentric circles out to, say, 15, 20 levels, going all the way out to the public. The in/out game was that the idea that you could slip into the inner circle or move out in different circles based on your state of mind, your state of practice, and your importance to the organization.
Q And based on your own personal observations, how did Nicole Daedone use the in/out game at OneTaste?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
MS. BONJEAN: Objection to foundation and speculation.
MR. ROBOTTI: Vague.

THE COURT: Sustained.

Q Mr. Kandell, did you have an opportunity to observe how Nicole Daedone used the in/out game at OneTaste?

A Yes.

Q And did you have an opportunity to observe how she used it during this time period during the years that you were living at the warehouse?

A Yes.

Q How did she use the in/out game during that time period?

MS. BONJEAN: Same objection.

MR. ROBOTTI: Joined.

THE COURT: Overruled.

A There was a carrot and a stick effect. You know, you had the carrot to do more, to be involved, to go closer to the inner circle, and then there was the fear of being kicked out the inner circle to outer circles.

Q And how did she use that fear?

A To motive for your own self and also motive for your work within the organization.

Q And to what end, Mr. Kandell?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Q When you're talking about using fear to motive people, motive them to do what?

orgasm, everyone follows. It's nuts. Weird things. Like we have done some really weird things that were the right thing to do and everyone backed it because it was just right. So it isn't a thing as either right or wrong. It's right or wrong in the context that you're in. But it might be wrong later. The same thing that was totally right for me before is totally wrong for me now for this moment because it tells me what to do. So then the real question is where are you out of alignment with the moment and where are you pretending that this moment isn't telling you what it's telling you and holding onto something, and you can know you're holding onto it when you find yourself saying, but I'm right. When you find yourself arguing with it, you know.

I want to pause here.

There was a reference to orgasm.

How was the term orgasm used at OneTaste?

A It was used for many many things. There was the physical practice orgasm meditation which led to orgasm. Orgasm not meaning climax, but orgasm being the energic energy in the body. It was also used as life force, you know, that thing that powered you. Some people even looked at it as a relationship to God, as orgasm as the connection to God.

Q And who did -- did Nicole teach that?

A Yes.

Q And what exactly did she teach as orgasm being the

connection to God?
A I think she meant it as just a connection to -- or the pathway to your spiritual enhancement your spiritual awareness, spiritual to the unknown.
Q And did she teach what that pathway was?
A Yes.
Q I'm going to keep reading.
Judy: How about when you're unconcern about certain about it?
Nicole: Then I think you're just uncertain about it. I think you don't have enough information about it.
Judy: But if you're justifying...
Nicole: If you're justifying or blaming, then you're not hearing what the moment has to tell you, and you're making someone else the reason for it. And we usually create another person that we're justifying against. It's this person's fault I can't do what I want to do. But what if you just took that person away, entirely? What would you telling yourself?
And does that end this portion of the exhibit, Mr. Kandell?
A Yes.
Q You testified earlier that Rachel Cherwitz joined the OneTaste community I believe in January 2007; is that correct?
A Yes.
Q You also testified earlier that Daedone made statements to you with respect to your relationship with Justine Dawson vis-Ã -vis Rachel Cherwitz; is that correct?

receipt of these services?

MS. BONJEAN: Objection, foundation.

THE COURT: Sustained.

Q Mr. Kandell, you've already testified that Reese Jones invested in OneTaste. What kind of investment did he make?

A Equipment, cash, expert opinion and advice, time, introductions, housing in New York City, hotels and the like, and just was a general supporter of the entire ecosystem.

Q You testified already that his financial investment began in early 2007; is that correct?

A Yes.

Q For how many years or for how long did Reese Jones invest in OneTaste financially?

A I believe until 2011.

Q Do you know how much Reese Jones financially invested in OneTaste?

A Close to $800,000, cash wise.

Q You testified that he invested in terms of provision of equipment; is that correct?

A Yes.

Q What kind of equipment?

A Computer equipment.

Q And do you know approximately how much that was worth?

A At the time 50, $60,000.

Q Did you and Nicole Daedone discuss Reese Jones' financial

investments in OneTaste?
A Yes.
Q What did you discuss?
A It was just mandatory. It was important. We couldn't have done 1080 Folsom without his capital investments. And overall his attention and expert advice was crucial.
Q In this time period, 2007 to 2011, was OneTaste making a profit?
A No.
Q So how was OneTaste supporting its operations?
A We were in the red. Reese's cash investments were crucial to the success.
Q Were you, Nicole Daedone and Reese Jones on emails discussing these financial transactions?
A Yes.
Q Do you remember the specific dates?
A No.
Q I want to show you a series of emails to see if that refreshes your recollection. I'll start with Government's Exhibit 1007, tab 12 of your binder.
Let me know if this refreshes your recollection as to dates on which you, Reese Jones and Nicole Daedone were on emails regarding Reese Jones' investment in OneTaste?
A Yes.
Q And so, on what date were one of these emails?

A Yes.

MS. BENSING: Your Honor, the Government moves to admit to admit Government Exhibit 1125 into evidence.

MR. ROBOTTI: Objection; relevance, cumulative.

MS. BONJEAN: Same objections.

THE COURT: Overruled.

Government Exhibit 1125 is admitted.

(Government's Exhibit 1125 was received in evidence.)

MS. BENSING: And if we can please publish this to the jury.

(Exhibit published.)

BY MS. BENSING:

Q So, Mr. Kandell, as of July 11th of 2012, was OneTaste still paying back Reese Jones?

A Yes.

Q And approximately how much did you pay off on that date?

A $12,000.

Q Setting that aside for a minute, what was going on with the business of OneTaste in 2012, was it profitable?

A Yes.

Q When did it first become profitable?

A April or May 2012.

Q And what happened that caused it to be profitable?

A We started C -- Coaching Program Number 5, CP5.

part of the Bryan Franklin Program we hosted at the house.
Q And when you say "we hosted VIPs," who are you talking about?
A People of interest who would come by and be -- you know, work with us or some kind of joint venture, we would bring them to Stinson.
Q And who would bring them to Stinson, specifically?
A Nicole and Joanna, I believe, would invite them to Stinson, maybe Reese as well.
Q Did there come a time where you attended a demonstration of Orgasm at Stinson Beach?
A I did.
Q Approximately when?
A Mid 2009.
Q And do you recall exactly when that was?
A No.
Q What was that event?
MS. BONJEAN: Objection on vagueness grounds.
THE COURT: Overruled.
Q What was the event that you attended, Mr. Kandell?
A I'm just rethinking the date because the writer of the New York Times was there, I believe.
MR. ROBOTTI: Objection.
THE COURT: Overruled.
A I think it was closer to the end of 2008. The writer of

the <u>New York Times</u>, other persons of interest we invited. We were hanging out with a Buddhist monk at that point, he got invited. And other various members of the team.

Q And what was -- did you participate in that demo?

A I held the operations aspect of it.

Q And what does that mean?

A Music, setup, lights. Just general support.

Q Who else participated in the demo?

A Joshua Boshnack, Nicole Daedone, Reese Jones, Rachel Cherwitz.

Q And what was Nicole Daedone's role?

A She was the strokee.

(Continued on the following page.)

A She was writing an article about OneTaste.
Q When you first became involved in OneTaste and OneTaste developed in their early years, what did you and Nicole Daedone was the purpose of OneTaste?
MS. BONJEAN: Objection to the form.
THE COURT: Sustained.
Q You said that you cofounded OneTaste, correct?
A Yes.
Q What was the purpose of OneTaste?
A We wanted to bring orgasm into the world conversation. We wanted to redefine different ways of relating between people.
Q And I think you testified earlier that Daedone taught about spirituality; is that correct?
A Yes.
Q What, if anything, did Daedone teach --
MS. BONJEAN: Objection.
THE COURT: I think she's not finished yet.
MS. BENSING: Withdrawn.
Q What, if anything, did you hear Daedone say regarding a connection between spirituality and sexually servicing Reese Jones?
MS. BONJEAN: I'm going to object to the foundation. I'm sorry, late objection.
THE COURT: Overruled.

A By all the leaders in one shape or form, my included, Nicole, Rachel Cherwitz, Rachael Hemsi, Yia Vang, Joanna Van Vleck, myself.
Q How was manipulation used as a means of directing labor at OneTaste?
A Manipulation has a negative connotation. I think manipulation is directing someone towards the higher goal, sometimes past their own perceived self-abilities and self-limitations.
Q And so how was that used at OneTaste?
A We would direct people past their comfort zonings into situations, either through sales or through connection with other or courses to further the goal of the organization.
Q And you testified that that included yourself and Nicole Daedone, correct?
A Yes.
Q And what way did you and Nicole Daedone do this?
A We would see where people were, you know, we perceived playing small or not at their full potential, and we would use various techniques to inspire, manipulate, cajole, into moving them into a different direction.
Q What techniques?
A Threats, fear of losing position, fear of losing social status, taking away, you know, you were in the inner circle on Tuesday and you were in the fifth circle by Thursday, you

A That was Rachel and Nicole's.
Q You testified about a term, love bombing.
What is that?
A Love bombing is when you see someone come new and you believe there was a possibility of being benefit to the business, so a lot of people would pay a lot of attention --
MS. BONJEAN: I object to the question and.
THE COURT: A foundational objection?
MS. BONJEAN: Yes.
THE COURT: Sustained.
Q Mr. Kandell, you testified that one means by which Rachel Cherwitz manipulated people was love bombing; is that correct?
A Yes.
Q And when you used that term, love bombing, what you do you mean?
A Love bombing refers to putting a lot of attention from members of the opposite sex to have that person feel special, feel loved, feel something they may never have felt before. It could be promise of sex or attention or OMing, and so you would just put a lot of tension on someone when they first came in order to, you know, further the business or perhaps get a sale.
Q And how was that used in the manipulation of people to provide labor?
A I don't think love bombing was used much in the promotion

of labor. It was mostly for the promotion of sales.

Q Got it. You testified that one means of using manipulation for the promotion of labor was use of threats. What did you mean by that?

A We believed that, you know, your power, your path to God was through your orgasm, was through your practice, through your attention and loyalty to the organization. You could fear losing that. You could fear losing that social status. It was kind of, like, a high school clique situation gone bad, and you could lose, you know, being closer to the cool kids, you could be outcasted, you could lose position. There was just a -- there was a lot of social pressure to do what the organization wanted you to do.

Q What was the purpose of your using these techniques, Mr. Kandell?

A I had some significant challenges around the operational end of the business with providing courses and moving equipment and being back of house, and so I would push people past their perceived limits in terms of providing the foundational support for the business.

Q And when you say, push them past their perceived limits, what do you mean?

A We would work, you know, sometimes 10, 12 hours a day, we would start at 7:00 o'clock in the morning. We would go until 8:00, 9:00 at night. We would set up for the next day. We

Q Did a New York Times article, in fact, come out in March of 2009?
A It did.
Q Did that have an impact on OneTaste's business?
A It did.
Q What was that impact?
A We became well-known or we became known. There were many many blogs and articles written about us. It led to more media. It led directly to a publishing deal for Nicole's book and I'm sure other tangential benefits.
Q Did you discuss that New York Times article with Nicole Daedone?
A Yes.
Q What did she say about it?
MS. BONJEAN: I'm going to object, Your Honor.
MR. ROBOTTI: Object.
THE COURT: Overruled.
MS. BONJEAN: We maintain the objections from --
THE COURT: I didn't hear you, Mr. Robotti.
MR. ROBOTTI: We also object based on the previous discussion.
THE COURT: Yes. Overruled.
Q What did you discuss about it? Or I'm sorry, I think I asked, what did she say about it?
A I don't remember specifically. We were excited by it.

A Well, specifically they didn't close down, we released them from us running those cities.
Q And why did that happen?
A Several things. One was we wanted to focus on the core business. Austin was a challenging city in terms of management and personnel. And it was very hard to build our core business of the larger scale programs when we were also responsible of the minutia of running the cities.
Q What about with respect to Boulder?
A Boulder we worked out of something called the Integral Center. And the members of the Integral Center rejected us teaching and having our classes and sessions there.
Q You testified earlier that the company started making a profit in approximately 2012. Do I have that right?
A Yes.
Q Did there come a time when the company's business model changed?
A Yes.
Q When was that?
A March 2012.
Q And what happened in March 2012?
A Nicole and Ken Blackman took a walk on the beach and came back and decided to move it from a service-based organization to a sales-based organization.
Q What do you mean by service based versus sales based?

A The intention of the company. The intention up to that point was of being one of service to the world, to bringing this technology to them, to make the world a better place. And unfortunately, that led us to eight years in the red and the debt we discussed previously.

And so turning it into a service organization -- a sales organization, was changing the focus to increase our sales.

Q And when you say bringing this technology, what technology are you talking about?

A The OM technology, the language of the courses, all the work we've done to building the courses.

Q By OM technology, do you much mean the practice of orgasmic meditation?

A Yes.

Q What role did you have in March of 2012?

A I was still Chief Operating Officer.

Q After the company's business model changed, did you become familiar with the concept of sales goals?

A Yes.

Q What are those?

A We set a specific goal per day of how much sales we made for that day cash in.

Q When you say we set it, who set them?

A Nicole Daedone.

Q Who implemented them?

A Rachel Cherwitz.
Q And at that time -- and throughout the entire time that you were with OneTaste, was Nicole Daedone running the company?
A Yes.
Q And at that time in 2012, what was Rachel Cherwitz's role?
A Head of sales.
Q Did that remain the case until you left OneTaste?
A Yes.
Q Based on your own personal observations, how did Rachel Cherwitz approach her role as head of sales?
A Passionately, all in, 100 percent.
Q You testified earlier regarding language that she would sometimes use with her staff; is that correct?
A Sometimes she would use that language, yes.
Q In what manner did she treat her staff?
MR. ROBOTTI: Objection.
Q Based on your own personal observations?
MR. ROBOTTI: Vague.
THE COURT: Sustained.
Q Did Rachel Cherwitz use shaming techniques with her staff based on your own personal observations?
MS. BONJEAN: Objection to the leading and --
MR. ROBOTTI: Vagueness.

MS. BONJEAN: -- foundation.
THE COURT: Sustained.
Q Mr. Kandell, in 2012, 2013 and until you left in 2014, did you have opportunity to observe Rachel Cherwitz interact with her staff?
A Yes.
Q In that time period, in what manner did she interact with her staff?
A She was everything. She was a passionate, inspiring leader. We've talked a lot about the negative terms, but she was also and incredibly dedicated, worked with people, were patient with people, wanted them to succeed, wanted the organization to succeed. At the best of times that's what came across. In the worst of times, she got annoyed because people weren't doing what they were doing or they were lazy or they were argumentative. And so the whole spectrum of what a sales manager has to deal with.
Q Did you observe Rachel Cherwitz direct individuals on her staff to engage in sexual acts?
A Yes.
Q In what incident instances?
A I have a memory directing two members of the staff go and have sexual relations because there was energy between them, negative energy between them.
Q Which members of the staff?

A If memory serves, it was Becky Uman and Ruwan.
Q Approximately when?
A Mid to late 2013.
Q Are there other instances in which she directed employees to engage in sexual acts?
A That's the one I can remember.
Q During the course of your time at OneTaste, did have you an opportunity to observe Nicole Daedone and Rachel Cherwitz's relationship?
A Yes.
Q What was that relationship like in the service phase of OneTaste that you've testified about?
A She was really inspired by Rachel, Nicole was inspired by Rachel and enjoyed, they had a deep friendship and deep mentorship. She can get annoyed with Rachel in terms of any business owner, but overall very positive, nurturing relationship.
Q What about with respect to when the company transitioned to a sales-base model?
A I think it was more of the same, probably higher stakes, more energy. Rachel was in an incredibly difficult position and she put everything she had, she worked harder than any of us, for sure. And I think Nicole put a lot of pressure on her to make those sales calls, especially as they got higher.
Q Was Nicole Daedone personally involved in the sales goals

A I wasn't privy to those conversations.
Q So, as the COO of the company, you have no idea what Beverly Daedone did at the company?
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection to leading.
MS. BONJEAN: Asked and answered.
THE COURT: Sorry, say again, Ms. Bonjean. I didn't hear the end.
MS. BONJEAN: I said objection to the leading and asked and answered.
THE COURT: Overruled. That means you can answer.
A I was not aware of the specific conversations between Nicole and Beverly.
BY MS. BENSING:
Q Did OneTaste ever come to have affiliates?
A Yes.
Q What is an affiliate?
A Affiliate is an organization that pays or has an agreement with a company to use various parts of the company, usually their name, their resources, things like the OM classes.
So, we had affiliates and we transitioned from cities that we ran to them becoming affiliates.
Q And approximately when did that transition happen?
A 2013.

Q And what were the affiliates that you were aware of?
A We started off with Austin. We then migrated Boulder, Las Vegas, Philadelphia. Those are the ones I remember from my tenure.
THE COURT: Ms. Bensing, in five minutes I am going to want to take a break.
MS. BENSING: Yes, Your Honor.
Q Mr. Kandell, you testified earlier that you left OneTaste in approximately 2014.
Is that correct?
A July of 2014.
Q How did that come about?
A I decided in July of 2013 that I wanted to change direction in my life.
Q And so why did it take you a year to leave?
A Several things.
One was the company wasn't ready for me to be gone. There was too much depending. There was too much in my head. People weren't trained.
And the second, that the company didn't have the funds for my buyout that I wanted.
Q Approximately what -- or what day did you resign, do you recall?
A Around July 14th, 15th, 2014.
Q Is there something that would refresh your recollection?

A Yes, an e-mail or text message thread.
Q I'm going to show you what's been marked as Government Exhibit 1589, which is Tab 49 of your binder.
And just review that and let me know if that refreshes your recollection as to the date that you left.
(Pause.)
A Yes.
Q What day did you leave?
A July 30th, 2014.
Q Sorry, is that July 31st?
A Well, it says I resigned as of last night, so....
Q Got it.
Did you enter into a Stock Redemption Agreement with OneTaste and Nicole Daedone when you left?
A Yes.
Q And what is that?
A It's the selling of my shares of the organization.
Q And what were the terms of the Stock Redemption Agreement?
A I was paid cash on a payment plan for my shares.
Q And approximately how much did you get for your shares?
A 1.3 million.
Q And that was the 50 percent of the shares that you owned in OneTaste, is that correct?
A OneTaste, Incorporated; Caravan Retreats, Incorporated;

Q And at that point in time were you her superior at OneTaste?
A No.
Q Is that because she was a community member?
A Yes.
Q And what was your role at the time?
A In the community?
Q At OneTaste.
A Oh, chief operating officer.
MS. BENSING: I have no further questions.
THE COURT: Mr. Robotti, any cross-examination?
MR. ROBOTTI: Yes, Your Honor.
THE COURT: Okay, go ahead.

CROSS-EXAMINATION
BY MR. ROBOTTI:

Q Good afternoon, Mr. Kandell.
A Hello.
Q So, Mr. Kandell, you were a co-founder of OneTaste, is that correct?
A Yes.
Q And you started it with Nicole Daedone, is that right?
A Yes.
Q And that was at about 2004?
A OneTaste -- yes.
Q And you left in 2014, correct?

A Yes.
Q So you were there for about ten years in total?
A Yes.
Q And fair to say you wore many hats at OneTaste?
A Yes.
Q Among your titles, you were a major shareholder, correct?
A Yes.
Q Chief financial officer?
A Yes.
Q Chief operations officer?
A Yes.
Q And so it's fair to say you were one of the top leaders of the company, correct?
A Yes.
Q Now, you're testifying pursuant to an Order of Immunity today, is that right?
A Yes.
Q And the Government obtained that Order?
A Yes.
Q And the purpose of that Order is to permit the Government to call you to testify at this trial, correct?
A Yes.
Q And the Government has agreed not to use any of your testimony today against you, is that right?
A Yes.

Q And the Government also separately agreed not to use any statements you made at meetings with the Government against you, correct?
A Yes.
Q Now, in connection with the Government's grant of immunity, you did not admit to committing any crime, is that correct?
A That is correct.
Q And, in fact, you deny committing any crime, correct?
A Yes.
Q And you maintain your innocence, correct?
A Yes.
Q So, you are not here today to testify that you committed a crime while you were on the OneTaste, correct?
A Yes.
Q You are not here today to testify that you committed a crime with Rachel Cherwitz, correct?
A Yes.
Q And you are not here today to testify that you committed a crime with Nicole Daedone, correct?
A Yes.
Q You are, obviously, not on trial here today, correct?
A That is correct.

(Continued on the following page.)

BY MR. ROBOTTI: (Continuing.)
Q And because you have not been charged with any crime, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, on December 19th, 2024, in explaining how OneTaste works to the Government, you used an analogy to CrossFit. Do you recall that?
A I do.
Q And in general, you found it useful to use CrossFit as a comparison to explain OneTaste, correct?
A Yes.
Q And you've taken CrossFit yourself, correct?
A I did.
Q So CrossFit is a fitness class you take when you want to get into great shape, correct?
A Yes.
MS. BENSING: Objection. Relevance.
A Yes.
Q And there's a trainer or instructor with you in class?
A Yes.
Q And the trainers push you to your physical limits; is that right?
A Yes.

Q And that's how you grow your muscles?
A Yes.
Q And sometimes they're very tough on you and yell at you; is that correct?
A Yes.
Q And that helps you push yourself to get into great shape, right?
A Yes.
Q And you're making the choice to show up every day to be pushed; is that correct?
A That is correct.
Q And if you don't want to get pushed, you can leave, right?
A Yes.
Q But then you've made the choice not to get stronger through CrossFit; is that correct?
A Yes.
Q So OneTaste provided courses to help people get in sexual or spiritual shape; is that right?
A Yes.
Q And that's what the OM practice was designed to do, correct?
A Yes.
Q And that practice involved pushing people beyond their comfort zone, correct?

A Included pushing people past their comfort zone, yes.
Q And OneTaste was open about that fact, so people were advised of it going in, right?
A Once they got past the first course, yes. I'm not sure if that happened before the initial courses.
Q And as we'll get to later, they were consent forms laying out the nature of the course, correct?
A Yes.
Q And OneTaste pushed boundaries by trying to encourage people to have different sexual experiences than they were used to; is that right?
A Yes.
Q And oftentimes, that meant trying OM, the OM practice with a variety of partners, correct?
A Yes.
Q And sleeping next to someone different than you're used to?
A Yes.
Q And trying a sexual relationship with someone you weren't attracted to, right?
A Yes.
Q Or trying a sexual practice you had an aversion to?
A Yes.
Q And the idea was to challenge preconceived notions, correct?

A Yes.
Q And OneTaste programs also tried to encourage people to speak about sex differently, right?
A Yes.
Q And to discuss their desires differently, correct?
A Yes, sir.
Q And the idea was that by going beyond your boundaries, you believed that could lead to growth?
A Yes.
Q And you had experienced that the type of growth yourself, correct?
A Yes.
Q And while you were there, you woke up every day and chose to be apart of OneTaste, correct?
A That is correct.
Q Now, on direct, you said that some people on the internet called OneTaste a cult.
Do you remember that?
A I do.
Q And you have your own subjective definition of that term, right?
A I do.
Q And, in fact, you viewed the term cult to be more of a subculture; is that right?
MS. BENSING: Objection.

THE COURT: Overruled.

A I believe the word cult comes from the word culture, and it is the definition of a subculture and not a negative connotation.

Q And in your view, many other legitimate organizations and companies could be considered cults, right?

A Absolutely.

Q And you view CrossFit as a cult, for example?

A Definitely.

Q And when you say CrossFit is a cult, you don't think of that as a bad thing, right?

A Yes.

Q By cult, you mean an organization with its own subculture right?

A Yes.

Q And that speaks with a common lingo, correct?

A Yes.

Q Has a defined leadership, correct?

A Yes.

Q A hierarchy within the organization?

A Yes.

Q And it's own rules and regulations, right?

A Yes.

Q And as you said, you don't think that has to be a negative thing, right?

A Correct.
Q And, in fact, it can help people achieve positive things this in their life, right?
A Yes.
Q Just like CrossFit does, right? Is that correct?
A Yes.
Q And in terms of other organizations, for instance, you think Bikram yoga qualifies as a cult?
A Yes.
Q Veganism?
A Yes.
Q Pickle ball?
A Yes.
Q The Catholic church?
A Definitely.
Q And you also think of OneTaste as a cult in this positive sense, right?
A Yes.
Q Do you recall speaking about the benefits of the OM practice to a group of students during CP6 in 2013?
A Not specifically.
Q Well, at that time period around 2013, do you recall that you felt that before OneTaste, you were a nice guy who wasn't connected to his true feelings?
A Yes.

Q And that you had built up walls or layers preventing you from getting access to your true feelings?
A Yes.
Q And you felt that the practice had helped you shatter those walls and get access to your true self?
A Yes.
Q And you felt that the work you had done had helped you become a powerful person who affects lives?
A Yes.
Q And that as a result of that work, you genuinely liked yourself at that point?
A Yes.
Q And you believed you had taught others to do the same, correct?
A Yes.
Q And that you had affected their lives for the better, right?
A Yes.
Q And you believe the work at OneTaste was not easy, right, but it was worth it?
A Yes.
Q In your experience, the positive aspects of OneTaste significantly outweighed the negative aspects; is that correct?
A Yes.

Q In your experience, you believed that the vast majority of OneTaste customers found the practice beneficial?

MS. BENSING: Objection.

THE COURT: Sustained.

Q In your experience, did you have complaints from the vast majorities of customers at OneTaste?

MS. BENSING: Objection.

THE COURT: Sustained.

Q In your experience, could you cherrypick a handful of people who had bad experiences over years?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Is it fair to say that anyone who had a bad experience could walk out the door and not come back?

A Yes.

Q And that applies for both students and employees, correct?

A Yes.

Q All right. So I'd like to back up and talk a little bit about how OneTaste got started. I know you've testified to this on direct, as well.

But is it fair to say that OneTaste was a startup company?

A Yes.

Q And a startup company is a new company founded upon an idea or product, correct?

practice called deliberate orgasm?
A Yes.
Q And you practiced deliberate orgasm while you were at More House, correct?
A Yes.
Q And that practice is known as Doing?
A Yes.
Q And Doing was taught from a perspective of a man; is that right?
A Yes.
Q And Nicole had the idea to teach orgasmic meditation from the perspective of a woman; is that correct?
A Yes.
Q And is it fair to say it was primarily Nicole who reworked the practice, the Doing practice?
A I think she was the lead. But she definitely solicited ideas from many people.
Q Okay. And did that practice ultimately become known as OMing?
A Yes.
Q And Nicole incorporated other philosophies into that practice, including Buddhist principles?
A Yes.
Q And from your perspective, OM is meant to be more of a spiritual practice than a sexual practice, correct?

Q And just again, for the jury, here, the top photograph is you and Nicole Daedone.
Is that teaching at the Insight Institute?
A Yes.
Q And the bottom is you during -- and you Nicole during the first workshop.
And can you identify yourself by touching on the screen there.
A (Witness complies.)
Q There's a blue dot on the third person from the left in the back, correct?
A Yes.
Q And is Nicole Daedone standing right next to you?
A Yes.
Q All right.
MR. ROBOTTI: We can take that down.
Q Now, you also had a website for Insight Institute?
A We did.
Q And so even early on, you all were trying to get the word out about what you were doing?
A Correct.
Q Now, around this time, Nicole had the idea to open a center; is that correct?
A Yes.
Q And the concept was an urban retreat center where people could come together to focus on their physical and mental

health?
A Yes.
Q You were a big fan of this idea?
A When she first came up with it, I didn't even know about it. She sort of came up with it, and once she reminded me of the concept, I was a fan of it.
Q And it ultimately inspired to you ditch your day job, right?
A Eventually.
Q And pretty quickly, Nicole found a two-story building in the south of the Market area -- or the South Market area of San Francisco, correct?
A Like the next day.
Q Okay. And you all signed the lease for 1074 Folsom Street in San Francisco in April of 2003?
A April or May of 2004.
Q Okay. And that's when you formed a company Caravan Retreats; is that correct?
A It was originally called Caravan Incorporated. It was later renamed Caravan Retreats.
Q And that did business as OneTaste?
A DBA OneTaste.
Q And the plan was to sell Insight Institute courses as part of this multiuse center, right?
A Yes.

Q And OneTaste, the name is a reference to a Buddhist poem, correct?
A Yes.
Q And the poem is, just as the great ocean has OneTaste, the taste of salt, so too does liberation, and the taste of truth, correct?
A Yes.
Q And the basic idea is that truth can lead to spiritual awakening or a spiritual truth?
A Yes.
Q Now, you and Nicole each owned 40 percent -- at that time, it was Caravan, correct?
A We owned 40 percent of what was Insight Institute, each, and then Allyson Wyenn 20 percent, and I believe Caravan was 50/50.
Q Okay. And as you testified on direct examination, you invested about $350,000?
A Yes.
Q And that was of a total of about $500,000 you had obtained from the sale of your house, correct?
A Yes.
Q So you invested about 70 percent of your assets in the company?
A Yes.
Q And to be clear, you all had no idea what you were going

to do with the center at the time, right?
A We had an idea.
Q Did you have a business plan to make money at that point?
A No.
Q But when you had was more of a group of like-minded people who had this concept, correct?
A Correct. We were enthusiastic, if not educated.
Q And it was an idea to focus on the practice of OM to help make people's lives better, correct?
A The center itself had multiple uses. Insight Institute was just, at that point, just one portion of it.
Q Okay. Is it fair to say that you and Nicole kind of dove into this headfirst and said we'll figure out how to make it work?
A Yes.
Q So this is a true startup company, right?
A Yes.
Q And for the next 12 months or so, you started brainstorming and planning how this was going to work, right?
A Yes.
Q And there's was kind of a certain amount of if-you-build-it-they-will-come mentality?
A Yes.
Q So the center was a 4,000-square foot building, correct?
A Yes.

Q And as you mentioned it held several different types of events?
A Yes.
Q Some of those activities were a book store, a cafe, a yoga studio, meditation, massage class, live events, private events?
A Yes.
Q Did I miss anything?
A And the Insight Institute classes.
Q OMing was still a new idea at the time, correct?
A Yes.
Q And as you mentioned, OM was practiced at the center?
A Yes.
Q And is it fair to say that you and Nicole tried just about everything to generate interest?
A Yes.
Q You would advertise, correct?
A Yes.
Q Throw parties and free or low-cost events?
A Yes.
Q And you'd show up every day at 8:00a.m. and do yoga in the hopes that people would come join you?
A Yes.
Q And eventually, people did start to come to the center, right?

Q And even though the center wasn't really making money, you did have some success in building the community; is that fair?
A Yes.
Q Now, certain people who were focused on the OM practice decided to live together in the early days of OneTaste; is that right?
A Yes.
Q And before people -- 2006, people lived in three communal houses around Brisbane, California?
A Yes.
Q And in 2006, you rented a location at 1060 Folsom Street; is that right?
A Yes.
Q That was just down the street from the center?
A Yes.
Q And this is the building known as the warehouse, correct?
A Yes.
Q And you lived there for about two and a half years from June 2006 until December of 2008, correct?
A Yes.
Q And it averaged about 40 people living there during that time?
A Yes.
Q All right. I'd like to show you what is in evidence as

Defense Exhibit 4F. And this can go for the jury, as well. Now, is this a view from the loft of the warehouse?
A Yes.
Q And you can see on either side there's beds separated by curtains; is that correct?
A Yes.
Q And we saw earlier today in that diagram the Government showed you, there are also several rooms beside this one big room, right?
A Yes.
Q So it wasn't 40 people living in this space at once, right?
A Correct.
Q Now, in 2008, OneTaste rented a 45-room residential building, correct?
A Yes.
Q And that was at 1080 Folsom Street?
A Yes.
Q And this was a rundown building that needed a lot work, correct?
A Yes.
Q And you were the one who spearhead the rehab of that space?
A I did.
Q And you did that by scraping together money and

volunteers, correct?
A Yes.
Q And over time you were able to turn this into a pretty good place to live, right?
A Yes.
Q And by December 2008, OneTaste opened the residence at 1080?
A Yes.
Q At that time, OneTaste closed the warehouse, correct?
A Yes.
Q And some people from the warehouse, but not most people, moved over to 1080; is that right?
A A few people from the warehouse moved over, 13 of the 40 or 50 that were there.
Q And you were involved in managing 1080 throughout your time at OneTaste, correct?
A I was.
Q And generally, there was 30 to 60 people living there at a given time, right?
A Yes.
Q The 1080 was open for about six years until 2014, correct?
A Yes.
Q And you lived there on and off during that time period?
A Yes.

Q Both the warehouse and 1080 were communal homes?
A Yes.
Q And so that's basically like a college dorm, right?
A Yes.
Q And there were a lot of advantaging to living together like that?
A There was.
Q So like New York City, for instance, San Francisco was very expensive?
A Yes.
Q Living together allowed to save on present rent?
A Yes.
Q It allowed to pool resources for things likes food, electricity, heat, Wi-Fi, all those amenities?
A Yes.
Q Rent was also comparatively cheap compared to the rest of San Francisco?
A Yes.
Q And rent generally ranged from about 500 per month to about 1600 per month, correct?
A Yes.
Q But mostly, the rent was on the lower end of that scale?
A Yes. Just two rooms were higher than a thousand or two or three rooms.
Q There was also a communal kitchen for the house, correct?

A Yes.
Q And there was a meal plan that allowed people to buy into to get lunch or dinner every day?
A Yes.
Q Fair to say that everyone was asked to pitch in on chores?
A Yes.
Q And to contribute to the house in terms of cooking and cleaning?
A Yes.
Q There were also other advantages aside from just saving money, right?
A Yes.
Q So you would view this place as a lot of fun to live, right?
A Most of the time.
Q You've described it as a beautiful, incredible, intense experience, right?
A Yes.
Q Truly one of the greatest experiences of my life?
A Yes.
Q And you were so grateful you got to live in the riches of it because it was a magical experience?
A Yes.
Q And for you, part of what made this such an amazing

experience was the sense of community, right?
A Yes.
Q Most people there were also focused on bettering their lives through the OM practice, right?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Is it fair to say that the OM practice was the focus of the communal living then?
A Yes.
Q You got to connect with other people interested in that practice?
A Yes.
Q And you had sexual experiences with many other people there, right?
A Yes.
Q Just like a college dorm, there was a lot of drama, correct?
A Yes.
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes.
Q There were relationships issues, personal conflict, jealousy?
A Yes.
Q And you yourself spent a lot of time helping people sort

that out, right?
A Yes.
Q And part of the, you know, fun of living there was dealing with the drama?
A Yes.
Q That was, itself, what was made this part of the community, correct?
A Yes.
Q Aside from the drama, you would say there was a lot of laughing, parties, meditation, yoga, OMing, all sort of fun activities?
A Yes.
Q All right. I'd like to show you what's in evidence as Defense Exhibit 3DC and 3DA. Let's start with 3DC. So 3DC, what do you see there?
A 1080 Folsom.
Q And is that the top two floors of this yellowish building?
A Yes.
Q And below, there's a cafe there, correct?
A Yes.
MR. ROBOTTI: And can we look at 3DA.
Q And is this the interior of 1080?
A Yes.
Q And is this a communal dinner at the residence?

Q For the court reporter we need a yes or no.
I'd like to show you next what is in evidence as Government Exhibit 3500-RW-12. Aside from 1080, there were other people who practiced OM who wanted to live together, correct?
A Yes.
Q There were a few locations like 1080 that were actually operated by OneTaste, correct?
A Yes.
Q But there were other locations that were just organized by community members who practiced OM?
A Yes.
Q Looking at this document in front of you, OneTaste put together an OM residential handbook, correct?
A Yes.
Q These were general guidelines for living in an OM house; is that right?
A Correct.
Q This guide had a set of ground rules for how the houses were supposed to operate, correct?
A Yes.
Q All right. So I want to go through some the categories here. On the very top, there is rules of play. If you can highlight that. That sets out general ground rules, correct?
A Yes.
Q Then below that there is staying connected. This section

right?
A Yes.
Q And you write the inventory, then you say it out loud to someone else, correct?
A Yes.
Q Then you rip it up?
A Yes.
Q So renting 1080 was a source of income for OneTaste?
A Yes.
Q That helped sustain OneTaste in the early years?
A Yes.
Q Even with that income, is it fair to say that OneTaste was still struggling?
A Yes.
Q You and Nicole almost walked away from the business entirely in 2008, correct?
A Yes.
Q But instead of doing that, you all decided to recommit and try to take it to the next level; is that right?
A Yes.
Q You talked a little bit about this on direct examination, but in 2007 you realized that OneTaste needed to have a clearer distinction between its community and its business; is that right?
A Yes.

Q So for example, do you recall an email you sent on November 7, 2007 discussing this topic?
A Not specifically.
Q I'm going to show the witness Defense Exhibit 4H. If you want to take a moment and read over that.
A I remember it now.
Q Putting aside the document. Is it fair to say that at that time you expressed your opinion about the need to --
MS. BENSING: Objection, calls for hearsay.
THE COURT: I have to hear the question first. You can continue the question.
BY MR. ROBOTTI:
Q Fair to say that you expressed your views at that time that you needed to separate the community of people who practiced OM from the OneTaste business?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Did you hold the view at the time that you needed to have that separation?
A Yes.
Q At that time you had a tight-knit community of about a hundred people?
A Yes.
Q Is it fair to say you realized to grow the business you

needed more of a structure for the people who were interested in the practice?

A Yes.

Q And at this time, in 2007, your view is that you needed to take concrete of steps forward to separating the community and the business?

A Yes.

Q In your view you had kind of a Land of Misfit Toys on one side and the people who wanted to focus on the business on the other side?

A That is something I would say, yes.

Q And you viewed the distinction between party throwers and party goers, right?

A Yes.

Q Party throwers were the ones who wanted to help the business grow, correct? And party goers were the ones who just wanted to be there for the community and the parties, correct?

A Yes.

Q But you were trying to identify people that would help take OneTaste to the next level, right?

A Yes.

Q Fair to say there were certain people in the OneTaste community who simply did not want to work that hard?

A Yes.

Q And that was something that OneTaste struggled with throughout your time there, correct?
A If they were a member of the staff, yes. If not, then they were hopefully paying customers.
Q So with members of the staff, OneTaste often had an issue of people not wanting to --
MS. BENSING: Objection as to which people.
THE COURT: Yes. Sustained.
BY MR. ROBOTTI:
Q During your time there, you viewed it as an issue that some people did not want to work that hard?
A Yes.
Q So you did put in place this separation between the business and the community, correct?
A Yes.
Q And as you said on direct examination, it still remained a little bit blurry throughout you're time there, right?
A Yes.
Q But it was a structure that you tried to put in place?
A Yes.
Q Fair to say that the company did become more structured over time?
A Yes.
Q And that was part of a startup, growing up at a company, correct?

A Yes.
Q By 2006 you and Nicole had met Reese Jones?
A Yes.
Q And at the time, you needed seed money beyond the initial investment that you put in from the sale of your house, right?
A Yes.
Q And Mr. Jones offered to help out, correct?
A He did.
Q Mr. Jones was a wealthy person at the time?
A Yes.
Q To your knowledge he was a millionaire who had started various networking companies?
A Yes.
Q It was your understanding that Mr. Jones invested in various startup companies not just OneTaste, correct?
A Yes.
Q Mr. Jones had come to some OneTaste courses, correct?
A Yes.
Q He had a relationship with Nicole Daedone?
A He did.
Q And he agreed ultimately to help out the company, correct?
A Yes.
Q And that was not just with money, but as you testified on direct examination, as a mentor and as someone who could give

advice?
A Yes.
Q Over time that investment accumulated in terms of money to about $800,000, right?
A That's my memory.
Q Between 2006 and 2011, correct?
A Yes.
Q On top of the cash, Mr. Jones also contributed to purchasing equipment, correct?
A Yes.
Q And he also paid some OneTaste personnel directly such as to produce media, correct?
A Yes.
Q There was the financing that helped keep OneTaste afloat during these early years, right?
A Yes.
Q But by 2012 the company had fully paid back what was, in your view, was the total amount owed, correct?
A Yes.
Q By 2009 there was a lot of interest in OneTaste?
A Yes.
Q And OneTaste needed to figure out how to translate that interest into revenue, correct?
A Yes.
Q And you had a lot of responsibilities on your plate at

A Yes.
Q We can take this document down.
So was the focus on sales that helped CP5 become profitable, correct?
A Correct.
Q And around that time in 2012, OneTaste developed the sales team with daily sales goals, right?
A Yes.
Q And the goal here was to sell courses, correct?
A Yes.
Q And this is when the company really started to take off?
A Yes.
Q You were working very hard during these years to help make the company successful?
A Yes.
Q You were working perhaps 70, 80 hours per week?
A Yes.
Q Many other people were working very hard at the company at this time too?
A Yes.
Q And your understanding is this was typical of startup culture, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes.

BY MR. ROBOTTI:
Q You need to work very hard in these early years to help make the companies successful?
A Yes.
Q OneTaste had a policies and procedures that governed coaching program, correct?
A We did.
Q I believe you testified on direct examination that those started early on in the company's history?
A Yes.
Q As the company got more interest and grew, you tried to improve the company's structure, correct?
A Yes.
Q That involved putting in place ethical rules, right?
A Yes.
Q Making sure the company was not running afoul of prostitution laws, correct?
A Yes.
Q You considered these issues and you took responsible steps to make sure you addressed them, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q You considered these issues and you took steps to make sure you addressed them?

A Yes.
Q And during that time period you were also asking the advice of outside professionals about how to do this?
A Yes.
Q Do you recall on March 8, 2009 the management of OneTaste discussing putting in place an ethics policy?
A I do.
Q That discussion included you and Rachel Cherwitz and Nicole Daedone and other people at OneTaste, correct?
A Yes.
Q Do you recall that the ethics policy you were seeking to put in place related to when and how teachers and employees could engage in OMs and sexual relations with students?
A Yes.
Q And generally, the idea was to put in place waiting periods after classes and events before any OneTaste personnel could have an OMing relationship?
A Correct.
Q Or have a sexual relationship, right?
A Yes.
Q And was your understanding at the time that Ms. Cherwitz recommended a stricter policy than had been proposed?
MS. BENSING: Objection, called for hearsay.
THE COURT: Sustained.
MR. ROBOTTI: 803(3).

THE COURT: Sustained.
BY MR. ROBOTTI:
Q This ethics policy went into effect?
A It did.
Q It remained in place during your time at OneTaste, correct?
A It did.
Q This was modeled on ethics policies that had been borrowed from other organizations, correct?
A Yes.
Q I'd like to show you what has been marked for identification as Defense Exhibit 1X. Do you recognize this as the OneTaste Coach Association Code of Conduct?
A Yes.
Q Is this from April of 2011?
A Yes.
Q In your capacity as COO and CFO were you involved in the creation of this Code of Conduct?
A I did the initial one, I believe this was updated and written by others, but I did the original draft.
Q You were familiar with this Code of Conduct based on your position at OneTaste?
A Yes.
MR. ROBOTTI: Your Honor, the defense offers Defense Exhibit 1X.

MS. BENSING: Your Honor, the Government objects to this version coming in based on the testimony that he's given.

THE COURT: Is this a different version than the version you've seen before? I'm not sure I'm following what your objection is of the version.

MS. BENSING: Just with respect to his testimony as to recognizing this document, your Honor.

MR. ROBOTTI: He testified he recognized it in his role.

THE COURT: Sustained on the current foundation.

BY MR. ROBOTTI:

Q Mr. Kandell, do you recognize this document?

A I do.

Q You're familiar with it based on your role as OneTaste?

A I do.

Q You recognize that this is the Code of Conduct from April 2011?

A Yes.

Q Is this a fair and accurate representation of that Code of Conduct?

A Yes.

MR. ROBOTTI: We renew our request to admit Defense Exhibit 1X.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 1X is admitted.

(Defense Exhibit 1X, was received in evidence.)

BY MR. ROBOTTI:

Q If we can publish for the jury. I would like to blow up the third paragraph there, beginning acknowledging. Mr. Kandell, if you can read that?

A Acknowledging the sensitivity of client/teacher relating, OneTaste coaches and trainers agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a client. Because several coaches and trainers in organizations have developed relationships with former clients, we acknowledge that such a healthy relationship can be possible but that great care and sensitivity are needed. In such cases, the coach/trainer and the client can consult with the ethics committee to determine the healthiest approach.

(Continued on next page.)

(Continuing.)

MR. ROBOTTI: All right. And we can put aside that document.

And I'd like to next show you what's been marked as Defense Exhibit 1-AB for identification.

CROSS-EXAMINATION (Continues)

BY MR. ROBOTTI:

Q All right. Do you recognize this as a later version of the Code of Conduct?

A Yes.

Q And you're familiar with this version based on your role at OneTaste?

A Yes.

Q And you recognize this as a fair and accurate depiction of the OneTaste Code of Conduct from February of 2014?

A Yes.

MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 1-AB.

MS. BENSING: No objection.

THE COURT: Defense Exhibit 1-AB is admitted.

(Defense Exhibit 1-AB was received in evidence.)

(Exhibit published.)

Q All right. So looking at this document, this is the Code of Conduct for all teachers, coaches, leaders and support staff. Is that correct?

A Yes.
Q And if you can just look at the third paragraph here.
MR. ROBOTTI: And if we can just blow that up.
Q Could you read the first just three sentences there?
A Our work is intended for adults, and we mean emotional, spiritual, as well as physical. This means that you are willing to take responsibility in your experiences within OneTaste. That means you overtly agree to play using green, yellow, red rules.
Q And the following sentence there is: These rules are explained in all of our classes and programs, correct?
A Yes.
Q And then the last sentence of this paragraph says: OneTaste teachers and staff are well-acquainted with red, yellow, green, and agree to respect them in student interactions.
Correct?
A Yes.
Q All right. And I would like to turn to page 3 of this document.
MR. ROBOTTI: I'm sorry. If we can back up one page and just blow up Ethics Committee Petitions. It's down near the bottom.
BY MR. ROBOTTI:
Q Now, Mr. Kandell, does this document, this paragraph

describe the process for submitting a request to the Ethics Committee for exemptions from this policy?
A Yes.
Q All right.
MR. ROBOTTI: And if we could go to page 3.
Q On page 3 we have --
MR. ROBOTTI: We can just highlight beginning "OM Guidelines" to the end.
Q All right. And does this set forth the ethics policy for OM guidelines?
A Yes.
Q And then below that in the document there's the ethics policy for makeout guidelines?
A Yes.
Q And then turning to the next page. And the next page sets forth --
MR. ROBOTTI: If we can just pull up the next page.
(Exhibit published.)
Q And the next page sets forth the consequences for violations of the Code, correct?
A Yes.
Q Now --
MR. ROBOTTI: And we can put this document aside.
BY MR. ROBOTTI:
Q Now, people often did send in these ethics requests to

the Committee, correct?
A I don't know how often or not.
Q People did send in requests?
A Yes.
Q Including yourself?
A Yes.
Q And those requests for exemptions would be granted sometimes or most times?
A I don't know the frequency. Sometimes.
Q But to your knowledge, they were denied at some points?
A Yes.
Q All right. So let's talk a little bit about the corporate structure of the company as it grew.

So as the company grew, is it fair to say your responsibilities also grew?
A Yes.
Q And by 2011 you had taken on additional responsibilities from what you'd had previously?
A Yes.
Q So, on top of your CFO and COO tasks, you were co-director of the overall business?
A Yes.
Q You handled the finances and the bookkeeping, including payroll?
A I was responsible for the bookkeeper and responsible for

you aware of certain volunteers' financial resources?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q All right. The company also offered work trade, correct?

A Yes.

Q And just stepping out of this legend here.

There were several people on this organizational chart who were in the work trade arrangement, correct?

A Yes.

Q That included Amy Jones, Maddie Fuller and Michelle right?

A Maddie Carl.

Q Oh, excuse me, Maddie Carl.

A And Audrey Wright, yes.

Q And work trade was generally for people living at 1080, correct?

A Yes.

Q And the agreement for work trade was that instead of paying for something, like rent or a course, you could pay with time?

A Yes.

Q So, for example, if you wanted to take a course for free, you could devote six hours to sweeping the floors at 1080, correct?

A Yes.
Q Or if you wanted a free room at 1080, you could do like 10 cooking shifts per month, right?
A Yes.
Q And that was offered to people who said they wanted to be involved in OneTaste, but couldn't pay the full fees, correct?
A Yes.

(Continued on the following page.)

BY MR. ROBOTTI: (Continuing.)
Q And that could also lead to a paid position, right?
A Yes, sir.
Q And the terms of the work trade agreement were explained to people upfront, correct?
A Yes.
Q And if someone changed their mind or wanted to volunteer or do work trade, they could leave, correct?
MS. BENSING: Objection. Calls for speculation.
THE COURT: Sustained.
Q Now, is it fair to say there was no obligation to volunteer or do work trade --
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, the payment structure for employees fell under your jurisdiction; is that correct?
A Yes.
Q And it changed and evolved during your time at OneTaste, right?
A Yes.
Q And as you talked about a bit on direct examination, there were some growing pains, correct?
A Yes.
Q And in your view certain, mistakes were made regarding the payment structure, right?

A Yes.
Q So for example, the company changed back and forth from W-2 employees to independent contractors a few times?
A Yes.
Q And in your view, under the IRS guidelines, that -- the independent contractor should have been treated as W-2 employees, correct?
A Yes.
Q And this raised concerns for you about tax issues, correct?
A Yes.
Q And the problem that was driving those changes was OneTaste cash flow issues, correct?
A Yes.
Q Now, as the company continued to grow over time, you continued to consult with additional outside professionals, correct?
MS. BENSING: Objection.
THE COURT: Overruled.
A Yes, I did.
Q And those resources became more available to you as the company got more resources?
A Yes.
Q And you consulted with them about how to try to do things the correct way, right?

A Yes.
Q All right. So I'd like to talk a little bit more about consent at OneTaste.
So in your view, even in the early years, consent was very important at the company?
A Yes.
Q From the very beginning, the company had consent forms, correct?
A Yes.
Q You were involved in drafting the consent forms?
A Yes.
Q And while the wording of these forms might have changed over time, the general substance was the same, correct?
A Yes.
Q And if a person wanted to participate in a OneTaste program, they had to sign a consent form, correct?
A Yes.
Q The company was strict about this?
A Yes.
Q And, in fact, before you left in 2014, you were involved in digitizing boxes and boxes of hard copy consent forms?
A I was.
Q I'd like to show you what's been marked for identification as Defense Exhibit 1AN.
Now, do you recognize this as a general release form for all

OneTaste programs at the Urban Retreat Center?
A Yes.
MR. ROBOTTI: If we can scroll down to the bottom. There's a very small -- the bottom there.
Q Do you recognize the date of this document?
A Yes. October 2006.
Q And you recognize this form your work at OneTaste, as well as the fact that you drafted it, correct?
A Yes.
Q Is this a fair and accurate depiction of the consent form back in October of 2006?
A Yes.
MR. ROBOTTI: The defense moves to admit Defense Exhibit 1AN, Your Honor.
MS. BENSING: Your Honor, the Government objects on relevance grounds for lack of testimony with respect to this program.
THE COURT: The form I have is a blank as to the course.
Is that what everybody is using?
MR. ROBOTTI: He testified this is the standard form used for all courses during this time period.
MS. BENSING: Yes, Your Honor. Again, during this time period with respect to lack of testimony about these courses, the Government objects on relevance grounds.

MR. ROBOTTI: I could ask another question, Your Honor.

THE COURT: Sustained.

You can ask another question.

Q So you spoke earlier about the Insight Institute?

A Yes.

Q And these were courses that were held by the Insight Institute at the Urban Retreat Center, correct?

A Yes.

Q And this form was one of the foundational forms that was used to create the consent forms throughout the rest of your time at OneTaste, correct?

A Yes.

MR. ROBOTTI: Your Honor, based on that foundation, we renew our offer to admit.

MS. BENSING: The Government maintains its objections on relevance grounds.

THE COURT: Overruled. Government -- excuse me, Defense Exhibit 1AN is admitted.

(Defense Exhibit 1AN, was received in evidence.)

Q All right.

MR. ROBOTTI: And if we could just pull up the assumption of risk portion.

Q Now, we won't go through all of these, but just to go over a couple, the first point is that the content of the

MS. BENSING: Objection.

THE COURT: Sustained.

Q You taught numerous different courses while you were at OneTaste, correct?

A I did.

Q You taught the CP programs, correct?

A I did.

Q You were involved, for instance, in CP1 through CP5, correct?

A CP7.

Q CP1 through CP7.

And those courses took place over the course of what years?

A 2010 to end of my tenure in 2014.

Q Now, during that time period, did a student ever tell you they didn't want to do something?

MS. BENSING: Objection.

THE COURT: Sustained.

Q During these programs, OneTaste had safe words, correct?

A Yes.

Q We talked, again, about the red, yellow, green scale?

A Yes.

Q That's pulled from the BDSM community, right?

A Yes.

Q And if someone said red, that meant stop, correct?

A Yes.

Q And if someone said red, that was a way to communicate they were no longer giving their consent, correct?
A Yes.
Q These safe words went back to the very beginning of OneTaste?
A Yes.
Q And OneTaste programs were designed for people to have some very heavy experiences and play some serious games, correct?
A Yes.
Q And the company would look to people to know their own boundaries, correct?
A Yes.
Q And they gave them the tools to express those boundaries through the red, yellow, green scale, correct?
A Yes.
Q And the company relied on the students to use that scale, correct?
A Yes.
Q OneTaste also had the concept of safeporting, correct?
A Yes.
Q And that basically meant checking in with someone in OM to ensure that there was still consent, correct?
A Yes.
Q And that was a concept that was also taught during the

coaching program, correct?
A Yes.
Q And more generally, as part of the OM practice?
A Yes.

(Continued on the following page.)

(Continuing.)
BY MR. ROBOTTI:
Q And OneTaste had a refund policy, correct?
A We did.
Q And if people dropped out of courses they could get a refund through that policy, correct?
A They could.
Q And some customers did chose to do that, right?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance as to which customers, when.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q There was a policy that allowed customers to get refunds, correct?
A There was.
THE COURT: I'll let you stop, now if you want.
MR. ROBOTTI: Perfect place, Judge.
THE COURT: I'll let the witness step down for today. We'll resume tomorrow.
(Whereupon, the witness steps down.)
THE COURT: Mr. Robotti, you're welcome to sit down too.
We'll stop for today we'll resume tomorrow at the usual time, come at 9:15 and we'll start at 9:30.

of four years of bank statements of what she spent that money on I think is designed for some other purpose, other than --

THE COURT: Well, it is telling that it's labeled "select purchases."

MS. BONJEAN: Right. I understand, but again, like this is from our perspective --

THE COURT: I'm agreeing with you. I'm agreeing with you, Ms. Bonjean.

MS. BONJEAN: Yes, okay. I can't take a hint.

THE COURT: Yes. Let me hear from the Government on this particular one. The others are a bit of different category.

MS. FARRELL: Sure.

So just factually, these -- these expenses predate the sale of the company. So, it's not that she's using the proceeds from the sale to buy this stuff, it's what she's using her salary coming from OneTaste to spend her money on.

And, look, this is a forced labor conspiracy. The whole theory is that there -- you know, there's some kind of benefit or gain from forcing the "un" or underpaid laborer of these, you know, women who have now testified in this trial. And -- and we think we're entitled to show the jury what the fruits of that labor entailed, including everything set forth in this chart, Government Exhibit 865.

And it's not -- it's not just for -- to make a

**ROBERT KANDELL**, having been previously duly sworn/affirmed, testified as follows:

CONTINUED CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good morning, Mr. Kandell. So let's talk a little bit about Rachel Cherwitz. So in early 2007 you met Ms. Cherwitz; is that correct?
A Yes.
Q And she showed up on the door step at the warehouse in San Francisco?
A Yes.
Q And she was a shaved-headed dynamo as you described her; right?
A Yes.
Q And you just let Rachel and her two friends come in and stay; right?
A Yes.
Q Even though they had no money at the time?
A Yes, they did work trade.
Q And there were several reasons she was invited to stay at the warehouse; correct?
A Yes.
Q So Rachel was young, perhaps 27 or so?
A Yes.
Q She had shown up from Texas and needed a place to stay?

A Yes.
Q She was energetic, a hard worker and strong-willed; correct?
A Yes.
Q And you were immediately drawn to her?
A Yes.
Q And you formed a bond very quickly; correct?
A Yes.
Q And your understanding is that Rachel turned to OneTaste in part because she had her own trauma; correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Calls for hearsay.
THE COURT: Overruled.
A She described being --
THE COURT: Sustain as to any hearsay.
BY MR. ROBOTTI:
Q Just a yes or no question. Your understanding is that Rachel turned to OneTaste in part because she had her own trauma?
A Yes.
Q Based on your observations, Nicole Daedone also formed a bond with her very quickly; correct?
A Yes.
Q And she quickly took Rachel under her wing; right?

A Yes.
Q It's fair to say that Ms. Cherwitz quickly rose up the ranks in the company; right?
A Yes.
Q You did not think that Rachel was business minded; right?
A I did not think she was business minded.
Q But she was motivated and dedicated?
A Yes.
Q And in a way that many others in the company were not at the time; correct?
A Yes.
Q Rachel had an ability to manage people?
A Yes.
Q And that was something that OneTaste needed at the time; correct?
A Yes.
Q Now, you testified that Rachel also became your research partner; is that right?
A Yes.
Q And that was someone with whom you explored an OM practice; correct?
A Yes.
Q And more broadly who you explore an emotional and sexual relationship with?
A Yes.

Q And you viewed it as helping improve yourself, too; correct?
A Yes.
Q And even toward the end of your time at OneTaste in 2014, you spoke very fondly of Ms. Cherwitz; correct?
A Yes.
Q At that time you believed she could be sharp and pointed; right?
A Yes.
Q But she had a flip side of pure love and dedication; correct?
A Yes.
Q She could be a smart and caring teacher?
A Yes.
Q You had some amazing times together in New York especially?
A Yes.
Q And you believed that Rachel was the best practice partner you had; correct?
A Yes.
Q And in your view she taught you to get out of your linear break; is that right?
A Yes.
Q And she taught you how to engage with a dynamic, powerful, unilinear woman; is that right?

A Yes.
Q And it's true that during your time at OneTaste, there was a heavy focus on marketing?
A Yes.
Q And spreading the word about the mission of the company?
A Yes.
Q The people at OneTaste were basically shouting from the rooftops about the benefits of orgasmic meditation; correct?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q It's fair to say that the company was heavily marketing the benefits of orgasmic meditation?
A Yes.
Q The company did have some marketing success; correct?
A Yes.
Q And it regularly opened its doors to media attention; correct?
A Yes.
Q But standing alone that media attention and that interest was not enough to make the company profitable; right?
A Yes.
Q You mentioned in 2012 the company shifted its strategy and started focusing on sales, right?
A Yes.

Q And it implemented a sales team?
A Yes.
Q And the company was selling enrollment in its courses, right?
A Yes.
Q And the basic idea was that at OneTaste events a salesperson would talk to potential customers; correct?
A Yes.
Q And try to sign them up for classes; right?
A Yes.
Q And salespersons could also generate leads through outreach through their sales network?
A Yes.
Q And the salespeople would talk to potential customers about the classes; right?
A Yes.
Q And they would explain the benefits; right?
A Yes.
Q And they would talk about their personal experiences; right?
A Yes.
Q And help the potential customers try to figure out payment; correct?
A Yes.
Q So this is a typical sales job?

MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q So you were involved in starting up the sales team; right?
A Not directly.
Q Were you familiar with the company's efforts to set up the sales team?
A Yes.
Q Is it fair to say that the company looked to other businesses to see how they ran their sales teams?
A Yes.
Q And you used other businesses as a model for your sales team; correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Lack of personal knowledge. He testified he wasn't involved in the process.
THE COURT: Overruled.
Q So you looked to other companies as a model for your sales team?
A Yes.
Q And while you were there, OneTaste had several outside consultants come to train the sales team; correct?
A Yes.

Q And is it fair to say that it was hard to sell a new fringe product?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Well, based on your experience as chief operations officer running the business was it hard to sell the OM practice?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Is it fair to say that the company taught its sales team proven sales techniques?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Did the company also put in place daily sales goals; is that right?

A Yes.

Q And those started at about $5,000; correct?

A Yes.

Q And the goal was that between all salespersons on a given day, they would hit $5,000?

Q Now these were potential customers who had expressed interest in courses; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q The people at the coaching courses who showed up were potential customers who had expressed interest in the program; right?

A Yes.

Q And the people who showed up to the OneTaste programs, they were adults; correct?

A Yes.

Q And the potential students had their own outside jobs; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Now, to be clear, you do not view debt necessarily as being a bad thing; correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Now, based on your experience at OneTaste, to your

knowledge the sales team never targeted people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q You were familiar with the sales practices at OneTaste based on your position and experience; correct?

A Yes.

Q And you had an understanding of the company's sales practices from 2012 to 2014; correct?

A Yes.

Q And you had the opportunity to observe those sales practices based on your own experience; correct?

A Yes.

Q And based on your own observations and your own experience, the company never targeted people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Relevance, lack of personal knowledge as to which people, when.

THE COURT: Overruled.

A Yes, we never targeted anyone with trauma.

Q It's fair to say that OneTaste never sought out, based on your experience, people with trauma; correct?

MS. BENSING: Objection.

THE COURT: Sustained.

BY MR. ROBOTTI:

Q Based on your experience, again your own observations and your own interactions, you knew that the salespersons talked to potential customers about her sexual wants and needs; correct?

A Yes.

Q I'd like to show you what's been marked as Defense Exhibit 11-FS.

(Exhibit published to the witness, counsel and the Court.)

Q Now, do you recognize this as the sales and business development manual from 2013?

A Yes, I do.

Q And you recognize that based on your role with OneTaste; correct?

A Yes.

Q And you are familiar with this as part of overseeing the business at OneTaste; correct?

A Yes.

THE COURT: Sorry, you're going to have to give that to me.

(Counsel approaches.)

BY MS. BENSING:

Q And this was from the 2013 time period; correct?

A Yes.
Q And this was used to train the sales team?
A Yes.
Q And is this a fair and accurate depiction of the 2013 manual?
A Yes.
MR. ROBOTTI: Your Honor, the defense moves to admit Defense Exhibit 11-FS.
THE COURT: Any objection?
MS. BENSING: Can I have just one minute?
THE COURT: Yes.
MS. BENSING: I just want to look at it. It's a longer --
THE COURT: Sure.
MS. BENSING: Your Honor, the Government objects on relevance grounds to the entirety of this document coming in.
THE COURT: Give me one moment now.
Sustained, on this foundation.
BY MR. ROBOTTI:
Q All right, well, Mr. Kandell, you were familiar with this document at the time you were at OneTaste; correct?
A Yes.
Q And you reviewed this document; correct?
A Yes.
Q It's your understanding that this was used to train the

sales team; correct?
A Yes.
Q This document was used to inform the sales practices and tactics at OneTaste; correct?
A Yes.
Q And this is a document that the sales team relied upon in reaching out to potential customers; correct?
A Yes.
MR. ROBOTTI: Your Honor, again, we renew our offer of Defense Exhibit 11-FS.
MS. BENSING: Same relevance objection to the entirety of this coming in.
THE COURT: Sustained on this foundation, to the extent you're seeking to offer the entirety.
BY MR. ROBOTTI:
Q Could we turn to page 12 of this document? Actually, can we look at page 11?
Now, on page 11, Mr. Kandell, does that reference the sales process?
A Yes.
Q Okay. And looking from page 11 to page 17, does that give an overview of the sales process?
A Yes.
Q All right. And this was the manual that was used to train the salespeople at OneTaste on the sales process?

A Right.

MR. ROBOTTI: Your Honor, we would move to admit just pages 11 through 17.

THE COURT: Any objection?

MS. BENSING: No objection.

THE COURT: So, Defense Exhibit 11-FS, pages 11 through 17, are admitted.

(Defense Exhibit 11-FS, pages 11 through 17, received in evidence.)

MR. ROBOTTI: All right. And if we could publish to the jury.

(Exhibit published.)

BY MR. ROBOTTI:

Q Do see at the top there it says "Sales Process" on page 11?

A Yes.

MR. ROBOTTI: And if we can turn to page 12, if we can highlight "exploratory session."

Q And could you just read that paragraph, Mr. Kandell?

A "The exploratory session formally opens the relationship. The session should only be 45 minutes long. An exploratory session is not coaching. In this session you dive deeper into getting what the client's desires are, what's blocking them from having what they want and then making them an offer that they can say yes to."

Q Okay.

MR. ROBOTTI: And if we can highlight the portion that says "Safeporting" at the bottom.

Q Can you read the first two sentences under "Safeporting"?

A "You are preparing them for how the rest of the session will go. This allows them to know where the call is moving as it progresses."

MR. ROBOTTI: And the next paragraph -- we can leave the highlight.

Q Can you read that paragraph beginning "Okay"?

A "Okay. Here is how the session is going to go. First, we're going to talk about what you want, goals and desires. Does that make sense? They should say yes. If not, ask them what part they don't understand."

MR. ROBOTTI: And then can you skip down to the last portion beginning "And then."

A "And then we're going to talk about what's blocking you from having the things you said you want. Does this make sense. Yes."

MR. ROBOTTI: Can we turn to the next page?

Q And this first paragraph beginning "Finally."

A "Finally, I will go he over the OneTaste method of coaching, what it is and how we do it. Then we will go over any questions you might have. After that, I will make you an offer. For example, I might recommend so many sessions over X

period of time for this amount of money. You are free to say yes or no. No is always an acceptable answer. My only request is that you make a very clear decision at the end of our time together. Does this make sense?"

MR. ROBOTTI: Now, under the next section "Stroking" can we highlight the paragraph, "What do you want?"

Q Could you read that, Mr. Kandell?

A "Here, the client is tapping into their desires. They might find it hard to identify what they are in the beginning. There might be some silence as they unearth their answers. This is fine. Once they get going, the answers will gain momentum.

MR. ROBOTTI: And can we turn to page fourteen, please?

Q And that top paragraph, "What do you feel is blocking you?"

A "Have the client list all the ways they feel blocked from living the life they want. The sensation in this part of the question might be heavier but stay with the client. If they cry or get emotional, allow them to feel the emotion. Again, refrain from coaching or making additional comments that will take them out of the experience. It's important to let the client experience and feel what is blocking them so they're more motivated to move out of that state."

MR. ROBOTTI: And, lastly, can we turn to the next

page, which is page 15. And can we highlight the top paragraph?

Q Beginning "The second phase."

A "The second phase of coaching is education. This is where we teach you how to live a turned-on life. You will learn to live in the world in a different way; operating from your desire, instead of fear or obligation. Education may include OM practice, communication exercises and written exercises such as a desire contract.

"A desire contract is a living, breathing agreement with your desire where you get in touch with what you -- where you get in touch with what you are here to do, discover how you will achieve it and what your boundaries are, how to ask for what you want and define how someone can be with you. The desire contract will act as a compass you can use at any time to ask, is this moving me closer to or further away from what I desire."

Q Thank you, Mr. Kandell. We can put this document aside.

Now, to your knowledge the sales team would track information about leads in Salesforce; is that right.

A Yes.

Q And Salesforce is a tool used by many companies; correct?

A Yes.

Q And that was information that was tracked so that they could keep their connection with potential customers; correct?

A Yes.
Q Now, you testified on direct that Rachel was very good at her job as the lead salesperson; correct?
A Yes.
Q But it was your understanding that Rachel found this job stressful; correct?
A At times.
Q And, to your knowledge, sales goals in particular were stressing her out?
A At times.
Q Is it fair to say that based on your observations, Rachel pushed her team hard yelled at them?
A Yes, at times.

(Continued on the following page.)

MS. BENSING: Objection. Misstates the testimony.
THE COURT: Sustained.
Q Now, you referenced -- well, let me ask it this way: At times, OneTaste could feel like high school, correct?
MS. BENSING: Objection.
THE COURT: Sustained.
Q In your view, were there cliques at OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You testified yesterday that at OneTaste you could fear losing social status, that was kind of like a high school clique situation gone bad, you could lose, you know, being closer to the cool kids.
Was that your testimony yesterday?
A Yes.
Q So there were cliques at OneTaste?
A Yes.
Q And fair to say you were the equivalent of a popular kid?
MS. BENSING: Objection.
THE COURT: Sustained.
Q Now, to be with the inner circle at OneTaste, you had to be a hard worker in the company, correct?
A Or -- yes. And offer something of value to the company.
Q And you had to believe in the OM practice, correct?
A Yes. And to offer something valuable to the company.

A Yes.
Q All right.
MR. ROBOTTI: I'd like to next turn to Government Exhibit 208 which is in evidence.
Q Do you recognize this as Christina Berkeley?
A Yes.
Q And you testified on direct that she handled Reese Jones for a time?
A Yes.
Q All right. So I'd like to talk about your knowledge and understanding of that relationship with him.
Now, you lived in the warehouse with her starting around 2007, correct?
A 2006.
Q And you OMed with her, correct?
A Yes.
Q You observed her interacting with Nicole, correct?
A Yes.
Q And she seemed like she wanted to get close to Nicole, correct?
A Yes.
Q And it was your understanding that she was enthusiastic about handling Reese Jones, correct?
MS. BENSING: Objection.
THE COURT: Sustained.

Q So I want to speak about your knowledge and understanding of this relationship.

Was it your understanding at the time that she was enthusiastic about handling Reese Jones?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Did you have a chance to observe her interacting with Reese Jones?

A Yes.

Q Did she seem enthusiastic about that relationship?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, was it your understanding that it was an opportunity for her to handle Reese Jones?

A Yes.

Q And as part of that opportunity, she had the chance to live in a nice house with Mr. Jones, correct?

MS. BENSING: Objection.

THE COURT: Overruled.

A Yes.

Q And it was your understanding that she was free to leave OneTaste during that time, correct?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Have you had the chance to interact with Ms. Berkeley

since leaving OneTaste?
A Yes.
Q And how often have you had communication with her?
A We taught a workshop together afterwards. We communicated frequently for the first year or two after, and then more sporadically in the last seven, eight years.
Q All right. I'd like to show you what's in evidence as Government Exhibit 408.
Do you recognize this person as Michelle Wright?
A Yes.
Q And Michelle showed up to OneTaste around 2010?
A Yes.
Q And you were aware that she was in a relationship with Maddie Carl for a period?
A Yes.
Q And you testified that Michelle and Maddie handled Reese Jones for a time period, correct?
A Yes.
Q And it was your understanding that this was an opportunity for them, correct?
A Yes.
Q Again, they got the opportunity to live in that house, correct?
A Yes.
Q And they got to share a room together there, correct?

MS. BENSING: Objection.

THE COURT: Basis?

MS. BENSING: Lack of personal knowledge.

THE COURT: Sustained.

Q Was it your understanding at the time that they got to share a room together?

MS. BENSING: Same objection.

THE COURT: Sustained.

Q It was your understanding at the time they were free to leave OneTaste if they did not want to handle Mr. Jones?

MS. BENSING: Objection.

THE COURT: Sustained.

Q Now, at some point, Ms. Wright, did stop handling Reese Jones and was reassigned to Las Vegas, correct?

A I think she was in Las Vegas first and then went to be are Reese and then I believe she went to Los Angeles.

Q And the Las Vegas position was a promotion within OneTaste, correct?

A Yes.

Q Now, you maintained contact with her since you left OneTaste, right?

A Yes.

Q And she worked for you for a while after she left, correct?

A She did.

Q I'd like to show you Government Exhibit 260 in evidence.
(Exhibit published.)
Q This is Lianna Lifson?
A Yes.
Q And she ran OneTaste in Boulder, correct?
A Yes.
Q And that location struggled?
A Yes.
Q And ultimately, it was closed, correct?
A Yes.
Q And then Ms. Lifson asked to get another job within OneTaste, correct?
A Yes.
Q And she was relocated to New York -- to New York to run a yoga studio, correct?
A Yes.
Q And she later asked to be taken off of that job?
A Yes.
Q And she was reassigned to be a coach, correct?
A Yes.
Q And then she was later terminated, correct?
A I think that happened after my tenure ended.
Q Do you recall directing Ms. Lifson and Jenny Slusher to have oral sex with a man named Toby?
A No.

Q And do you recall Ms. Lifson telling you she did not want to do that with this man?
A No.
Q To your knowledge, Ms. Lifson had enthusiastically participated in OMs, correct?
A Yes.
Q As well as other sexual activity at OneTaste?
MS. BENSING: Objection.
THE COURT: Sustained.
BY MR. ROBOTTI:
Q Have you had contact with Ms. Lifson since leaving OneTaste?
A Yes.
Q And how often?
A We were friends from around when I left, she showed up I think August of 2014, until mid 2015. And we had a business venture together, and her partner was a partner of mine in a business together as well.
Q All right. I'm going to show you Government Exhibit 207.
(Exhibit published.)
Q Do you recognize this as Chris Kosley?
A Yes.
Q And he started participating in OneTaste in around 2006?
A Yes.
Q And ultimately, he was given a role doing media

Q And at the end of the day, you understood that you were responsible for that decision, correct?
A Yes.
Q Now, before the break, we talked about Christina Berkley, Michelle Wright and Maddie Carl and Alisha Price, correct?
MS. BENSING: Objection. I don't think that --
MR. ROBOTTI: Apologies.
THE COURT: Sustained.
Q So we talked about Christina Berkley and Michelle Wright before the break, correct?
A Yes.
Q And you testified yesterday as well about Alisha Price and Maddie Carl, correct?
A Yes.
Q And you testified that among other people, they were handlers for Reese Jones, correct?
A Yes.
Q And in your role as COO of the company, you were aware of these assignments, correct?
A Yes.
Q And you testified yesterday that you were also aware of the responsibilities of these assignments, correct?
A Yes.
Q And you were aware of the parameters of this role, correct?

A Yes.
Q And as COO of the company, your understanding at the time was that they were free to leave this assignment, correct?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Relevance and lack of personal knowledge.
THE COURT: Overruled.
A Yes, they were free to leave at any time.
Q All right. So, I want to go back to 2014.
That's when you left the company, correct?
A Yes.
Q So in total, you were at the company for about ten years, right?
A Yes.
Q And before we get to why you left the company, let's talk for a minute about why you stayed for a decade. Okay?
So you believed deeply in the company, correct?
A Yes.
Q You believed in the practice of OM, correct?
A Yes.
Q And although you were working hard, you found this to be a fulfilling job, correct?
A Yes.
Q And aside from your belief in the company, you also were

correct?
A Darshan.
Q Darshan, my apologies.
And can you elaborate a little more about what a darshan is?
A My understanding of a darshan, I believe it's a Buddhist term, and it's a group teaching where a teacher sits, often with a Socratic method of teaching, of the students asking questions and the teacher and the participants sharing knowledge.
Q Okay. And did Ms. Daedone routinely hold darshans back in the warehouse days?
A We did for a period of time, yes. It was the warehouse times.
Q And we looked at a transcript, a portion of a transcript for darshan.
Do you remember that?
A Yes.
Q And do the darshans kind of have a theme usually?
A Nicole was a voracious researcher, so she would find things and hear things and often bring the ideas to the darshan to share and to explore.
Q And did you find yourself that darshans were helpful to personal growth?
A Yes.

Q And did Darshans continue later on into the history of OneTaste or the progression of OneTaste, or was it more in the old days?
A I don't have -- I think they ended 2009, 2010.
Q Now, you testified on direct examination about manipulation being used at OneTaste.
Do you remember that?
A Yes.
Q And you also testified that manipulation has a negative connotation.
Do you remember what you meant by that?
A Yes.
Q Can you explain?
A Manipulation -- my opinion, manipulation has a negative connotation that one person does covertly to another.
My personal opinion is that we're manipulating each other constantly, consciously or unconsciously. We're asking for things, we're pouting, we're yelling, we're being human beings with each other.
And so, my belief is that there's a conscious manipulation and unconscious manipulation. And so I have it as value-neutral connected to what's the intention behind it.
Q And I think you also testified that in connection with your work at OneTaste, that manipulation was used towards a higher goal?

A Yes.
Q And that sometimes people were pushed past their abilities, but the intention was to push them to a higher goal.
Was that right?
A Yes.
Q You also testified on direct examination about -- I think the Government asked you about, you know, what techniques were used. And you testified that there were, I believe, threats of like losing your position within the -- in the company.
Is that right?
A Yes.
Q Okay. And when you say "threats," you mean like a fear of losing social status, right?
A Social status, possible income, position, coaching, teaching, doing the OM, you know, the -- the perception of loss or the possible loss.
Q Okay. And you certainly never prevented anyone from leaving OneTaste, right?
A I never prevented anyone.
Q And did you ever see anyone in the upper management at OneTaste prevent somebody from leaving OneTaste?
A We would certainly talk to someone to consider, to hear, but there was never a prevention of someone leaving.
Q Okay. You also used the word "love-bombing."

Can we agree that that wasn't a term that was used back then? Or maybe it was, I don't know.
A No, it was -- it was present back then. It wasn't the popular term it is now, let's say that.
Q Okay. And you testified, I think, that love-bombing is, basically, placing, you know, a significant amount of attention on someone so they feel a particular way, right?
A Yes.
Q Did OneTaste get involved in projects that benefited people outside the community of OneTaste?
A Yes.
Q What were those projects?
MS. BENSING: Objection.
THE COURT: Basis?
MS. BENSING: Outside the scope and relevance, consistent with the Government's pretrial briefing on this.
THE COURT: Overruled as to this question.
BY MS. BONJEAN:
Q Can you just provide us the names of the projects, if you recall them?
MS. BENSING: Objection.
THE COURT: Sustained.
MS. BONJEAN: Okay.
Q But you would agree that OneTaste tried to help the community on the outside of OneTaste?

A Yes.
Q And was there a program called Fill Up America?
MS. BENSING: Objection.
THE COURT: Sustained.
Q You and Nicole talked about the issues of having a joint community and company, right?
A Yes.
Q And that seems like it was a conversation that went on for, frankly, like years, right?
A Yes.
Q And am I correct that in 2013, there was an actual affirmative announcement of splitting community and company?
A Yes.
Q Like a formal announcement that was made to the entire community?
A Yes.
Q I think you said in 2014, when you were departing OneTaste, OneTaste was -- had revenue somewhere north of $4 million.
Does that sound right?
A Yes.
Q And do you know if or how much the revenue increased following your departure in 2015, 2016, 2017?
A Just what I read in the Inc. 5000. I think it was 11.1 million.

But yeah, I -- this is what needed to be done in order for the course to go forward.
Q All right. But this was your suggestion?
A Yes.
Q Okay.
A Yeah, I was making the course work.
Q Right. It was your suggestion in order to make the course work, to make it a procedure, basically, to just make people come in regardless of where they are to balance the gender, right?
A That's right. That's where we had gotten to by that time.
Q But that was your idea?
A It was -- yes.
Q Okay. And that was actually something that there was a lot of pushback on, correct?
A I -- I don't remember.
Q You had a couple of your own ethics violations, right?
A Yes.
Q Including you were put on ethics probation when you fondled a student's breast who didn't give consent?
MS. GUPTA: Objection, outside the scope.
THE COURT: Overruled.
A When we talked -- yes, I -- yes, I was. And when we talked through it later, it turned out that she had given

consent.
Q She did what?
A She had given consent.
Q She had given consent?
A Yes.
Q Isn't it true that she didn't verbally give consent, even though that's part of the practice when you're safe wording?
A That's right, but once -- once we talked through it, she -- we -- the ethics violation was dropped.
Q So, you understand what safe wording is, right?
A Yes.
Q And what is it?
A It's telling someone what you're gonna do before you do it.
Q Okay. And that's one of the rules of OMing, right?
A Yes.
Q And that's something you didn't do, correct?
A No, I did do it. That was the point.
Q Okay. So --
A I said I -- I said: I'm going to touch your breasts.
Q Okay.
A And then I did. And then afterwards someone pointed out to you: Hey, he just felt you up. And she's like: Oh, yeah. There's -- there's ethics about this.

So then I was put on probation. And then once it

was talked through: Oh, actually he did safe word her. Then the -- the ethics violation was dropped.

Q So somebody put it in her head that you had done that; is that right?

MS. GUPTA: Objection, misstates the testimony.

THE COURT: Sustained.

BY MS. BONJEAN:

Q Who were you talking to when you said the "you," that was your testimony, he touched you without consent, who said that?

A I don't -- I don't remember who it was.

Q Okay. You also had an ethics violation when you were doing an OM demonstration with Maddie.

Do you remember that?

A Yes.

Q Okay. Tell the ladies and gentlemen of the jury what you did there.

A Yeah --

MS. GUPTA: Objection, outside the scope.

THE COURT: Sustained.

Q Well, do you remember doing -- we've talked about Maddie Carl here, right?

A Yes.

Q Okay. And isn't it true that you bit her thigh without her consent during an OM demonstration?

MS. GUPTA: Objection, outside the scope.

THE COURT: Overruled.
A Yes, that's correct.
Q Okay. And those are the real reasons why you are so angry about what's going -- strike that.
These are situations where you felt unfairly treated, right?
A No.
Q You felt -- you thought you deserved an ethics violation for biting Maddie's thigh without her consent?
A I thought it was appropriate.
Q But that violated the rules of OMing, right?
A Yeah, it did.
Q Now, you were also a big proponent of male OM, right?
A Yes.
Q And OneTaste had discontinued male OMing as a course, right?
A That's right.
Q And you didn't like that, did you?
A I -- I was asked by multiple students why it had stopped. So, I had conversations with community members to find out why it had stopped. And I thought there is a way we can teach this that will be -- that will be ethical and clean and won't mess with the OM practice.
So I spent actually a couple years thinking through how to teach it in a way that would be clean.

A Psychologically, there was -- I felt a lot of damage from my time at OneTaste.
Q Do you know an individual named Rachel Cherwitz?
A Yes.
Q And who is Rachel Cherwitz to you?
A She was the head of sales at OneTaste when I was there.
Q And do you see her here in the courtroom today?
A Yes. She's wearing the off-white blazer.
Q Has Rachel Cherwitz ever harmed you?
MS. COHEN: Objection.
THE COURT: Overruled.
A Same.
Q And at a high level, how has Ms. Cherwitz harmed you?
A Same thing.
Q What do you mean, same thing?
A That they were both in charge of OneTaste while I was there and it caused me a lot of psychological and a bit of physical harm.
MS. FARRELL: And Your Honor, I would just ask the Court to confirm the identifications on the record.
THE COURT: Yes.
MS. FARRELL: Thank you.
Q So you mentioned OneTaste.
Were you involved with OneTaste?
A Yes.

Q And in what capacities?

A I was a student for about a year and then became a owner of OneTaste New York, LLC, which was a franchise branch of OneTaste at the time, for a year and a half.

Q And approximately what were the -- was the span of years that you were involved in OneTaste?

A About two and a half years.

Q From when to when?

A From, like, spring 2013 to summer 2015.

Q Did you ever live in OneTaste housing?

A Yes.

Q And approximately how old were you during that span of time you just testified about?

A I was 25 in 2013, and 27 in 2015.

Q What type of business was OneTaste?

A It was, you know, billed as a wellness and, like, health company that taught an array of practices and coaching things. There were high level, but I often liken it to, like, Tony Robbins kind of a transformational coaching company.

Q Was there a particular practice that the company revolved around?

A Yes.

Q What was that?

A The main practice was called orgasmic meditation or OM, for short.

wasn't mine, and I was working at Trampoline Park. But my, like, some of my main income, like, what was paying my rent was from my parents. They were helping me out.
Q And did you have family wealth at the time?
A Yes.
Q So you mentioned that you attended a OneTaste event in which Nicole Daedone spoke?
A Mm-hmm.
Q Tell us about that event.
A Yes. It was a lecture kind of at a pop-up venue. It was very, like, chic and hip and kind of, I don't know, felt like buzzy. And I went and it was probably, I don't know, an hour, hour and a half kind of thing and Nicole basically told her, like, story of how she'd gotten into his practice, and then you know, described the practice and gave kind of, like, a pitch for signing up for classes and everyone was encouraged to at least sign up for How to OM before they left.
Q And when you say, she, being Nicole Daedone described a practice, what practice are you talking about?
A Orgasmic meditation.
Q And what was your reaction to Nicole Daedone's talk that night? That day?
A I was pretty amazed by her.
Q And what was it about her that made you amazed?
A Yeah, I'd never met anyone who, like, knew themselves so

well and was so, like, aware of their flaws and willing to just, like, own them and just, like -- it was like she had mapped her entire psyche, basically, and was able to just talk about it. And it just seemed very powerful and I really wanted to -- like, I was struggling with my aerial silks business, it was not going very well, and I really wanted to become a powerful businessman and I sort of thought if it woman could sell orgasm, I could sell circus, she could teach me to sell circus. But I was not interested in the practice at all.

Q So after attending that first event, what did you do?

A I kind of ran out the door. They were trying to persuade me to take a How to OM class and I wanted no part of it.

Q When you say, they were trying to pursued, you who were you talking about?

A There was, like, a sales team in the back. I think Marcus Ratnathicam might have been there. I don't remember. Rachel might have -- Rachel was definitely there as, like, head of sales. I don't remember it well so it might have been Margo or Allie.

Q What you say, Rachel, who are you referring to?

A Rachel Cherwitz.

Q So did you sign up for an additional class that night?

A I did not.

Q And then but did you come to sign up for something else?

on a date, and we -- things got, like -- we kissed afterwards and that's that he was what he confessed to me that he was married to someone.

MS. COHEN: Objection. Hearsay.

THE COURT: Sustained.

THE WITNESS: Oh, sorry.

Q Did you understand James to be married at some point?

A Yes.

Q Did you decide to engage a physical relationship, nonetheless?

A Yes.

Q Why?

A I recalled in my head what Nicole had said about sleeping with men who were taken by women and in the community and the women teaching me.

Q And did James -- was James a member of OneTaste?

A Yes.

Q Did he come to your apartment at the time that you all had a relationship?

A Yes.

Q And what was your apartment like?

A It was a -- it's called live-work loft. It was, like, a pretty fancy new-build, like, modern lofted space that had, like, kind of a bedroom on one side and a setup over on the other, and my silks were hanging from the 18-foot ceilings.

It was probably like 3,000 square feet.
Q How did you afford an apartment like that in San Francisco?
A My parents were covering the rent.
Q Did you later come to understand anything about whether your personal wealth had been reported back to OneTaste leaders?
MS. BONJEAN: Objection. Foundation. Hearsay.
THE COURT: Sustained.
Q So you mentioned that you signed up for the coaching program request?
A Yes.
Q And which coaching program was that?
A CP7.
Q And what were you hoping to get out of it?
A And during that exploratory session, when Rachel offered me that, I told her I did not want to be a life coach, like, that was -- I already had a business that I wanted to do. And she mentioned that, like, I could basically coach myself and that it could be, like, an education on spirituality and knowing myself, and I felt like if I took CP, I would get closer to that goal of becoming the, like, powerful businesswoman that I'd seen in Nicole who knew herself inside and out.
Q What did the CP cost, approximately?

each other off to get our beast out.

Q You mentioned OM training was part of the coaching program?

A Yes.

Q Was that just traditional OMing or did it include male OMing, as well?

A We did do a male OM, I believe one weekend at CP7, yeah.

Q Did -- what, if any, sort of interaction with the community outside of the coaching program was there as part of the coaching program?

MS. BONJEAN: Objection to the form.

THE COURT: Sustained.

Q Was there any -- was there any interaction with the outside community?

A Yeah. So pretty soon after -- because Rachel threw in the How to OM class for free when I signed up for CP7, so I did get OM trained. I had to get OM trained before I started CP7.

So pretty soon after I was OM trained, which was still a couple of months before CP, I requested joining what was known as morning practice. It was open only to basically, like, very senior community members or residents of 1080. And after that, I had pretty much -- there was two OMs for morning practice, sometimes -- but usually, it was just those two OMs, and I would go to that almost every day. And then I also

particular experience that's, like -- it's, like, usually pretty laid out. So it'll be either for, like, a set amount of time or, like, in BDSM there's, like, Saint Andrew's crosses or flogging or like, it would be set tools, you know, or it could be to -- OneTaste used it often, to, like, achieve, not like a particular goal, but like a state, kind of thing like, I said to be put in effect or to be, I don't know, like turned on, but not climaxed. There were like particular things from each scene.

Q So you testified earlier that when you first attended the Nicole Daedone talk, you weren't particularly interested in orgasmic meditation.

By the time that you're a beastie at 1080, are you participating in orgasmic meditation?

A Yeah. Generally, like, four plus times a day.

Q And what about some of these other sexual things that you've described?

A Yeah.

MS. COHEN: Objection. Vague.

MS. BONJEAN: I join.

THE COURT: Overruled.

A I -- yeah, I was -- when I became a beastie, I was -- it wasn't until I became a beastie that I was then asked to participate and help with the scenes and emersions.

Q So we talked about someone named Perry, Cole, and Rob

Shaw.

A Mm-hmm.

Q While you were a beastie, did you participate in any scenes involving any of those people?

A Yes. All three.

Q So let's start with Cole.

Who is that?

A So Cole was Perry's boyfriend at the time.

Q And who was Perry?

A Perry was a student in I believe it was CP8, the CP after me.

Q And did there come a time when you participated in a scene involving Cole?

A Yes.

Q Tell us what happened.

A Yeah. So I was asked by, like, Allie Wall was coordinating it for Rachel Cherwitz. Rachel was on the, like, text thread that was running this, to participate in an experience for Cole. It was basically, it was supposed to be his day, because Perry had signed up for CP8 and Cole was not. He had been offered to, like, sign for CP and had not signed up. So it was his day that was planned to help him, like, make the decision and sign up for CP. And I was asked to participate in a section of that day that was, like, a ritualized shower in the upstairs shower of 1080.

Q And who -- did you do the ritualized shower with anyone else?

A Yeah. It was me and Margo and Leah Mendleson, I believe, and Allie Wall. I can't remember if she came in the shower or just, like, dropped us off. But she was part of that.

Q So what happened in the shower scene?

A We had, like, hung sheets from these, like, clothing lines, kind of going across the shower room because it had like three opened -- there was, like, three showerheads in the stalls, and the sheets kind of created a pathway to the shower and there was, like, music on and we were -- we, like, brought Cole into the shower room and bathed him, everything, just you know, like head to toe. And it was, like, this foot soaking ritual that was -- that Nicole talked about a lot of. It was supposed to like mimic the Temple of Ephesus, where the whores, like, fucked the war out of warriors when they came back into ancient Greece.

Q Were you clothed?

A No.

Q What about the other women involved?

A No.

Q And then what about Cole?

A No. None of us were clothed.

Q And so when you and the others were done bathing him in the shower, what happened after that?

A No.
Q Why did you do it?
A As a -- so, sort of as a Beasty, but in general I was pretty much always looking for accolades and for like more like attention and time with -- with Rachel and Nicole and other senior staff members.
And there -- a little bit before this time I'd also had an experience of like what it was to not have that attention. And I was very scared of not -- not getting that attention to like what it felt on the other side of it.
Q What had happened?
A I was asked to be like a women-in-waiting. There was a course called The Men's -- The Men's Course. And Rachel did a demo, a demonstration of OMing for that course. And the -- it was an all men's course. So, basically, like she would have been the only woman walking into the room. And so there were a number of like other women who went as sort of a cohort with her for that experience. And I'd been asked to -- to be one of those women.
And the -- like the morning of the event we did what was known as like a check-in circle where Rachel would give a prompt and we would go around the circle answering it. And one of the questions was like: This is something that's like turning me on or like a hot -- maybe I can't remember what the exact question was, but my answer was that I wanted to have

I know it's tiny on the print. You can also look at the --

MS. FARRELL: Mr. McNett, if you could go to page 2 and highlight the top there.

A Yeah, this is -- it would be like a leads, sales leads document.

Q And what sort of information would you track in a sales -- putting aside this particular exhibit, what sort of information, if any, would you track in a sales leads document?

A I mean any and everything that we could find out about a lead, it went in either -- well, generally both in a document like this, as well as in Salesforce.

So, like after I made a sales call, I would log any information that I'd found out that was relevant to that person. So that could -- it could be anything from like recently divorced or has a crush on so-and-so. Like, it was -- it was any and all personal information that would help close a sale.

Q And would you share this information with anyone?

A Yeah. These documents were shared with, like, the city sales team. Sometimes the core sales team, and always Rachel Cherwitz. And the Salesforce was, like we all had the same like privileges and viewership of the Salesforce account.

Q You testified a moment ago that you would track personal

Honor.

MS. BONJEAN: Yes, Your Honor, we object on the same grounds.

THE COURT: Okay, overruled. Page 2 of Government Exhibit 3164 is admitted.

(Government's Exhibit 3164, Page 2, was received in evidence.)

MS. FARRELL: And if we could publish that to the jury, please.

(Exhibit published.)

BY MS. FARRELL:

Q Can you just walk us through what we see here, please.

A Yes. So, there are one, two, three, four, five, six -- these were technically broken up --

Q Let me stop you. Why don't you start at the top and work your way down.

A Okay. So, the How to OM course was the introduction course where people would learn orgasmic meditation and learn the -- the basics of the practice, the rules of how it went, and how everyone was expected to behave in the practice.

The OM Practice Club says it was a 28-day training support. That was -- it was more practically used as a monthly membership. So, we would -- people would sign up with a recurring membership, and it would run until they canceled it.

The Intro to Mastery was like an additional class that was developed to -- into Mastery, but they were related. So, it was supposed -- the Intro to Mastery was functionally used as like advanced OMing practices. Like there were more specific reasons. Some of this was done in the Practice Club, but this was, the Intro to Mastery was more of it.

So, like sometimes they would do male OMs. Some of the OM Practice Club stuff were -- there was like specific OMs like OMing Around the Clock. They were like guided and -- and it was more specific instructions in each of those.

And then Mastery was -- it was -- it was -- it more got into things like oral sex and sex, like sex as OM as like as a ritual practice.

And then Taboo and Magic School, those were actually two separate classes. They were the same costs and sort of the same level of intensity, but they were broken out.

Taboo was into stuff like BDSM and power roles, that kind of thing. And Magic School was more into like Kabbalah. And that's where we had sort of like priests and priestesses of orgasm were in it ninthd. It was like a -- it was like more in the ritual of it.

And then the Nicole Daedone Intensive was the demo training specific, and it was designed as a year-long coaching. You were assigned like a private coach that only had like one or two clients in the Intensive. And then it

ended in a two-week retreat with Nicole as the only teacher.
Q And you took all of these?
A Yes.
Q Okay.
A Sorry, with -- with the exception of Intro to Mastery, which was developed after I took Mastery, but I worked back-of-house for it.
Q So, turning your attention to August 2014, did you attend the Magic School?
A I attended -- yes, that was the first Magic School that I attended. And the second one was in the spring of 2015.
Q And so, what happened at Magic School?
A That -- for the first Magic School that I attended, it was a somar retreat. And I was, basic -- I mean the only thing of note that happened there was I was pulled out and we like did that, like that was like a first signing of the -- like -- like getting into ownership of OneTaste New York.
Q Sorry. While you were at Magic School, you executed the ownership document?
A Yes.
Q And then did you also attend Taboo?
A Yeah, I attended Taboo in like October of that year of 2014.
Q Earlier you testified about a sexual assault you experienced earlier in your life, is that correct?

A Yes.
Q Did there come a time when you addressed that in a Taboo course?
A Yes. There -- sorry.
Q And was Rachel Cherwitz there?
A She was in and out on that course. It was one of the few courses taught by guest teachers, but she was in and out.
Q Okay. And -- and what happened during the Taboo course in connection with your past sexual assault?
A There was a -- one of the exercises that we did during that course was to stage a scene, a BDSM scene, of a past trauma that we had. And we were, like, broken out into groups to do so.
Q And so, did you stage a BDSM scene of a past trauma you had?
A Yes. I --
Q What happened?
A I staged a reenactment of the rape that I had experienced when I was 21.
Q And did it involve the actual -- an actual sexual act?
A Yes. I asked one of the -- my fellow students to -- it was the -- we kind of designed the whole thing as a group.
But what -- what happened was that the other student stripped down, as did I, like we were both naked. And the rest of the group watched while he forced himself on me and

with fellatio and -- sorry, with a blow job. And they were -- the rest the of the group was supposed to watch and start telling me that I was beautiful, which is what my rapist had told me when they noticed that I went from, like, revulsion to turn-on.

Q And what happened to you physically when you were reenacting this thing that had happened to you?

A My whole body was shaking. I was like -- I just remember just dripping sweat. And like I -- when it started I was like, this was a terrible idea. Like it -- you know, it -- when we were designing with the group, I -- I felt like very honored and like, oh, I'm getting picked to do this thing and it's gonna earn me brownie points. And, like, look how like deep I'm going. Because I was constantly chasing these break-throughs of, like, the highs of -- Nicole Daedone would say this thing where like, the lower lows you can experience, the higher highs you can experience.

And so, I was constantly pushing to, like, find places that were gonna hurt to -- to hit the highs on the other side of it. And so --

Q And -- sorry.

A Sorry.

Q Did it help you to reenact this sexual assault that you had experienced?

A I mean I -- I felt a incredible high afterwards. I

remember like laying on the floor and being like, I did it. That was epic.

But I'd like -- I -- as I've learned more and more about therapy, I don't think that's the kind of thing you should put yourself through twice and/or reenact it. That's not -- it's not the softest way to heal from that kind of thing.

Q And what kind of mental state were you in when you were in the process, you know, reenacting a sexual assault of your past?

A Yeah, I mean I was totally freaking out. Like I said, once it started it felt like a very, very bad idea.

Q Well, why did you do it then?

A Again, just for the -- for the accolades, for the break-through, for the -- for being a star student.

Q Did you ever witness Nicole Daedone giving sexual assignments?

A Yes.

Q Can you give some examples?

A Often during classes like for various questions or reasons, she would assign someone to do, like a 30-day research experiment is what they called it. And so, some of those -- sometimes they were like having what they would call a makeout, which could be anything of any kind of sexual interaction with someone for thirty days.

Sometimes there were people assigned to schedule those makeouts and like select those makeouts.

Sometimes it was actually telling people, like, not to have sex, like prescriptions on what people should do with their sex life was very common in her assignments.

Q Did Nicole Daedone ever discuss her own like current sexual exploits in any of the classes you were in?

A Yes.

Q What did she say?

A She was supposedly working on a book at that time. To my knowledge it never got published, but it was called Unconditional Sex. And she would often recruit -- sorry, retell stories about makeouts that she was having with anyone from like strangers off Craigslist, to people on OkCupid. But she was, basically, having sex like no matter where she was, no matter what she was doing, no matter what her day was like, at least once a day.

Q Did people within OneTaste follow that lead, to your --

MS. BONJEAN: Objection to the foundation.

THE COURT: Sustained.

Q What effect, if any, did that -- did her telling those stories have on employees at OneTaste?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

Q Did you end up doing anything similar?
A Yes.
Q Why?
A The -- Nicole would teach, basically – and, again, Rachel would re-enforce– but there was -- there was like a current stroke is what they would call it. And so, sort of like whatever Nicole was doing almost immediately would -- it would filter down to what, like, the rest of us were doing.
So, like often when -- the second I would hear her talk about a thing in a course, I'd -- like I knew that was the next stroke, the next like fad, the next thing we were supposed to be doing as junior and senior staff. And I would often start doing it like that day if I could, to stay ahead of it.
Q Did you ever witness Rachel Cherwitz giving someone similar instructions?
A Yeah. So, on the staff threads there -- it was -- Rachel Cherwitz would post these texts of like: This is the next stroke.
And so like, one of those was -- was the unconditional sex stroke. Like everyone, including myself, was having sex almost -- like at least once a day. And then, you know, like sometimes more like twice a day.
I mean there were days I probably had sex with like three or four people, different people, like during the day

just like if -- if I had makeup -- makeouts lined up. And, you know, some of those strokes included like engagement stroke and monogamy stroke, and there was a marriage stroke. They would use kind of any anything that Nicole was doing next.
Q Okay. We'll get back to the strokes in a moment, but did you -- did you ever personally receive instructions to make out or OM with a prospective client?
A Yes.
Q Who gave you those instructions?
A Rachel Cherwitz at -- at -- like, we would often have these sort of little like check-in huddles right before TurnONs, and Rachel would often assign to me and others OM partners for people -- the idea, basically, was that like an experienced OMer should give one of these like new OMers, who wasn't going deeper, a taste of like advanced orgasm and then that would help with the sale.
Q And did you OM with people that Rachel Cherwitz told you to OM with?
A Yes.
Q Why?
A Again, the accolades, the staying -- staying on stroke, not wanting to get shamed for why I wasn't doing what was asked.
Q What if you weren't attracted to the person?

A That wasn't a part of it with OMing.
Q Why not?
A There was -- basically, with OMings for sure, but even with -- with makeouts, it was -- we were kind of supposed to basically like, your preferences, so like who you were attracted to, it was considered like a small range of the available TurnON that you could access in your life.
And so, you were basically supposed to constantly be trying to broaden that range and push who you OMed with, who you had sex with. Because like you -- like the concept was like you didn't know, like it could be that, like, this person that you're completely disgusted by is actually really, like, hot and amazing and, like, actually has a ton of potential and energy. And so, you were supposed to experiment in any way that you could.
Q And did that teaching affect your provision of labor or services to the company at the time?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A Sorry. I don't -- can you repeat question? I don't understand it.
MS. BONJEAN: The question assumes a legal conclusion, Your Honor.
THE COURT: Overruled.
BY MS. FARRELL:

Q Did that teaching that you just described affect your willingness to provide labor or services to the company at the time?

A Yes.

Q How so?

A I -- I, again, was, you know, wanting to be the star student, wanting to push myself, wanting to like find those TurnONs, so I would -- I was quite willing to for sure to OM with people I wasn't attracted to and, you know, on occasion even -- even when it was incredibly uncomfortable to have makeouts with people that I was disgusted by.

Q Are you familiar with a man named Dennis?

A Yes.

Q What happened with him?

A He was a student of mine in -- inside the CPs there were small groups of students that were assigned, like six or eight kind of students, to individual coaches. They were known as pods.

So, I was his pod leader for his CP. And he was older than my dad for sure, probably in his early seventies at the time. And he was -- had basically -- so while I was in what was known as a woman's group, which were these like once-a-week breakouts of -- all the women in the staff would get together and all the men in the staff would get together, and occasionally Beasties were invited. And there was like a

format to the -- to the meeting and the conversation.

And Rachel Cherwitz said that they'd promised Dennis when he went into CP that he was, basically, gonna like become really attractive with orgasm and get a bunch of ass. And that he -- that hadn't happened and he hadn't had any breakouts during the CP. And she said that someone in this room, meaning at the women's group, should have a makeout with him. And like announced to the community that it was -- that it was really hot and, basically, make a big deal out of it.

And I looked around the room, and this was during the like monogamy stroke, and a lot of people were getting like engaged and married, and I realized that I was the only one that wasn't. Like, I was in a relationship, but I had gone against the stroke I was in and I was getting a lot of flack for that. And so, I wasn't monogamous and I realized that I wasn't the only one. And I was, basically, who was left to have that makeout with Dennis.

Q So, had Dennis paid for the Coaching Program that he was taking?

A Yes.

Q And were you one of his coaches?

A I was -- the CP had finished, I think maybe like a week before that. So I had just stopped being one of his coach after -- after like a -- I'd been his coach for a little over six months.

Q And what did you do with Dennis?
A So I -- there was -- it was like -- I think actually it was the last night, like -- 'cause there was -- during the CP weekends a lot of people would stay at 365 and there were just like mattresses all over the main living room floor.
And so, it must have been that Sunday night from CP because the mattress were still there. And I went to, like, his mattress and we did actually have what people would think of as a makeout. I just kissed him, but I was crazy revolted by it. And that was like the last -- like the least amount of sexual activity that I could muster, and then I announced to the room how hot it was.
Q Are you familiar with a man named Harish?
A Yes.
Q Were you instructed to engage in activity with him?
A Yes.
Q By who?
A Rachel Cherwitz.
Q And just briefly, what happened?
A Um, it was during a Mastery class that I had sold to him. There was an exercise to do a prostate massage. And we always balanced the classes with the number of men and women, but one of the women had to step out and Rachel called me down from the back-of-house booth, AV booth, and she like slapped a pair of gloves on my hand and said I was gonna -- I was gonna do

the prostate massage on Horatio.
Q And did you?
A Yes.
Q Why?
A I -- I mean that was like fire in her eye when she said that. I was in no position to question that. That was -- it was a command.
Q Was she your superior at the company at the time?
A Yes.
Q I want to turn back to this stroke you described earlier about this -- this sex stroke, not the monogamy stroke.
Do you know what I'm talking about?
A Yes.
Q Did you participate in that stroke?
A Yes.
Q What did you do?
A I had sex at least once a day.
Q And did you discuss -- discuss this with Rachel Cherwitz?
A Rachel Cherwitz and the rest of the exec team at New York.
Q And did other people that you were living with also participate in this stroke?
A Yes.
Q What did you all do in order to participate in this stroke?

A I mean it was like announced on the thread, like that we were like constantly like: Oh, like had a hot makeout with this person. It was constantly being discussed. And you needed to, basically, check in once a day with your like makeout.

And we also, at one point Rachel Cherwitz told us all to get on OkCupid and had Maya set up OkCupid profiles for us and take photos of us to make those profiles.

Q And when you say "Maya," who are you talking about?

A I keep blanking on her name. The Maya that I identified in the picture.

Q And who else besides you did Rachel Cherwitz instruct to create OkCupid profiles?

A It was all the women on the exec team. So, it was Ayries Blanck, Po-Hong Yu, myself, and Alexis Ware was living at the -- in The Bunker during that time, and she was also instructed to make one.

Q Did Rachel Cherwitz say anything about how this stroke related to sales in the company?

MS. BONJEAN: Objection to the leading.

THE COURT: Overruled.

A Yeah. We were not making sales at the time. It was just -- this was a common thing that Rachel said, but so she -- she, basically, said that we needed to turn the heat up, meaning that we needed to have -- it could either mean

that we needed to increase the number of OMs that we were doing per day or that we needed to have a lot more sex and makeouts to like, again, fire up the orgasm furnace and -- and pull in more sales leads.

Q Did Rachel Cherwitz ever direct you to engage in sex with other OneTaste staff members?

A Yeah, that was like -- you always did that. I don't know -- I mean I'm sure Rachel Cherwitz said that. Specifically, it was --

MS. COHEN: Objection.

THE WITNESS: Sorry.

THE COURT: Sustained.

BY MS. FARRELL:

Q So just a yes or no answer.

Did Rachel Cherwitz direct you to engage in sex with other OneTaste staff members?

A Yes.

Q What did she say?

A There was -- there was -- one particular time I can remember was I was working back-of-house. I can't remember what course it was, but we like were on our lunch break and Rachel -- it was the first course that I was getting trained to like be the head of back-of-house.

And, again, back to the like limbic brain that they talked about. They, basically, said that like -- when Rachel

Cherwitz specifically said to me that when I was the head of back of house, that the -- the sales from the class were resting on my limbic system. So, like it was -- I was, basically, responsible for if there were sales or not.

And that day she was yelling at me that I was too messed. You know, basically the way interpreted that is like nervous. And I was, I was very nervous about running the back of house. And she said that I needed to have a makeout with -- there were like three staff members in the room at the moment, and I needed to have a makeout with one of those three staff members during that lunch period to burn off my tumescence.

Q Did you do that?

A Yes.

Q Who did you have a makeout with?

A Well, I selected Ravi because I knew that he was gonna be the most, like, kind about it. And when we went back to have the makeout, he -- he asked me if I wanted to actually have sex. And I told him no. And so, we -- we actually -- I didn't end up having sex, I OMed with him instead. But we both told Rachel that we did have -- have a makeout, have sex. Like, we reported that it was hot.

Q You mentioned earlier that this OkCupid stroke involved someone named Ayries, is that correct?

A Yes.

Q What was her role in this OkCupid stroke?

DIRECT EXAMINATION
BY MS. FARRELL: (Continuing)
Q Describe to us how you got engaged.
A Yeah. Basically, after I was at the sales training that I did in San Francisco, when I flew home from that, everyone else was engaged at that point. I was like the last one. And Raph had moved my stuff and we moved from -- like, moved rooms, I think. Or it might have been to actual 365. But he had moved my stuff in the room and set up these rows. And I was like oh, my God, he's actually a good guy. I was not attracted to him at all. But I was like I would be stupid not to -- like, he was kind of the last senior staff member left, and I would be stupid to not get engaged to him.
Q Did you?
A Yeah. He was asking me why we hadn't been having sex and he was asking if I was thinking about the marriage stroke and I basically said yes. And then I was, like, well, should we? He was joking, and I said no, seriously, I think we should.
Q Where in time did the marriage stroke happen in relation to this OkCupid stroke?
A It was after about by a couple months.
Q Why was everyone getting engaged?
MS. BONJEAN: Objection.
MS. COHEN: Objection.
THE COURT: Sustained.

affected?
A I --
Q Again -- I'm sorry. Please be careful about not saying what other people said.
A I had been kind of questioning my involvement with OneTaste a little bit before that and I was -- it was like deeply, deeply increasing. I was very concerned that, like, that this was a cult, that I was involved in a cult, that I was harming other people. Yeah, that I was like wrecking lives, and I was really morally grappling with that and if I could continue working with this company.
Q Did you write down your feelings in any way?
A I did.
Q Did you share what you wrote with anybody?
A Yeah, I shared it with Rob Kandell.
Q Did you share it with anyone else?
A I shared the more general sentiments with Ulysses.
Q And was Rob Kandell still at the company at the time?
A No.
THE COURT: Ms. Farrell, just in the next ten minutes or so, I would like to take a break, so just tell me when that's convenient.
MS. FARRELL: Give me one moment. Now is actually a good time, Your Honor.
THE COURT: I think you should go for at least

MS. FARRELL: All right. We can take that down.
Q Did you just discuss your departure with Nicole Daedone?
A Yes.
Q What did she say to you, if anything?
A I mean, you know, sorry to see you go. It was -- there was never any like bars on leaving. In fact, Nicole frequently said in like even in sales pitches, you know, fuck. Get away from this. Run.
It was more -- it was the fact that I was going to leave, you know, lose all my friends and family -- like they're called my friends and family. It was like a death of a whole life, like that was the hard part, but it was not that Nicole or Rachel were stopping me from leaving.
Q Did you discuss your departure with Rachel Cherwitz?
A Yes.
Q What did she say?
A She -- I think she said, okay, love.
Q Where did you go after you left OneTaste?
MS. BONJEAN: Objection; relevance.
THE COURT: Overruled.
A I drove across the country. I went home to my mom's house. Yeah.
Q And why did you go there?
A To find -- I mean, more than anything, I needed to really finally grief my dad's death, like I pushed it aside and I --

Q Did they ask you to -- did anyone, Agent McGuinness or Schmidt ask you to provide your writings regarding your experience at OneTaste?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Okay. You didn't bring them here with you today, though; right?

A No.

Q You didn't think they would be beneficial for the jury to hear about, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q Okay. So you moved to San Francisco from Colorado in your 20s; right?

A Yes.

Q And you did that to start a business in circus arts; is that right?

A Yes.

Q And you had already earned a Bachelor's degree; correct?

A Yes.

Q In what area of expertise -- or again, what area did you study?

A Anthropology.

Q Anthropology.

And what did you get, a B.A. or is that a B.S.?

A It's a B.A.
Q And you had a close-knit family; right?
A Yeah, relatively close-knit.
Q You're an only child, as I understand it?
A Yes.
Q You have parents who were involved in your life; right?
A Yes.
Q I think you testified that you came from a wealthy family; right?
A Yes.
Q You had access to financial resources?
A Yes.
Q And in 2012, you were living in Santa Monica; correct?
A Yes.
Q You had a nice large loft that your parents were paying for?
A Sorry, not Santa Monica. 2012?
Q Yes.
A No, I was living in San Francisco in 2012.
Q I'm sorry. I didn't hear you.
A I was living in San Francisco in 2012. Wait. Sorry. Yes. 2012, San Francisco.
Q San Francisco?
A Yeah.
Q Did you live in Santa Monica at some point?

A Yeah, years later.
Q Okay. My apologies.
Okay. So, in 2012, you were living in San Francisco in a large loft, work/live loft that your parents were paying for; right?
A Yes.
Q And you meet this guy on the beach who is cutting his toenails named James Barford; right?
A On a street in the Southern Market District, not the beach, but, yes.
Q And did you stop to talk to him while he was cutting his toenails?
A No. He came running after me and started talking to me and I responded to him.
Q Okay. And he invited you to coffee; correct?
A Yes.
Q And you go to have coffee with him; correct?
A Yes.
Q And he tells did you that he's living in a commune; right?
A Yes.
Q And you know the concept of a commune; correct?
A Yes.
Q You know that people live in communes, which are also known as intentional communities; correct?

A Yes.
Q What's an intentional community?
A They're generally houses, group houses organized around, you know, their particular interest, sort of particular belief or a particular pursuit, I suppose.
Q Right.
People intentionally move into a group setting because they share beliefs or ideas; right?
A Yes.
Q And you testified on direct examination that these communes were not uncommon in San Francisco; correct?
A Yes.
Q There is a long history of communes, particularly in San Francisco. Would you agree?
A Yes.
Q You also at that time had been involved in a number of spiritual practices; correct?
A Yes.
Q Meditation; right?
A Yes.
Q You were involved in meditation and spiritual practice since your like your teenage years; right?
A Yes.
Q Yoga; is that right?
A Yes.

Q And community-based philosophical discussion groups?
A Yes.
Q Holistic healing practices?
A Yes.
Q And a healing system known as biogenesise (phonetic)?
A Biogenesis.
Q Oh, it's biogenesis. That's just my typo. Sorry.
And what is biogenesis?
A It's a like crystal-based healing system that's owned by a company.
Q You said crystal-based?
A Yes.
Q Like the pretty crystals that you can see in a store sometime?
A They are like -- it's glass, crystal-infused glass objects.
Q Okay. And all -- there's a common theme in these -- in these practices you had been previously involved in, insofar as they were around like spiritual growth; right?
A Yes.
Q And human development; right?
A Yes.
Q Does this healing system known as biogenesis have some sort of mystical qualities as well?
A Yeah. One of the family members who founded it gets

messages downloaded from a higher being.
Q Right. And all these ideas from these spiritual practices you learned all predated your contact with Ms. Daedone; right?
A Yes.
Q So you start hanging around with James and he invites you to a turn-on event; right?
A Yes.
Q And as I understand it, you weren't interested initially at least; correct?
A Correct.
Q But you ended up eventually attending a lecture that was being given by Ms. Daedone?
A Yes.
Q And do you recall -- well, we know this was what, 2013; right?
A Yeah. I believe it was '12, 2012.
Q Oh, 2012?
A It could have been early 2013. I'm not positive.
Q And this lecture that you attended, this first lecture was about an hour, an hour and-a-half?
A Roughly, yeah.
Q And the lecture was about OneTaste, right?
A Yeah, about orgasm meditation.
Q Right. The core tenet of OneTaste is orgasmic

meditation; right?
A Correct.
Q And so she lectured about the practice; right?
A Correct.
Q She gave an overview of how she developed the practice; correct?
A Yes.
Q She gave an overview of her long journey developing the practice into this very successful wellness company; right?
A Yes.
Q And you understood that OneTaste was a sexual wellness company with these like spiritual elements; right?
A Yes.
Q There was paper, marketing materials available at this lecture, I assume?
A Yes.
Q There were -- you understood that orgasm didn't necessarily mean only, you know, climax, but was more about energy; right?
A Yes.
Q It pulled from Buddhist principles like the concept of qi; right?
A Yes.
Q They have slogans like "powered by orgasm"; right?
A I'm not positive that was being used at the time, but it

was definitely being used later.
Q Okay. And also that orgasm was metaphorical; right?
A Yes.
Q It was about a source of energy; correct?
A Yes.
Q And this resonated with you; right?
A Yeah, the philosophies resonated with me. The practice was what I was opposed to, but the philosophies did.
Q Awesome.
It took you awhile to get onboard with the practice, but the message was something that resonated with you. Do I have that right?
A Yes.
Q Of course, you understood when you went to this, you weren't going to a lecture about how to start a small business or anything; right?
A Yes.
Q You weren't going to a wine course or anything like that; correct?
A No.
Q It was in the realm of sexual wellness, spirituality, and sort of human potential; right?
A Yeah. I mean, the title of the lecture was, you know, Orgasmic Meditation by Nicole Daedone. It was in the title.
Q And you were -- you testified on direct you were very

impressed by Ms. Daedone; right?
A Yes.
Q And you said you were impressed because she was a successful businesswoman; right?
A Yes.
Q And she was a successful businesswoman; right?
A Yep.
Q She had built an entire company off of this ideal; right?
A Uh-hum. Yes.
Q In fact, I think you said on direct examination if she can sell orgasm, I can sell circus arts; right?
A Yes.
Q That was inspiring because she had built an entire sort of massive company out of these teachings that she developed; right?
A Yes.
Q But you didn't sign up for a course right away; right?
A Correct.
Q I'm assuming there was a sales pitch at some point during that lecture.
A Yes.
Q And, you know, now having had the experience with OneTaste, there was always some type of sales pitch with these events; right?
A Yes.

Q That's how she became a successful businesswoman; right?
MS. FARRELL: Objection.
THE COURT: Overruled.
Q Correct?
A Yes.
Q And then you had the opportunity to have this one-on-one kind of little coaching session with her at this event; right?
A I --
Q Or was that later?
A It was after the event, and it was 15 people with -- like we each got an individual amount of time. It wasn't one-on-one.
Q Okay. So was the event that you went to, did it include this little I guess kind of group coaching circle?
A No, that was a few days later.
Q Okay. So you went to this initial event and you were so moved, you kind of almost immediately decided to do this coaching circle with Ms. Daedone; right?
A I -- I had -- definitely had to go think about it for a few days. I don't know that I would agree with immediately.
Q Right. You gave it a couple of days and then you signed up for the coaching circle; right?
A Yes.
Q And then you went to this.
And you went to this coaching circle for the

opportunity to have a one-on-one conversation with her basically; right?
A To ask Nicole a question directly.
Q Right.
And, of course, you knew she wasn't an expert in circus arts; right?
A Yes.
Q Okay. And you testified that you went because you really just wanted to know how to get your business going; right?
A Yes.
Q And she responds with a question about your sex life and your sexual wellness; correct?
A Correct.
Q And you said you found that strange?
A I did.
Q You found it strange that a woman whose entire company and core tenet centers around energy coming from orgasm would ask you about your sexual wellness?
A I found it strange that she didn't answer my question directly and that it was it -- that it was like -- it felt like an abrupt subject change to me.
Q Well, maybe that.
But certainly looking back, you're not surprised that Ms. Daedone didn't answer your question directly; right?
A Sure. I mean, I guess there were other times that she

didn't answer questions directly.
Q Right. That's not really how she teachers, is it?
A You could say that, yeah.
Q Yeah. She teaches with stories and metaphors and narratives; correct?
A Yeah.
Q Okay. And you, of course, at least now understand that it is her belief that your success in life comes from being turned on; right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q She testified at length about Ms. Daedone's views and teachings?
THE COURT: Sustained objection.
Q Did Ms. Daedone teach in these classes that you attended, okay, that your source of energy comes from your orgasm?
A Orgasm? Nicole Daedone taught us that orgasm was synonymous with God and synonymous with like a soul and, so, that like our -- your source of energy came from God and soul orgasm.
Q Right.
A Yes.
Q So no surprise then to you, at least looking back, that that would be where she would focus her questions on you; correct?

A Yeah.
Q This wasn't like a class on how to write a business plan, was it?
A No.
Q And how long was this brief one-on-one interaction that you had with her?
A How long did I specifically talk to her?

(Continued on next page.)

BY MS. BONJEAN (Continuing):
Q Correct.
A A few minutes.
Q So a couple minutes. Two, three, less than five?
A Yeah, call it -- yeah, less than five.
Q And in the course of this, you know, less than five-minute conversation -- and you are in a room, you're with other people, right?
A Yeah.
Q You discuss the fact that you aren't a girl's girl, right?
A Yeah.
Q I think you testified that you missed the girl's code, right?
A Yes.
Q And that was something that you felt was lacking in your life; is that right?
A I felt that, like, female friends, and a sense of belonging I was lacking in my life, yeah.
Q And you testified on direct examination that Ms. Daedone basically told you in sum and substance, you know, go out and fuck a bunch of men in the OneTaste community who were with women; is that the message you received?
A Yes.

Q And this is -- that's sort of your recollection of it, correct?
A Yes.
Q And you weren't in the OneTaste community at that point, right?
A No.
Q So she was suggesting that you just go to the OneTaste community and have sex with the OneTaste men?
A You had to get OM trained to become a part of the OneTaste community, so it was, like, part and parcel of that was to get OM trained.
Q Part and parcel what?
A In order to, like, ask for make-outs and participate in the OneTaste community, you needed to be OM trained.
Q So she was suggesting that get OM trained and explore sexuality at OneTaste, right?
A Yes.
Q And you understood, of course, that monogamy was not -- at least, at that time -- a wildly popular practice in the OneTaste community, right?
A Yes.
Q So there weren't actually men and women who were, like, monogamous or at least very many men and women, right, at that time?
A They weren't monogamous, but there were plenty that

were in open relationships.

Q Right, exactly. There were many people who were in open relationships, right?

A Yes.

Q But it's still your contention that Ms. Daedone said go take other people's men?

A Yes.

Q Okay. How could you be taking anyone else's men if people were in open relationships?

A I mean, I've personally never understood how anyone else can own anyone else, but it was -- it was that they were connected and that there were -- I was -- I learned from them and from Nicole Daedone's teachings that there was basically like a way to ask permission from the woman in order to have a make-out with the men and that it, like --

Q Let's stay focused on this initial conversation, though, because that's what I'm asking about.

A Okay.

Q If it was your takeaway that Ms. Daedone was saying go get OM practice and then join the OneTaste community and have these sexual experiences with men that were actually in open relationships, right?

A Yes.

Q You testified on direct that?

MS. BONJEAN: One second.

THE COURT: Sure.
(Pause in proceedings.)
BY MS. BONJEAN:
Q You testified on direct that you signed up for some free coaching with Rachel Cherwitz, right?
A Yes. I was offered a one-hour free exploratory with Rachel following the morning after the --
Q Right. This was an exploratory session, correct?
A Yeah.
Q And the exploratory session was really just like a sales pitch, right?
A Yeah. It was -- it was functionally an hour-long version of, like, take people to your pain process that I described earlier.
Q Right. And this take people to your pain concept is sort of like getting to what they really want and need, right?
A Yeah. And what's blocking them from it, like, what they're --
Q Right.
A -- what their issues are.
Q And this is a -- this is a tactic that was used, at least according to your training, in other settings, correct?
A It was the basis of all sales at OneTaste.

Q Okay, but it was pulled from other sales curriculums, correct?
A Yes.
Q This wasn't just something that OneTaste came up with; they actually had outside people come teach this, right?
A I don't know if they had outside people come teach it before I was there, but during my time there, yes.
Q And this idea was that find out what people are struggling with, take them there, and then, you know, offer them what you have to offer that might help them get through it, right?
A Yes.
Q And this exploratory session was part of that process, correct?
A Yes.
Q And you're a bright woman, you understood you were pitched, right?
A Yes.
Q But you also liked the product, right?
A I still wasn't sure I wanted to OM, if that's the product you're referring to.
Q Well, you understood that the community, the intentional community was based around the practice of OM, right?
A Yes.

Q Okay. And there were other things about the community that were attractive to you, right?
A The main thing that was attractive to me was Nicole and the way of being that she had.
Q Right. She was -- she was a smart woman and charismatic and all those things, right?
A Yes.
Q And she had an impressive pedigree in terms of what she had built, correct?
A Yes.
Q Okay. But you did understand that her entire philosophy was built around OM, right?
A Yes.
Q And when you looked around in this community, there wasn't anybody in the community who was just rejecting the practice of OM, right?
A No, yeah, you were either an OMer and in the community unit or not or you didn't take part of the practice and you were not in the community.
Q And you could still actually go to the courses and not OM, right?
A No.
Q Well, you could go to a course -- well, you weren't OMing in the courses, were you?
A Yes, we were.

relationship with him, right?
A Yes.
Q That's kind of what goes on at OneTaste, right?
A At the time.
Q Yeah. And you testified on direct that, you know, I did this because Ms. Daedone told me to, right?
A Yes.
Q But that was literally the community you were getting involved in, right?
A Yes.
Q Okay. So it wasn't just that Ms. Daedone told you in some coaching session to go sleep with people who are in relationships; it was -- the fundamental of the company and the community was to explore your sexuality, right?
A Yes.
Q And can we agree that if people are in an open relationship or open marriage, that's not really off limits to sleep with other people or generally not off limits, right?
A I would say that every open relationship has its own rules. But the definition of it, right, is that there are -- there are ways to have relationships with other people outside that relationship, right.
Q And you have no reason to believe that James and his wife had any problem with you having this relationship with

instead of going back to your loft, right?
A Yes.
Q And, again, your parents are paying for your rent, correct?
A They were paying for my rent at the live-work loft. They didn't pay for my rent at OneTaste.
Q And how much was the rent at your 3,000-square-foot live-work loft?
A 3400.
Q So cheaper than the commune, correct?
A No.
Q I mean, I'm sorry, I got that backwards.
More expensive than the commune, right?
A Yes.
Q Like double the price, correct?
A Yes.
Q So to be clear, you had other options than going to the commune, right?
A I wasn't homeless, if that's what you're asking.
Q It's not just that you were homeless. You could have decided to live somewhere else other than 1080 Folsom, right?
A Yes, yes.
Q Because on direct you sort of made it sound like you had nowhere to go.

MS. FARRELL: Objection.

THE COURT: Sustained.

Q You weren't trying to mislead anybody about that, right?

MS. FARRELL: Objection.

THE COURT: Sustained.

Q So you could have waited for your nice loft to get fixed, right?

A Yes. There -- I could have waited for that. There're plenty other places to live in the world. I had other options.

Q Right. And you received an application that you had to fill out in order to live at 1080 Folsom, right?

A Yes.

Q And when you were inquiring --

MS. BONJEAN: Well, strike that.

Q You actually did fill out the application and sent it to Amy Jones pretty promptly, right?

A Yes.

Q And you had to answer questions in the application, fair?

A I don't remember the application at the time, but I'm sure I did.

Q Would anything refresh your recollection?

A Sure.

Q I'm going to have you look at 12-AD, as in dog.

MS. BENSING: May we have a copy, please?

Q Do you recognize this document, Ms. Gillick?

A Yes.

Q And what do you recognize it to be?

A I mean, again, this is my application and this is my information about where I was living and how I was employed.

Q I'm sorry, could you speak into the microphone?

A Sorry.

This is my application and this is my information about where I was living and how I was employed.

Q Okay. And you were asked questions such as whether you had ever lived in a community setting before, right?

A Yeah.

Actually, could we zoom in on the bottom half?

THE COURT: Does she have a hard copy? I think if it's better, if you are going to use a document, just to give her a hard copy. Thank you.

Q They asked you, of course, what your experience was living in a community setting, right?

A Yes.

Q They asked you why you wanted to live in a community setting, right?

A Yes.

Q And what's your understanding of why they asked those

questions?
A To see if it was a good fit.
Q Right. Make sure you're right for them and they're right for you, right?
A Yeah.
Q They asked you about what is your experience with the container of a practice and your intentional living.
What did you understand that to mean?
A The container, it was talked about in the How to OM course was, basically, you know, again, everything was split, the holographic, and the OM practice expanded basically. And the container for the OM practice was the 15-minute, you know, so there were gloves worn and lube used and it was particular order of things and that -- the expansion of that was, like, there were particular rules in the community.
Q Right. The rules of OMing, right?
A Yeah. And the rules of, like, community participation kind of thing.
Q And they asked you about your experience in intentional living, right?
A Yes.
Q And they asked you about your prior experiences -- or, I'm sorry, your prior practices or your practices outside of OM, that's a better way to put it, right?

A Yes.
Q They asked you to tell them about yourself, fair?
A Yeah. A little bit.
Q What brought you there. Why you're there. What you want to get out of it.
You can turn it on the other side.
A Thank you. Give me a minute to read, please.
(Pause.)
A Yes, I did.
Q And when you filled out this application, you didn't say, like, I need a place to stay because my loft flooded or anything like that, right?
A No.
Q You didn't say anything like, you know, I just want Ms. Daedone to tell me how to be a girl boss, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q You didn't tell -- you didn't put in your application to live in a community that you just wanted to learn how to start a business, right?
A No, I did not.
Q Okay. And by this time, that you filled this application out, you are practicing OM, correct?
A Yes.
Q It wasn't as if, like, you were still unsure about

whether you wanted to engage in the practice at this point, correct?
A Correct.
Q And you told the folks at OneTaste that you were there to explore your sex life, relationships, and career and personal growth, right?
A Yes.
Q And Ms. Daedone didn't stand over you while you filled out that application, right?
A No.
Q Ms. Cherwitz didn't stand over your shoulder while you filled out that application?
A No.
Q You filled that application out yourself, at either a computer or -- I assume a computer, right?
A It's typed, so yes.
Q You testified on direct that you didn't really connect with the practice, but when you applied for this -- when you applied to live in 1080 Folsom, you actually said the whole practice fits me like a tee.
A This was a number of months after -- like, that same when I didn't connect with the practice was before I tried the practice.
Q So before you tried the practice, you weren't sure about it, but then you practiced it and you liked it --

A Yes.
Q -- correct? Okay.
And there were no surprises about what type of community you were moving into, right?
A No.
Q And you even said that you found OMing to be a profound reawakening for you, correct?
A I don't -- I don't remember using those words, but, I mean, OMing was an amazing practice. I believed in it deeply, yes.
Q Do you want to look at the other side of this, the second page of this application?
A Reawakening, yes, thank you.
Q And no one promised you anything in exchange for writing these words, right?
A No. I mean -- no, except, the -- if -- I could get accepted into living into 1080.
Q What the community had to offer, apart from that, right?
A This -- it was just the application to move into 1080.
Q Right. And you also put down that you were looking to be close to people in the house and you wanted to push each other, right? Last sentence of that.
A Yes.
Q Now, you testified on direct examination, when the

Government was asking you questions, whether you had any privacy when you were living in an OM residence.

Do you remember those questions?

A Yes.

Q And you said in response, in your two-and-a-half years, you had no privacy.

Remember that?

A Yes.

Q You also testified that you are definitely someone who needs solo alone time, right?

A Yes.

Q But when you were applying to live at 1080 Folsom, you told the people at 1080 and OneTaste that you had experience living in college dorms, but you didn't live with open doors or shared communal areas and you wanted that.

Remember that?

A Yeah. I was -- I was curious about it at the time.

Q So you wanted to live in a setting where there were communal areas and you didn't even have doors, right?

A We had doors to the rooms. Like, there -- it -- I -- I -- open doors is in quotes in here. I meant that as like a -- that like it was more --

Q What did you mean?

A -- community based. A dorm I think is not very community based.

Q So you wanted community based and you understood that if you are sharing a bed with somebody, you're probably not going to have much privacy, right?
A Yes.
Q And you knew that going into it, correct?
A I knew about that level of not having privacy.
THE COURT: Ms. Bonjean, we are going to take a break for lunch in a couple minutes unless right now is good for you.
MS. BONJEAN: Just a couple of questions and then it would be a good breaking point.
THE COURT: Go ahead.
Q In fact, when you submitted your application, you not only understood that you would be having a roommate; you asked that you be paired up with Clouds, right?
A Yes.
Q And that was before you even moved in?
A Yes.
Q So, again, you were very clear on the fact that you were going to have a roommate and that you would be living in a communal setting, right?
A Yes.
Q And you also understood from this application that it was a zero tolerance policy towards drug use and alcohol on the premises, right?

A Yes.
Q This is an alcohol and drug-free environment, right?
A Yes.
Q And the community, itself, was alcohol and drug-free, right?
A Yes, it was.
Q I mean, you testified on direct that you were terrified to go have a beer.
Remember that?
A Yes.
Q But in a sexuality setting where people are engaging in these very types of activities where consent is very important, you could understand why you would want a community that was drug-free and alcohol-free, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Were you quarreling with -- okay, you have issues based on the Government's question that you couldn't have a beer, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q Maybe I missed it. Did you say you felt terrified about having a beer?
MS. FARRELL: Objection.
A Yes.

THE COURT: Overruled.
A Yes.
Q Okay. And that was a rule associated with living and working at OneTaste, right?
A It was a -- it was a written rule about 1080 and that it was an understanding about the rest of the larger community that I gained after moving into 1080.
Q Right. And this was -- this was -- you weren't surprised that that was what the community expected from you, right?
A No.
Q A community you voluntarily chose to be a member of, right?
A Yes.
Q And lastly, even at the bottom of this application, the community -- or, I'm sorry, the people there at 1080 and the OneTaste made it very clear that this intentional living experience was around the practice of Orgasmic Mediation, you understood that, right?
A Yes.
Q And that it was deeply woven into daily life at 1080, right?
A Yes.
Q And that the values of connection, engagement and contribution were paramount to this intentional community

living scenario, right?

A Yes.

MS. BONJEAN: We can take a break, Your Honor.

THE COURT: I will ask the witness to step down for the lunch break.

(Witness steps down.)

THE COURT: We'll come back at 2 o'clock. Enjoy your lunchtime. Don't talk about the case. Keep an open mind. See you at 2 o'clock.

(Jury exits.)

THE COURT: I will see everyone at 2 o'clock.

(Luncheon recess taken.)

(Continued on the following page.)

BY MS. BONJEAN:

Q Do you remember on September 22nd of 2013 asking to enter into a sexual relationship with your coach and OM trainer, Billie Stubblebine?

A Yes.

Q So that Ethics Committee existed, right?

A That is during the time that I was in CP7.

Q Right. And you asked again in February of 2014?

A Yes. I was still in CP7.

Q Right. CP7 lasted ten months, right?

A Correct.

Q But you weren't just in CP7, you were doing other things as a member of the community as well, correct?

A Correct.

Q Okay. So you asked to engage in a relationship with Jeff Ridenour in February of 2014?

A Correct.

Q And you sent that request to the Ethics Committee, correct?

A Correct.

Q Now, also as part of your -- part of your entry into the Coaching Program, we discussed this desire contract that you filled out.

Do you remember that?

A Yes.

Q Okay. And you sent that to Lianna Lifson on September 10th?
A Yes.
Q And I think you explained earlier about the big D's and little d's, and certain -- you made out certain desires you had at the time, right?
A Yes.
Q And as part of the Coaching Program, you were very happy with the OM practice at that point, correct?
A Yes.
Q You were open to not only OM, but open relationships, do you remember --
A Yes.
Q -- that?
You were very interested in assisting in running of your own business; that was important to you, right?
A Yes.
Q You were still working in your own business at that time, correct?
A Correct.
Q You wanted to be able to articulate your desires very cleanly and sharply to other people, right?
A Yes.
Q You wanted to conquer the unknown, that was an important thing for you?

A Yes.
Q Conquer your fears?
A Yes.
Q And you were looking to find a financial advisor to help you with your business, right?
A I don't remember that specifically, but if I wrote it down, then yes.
Q Okay. So, you -- you knew what you wanted when you went to coaching -- the Coaching Program 7, right?
A Um, I would say generally, as much as any 25-year-old does.
Q I'm saying in the moment that's what was important to you, right?
A Sure.
Q And just to be clear, neither Ms. Daedone nor Ms. Cherwitz told you what to put down for your desires, right?
A No, they didn't.
Q You also made some admissions, correct?
A Yeah, that was part of the desire contract.
Q Right. And some of the admissions you made is that you pretend to be a good girl, but that sometimes you only do it because you want to get what you want as early as possible?
A Yes.
Q You admitted that you don't -- you're not a girl's girl,

MS. BONJEAN: We can put that aside.
BY MS. BONJEAN:
Q And you would agree that OneTaste also had a refund policy, right?
A I didn't know about a refund policy at the time of CP7.
There was definitely a refund policy later that I was aware of. It -- it could have been and I might have missed it in fine print, but I didn't know about it at the time.
MS. BONJEAN: If we can look at Government Exhibit 665. Go to the second page, and the third page.
Q Okay. Can you take a look at that and --
A Can you make it larger, please?
Q Yes.
And just look at it tell me if it refreshes your recollection about whether there was a refund policy.
MS. BONJEAN: You can go to the next page. You could stop.
Q Or cancellation policy, do you see that?
A You're talking about the paragraph at the top that says OneTaste provides a three-day right of rescission?
Q Yes. That OneTaste provides a three-day right of rescission.
Do you see that?
A Yes.

Q So you recall at the time that OneTaste offered a cancellation policy that allowed you to actually get a hundred percent of your payment back three days after enrollment?
A Yes.
Q And then you also could get less back if you waited longer, right?
A Yes, that's what is written on this document.
Q Now, you took other courses -- while you were in that ten-month Coaching Program, you took other courses during that period of time too, right?
A Yes.
Q You took -- did you take the Ignited Man Demo?
A No. That was not a -- the Ignited Man class was for men. I attended one of the demos, but I didn't take a class.
Q Okay. So you attended the Ignited Man Demo, but you didn't take the course, right?
A One of them, yes.
Q Okay. And you took the Taboo course, right?
A Not during CP7.
Q Okay. After CP7?
A Yes.
Q What was the order you took them in? You had CP7.
You took the Nicole Daedone Intensive, right?
A Much later, yeah.
Q Okay. That was later?

A Yeah.
Q Okay. But you did go on vacations; correct?
A I went on one vacation during my time at OneTaste.
Q Do you remember going to the Hamptons?
A That was for my cousin's wedding for a short weekend.
Q Do you remember going back to San Francisco?
A That was for a sales trip.
Q Do you remember going to -- you remember Bali, of course; right?
A Yes.
Q Do you remember going to Antarctica?
A That was when I was a student before I was a staff member.
Q So, you did travel a fair amount more than most people in a two-year span; right?
A I don't have any basis for that. I don't know what other people do every year.
Q You know the people you socialize with, but that's a lot of traveling you're going out of the country on at least two occasions; correct?
A Again, it was other more than a year, but yes.
Q Okay. You also testified that you said you weren't having any contact with your family; right?
A I said I was having very little, yes.
Q And you told the jury this story of how you fell and

injured yourself during your surface acts and aerial activities; right?

A Yes.

Q And you said that you really -- you really hurt yourself and Rachel Cherwitz and Nicole Daedone either implicitly or expressly, it's unclear, discouraged you from getting medical treatment; right?

A They did and, like, in a normal job if you worked normal job there would be hours outside. There was never any hours outside of work to go and get that kind of medical.

Q Okay. And it's your testimony that you didn't actually go see a doctor; is that right?

A Correct.

Q Ma'am, isn't it true that on September 7th of 2014, you actually did a performance, the performance you fell at, and your mom was present?

A She had flown out for the weekend.

Q Right. So this family that you're having minimal contact with, she flew into New York to see your performance; right?

A Yes.

Q Okay. And you let people, your friends, know; Ayries and Maya; correct?

A Let them know what?

Q That you had fallen and that your mom was in town. Do you remember that?

A Yes.
Q And on the night you fell and hurt yourself so badly you said you're going to go out with the girls for a bit I'll be home after midnight. Do you remember that?
A No.
Q I'm going to have you look at Defense Exhibit 12-GA.
(Exhibit published to the witness, counsel and the Court.)
MS. BONJEAN: I don't know if you have a copy.
THE COURT: I can see it on the screen, but thank you.
BY MS. BONJEAN:
Q Okay. You looked at some text messages earlier during your direct examination. Do you remember those?
A Yes.
Q Okay. And do you remember texting your friends on September 7th of 2014 about how you fell at your performance?
A Yes, I texted Ayries and Maya.
Q And your mom was there, right?
A Yes.
Q And you said --
MS. FARRELL: I'm going to object to improper impeachment.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You celebrated that you rocked the part; right?

A The performance went long -- I completed the performance despite my injury, yes.

Q You not only completed the performance, you went out afterwards, right?

MS. BONJEAN: Objection, improper impeachment.

THE COURT: Overruled.

A I don't remember -- I don't know who the girls are in this text, but --

Q They're not the girls from OneTaste, right? Right?

A Probably not.

Q They're your friends from outside of OneTaste; correct?

A I did have a couple of friends still from college. I don't remember going out with them that night.

Q That's fine that you don't remember, but you have said that OneTaste was your whole world, you had minimal contact with your family, but in fact you did have contact with your mother; right?

A I, again, I said minimal, not none.

Q Enough where she's going to fly in from Colorado to watch a performance of yours; right?

A Yes.

Q And you had friends that you socialized with that were not associated with OneTaste?

A I socialized with them less and less and I had to ask permission to go out and see them.

Q Who did you ask permission from?
A After about this time I had to ask Rachel Cherwitz's permission to see anyone -- to go out for an hour.
Q How many thousands of pages of text messages did you provide the Government?
A Not actual text messages. They're from other apps and I'm not sure.
Q Okay. Did you show the Government a single text where you were asking Rachel Cherwitz for permission to go out?
MS. BONJEAN: Objection.
THE COURT: Sustained.
Q Can you provide me with a single text message demonstrating that you had asked permission to go out?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q Is it your testimony under oath to this jury that you had to ask Ms. Cherwitz to go out?
A Yes.
Q And what were the consequences if she said you couldn't go out?
A I wouldn't get her attention and approval and there were results like being demoted or not being asked to teach the next class or there were consequences to those kinds of actions.

Q So you would lose her attention and approval, right? That's one of the consequences?
A Yes.
Q And she would not let you do something because she thought you were prioritizing something else; right?
A Yes.
Q Sounds like a job; right?
A Again, a job has hours that stop and you were allowed a social life outside of it. That was not the case here.
Q Right, but you chose that for yourself; right?
A A long way in when I was in the kind of mind when I started, I chose to be an owner and I thought that I would actually not be subjected to that kind of rules as an owner and then I was.
Q You saw how hard these people worked; right?
A Yes.
Q Did you really think that if you bought a franchise that you would somehow be the exception to the rule?
A I may have been delusional, but yes.
Q Okay. You also testified under oath that you didn't -- that you didn't -- you didn't go on trips and you mentioned something about going back to San Francisco which you said was actually for a sales meeting; right?
A It was for a sales training, yes.
Q Okay. But isn't it true on September 8 of 2014, you let

company.

Q Right. Again, you testified you were discouraged from seeing doctors, et cetera, but in October of 2014 you and Paul went to see an acupuncturist; right?

A That was for that injury. It was one of the only appointments I had for it. I think I had one other massage.

Q Actually on October 30th, you went to the doctor's, didn't you?

A I'd be happy to see that. I don't remember that.

Q Sure. Defense Exhibit 12-F, as in Frank, Z, as in zebra.

(Exhibit published to the witness, counsel and the Court.)

A It looks like I did, yes.

Q I'm sorry?

A It looks like I did, yes.

Q Now, so whether you were discouraged or not, you still went to the doctor's; right?

A Sorry, apparently I went at least once. I still deal with these injuries. Normally if I had had that injury, I would have gone to a bunch of physical therapy for an ongoing basis and, again, if I had a 9-to-5 job I would have done it outside of work hours. And I, to my memory, do not remember going to the doctor to the degree that would have healed the injury and I still deal with it.

Q And are Nicole and Rachel responsible for you falling from the aerial silks?

Q All right. So if he had already done CP7 --
A He would not have been doing CP8, that's correct.
Q And this was a ritual shower sort of thing; right?
A That was one of the scenes for the day.
Q And you testified on direct that it was Rachel Cherwitz who was directing you to do this; correct?
A Yes, she was in charge of the experience for the day.
Q But when you're using the word "direct" you're not saying mandated; you're saying she was directing the production of it; correct?
A Yes.
Q I mean, you -- she asked you?
A Yes.
Q -- and you could have said no; correct?
A Yes.
Q And, again, you weren't even employed by OneTaste at this time; right?
A Yeah, these kinds of things were, like, a huge honor and I felt I earned a lot of brownie points from participating in it and that's why I did it.
Q You wanted to get closer to the center; right?
A Yes.
Q Because you admired these women; right?
A Yes.
Q And you were vibing with the messages; correct?

A Yes.
Q All right. Now, also you testified that your father passed away in January 2014 in a very terrible helicopter accident and for that, I am sorry, but after that tragic event everyone in the community supported you; right?
A For a while. So, yes, I got a lot of support particularly for that first month and then I started feeling like I was getting, like, very left behind in my grief; like the rest of the Beasties were moving on to training and teaching and I was not doing any of that.
Q Right. And that's sort of the nature of grief, isn't it; everyone is real supportive in the first month and then you're still suffering and the world goes on?
A I would say so, yes.
Q And you testified that you -- you were upset you had not gone home for Christmas before he passed away; right?
A Yes.
Q And you blame OneTaste for that also; correct?
A Rachel suggested that I stay and it was that I would be, like, left behind from Beasties if I didn't stay.
Q Right. She wanted you to stay and, you know, continue to work in the community; correct?
A Yes.
Q And you were a volunteer at the time; right?
A Yes.

Q Now, you do understand as a grown woman you don't have to take people's suggestions, right?
A Yes. Again, that was not the mental state that I was in at that time.
Q Okay, but you understand that Ms. Cherwitz, despite her witchy abilities, had no knowledge that your father was going to pass away in January, right?
MS. FARRELL: Objection.
THE COURT: Sustained.
BY MS. BONJEAN:
Q You would agree that she wouldn't have had any advance knowledge of this tragic accident; right?
A I agree she's not psychic.
Q Okay. So, therefore, in December when she said don't go home for Christmas, stay here, by your own words it was a suggestion; right?
A It was a strongly worded suggestion that came with those implied consequences that I was terrified of.
Q Which were what?
A Getting left behind, not being able to continue with the Beasties, not getting trained to teach and all of the things that you mentioned that I wanted to get closer into the organization.
Q Sometimes -- for instance, I have an associate who wants to go on vacation rather than be on this trial. There's

consequences for that; right?
A Yes.
Q But they're natural consequences; correct?
A I'm not sure what you mean by "natural."
Q Like, if -- you may think it's very intense and unfair, but if Ms. Cherwitz says, listen, I want everyone here; if you're not going to be here it's okay, but there are going to be consequences, you may not get to do X, Y and Z, that's fair, isn't it?
A I don't know that I would agree with the word "fair." It's, like -- in a normal job setting there would be a three-strike rule or something like that. There was nothing like that. There was nothing that you were able to track in this circumstance. It was -- it was very, very malleable and changeable and I never could predict what was going to happen.
Q You weren't an employee.
A That is correct.
Q What do you mean three strikes and you're out? You were volunteering.
A I was scared I would never become an employee and I wanted to become one.
Q You wanted to impress the boss; right?
A Yes.
Q And you knew that if someone like Maya Gilbert didn't go on vacation, she might impress the boss more than you would;

right?
A She was in New York at the time and I didn't know her, but sure.
Q Okay. That's just life, isn't it?
A I suppose so.
Q Okay. And, by the way, what OneTaste or what Rachel and OneTaste was focusing on was they were doing this big Christmas food bank volunteer program; right?
A Yes.
Q And that was to help people outside of the community of OneTaste; do I have that right?
A Yes.
Q But when, of course, your father passed, Ms. Cherwitz, you know, nobody -- everybody supported you in going and they took care of somebody going with you, right?
MS. FARRELL: Objection to the form.
THE COURT: Yes, sustained.
BY MS. BONJEAN:
Q Did Clouds, your friend, go with you?
A Yes.
Q And I know on direct examination when the Government was asking you questions you said as a handler, but she was your friend; right?
A Yes -- yeah, I mean she wasn't someone that I was so close with I would have wanted her at ever inch of my father's

memorial, but she was a friend.
Q She's a person you shared a bed with?
A It doesn't mean someone is your best friend.
Q For most of us it does, actually, but --
A But it didn't there.
Q But she was your friend and, in fact, you asked to share a room with her when you first went into 1080; right?
A Yes.
Q And when Ms. Cherwitz said we'll send Clouds with you, you didn't say no; right?
A No.
Q And in hindsight you thought it was weird, but at the time Ms. Cherwitz was doing it, as you understand, it was a gesture of kindness; correct?
A Yeah, I felt that it was an honor at the time to have a handler.
Q You mentioned -- I guess I'm just confused about this, but you mentioned sitting Shiva; right?
A Yes.
Q You also said the body was in the room?
A Yes. My family is reformed Jewish. We follow some traditions and not others.
Q So it was a wake/Shiva?
A Sure.
Q Okay. And when you then returned to 1080, obviously you