# 26-943-cr(L), 26-944-cr(CON)

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals
*for the*
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

RACHEL CHERWITZ, NICOLE DAEDONE,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## APPENDIX

**Volume VI of VII (Pages A-1446 to A-1729)**

ALEXANDRA A.E. SHAPIRO
ALICE BUTTRICK
CHRISTOPHER JOHNSON
WILLIAM TAYLOR
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants*
*Rachel Cherwitz & Nicole Daedone*

# TABLE OF CONTENTS

**Page**

District Court Docket Entries in *United States v. Cherwitz et al.*, No. 23-cr-146 (DG) (E.D.N.Y) ........ A-1

Indictment, filed April 3, 2023 (Dkt. 1) ........ A-77

Excerpts of May 3, 2024 Pre-Trial Conference Transcript ........ A-85

Declaration of Adam Goldberg, dated May 31, 2024 (Dkt. 287-2) ........ A-89

Declaration of Joanna Van Vleck, dated August 1, 2024 (Dkt. 287-1) ........ A-91

Excerpts of September 27, 2024 Pre-Trial Conference Transcript ........ A-96

Government Letter Supplementing Record, filed October 7, 2024 (Dkt. 163) ........ A-106

Excerpts of November 15, 2024 Pre-Trial Conference Transcript ........ A-108

Declaration of Paul Pelletier, dated December 20, 2024 (Dkt. 287-5) ........ A-113

Joint Requests to Charge, filed December 9, 2024 (Dkt. 223) ........ A-120

Joint Letter Supplementing Requests to Charge, filed April 16, 2025 (Dkt. 326) ........ A-192

Joint Letter Supplementing Requests to Charge, filed May 24, 2025 (Dkt. 389) ........ A-211

Excerpts of February 26, 2025 Pre-Trial Conference Transcript ........ A-220

Excerpts of Trial Transcript ........ A-225

**Government Exhibits**

GX56: Photo of Front of Reese Jones Townhouse.......................................................... A-1389

GX57: Photo of Side of Reese Jones Townhouse.......................................................... A-1390

GX58: Photo From Deck of Reese Jones Townhouse.......................................................... A-1391

GX59: Photo From Deck of Reese Jones Townhouse.......................................................... A-1392

GX60: Photo of Inside of Reese Jones Townhouse.......................................................... A-1393

GX826: March 2011 OneTaste Organizational Chart .......................................... A-1394

GX853: Summary Chart of Nicole Daedone Reported Wages And Income Received from OneTaste .......................................................... A-1396

GX856: Summary Chart of Select Individuals Reported Wages Received from OneTaste ......... A-1397

GX862: Summary Chart of Rachel Cherwitz Reported Wages And Income Received from OneTaste .......................................................... A-1398

GX1013: September 21-23, 2008 Emails from Reese Jones And Bryan Franklin................ A-1399

GX1045R: September 27-28, 2011 Emails from Michelle Wright And Robert Kandell......... A-1403

GX3120: How to OM Manual............................ A-1407

GX3147: OneTaste Fear Inventory Manual ........ A-1420

GX3164: Plan to Fulfillment – OneTaste Curriculum Slideshow........................................ A-1422

GX3212R: July 10, 2008 Darshan Transcript ..... A-1429

GX3224: OneTaste Coach And Trainer Association Code of Conduct, Signed January 12, 2013 .......... A-1446

GX3234: OneTaste Coaching & OM Training Program Packet .......... A-1452

GX3500RW12: OM Residential Living Handbook .......... A-1465

GX3608: OneTaste Resignation of Nicole Daedone, Effective March 3, 2017 .......... A-1470

GX3743: Employment Agreement of Lianna Lifson .......... A-1471

GX3767: OneTaste – Rachel Cherwitz Separation Agreement And Release, Signed May 14, 2018 .......... A-1485

GX3768: Employment Agreement of Rebecca Halpern .......... A-1496

GX3772: Employment Agreement of Michelle Wright .......... A-1513

GX3875 (produced in native format): August 23-25, 2013 Video of OneTaste Coaching Program – Nicole Daedone Lecture .......... A-1521

GX3879 (produced in native format): February 21-24, 2013 Video of OneTaste Coaching Program – Beast Exercise .......... A-1522

GX4056: OneTaste Inc. Stock Purchase Agreement, Dated March 3, 2017 .......... A-1523

GX4513AR: July 10-12, 2015 Text Messages Between Michal Neria and Rachel Cherwitz .......... A-1579

GX4514AR: June 8-11, 2015 Text Messages Between Michal Neria And Rachel Cherwitz .......... A-1585

## Defense Exhibits

DX1AB: OneTaste Code of Conduct, Dated February 20, 2014 .......... A-1589

DX1AN: October 2006 OneTaste Release of Liability Form .......... A-1597

DX1BG: 1080 Folsom Handbook .......... A-1600

DX1BS: October 2013 OneTaste Employee Handbook .......... A-1602

DX1X: OneTaste Coach Association Code of Conduct, Dated April 22, 2011 .......... A-1629

DX3AR: Photo of Michelle Wright And Others .......... A-1632

DX3AS: Photo of Michelle Wright And Audrey Wright .......... A-1633

DX3AZ: Photo of Michelle Wright .......... A-1634

DX3DU: Photo of Michelle Wright And Others .......... A-1635

DX3DW: Photo of Michelle Wright And Others .......... A-1636

DX3DY: Photo of Michelle Wright And Eric Swanson .......... A-1637

DX3EA: October 1, 2013 Chat Log Between Nicole Daedone And Michelle Wright .......... A-1638

DX3Z: Photo of Michelle Wright And Others .......... A-1639

DX4A4: Photo of Inside of Center .......... A-1640

DX9FD1 (produced in native format): Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend .......... A-1641

DX9FD1T: Transcript of Lyndsi Keves Audio Recording from February 9, 2017 Nicole Daedone Coaching Circle Weekend .................... A-1642

DX11EP (produced in native format): Video of Michal Neria and Misha Safyan..................... A-1643

DX11FS: 2013 Coaching Program Sales & Business Dev. Guide........................................... A-1644

DX11R: OneTaste Refund Policy And Release, Signed December 27, 2014 ................... A-1652

DX12AI: Photo of Anthia Gillick, Michelle Wright, And Aubrey Fuller................................. A-1657

DX12BY: OneTaste Coach And Trainer Association Code of Conduct And Release (September 2013) ............................................... A-1658

DX12Q: Photo of Rachel Cherwitz and Anthia Gillick ..................................................... A-1666

DX13BA: Photo of Margaret Pixley And Others ................................................................. A-1667

DX13K: Photo of Margaret Pixley...................... A-1668

DX20AE: OneTaste Release of Liability Form, Signed September 8, 2012 ........................ A-1669

DX20AW: Photo of Dana Gill, Lianna Lifson, And Others ............................................. A-1671

DX21AL: Photo of Rebecca Halpern And Chelsea Hunter .................................................. A-1672

DX21AM: Photo of Rebecca Halpern And Others ................................................................. A-1673

DX21AN: Photo of Rebecca Halpern And Others ................................................................. A-1674

DX171-1: Photo of Rebecca Halpern And Others .................................................. A-1675

DX21AP: Photo of Rebecca Halpern, Margaret Pixley, And Chelsea Hunter ................. A-1676

DX21AQ: Photo of Rebecca Halpern And Others .................................................. A-1677

DX21AS: Photo of Rebecca Halpern And Others .................................................. A-1678

DX21J: OneTaste Release of Liability Form, Signed September 8, 2012 .................................. A-1679

DX21L: Rebecca Halpern Financial Agreement And Cancellation Policy re Coaching Program (January 2013) ...................... A-1681

Memorandum And Order Denying Rule 29 Motion, dated August 11, 2025 (Dkt. 429) .......... A-1683

Letter Motion for Forfeiture of Property, filed December 10, 2025 (Dkt. 481) .................... A-1688

Order Granting Forfeiture Motion and Preliminary Order of Forfeiture, filed March 18, 2026 (Dkt. 504) .......................... A-1699

Excerpts of Daedone Sentencing Transcript, dated March 30, 2026 .......................................... A-1710

Cherwitz Judgment, filed March 31, 2026 (Dkt. 523) .......................... A-1714

Daedone Judgment, filed March 31, 2026 (Dkt. 521) .......................... A-1721

Cherwitz Notice of Appeal, filed April 10, 2026 (Dkt. 528) ............................ A-1728

Daedone Notice of Appeal, filed April 10, 2026 (Dkt. 529) ............................ A-1729

**FILED UNDER SEAL**

Declaration of Joanna Van Vleck, dated June 1, 2024 (Dkt. 127-1) .......................... A-1730

Declaration of Mitchell Aidelbaum, dated July 31, 2024 (Dkt. 141-1) .......................... A-1734

Declaration of Kevin Williams, dated August 1, 2024 (Dkt. 113-3) ...................... A-1741

Declaration of Rachel Caine, dated August 1, 2024 (Dkt. 113-5) ...................... A-1747

Government Opposition to Defendants' Motion to Dismiss, filed August 15, 2024 (Dkt. 118) ...... A-1751

Filter Team Letter Supplementing Government Opposition to Motion to Dismiss, dated August 15, 2024 (Dkt. 127) ................................ A-1790

Defendants' Reply In Support of Motion to Dismiss, filed September 6, 2024 (Dkt. 141) ...... A-1798

Government Letter Supplementing Record, filed September 20, 2024 (Dkt. 154) ................... A-1825

FBI 302, filed September 20, 2024 (Dkt. 156-1) ............... A-1829

FBI Notes, filed September 20, 2024 (Dkt. 156-2) ............... A-1833

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

GOVERNMENT EXHIBIT
3224
23-CR-146 (DG)

OneTaste®

# OneTaste Coach and Trainer Association Code of Conduct

**Overview**

OneTaste Coaches & Trainers recognize that in a world of separation, we are about connection. We provide tools for intimacy in everyday life. Going to the root of experience, OneTaste teachings integrate the principles of mindfulness with the practice of orgasm. By nourishing and including this basic and essential part of life, we support students and clients to discover richer relationships, an embodied sense of self and the uncompromised feeling of wholeness.

As OneTaste Coaches & Trainers we agree to support the natural unfolding of each individual. That being said, we agree to not push clients beyond their boundaries and encourage all individuals to participate within their comfort zone. All coaching and training exercises, homework assignments and activities are optional and clients reserve the right to decline participation at any time.

Acknowledging the sensitivity of client-teacher relating, OneTaste Coaches & Trainers agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a client. Because several coaches & trainers in our organization have developed relationships with former clients, we acknowledge that such a healthy relationship can be possible, but that great care and sensitivity are needed. In such cases, the coach/trainer and the client can consult with the Ethics Committee to determine the healthiest approach.

OneTaste maintains an Ethics Committee to provide guidance in individual circumstances and to administer an explicit C*ode of Conduct* for the benefit of the community. The committee consists of three individuals known for their integrity and fairness. In reviewing potential violations, the committee begins with the presumption that responsibility for honoring the code rests 100% with the coach or trainer and never with the client. Final decisions on the repercussions of violations rest with the Ethics Committee.

**Petitions**

Any party (coach/trainer or client) can contact the ethics committee to discuss or request an exemption to the Code of Conduct rules. The ethics committee will discuss with all applicable parties and respond once a decision has been reached. Submissions should be presented in email to all members of the committee. Petitioners should expect the petition process to take **one week** from the date submitted. Decisions will either be: approved; denied; responded to with a request for more information; or a notice that a specific amount of additional time will be required to investigate the request. Petitioners and involved parties should expect they might be asked to discuss the request in a telephone call with the ethics committee. The committee can be contacted at ethics@onetaste.us

**Grievances**

We hold central to our Code of Conduct a deep respect for our clients and their learning. It is of utmost importance that our clients feel they are given the respect and support they need while working with us.
At OneTaste, we discuss and deal with sexuality and subjects that are deeply personal. This may at times be difficult or confronting. While it is not unusual to feel personally challenged in this work, it is very important to us that clients know they have the support of the coaches, trainers and staff. If they feel uncomfortable about the behavior of any staff member, we want to know.

Any client who has any questions or concerns to share with the ethics committee is encouraged to contact them at ethics@onetaste.us

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

OneTaste®

## Regulations

*All* coaches and trainers agree to:

1. Engage in responsible behavior when initiating any sexual relationship within the OneTaste extended community
2. Not offer illegal services or sexual entertainment in exchange for money
3. Refrain from illegal activity during their service in one of these roles

In addition, there are specific requirements and consequences governing sexual relationships between coaches, trainers and students. The following consequences represent the uppermost limit of repercussion. Discretion as to final discipline rests with the ethics committee.

**Sexual Guidelines**

A minimum of **3 months** must pass after a coaching or training relationship ends before initiation of a sexual or romantic relationship with a client. **30 days must pass before OM.**

If you have a pre-existing OM or sexual relationship with an individual who becomes your coaching or OM training client, all OM and sexual contact must be suspended for the length of your coaching relationship. You may resume your prior relationship **30 days** after the coaching relationship ends.

In order to maintain clear boundaries between our personal OM practice and training others, we also have clear guidelines on the training of OM partners. Coaches & trainers may only OM with individuals who have received OM training through official OneTaste channels. Your OM partner must have completed OM Badge, The OM Class or a full OM training session with a Certified Trainer before you start an OM practice with them. If you wish to be their partner for their first OM, another trainer must lead the session. The Learn to OM video is not considered sufficient training to meet this standard.

*First offense:*

1. The coach or trainer is suspended from all coaching & training activities and the OneTaste Coach Association for 30 days.
2. During the 30 days, the coach or trainer is required to attend 4 anonymous program meetings* and complete daily inventory.
3. At the end of the 30 days, the coach or trainer must appear before the Ethics Committee for a review.

*Second offense:*

1. The coach or trainer is suspended from all coaching and training activities and the OneTaste Coach Association for 3 months.
2. During the 3 months, the coach or trainer is required to attend 4 anonymous program meetings per month, complete daily inventory, and check in monthly with an ethics guide.
3. The coach or trainer is required to complete 4 hours of service per month for a program approved by the Ethics Committee.
4. At the end of the 3 months, the coach or trainer must appear before the Ethics Committee for a review.

*Third and final offense:*

1. The coach or trainer will lose coaching and training status, including removal from the OneTaste Coach Association, for a minimum of 1 year.
2. During the year or more, the coach or trainer is required to attend 4 anonymous program meetings per month, complete daily inventory, and check in monthly with an ethics guide.
3. At the end of the one year suspension, the coach or trainer can petition the Ethics Committee for reinstatement of teaching and coaching duties. The Ethics Committee reserves the right to deny any request.

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

OneTaste®

**Duration of Records:**

Ethics violations will be tracked on a year to year basis. After **one year** without violation, the coach/trainer may have past violations cleared from their record. While these violations will remain in archives, they will not be included when calculating the number of offenses.

As an OneTaste coach & trainer, I agree to abide by this Code of Conduct and understand the repercussions of noncompliance. I sign this document of my own volition and understand that if I violate these ethics I may lose position, salary, and/or my OneTaste Coach Association status.

| | |
|---|---|
| Signature | DocuSigned by: [signature] E5E419B3198E4EF... |
| Name | Becky "Uma" Weiner |
| Date | 1/12/2013 |

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

OneTaste®

## Representation and Usage Agreement

Welcome to the OneTaste Coaching and OM Training Program. This agreement covers important information to consider when creating your private coaching business and/or OM Community during and after the program. As a prerequisite to your participation in the Program, please indicate that you understand and agree to the following by initialing each section and then signing and dating the bottom of this document.

OneTaste Copyrighted Material

1. I understand that "Orgasmic Meditation" and "OneTaste" are registered trademarks of OneTaste LLC.
2. I understand that OneTaste will provide certain copyrighted documents, such as one-pagers, for the sole purpose of using them with or distributing them to my clients in intern coaching or training sessions. I agree to not alter the form or content in any way and to always use the most recent version of any materials. I agree that if, for any reason, I leave the program pre-certification, or in any way do not quality for certification, I will cease use of all copyrighted OneTaste documents or materials.
3. When sharing or distributing OneTaste copyrighted material I agree to include an attribution to OneTaste.

**Representing Myself**

1. I agree to clearly convey to my clients, potential clients, and others the following: (1) that I am an Intern Trainer or Intern Coach, (2) that these are intern sessions, (3) and that these sessions are a necessary step for me to become a OneTaste-Certified Trainer or Coach.
2. Until OneTaste certifies me for my Program, I agree not to advertise, claim, or otherwise represent that I have received training from OneTaste without including language that clearly conveys that I have not completed the Program.
3. If at any time I lose my eligibility to become certified and fail to achieve Certification during the eligibility period, I agree to no longer use any title or make any claims with respect to any professional training I received at OneTaste.
4. If at any time I lose my eligibility to become Certified and fail to achieve Certification during the eligibility period, I agree not to use the phrase "Orgasmic Meditation" in connection with any training or coaching that I provide, paid or unpaid.

**Where and how I practice my skills**

1. I understand that my training in the Program prepares me to work in sessions with either (a) one person as my client; or (b) two people who wish to be coached or trained together as a pair. I may partner with with a OM training partner for the session as long as that partner is also an intern or certified graduate of this program.
2. I understand that the training provided in the Program does not prepare me for performing or hosting demonstrations of Orgasmic Meditation. I agree not to perform or conduct a live, recorded, or otherwise transmitted demonstration of Orgasmic Meditation, for any audience (including in a training session), paid or unpaid, without the express written permission from OneTaste.
3. I understand that OneTaste may permit me to host, lead, or otherwise conduct OneTaste-related events and gatherings (such as "meet-ups", Introductory presentations on OM or similar lead-generation events) of up to 2 hours in length, but not more.
4. I agree neither to attempt nor to claim to train others to become teachers, coaches, instructors, trainers, demonstrators or presenters of any OneTaste-related material.

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

OneTaste®

**Other Conduct**

I understand that pertinent laws, statutes and customs vary greatly from location to location. I agree to research the laws, statutes and customs that apply in my local area, and to refrain from engaging in any portion of my Program training that may conflict with those. I further agree to indemnify OneTaste from any consequences resulting from my actions, where such actions are in conflict with the laws, statutes or customs of my locality.

I understand and agree to all of the terms and conditions specified in this document.

| | |
|---|---|
| Signature | DocuSigned by: [signature] E5E419B3198E4EF... |
| Program | OneTaste Coaching Program ("CP6") |
| Date | 1/12/2013 |

DocuSign Envelope ID: 49196557-7EB9-4376-BF21-A6BC1FD779D4

OneTaste®

## Media / Photography Release Form

I, Becky "Uma" Weiner hereby irrevocably grant to OneTaste Incorporated, its subsidiaries, affiliates, nominees, licensees, their successors and assigns, and those acting with its authority (hereinafter collectively referred to as "OT"), with respect to the audio and visual recording of the entire contents of the 2013 Coaching Program ("CP6") (the "Works"), the unrestricted absolute, perpetual, worldwide right to:

1. Reproduce, copy, modify, create derivatives in whole or in part, or otherwise use the Pictures or any part thereof in combination with or as a composite of other matter, including, but not limited to, text, data images, photographs, illustrations, animation and graphics, video or audio segments of any nature, in any media or embodiment, whether now known or hereafter to become known, including, but not limited to such formats of computer readable electronic magnetic, digital, laser, optical-based media, and
2. Use and permit to be used the original form of the Works or in any modified form, in connection with any OT publication, and
3. Display, perform, copy, distribute, trade or broadcast the Works by any means not limited to advertisement, publicity, for profit, through electronic media, print media, other formats whether now known or to become known, and
4. There is no time-limit on the validity of the release of the Works nor is there any geographic specification or limitation of where the Works my be distributed.

**Waiver and Release**

I hereby waive the right and release OT from, and shall neither sue nor hold against OT any claim on format of use, violation of copyright whether now known or unknown, for defamation, invasion of right to privacy, publicity or personality based upon or relating to the use and exploitation of the Works.

I agree that there shall be no obligation to utilize the authorization granted by me hereunder. The terms of this authorization shall commence on the date hereof and be without limitation.

I warrant and represent that I over the age of eighteen years and that I am free to enter into this agreement.

| | |
|---|---|
| Signature | DocuSigned by: [signature] E5E419B3198E4EF... |
| Program | OneTaste Coaching Program ("CP6") |
| Date | 1/12/2013 |

ONETASTE00259680

*Gov. Ex. 3224-006*

A-1452

GOVERNMENT EXHIBIT
3234
23-CR-146 (DG)

# OneTaste Coaching & OM Training Program

*"Combining meditative awareness with sexual pleasure! What could be better – or more life enhancing than this?"*



–Christiane Northrup, M.D., ob/gyn physician & author of the NYT bestsellers: *Women's Bodies, Women's Wisdom* & *The Wisdom of Menopause*

# In an innovative educational experience, unlike any other in the world, learn the art and skill of guiding clients into an OM lifestyle philosophy -- where connection, intimacy, and turnON become their fundamental orientation to the world.

### *Overview: What is OneTaste Coaching and OM Training?*

At OneTaste, we believe that people are meant to live TurnedON. We sense it when we feel that something more must be possible -- possible in the realm of our relationships, our connections, our sex, our world. TurnON removes the layers we've put on top of our internal compasses and gives us the ability to discover what that "more" is. Our most potent biological drive, Orgasm, is the key to unlocking this power. And the way to have access to this catalyst is through Orgasmic Meditation.

OneTaste Coaching offers innovative ways and a physical practice to uncover new possibilities in the realms of our sex, our relationships, and our lives. The focus is on feeling. Feeling more in our bodies. Feeling more in our relationships. And, ultimately feeling more of our world. By accessing the deep seated compass within, we reconnect to our felt senses. This has us experience greater nourishment in our day-to-day experiences, as well as greater depth in our sex and intimacy.

At the heart of OneTaste Coaching is a practice: Orgasmic Meditation (OM). OM is a simple sexuality practice that offers practitioners the visceral experience of connection, sensation and turn on. OM becomes a process for discovering the answers that live deep inside of us. It gives us access to what we want in life as a whole. Desire, sex, shadow, and relationship become crucibles of growth.

An integration of cutting-edge coaching theory and practice, with a simple yet transformational sexuality practice, OneTaste Coaching represents an evolution in the helping professional field.

*"At a time when many women feel pressured to add sex to their Superwoman to-do list without feeling like they get much in return,OM is a much needed and welcome invitation for women and men to strip down to the bare essentials of a woman's authentic sexuality so sex can fill her up, rather than deplete her. A must for any woman who hasn't fully accessed her orgasmic potential and yearns to more fully embody the intimacy and surrender a loving sexual relationship can bring to a woman's wholly healthy life."*

–Lissa Rankin, MD, OB/GYN,
author of What's Up Down There
& founder of OwningPink.com

# OneTaste Coach Program – Become a Certified Coach & Advanced OM Trainer

***As a OneTaste Certified Coach and OM Trainer you will become skilled in supporting people to:***

- Experience more intimacy and aliveness in sex
- Viscerally connect to others
- Understand and express their desire
- Identify and integrate their shadow
- Engage and move through confronting situations
- Approach relationships with a greater curiosity, creativity, and depth
- Communicate powerfully in and outside of the bedroom
- Cultivate energy and responsiveness that inspires every area of their lives
- Move through the fear, shame and taboo that arise with sex
- Learn the OM practice step-by-step
- Understand sexual anatomy and clitoral mapping
- Troubleshoot OM problem areas, including posture, stroking and finding the spot
- Develop an OM practice routine that works
- Understand and integrate key OM exercises
- Communicate effectively during the practice
- Expand their capacity to feel and pay attention in OM and life

# The OneTaste Method Training - A Curriculum of Depth

***As a student of the OneTaste OM Trainer and Coach Program, you will experience the fulfillment of learning to guide individuals and couples in cultivating a profound depth of intimacy in their lives. In training sessions rich in experiential learning, core areas of study will include:***

- Sex as a power source and referent for a client's whole life
- Discerning and working with desire
- Assessing sexual personality types
- Drawing out and converting shadow to power
- Working with the challenging emotions of shame, fear and jealousy
- Dynamic relating
- Intuitive communication
- Navigating resistance
- Honoring boundaries and safety
- Working at a client's expanding edge
- OM technique and troubleshooting
- Practical tools and exercises
- Client self-care
- Sustainable sales and business development
- Advanced coaching and leadership skills - becoming masterful in each stage of the coaching relationship



# Innovative Teaching

**Nicole Daedone** is a sought-after speaker, teacher, and author who has spends her groundbreaking career redefining orgasm from a woman's point of view. Starting with her fundamental belief that a woman's orgasm is her power, she treats supposedly taboo subjects with unparalleled humor, intelligence, and insight.

Nicole is the author of Slow Sex: The Art and Craft of the Female Orgasm (Grand Central/Hachette, May 2011) and is the founder of OneTaste. Helping to foster a new conversation about orgasm—one that's relevant and real—she has inspired thousands of students to make OM, a part of their everyday lives.

**Ken Blackman** has been researching Orgasmic Meditation and related practices since 1998, making him OneTaste's most experienced OM practitioner and teacher. In 2008, Ken was drawn to OneTaste through his longstanding friendship with founders Nicole Daedone and Robert Kandell, and through his desire to share his extensive experience in Orgasmic practices. Over a decade of immersive research and rewarding practice prepared him to teach OneTaste's Professional training programs where he guides students in deepening their practice, Ken's teachings create a rich experience for both coach and client, helping them incorporate the fruits of their practice into their lives and relationships.





**Yia Vang** was raised in the shamanic tradition of the Hmong Culture. She has studied and practiced Orgasmic Meditation for over 6 years and is head faculty of the Orgasmic Meditation Trainer Program. Yia holds a B.A. in Communications, specializing in Interpersonal Communication and Group Dynamics, from the University of California, Davis. Yia's passion for this work is driven by her desire to see every woman open her orgasm and every man know how to handle a turned on woman.

**Alisha Price** was trained by some of the foremost experts in spiritually meditative practices. After many years of travel and exploration, she discovered OneTaste and the practice of OM in 2006. Now OneTaste's lead Coach, she utilizes her years of experience as a practitioner of meditation and dance to help her students and clients embrace themselves in connection with others, and with the world.



*There is a special power in the bond between two people engaged in an OM practice. There is a different but equally healing power in the bond between a group of strangers consciously casting aside the social taboos we have around sex and sharing their thoughts and experiences. Since the class I've felt a lot less performance anxiety when OMing and that has been very liberating.*

- Matt Wynn, Student



**Joanna Van Vleck** first stepped through OneTaste's doors from the land of internet business. After denying any need for the product of OM (yes, that went on for quite some time), she became an evangelist of OM. Where once her sex life was just fine thankyouverymuch, OM taught her the A+ sex moves didn't equate to senstion in the world of OM. Whereas she had always been loud in sex, after OM she was now quite silent. A deeper subtlety began to rumble in her body, and over the past 2 years of practicing, her sex has transformed from looking good to feeling good. Joanna brings a background of psychology, product development and business development to the OneTaste team. When not OMing, Joanna can be found introducing OM to men in bars!

**Rachel Cherwitz** is passionate about bringing consciousness areas where people most commonly shut down - from sex and food to anger and lust. Drawing on her personal experience of addiction and recovery, she received her B.S. in rehabilitative studies, substance abuse, and addiction from University of North Texas, before coming to OneTaste in 2006. Profoundly moved by the discovery of how to live a turned-on life, she decided to pursue a career as a coach and OM trainer to give other people the same opportunity. Over the last 6 years, Rachel has taught hundreds of people the practice of Orgasmic Meditation and showed them what an integral part orgasm can play in their life. She is now Head of Sales for OneTaste, bringing her expertise in business development and sales she now trains people to sell in an ethical way.



# The Program Design

***Understanding that each participant in OneTaste's professional training has significant goals and an already full life, we have designed a responsive educational experience***

- A training schedule that you can easily incorporate into your life - 3 in-person class days in New York each month (also available via telecast*), monthly tele-classes, weekly coaching and OM training practice labs, personal coaching in person or via Skype, and integrated homestudy.
- Teaching modalities that include lecture, experiential exercises, integrative assignments, and much more.
- A focus on business development -weekly calls throughout the program to build your business as you go.

* Distance learning students must attend at least 3 of the 10 immersions in person in order to graduate.

***Program Includes:***

- 30-days of in-person or telecast immersion with Nicole Daedone and OneTaste Senior Faculty
- Weekly tele-classes on business development with OneTaste Senior Faculty
- Weekly alternating OM Training and Coaching practice labs in OneTaste cities with Certified Coaches and OM Trainers
- 10 months of personal Coaching and OM Training from a OneTaste Master Coach
- Ongoing Peer Coaching and OM Training Practice

# February 22, 2013 - November 17, 2013

***Immersions:***

February 21-24, 2013 (Opening Reception Feb 21st at 7pm)
March 22-24, 2013
April 26-28, 2013
May 17-19, 2013
June 21-23, 2013
July 26-28, 2013
August 23-25, 2013
September 27-29, 2013
October 25-27, 2013
November 15-17, 2013 (Testing and Closing Reception)

***Other Classes:***

- Coaching and OM Training Practice Labs every Monday from 7-8:30pm, starting March 4th
- Teleclasses every Tuesday from 5:00-6:30pm PST, starting March 11th
- Private OM Training and Coaching: As scheduled with your Coach

# Program Prerequisite

***How to OM Course or 3 OM Training sessions with a certified OM Trainer***

For more information on How to OM visit: http://www.onetaste.us/omclass.php
The cost of this course or training sessions is included in your tuition.

- Please note that group OM practice will occur at the immersions and is a requirement for participation in the program. Should you wish to bring your own OM partner please contact us to discuss.

# Certification

***Benefits***

- Be uniquely positioned in the industry as a OneTaste Certified Coach and OM Trainer.
- Receive 50% discounts on continuing education opportunities at OneTaste Centers all over the world.
- Gain use of the OneTaste logo on your individual website and access to OneTaste brochure, flyer, and business card templates for consistent and high-quality branding.
- Enjoy the support and inspiration of the OneTaste community of Coaches and Trainers,including monthly continuing education calls.
- Access to ongoing biannual training to update skills, gain new content and maintain current certification.
- Receive 50% discounts on continuing education opportunities at OneTaste Centers in San Francisco and New York.
- Be a certified TurnON city leader

***Requirements***

- 25 OM Training sessions with a minimum of 5 clients - including 5 guided OM sessions supervised by Program Faculty.
- 75 Coaching Hours with a minimum of 5 clients - including 5 sessions supervised by Program Faculty.
- Complete a written exam at the November 2013 immersion weekend.
- Agree to the OneTaste Coaches and OM Trainers Code of Conduct
- To maintain certification in future years - participate in biannual continuing education.

** Students have until October, 30th, 2014 to complete certification requirements.

# Advanced OM Trainer and Coach Program Tuition

Tuition rates include immersion classes, tele-classes, OM Training and Coaching Practice labs, OM Training and Coaching supervision, online resources, and your own personal coach and OM Trainer.

Paid in Full: $13,000

Sign up early and save:
October 11th to November 10th – 12k in full, 14k payments
November 11th to start – 13k in full, 15k payments

**For more information, contact Rachel Cherwitz at:**
**rachel.cherwitz@onetaste.us**
**415.218.0073**



GOVERNMENT EXHIBIT
3500-RW-12
23-CR-146 (DG)

# OM Residential Handbook
## Guidelines to Living in an OM House

Congratulations on your decision to dive into the waters of living in an OM House! It means you are making a commitment: to your desire, to the community, and to staying connected. It is a cooker, where your emergent behavior will arise. It is a container that we agree to enter in to, in order to see who we are, know each other, and support the practice and growth of Orgasmic Meditation. The following is a guidebook where the rules of play are specifically outlined. Every city is a little bit different; make sure to go over any questions with your local house manager.

### Rules Of Play

Many institutions offer themselves as a refuge. This is not one of them. An OM House is intended for adults- spiritual, emotional, psychological, and physical adults. You are moving in because you want something: a deeper sense of your orgasm, actualization, and connection. The nature of this work is that, on your path to search for these things, you will be confronted. At some point, you'll probably want to blame the people around you for your experience. You'll most likely be up against your demons. We find that these rules of play help us remember, that we are coming into the house as fully volitional Beings ready to take responsibility for our own experiences.

**Stay connected (no matter what)**
Usually when we get angry, confronted, embarrassed, or rejected we disconnect. We don't like to look messy or vulnerable in front of others. This rule of play is probably the most difficult and the most crucial. It means you agree to break the pattern of disconnection. You agree to let the other person in when your feelings are hurt, when you're mad, or when you love them. You don't get to check out from the house for a week without telling your house manager and housemates what is going on. You recognize that all of your actions have impact on the people around you.
Staying connected means that even in the face of the most uncomfortable realization, you let the other people you live with in. It is disconnection that causes the destruction in our relationships. If we stay connected no matter what, we always know each other better on the other side.

**Use safe-words**
The house is a place for us to play. That being said, we want to stretch, not break. We want to push edges, but not play in the place that will get us injured or harmed. We are also all responsible for communicating our own boundaries. We play with safe words because they are a clean way for us to tell each other where we are at, while still intentionally going into uncharted waters.

- Green: I'm good! All clear, and ready for more play.
- Yellow: Something challenging is arising for me. We need to slow down.
- Red: I feel like I am in danger. I am at a hard limit. This is the emergency brake. All play stops. Attention is given to the player until they feel like there is some resolution and they can move forward.

**Ask for 100% of what you want (and stick around to negotiate)**
Your house manager wants to give you what you want. Your fellow residents want to give you what you want too. Ask for what you want coming from this assumption, that everyone else wants you to have it.

SUBJECT TO PROTECTIVE ORDER

We will do our best to deliver on your requests. When there is something we can't deliver on, stay in the conversation. Chances are that we can come to an amenable middle ground.
Disconnection and damage is created when you assume that someone doesn't want to give you what you want. And then you hide your desire, stuff it down until it rots, and turns into a putrid mixture of fear and resentment.

**Be responsible for your own Journey**
You have decided that you want to live in this dynamic orgasmic house. Take responsibility for everything that it means. Keep track of your practices and keep your commitments, because these are the things that will get you what you want. Your house manager is not here to shame or punish you into doing anything. No one is going to come in and get you. Ask for what you want, and call yourself out when you are distanced or whacked. Ask for help and support when you need it.

## Program Application Procedure

In order to be considered for a residency, applicants must complete the following:

- How to OM course or OM Training prior to submitting application.
- Application and $25 processing fee.
- Approval of application.
- Meet with House Manager to remit first month's rent, security deposit, and food program payment.

## The Residential Practice

The residential practice consists of a three-fold practice of flooding, metabolizing, and revealing, which facilitates balance and growth. Orgasmic Meditation (OM or OMing), sitting meditation, and mindful movement are the main focus of each practice element.

**OM**
Orgasm is the basis of all activities, with OMing as the foundation of our practice. Having a daily practice is an integral part of being a member of the community. It is the thing that keeps your body plugged in. It is your teacher. And it is your power source.

**Service**
Each resident takes on a service project. Service is a foundation of the OM lifestyle. It is a metabolizing practice that allows us to digest and ground our experience. It's a way of giving back what has been given to us and develops our skills in having attention outside of ourselves. Residents can chose what kinds of service to participate in based on their interests. Discuss your project with your house manager.

**Movement**
Living in an OM house means that you have an increased amount of energy running through your body. Movement keeps you sane and it has your body feel good. We recommend Bikram, because you sweat out all of the impurities you build up.

SUBJECT TO PROTECTIVE ORDER

**Fear Inventory**
Fears are the charges that build up and have us disconnect from others. Fear inventory is designed to promote flow and release of the charge intrinsic to this environment. In addition to a regular fear inventory schedule, residents are expected to make use of this tool as needed.

**Journaling**
All residents are encouraged to make Journaling a regular part of their life. This has proven to be both a powerful revealing practice and a valuable tool for continuity and growth over time. Journaling can be personal or posted on a blog.

**TurnON Attendance**
TurnON is held every week. Residents are highly encouraged to attend at minimum one TurnON a week to connect with other members of the community, and people who are interested in Orgasm. TurnONs is also a place where you put your attention out on others and give them the experience of having exquisite attention on them.

**Required Commitments**

- Balanced three-fold Practice
  - Flood: Practice of 1-3 OMs throughout the day.
  - Metabolize: Practice of yoga, bikram yoga, chi gong, or other mindful movement.
  - Reveal: Practice of sitting meditation, journaling, and/or fear inventory.
- Commitment to a service project.
- Attendance at other scheduled residence gatherings and activities.
- Attend TurnONs (minimum one per week)
- Adhere to room cleanliness standards.
- Outings to further the growth of the game.

## Housing and Accommodations

**Rent Fee**
Rent for your stay at an OM house varies. Please check with your House Manager on the fees and space available.

**Food Program**
Dinner is the most important meal of and promotes connection and socializing. Residents are encouraged to dine together at the scheduled time. When dinner starts, laptops and work related items are put away from the common area. Check with your OM house on food program fees.

**Guests**
Check with your OM house on policies around guests.

**Room & Furnishing**
Simple living is a core value of the OM house. It's important to keep the house simple and clean to keep the energy flowing. Residents take pride in the appearance of the house and in making it welcoming and open for guests. Rooms have been designed and furnished with spaciousness, simplicity, and clarity in mind. Please consider the care and condition of your room as a part of your practice - order and

cleanliness should all be taken into consideration daily. If your room falls short of appropriate cleanliness level and you do not respond to verbal requests for improvement, your residency eligibility will be reviewed.

Residence Policy and Protocol

**Ecological Sustainability**
The OM house is committed to the health of the larger community; the world. Please make sure you are making ecologically sound choices. Turn your lights and heater off when not in the room. Limit your water use, take brief showers and turn the tap off while brushing your teeth. Each resident is responsible for taking his or her trash and recycling out.

**Drugs/Alcohol**
An OM house has a non-smoking policy. Smoking is not permitted anywhere on the property or within 25 feet of entrances, per health code laws.
No drugs or alcohol are permitted in the residence or within 25 feet of entrances. Infraction of this policy is grounds for removal.
Repeated disturbances due to alcohol and drugs intoxication are grounds for suspension and/or removal.

**Safer Sex: STI**
The OM house is committed to conscious play. Central to this is knowing your STI status. Residents should get tested every six months and make their results known to any sexual partners. A recommended best practice is maintaining a hard copy of your test results so you can show your partner(s). Please play safely and consciously! Always use whatever barrier method best suits the activity you are engaged in.

**Recommended tests**

- HIV
- Herpes simplex 1 & 2 (there is a specific test that can distinguish between the types)
- Gonorrhea
- Syphilis
- Chlamydia
- Hepatitis B/C
- HPV

Important Phone Numbers

House Manager
Kim Howerton
415-860-6426

SUBJECT TO PROTECTIVE ORDER

DocuS gn Enve ope ID: C570FF04-FECC-46F6-9C43-C10C88FD2BAA

GOVERNMENT EXHIBIT
3608
23-CR-146 (DG)

ONETASTE®

# RESIGNATION

I, Nicole Daedone, hereby resign from my position as a director of OneTaste Incorporated, a California incorporated company, and from all offices I hold with OneTaste Incorporated including my office as CEO, effective March 3, 2017.

Signature: DocuSigned by: Nicole Daedone 9DE21100E2844C8...

Name: Nicole Daedone

Date: March 2, 2017

GOVERNMENT EXHIBIT
3743
23-CR-146 (DG)

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made as of the 1st day of October, 2013 by and between OneTaste Incorporated (the "Company") on behalf of its past and present officers, subsidiaries, related corporations or entities, owners, principals, stockholders, partners, directors, agents, managers, members, contractors, successors, predecessors, insurers, assigns, affiliates and representatives (collectively "Affiliates") and Lianna Lifson, behalf of him/herself, his/her agents, heirs, executors and assigns ("Employee").

**WHEREAS**, the Company and Employee wish to enter into a formal employment contract, which will govern the terms and conditions applicable to Employee's employment with the Company and will provide certain severance benefits for Employee in exchange for the Employee's agreement to abide by the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, the parties agree as follows:

## PART ONE – TERMS AND CONDITIONS OF EMPLOYMENT

1. **Duties and Responsibilities.**

**A.** Employee shall serve as City Director Boulder and shall report directly to Joanna VanVleck and/or Robert Kandell. Employee shall perform the responsibilities of his/her position, as indicated in Exhibit A hereto, including such duties and functions as may be reasonably assigned to Employee from time to time.

**B.** Employee agrees to use his/her best efforts to advance the business and welfare of the Company, to render his/her services under this Agreement faithfully, diligently, competently and to the best of his/her ability. Employee agrees that he/she will not engage in other employment that either interferes with his/her services rendered to Company pursuant to this Agreement or competes with Company's business endeavors, while employed by the Company.

**C.** Employee represents that he/she has the qualifications and skills necessary to perform the services contemplated in this Agreement in a competent, professional manner, without detailed advice or direction from the Company. But for this representation, Company would not otherwise engage Employee for the services contemplated in this agreement.

2. **Period of Employment.** Employee's employment with Company shall be governed by the provisions of this Agreement commencing October 1, 2013, or the first date that services were performed for the Company, whichever is earlier (such date, the "Effective Date") and will continue for twelve (12) months, unless terminated earlier by either party with or without cause. Employee's employment shall be "at will" and may be terminated by either the Company or Employee for any reason. The period during which Employee's employment continues in effect shall be referenced as the "Employment Period."

3. Base Pay.

A. Employee shall be paid a base salary of $2,800 per month based on a full time work schedule (hereinafter "Base Pay") during the Employment Period.

B. The Company shall review Employee's Base Pay annually for potential adjustments but no increases are guaranteed. In the event of any increase as permitted by this Section 3.B., the increased amount in effect at that time shall become the new Base Pay for all purposes. Employee's Base Pay shall be paid at periodic intervals in accordance with the Company's payroll practices for salaried employees.

C. Company shall deduct and withhold from the compensation payable to Employee, including but not limited to Employee's Base Pay, any and all applicable Federal, State and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable statutes, regulations, ordinances or orders governing or requiring the withholding or deduction of amounts otherwise payable as compensation or wages to employees. Company shall also deduct such amounts as may be authorized by Employee from time to time in writing and as permitted by law.

4. Termination of Employment.

A. Employee's employment may be terminated by either the Company or Employee at any time, for any reason, with or without Cause (as defined herein), upon written notice specifying the Effective Date of Termination, and without additional compensation, except as otherwise provided in Section 5. The Effective Date of Termination specified in the written notice may be immediate.

B. For purposes of this Agreement, termination for "Cause" shall mean the involuntary termination of the Employee's employment by the Company for any of the following reasons:

(i) Employee's conviction or entry of a plea of guilty in, a court of competent jurisdiction for any felony or misdemeanor;

(ii) The material breach of this Agreement by Employee which, if curable, Employee fails to cure within thirty (30) business days following written notice from the Company;

(iii) Employee's commission of any act of fraud, misappropriation or embezzlement in connection with his/her employment by the Company;

(iv) Employee is unable to perform the essential functions of his/her job for sixty (60) consecutive days in any twelve (12) month period;

(v) Employee's lack of experience or sub-par performance. If it is discovered that Employee does not have the experience or expertise to perform the duties contemplated in this agreement to the satisfaction of the Company or if Employee fails to perform at a standard expected by and acceptable to Company, Company will give Employee written warning of such sub-par performance and will give Employee thirty (30) days to improve his/her performance to a standard acceptable to Company. If after the thirty (30)-day probationary period Employee's performance has not improved, Employee's employment with Company may be terminated for Cause.

(vi) Employee's death.

An involuntary termination of Employee's employment by the Company in any other circumstances or for any other reason will be a termination "Without Cause."

**C.** The "Effective Date of Termination" shall be: (i) in the case of termination due to death, the date of Employee's death, or (ii) in the case of any other termination, the date of Employee's separation from service, within the meaning of Section 409A of the Internal Revenue Code, as amended (the "Code"), from the Company and its subsidiaries or affiliates (the "Separation from Service") specified in the written notice required by this Section.

**D.** On the Effective Date of Termination, Employee shall be paid all Base Pay earned through the end of the Employment Period, any unpaid business expenses, and any accrued but unused vacation earned through the Effective Date of Termination. Unless Employee is entitled to severance benefits under Section 5, he/she shall not be entitled to any compensation or benefits following the Effective Date of Termination, except as required by law.

**E.** Employee shall resign from Employee's position(s) with the Company and as employee, officer or director, as applicable, with the Company or any of its subsidiaries or Affiliates, effective as of the Effective Date of Termination.

**F.** In the unlikely event that the Company is sold, Company agrees to give Employee ten (10) days' notice of said sale.

## PART TWO – SEVERANCE BENEFITS

**5. Severance Entitlement.**

**A.** Employee shall be entitled to receive the severance benefits specified in Section 5.B. in the event that the Company terminates Employee's employment Without Cause or With Cause, except where the termination for Cause is pursuant to Section 4.B.(i), 4.B.(iii) or 4.B.(vi). Employee shall also be entitled to receive the severance benefits specified in Section 5.B. in the event that Employee resigns.

All severance payments made to Employee pursuant to Section 5 shall be subject to all applicable withholding requirements.

**B.** In the event Employee's employment terminates under the conditions described in Section 5.A., Employee shall be entitled to severance benefits of:

(1) Two (2) weeks' pay at Employee's regular rate of pay at the time of separation, paid in accordance with standard payroll practices.

Notwithstanding anything to the contrary contained herein, Employee's employment with the Company shall be "at will." Employment with the Company is on an at-will basis and for no specified time period. Employee is free to terminate his/her employment at any time with or without prior notice or cause. Similarly, the Company may terminate the employment relationship or change any term of employment with or without cause or notice and no guarantee of any severance benefits shall exist at that time.

**C.** The severance benefits provided Employee under this Paragraph 5 are the only severance benefits to which Employee is entitled upon the termination of his/her employment with the Company during the applicable time period, and no other benefits shall be provided to Employee by the Company pursuant to any other severance plan or program of the Company, except as required by applicable law or in Company's sole discretion. Employee acknowledges and agrees that but for his/her execution of this Agreement, he/she would not be entitled to such benefits. Receipt of said severance benefits are contingent upon Employee's execution of a confidential separation release and waiver by which Employee releases Company of any and all potential claims, known or unknown, which Employee may have against Company regarding the employment relationship between the parties as well as a non-disparagement agreement and adherence to the non-solicitation provision of this Agreement.

## PART THREE – MISCELLANEOUS PROVISIONS

**6. Successors and Assigns.** The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the Company, its successors and assigns. This Agreement shall inure to the benefit of and be enforceable by Employee's personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees.

**7. Indemnification.** The Company shall indemnify the Employee to the fullest extent required under the law resulting from the Employee's good faith performance of the Employee's duties and obligations with the Company. In addition, the Company shall indemnify the Employee for any and all activity performed by the Company, its officers, employees, managers or representatives prior to the Effective Date.

**8. Notices.**

**A.** Any and all notices, demands or other communications required or desired to be given by any party shall be in writing and shall be validly given or made to

another party if served either personally or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice, demand or other communication shall be served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is given by overnight delivery, it shall be conclusively deemed given the day after it was sent addressed to the party to whom such notice, demand or other communication is to be given. If such notice, demand or other communication is given by mail, it shall be conclusively deemed given two (2) days after it was deposited in the United States mail addressed to the party to whom such notice, demand or other communication is to be given. The address for notice for each of the parties shall be as follows:

To the Company:

347 9th St., Suite 483
San Francisco, CA 94103

To Employee:
Lianna Lifson
3080 Valmont Road
Boulder, CO 80301

**B.** Both parties agree that if notice is by mail, then in good faith, the party giving notice will attempt to contact the other by their last known phone number and email address, to ensure notice was received.

**C.** Any party may change its address for the purpose of receiving notices, demands and other communications by a written notice given in the described manner to the other party.

**9. Governing Document.** Except as otherwise provided or referenced herein, this Agreement constitutes the entire agreement and understanding of the Company and Employee with respect to the terms and conditions of Employee's employment with the Company and the payment of severance benefits, if applicable, and supersedes all prior and contemporaneous written or verbal agreements and understandings between Employee and the Company relating to such subject matter. This Agreement may only be amended by written instrument signed by Employee and an officer of the Company specifically authorized for such purpose. Any and all prior agreements, understandings or representations relating to the Employee's employment with the Company are terminated and cancelled in their entirety and are of no further force or effect. However, Employee will be bound by the Company's Employee Handbook and other policies and said document will be read in conjunction with this Agreement.

**10. Governing Law.** The provisions of this Agreement will be construed and interpreted under the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

11. **Construction.** The normal rule of construction that any ambiguity or uncertainty in a writing shall be interpreted against the party drafting the writing shall not apply to any action on this Agreement.

12. **Arbitration.** The parties agree that should any controversy or claim arise out of, or relating to Employee's employment with the Company, this agreement or the making, performance, or interpretation of it, they will attempt to settle said dispute informally and in good faith (including but not limited to mediation or informal settlement negotiations). However, should such informal efforts to resolve any dispute fail after thirty days, any disputes shall be settled by arbitration in California under the employment arbitration rules of the American Arbitration Association then existing, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.

Any controversy, claim or dispute between the parties directly or indirectly concerning Employee's employment, this Agreement, or the breach or subject matter hereof, including, but not limited to, the interest Employee shall have in the Company as outlined in the Operating Agreement, shall be finally settled by arbitration held in San Francisco, California. The Company will pay the fees for the Arbitrator and any other fees, costs or expenses unique to arbitration, including the filing fee, the fees and costs of the Arbitrator, and rental of a room to hold the arbitration hearing. As a requirement for Employment, Employee must execute an Arbitration Agreement.

13. **Remedies.** All rights and remedies provided pursuant to this Agreement or by law shall be cumulative, and no such right or remedy shall be exclusive of any other. A party may pursue any one or more rights or remedies provided by this Agreement or may seek damages or specific performance in the event of another party's breach or may pursue any other remedy by law or equity, whether or not stated in this Agreement.

14. **Counterparts.** This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement as of the day and year written above.

**ONETASTE INCORPORATED**

By: Robert Kandell
Title: COO

**EMPLOYEE**

Lianna Lifson

Job Description

**OneTaste City Director**
Responsible for holding the team in respective city, ensuring all team members are on task, ignited, awake and creating. Provide structure and energy to keep people in motion around daily to-do's and closing cycles, completing projects and fulfillment of tasks.
In the case where the city director and sales leader are held by different people, the city director will work with the sales leader to ensure that enrollment goals and weekly monetary goals are met.
• Responsible for overseeing the city team and tasks
• Responsible for city's weekly sales goal of $xxx/week
• Accountable for the city progress and meeting benchmarks and goals
• Main person in contact with headquarters
• Conduct daily meeting with city staffs
• Ensure daily practices are happening by team members
• Provide structure and planning for hiving to happen
• Ensure city staff write up daily schedule on the EAA
• Ensure city staff meet daily schedule and goals at the end of the day
• Report on the health of the local city to exec team weekly

**OneTaste Sales Leader**
Responsible for holding city's sales goal, and ensure that sales representatives are on task, ignited, awake and creating. Provide structure and energy to keep the sales team in flow around sales goals, attending events, and generating leads.
• Responsible for city's weekly sales goal of $7,500/week
• Oversee the sales team
• Works with sales reps to implement enrollment plan and strategy around lead funnel and cultivation of community members
• Conduct sales meetings as necessary
• Submit daily forecast goals to Sales Manager
• Daily tracking of city's sales
• Make concrete plans for lead gen and sales potential weekly
• Report on the health of sales of local city to exec team weekly
• Make follow up calls to TurnON and course participants within 3 days of event
• Meet daily requirement phone calls of customers
• Meet daily requirement of leads generated
• Familiarity with SalesForce and continue training as needed
• Log and record all calls in SalesForce

**Community Holder**
Responsible for the cultivation of a thriving OM community where members understand and engage with the philosophies of OM and have a solid sustainable practice. Works in tandem with sales and city lead to host OM Day, OM circles and has active participation on OM Hub

• Liaison between OM community members and staff
• Engage with and provide support to community members around OM practice
• Take requests from community members and integrate ideas as necessary
• Listen to community complaints and suggestions
• Make sure OM circles are staffed and held
• Report health of the community to exec team on a weekly basis
• Report to exec team of individuals that may be tumescent bumps

**TurnON Leader**
• Co-lead TurnONs in local city
• Continual education and training of leading TurnONs
• Training and refining of sales pitch
• Greet and interact with participants
• Uphold the integrity of OneTaste philosophies and transmission of orgasm

**OneTaste Course Teacher**
• Teach OneTaste courses in local city
• Continual education and training of OneTaste content as needed for courses
• Deep immersion into the practice and content material
• Greet and interact with participants
• Uphold the integrity of OneTaste philosophies and transmission of orgasm
• Strong personal practice in OM, fear inventory and yoga

**OneTaste Coach and OM Trainer**
• Provide coaching and OM training services to OneTaste clients
• Provide coaching and OM training services to students in major OT programs
• Maintain strong relationship with clients
• Keep attention on clients until the coaching relationship is expired
• Speedy responses to client emails and phone calls
• Keep track of all clients in the Coach Tracker system
• Write regular reports after each coaching session in the Coach Tracker system
• Continue to develop skills as a coach and trainer
• Attend staff and OneTaste Coach Association trainings as scheduled
• Receive reviews on coaching and training skills from senior staff as needed

**Content Writer**
• Write the Mastery book with Chris via daily post to the OM Hub, Mastery content into weekly relationship calls with Alisha
• Write content for TOW material
• Write articles on 3 laws or philosophy of TOW weekly
• Collect 2 stories of TOW weekly from community members

**Production Support**
• Attend TurnONs and provide back of house support
• Back of house support for local city
• Run errands during course weekends
• Handle teachers as requested
• Familiarity with OneTaste courses and curriculum
• Duties include and are not limited to: set up and strike of room, snack and tea preperation, cleaning common area and lavatory, interfacing with participants
• Attend major OneTaste programs in different cities as requested for back of house support
• Handles room and transportation arrangements for executive staff
• Handles room and transportation arrangements for Nicole
• Handles errands and logistics for Nicole

**General Staff Duties**
• Attend daily company calls
• Hive on business threads
• Post daily schedule on the Employee Accountability App
• Keep track of duties and deadlines
• Take on projects and duties as needed
• Receive evaluation on job performances as needed

March 11, 2013

Lianna Lifson
1080 Folsom Street
San Francisco, CA 94013

Dear Lianna,

On behalf of OneTaste Incorporated, (the "Company") I am pleased to confirm our offer to hire you on the terms and conditions described in this letter. It is understood that you will be working under the general supervision of the Company's Chief Operating Officer, Robert Kandell, and will perform such services as are reasonably assigned to you from time to time by him/her or by other appropriate Company management personnel.

You shall receive an initial salary of $2200 per month based on the time actually spent in performing your duties. Your work schedule shall be determined from time to time by Robert. From time to time, your salary may be reviewed and adjusted based upon your performance of your employment duties. In addition to your salary, you shall receive such employment benefits, if any, as are regularly provided to other employees in your job category. The Company does not offer medical insurance or 401(k) or similar retirement benefit programs at this time.

OneTaste also reserves the right to supplement or modify the terms and conditions of your employment at any time in writing and upon reasonable notice.

It is understood and agreed that you are being employed on an "at will" basis as such term is defined under California law. This means that, notwithstanding any other terms of our agreement, your employment is completely voluntary in nature, and will not be for a specific duration or term. Either of us may elect to terminate your employment at any time, without notice or cause. Although we obviously look forward to a long term employment relationship with you, each of us specifically reserves the right to terminate the employment in the event either of us becomes dissatisfied with the relationship for any reason.

Before responding to this offer, please review the enclosed Confidential and Proprietary Information Agreement which further describes the "at will" nature of your employment, affirms that you will not work for a competitor of OneTaste while employed by us, and that you will preserve and protect the Company's trade secrets. The Mutual Agreement to Arbitrate Disputes provides that, in the unlikely event that a dispute arises between us related in any way to your employment, each of us agrees that the dispute will be resolved by binding arbitration. If you have any questions concerning either of the foregoing agreements or any other aspect of this offer of employment, please call me.

If you have any questions concerning any aspect of this offer of employment, please call me. We are very pleased by the prospect of having you with us. We hope you will accept this offer by signing below and returning a copy to me.

Very truly yours,

Robert Kandell
Chief Operating Officer

Acceptance:

I hereby accept your offer of employment with OneTaste Incorporated on the terms and conditions described above.

Lianna Lifson

www.onetaste.us
[illegible]
[illegible] Folsom st. suite [illegible] SF, CA [illegible]

OneTaste®

## CONFIDENTIAL AND PROPRIETARY INFORMATION AGREEMENT

This agreement is made in San Francisco, California by and between **OneTaste Incorporated**, a California corporation (hereafter sometimes referred to as "OneTaste" or the "Company") and **Lianna Lifson** (hereafter referred to as "you" or "your").

This agreement sets forth various terms and conditions related to your employment with OneTaste. By this agreement we wish to memorialize the position of trust and confidence that your employment represents, and to be as clear and straight-forward as possible concerning your obligations and duties both while you are employed with OneTaste and following such employment.

In consideration of the commencement and continuation of your employment with OneTaste, we hereby mutually agree as follows:

1. "At Will" Employment. You are being employed on an "at will" basis as such term is defined under California law. This means that either of us may elect to terminate this agreement at any time without notice or cause. The Company also reserves the right to supplement or modify the terms and conditions of employment at any time in writing and upon reasonable notice.

2. Confidential Information. It is understood and agreed that the Company has and will develop and compile certain proprietary techniques and confidential information concerning the Company's business plans and practices, product formulations, customer relationships, and similar information and trade secrets that have great value to the Company. Such techniques and information are referred to herein as "Confidential Information". As used herein, such term applies not only information disclosed by the Company to its employees in the course of their employment, but also information developed or learned by employees in the course of their employment or directly from Customers. Confidential Information is to be broadly defined, and includes all information that has or could have commercial value in the business in which the Company is engaged. By example, and without limitation, Confidential Information includes any and all information concerning coaching techniques, processes, product formulas, trade secrets, improvements, test results, data, know-how, marketing plans, strategies, unpublished financial information, and projections, as well as customer and supplier identities, preferences, characteristics, and agreements.

3. Protection of Confidential Information. In the course of your employment with the Company, you may become acquainted with various aspects of the Company's Confidential Information. You agree that, except as is required in the course of your employment, you will not disclose any such Confidential Information or trade secrets, directly or indirectly, to any other person or use them in any way, either during the term of this agreement or at any other time thereafter. It is further agreed that all files, records, documents, equipment, and similar items relating to the Company's business, whether prepared by you or others, are and shall remain exclusively the property of the Company.

4. Competitive Activities While Employed By Company. During the term of this agreement you shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage, advise, or participate in any business that is in competition in any manner whatsoever with OneTaste.

5. Duties Following Termination of Employment. We recognize that you have acquired and will continue to acquire valuable personal skills and experience. Following termination of your employment with the Company, you are free to accept employment with other similar businesses or to utilize your personal

skills by starting a similar business of your own. In doing so, however, you agree that you will not use any of the Company's Confidential Information or trade secrets, nor disclose such information, directly or indirectly, to any other person for any reason whatsoever. Any and all documents, customer records, and other data related to the Company and its customers that are in your possession will be returned to the Company promptly.

6. Non-Solicitation of OneTaste Customers and Employees. The Company's customer list and related customer records have been compiled over a significant period of time at great effort and expense. They are among the Company's most highly confidential and valuable trade secrets. In addition to the obligations described above, it is understood and agreed that, while employed by OneTaste, and for a period of one year thereafter, you will not solicit any of the Company's Customers, nor shall you solicit any Company employees to join you in any other business activity.

7. Obligations to Prior Employers / Conflicts. The Company wishes to observe and respect any confidentiality agreements that you may have with prior employers. Consequently, you agree that you will not disclose to OneTaste or use in your work with us any proprietary information or trade secrets of others. You further confirm that you have no other agreements, relationships, or commitments to any other person that conflicts with your obligations to OneTaste under this agreement.

8. Procedure For Resolution of Disputes. In the event any controversy or claim arises between us relating in any way to this agreement or to your employment by OneTaste, we will try to resolve such differences amicably. We urge you to discuss the facts and state your concerns promptly and frankly to the Company's management. Most issues can be worked out at this level just by getting them out in the open. If you are not satisfied with management's handling of your concern, you should file a formal written complaint with the Company describing the dispute in detail. All formal complaints should be submitted directly to the Company's president or secretary within 15 work days of the event giving rise to the dispute.

9. Arbitration. If a dispute is not resolved to your satisfaction within 20 days of submission of your formal written complaint, you may refer the matter to final and binding arbitration by submitting a request for arbitration to the Company's president. Any unsettled complaint that is not referred to arbitration within one year will be considered dropped and no further action will be taken by either party. Arbitration shall be conducted by the American Arbitration Association in accordance with its Employment Dispute Resolution rules and the terms of our separate "Mutual Agreement to Arbitrate Disputes". *By entering into this agreement both parties acknowledge and agree that binding arbitration shall be the exclusive method for resolving any disputes that may arise between them related in any way to their employer-employee relationship, and they expressly waive their entitlement to have such controversies decided by a court or a jury.* Notwithstanding the foregoing, this provision does not apply to workers' compensation claims or suits for injunctive relief which shall be administered in a normal manner in accordance with prevailing state law.

10. Injunctive Relief. The parties acknowledge that the misuse of Confidential Information in violation of this agreement cannot be reasonably or adequately compensated in damages and is likely to cause the Company irreparable harm. Consequently, we agree that the Company will be entitled to injunctive relief to enforce this agreement in addition to damages and all other available remedies.

11. Effect of Waiver. The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this agreement shall not be deemed a waiver of that term, covenant, or condition, nor shall any waiver or relinquishment of any right or power at any one time or times be deemed a waiver or relinquishment of that right or power for all or any other times.

12. Entire Agreement - Modification - Severability. This agreement supersedes any and all other agreements, either oral or in writing, between the parties with respect to the specific employment matters discussed herein. Any modification of this agreement will be effective only if it is in writing signed by the party to be charged. If any provision of this agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force without being impaired or invalidated in any way.

Executed on March 11, 2013, at San Francisco, California.

OneTaste Incorporated
1072 Folsom Street, Suite 483
San Francisco, California 94103

By ______________________
Robert Kandell, COO

Lianna Lifson
1080 Folsom Street
San Francisco, CA 94013

______________________
Lianna Lifson

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

GOVERNMENT EXHIBIT
3767
23-CR-146 (DG)

# SEPARATION AGREEMENT AND GENERAL RELEASE

**NOTICE: YOU SHOULD THOROUGHLY REVIEW AND UNDERSTAND THE TERMS, CONDITIONS AND EFFECT OF THIS GENERAL RELEASE. YOU ARE ADVISED TO CONSULT WITH AN ATTORNEY BEFORE YOU SIGN THIS GENERAL RELEASE.**

This Separation Agreement and General Release ("Agreement" or "Release") is made by and between OneTaste Incorporated ("OneTaste") and you, Rachel Cherwitz, to settle all claims and issues that you have, or could have, arising out of or in any way related to the acts, transactions or occurrences between you and OneTaste to the date you sign this Agreement including, but not limited to, your employment with OneTaste or the termination of that employment, on the terms set forth below. You and OneTaste (together, the "Parties") agree to the following terms in exchange for your mutual promises and obligations in this Agreement.

1. **Last Day of Employment**: Your last day of employment with OneTaste ("Separation Date") shall be the date May 11, 2018. Whether you enter into this Agreement or not: (a) You will be paid your salary and full benefits through your Separation Date; (b) you will be paid for any accrued and unused vacation as of your Separation Date; and (c) if you are enrolled in OneTaste's medical and dental insurance program as of your Separation Date, you and/or your eligible dependents may elect to continue medical and dental insurance coverage after your separation from employment at your own expense pursuant to a federal law known as COBRA. You will receive under separate cover information and enrollment forms regarding continuing insurance coverage pursuant to COBRA.

2. **Termination Payments**: Provided that you sign and return this Agreement and observe its terms, following your Separation Date, OneTaste will, provided that you sign and return this Agreement, and observe its terms, following your Separation Date, pay you the gross amount of $70,000.00, as Severance Pay, for twelve (12) months in monthly increments of $5,833.33 on the 15th day of each month.

3. **Withholding on Payments**: Taxes, applicable withholding and authorized or required deductions will be deducted from all payments to you.

4. **No Other Payments**: You understand and agree that absent this Agreement, you would not otherwise be entitled to the Severance Pay listed in Section 2 of this Agreement. Further, by signing this Agreement, you agree that you are not entitled to any other payments, benefits and/or other consideration from OneTaste that is not specifically listed in this Agreement. In addition, except as otherwise stated in this Agreement, you hereby expressly waive any right or claim that you may have or assert to employment or reinstatement to employment, and/or to payment for back pay, front pay, interest, bonuses, damages, benefits, outplacement, severance pay, and/or attorneys' fees, except for those qualified retirement benefits in which you have vested rights under the terms of the plan and applicable law. You further agree and acknowledge that once OneTaste has provided you your salary through your Separation Date, your accrued unused vacation, and your payments and other consideration set forth in this Agreement, OneTaste will have paid you in full any and all monies owed to you in connection with your

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

employment with OneTaste and separation from employment, including but not limited to payment for all services performed on behalf of OneTaste through your Separation Date, except as otherwise specifically stated in this Agreement.

5. **General Release of All Claims**: Except as otherwise specifically stated in Sections 6 and 7 of this Agreement:

(a) You, in exchange for OneTaste's payments and other consideration set forth in this Agreement, release OneTaste, and its current and former parents, subsidiaries, divisions, joint ventures, partnerships and/or affiliated entities, their predecessors, successors and assigns, present and/or former officers, directors, trustees, managers, supervisors, employees, shareholders, agents, representatives, and employee benefit or pension plans or funds (and the trustees, administrators, fiduciaries and insurers of such plans or programs) (referred to in this Agreement as "Releasees") from any and all claims that may legally be waived by private agreement, known or unknown, including but not limited to those related to your employment, your separation from employment or otherwise, from the beginning of time through the date that you sign this Agreement. You agree that any persons acting by, through or under you, such as your spouse, heirs, executors, administrators, representatives and assigns, are also bound by your release of claims.

(b) You understand and agree that you are releasing Releasees from any and all claims and potential claims that may legally be waived by private agreement, including but not limited to: (i) such claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Acts of 1866, 1871 and 1991, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Federal Rehabilitation Act, the Family and Medical Leave Act, the Equal Pay Act, the Genetic Information Non-Discrimination Act, the Immigration Reform and Control Act, Sections 503 and 504 of the Rehabilitation Act of 1973, the Worker Adjustment Retraining and Notification Act, the Fair Credit Reporting Act, The Sarbanes-Oxley Act of 2002, and The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, all as amended; (ii) such claims under the New York State Human Rights Law, the New York State Labor Law, the New York Civil Rights Law, the New York City Human Rights Law, the New York City Administrative Code, the New York Whistleblower Law, the New York Code of Rules and Regulations, the New York Paid Family Leave law, all as amended, and all other federal, state and local anti-discrimination, labor or employment laws, regulations or orders, as well as the laws of any other country, to the extent that they may be waived by private agreement; (iii) such claims relating to or arising out of any work you have done for OneTaste in any capacity, your employment, the terms and conditions of your employment and/or your separation from employment, including but not limited to statutory claims and claims in common law or in equity, including, without limitation, claims for discrimination, harassment, retaliation, whistle-blowing, breach of contract (oral or written, express or implied), detrimental reliance, breach of policy or practice, constructive discharge, wrongful discharge, negligence, emotional distress, and all torts, including any intentional torts, such as defamation; (iv) such claims subject to federal, state and local occupational safety and health laws and regulations; (v) such claims under any other federal, state or local Constitution, statute, regulation, agreement, order or duty or those of any other country; (vi) such claims concerning or based on the adequacy of your compensation or remuneration, including incentive payments, or claims for benefits, including but not limited to claims under the Fair Labor Standards Act, to the extent such claims are waivable; and (vii) any claims for relief of any kind, including but not limited to claims for back

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

pay, front pay, compensatory or punitive damages, reinstatement or other equitable relief, injunctive or declaratory relief, attorneys' fees, costs, disbursements and/or the like. You understand that the claims you are releasing include, but are not limited to, any claims of discrimination, harassment or retaliation that you have made in any performance reviews, emails, conversations or meetings with OneTaste's executive team or human resources department, or any other such assertions you have made against OneTaste during your employment. You acknowledge that any such claims are fully and completely settled and satisfied by the terms of this Agreement including the Severance Payments that will be made to you.

6. **<u>Claims Not Released:</u>** Under this General Release, you are not waiving any claims or rights (i) that may arise after the date that you sign this Agreement, (ii) for breach of this Agreement, (iii) for reimbursement of business expenses incurred on behalf of OneTaste under OneTaste's expense reimbursement policies, (iv) for rights under any of OneTaste's ERISA-covered employee benefit plans applicable to you and vested on the date you sign this Agreement, (v) any claims that controlling law clearly states may not be released by private settlement, including but not limited to claims for Worker's Compensation benefits for job-related illness or injury or for unemployment insurance and/or (vi) to challenge the validity of this General Release under the Older Workers Benefit Protection Act (OWBPA).

7. **<u>No Interference with Rights:</u> You also understand that nothing in this Agreement -- including but not limited to the provisions of Section 5 regarding the release and waiver of claims, Section 8, concerning claims filed, Section 10 concerning cooperation, Sections 11 and 12 concerning confidential information and the return of OneTaste property, and Section 14 concerning negative statements -- prevents you from filing a charge or complaint with, or voluntarily participating in an investigation or proceeding conducted by, the Equal Employment Opportunity Commission (EEOC), the National Labor Relations Board (NLRB), the U.S. Department of Labor (DOL), the Securities and Exchange Commission (SEC), the Occupational Safety and Health Administration (OSHA), or any other federal, state or local agency charged with the enforcement of any laws. Further, the Parties agree that nothing in this Agreement shall be construed to interfere with (i) the ability of any federal, state or local government agency to investigate any such charge or complaint, (ii) your ability to communicate voluntarily with, including providing documents or other information to any such agency, and/or (iii) your ability to provide truthful testimony in any court, administrative agency and/or arbitration proceeding. However, by signing this Agreement you are waiving your right to individual relief based on claims asserted in such a charge or complaint, regardless of whether you or another party has filed it, to the extent allowed by law, and agree that the severance you will receive as provided in this Agreement fully and completely satisfies any and all such claims, except for any right you may have to receive a payment from a government agency (and not OneTaste) for information provided to the government agency. Nothing in this Agreement, including the sections listed above, shall be interpreted or enforced in a manner that would interfere with your rights under the National Labor Relations Act, if any, to discuss or comment on your terms and conditions of employment or engage in other protected concerted activities.**

8. **<u>No Claims Filed</u>:** Except as otherwise provided in Sections 6 or 7 of this Agreement, you agree not to file any charge, action, suit, complaint, claim, grievance, demand for arbitration or other proceeding against any of Releasees, either individually or as a member of a class in any

class or collective action, in any court or other forum with regard to any claim, demand, liability, obligation or matter arising out of your employment with OneTaste, separation from employment or otherwise. Except as otherwise provided in Sections 6 and 7 of this Agreement, you hereby represent that no action, suit, complaint, claim, grievance, demand for arbitration or other proceeding is pending against any of the Releasees in any court or other forum relating directly or indirectly to your employment with OneTaste, separation from employment with OneTaste, or otherwise.

9. **<u>Dispute Resolution</u>:** The Parties agree that should any controversy or claim arise out of, or relating to this Agreement or the making, performance, or interpretation of it, they will attempt to settle said dispute informally and in good faith (including, but not limited to, mediation or informal settlement negotiations). However, should such informal efforts to resolve any dispute fail after thirty days, any disputes (except actions to obtain dismissal of actions filed in court in contravention of this arbitration provision, to seek injunctive relief as may be allowed by state or federal law, or to confirm, enter and enforce the arbitrator's decision) shall exclusively be settled by binding arbitration in New York, New York, before an arbitrator, and not by way of a court or jury trial, under the arbitration rules of the American Arbitration Association or JAMS then existing. Judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy. A demand for arbitration must be in writing and delivered by hand, first class mail, or overnight delivery to the other party within the applicable statute of limitations period. Each Party shall pay the fees for her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. Costs incidental to the arbitration, including the cost of the arbitrator, will be borne by the Company and Employee equally unless otherwise required by applicable law.

10. **<u>Cooperation:</u>** You agree to be reasonably available to OneTaste to respond to reasonable requests for information pertaining to OneTaste's business that may be within your knowledge. Except as otherwise stated in Sections 6 or 7 of this Agreement, you agree to cooperate with OneTaste in connection with any pending or future litigations, depositions or investigations brought by or against OneTaste or any of the Releasees, and that if you are subpoenaed in connection with any litigation or investigation involving OneTaste, you will immediately notify OneTaste and provide it an opportunity to respond before taking any action or making any decision in connection with such subpoena. This Section shall not require you to cooperate with OneTaste with respect to any charge or litigation or any confidential investigation by a government agency in which you are a plaintiff or complaining party, or a witness for or providing support to a charging or complaining party.

11. **<u>Confidential Information and Return of OneTaste Property</u>**:

(a) Except as otherwise provided in Sections 6 or 7 of this Agreement, you agree that you shall not retain, use and/or disclose any confidential and/or proprietary information you learned or acquired while employed by OneTaste ("Confidential Information"). As used herein, Confidential Information applies to the Company's proprietary information currently in existence or to be created in the future that satisfies the following three criteria: (i) information disclosed to or known by Employee in the course of his/her employment, (ii) information not generally known to others outside the Company; and (3) information, observations, and data that relate to the trade secrets or otherwise to the organizational structure, systems, manuals, procedures, databases, policies and company standards, written directives, nicknames or observations shared

in the workplace that may be material for any publication, drawings, designs, equipment, development efforts and methodologies, testing, personal interactions between employees, engineering, marketing, sales, finances or operations (including without limitation any processes, formulae, methods, techniques, devices, know-how, sales and prospecting processes, permitting information or timelines, coaching techniques, coaching materials, tests, engineering processes, customer lists, sales statistics, tactics and projections, marketing strategies and plans, and personnel and client information or data) of the Company (or of any other party that entrusted the Company such information in confidence), and any other processes, formulae, methods, techniques, devices, know-how, engineering processes, client and vendor lists, client or vendor or potential client or vendor databases and information, sales statistics, tactics and projections, marketing strategies and plans, and personnel information or data made available by the Company which is (i) designated as confidential; (ii) known by Employee to be considered confidential by the Company; or (iii) by its nature inherently or reasonably considered confidential. You further promise that, except as permitted by Sections 6 or 7 of this Agreement that (1) you shall not directly or indirectly use, disclose, reproduce, sell, retain, remove from the premises, make available to any other person or entity, or use for your own or for any other person or entity's benefit, any portion of the Confidential Information, and (2) you shall not use any such Confidential Information to damage OneTaste, its interests or its clients, or any other person or entity with whom OneTaste does business.

(b) By signing this Agreement, you certify that, except as permitted by Sections 6 or 7 of this Agreement: (i) you have returned to OneTaste any and all Confidential Information and all other materials, documents and/or property belonging to OneTaste and/or any of its affiliated entities, including the originals and any and all copies thereof, whether in hard copy or electronic form, which were in your possession or under your control, including without limitation files, documents, lists, records, manuals, reports, software and hardware, laptops, printers, computers, cell phone, iPhone, tablet, or other PDA, keys, equipment, identification cards, access card, corporate credit cards, mailing lists, personnel information, electronic information and files, computer print-outs, and computer disks, and external drives, (ii) you have not retained any copies of any Confidential Information and/or any other materials, documents and/or property belonging to OneTaste and/or any of its affiliated entities, (iii) you have permanently deleted all Confidential Information from your home and/or personal computer drives and from any other personal electronic, digital or magnetic storage devices except as directed by an "litigation hold" or preservation instructions and that you will preserve any and all such information as required in such "litigation hold" or preservation instructions**,** and (iv) you agree that you continue to be bound by any and all obligations concerning the nondisclosure of trade secrets and confidential and/or proprietary information, prohibiting solicitation of employees, prohibiting competition with OneTaste and/or assigning intellectual property, contained in any agreements you have entered into with OneTaste or in any of OneTaste's personnel manuals or policy statements that were applicable to you, or under applicable law.

12. **Confidentiality of Agreement**: Except as permitted in Sections 6, 7, 13, and in this paragraph, you agree that the terms of this Agreement are confidential. Except as otherwise provided in Sections 6 and 7 of this Agreement, you shall keep the terms of this Agreement strictly confidential and shall not tell anyone, including but not limited to any current, former or future employees of OneTaste, about the existence of this Agreement or disclose any information contained in this Agreement, except that you may state that you have resigned and that you and

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

OneTaste have reached mutually agreeable terms regarding your separation from OneTaste's employment. Notwithstanding these restrictions, you may disclose such information to your immediate adult family members, lawyer, financial advisor, and/or as required by law in connection with a legal proceeding and/or governmental investigation. If you do tell your immediate adult family members, lawyer, and/or financial advisor about this Agreement or its contents, you must immediately instruct the person to whom the disclosure is made that the information disclosed must be kept strictly confidential. Nothing in this Agreement shall prevent you from disclosing to any person that you are subject to the confidentiality and non-solicitation obligations contained in Sections 11, 12 and 14 of this Agreement.

13. **Defend Trade Secrets Act Notice**. You acknowledge that you hereby received notice that under the 2016 Defend Trade Secrets Act (DTSA): (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (A) is made in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and, (2) an individual who pursues a lawsuit for retaliation by the employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

14. **Non- Solicitation**

(a) You acknowledge that you were employed in a position of trust and subject to a duty of loyalty to OneTaste, and that by reason of your employment and service to OneTaste, you have acquired and have had access to OneTaste's Confidential Information (as defined above), which is a valuable, special and unique asset, the unauthorized disclosure or use of which could cause substantial injury and loss of profits and goodwill to OneTaste. You further agree that, to protect such Confidential Information and OneTaste's good will and investment in its employees and business, it is in OneTaste's legitimate business interest to restrict your disclosure or use of Confidential Information for any purpose other than in connection with the performance of your duties for OneTaste, to limit any potential misappropriation of such Confidential Information, and to reasonably restrict certain of your activities for a certain period following your employment, as more fully set forth in Sections 11 and 12. You therefore agree that, for a period of one year after your Separation Date:

(b) You will not directly or indirectly, as an employee, agent, consultant, equity holder, director, manager, partner, officer, stockholder, individual proprietor, joint venturer, or in any other individual or representative capacity, solicit, divert or take away (or attempt to solicit, divert or take away): (i) any clients of OneTaste whom you provided direct, substantive services for, worked with, developed a relationship with, had any substantial contact or involvement with, or obtained Confidential Information about, during your employment with OneTaste, or (ii) any prospective clients of OneTaste with whom you developed a business relationship with, had any substantial contact or involvement with on behalf of OneTaste, or obtained Confidential Information about, during your employment with OneTaste;

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

(c) You will not directly or indirectly, as an employee, agent, consultant, equity holder, director, manager, partner, officer, stockholder, individual proprietor, joint venturer, or in any other individual or representative capacity, solicit, recruit, hire, or retain for employment or engagement (including as a consultant) (or attempt to solicit, recruit, hire or retain), any OneTaste Employee, or otherwise seek to influence, interfere with or alter any such person's relationship with OneTaste. For purposes of this Agreement, "OneTaste Employee" means any person who is (or was during the one-year period before the conduct prohibited by this paragraph occurs) an employee of OneTaste.

(d) You will not directly or indirectly, as an employee, agent, consultant, equity holder, director, manager, partner, officer, stockholder, individual proprietor, joint venturer, or in any other individual or representative capacity (a) maliciously or willfully interfere or attempt to interfere with, or maliciously or willfully hinder, or use any Confidential Information to interfere or attempt to interfere with or hinder, any of OneTaste's contracts or relationships with any of OneTaste's customers, clients, business partners, referral sources, suppliers or vendors, or prospective customers, clients, business partners, referral sources, suppliers or vendors, with whom you had any contact or involvement on behalf of OneTaste, or about whom you had Confidential Information, during your employment with OneTaste, or (b) solicit, persuade, induce, encourage, entice or recruit any client, customer, business partner, referral source, supplier or vendor of OneTaste to terminate or otherwise restrict, limit, reduce or modify its or their contractual or other relationship or business dealings with OneTaste or any of its officers, directors, employees, or agents.

(e) You represent and warrant that the provisions of Sections 11, 12, and 14 of this Agreement will not substantially impair your ability to earn a livelihood, nor will such provisions cause you any undue hardship. In the event of a breach or threatened breach by you of any of the provisions of Sections 11, 12, or 14 of this Agreement, you agree that OneTaste shall have the right to provide a copy of this Agreement to any third-party affected by such breach or threatened breach.

15. **No Negative Statements**: Except as otherwise provided in Sections 6 and 7 of this Agreement, you agree that you shall not make, directly or indirectly, to any person or entity, including but not limited to OneTaste's present, future, and/or former employees, and/or the press, any negative or disparaging oral or written statements about Releasees or your employment with and/or separation from employment with OneTaste, do anything which damages Releasees or any of its and/or their services, reputation, good will, financial status, or business or client relationships, or assist any other person, firm, entity or company in so doing. Written statements include, but are not limited to, posts made on social and professional networking sites, including, but not limited to, Facebook, Glassdoor, LinkedIn, Twitter, Instagram, or any other internet site, message boards, blogs, listservs, websites, Web forums, or similar electronic media and platforms.

16. **Breach of Agreement:** You agree and acknowledge that the commitments you are making in Sections 10, 11, 12, 14 and 15 of this Agreement are reasonable and necessary for the protection of OneTaste's legitimate business interests, and that you fully understand and freely enter into these covenants. Except as otherwise provided in Sections 6 and 7 of this Agreement, you further acknowledge and agree that OneTaste would be irreparably injured by a violation by you of Sections 10, 11, 12, 14, and/or 15 of this Agreement, and you agree that in the event of

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

any such breach or threatened breach, OneTaste shall, in addition to any other remedies available to it, be entitled to: (i) a temporary restraining order and/or preliminary and/or permanent injunction, or other equivalent relief, restraining you from any actual or threatened breach of Sections 10, 11, 12, 14, and/or 15 of this Agreement, (ii) cease further payments pursuant to Section 2(a) of this Agreement and/or recover any payments already made, (iii) recover damages from you, plus reasonable attorneys' fees and costs, and (iv) you shall remain bound by your obligations in this Agreement, including but not limited to your release of claims in Section 5. These injunctive remedies are cumulative and in addition to any other rights and remedies OneTaste may have.

17. **<u>No Admission of Wrongdoing</u>**: By entering into this Agreement, neither of the Parties admits, and each specifically denies, any liability, wrongdoing or violation of any law, statute, regulation, agreement or policy, and it is expressly understood and agreed that this Agreement is being entered into solely for the purpose of amicably resolving any and all matters in controversy, disputes, causes of action, claims, contentions and differences of any kind whatsoever between the Parties. You acknowledge that you have not made any prior allegations of sexual harassment against OneTaste and that this Agreement is therefore not made in settlement of a prior claim of sex harassment.

18. **<u>Governance</u>**: This Agreement shall be governed by and construed under New York law without regard to its choice of law principles, except as it may be preempted by federal law.

19. **<u>Use of Agreement in Subsequent Proceedings</u>**. You further agree that this Agreement may be used as evidence in a proceeding in which OneTaste or you allege a breach of this Agreement, or to assert a complete or partial defense to any lawsuit, arbitration or claim, and may be used as a basis for an injunction against, any action, suit or other proceeding that may be prosecuted, instituted or attempted by you in breach of this Agreement. Other than this exception, you agree that neither will offer nor introduce this Agreement as evidence in any administrative proceeding, arbitration or lawsuit.

20. **<u>Severability</u>:** The Parties agree that in the event that any provision of this Agreement is judicially declared to be invalid or unenforceable, only such provision or provisions, except for the General Release, shall be invalid or unenforceable without invalidating or rendering unenforceable the remaining provisions hereof, which shall remain in full force and effect to the fullest extent permitted by law.

21. **<u>Entire Agreement</u>**: This Agreement contains the entire agreement between you and OneTaste and supersedes and replaces any prior agreements or understandings between you and OneTaste, whether written or oral (including the Separation Agreement and General Release executed on May 13, 2018 which contained an error in clause 2 Termination Payments which is rectified in this agreement), and any and all other obligations concerning the nondisclosure of trade secrets and confidential and/or proprietary information, prohibiting solicitation of employees, prohibiting competition with OneTaste, and/or assigning intellectual property, contained in any agreements you have entered into with OneTaste or in any of OneTaste's personnel manuals or policy statements that were applicable to you, or under applicable law, to the extent permitted by law.

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

22. **Drafting and Modification**: The Parties agree that this Agreement shall be construed without regard to who drafted it, and shall be construed as though each party participated equally in its preparation and drafting. This Agreement shall not be modified, altered, or discharged except by written agreement signed by an authorized OneTaste representative and you.

23. **Enforcement**: The failure of either party to insist upon strict adherence to any term of this Agreement shall not be considered a waiver of that term or of any other term of this Agreement, and shall not deprive that party of the right to later insist upon strict adherence to that term or any other term of the Agreement.

24. **Voluntary Agreement and Advice of Counsel**: By signing this Agreement, you acknowledge that:

(a) You have carefully read, and understand, this Agreement;

(b) You acknowledge that you have consulted with an attorney of your choice before signing this Agreement, and that this Agreement is the product of negotiations between your attorney and legal counsel for OneTaste;

(c) You understand that this Agreement is legally binding and, except as otherwise provided in Sections 6 and 7 of this Agreement, by signing it you give up certain rights, including your right to pursue any claims you had, have or may have had against the Releasees;

(d) You have voluntarily chosen to enter into this Agreement and have not been forced or pressured in any way to sign it;

(e) You have not relied upon any representation, statement or omission made by any of OneTaste's agents, attorneys or representatives with regard to this Agreement, or the basis or effect of this Agreement or otherwise, other than those expressly stated in this document;

(f) Except as otherwise provided in Sections 6 and 7 of this Agreement, you have knowingly and voluntarily released Releasees from any and all claims you may have, known or unknown, in exchange for the payments and other consideration you obtain by signing this Agreement, and acknowledge that these payments and other consideration are in addition to any that you would have otherwise received if you did not sign this Agreement;

(g) You (i) have reported to OneTaste any and all work-related injuries incurred by you during your employment by OneTaste; and (ii) have been properly provided any leave of absence because of any health condition or military service of you or a family member, and have not been subjected to any improper treatment, conduct or actions due to a request for or taking such leave; and

(h) This Agreement does not waive any rights or claims that may arise after you sign this Agreement.

25. **Return of Signed Agreement**: You must return the signed Agreement to OneTaste c/o Kevin Williams, Director of Compliance, OneTaste Incorporated, 1446 Market Street, San Francisco, California, 94102 (kevin.williams@onetaste.us), no later than three (3) days after you receive it.

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

26. **Headings**: The headings in this Agreement are for reference only, and shall not in any way affect the meaning or interpretation of this release.

27. **Counterparts:** This Agreement may be signed in counterparts and the counterparts shall be treated as though signed as one document.

[Signatures appear on following page]

DocuS gn Enve ope ID: 2163244E-47C6-431B-9961-55553F10ADB8

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed on the date below noted.

**OneTaste Incorporated**

DocuSigned by:
By: Anjuli Ayer
6D0B992FBF4041E...

5/14/2018
Date

**Anjuli Ayer**
**Director**
**Vice President, Sales and Marketing**

**I have read and understand the General Release set forth above. I agree to accept the consideration stated above and agree to be bound by the terms of this General Release**.

DocuSigned by:
C3208FFE5BB941F...
**Rachel Cherwitz**

5/14/2018
Date

Firmwide:154615504.1 085809.1000

GOVERNMENT EXHIBIT
3768
23-CR-146 (DG)

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made as of the 1st day of October, 2013 by and between OneTaste Incorporated (the "Company") on behalf of its past and present officers, subsidiaries, related corporations or entities, owners, principals, stockholders, partners, directors, agents, managers, members, contractors, successors, predecessors, insurers, assigns, affiliates and representatives (collectively "Affiliates") and Becky Uma, behalf of him/herself, his/her agents, heirs, executors and assigns ("Employee").

**WHEREAS**, the Company and Employee wish to enter into a formal employment contract, which will govern the terms and conditions applicable to Employee's employment with the Company and will provide certain severance benefits for Employee in exchange for the Employee's agreement to abide by the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, the parties agree as follows:

## PART ONE — TERMS AND CONDITIONS OF EMPLOYMENT

71. **Duties and Responsibilities**.

A. Employee shall serve as Sales Representative and shall report directly to Rachel Cherwitz. Employee shall perform the responsibilities of his/her position, as indicated in Exhibit A hereto, including such duties and functions as may be reasonably assigned to Employee from time to time.

B. Employee agrees to use his/her best efforts to advance the business and welfare of the Company, to render his/her services under this Agreement faithfully, diligently, competently and to the best of his/her ability. Employee agrees that he/she will not engage in other employment that either interferes with his/her services rendered to Company pursuant to this Agreement or competes with Company's business endeavors, while employed by the Company.

C. Employee represents that he/she has the qualifications and skills necessary to perform the services contemplated in this Agreement in a competent, professional manner, without detailed advice or direction from the Company. But for this representation, Company would not otherwise engage Employee for the services contemplated in this agreement.

72. **Period of Employment**. Employee's employment with Company shall be governed by the provisions of this Agreement commencing October 1, 2013, or the first date that services were performed for the Company, whichever is earlier (such date, the "Effective Date") and will continue for twelve (12) months, unless terminated earlier by either party with or without cause. Employee's employment shall be "at will" and may be terminated by either the Company or Employee for any reason. The period during which Employee's employment continues in effect shall be referenced as the "Employment Period."

73. **Base Pay.**

A. Employee shall be paid a base salary of $1,500 per month based on a part time work schedule (hereinafter "Base Pay") during the Employment Period.

B. The Company shall review Employee's Base Pay annually for potential adjustments but no increases are guaranteed. In the event of any increase as permitted by this Section 3.B., the increased amount in effect at that time shall become the new Base Pay for all purposes. Employee's Base Pay shall be paid at periodic intervals in accordance with the Company's payroll practices for salaried employees.

C. Company shall deduct and withhold from the compensation payable to Employee, including but not limited to Employee's Base Pay, any and all applicable Federal, State and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable statutes, regulations, ordinances or orders governing or requiring the withholding or deduction of amounts otherwise payable as compensation or wages to employees. Company shall also deduct such amounts as may be authorized by Employee from time to time in writing and as permitted by law.

74. **Termination of Employment.**

A. Employee's employment may be terminated by either the Company or Employee at any time, for any reason, with or without Cause (as defined herein), upon written notice specifying the Effective Date of Termination, and without additional compensation, except as otherwise provided in Section 5. The Effective Date of Termination specified in the written notice may be immediate.

B. For purposes of this Agreement, termination for "Cause" shall mean the involuntary termination of the Employee's employment by the Company for any of the following reasons:

(i) Employee's conviction or entry of a plea of guilty in, a court of competent jurisdiction for any felony or misdemeanor;

(ii) The material breach of this Agreement by Employee which, if curable, Employee fails to cure within thirty (30) business days following written notice from the Company;

(iii) Employee's commission of any act of fraud, misappropriation or embezzlement in connection with his/her employment by the Company;

(iv) Employee is unable to perform the essential functions of his/her job for sixty (60) consecutive days in any twelve (12) month period;

(v) Employee's lack of experience or sub-par performance. If it is discovered that Employee does not have the experience or expertise to perform the duties contemplated in this agreement to the satisfaction of the Company or if Employee fails to perform at a standard expected by and acceptable to Company, Company will give Employee written warning of such sub-par performance and will give Employee thirty (30) days to improve his/her performance to a standard acceptable to Company. If after the thirty (30)-day probationary period Employee's performance has not improved, Employee's employment with Company may be terminated for Cause.

(vi) Employee's death.

An involuntary termination of Employee's employment by the Company in any other circumstances or for any other reason will be a termination "Without Cause."

**C.** The "Effective Date of Termination" shall be: (i) in the case of termination due to death, the date of Employee's death, or (ii) in the case of any other termination, the date of Employee's separation from service, within the meaning of Section 409A of the Internal Revenue Code, as amended (the "Code"), from the Company and its subsidiaries or affiliates (the "Separation from Service") specified in the written notice required by this Section.

**D.** On the Effective Date of Termination, Employee shall be paid all Base Pay earned through the end of the Employment Period, any unpaid business expenses, and any accrued but unused vacation earned through the Effective Date of Termination. Unless Employee is entitled to severance benefits under Section 5, he/she shall not be entitled to any compensation or benefits following the Effective Date of Termination, except as required by law.

**E.** Employee shall resign from Employee's position(s) with the Company and as employee, officer or director, as applicable, with the Company or any of its subsidiaries or Affiliates, effective as of the Effective Date of Termination.

**F.** In the unlikely event that the Company is sold, Company agrees to give Employee ten (10) days' notice of said sale.

**PART TWO — SEVERANCE BENEFITS**

**75. Severance Entitlement.**

**A.** Employee shall be entitled to receive the severance benefits specified in Section 5.B. in the event that the Company terminates Employee's employment Without Cause or With Cause, except where the termination for Cause is pursuant to Section 4.B.(i), 4.B.(iii) or 4.B.(vi). Employee shall also be entitled to receive the severance benefits specified in Section 5.B. in the event that Employee resigns.

All severance payments made to Employee pursuant to Section 5 shall be subject to all applicable withholding requirements.

B. In the event Employee's employment terminates under the conditions described in Section 5.A., Employee shall be entitled to severance benefits of:

(1) Two (2) weeks' pay at Employee's regular rate of pay at the time of separation, paid in accordance with standard payroll practices.

Notwithstanding anything to the contrary contained herein, Employee's employment with the Company shall be "at will." Employment with the Company is on an at-will basis and for no specified time period. Employee is free to terminate his/her employment at any time with or without prior notice or cause. Similarly, the Company may terminate the employment relationship or change any term of employment with or without cause or notice and no guarantee of any severance benefits shall exist at that time.

C. The severance benefits provided Employee under this Paragraph 5 are the only severance benefits to which Employee is entitled upon the termination of his/her employment with the Company during the applicable time period, and no other benefits shall be provided to Employee by the Company pursuant to any other severance plan or program of the Company, except as required by applicable law or in Company's sole discretion. Employee acknowledges and agrees that but for his/her execution of this Agreement, he/she would not be entitled to such benefits. Receipt of said severance benefits are contingent upon Employee's execution of a confidential separation release and waiver by which Employee releases Company of any and all potential claims, known or unknown, which Employee may have against Company regarding the employment relationship between the parties as well as a non-disparagement agreement and adherence to the non-solicitation provision of this Agreement.

**PART THREE — MISCELLANEOUS PROVISIONS**

**76. Successors and Assigns.** The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the Company, its successors and assigns. This Agreement shall inure to the benefit of and be enforceable by Employee's personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees.

**77. Indemnification.** The Company shall indemnify the Employee to the fullest extent permitted under the law resulting from the Employee's good faith performance of the Employee's duties and obligations with the Company. In addition, the Company shall indemnify the Employee for any and all activity performed by the Company, its officers, employees, managers or representatives prior to the Effective Date.

**78. Notices.**

A. Any and all notices, demands or other communications required or desired to be given by any party shall be in writing and shall be validly given or made to another party if served either personally or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice, demand or other communication shall be served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is given by overnight delivery, it shall be conclusively deemed given the day after it was sent addressed to the party to whom such notice, demand or other communication is to be given. If such notice, demand or other communication

is given by mail, it shall be conclusively deemed given two (2) days after it was deposited in the United States mail addressed to the party to whom such notice, demand or other communication is to be given. The address for notice for each of the parties shall be as follows:

To the Company:

347 9th St., Suite 483
San Francisco, CA 94103

To Employee:

Becky Uma
159 W. 118th St.
New York, NY 10026

**B.** Both parties agree that if notice is by mail, then in good faith, the party giving notice will attempt to contact the other by their last known phone number and email address, to ensure notice was received.

**C.** Any party may change its address for the purpose of receiving notices, demands and other communications by a written notice given in the described manner to the other party.

**79. Governing Document.** Except as otherwise provided or referenced herein, this Agreement constitutes the entire agreement and understanding of the Company and Employee with respect to the terms and conditions of Employee's employment with the Company and the payment of severance benefits, if applicable, and supersedes all prior and contemporaneous written or verbal agreements and understandings between Employee and the Company relating to such subject matter. This Agreement may only be amended by written instrument signed by Employee and an officer of the Company specifically authorized for such purpose. Any and all prior agreements, understandings or representations relating to the Employee's employment with the Company are terminated and cancelled in their entirety and are of no further force or effect. However, Employee will be bound by the Company's Employee Handbook and other policies and said document will be read in conjunction with this Agreement.

**80. Governing Law.** The provisions of this Agreement will be construed and interpreted under the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

**81. Construction.** The normal rule of construction that any ambiguity or uncertainty in a writing shall be interpreted against the party drafting the writing shall not apply to any action on this Agreement.

**82. Arbitration.** The parties agree that should any controversy or claim arise out of, or relating to Employee's employment with the Company, this agreement or the making, performance, or interpretation of it, they will attempt to settle said dispute informally and in good faith (including but not limited to mediation or informal settlement negotiations). However, should such informal efforts to resolve any dispute fail after thirty days, any disputes

shall be settled by arbitration in California under the employment arbitration rules of the American Arbitration Association then existing, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.

Any controversy, claim or dispute between the parties directly or indirectly concerning Employee's employment, this Agreement, or the breach or subject matter hereof, including, but not limited to, the interest Employee shall have in the Company as outlined in the Operating Agreement, shall be finally settled by arbitration held in San Francisco, California. The Company will pay the fees for the Arbitrator and any other fees, costs or expenses unique to arbitration, including the filing fee, the fees and costs of the Arbitrator, and rental of a room to hold the arbitration hearing. As a requirement for Employment, Employee must execute an Arbitration Agreement.

**83. Remedies.** All rights and remedies provided pursuant to this Agreement or by law shall be cumulative, and no such right or remedy shall be exclusive of any other. A party may pursue any one or more rights or remedies provided by this Agreement or may seek damages or specific performance in the event of another party's breach or may pursue any other remedy by law or equity, whether or not stated in this Agreement.

**84. Counterparts.** This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement as of the day and year written above.

**ONETASTE INCORPORATED**

[signature]

By: Robert Kandell
Title: COO

**EMPLOYEE**

[signature]

Becky Uma

Job Description

**OneTaste Sales Representative**
• Responsible for city's weekly sales goal of $xxx/week
• Continual Lead gen daily
• Responsible for making $xx in their city
• Works with sales leader to implement enrollment plan and strategy around lead funnel and cultivation of community members
• Meet daily requirement phone calls of customers
• Meet daily requirement of leads generated
• Attend sales meetings as necessary
• Make follow up calls to TurnON and course participants within 3 days of event
• Familiarity with SalesForce and continue training as needed
• Log and record all calls in SalesForce

**Production Support**
• Attend TurnONs and provide back of house support
• Back of house support for local city
• Run errands during course weekends
• Handle teachers as requested
• Familiarity with OneTaste courses and curriculum
• Duties include and are not limited to: set up and strike of room, snack and tea preperation, cleaning common area and lavatory, interfacing with participants
• Attend major OneTaste programs in different cities as requested for back of house support
• Handles room and transportation arrangements for executive staff
• Handles room and transportation arrangements for Nicole
• Handles errands and logistics for Nicole

**TurnON Leader**
• Co-lead TurnONs in local city
• Continual education and training of leading TurnONs
• Training and refining of sales pitch
• Greet and interact with participants
• Uphold the integrity of OneTaste philosophies and transmission of orgasm

**General Staff Duties**
• Attend daily company calls
• Hive on business threads
• Post daily schedule on the Employee Accountability App
• Keep track of duties and deadlines
• Take on projects and duties as needed
• Receive evaluation on job performances as needed

# MUTUAL CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT & INVENTIONS ASSIGNMENT AGREEMENT

This Confidentiality and Non-Disclosure Agreement & Inventions Assignment Agreement is made in San Francisco, California by and between Becky Uma on behalf of him/herself, his/her agents, heirs, executors and assigns (collectively referred to in this Agreement as "Employee") and OneTaste Incorporated (the "Company") on behalf of itself and its past and present officers, owners, principals, stockholders, partners, directors, agents, managers, employees, successors, predecessors, insurers, assigns, affiliates, predecessors and representatives.

In consideration of the of the rights and obligations set forth herein and commencement and continuation of Employee's employment with the Company, the parties hereby mutually agree as follows:

1. <u>Confidential Information</u>. It is understood and agreed that the Company has and will develop and compile certain proprietary techniques and confidential information concerning the Company's business plans and practices, product formulations, customer relationships, and similar information and trade secrets that have great value to the Company. Such techniques and information are referred to herein as "Confidential Information". As used herein, Confidential Information applies to the Company's proprietary information currently in existence or to be created in the future that satisfies the following three criteria: (i) information disclosed to or known by Employee in the course of his/her employment, (ii) information not generally known to others outside the Company; and (3) information, observations, and data that relate to the trade secrets or otherwise to the organizational structure, systems, manuals, procedures, databases, policies and company standards, written directives, nicknames or observations shared in the workplace that may be material for any publication, drawings, designs, equipment, development efforts and methodologies, testing, personal interactions between employees, engineering, marketing, sales, finances or operations (including without limitation any processes, formulae, methods, techniques, devices, know-how, sales and prospecting processes, permitting information or timelines, coaching techniques, coaching materials, tests, engineering processes, customer lists, sales statistics, tactics and projections, marketing strategies and plans, and personnel and client information or data) of the Company (or of any other party that entrusted the Company such information in confidence), and any other processes, formulae, methods, techniques, devices, know-how, engineering processes, client and vendor lists, client or vendor or potential client or vendor databases and information, sales statistics, tactics and projections, marketing strategies and plans, and personnel information or data made available by the Company which is (i) designated as confidential; (ii) known by Employee to be considered confidential by the Company; or (iii) by its nature inherently or reasonably considered confidential.

Confidential Information is to be broadly defined, and includes include information in any form whether memorialized in a tangible format such as printed information or in an intangible format such as electronically captured data or whether merely retained in Employee's memory after having had access to such information through his/her employment with the Company. Confidential Information in intangible form, which is retained in memory by persons who have had access to the confidential information, is referred to herein as "residuals."

Residuals shall consist of, but are not limited to, the following: ideas, concepts, know-how or techniques contained therein. However, "Confidential Information" is not intended to be construed so broadly that Employee's rights to the independent pursuit of a lawful profession, trade, or business would be restrained without use of the Company's or other third party's confidential information.

Confidential information, as used throughout this Agreement, also refers to information, observations, and data relating to customer and supplier identities, preferences, characteristics, and practices, which Employee learned of through his/her employment with the Company and which are not a matter of public knowledge.

2. Protection of Confidential Information. Employees agreea that, except as is required in the course of his/her employment, Employee will not disclose any such Confidential Information, either directly or indirectly, to any person or entity other than the Company and its employees or independent contractors, nor use said Confidential Information in any way, either during the term of this agreement or at any other time thereafter. Employee understands that his/her obligations regarding disclosure of Confidential Information shall survive and continue beyond his/her separation from the Company. In the event that Employee's employment with the Company is terminated for any reason, Employee hereby grants consent to notification by the Company to Employee's new employer or associated organization about his/her rights and obligations under this Agreement.

With respect to Confidential Information disclosed to the parties under this Agreement, Employee shall: (a) hold the Confidential Information in confidence, exercising a degree of care not less than the care Employee would use to protect his/her own proprietary or confidential information, but in any event, not less than a reasonable standard of care; (b) restrict disclosure of the Confidential Information solely to those directors, officers, employees, and/or agents/consultants with a need to know and not disclose it to any other person; (c) advise those persons to whom the Confidential Information was disclosed of their obligations with respect to the Information; and (d) use the Confidential Information only in connection with continuing correspondence and discussions by the parties regarding Company's business, except as may otherwise be mutually agreed upon in writing.

The parties acknowledge and understand that this Agreement does not limit or restrict Employee's ability to engage in his/her respective business, nor does it limit Employee's use or application of any information or knowledge acquired independently of the Company without breach of this Agreement in the course of such business.

It is further agreed that all files, records, documents, equipment, and similar items relating to the Company's business, whether prepared by Employee or others, are and shall remain exclusively the property of the Company.

Employee agrees that he/she will not at any time during or after his/her service with the Company, use or disclose Confidential Information in any publication, writing, blog, or other social media platform without the prior written permission and approval of Adam Jacobowitz or Robert Kandell.

3. Exceptions. The parties agree that the confidentiality restrictions in this Agreement shall not apply to Confidential Information as follows: (a) The Confidential Information is or becomes generally known to and available for use by the public, other than as a result of Employee's acts or failures to act; (b) As evidenced by Employee's contemporaneous written records, the Confidential Information is or was already in his/her possession prior to the Company's initial disclosure of such Confidential Information to Employee or is or was independently developed by Employee without having violated any obligation under this Agreement; or (c) The parties are, by law or court order, required to disclose the Confidential Information, provided, that (with respect to clause (c)), the parties shall have provided an authorized officer of the Company with a copy of the subpoena or court order at the earliest date practical.

4. Assigned Inventions and Works. Employee acknowledges and agrees that the word "Assigned Inventions" as used throughout this Agreement is intended to mean any new or useful art, discovery, contribution, finding or improvement (including without limitation any system, process or technique associated with creating plans, drawings, models, computer programs, test, concept, idea, apparatus, device, mechanism, equipment, machinery, process, method, composition of matter, formula, or technique), whether or not patentable, and all know-how related thereto, that Employee makes, creates, conceives, develops, or first reduces to practice (a) in the course of his/her employment, (b) using the Company's equipment, time, supplies, facilities or proprietary information of the Company, or (c) relate to the Company's actual or demonstrably anticipated research and/or business development.

The Company and Employee agree that the word " Assigned Works," as used by us throughout this Agreement, is intended to mean any materials for which copyright protection may be obtained, including without limitation literary works (including books, pamphlets, essays, summaries, articles and other writings as well as oral creations such as nicknames, characters, catch phrases, etc.), mask works, artistic works (including designs, graphs, drawings, blueprints, and other graphic works), computer programs, compilations, recordings, photographs, motion pictures and other audio-visual works that have been made, created, developed, written, or conceived, wholly or partially, by Employee or any other employee or consultant of the Company (a) in the course of his/her employment; (b) relating to the actual or anticipated business of the Company; or (c) with the use of the Company's time, material, proprietary information, or facilities.

5. Works for Hire. Employee agrees that all Works created by him/her, alone or with others, shall be deemed "Works made for hire" under the copyright laws and shall be owned by the Company. Employee shall not make use of said Works without the prior written approval and permission of the Company.

6. Assignment of Rights. Employee agrees to assign, and does hereby irrevocably transfer and assign, to the Company, effective as of the first date on which Employee provided services to the Company, all rights, title, benefits, privileges and interests in and with respect to any Assigned Inventions and Assigned Works, to the extent any such Works may not, by operation of law, be works made for hire. Employee understands that this Assignment of Assigned Inventions and Assigned Works applies to all Inventions and Works created by Employee during the term of his/her employment with the Company, any of Company's

predecessors, and/or while working with or for any of Company's affiliates. Employee also hereby forever waives and agrees not to assert any Moral Rights he/she may have in or with respect to any Assigned Works, even after termination of his/her employment with the Company. "*Moral Rights*" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

7. Assistance. Employee will assist the Company in every proper way to apply for, obtain, register, vest, and enforce in the name of the Company alone, all patents, copyrights, trademarks, mask work rights, trade secret rights and other legal protections for the Assigned Inventions and Assigned Works, worldwide. Employee will promptly execute and deliver any documents that the Company may reasonably request from Employee in connection with providing such assistance. Employee further agrees to assist in the defense of any judicial, opposition, or other proceedings in respect to such applications and any judicial, opposition or other proceedings or petitions or applications for revocation of such letters patent, copyright, trademark, or other analogous protection. Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the Assignment contemplated by this Agreement. Employee understands that his/her obligations under this section will continue beyond the termination of his/her employment with the Company.

8. Power of Attorney. If, for any reason, the Company is unable because of Employee's unavailability, mental, or physical incapacity, or for any other reason, to secure Employee's signature to apply for or to pursue any application for any United States of foreign patents or mask work or copyright registrations covering the Inventions or Works for Hire assigned to the Company, Employee hereby irrevocably appoints the Company and its duly authorized officers and agents as Employee's attorney-in-fact to act for and in Employee's behalf, to execute and file documents, and to do all other lawfully permitted acts to further the prosecution and issuance of patents, copyright and mask work registrations thereon with the same legal force and effect as if executed by Employee.

9. Non-Competition While Employed By Company. Employee agrees that during the course of his/her employment with the Company, Employee shall devote his/her best talents, efforts, and abilities to advance the interests of the Company. During the term of Employee's employment or other work relationship with the Company, Employee shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage, advise, or participate in any business that is in competition in any manner whatsoever with the Company, nor shall Employee start his/her own business or other organization that is in competition with the Company.

10. Notification Requirement. Following the date of this Agreement as well as from Employee's first date of employment, Employee will promptly disclose to the Company in writing, all Inventions and Works that are conceived, made, discovered, written, or created by

Employee alone, or jointly with someone else, on the Company's time or on his/her own time, while he/she is employed by the Company.

11. Image & Likeness. Employee understands and agrees that Company shall have a royalty-free right to use Employee's name, image, likeness, and voice in connection with photographs, video, audio or other media footage of Employee during his/her attendance at Company seminars, lectures, classes, or at other Company events.

12. Duties Following Termination of Employment. Following termination of Employee's employment with the Company, Employee agrees that he/she will not use any of the Company's Confidential Information, nor disclose such Confidential Information, directly or indirectly, to any other person or entity for any reason whatsoever. Any and all documents, manuals, written directives, materials, customer records, and other Confidential Information, along with all copies thereof, must be returned to the Company promptly upon separation of employment, or upon request by the Company at any time.

13. Non-Solicitation of Company's Customers and Employees. The Company's customer list and related customer records have been compiled over a significant period of time at great effort and expense and are among the Company's most highly confidential and valuable trade secrets. In addition to the obligations described above, it is understood and agreed that, while employed by The Company, and for a period of one year thereafter, Employee will not directly or indirectly solicit, induce, encourage, or recruit any of the Company's customers employees, or contractors to leave their relationship with the Company, nor shall Employee take away such customers, employees, or contractors for him/herself or for any third party.

14. Obligations to Prior Employers. The Company wishes to observe and respect any confidentiality agreements that Employee may have with prior employers. Consequently, Employee agrees that he/she will not disclose to the Company or use in his/her work with us any proprietary information or trade secrets belonging to prior employers. Employee further confirms that he/she has no other agreements, relationships, or commitments to any other person or entity that conflicts with his/her obligations to the Company under this Agreement.

15. Arbitration. Any controversy or claim arising from or relating to Employee's employment with the Company, including any questions regarding the use of Confidential Information, shall be settled by arbitration pursuant to the Arbitration Agreement Employee has signed with the Company. Employee agrees that the existence, conduct, and content of any such arbitration proceeding shall be treated as confidential information. If for any reason a dispute arising under this Confidentiality Agreement is submitted to a court, rather than an arbitrator, including actions to compel arbitration or for equitable relief in aid of arbitration (which actions the parties are hereby authorized to bring), Employee agrees that venue and jurisdiction are proper in any state or federal court in which he/she was employed, and he/she specifically consents to the jurisdiction and venue of such Courts for the purpose of any proceedings contemplated by this paragraph. If any part of this Confidentiality Agreement is held void, voidable, or otherwise unenforceable by any court or arbitrator, nothing contained herein shall limit the enforceability of any other part.

16. Injunctive Relief. The parties acknowledge that the misuse or unauthorized disclosure of Confidential Information in violation of this Agreement would result in damages to the Company that may be difficult, if not impossible, to ascertain. Consequently, the parties agree that the Company is entitled to seek injunctive relief or other equitable relief, in addition to monetary damages, against a party who breaches this Agreement.

17. Effect of Waiver. The failure of either party to insist on strict compliance with any of the terms, covenants, or conditions of this agreement shall not be deemed a waiver of that term, covenant, or condition, nor shall any waiver or relinquishment of any right or power at any one time or times be deemed a waiver or relinquishment of that right or power for all or any other times.

18. Entire Agreement. This Agreement contains all of the agreements, understandings, representations, conditions, and covenants made between the parties. This Agreement supersedes any and all other prior agreements, either oral or in writing, between the parties with respect to the subject matters discussed herein. Any modification of this Agreement must be in writing and signed by the party to be charged.

19. Consideration of Restraints. Employee has given careful consideration to the restraints imposed upon him/her by this Agreement, and he/she is in full accord as to the necessity of those restraints for the reasonable and proper protection of the Company's Confidential Information and the goodwill of the Company. EMPLOYEE EXPRESSLY ACKNOWLEDGES AND AGREES THAT EACH AND EVERY RESTRAINT IMPOSED BY THIS AGREEMENT IS REASONABLE WITH RESPECT TO SUBJECT MATTER, TIME PERIOD, AND GEOGRAPHICAL AREA.

20. No Guarantee. This Agreement will not be construed and is not intended by either Employee or the Company to be a guarantee, commitment, or understanding of Employee's continued engagement by the Company, as an employee, agent, or any other representative or otherwise, for any period of time.

21. Severability. If any provision of this agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions will nevertheless continue in full force without being impaired or invalidated in any way.

22. Controlling Law. The validity, interpretation, and performance of this Agreement shall be controlled by and construed under the laws of the State of California, the state in which this Agreement is being executed.

23. No Conflicts. Employee hereby represents to the Company that there is no agreement with any other party that would conflict with his/her obligations under this Agreement. Employee also hereby represent that: (a) he/she has read and understands each and every provision of this Agreement; (b) he/she has had the opportunity to obtain advice from legal counsel of his/her choice in order to interpret any and all provisions of this Agreement; and (c) he/she has had the opportunity to ask the Company questions about this Agreement and any of such questions Employee has asked have been answered to his/her satisfaction. Employee understands that this Agreement becomes effective on his/her start date.

24. Execution in Parts. This Agreement may be executed in counterparts and delivered by facsimile transmission, each of which shall be deemed an original and both of which together shall constitute one and the same document.

Executed on October 1, 2013 at San Francisco, California.

**OneTaste Incorporated**

By ______________________

**Robert Kandell, COO**

**Employee**

By ______________________

**Becky Uma**

# MUTUAL AGREEMENT TO ARBITRATE CLAIMS

This Mutual Agreement to Arbitrate Claims ("Agreement") is entered into between Becky Uma ("Employee") and OneTaste Incorporated ("Company") as of October 1, 2013. Employee and Company recognize that differences may arise between them prior to, during, or following employment with the Company and that those differences may or may not be related to that relationship. Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial, final, and binding dispute resolution procedure.

Claims Covered By This Agreement. Employee agrees to arbitrate any dispute, claim, or controversy against the Company and its current and former partners or employees arising out of the employment relationship or the cessation of said relationship which could have been brought in a court of competent jurisdiction or administrative agency including, but not limited to, claims under the Title VII of the Civil Rights Act of 1964, Age Discrimination in Employment Act, the Americans with Disabilities Act of 1990, Title 42 of the United States Code—Sections 1981 through 1988, as well as other federal, state, or local law, ordinance, or regulation, or based on any public policy, contract, tort, or common law or any claim for costs, fees, or other expenses including attorney's fees ("claim"). Employee understands that all claims that could be raised in a court must be raised in arbitration and the arbitrator shall apply the law accordingly and render a decision. This Agreement does not limit the Company's ability to report and pursue remedy for any criminal wrongdoing it may discover against Employee.

The Company also has the right to initiate arbitration regarding any matter covered by this Agreement. Employee understands that by signing this Agreement, Employee is waiving his/her right to obtain legal or equitable relief (e.g., monetary, injunctive, or reinstatement) from any government agency or court. Employee also understands that he/she is waiving the right to commence any court action. Employee has the right to be represented by counsel.

Required Notice of All Claims and Statute of Limitations. The Company and Employee agree that the aggrieved party must give written notice of any claim to the other party no later than the applicable Statute of Limitations as may be prescribed by law. Otherwise, the claim shall be void and deemed waived. Employee understands that the aggrieved party is encouraged to give written notice of any claim as soon as possible after the event or events in dispute so that arbitration of any differences may take place promptly.

Written notice to the Company, or its partners, owners, employees or agents, shall be sent to OneTaste Incorporated, 47 Moss Street, San Francisco, CA 94103. Employee will be given written notice at the last known address he/she provided to the Company.

The written notice shall identify and describe the nature of all claims asserted and the facts upon which such claims are based and the relief or remedy sought. The notice shall be sent to the other party by certified or registered mail, return receipt requested.

Rules Governing Arbitration. Except as provided in this Agreement, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. To the extent that the Federal Arbitration Act is inapplicable, or held not to require

arbitration of a particular claim or claims, state law pertaining to agreements to arbitrate shall apply.

Arbitration Procedures. The arbitration will be held under the auspices of a sponsoring organization, either the American Arbitration Association or Judicial Arbitration & Mediation Services, with the designation of the sponsoring organization to be made by the party who did not initiate the claim. Arbitration rules of the American Arbitration Association may be obtained at http://www.adr.org/employment. Arbitration rules of Judicial Arbitration & Mediation Services may be obtained at http://www.jamsadr.com/rules-employment-arbitration/. Employee may also obtain a copy of both arbitration rules from the Company.

The Company and Employee agree that, except as provided in this Agreement, any arbitration shall be in accordance with the sponsoring organization's then-current arbitration rules/procedures. The Arbitrator shall be either a retired judge, or an attorney who is experienced in employment law, or the area of law at issue between the parties, and who is licensed to practice law in the state in which the arbitration is convened ("the Arbitrator"). The arbitration shall take place in or near the city in which Employee worked as an employee with the Company.

The Arbitrator shall be selected by either mutual agreement or by alternatively striking names from a panel of ten arbitrators drawn from the sponsoring organization's panel of arbitrators experienced in employment law. The party who demanded arbitration will strike the first name.

The Arbitrator shall apply the substantive law (and the law of remedies, if applicable) of the state in which Employee worked as an employee with the Company, or federal law, or both, as applicable to the claim(s). The Arbitrator is without jurisdiction to apply any different substantive law or law of remedies. The Arbitrator shall have the power to award any types of legal or equitable relief available in a court of competent jurisdiction including, but not limited to, attorney's fees and costs, to the extent such relief is available under law.

The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.

Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic and/or video record of the proceedings. Should any party refuse or neglect to appear for, or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented.

Either party, upon request at the close of hearing, shall be given leave to file a post-hearing brief. The time for filing such a brief shall be set by the Arbitrator.

The arbitration shall be final and binding upon the parties. Employee agrees and understands that any relief or recovery to which Employee is entitled from any claims arising out of employment shall be limited to that awarded by the Arbitrator.

Arbitration Fees and Costs. The Company will be responsible for paying any filing fee and the fees and costs of the Arbitrator; provided, however, that if Employee is the party initiating the claim, he/she will contribute an amount equal to the filing fee to initiate a claim of the court of general jurisdiction in the state in which he/she is (or was last) employed. Each party shall pay for its own costs and attorneys' fees, if any.

Requirements for Modification or Revocation. Parties agree that this Agreement shall survive the termination of Employee's employment with the Company. It can only be revoked or modified by a writing signed by the parties which specifically states the intent to revoke or modify this Agreement.

Sole and Entire Agreement. This is the complete agreement of the parties on the subject of arbitration of disputes. This Agreement supersedes any prior or contemporaneous oral or written understanding on the subject. No party is relying on any representations, oral or written, on the subject of the effect, enforceability, or meaning of this Agreement, except as specifically set forth in this Agreement.

Construction. If any provision of this Agreement is adjudged to be void or otherwise unenforceable, in whole or in part, such adjudication shall not affect the validity of the remainder of the Agreement.

Consideration. The promises by the Company and by Employee to arbitrate differences, rather than litigate them before courts or other bodies, provide consideration for each other.

Not an Employment Agreement. Employee understand that this Agreement is not, and shall not be construed to create, any contract of employment, express or implied. Employment with the Company is on an at-will basis and for no specified time period. Employee is free to terminate employment at any time with or without prior notice or cause. Similarly, the Company may terminate the employment relationship or change any term of employment with or without cause or notice. This at-will relationship cannot be modified except by a written agreement signed by the Company and Employee.

Voluntary Agreement. Employee acknowledges that he/she has carefully read this Agreement, that he/she understands its terms, that all agreements between Employee and the Company covered in the Agreement are contained in it, and that he/she has entered into the Agreement voluntarily and not in reliance on any promises or representations by the Company other than those contained in the Agreement itself. Employee understands that by signing this Agreement, Employee is giving up the right to a jury trial.

Employee further acknowledges that he/she has been given the opportunity to discuss this Agreement with private legal counsel and has taken advantage of that right to the extent he/she wishes to do so.

| | |
|---|---|
| **EMPLOYEE** | **ONETASTE INCORPORATED** |
| Becky Uma | Robert Kandell, COO |

GOVERNMENT EXHIBIT
3772
23-CR-146 (DG)

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made as of the 1st day of October, 2013 by and between OneTaste Incorporated (the "Company") on behalf of its past and present officers, subsidiaries, related corporations or entities, owners, principals, stockholders, partners, directors, agents, managers, members, contractors, successors, predecessors, insurers, assigns, affiliates and representatives (collectively "Affiliates") and Michelle Wright, behalf of him/herself, his/her agents, heirs, executors and assigns ("Employee") .

**WHEREAS**, the Company and Employee wish to enter into a formal employment contract, which will govern the terms and conditions applicable to Employee's employment with the Company and will provide certain severance benefits for Employee in exchange for the Employee's agreement to abide by the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, the parties agree as follows:

## PART ONE — TERMS AND CONDITIONS OF EMPLOYMENT

**351. Duties and Responsibilities.**

**A.** Employee shall serve as City Director Las Vegas and shall report directly to Joanna VanVleck and/or Robert Kandell. Employee shall perform the responsibilities of his/her position, as indicated in Exhibit A hereto, including such duties and functions as may be reasonably assigned to Employee from time to time.

**B.** Employee agrees to use his/her best efforts to advance the business and welfare of the Company, to render his/her services under this Agreement faithfully, diligently, competently and to the best of his/her ability. Employee agrees that he/she will not engage in other employment that either interferes with his/her services rendered to Company pursuant to this Agreement or competes with Company's business endeavors, while employed by the Company.

**C.** Employee represents that he/she has the qualifications and skills necessary to perform the services contemplated in this Agreement in a competent, professional manner, without detailed advice or direction from the Company. But for this representation, Company would not otherwise engage Employee for the services contemplated in this agreement.

**352. Period of Employment.** Employee's employment with Company shall be governed by the provisions of this Agreement commencing October 1, 2013, or the first date that services were performed for the Company, whichever is earlier (such date, the "Effective Date") and will continue for twelve (12) months, unless terminated earlier by either party with or without cause. Employee's employment shall be "at will" and may be terminated by either the Company or Employee for any reason. The period during which Employee's employment continues in effect shall be referenced as the "Employment Period."

353. <u>Base Pay.</u>

A. Employee shall be paid a base salary of $2,800 per month based on a full time work schedule (hereinafter "<u>Base Pay</u>") during the Employment Period.

B. The Company shall review Employee's Base Pay annually for potential adjustments but no increases are guaranteed. In the event of any increase as permitted by this Section 3.B., the increased amount in effect at that time shall become the new Base Pay for all purposes. Employee's Base Pay shall be paid at periodic intervals in accordance with the Company's payroll practices for salaried employees.

C. Company shall deduct and withhold from the compensation payable to Employee, including but not limited to Employee's Base Pay, any and all applicable Federal, State and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable statutes, regulations, ordinances or orders governing or requiring the withholding or deduction of amounts otherwise payable as compensation or wages to employees. Company shall also deduct such amounts as may be authorized by Employee from time to time in writing and as permitted by law.

354. <u>Termination of Employment.</u>

A. Employee's employment may be terminated by either the Company or Employee at any time, for any reason, with or without Cause (as defined herein), upon written notice specifying the Effective Date of Termination, and without additional compensation, except as otherwise provided in Section 5. The Effective Date of Termination specified in the written notice may be immediate.

B. For purposes of this Agreement, termination for "<u>Cause</u>" shall mean the involuntary termination of the Employee's employment by the Company for any of the following reasons:

(i) Employee's conviction or entry of a plea of guilty in, a court of competent jurisdiction for any felony or misdemeanor;

(ii) The material breach of this Agreement by Employee which, if curable, Employee fails to cure within thirty (30) business days following written notice from the Company;

(iii) Employee's commission of any act of fraud, misappropriation or embezzlement in connection with his/her employment by the Company;

(iv) Employee is unable to perform the essential functions of his/her job for sixty (60) consecutive days in any twelve (12) month period;

(v) Employee's lack of experience or sub-par performance. If it is discovered that Employee does not have the experience or expertise to perform the duties contemplated in this agreement to the satisfaction of the Company or if Employee fails to perform at a standard expected by and acceptable to Company, Company will give Employee written warning of such sub-par performance and will give Employee thirty (30) days to improve his/her performance to a standard acceptable to Company. If after the thirty (30)-day probationary period Employee's performance has not improved, Employee's employment with Company may be terminated for Cause.

(vi) Employee's death.

An involuntary termination of Employee's employment by the Company in any other circumstances or for any other reason will be a termination "Without Cause."

**C.** The "Effective Date of Termination" shall be: (i) in the case of termination due to death, the date of Employee's death, or (ii) in the case of any other termination, the date of Employee's separation from service, within the meaning of Section 409A of the Internal Revenue Code, as amended (the "Code"), from the Company and its subsidiaries or affiliates (the "Separation from Service") specified in the written notice required by this Section.

**D.** On the Effective Date of Termination, Employee shall be paid all Base Pay earned through the end of the Employment Period, any unpaid business expenses, and any accrued but unused vacation earned through the Effective Date of Termination. Unless Employee is entitled to severance benefits under Section 5, he/she shall not be entitled to any compensation or benefits following the Effective Date of Termination, except as required by law.

**E.** Employee shall resign from Employee's position(s) with the Company and as employee, officer or director, as applicable, with the Company or any of its subsidiaries or Affiliates, effective as of the Effective Date of Termination.

**F.** In the unlikely event that the Company is sold, Company agrees to give Employee ten (10) days' notice of said sale.

## PART TWO — SEVERANCE BENEFITS

**355. Severance Entitlement.**

**A.** Employee shall be entitled to receive the severance benefits specified in Section 5.B. in the event that the Company terminates Employee's employment Without Cause or With Cause, except where the termination for Cause is pursuant to Section 4.B.(i), 4.B.(iii) or 4.B.(vi). Employee shall also be entitled to receive the severance benefits specified in Section 5.B. in the event that Employee resigns.

All severance payments made to Employee pursuant to Section 5 shall be subject to all applicable withholding requirements.

B. In the event Employee's employment terminates under the conditions described in Section 5.A., Employee shall be entitled to severance benefits of:

(1) Two (2) weeks' pay at Employee's regular rate of pay at the time of separation, paid in accordance with standard payroll practices.

Notwithstanding anything to the contrary contained herein, Employee's employment with the Company shall be "at will." Employment with the Company is on an at-will basis and for no specified time period. Employee is free to terminate his/her employment at any time with or without prior notice or cause. Similarly, the Company may terminate the employment relationship or change any term of employment with or without cause or notice and no guarantee of any severance benefits shall exist at that time.

C. The severance benefits provided Employee under this Paragraph 5 are the only severance benefits to which Employee is entitled upon the termination of his/her employment with the Company during the applicable time period, and no other benefits shall be provided to Employee by the Company pursuant to any other severance plan or program of the Company, except as required by applicable law or in Company's sole discretion. Employee acknowledges and agrees that but for his/her execution of this Agreement, he/she would not be entitled to such benefits. Receipt of said severance benefits are contingent upon Employee's execution of a confidential separation release and waiver by which Employee releases Company of any and all potential claims, known or unknown, which Employee may have against Company regarding the employment relationship between the parties as well as a non-disparagement agreement and adherence to the non-solicitation provision of this Agreement.

## PART THREE — MISCELLANEOUS PROVISIONS

356. Successors and Assigns. The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the Company, its successors and assigns. This Agreement shall inure to the benefit of and be enforceable by Employee's personal or legal representatives, executors, administrators, successors, heirs, distributes, devisees and legatees.

357. **Indemnification.** The Company shall indemnify the Employee to the fullest extent permitted under the law resulting from the Employee's good faith performance of the Employee's duties and obligations with the Company. In addition, the Company shall indemnify the Employee for any and all activity performed by the Company, its officers, employees, managers or representatives prior to the Effective Date.

358. **Notices.**

A. Any and all notices, demands or other communications required or desired to be given by any party shall be in writing and shall be validly given or made to another party if served either personally or if deposited in the United States mail, certified or registered, postage prepaid, return receipt requested. If such notice, demand or other communication shall be served personally, service shall be conclusively deemed made at the time of such personal service. If such notice, demand or other communication is given by overnight delivery, it shall be conclusively deemed given the day after it was sent addressed to the party to whom such notice, demand or other communication is to be given. If such notice, demand or other communication

is given by mail, it shall be conclusively deemed given two (2) days after it was deposited in the United States mail addressed to the party to whom such notice, demand or other communication is to be given. The address for notice for each of the parties shall be as follows:

To the Company:

347 9[th] St., Suite 483
San Francisco, CA 94103

To Employee:

Michelle Wright
150 N. Las Vegas Blvd.
Las Vegas, NV 89101

**B.** Both parties agree that if notice is by mail, then in good faith, the party giving notice will attempt to contact the other by their last known phone number and email address, to ensure notice was received.

**C.** Any party may change its address for the purpose of receiving notices, demands and other communications by a written notice given in the described manner to the other party.

**359.** **Governing Document.** Except as otherwise provided or referenced herein, this Agreement constitutes the entire agreement and understanding of the Company and Employee with respect to the terms and conditions of Employee's employment with the Company and the payment of severance benefits, if applicable, and supersedes all prior and contemporaneous written or verbal agreements and understandings between Employee and the Company relating to such subject matter. This Agreement may only be amended by written instrument signed by Employee and an officer of the Company specifically authorized for such purpose. Any and all prior agreements, understandings or representations relating to the Employee's employment with the Company are terminated and cancelled in their entirety and are of no further force or effect. However, Employee will be bound by the Company's Employee Handbook and other policies and said document will be read in conjunction with this Agreement.

**360.** **Governing Law.** The provisions of this Agreement will be construed and interpreted under the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

**361.** **Construction.** The normal rule of construction that any ambiguity or uncertainty in a writing shall be interpreted against the party drafting the writing shall not apply to any action on this Agreement.

**362.** **Arbitration.** The parties agree that should any controversy or claim arise out of, or relating to Employee's employment with the Company, this agreement or the making, performance, or interpretation of it, they will attempt to settle said dispute informally and in good faith (including but not limited to mediation or informal settlement negotiations). However, should such informal efforts to resolve any dispute fail after thirty days, any disputes

shall be settled by arbitration in California under the employment arbitration rules of the American Arbitration Association then existing, and judgment on the arbitration award may be entered in any court having jurisdiction over the subject matter of the controversy.

Any controversy, claim or dispute between the parties directly or indirectly concerning Employee's employment, this Agreement, or the breach or subject matter hereof, including, but not limited to, the interest Employee shall have in the Company as outlined in the Operating Agreement, shall be finally settled by arbitration held in San Francisco, California. The Company will pay the fees for the Arbitrator and any other fees, costs or expenses unique to arbitration, including the filing fee, the fees and costs of the Arbitrator, and rental of a room to hold the arbitration hearing. As a requirement for Employment, Employee must execute an Arbitration Agreement.

**363.** **Remedies**. All rights and remedies provided pursuant to this Agreement or by law shall be cumulative, and no such right or remedy shall be exclusive of any other. A party may pursue any one or more rights or remedies provided by this Agreement or may seek damages or specific performance in the event of another party's breach or may pursue any other remedy by law or equity, whether or not stated in this Agreement.

**364.** **Counterparts**. This Agreement may be executed in more than one counterpart, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed this Employment Agreement as of the day and year written above.

**ONETASTE INCORPORATED**

By: Robert Kandell
Title: COO

**EMPLOYEE**

Michelle Wright

Job Description

**OneTaste City Director**
Responsible for holding the team in respective city, ensuring all team members are on task, ignited, awake and creating. Provide structure and energy to keep people in motion around daily to-do's and closing cycles, completing projects and fulfillment of tasks.
In the case where the city director and sales leader are held by different people, the city director will work with the sales leader to ensure that enrollment goals and weekly monetary goals are met.
• Responsible for overseeing the city team and tasks
• Responsible for city's weekly sales goal of $xxx/week
• Accountable for the city progress and meeting benchmarks and goals
• Main person in contact with headquarters
• Conduct daily meeting with city staffs
• Ensure daily practices are happening by team members
• Provide structure and planning for hiving to happen
• Ensure city staff write up daily schedule on the EAA
• Ensure city staff meet daily schedule and goals at the end of the day
• Report on the health of the local city to exec team weekly

**Community Holder**
Responsible for the cultivation of a thriving OM community where members understand and engage with the philosophies of OM and have a solid sustainable practice. Works in tandem with sales and city lead to host OM Day, OM circles and has active participation on OM Hub
• Liaison between OM community members and staff
• Engage with and provide support to community members around OM practice
• Take requests from community members and integrate ideas as necessary
• Listen to community complaints and suggestions
• Make sure OM circles are staffed and held
• Report health of the community to exec team on a weekly basis
• Report to exec team of individuals that may be tumescent bumps

**OneTaste Course Teacher**
• Teach OneTaste courses in local city
• Continual education and training of OneTaste content as needed for courses
• Deep immersion into the practice and content material
• Greet and interact with participants
• Uphold the integrity of OneTaste philosophies and transmission of orgasm
• Strong personal practice in OM, fear inventory and yoga
• Student Coordinator for CP7 & 8
• Hold the Beasty School for CP7
• Hold CP Labs for local city

**OneTaste Coach and OM Trainer**
• Provide coaching and OM training services to OneTaste clients
• Provide coaching and OM training services to students in major OT programs
• Maintain strong relationship with clients
• Keep attention on clients until the coaching relationship is expired
• Speedy responses to client emails and phone calls
• Keep track of all clients in the Coach Tracker system
• Write regular reports after each coaching session in the Coach Tracker system
• Continue to develop skills as a coach and trainer
• Attend staff and OneTaste Coach Association trainings as scheduled
• Receive reviews on coaching and training skills from senior staff as needed

**Production Support**
• Attend TurnONs and provide back of house support
• Back of house support for local city
• Run errands during course weekends
• Handle teachers as requested
• Familiarity with OneTaste courses and curriculum
• Duties include and are not limited to: set up and strike of room, snack and tea preperation, cleaning common area and lavatory, interfacing with participants
• Attend major OneTaste programs in different cities as requested for back of house support
• Handles room and transportation arrangements for executive staff
• Handles room and transportation arrangements for Nicole
• Handles errands and logistics for Nicole

**General Staff Duties**
• Attend daily company calls
• Hive on business threads
• Post daily schedule on the Employee Accountability App
• Keep track of duties and deadlines
• Take on projects and duties as needed
• Receive evaluation on job performances as needed

# GX3875 Produced in Native Format

# GX3879 Produced in Native Format

GOVERNMENT EXHIBIT
4056
23-CR-146 (DG)

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**ONETASTE INCORPORATED**

**STOCK PURCHASE AGREEMENT**

among

**ONETASTE INCORPORATED**

**NICOLE DAEDONE**

and

**ONE TASTE INVESTMENTS LLC,**

**ONE TASTE HOLDINGS LLC,**

**AMANDA DUNHAM &**

**SUJO OFFIELD**

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "**Agreement**"), dated as of March 3, 2017, is entered into by and among OneTaste Incorporated (the "**Company**") and Nicole Daedone, an individual residing in the State of California ("**Seller**") and each of the Buyers listed on the signature page hereto, with respect the number of Shares (as defined below), set forth across their respective names (each and collectively referred to as "**Buyer**").

## Recitals

WHEREAS, Seller owns all of the issued and outstanding shares of capital stock of the Company, consisting of 50,000 shares of common stock (the "**Shares**"); and

WHEREAS, Seller wishes to sell to Buyers, and each Buyer wishes to purchase from Seller, the Shares, subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms have the meanings specified or referred to in this Article I:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Financial Statements**" has the meaning set forth in Section 3.06.

"**Balance Sheet**" has the meaning set forth in Section 3.06.

"**Balance Sheet Date**" has the meaning set forth in Section 3.06.

"**Benefit Plan**" has the meaning set forth in Section 3.16(a).

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in California are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Benefit Plans**" has the meaning set forth in Section 5.05(b).

"**Closing**" has the meaning set forth in Section 2.04.

"**Closing Date**" has the meaning set forth in Section 2.04.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Stock**" has the meaning set forth in Section 3.03(a).

"**Company**" has the meaning set forth in the recitals.

"**Company Continuing Employee**" has the meaning set forth in Section 5.05(a).

"**Company Intellectual Property**" has the meaning set forth in Section 3.11(b).

"**Confidentiality Agreement**" means the Confidentiality Agreements, dated as of January 25, 2017, between each individual acting jointly and severally hereunder as Buyer and Seller.

"**Data Room**" means the electronic documentation site platform hosted by Google or another cloud storage services provider containing documents from Seller.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

"**Direct Claim**" has the meaning set forth in Section 7.05(c).

"**Dollars or $**" means the lawful currency of the United States.

"**Employees**" means those Persons employed by the Company immediately prior to the Closing.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**Environmental Claim**" means any action, suit, claim, investigation or other legal proceeding by any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Financial Statements**" has the meaning set forth in Section 3.06.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Indemnified Party**" has the meaning set forth in Section 7.04.

"**Indemnifying Party**" has the meaning set forth in Section 7.04.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

"**Indemnified Person**" has the meaning set forth in Section 5.07(a).

"**Insurance Policies**" has the meaning set forth in Section 3.12.

"**Intellectual Property**" has the meaning set forth in Section 3.11(a).

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of Seller, Joanna Van Vleck, or Kevin Williams.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Losses**" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is materially adverse to (a) the business, results of operations, financial condition or assets of the Company, or (b) the ability of Seller to consummate the transactions contemplated hereby; *provided*, *however*, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Company operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (viii) the completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Company; (ix) any natural or man-made disaster or acts of God; or (x) any failure by the Company to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"**Material Contracts**" has the meaning set forth in Section 3.09(a).

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in Section 3.10(a).

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Purchase Price**" has the meaning set forth in Section 2.02.

"**Qualified Benefit Plan**" has the meaning set forth in Section 3.16(b).

"**Real Property**" means the real property owned, leased or subleased by the Company, together with all buildings, structures and facilities located thereon.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Seller**" has the meaning set forth in the preamble.

"**Shares**" has the meaning set forth in the recitals.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third-Party Claim**" has the meaning set forth in Section 7.05(a).

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

## ARTICLE II

## PURCHASE AND SALE

**Section 2.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Shares, free and clear of any and all Encumbrances, for the aggregate consideration specified in Section 2.02.

**Section 2.02 Purchase Price.** The aggregate purchase price for the Shares shall be $12,000,000 (the "**Purchase Price**").

**Section 2.03 Transactions to be Effected at the Closing.**

(a) At the Closing, each Buyer shall deliver to Seller:

(i) the Purchase Price, as set forth across their respective name on the signature page hereto, by wire transfer of immediately available funds to an account of Seller designated in writing by Seller to Buyer no later than two Business Days prior to the Closing Date; and

(ii) all other agreements, documents, instruments or certificates required to be delivered by Buyer at or prior to the Closing pursuant to Section 6.03 of this Agreement.

(b) At the Closing, Seller shall deliver to Buyer:

(i) stock certificates evidencing the Shares, free and clear of all Encumbrances, duly endorsed in blank or accompanied by stock powers or other instruments of transfer duly executed in blank, with all required stock transfer tax or documentary stamps affixed thereto or, if such shares are uncertificated, with all required instructions or confirmation of a book-entry transfer of such Shares to the Buyer;

(ii) a certificate of good standing of the Company issued by the Secretary of State of the State of California and dated within ten (10) Business Days prior to the Closing Date; and

(ii) all other agreements, documents, instruments or certificates required to be delivered by Seller at or prior to the Closing pursuant to Section 6.02 of this Agreement.

**Section 2.04 Closing.** Subject to the terms and conditions of this Agreement, the purchase and sale of the Shares contemplated hereby shall take place at a closing (the "**Closing**") to be held at March 3, 2017, virtually and electronically, through the exchange of execution copies of documents and signature pages, or at such other time or on such other date or at such other place as Seller and Buyer may mutually agree upon in writing (the day on which the Closing takes place being the "**Closing Date**").

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this Article III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is an individual residing in the state of California. Seller has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**Section 3.02 Organization, Authority and Qualification of the Company.** The Company is a corporation duly organized, validly existing and in good standing under the Laws of the state of California and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. The Company is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect. All corporate actions taken by the Company in connection with this Agreement will be duly authorized on or prior to the Closing.

**Section 3.03 Capitalization.**

(a) The authorized capital stock of the Company consists of 1,000,000 shares of common stock ("**Common Stock**"), of which 50,000 shares are issued and outstanding and constitute the Shares. All of the Shares have been duly authorized, are validly issued, fully paid and non-assessable, and are owned of record and beneficially by Seller, free and clear of all Encumbrances.

(b) There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of the Company or obligating Seller or the Company to issue or sell any shares of capital stock of, or any other interest in, the Company. The Company does not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares.

**Section 3.04 Subsidiaries.** The Company does not own, have any interest in any shares, or have an ownership interest in any other Person other than as listed in Schedule 3.04 (the "Subsidiaries"), all of which Subsidiaries are solely owned, by or through, the ownership of all the authorized and issued Shares of the Company, and all right, title and interest in and to the Subsidiaries shall transfer to Buyer by virtue and this Agreement and the acquisition of the Shares.

**Section 3.05 No Conflicts; Consents.** The execution, delivery and performance by Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of the Articles of Incorporation or by-laws of Seller or the Company; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller or the Company; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Material Contract, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller or the Company in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**Section 3.06 Financial Statements.** Copies of the Company's financial statements consisting of the balance sheet of the Company as at December 31, 2016 in each of the years 2015 and 2014 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Financial Statements**") have been delivered to Buyer. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject to normal and recurring year-end adjustments and the absence of notes; provided, however, that any adjustment over $50,000 will be disclosed to Buyer on Schedule B. The Financial Statements fairly present in all material respects the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of March 1, 2017 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**".

**Section 3.07 Undisclosed Liabilities.** The Company has no undisclosed liabilities, obligations or commitments of a type required to be reflected on a balance sheet prepared in accordance with GAAP, excluding (i) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, (ii) those which have been otherwise disclosed on Schedule C; and (iii) those which have been incurred in the ordinary course of business since the Balance Sheet Date and which are not material in amount.

All Books and Records Except as disclosed on Schedule D, all books and records which are material to the transaction and which have been disclosed to the Buyer by the Company are complete and accurate in all material respects and reflect the Business as conducted by the Company and its Subsidiaries. The Company has given the Buyer reasonable access to, and permitted the Buyer to make reasonable examinations of, the Books and Records.

**Section 3.08 Absence of Certain Changes, Events and Conditions.** Except as expressly contemplated by the

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

Agreement from the Balance Sheet Date until the date of this Agreement, the Company has operated in the ordinary course of business and there has not been, with respect to the Company, any:

(a) event, occurrence or development that has had a Material Adverse Effect, or that Seller would reasonably expect to have a Material Adverse Effect;

(b) amendment of the charter, by-laws or other organizational documents of the Company;

(c) split, combination or reclassification of any shares of its capital stock;

(d) issuance, sale or other disposition of any of its capital stock, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its capital stock;

(e) declaration or payment of any dividends or distributions on or in respect of any of its capital stock or redemption, purchase or acquisition of its capital stock;

(f) change in any method of accounting or accounting practice of the Company, except as required by GAAP or applicable Law or as disclosed in the notes to the Financial Statements;

(g) incurrence, assumption or guarantee of any indebtedness for borrowed money in an aggregate amount exceeding $25,000, except unsecured current obligations and liabilities incurred in the ordinary course of business;

(h) sale or other disposition of any of the assets shown or reflected on the Balance Sheet, except in the ordinary course of business and except for any assets having an aggregate value of less than $25,000;

(i) increase in the compensation of its Employees, other than as provided for in any written agreements or in the ordinary course of business;

(j) acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business or any Person or any division thereof for consideration in excess of $25,000.

(k) adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law; or

(l) any agreement to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.09 Material Contracts.**

(a) Schedule E lists the following contracts and other agreements of the Company (collectively below, the "**Material Contracts**"):

(i) each agreement of the Company involving aggregate consideration in excess of $25,000 or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled by the Company without penalty or without more than 180 days' notice;

(ii) all agreements that relate to the sale of any of the Company's assets, other than in the ordinary course of business, for consideration in excess of $25,000;

(iii) all agreements that relate to the acquisition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise), in each case involving amounts in excess of $25,000;

(iv) except for agreements relating to trade receivables, all agreements relating to indebtedness (including, without limitation, guarantees) of the Company, in each case having an outstanding principal amount in excess of $25,000;

(v) all agreements between or among the Company on the one hand and Seller or any Affiliate of Seller (other than the Company) on the other hand; and

(vi) all collective bargaining agreements or agreements with any labor organization, union or association to which the Company is a party.

(b) the Company is not in breach of, or default under, any Material Contract.

**Section 3.10 Title to Assets; Real Property.**

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

(a) Assets. Except as set forth in ***Schedule F***, the Company or its Subsidiaries has, and immediately prior to Closing will have, good and marketable title (or in the case of leased personal property, a good and valid leasehold interest) to all of the material Assets, subject to no Encumbrances or restrictions on transfer except for Permitted Encumbrances, all of which Encumbrances or restrictions on transfer (other than Permitted Encumbrances) shall be terminated prior to Closing. Except as set forth in ***Schedule G***, the material tangible Assets are in good working order, repair, and condition (ordinary wear and tear excepted), have been maintained in accordance with normal industry practice, and are suitable for the purposes for which they are presently used. Except as set forth on ***Schedule H***, the Company or its Subsidiaries owns, validly leases or otherwise has the right to use all assets, properties and rights used in, or held for use in, the Business as presently conducted in all material respects. The Assets include all the assets, properties, and rights used to operate, and necessary to the operation and conduct of, the Business as currently conducted in all material respects. Other than this Agreement, there are no outstanding options to purchase any of the Assets or any portion thereof or any interest therein.

(b) Real Estate. ***Schedule I*** sets forth a true, correct and complete list of each and every parcel of real property owned in fee simple by the Company or its Subsidiaries, or leased by same, together with the physical street address thereof and an indication of whether there is an ownership or leasehold interest in the real property. The parcels of real property identified in ***Schedule J*** (together with all buildings, structures and improvements thereon and appurtenances thereto) are hereinafter referred to as the "***Real Property***". The Company has good and valid (and, in the case of owned Real Property, good and marketable fee simple) title to, or a valid leasehold interest in, all Real Property.

All such Real Property is free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(i) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures;

(ii) mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business;

(iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property;

(iv) other than with respect to owned Real Property, liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; or

(v) other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect.

**Section 3.11 Intellectual Property.**

(a) **Schedule K** sets forth a complete and accurate list of each of the following owned, used or held for use by the Company or its Subsidiaries in the conduct of its Business throughout the world: (i) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) patents and patent applications; and (v) internet domain name registrations; and specifying as to each, as applicable, (1) the owner of the item, (2) the jurisdiction in which the item is registered or issued, or in which any application has been filed, (3) the respective issuance, registration or application number, and (4) the date of application and issuance or registration of any item. **Schedule L** sets forth material licenses pertaining to Intellectual Property that any third Person owns and that the Company or its Subsidiaries use in the conduct of the Business, excluding off-the-shelf, click-wrap license or other licenses for commercially available software that were acquired for less than $25,000. From and after the Closing, the Company and its Subsidiaries shall have the right to continue to use or utilize all of the Company Software that was used or utilized by the Company or its Subsidiaries immediately prior to Closing, without consent or approval of any Person or the payment of any amounts to any Person. Schedule M sets forth material licenses pertaining to Intellectual Property that the Company or its Subsidiaries owns and licenses to a third Person.

(b) The Company owns or has the exclusive right to use all Intellectual Property necessary to conduct the business as currently conducted (the "**Company Intellectual Property**"), and has provided documentation of all patents, patent applications, trademark registrations and pending applications for registration, copyright registrations and pending applications for registration and internet domain name registrations owned by the Company.

(c) Except as set forth on Schedule N, the Company or its Subsidiaries own or has a valid right to use, all Company Intellectual Property currently licensed or used by the Company, and the Company's conduct of its

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

Business as currently conducted. Neither the Company nor its subsidiaries is in material breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, under any license it has to use any of the Intellectual Property. Except as set forth in Schedule O, no claims are pending in writing or, threatened in writing with regard to the Company's use of the Intellectual Property does not result in, the infringement, misappropriatiaton or violation of the Intellectual Property or other legal rights of any Person. To Company's Knowledge and except as disclosed in Schedule P, no Person is infringing, misappropriating or otherwise violating any Company Intellectual Property.

**Section 3.12 Insurance.** Schedule Q contains a complete and accurate list, as of the date hereof, of all material insurance policies maintained by the Company or with respect to which the Company is a named insured or otherwise the beneficiary of coverage (collectively, the "**Insurance Policies**"), true and complete copies of which have been provided to the Buyer. Such insurance provides, and during the period of coverage has provided, coverage to the extent and in the manner as required by Law, any Material Contracts, any Lease or by any lender of the Company or its Subsidiaries. Such Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid. No insurance carrier has made a reservation of right with respect to any claim made by the Company or its subsidiaries under any such policy or binder.

**Section 3.13 Legal Proceedings; Governmental Orders.**

(a) There are no actions, suits, claims, investigations or other legal proceedings pending or, to Seller's Knowledge, threatened against or by the Company (or by or against Seller or any Affiliate thereof and relating to the Company), which if determined adversely to the Company (or to Seller or any Affiliate thereof) would result in a Material Adverse Effect.

(b) There are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Company or any of its properties or assets.

**Section 3.14 Compliance With Laws; Permits.**

(a) Except as show in Schedule R, since January 1, 2012, the Company and its subsidiaries is in compliance with all Laws applicable to it or the Business, properties or assets. Neither the Company nor its Subsidiaries has received any written notice alleging (or any written notice of any investigation related to) any violation by the Company or its Subsidiaries of any Law, which notice has not been finally resolved as of the date of this Agreement.

(b) All Permits required for the Company to conduct its business have been obtained by it and are valid and in full force and effect.

**Section 3.15 Environmental Matters.**

(a) To Seller's Knowledge, the Company is in compliance with all Environmental Laws and has not, and the Seller has not, received from any Person any (i) Environmental Notice or Environmental Claim, or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b) The Company has obtained and is in material compliance with all Environmental Permits necessary for the ownership, lease, operation or use of the business or assets of the Company.

(c) No real property currently owned, operated or leased by the Company is listed on, or has been proposed for listing on, the National Priorities List (or CERCLIS) under CERCLA, or any similar state list.

(d) To Seller's Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Laws with respect to the business or assets of the Company or any Real Property currently owned, operated or leased by the Company, and neither the Company nor Seller has received an Environmental Notice that any Real Property currently owned, operated or leased in connection with the business of the Company (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which would reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Laws or term of any Environmental Permit by, Seller or the Company.

(e) Schedule S sets forth any and all environmental reports, studies, audits, records, sampling data, site assessments and other similar documents with respect to the business or assets of the Company or any currently owned, operated or leased Real Property which are in the possession or control of the Seller or Company, copies of which have been provided to Buyer.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**Section 3.16 Employee Benefit Matters.**

(a) Schedule T sets forth a list of each material benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program, whether or not reduced to writing, in effect and covering one or more Employees, former employees of the Company, current or former directors of the Company or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by the Company, or under which the Company has any material liability for premiums or benefits (a "**Benefit Plan**"), copies of which have been provided to Buyer.

(b) To Seller's Knowledge, each Benefit Plan and related trust complies with all applicable Laws (including ERISA, the Code, and applicable local Laws). Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code (a "**Qualified Benefit Plan**") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Seller's Knowledge, nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion letter from the Internal Revenue Service. All benefits, contributions and premiums required by and due under the terms of each Benefit Plan or applicable Law have been timely paid in accordance with the terms of such Benefit Plan, the terms of all applicable Laws and GAAP. With respect to any Benefit Plan, to Seller's Knowledge, no event has occurred or is reasonably expected to occur that has resulted in or would subject the Company to a Tax under Section 4971 of the Code or the assets of the Company to a lien under Section 430(k) of the Code.

(c) No Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA). Except as would not have a Material Adverse Effect, neither Seller nor the Company: (i) has withdrawn from any pension plan under circumstances resulting (or expected to result) in a liability to the Pension Benefit Guaranty Corporation; or (ii) has engaged in any transaction which would give rise to a liability of the Company or Buyer under Section 4069 or Section 4212(c) of ERISA.

(d) Other than as required under Section 4980B of the Code or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e) There is no pending or, to Seller's Knowledge, threatened action relating to a Benefit Plan.

(f) No Benefit Plan exists that could: (i) result in the payment to any Employee, director or consultant of any money or other property; (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee, director or consultant, except as a result of any partial plan termination resulting from this Agreement; or (iii) limit or restrict the ability of Buyer or its Affiliates to merge, amend or terminate any Benefit Plan, in each case, as a result of the execution of this Agreement. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

(g) The representations and warranties set forth in this Section 3.16 are the Seller's sole and exclusive representations and warranties regarding employee benefit matters.

**Section 3.17 Employment Matters.**

(a) ***Schedules U(a)*** and ***U(b)*** list all Persons employed by the Company or its Subsidiaries on a full-time or part-time basis as of the date of this Agreement, and all natural persons providing services to the Company or its Subsidiary as independent contractors or consultants. ***Schedule U(a)*** states, with respect to all such Persons employed by the Company or its Subsidiary, their name, position, name of employing entity, and their salary or hourly rate (as applicable) and bonus arrangements in place as of the date hereof. ***Schedule U(b)*** states, with respect to all such natural persons providing services to the Company or its Subsidiary as independent contractors or consultants, their name, the name of the entity to which they are providing services, agreed duration of service, approximate cost or rate of compensation and the general type of service provided as of the date hereof. There are no employment, severance, change in control or termination agreements with the Company or its Subsidiaries, accruing to the benefit of any shareholder, director, officer, partner, or employee of the Company or its Subsidiary, except for agreements disclosed on ***Schedule U(c)*** to this Agreement or entered into at the request of the Buyer pursuant to this Agreement. A list of all employees to whom the Company or its Subsidiary has made any loan or

advance wherein the amount loaned to such employee exceeds one (1) week's compensation, which includes the amount of each such loan or advance and the date on which it was made, together with the terms of such loans (including maximum borrowings and minimum monthly payments) is set forth on ***Schedule U(d)***.

(b) The Company is not a party to, or bound by, any collective bargaining or other agreement with a labor organization representing any of its Employees. There has not been, nor, to Seller's Knowledge, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting the Company.

(c) The Company is in compliance with all applicable Laws pertaining to employment and employment practices to the extent they relate to employees of the Company, except to the extent non-compliance would not result in a Material Adverse Effect. There are no actions, suits, claims, investigations or other legal proceedings against the Company pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment of any current or former employee of the Company, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay or any other employment related matter arising under applicable Laws.

**Section 3.18 Taxes.**

(a) Except as otherwise disclosed:

(i) The Company has filed (taking into account any valid extensions) all material Tax Returns required to be filed by the Company. Such Tax Returns are true, complete and correct in all material respects. The Company is not currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business. All material Taxes due and owing by the Company and its Subsidiaries, including any estimated Taxes, in respect of periods ending on or before the Closing Date, have been timely paid. The Company and its Subsidiaries have withheld and paid all material Taxes required to be withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or any other third party. There are no liens for Taxes (other than for Taxes not yet due and payable)>

(ii) No extensions or waivers of statutes of limitations have been given or requested with respect to any material Taxes of the Company.

(iii) There are no ongoing or threatened actions, suits, claims, investigations or other legal proceedings by any taxing authority against the Company or its Subsidiaries, and there are no assessments, proposed deficiencies or other matters under discussion between the Company or its Subsidiaries and any Governmental Authority with respect to material Taxes. Neither the Company nor its Subsidiaries has waived any statute of limitation in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(iv) The Company is not a party to any Tax-sharing agreement.

**Section 3.19 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 3.20 No Other Representations and Warranties.** Except for the representations and warranties contained in this Article III and any information, documents or material made available to Buyer in the Schedules, none of Seller, the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Buyer and its Representatives or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law. Except for the specific representations and warranties expressly made by Seller in this Article III and any other disclosure made by made available to Buyer in the Schedules, Buyer specifically disclaims that it is relying upon or has relied upon any other representations or warranties that may have been made by Seller or any other Person, and acknowledges and agrees that Seller has specifically disclaimed and does hereby specifically disclaim any such other representation or warranty made by Seller or any other Person.

.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

Each individual comprising Buyer, severally and not jointly, represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer consists of separate individuals, each with all necessary power and authority to, separately as individuals, enter into this Agreement, to carry out the obligations hereunder, and consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of their separate obligations hereunder and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by, as applicable, all requisite corporate, partnership, or individual action on the part of each individual comprising the Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of each individual comprising the Buyer, enforceable against each individual comprising the Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02 No Conflicts; Consents.** The execution, delivery and performance by each individual comprising Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) result in a violation or breach of any provision of any agreements to which Buyer and the individuals who constitute Buyer are party; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to any individual comprising Buyer.

**Section 4.03 Investment Purpose.** Each individual comprising Buyer is acquiring the Shares solely for her or his own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Each individual comprising Buyer acknowledges that the Shares are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Shares may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Each individual comprising Buyer is able to bear the economic risk of holding the Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment. Each individual comprising Buyer represents and warrants that the purchase of the Shares, and Seller's offer and sale, was not accomplished by the publication of any advertisement or any other public communication.

**Section 4.04 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 4.05 Sufficiency of Funds.** Each individual comprising Buyer has sufficient cash on hand or other sources of immediately available funds to enable her or him to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 4.06 Legal Proceedings.** There are no actions, suits, claims, investigations or other legal proceedings pending or, to any Buyer's knowledge, threatened against or by any individual comprising Buyer or any Affiliate of any individual comprising Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.07 Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article III of this Agreement, including information disclosed; and (b) none of Seller, the Company or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Article III of this Agreement. Except for the specific representations and warranties expressly made by Seller in Article III, Buyer specifically disclaims that it is relying upon or has relied upon any other representations or warranties that may have been made by Seller or any other Person, and acknowledges and agrees that Seller has specifically disclaimed and does hereby specifically disclaim any such other representation or warranty made by Seller or any other Person.

**Section 4.08 Preexisting Relationship.** Each Buyer has a preexisting personal or business relationship with the Seller. By reason of its business or financial experience, each Buyer has the capacity to protect its own interests in connection with this transaction.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## ARTICLE V

## COVENANTS

**Section 5.01 Conduct of Business Prior to the Closing.** In the event that the Closing takes place after the date hereof, and except as otherwise provided in this Agreement or consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall, and shall cause the Company to: (a) conduct the business of the Company in the ordinary course of business; and (b) use commercially reasonable efforts to maintain and preserve intact the current organization, business and franchise of the Company and to preserve the rights, franchises, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having business relationships with the Company. In the event that the Closing takes place after the date hereof, and except as consented to in writing by Buyer (which consent shall not be unreasonably withheld or delayed), Seller shall not cause or permit the Company or its Subsidiaries to take any action that would or may reasonably be expected to result in: (i) any of the representations and warranties set forth in Article III being or becoming untrue in any material respect (including causing any of the changes, events or conditions described in Section 3.08 to occur); (ii) any of the conditions to the Closing set forth in Section --- not being satisfied; or (iii) any violation of any provision of this Agreement, except, in each case, as may be required by applicable Law.

**Section 5.02 Access to Information.** Until the Closing, Seller shall, and shall cause the Company to: (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the Real Property, properties, assets, premises, books and records, contracts, agreements and other documents and data related to the Company; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Company as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller and the Company to cooperate with Buyer in its investigation of the Company; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the normal operations of the Company. All requests by Buyer for access pursuant to this Section 5.02 shall be submitted or directed exclusively to Joanna Van Vleck or such other individuals as Seller may designate in writing from time to time. Notwithstanding anything to the contrary in this Agreement, neither Seller nor the Company shall be required to disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) cause significant competitive harm to Seller, the Company and their respective businesses if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior written consent of Seller, which may be withheld for any reason, Buyer shall not contact any suppliers to, or customers of, the Company and Buyer shall have no right to perform invasive or subsurface investigations of the Real Property. Buyer shall, and shall cause its Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 5.02.

**Section 5.03 Supplemental Disclosure.** From time to time, Seller shall have the right (but not the obligation) to provide supplemental disclosures with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Supplemental Disclosure**"). Seller will promptly supplement or amend the Disclosure Schedules with respect to any fact, matter or event arising after the date hereof which is required to make each representation and warranty set forth in Article III accurate as of the date such supplement or amendment is made (a "***Subsequent Event***"). Any disclosure in any such Supplemental Disclosure shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the indemnification or termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 6.02 have been satisfied; *provided, however,* that if Buyer has the right to, but does not elect to, terminate this Agreement within five Business Days of its receipt of such Supplemental Disclosure, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

**Section 5.04 Resignations.** Seller shall deliver to Buyer written resignations, effective as of the Closing Date, of the Seller's positions as officers and directors of the Company requested by Buyer at least two Business Days prior to the Closing.

**Section 5.07 Director and Officer Indemnification and Insurance.**

(a) Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by the Company now existing in favor of each Person who is now, or has been at any time prior to the date hereof or who becomes prior to the Closing Date, an officer or director of the Company, as provided in the Articles of Incorporation or by-laws

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

of the Company, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date hereof, shall survive the Closing Date and shall continue in full force and effect in accordance with their respective terms.

**Section 5.08 Confidentiality.**

(a) Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to the Closing, the Confidentiality Agreement and the provisions of this Section 5.08 shall nonetheless continue in full force and effect.

**Section 5.09 Governmental Approvals and Other Third-party Consents.**

(a) Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. Each party shall cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b) All analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals made by or on behalf of either party before any Governmental Authority or the staff or regulators of any Governmental Authority, in connection with the transactions contemplated hereunder (but, for the avoidance of doubt, not including any interactions between Seller or the Company with Governmental Authorities in the ordinary course of business, any disclosure which is not permitted by Law or any disclosure containing confidential information) shall be disclosed to the other party hereunder in advance of any filing, submission or attendance, it being the intent that the parties will consult and cooperate with one another, and consider in good faith the views of one another, in connection with any such analyses, appearances, meetings, discussions, presentations, memoranda, briefs, filings, arguments, and proposals. Each party shall give notice to the other party with respect to any meeting, discussion, appearance or contact with any Governmental Authority or the staff or regulators of any Governmental Authority, with such notice being sufficient to provide the other party with the opportunity to attend and participate in such meeting, discussion, appearance or contact.

(c) Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties as may be required for the successful completion of all transactions contemplated hereunder; *provided, however,* that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

**Section 5.10 Books and Records.**

(a) In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of five years after the Closing, Buyer shall:

(i) retain the books and records (including personnel files) of the Company relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Company; and

(ii) upon reasonable notice, afford the Representatives of Seller reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such books and records.

(b) Buyer shall not be obligated to provide Seller with access to any books or records (including personnel files) pursuant to this Section 5.10 where such access would violate any Law.

**Section 5.11 Closing Conditions.** Until the Closing, each party hereto shall, and Seller shall cause the Company to, use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VI hereof.

**Section 5.12 Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**Section 5.13 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 5.16 Taxes Incurred By Seller.** Buyer acknowledges that the Company has distributed cash to Seller from time to time in respect of Seller's tax liabilities with state and federal taxing authorities that have been incurred because of taxable income generated by the Company ("**Seller Tax Liability**"). Buyer covenants that following the Closing, it will take all measures to ensure that the Company distributes to Seller cash to cover any Seller Tax Liability for the 2016 tax year that Seller may incur within 30 days after written notice from Seller of such Seller Tax Liability; *provided however* that this clause shall not be deemed to cover any capital gains tax incurred by Seller that is generated by the sale of Seller's stock to the Buyers.

**ARTICLE VI**

**CONDITIONS TO CLOSING**

**Section 6.01 Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order or Law which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b) Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 3.05 and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.02, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

**Section 6.02 Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of Seller contained in Article III shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b) Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**Section 6.03 Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a) The representations and warranties of Buyer contained in Article IV shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b) Buyer shall have duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c) Buyer shall have delivered to Seller cash in an amount equal to the Purchase Price by wire transfer in immediately available funds, to an account or accounts designated at least two Business Days prior to the Closing Date by Seller in a written notice to Buyer.

**ARTICLE VII**

**INDEMNIFICATION**

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**Section 7.01 Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is six (6) months from the Closing Date (the "**Survival Period")**. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved. For the avoidance of doubt, the Parties hereby agree and acknowledge that the Survival Period set forth in this Section 7.01 is a contractual statute of limitations and any claim brought by any Party pursuant to this Article VII must be brought or filed prior to the expiration of the Survival Period. ***Buyers specifically acknowledge that following the Survival Period, they will have no remedy for any cause of action, whether in tort or contract or any other legal theory, for any claims of breach with respect to Seller's representations and warranties contained herein, and that such limitations on their ability to claim any breach of Seller's representations and warranties are reasonable.***

**Section 7.02 Indemnification By Seller.** Subject to the other terms and conditions of this Article VII, Seller shall indemnify Buyer against, and shall hold Buyer harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement (but such indemnity being only available during the Survival Period);

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; or

(c) without duplication, (A) any Taxes or costs relating to Pre-Closing Periods

**Section 7.03 Indemnification By Buyer.** Subject to the other terms and conditions of this Article VII, Buyer shall indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of, with respect to or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement; or

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement.

**Section 7.04 Certain Limitations.** The party making a claim under this Article VII is referred to as the "**Indemnified Party**", and the party against whom such claims are asserted under this Article VII is referred to as the "**Indemnifying Party**". The indemnification provided for in Section 7.02 and Section 7.03 shall be subject to the following limitations:

(a) The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under Section 7.02(a) or Section 7.03(a), as the case may be, until the aggregate amount of all Losses in respect of indemnification under Section 7.02(a) or Section 7.03(a) exceeds $25,000 (the "**Deductible**"), in which event the Indemnifying Party shall only be required to pay or be liable for Losses in excess of the Deductible. With respect to any claim as to which the Indemnified Party may be entitled to indemnification under Section 7.02(a) or Section 7.03(a), as the case may be, the Indemnifying Party shall not be liable for any individual or series of related Losses which do not exceed $25,000 (which Losses shall not be counted toward the Deductible).

(b) The aggregate amount of all Losses for which an Indemnifying Party shall be liable pursuant to Section 7.02(a) or Section 7.03(a) as the case may be, shall not exceed $1,800,000.

(c) Payments by an Indemnifying Party pursuant to Section 7.02 or Section 7.03 in respect of any Loss shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Company) in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements for any Losses prior to seeking indemnification under this Agreement.

(d) Payments by an Indemnifying Party pursuant to Section 7.02 or Section 7.03 in respect of any Loss shall be reduced by an amount equal to any Tax benefit realized or reasonably expected to be realized as a result of such Loss by the Indemnified Party.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

(e) In no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple.

(f) Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Loss upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Loss.

(g) Seller shall not be liable under this Article VII for any Losses based upon or arising out of any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement if Buyer had knowledge of such inaccuracy or breach prior to the Closing.

**Section 7.05 Indemnification Procedures.**

(a) Third-Party Claims. If any Indemnified Party receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third-Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense. In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to Section 7.05(b), it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third-Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to Section 7.05(b), pay, compromise, defend such Third-Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third-Party Claim. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third-Party Claim, including making available (subject to the provisions of Section 5.08) records relating to such Third-Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third-Party Claim.

(b) Settlement of Third-Party Claims. Notwithstanding any other provision of this Agreement, the Indemnifying Party shall not enter into settlement of any Third-Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed), except as provided in this Section 7.05(b). If a firm offer is made to settle a Third-Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all liabilities and obligations in connection with such Third-Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third-Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third-Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third-Party Claim, the Indemnifying Party may settle the Third-Party Claim upon the terms set forth in such firm offer to settle such Third-Party Claim. If the Indemnified Party has assumed the defense pursuant to Section 7.05(a), it shall not agree to any settlement without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed).

(c) Direct Claims. Any claim by an Indemnified Party on account of a Loss which does not result from a Third-Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have 30 days after its receipt of such notice to respond in writing to such Direct Claim. During such 30-day period, the Indemnified Party shall allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and assistance (including access to the Company's premises and personnel and the right to examine and copy any accounts, documents or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such 30-day period, the Indemnifying Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 7.06 Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**Section 7.07 Exclusive Remedies.** Subject to Section 9.11, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims on the part of a party hereto in connection with the transactions contemplated by this Agreement for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article VII, except for any claims arising out of or relating to the intentional fraud or intentional misrepresentation of any Party. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article VII. Nothing in this Section 7.07 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 9.11. Buyers hereby covenant not to sue or otherwise institute or cause to be instituted any legal, judicial, quasi-judicial or administrative proceedings concerning any matters arising out of this Agreement against Seller, and acknowledge that their sole remedy with respect to any claims of breach by Seller of this Agreement are the remedies provided by this Article VII.

## ARTICLE VIII

## TERMINATION

**Section 8.01 Termination.** This Agreement may be terminated at any time prior to the Closing:

(a) by the mutual written consent of Seller and Buyer;

(b) by Buyer by written notice to Seller if:

(i) there has been a breach of any representation, warranty or covenant made by the Seller or the Company, such that any condition in Section 6.01 and 6.02 would not be satisfied and which has not been cured by the Company by no less than five (5) days before Closing;

(ii) any of the conditions set forth in Section 6.01 or Section 6.02 shall not have been fulfilled by the Closing Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c) by Seller by written notice to Buyer if:

(i) Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VI and such breach, inaccuracy or failure cannot be cured by Buyer by the Closing Date; or

(ii) any of the conditions set forth in Section 6.01 or Section 6.03 shall not have been fulfilled by the Closing Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

(d) by Buyer or Seller in the event that:

(i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited; or

(ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 8.02 Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a) as set forth in this Article VIII and Section 5.08 and Article IX hereof; and

(b) that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01 Expenses.** Except as otherwise expressly provided herein (including Section 5.14 hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (signature of recipient required); or (c) on the date sent by e-mail of a PDF document (with written confirmation of receipt required) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient. Such communications must be sent to the respective parties, with a required copy to their respective representative, at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02):

| | |
|---|---|
| If to Seller: | Nicole Daedone<br>PO Box 43<br>Philo, CA 95466 |

**Section 9.03 Interpretation.** For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles and Sections mean the Articles and Sections of this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

**Section 9.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**Section 9.06 Disagreements; Attorneys' Fees**. The parties agree to attempt to resolve any disputes, controversies or claims ("Dispute") arising out of or relating to this Agreement in a meeting between a representative of each party who has decision-making authority with respect to a Dispute. Should the meeting either not take place or not result in a resolution of the Dispute within thirty (30) days following notice of the Dispute to the other party, then, and only then, either party may bring suit or action in accordance with this Agreement. In the event that any suit or action is instituted, the prevailing party of such dispute shall be entitled to recover all, costs and expenses of enforcing any right of such prevailing party under or with respect to this Agreement, including without limitation, such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals. Notwithstanding anything contained herein to the contrary, neither party shall be entitled to attorney's fees or costs unless such party attempted to mediate the Dispute in accordance with this Section.

**Section 9.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.08 No Third-party Beneficiaries.** Except as provided in Section 5.07 and Article VII, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction).

(b) ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF CALIFORNIA IN EACH CASE LOCATED IN THE CITY AND COUNTY OF SAN FRANCISCO, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c) EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10(c).

**Section 9.11 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.12 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 9.13 Non-recourse.** This Agreement may only be enforced against, and any claim, action, suit or other legal proceeding based upon, arising out of, or related to this Agreement, or the negotiation, execution or performance of this Agreement, may only be brought against the entities that are expressly named as parties hereto and then only with respect to the specific obligations set forth herein with respect to such party. No past, present or future director, officer, employee, incorporator, manager, member, partner, stockholder, Affiliate, agent, attorney or other Representative of any party hereto or of any Affiliate of any party hereto, or any of their successors or permitted assigns, shall have any liability for any obligations or liabilities of any party hereto under this Agreement or for any claim or Action based on, in respect of or by reason of the transactions contemplated hereby.

DocuSign Envelope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**[Signature Page to Stock Purchase Agreement]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER:**

DocuSigned by:

NICOLE DAEDONE 6B540F2E2EB8490...

**THE COMPANY:**

DocuSigned by:

By:

Name: Joanna Van Vleck B42FA95C7EC84A7...

Title: President

**BUYERS:**

| Purchasers | Address for Notices | Purchase Amount | Number of Shares of Common Stock |
|---|---|---|---|
| ONE TASTE INVESTMENTS LLC<br>DocuSigned by:<br>By: ANJULI AYER E7AFA03909B7459...<br>Title: Managing Member | [redacted]<br>Address:<br>[redacted]<br>With a required copy to:<br>Caroline Calio, Esq.<br>75 Isham Road, Suite 400<br>West Hartford CT 06107<br>ccalio@cl-law.com | $1,000,000 | 4,167 Shares (8.33%) |
| | | | |
| ONE TASTE HOLDINGS LLC<br>DocuSigned by:<br>By: AUSTIN AYER C09165EEFAB74EA...<br>Title: Director | [redacted]<br>Address:<br>[redacted]<br>With a required copy to:<br>Caroline Calio, Esq.<br>Cummings & Lockwood LLC<br>75 Isham Road, Suite 400<br>West Hartford CT 06107<br>ccalio@cl-law.com | $1,000,000 | 4,167 Shares (8.33%) |
| | | | |
| DocuSigned by:<br>AMANDA DUNHAM 8FE6464A7E9F424... | [redacted]<br>Address:<br>Care of: The Land<br>PO Box 43<br>Philo, CA 95466<br>With a required copy to: | $3,000,000 | 12,500 Shares (25.00%) |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

**[Signature Page to Stock Purchase Agreement]**

| | | | |
|---|---|---|---|
| | Mark Abdou, Esq.<br>Libertas Law Group, Inc.<br>225 Santa Monica Blvd, Suite 500<br>Santa Monica, CA 90401<br>mark@libertaslaw.com | | |
| | | | |
| DocuSigned by:<br>14E864A0A0B7485...<br>SUJO OFFIELD | [redacted]<br>Address:<br>[redacted]<br><br>With a required copy to:<br><br>Jeff Petersen, Esq.<br>Law Offices of Jeff Petersen<br>12526 High Bluff Dr., Suite 300<br>San Diego CA 92130<br>jeff@lawofficesjtp.com | $7,000,000 | 29,166 Shares (58.33%) |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# ONETASTE INCORPORATED

## Seller Disclosure Schedule to Stock Purchase Agreement

These Schedules are an itemization by Seller of those matters that constitute exceptions to the representations and warranties set forth in Section 3 of that Stock Purchase Agreement, dated March 3, 2017, by and among Nicole Daedone, sujo Offield, One Taste Investments LLC, One Tast Holdings LLC, Amanda Dunham and OneTaste Inc. ("The Stock Purchase Agreement"). Unless otherwise noted herein, any capitalized term in these Schedules shall have the same meaning assigned to such term in the Stock Purchase Agreement. Section and schedule headings are provided herein for convenience only. All other schedules or disclosures relating to Section 3 of the Agreement are incorporated herein by reference and the information therein shall be deemed to be disclosed for any and all purposes required pursuant to the Agreement. The inclusion of any item herein shall not be deemed to be an admission of any obligation of liability to any third party.

Where the terms of an agreement, contract or other document have been summarized or described in these Schedules, such summary or description does not purport to be a complete statement of the material terms of such agreement, contract or other document and are subject in their entirety to the full text of the appropriate agreement, contract or other document.

Matters or items included in these Schedules are not necessarily limited to the matters required by the Stock Purchase Agreement to be disclosed in these Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. The disclosure of any item or information in these Schedules shall not (i) be construed as an admission that such item or information is material to Seller; (ii) be deemed to constitute an admission, or otherwise imply, that any such item or information is material or created measures for materiality for the purposes of the Stock Purchase Agreement; or (iii) represents a determination by Seller that such item did not arise in the ordinary course of business.

To the extent a state of facts or the occurrence of any events are described in these Schedules, the existence of such a state of facts or the occurrence of such events shall not be deemed to constitute a breach of such any representations, warranties or obligations under the Stock Purchase Agreement. These Schedules are qualified in their entirety by reference to the specific provisions of the Stock Purchase Agreement, and are not intended to constitute, and shall not be construed as constituting, representations or warranties of Stock Purchase Agreement, except as and only to the extent specifically provided in the Stock Purchase Agreement.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.01 –
## Organization and Authority of Seller

No Exception

## – SECTION 3.02 –
## Organization, Authority and Qualification of the Company

No Exception

## – SECTION 3.03 –
## Capitalization

No Exception

## – SECTION 3.04 –
## Subsidiaries

**SCHEDULE A**

No Exception

## – SECTION 3.05 –
## No Conflicts, Consents

### Section 3.05(a)

No Exception

### Section 3.05(b)

No Exception

### Section 3.05(c)

The lease entered into by OneTaste NYC LLC for the space at 459 West 43rd Street, Apt 1R, New York, NY, 10036, requires in clause 11 that OneTaste NYC LLC secure the prior written consent to an assignment of the lease. Assignment is defined to include transfer of the majority of stock of a corporate tenant.

The lease entered into by OTI for the space at 1446 Market Street, San Francisco, CA, 94102, also requires in clause 12.1 that OTI secure the prior written consent to an assignment of the lease. A change of control, being the transfer of 25% or more of the voting control of OTI shall constitute an assignment for this purpose.

## – SECTION 3.06 –
## Financial Statements

**SCHEDULE B**

OTI's Financial Statements are prepared on a tax basis rather than a GAAP basis and therefore some differences between GAAP accounting and OTI's financial statements. Some of the key variances are that:

- -OTI elected in September 2014 to switch from cash to accrual accounting, effective 1/1/2013. However the accounting has been a hybrid of cash and accrual, with revenues in particular being accounted for on a cash basis;
- There are also differences in the amortization of assets, which follow tax accounting standards and may differ from GAAP standards.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.07 –
## Undisclosed Liabilities

**SCHEDULE C**

| | |
|---|---|
| **ASSETS** | |
| Advanced payments not subject to refunds | $501,828.64 |
| A/R from classes that are complete and full payment is due | $156,038.61 |
| | **$657,867.25** |
| **LIABILITIES** | |
| Advance payments totally or partially subject to refunds | $1,015,684.66 |

Note: the numbers provided reflect a 30% sales commission deduction, which could vary slightly by approximately 0.5%. The variance is considered immaterial. When placed on the balance sheet, the commissions will be broken out precisely. We anticipate having these items included in the OTI balance sheet with the February 2017 closing.

**SCHEDULE D**

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.08 –
## Absence of Certain Changes, Events and Conditions

### Section 3.08(a) – (i)

No Exception

### Section 3.08(j)

In February 2017, OTI's wholly owned subsidiary OneTaste NY Acquisition LLC became the owner of 100% of the participation interest in OneTaste NYC LLC. OneTaste NY Acquisition LLC had acquired 50% of the participation units in OneTaste NYC LLC in September 2016. On February 2, 2017 OneTaste NYC LLC repurchased 25% of the units in OneTaste NYC LLC from Aubrey Fuller. No cash was paid as Fuller had borrowed the money for the purchase of the units from OneTaste NYC LLC, and returned the shares in exchange for the cancellation of her debt to OTNY. On the same day, OneTaste NYC LLC also repurchased 25% of the units in OneTaste NYC LLC from The Next Right Thing LLC. Consideration for the units repurchased from The Next Right Thing was an exchange for forgiveness of a debt of $169,500 owed by The Next Right Thing to OTI, plus $30,500 in three payments between February 8, 2017 and March 31, 2017. This left OneTaste NY Acquisition LLC with 100% of the participation units in OneTaste NYC LLC.

### Section 3.08(k) – (l)

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.09 – Material Contracts

### SCHEDULE E

| PARTIES | EXECUTION DATE | TYPE | DESCRIPTION |
|---|---|---|---|
| *3.09(a)(i)* | | | |
| **OTI / Mirror Clan Inc** | 9/15/2014 | IP Agreement | Mirror Clan (wholly owned by Nicole Daedone) was created when the model envisaged for the City Affiliates was a franchise model, and an entity was needed that could be set up as the Franchisor. Mirror Clan's registration as a Franchisor was withdrawn in New York in 2016. Mirror Clan's application for registration as a Franchisor in California was also withdrawn in 2016. However the IP license remains in place and Mirror Clan acts as IP licensor to the US City Affiliates, OneTaste LA, OneTaste Bay Area and OneTaste New York, under license agreements. |
| **OTI and students (3 contracts to date)** | 2/2017 | Orgasm Lineage Program | OTI has very recently begun selling a three year program, the Orgasm Lineage Program, which takes place over 6 semesters of 6 months each. The cash price for the program paid in full upfront is $111,000 and the total price if paid in step with the program over three years is $180,000. One has been sold in full and two have been sold over monthly periods. |
| **OTI / United Commercial Development LLC; OTI / OTBA Inc.** | 10/28/2013 (lease); 3/1/2016 (sublease) | Lease / Sublease | OTI concluded a five-year lease on an 8,000 sq ft property in Mid-Market San Francisco, which it now subleases to OTBA, Inc. The head lease expires on 11/30/2018. The sublease expired 2/28/2017 and a draft lease is with OTBA Inc for signature. |
| *3.09(a)(ii)* | | | |
| **OTI / OTBA Inc** | 1/27/2015 | Asset Purchase Agreement | Bay Area City Affiliate. Asset purchase agreements between OTI and the Bay Area Affiliate in terms of which the City Affiliate acquired |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| | | | |
|---|---|---|---|
| | | | assets in the Bay Area from OTI. |
| **Mirror Clan / OTBA Inc (incl. OTI by reference)** | 1/27/2015 | License and Commission Agreement | Bay Area City Affiliate. The IP license and commission agreements between Mirror Clan Inc and OTBA Inc is closely related to the Asset Purchase Agreement. |
| **OTI / The Next Right Thing LLC** | 1/21/2015 | Asset Purchase Agreement | LA City Affiliate. Asset purchase agreements between OTI and the Los Angeles City Affiliate in terms of which the City Affiliate acquired assets in Los Angeles from OTI. |
| **Mirror Clan / The Next Right Thing LLC (incl. OTI by reference)** | 1/21/2015 | License and Commission Agreement | LA City Affiliate. The IP license and commission agreements between Mirror Clan Inc and OTBA Inc is closely related to the Asset Purchase Agreement. |
| **OTI / OneTaste NYC LLC** | 1/27/2015 | Asset Purchase Agreement | NY City Affiliate. Asset purchase agreements between OTI and the New York City Affiliate in terms of which the City Affiliate acquired assets in New York City from OTI. OneTaste NYC LLC is now a wholly and indirectly owned subsidiary of OTI |
| **Mirror Clan / OneTaste NYC LLC (incl. OTI by reference)** | 1/27/2015 | Franchise Agreement | NY City Affiliate (now indirectly wholly owned). The IP license and commission agreements between Mirror Clan Inc and OTBA Inc are closely related to the Asset Purchase Agreement. |
| **Powerlights (UK) / OneTaste Ltd (UK)** | 12/11/2014 | Asset Purchase Agreement | London City Affiliate. An Asset Purchase Agreement was concluded between Powerlights and the UK City Affiliate, in terms of which the UK City Affiliate acquired assets from OTI's wholly owned subsidiary Powerlights. |
| **Powerlights (UK) / OneTaste Ltd (UK)** | 12/11/2014 | License and Commission Agreement | London City Affiliate. The IP license and commission agreements between Powerlights and OneTaste Ltd are closely related to the Asset Purchase Agreement. |
| **OTI / Texas Limbic** | 11/26/2016 | Affiliate | Austin, TX City Affiliate. Unlike the |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| | | | |
|---|---|---|---|
| **Network LLC** | | Agreement | other City Affiliates, Austin did not acquire assets from OTI/Powerights. It started from scratch and was not guaranteed the payment of commissions on sales of OTI classes, and the agreement is only binding for 6 months. |
| *3.09(a)(iii)* | | | |
| **OTI / Robert Kandell / Nicole Daedone** | 7/31/2014; 12/13/2016 | Stock Redemption Agreement (7/31/2014); Full Release (12/13/2016) | OTI repurchased Robert Kandell's 50,000 shares in OTI for $1,350,000, to be paid over 60 equal payments, with 5 additional payments added in December 2016 to the end of the 60th payment and a full release signed. |
| **OTI / Justine Dawson** | 8/6/2014; 12/17/2016 | Separation Agreement and Release; Confidential Settlement and Release | OTI and Justine Dawson entered into an Agreement in terms of which her option to acquire 6,000 shares in OTI was cancelled in exchange for payment of $155,350. Additional payments were added in December 2016 and a full release signed. |
| **OTI / Ippolita Rostagno** | 7/13/2016 | Stock Repurchase Agreement | OTI repurchased Rostagno's 1,000 shares in OTI for $112,754 |
| **OTI / Joanna Van Vleck;**<br><br>**OTI / Yia Vang** | 7/16/2016; 7/28/2016 | Option Cancellation Agreement | OTI entered into agreements with each of Yia Vang and Joanna Van Vleck entered an Agreement in terms of which each of their options to acquire 6,000 shares in OTI were cancelled against payment of $430,000 to each of them, in an initial payment of $45,000 and quarterly payments of $17,032.23 from 1/1/2017 to 10/1/2022 |
| **OneTaste NYC Acquistion LLC / OneTaste NYC LLC;**<br><br>**OneTaste NYC LLC / Aubrey Fuller;**<br><br>**OneTaste NYC LLC / The Next Right Thing LLC** | 9/27/2016; 2/2/2017; 2/2/2017 | Letter Agreement (9/27/2016)<br><br>Membership Interest Repurchase Agreement (2/2/2017)<br><br>Membership Interest Repurchase | OneTaste NY Acquisition LLC (OTNY Acquisition) (a wholly owned subsidiary of OneTaste Inc) acquired 50% of the units of OneTaste NYC LLC (OTNY). The purchase consideration was $375,000.<br><br>OTNY repurchased 25% of the units in OTNY from Aubrey Fuller. No cash was paid as Fuller had borrowed the money for the purchase of the units from OTNY, and returned the shares in exchange for the cancellation of her |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| | | | |
|---|---|---|---|
| | | Agreement (2/2/2017) | debt to OTNY.<br><br>OTNY repurchased 25% of the units in OTNY from The Next Right Thing LLC. Consideration for the units The Next Right Thing was in exchange for forgiveness of a debt of $169,500 owed by The Next Right Thing to OTI, plus $30,500 in three payments between 2/8/2017 and 3/31/2016 from OTI to The Next Right Thing LLC. |
| *3.09(a)(iv)* | | | |
| **OTI / Powerlights Incorporated Ltd** | 12/29/2014 | Promissory Note | Powerlights received $479,700.97 from OneTaste Limited in initial purchase money for the sale of its London assets. Powerlights loaned this amount to OTI in December 2014.<br><br>A further amount was loaned by Powerlights to OTI in December 2015. Interest is being charged at 3% p/a.<br><br>The total current amount of the loan from Powerlights to OTI is $607,955.58, which is offset by an earlier loan made by OTI to Powerlights to cover UK operating expenses, of $140,967.11. Thus the total amount OTI owes to its wholly owned subsidiary Powerlights is $466,988.47.<br><br>The second payment and the interest rate are reflected in both companies' accounts but have not yet been documented. |
| **OTI / Rob Kandell / Nicole Daedone**<br><br>**Rob Kandell/ OTI** | 7/30/2014; 12/14/2016 | Promissory Note<br><br>Full Release of all claims | Arising out of OTI's repurchase of Kandell's 50,000 shares in OTI for $1,350,000 in July 2014, OTI wrote a promissory note in Kandell's favor providing for payment over 60 months.<br><br>Five additional payments were added in a further release of claims in December 2016. This amount was in full and final settlement of Kandell's |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| | | | |
|---|---|---|---|
| | | | claim that OTI was obliged under the Stock Repurchase Agreement to pay certain taxes on Kandell's behalf. |
| **OTI / Powerlights / Justine Dawson** | 12/17/2016 | Dawson Confidential Settlement Agreement and Release | Further payments to Dawson were agreed in December 2016, in settlement of a dispute related to the taxation of the consideration paid to Dawson for the cancellation of the options.<br>The additional amount to be paid was £43,008.89. A final payment of £5,670.32 is due to Dawson on March 10, 2017. |
| **OTI/ Yia Vang**<br>**OTI/Joanna Van Vleck** | 7/27/2016;<br>7/16/2016 | Promissory Note<br>Promissory Note | Payments to Vang and Van Vleck for the cancellation of their Options were paid pursuant to promissory notes issued to them by OTI. The notes provide for quarterly payments of $17,032.33 from 1/1/2017 to 10/1/2022. |
| **OneTaste NY Acquisition LLC / Ravi Agrawal / Ravi Agrawal LLC**<br>**OneTaste NY Acquisition LLC / OneTaste NYC LLC** | 9/27/2016;<br>10/3/2016; | Letter Agreement<br>Demand Loan | OTI's subsidiary OTNY Acquisition acquired 100% of the participation units in OTNY.<br>As part of the acquisition, OTNY Acquisition agreed to ensure repayment of a loan by former Managing Member Ravi Agrawal to OTNY in the amount of $89,000. $66,750 has been paid to date with $22,250 remaining and due on 3/28/2017.<br>OTI provided capitalization to OTNY Acquisition to make the payments, and OTNY Acquisition in turn loaned the money to OTNY. |
| OneTaste / Fire Up Training | Not yet concluded | Joint Venture Agreement | OneTaste and Fire-Up Training are in discussions to enter into a joint venture agreement in terms of which Fire-Up Training will train and work with Members of the OneTaste Coaches Association (OTCA) and will enter into a 60% (OTI) / 40% (Fire- |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| | | | |
|---|---|---|---|
| | | | Up) revenue sharing relationship in respect of revenues from a coaching business developed and led by Fire-Up in which OTCA members are given clients referrals and build a coaching business. |
| **OTI / OM Free Inc; OM Free Inc. / Liberos LLC; OM Free Inc. / University of Pittsburgh** | 5/15/2016 | Donation; Grant Agreement; Grant Agreement | OM Free Inc is a 501c3 non-profit dedicated to among other purposes scientific research into orgasm. OM Free Inc agreed to make grants to each of Liberos and The University of Pittsburgh in the amounts of $177,425 and $58,264 respectively, to conduct a two-year study of practitioners of Orgasmic Meditation, the first partnered stimulation study in the US since Masters & Johnson. OTI has agreed to donate the money to OM Free Inc to enable it to fund the study. To date, OTI has donated $75,000 to OM Free Inc this study. |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# – SECTION 3.10 –
# Title to Assets; Real Property

## Section 3.10(a)

**SCHEDULE F**

No Exception

**SCHEDULE G**

No Exception

**SCHEDULE G**

No Exception

## Section 3.10(b)

**SCHEDULE I**

No Exception

**SCHEDULE J**

No Exception

DocuSign Envelope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.11 –
## Intellectual Property

### Section 3.11(a)

### SCHEDULE K

(i) TRADEMARKS AND SERVICE MARKS

All of the below trademarks are owned by OTI.

| MARK | SERIAL NUMBER | CATEGORY | DATE OF REGISTRATION |
|---|---|---|---|
| **USA** | | | |
| Powered By Orgasm | 86542696 | IC 035 US 100 101 102 | 06.07.2015 |
| | | IC 041 US 100 101 107 | |
| Orgasmic Meditation | 85159647 | IC 041. US 100 101 107 | 08.23.2011<br>*Incontestability filed 09.19.2016* |
| OneTaste | 86550334 | IC 041. US 100 101 107 | 09.22.2015 |
| | | IC 035. US 100 101 102 | 09.22.2015 |
| | 86542689 | IC 041. US 100 101 107 | |
| OM Life | 87173798 | | *Application Date 09.16.2016* |
| **EU** | | | |
| OneTaste | 13433321 | Class 5; 6; 9; 16; 18; 25; 28; 35; 41; 44 | 03.13.2015 |
| Orgasmic Meditation | 13824231 | Class 5; 6; 9; 16; 18; 25; 28; 35; 41; 44 | 03.13.2015 |
| **AU** | | | |
| OneTaste | 1673041 | Class 9; 10; 16; 35; 36; 41; 43; 44 | 09.25.2015 |
| Orgasm Meditation | 1673042 | 41 | *Accepted 12.23.2016 and being advertised.*<br>*Anticipated registration date is March 20, 2017.* |
| **CA** | | | |
| OneTaste | 1785077 | | *Application Date 06.01.2016* |
| Orgasmic Meditation | 1785078 | | *Application Date 06.01.2016* |
| Powered By Orgasm | 1785079 | | *Application Date 06.01.2016* |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

Section 3.11(a)

## SCHEDULE K

(ii) COPYRIGHT

**WORKBOOKS & MANUALS**

Magic Practice Club
Intensive Booklets
OPC Manual
Relationship Book
OM Training Workbook
Coaching Workbook
OM Trainer Guidebook
OM Philosophy Workbook
Desire Contract E-Book
Turned ON Women's Manifesto
Onetaste Coaching Model
Turnon Essentials Packet
Turnon Script
I OM Meeting Script
Production Manual
BOH Manual
Affiliate Manual
ITO In A Box
I OM Stories
OM Basic Manual
OM Badges Manual
Orgasm Map
OM Life Manual
Mastery In A Box
Orgasm Mastery Online
Community Living Manual At 1080
Turn ON E-Book

**NICOLE'S WORK**

Tony Robbins Talk
Magic School Lecture
2 Mastery Lecture
Turned On Woman's Speech
Perfection Talk At NDI
Women's Lecture
Nicole Conversation With Jim Harriet (Audio And Transcript)
Nicole Conversation With Catherine Mccoun (Audio)
Love As Relational Experience Writing

**PHILOSOPHY CONTENT**

OM Life Relationship Types
Man/Woman Dynamics And The State Of Orgasm
Stages Of Man
Men's Promises
Stages Of Woman
Women's Promises
Levels Of Leadership And Purpose
Women's 7 Hindrances
We Believes
Industry Of Orgasm
Desire Sutras
Desire As A Path To Awakening
Stages Of Desire
Levels Of Desire
Big D Desire And Little D Desire
Stages Of Orgasm And Workbook And Quiz
Relationship As Practice
OM Based Relationship
Relationship By Design
Horizontal And Vertical Relationship
Forms Of Tumescence
Levels Of Tumescence
Tumescent Types And Quiz
Levels Of Attention
Levels Of Orgasm
Orgasm Infinitum
Orgasm Assessments
Orgasm Precepts
Language Of The Birds
Power, Orgasm And Surrender
Pleasure, Engagement, Flow
Rules Of Play
Communication And Meta-Messages
The Daemon
Bringing Out The Beast
Generative Coupling
Coaching For Wake Up
OM Hub

**CLASS SCRIPTS AND CONTENT**

All The Different Intensives
Coaching Program 1-12
ACP (Advance Coaching Program)
OTP (OM Trainer Program)
LTP (Leadership Training Program)
Community Course (3-Week Series)
Urban Monk Teacher Training
ITO Content
Healing Course
Desire Course
Union Retreat
Alchemy Of Desire Retreat
Power Retreat
Relationship Retreat
Relationship 2.0
Local Relationship Course
Winter Retreat
Magic School
YMO Course
Men's Course
What 10 Women Want You To Know
Women's Course
Taboo Course
Advance Taboo
Advance Opening Communication
Play Course
Opening Course
Advance Opening Course
Foundations Course
Mind Course
Body Course
OM Level I
OM Level II
OM Level III
OM Level IV
Male OM
Women, Power And Play
Raw Course
Art Of Intimacy
Desire Party Script

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## SCHEDULE K

**OM TRAINING CONTENT**

Principles Of Om
5 Tenets Of Om
Laws Of Orgasm
4 Elements Of Om
Attributes Of Om
Steps To Om
Cratography Of The Clit- 12 Spots On A Clit
Om 101 – Free Online Class
Navigating Resistance
Desire And Resistance
The Sweet Spot
Om Training Menu
3-Fold Practice
Hour Demo Description
Container Document
Alternate Om Positions
30-Day Om Challenge And All The Strokes
Orgasm State
5 Conditions Of Orgasm
Series Of One-Pagers On Om
Tumescence And Turn On
Sensation And Frames
Om Fundamentals
Stroking Concepts And Techniques
All The Different Types Of Stroke Exercises
Position And Posture
Peaking And Grounding
Upstrokes And Downstrokes

**COACHING TOOLS**

Om Life Wheel
Fear And Desire Exercise
Masculine And Feminine Exercise
Sexual Inventory
RxD Stroke Work
Desire Contract

**IMAGES**

Desire Cycle
Tarot Cards From Magic School-2 Images- Pussy Wheel, Masks

**PROMO MATERIALS**

Mastery Promo Packet
Coaching Program Brochure
Different Iterations Of The Website
Insight Institute Chat-Board
44 Women Website And Content

**AUDIO**

Stroke Sampler Om
Audio From Intensives
Audio From Mastery
Audio From Cps
Audio From Coaching Circles
Podcasts By Judy Silber
Podcasts By Sean Cummings

**VIDEOS**

Om App
5 Weeks To Turnon Your Life
5 Triggers Class
How To Series
8 Stages Video With Rachel Cherwitz
Cock Sucking For Her Pleasure
Pussy Sucking
How To Make Out
Gold Finger
How To Om
Cp Testimonials
Om Testimonials
Naked Yoga Dvd
Nicole Lecture – Dvd
Cp Promo Video
I Om Talks (And Audio)
The Orgasm Show With Kelly, Nicole, Kim, Special Guests
All Webinars- Om Life Series, Joanna's, Men's
Reality Show With Nicole And Jason
Omx Video Interviews And Recordings
Slow Sex Tips And Count Down Video
Slow Sex Book Launch Video
Video Series Interview With Sarah Gottfried
Nicole Hot Seat Training With Members

### Section 3.11(a)

(iii) PATENTS

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## Section 3.11(a)

## SCHEDULE K

(v) DOMAINS

| DOMAIN NAME | CREATED | EXPIRES | DOMAIN NAME | CREATED | EXPIRES |
|---|---|---|---|---|---|
| 12daysoforgasm.us | 12/12/2012 | 12/11/2017 | onetaste.net | 8/28/2014 | 8/28/2017 |
| 1446market.com | 6/2/2015 | 6/2/2017 | onetaste.org | 8/28/2014 | 8/28/2017 |
| 44-women.com | 3/16/2011 | 3/16/2017 | onetaste.tv | 12/9/2013 | 12/9/2017 |
| blackkittiesandpittiessanctuary.com | 12/28/2016 | 12/28/2017 | onetaste.us | 2/16/2007 | 2/15/2018 |
| bootstrapyourbiology.com | 5/6/2016 | 5/6/2017 | onetaste.xxx | 12/1/2011 | 12/1/2017 |
| bootstrapyourbiology.net | 5/6/2016 | 5/6/2017 | onetastecoach.com | 9/27/2016 | 9/27/2017 |
| bootstrapyourbiology.org | 5/6/2016 | 5/6/2017 | onetastecoach.us | 2/11/2013 | 2/10/2018 |
| drivenbydesire.us | 11/1/2016 | 10/31/2017 | onetastecoaching.com | 9/27/2016 | 9/27/2017 |
| fillupamerica.org | 10/8/2001 | 10/8/2017 | onetastecoachintraining.us | 2/11/2013 | 2/10/2018 |
| giveorgasm.us | 12/11/2014 | 12/10/2017 | onetastefoundation.com | 1/23/2014 | 1/23/2018 |
| happypussy.us | 3/14/2013 | 3/13/2017 | onetastefoundation.org | 1/23/2014 | 1/23/2018 |
| ignitedman.us | 2/28/2014 | 2/27/2018 | onetastefoundation.us | 1/23/2014 | 1/22/2018 |
| industryoforgasm.com | 4/13/2013 | 4/13/2017 | onetastemedia.us | 4/16/2013 | 4/15/2017 |
| industryoforgasm.us | 4/13/2013 | 4/12/2017 | onetastesa.us | 5/1/2013 | 4/30/2017 |
| lawsoforgasm.us | 3/5/2013 | 3/4/2018 | onetastethemovie.com | 4/28/2011 | 4/28/2017 |
| learntoom.com | 4/13/2015 | 4/13/2017 | oralsexforherpleasure.com | 11/13/2013 | 11/13/2017 |
| learntoom.us | 7/18/2012 | 7/17/2017 | oralsexforherpleasure.us | 11/13/2013 | 11/12/2017 |
| nicoledaedone.com | 1/24/2009 | 1/24/2018 | orgasm.life | 3/13/2016 | 3/13/2017 |
| nicoledaedone.xxx | 12/1/2011 | 12/1/2017 | orgasmcenter.us | 10/28/2013 | 10/27/2017 |
| nicoledaedonelecture.us | 2/15/2013 | 2/14/2018 | orgasmdaily.us | 4/21/2013 | 4/20/2017 |
| om.coach | 3/13/2016 | 3/13/2017 | orgasmevolution.com | 2/17/2015 | 2/17/2018 |
| omconference.us | 2/14/2013 | 2/13/2018 | orgasmevolution.us | 2/17/2015 | 2/16/2018 |
| omforlife.us | 4/13/2016 | 4/12/2017 | orgasmhowto.com | 11/13/2013 | 11/13/2017 |
| omfree.org | 4/22/2016 | 4/22/2017 | orgasmhowto.us | 11/13/2013 | 11/12/2017 |
| omfree.us | 3/13/2016 | 3/12/2017 | orgasmicmeditation.com | 1/9/2008 | 1/9/2018 |
| omhub.us | 2/11/2013 | 2/10/2018 | orgasmicmeditation.us | 7/1/2016 | 6/30/2018 |
| omxexperience.com | 1/25/2014 | 1/25/2018 | orgasmicmeditation.xxx | 12/1/2011 | 12/1/2017 |
| omxperience.com | 10/23/2010 | 10/23/2017 | orgasmicmeditations.com | 1/9/2008 | 1/9/2018 |
| otcoachintraining.com | 5/23/2013 | 5/23/2017 | orgasmistheway.com | 3/11/2011 | 3/11/2017 |
| otcoachintraining.us | 5/23/2013 | 5/22/2017 | orgasmnetwork.us | 1/8/2017 | 1/7/2018 |
| poweredbyorgasm.com | 4/13/2013 | 4/13/2017 | orgasmtarot.org | 1/23/2014 | 1/23/2018 |
| poweredbyorgasm.us | 4/13/2013 | 4/12/2017 | rachelcherwitz.us | 1/25/2013 | 1/24/2018 |
| rachelcherwitz.com | 1/25/2013 | 1/25/2018 | relationshipbydesign.us | 11/12/2013 | 11/11/2017 |
| simonandfrog.me | 11/28/2013 | 11/28/2017 | turnonaustin.us | 5/30/2012 | 5/29/2017 |
| slowsexthebook.com | 4/13/2011 | 4/13/2017 | turnonboulder.us | 5/30/2012 | 5/29/2017 |
| the-land.us | 11/13/2015 | 11/12/2017 | turnonbritain.co.uk | 11/29/2012 | 11/29/2017 |
| thelandproject.us | 12/9/2016 | 12/8/2017 | turnondenver.us | 11/6/2012 | 11/5/2017 |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

| DOMAIN NAME | CREATED | EXPIRES | DOMAIN NAME | CREATED | EXPIRES |
|---|---|---|---|---|---|
| thercr.org | 3/13/2014 | 3/13/2017 | turnoneb.us | 7/3/2012 | 7/2/2017 |
| turnedonwoman.com | 7/29/2010 | 7/29/2017 | turnoneurope.co.uk | 11/24/2012 | 11/24/2017 |
| turnedonwomen.com | 7/4/2010 | 7/4/2017 | turnoneurope.com | 11/24/2012 | 11/24/2017 |
| turnon1111.me | 5/18/2012 | 5/18/2017 | turnoneurope.eu | 11/24/2012 | 11/30/2017 |
| turnoneurope.fr | 11/24/2012 | 11/19/2017 | turnonpaloalto.us | 5/30/2012 | 5/29/2017 |
| turnoneurope.org | 11/24/2012 | 11/24/2017 | turnonphilly.us | 5/30/2012 | 5/29/2017 |
| turnoneurope.us | 11/24/2012 | 11/23/2017 | turnonportland.us | 4/21/2013 | 4/20/2017 |
| turnonla.us | 5/30/2012 | 5/29/2017 | turnonsandiego.us | 5/30/2012 | 5/29/2017 |
| turnonlv.us | 8/17/2012 | 8/16/2017 | turnonsd.us | 7/3/2012 | 7/2/2017 |
| turnonmarin.us | 5/30/2012 | 5/29/2017 | turnonsf.us | 5/30/2012 | 5/29/2017 |
| turnonny.us | 5/30/2012 | 5/29/2017 | turnonsoco.us | 7/3/2012 | 7/2/2017 |
| turnonnyc.us | 4/16/2013 | 4/15/2017 | turnonsv.us | 9/2/2012 | 9/1/2017 |
| turnonoakland.us | 5/30/2012 | 5/29/2017 | turnonuk.eu | 11/29/2012 | 11/30/2017 |
| turnonoregon.us | 4/21/2013 | 4/20/2017 | wwwunconditionalsex.us | 12/11/2012 | 12/10/2017 |
| turnonuk.org.uk | 11/29/2012 | 11/29/2017 | yiavang.com | 1/25/2013 | 1/25/2018 |
| turnonuk.us | 11/29/2012 | 11/28/2017 | yiavang.us | 1/25/2013 | 1/24/2018 |
| unconditionalsex.us | 12/19/2012 | 12/18/2017 | | | |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# – SECTION 3.11 –

## Section 3.11(a)

**SCHEDULE L**

**SOFTWARE LICENSES**

The only software license that meets the materiality threshold is listed below

| COMPANY | START | END | SERVICES | COST |
|---|---|---|---|---|
| Salesforce | 9/12/2016 | 9/11/2018 | Lightening Sales Cloud – Enterprise Edition<br>Data Storage (500MG)<br>Lightening Sales Cloud – Enterprise Edition | $153,465 |
| Frontdesk | 03/09/2016 | 03/09/2017 | Professional Edition | $26,721.12 |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.11 –

### Section 3.11(a)

**SCHEDULE M**

**COMPANY INTELLECTUAL PROPERTY LICENSED TO THIRD PARTIES**

| AGREEMENT | DATE RANGES | # SIGNED |
|---|---|---|
| IP Agreement between OTI and Mirror Clan Inc. | 9/15/2014 | |
| License and Commission Agreement between Mirror Clan and OTBA Inc. (incl. OTI by reference) | 1/27/2015 | |
| License and Commission Agreement between Mirror Clan and The Next Right Thing LLC (incl. OTI by reference | 1/21/2015 | |
| License and Commission Agreement between Mirror Clan and OneTaste NYC LLC (incl. OTI by reference) | 1/27/2015 | |
| License and Commission Agreement between Powerlights Incorporated Ltd (UK) and OneTaste Ltd (UK) | 12/11/2014 | |
| Affiliate Agreement between OTI and Texas Limbic Network LLC | 11/26/2016 | |
| Teacher Training Waivers Level 2 and Level 3 (Healing and Desire) | 01.18.2016 | 22 |
| Om Life Licensee Agreements (Inc. Orgasm Lineage Program Students) | January/February 2017 | 78 |
| Certified Coaches – At Will Association with OneTaste Inc. and Use of Intellectual Property | April/May 2016 | 44 |
| CP12 – OM Life Coach in Training Intellectual Property Agreements and License | November/December 2016 | 126 |
| CP 11 – OneTaste Coaches in Training At Will Licenses | April – December 2016 | 156 |
| CP 10 – OneTaste Coaches in Training At Will Licenses | Dec 2015 | Approx. 80 |
| **Total Licensees** | | 512 |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.11 –

### Section 3.11(b)

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# – SECTION 3.11(c) –

## Section 3.11(c)

### SCHEDULE N

No Exception

**Transfer of IP from Caravan Retreats:** Prior to forming OTI in December 2010, Nicole Daedone and Robert Kandell each owned 50% of Caravan Retreats Inc, which was formed on 5/4/2004. From 2004, Caravan Retreats operated as the OneTaste Urban Retreat Center and both offered courses and classes and operated a café and yoga studio and renting the venue to other groups. Gradually, Caravan Retreats became more focused on venue rental and management, and less focused on offering and teaching classes.

When OTI began operating in early 2011, Caravan Retreats licensed the use of its IP to OTI. In January 2012, OTI acquired intellectual property from Caravan Retreats for a total consideration of $225,000, which included the US-registered trademarks Orgasmic Meditation and OneTaste, professionally produced training videos, other videos, podcasts and e-books, OneTaste's website onetaste.us, and Carvan's presence on Facebook and Youtube.

Caravan Retreats stopped operating in May 2014 and was dissolved on February 3, 2016.

**Assignment of Copyright by Employees and Independent Contractors:** OTI does not have a complete record of which of the copyrighted materials were produced for which company. While OTI uses employment contracts and IC agreements that provide that works produced by an employee in the course and scope of his employment are assigned to OTI to the extent that they are not works made for hire, Seller does not guarantee that all such contracts were signed for every employee or Independent Contractor.

**Copyright not Registered**: None of OTI's copyrighted materials have been formally registered with the US Copyright Office.

### SCHEDULE O

No Exception

**SCHEDULE P**

Emmanuelle Duschene, a graduate of OneTaste's coaching program, has registered a trademark for Meditation Orgasmique in France, filed on 3/23/2016 (registration date unclear). We are advised that as a direct translation of OneTaste's trademark "Orgasmic Meditation" filed in the EU on 3/13/2015 and registered on 7/23/2015, the French registration contravenes OneTaste's prior EU registration. OneTaste could, accordingly bring an application in France to cancel the registration of her trademark.

## – SECTION 3.12 –
## Insurance

**SCHEDULE Q**

OneTaste has the insurance policies set out in the "Summary of Insurance OneTaste Incorporated" prepared by its insurance broker Nicole Parker at Sweet & Baker, dated March 2, 2017. The document is document 75 in the index to the electronic folder of documents. The policies are documents 76 to 86.

No Exception

## – SECTION 3.13 –
## Legal Proceedings; Governmental Orders

**Former Sales Consultant Claim Settled:** A claim by a former sales consultant, was made in August 2015. The former sales consultant made allegations of hostile work environment, quid pro quo sexual harassment, failure to prevent harassment, failure to pay minimum wage and overtime payments, and intentional infliction of emotional distress. The matter was settled in out of court mediation for $325,000, before any proceedings were instituted.

**Health Complaint Settlement**: An email complaint was received in 2011 from two practitioners of OM, claiming health concerns from an event 7 years prior, while painting the former OneTaste center, several years prior to the establishment of OTI in December 2010 (and when OneTaste operated as OneTaste Urban Retreat Center and was operated by Caravan Retreats, Inc.). Although the events related to a predecessor company, OTI paid $7,000 each to them in exchange for a full release of all claims. No documents are available.

## – SECTION 3.14 –
## Compliance With Laws; Permits

### Section 3.14(a)

**SCHEDULE R**

**San Francisco Health Care Security Ordinance (HCSO) Reporting and Record Keeping:** The HCSO is a San Francisco ordinance that requires that "covered employers" make specified "health care expenditures" on behalf of "covered employees." There is an obligation to submit and Annual Reporting Form to the OLSE by April 30th of each year which OTI has not complied with. HSCO also has record keeping requirements, for example retaining copies of quarterly "Revocable Expenditure Summaries" and "Separation Notices" which OTI is not compliant with.

**San Francisco Commuter Benefits:** The San Francisco Commuter Benefits Ordinance was adopted in 2009 to encourage commuters to walk, bike, take transit and rideshare by requiring their employers to offer commuter benefits. It applies to businesses with more than 20 employees nation wide and requires employers offer one of the following employee benefits (none of which OTI currently offers):

1. Pre-tax Transportation Benefits – A monthly pre-tax deduction, up to $130/month, to pay for transit or vanpool expenses.
2. Employer-Paid Transportation Benefits – A monthly subsidy for transit or vanpool expenses equivalent to the price of the San Francisco Muni Fast Pass (including BART travel), currently $76/month.
3. Employer-Provided Transportation – A company-funded bus or van service to and from the workplace.
4. Any combination of the above.

**Paid Sick Leave**: Paid sick leave is a mandatory requirement across most of the jurisdictions in which OTI operates and we began tracking and paying it since the start of 2017. It has been a statutory requirement to greater and lesser extents in San Francisco since Feb 1 2007, New York City since April 1 2014, California since July 1 2015 and Los Angeles since July 1 2016.

**I-9s Upon Hiring:** I-9 forms confirm that new hires can legally work in the US and must be completed in person within three days of the new employee's start date. Full compliance with I-9 collection requirements has varied at OTI. Not all current employees have compliant I-9s, though all have been confirmed as legally permitted to work in the United States.

**Zoning**: OTI (and its subsidiaries) are subject to zoning and permitting laws in the jurisdictions it operates. Many cities and counties have specific zoning and licensing requirements for "adult entertainment" businesses or "sexually oriented" businesses. Some do not, such as Mendocino County where OTI host's the majority of its courses.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

A small minority of OTI classes contain a demonstration of the practice of Orgasmic Meditation in the class. A demonstration includes some nudity, which is necessary for the practice to take place. It is not clear whether offering classes including a demonstration would place OTI's courses within the definition of "adult entertainment" or "sexually oriented business" or similar categories in certain jurisdictions. In two jurisdictions that we have considered in some detail, the City and County of San Francisco and the City of Los Angeles, OTI courses appear to fall outside such categories, either because they fall entirely outside the categories or because there is a materiality threshold for the application of such rules e.g. that live performances of a sexually explicit nature result in adult business classification only where they are "regularly featured". There is significant variety in the ordinances adopted by cities and counties, and it is not known how City Officials might apply such regulations.

**Beverley Hills Municipal Code**: On or around December 20 2017 the home owner of a property that OTI was renting for several months to host residential retreats at 1148 Coldwater Canyon, Beverly Hills, received a letter (dated December 5, 2016) from the City of Beverly Hills. The letter said that there had been a complaint regarding a violation of the Beverly Hills Municipal Code (BHMC) 10-3-4302, BHMC 3-1-201(A), namely unpermitted business use of the property. The notice said 'failure to comply with this notice will result in the referral of this matter to the City Prosecutor for further legal action.' OTI staff had already fully vacated the property by the time that the owner received the complaint, so no further action was needed or taken.

**Franchise Law:** In January 2015, OTI sold certain assets and Mirror Clan (wholly owned by Nicole Daedone) licensed rights to operate OneTaste businesses to City Affiliates in California (Bay Area and LA) and New York (NYC). The model selected for the relationship was as a franchise. Mirror Clan filed a Franchisor's Federal Disclosure Document with the Federal Trade Commission. It also applied to register as a Franchisor-Franchisee in California (with the California Department of Business Oversight) and New York (with the New York State Department of Law) on Sept 19, 2014.

Mirror Clan was registered as a Franchisor in New York on November 19, 2014. In California the California Department of Business Oversight (DBO) replied with queries related to the proposed business model, particularly in so far as it related to conducting the practice of Orgasmic Meditation during classes. After some correspondence with the DBO, Mirror Clan decided to withdraw the registration application in California on November 10, 2015. It also withdrew its franchise registration in New York on December 21, 2015.

Many of the concerns that were raised by the DBO in its correspondence are now no longer relevant due to changes to our business model, in particular taking group OM practice out of courses and classes, City Affiliate courses no longer including a practice lab for the students, and OTI and City Affiliate centers and venues no longer hosting free group OM practice.

City Affiliate licensees do not pay any licensing fees to OTI, operate with separate management and create and offer their own courses and products in addition to offering OTI licensed products. It is not known how federal and state laws with respect to franchising in CA and NY might be applied to the current model. OTI also has licensing agreements with City Affiliates in Texas and the United Kingdom. Neither jurisdiction requires registration to offer franchise licenses within their territory.

**Exempt/Non-Exempt**: Until October 1, 2016, most OTI employees were on fixed salaries. Since that time only employees who qualify as exempt are on fixed salaries and non-exempt employees track their time and overtime using software. This was also implemented for OTNY employees starting January 15, 2017.

## Section 3.14(b)

**San Francisco Business Tax and Registration:** OTI has not yet finalized 2014, 2015 San Francisco business taxes (which comprise of gross receipts and payroll taxes). OTI is working with the City to determine the exact amount of tax due, and has applied for and been accepted for a neighborhood-based exemption from this tax for 2017. The issue of OTI's San Francisco business registration is delayed pending the finalization of the amount of City tax due to the City.

## Section 3.14(c)

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.15 –
## Environmental Matters

**SCHEDULE S**

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.16 –
## Employee Benefit Matters

### Section 3.16(a)

**SCHEDULE T**

**OTI Severance** – In its offer letters to new employees, OTI makes the offer that in the event that an employee is terminated without Cause, and provided they sign a Release of All Claims, they will receive severance benefits equal to 1 weeks of their base salary if they they were employed by OTI for less than 6 months, and severance benefits equal to 2 weeks of their base salary if they were employed by OTI for longer than 6 months. OTI also makes offers of severance (based on the same time frames used in the case of terminations without cause) to employees who resign, if this is deemed desirable in the opinion of the Chief Strategy Officer, CFO or the COO, and provided they sign a Release of All Claims. No other severance packages are offered.

**OTI Paid Time Off (Sick Leave)** - OTI employees accrue paid sick leave at the rate of 1 hour per 30 hours worked. This amount is capped at 72 hours per year (the San Francisco statutory minimum) and is carried over at the rates required by the relevant state jurisdictions.

**OTI Paid Time Off (Vacation)** - OTI employees accrue paid vacation at the rate of one paid day of vacation per 5 weeks worked. This plan has been communicated to employees but has not been written up as a formal policy yet.

**OTI Medical Benefits** – OTI makes contributions to employees medical benefits of up to $410/month per full-time employee in California. OTI does not make contributions for full-time employee's dependents medical benefits in California. OTI pays for 100% of the medical benefits of full-time employees who live outside California. OTI pays for 50% of the medical benefits of dependents of full-time employees who live outside California. A full-time employee is a person who works 20 hours or more per week. OTI employees have five medical plan options: (1) Blue Shield of California Platinum Full PPO 0/10 OffEx; (2) Blue Shield of California Gold Full PPO 0/20; (3) Blue Shield of California Silver Full PPO 1700/40 (4) Kaiser Permanente Gold 80 HMO 0/35; (5) Kaiser Permanente Silver 70 PPO 1500/45 w/ Child Dental.

**OTI Dental Benefits** – OTI makes contributions of $99 per month of the cost of coverage for all full-time employees.

### Section 3.16(b) – (g)

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

# – SECTION 3.17 – Employment Matters

## Section 3.17(a)

**SCHEDULE U(a)**

OTI EMPLOYEES

| Name | Remuneration | F/P Time | Title |
|---|---|---|---|
| Aubrey Fuller | $42,000/annum | Full-time | Director of Coaching |
| Rachel Caine | $42,000/annum | Full-time | Regulatory Affairs Specialist/Compliance Officer |
| Rachel Cherwitz | $70,000/annum | Full-time | Sales Director |
| Kevin Williams | $42,000/annum | Full-time | COO |
| Eli Block | $42,000/annum | Full-time | Co-President |
| Maya Block | $42,000/annum | Full-time | Co-President |
| Anjuli Ayer | $42,000/annum | Full-time | Content and Marketing Manager |
| Matt Pelletier | $42,000/annum | Full-time | CTO |
| Joanna van Vleck | $80,000/annum | Full-time | Chief Strategy Officer |
| Donya Diamond | $85,000/annum | Full-time | Director of Production and Membership |
| Richard Hybner | $120,000/annum | Full-time | CFO |
| Nicole Daedone | $120,000/annum | Full-time | CEO *Has given notice of resignation, effective April 1, 2017* |
| Courtenay Lapovsky | $13/h | Full-time | Event Manager |
| Angela Richardson | $13/h | Full-time | Intensive Program Director |
| Rachel Short | $13/h | Full-time | Director of Student Development |
| Yia Vang | $13/h | Full-time | Curriculum Director |
| Elyna Rauen | $13/h | Full-time | Membership Coordinator |
| Christopher Paizis | $15/h | Full-time | Customer Experience Manager |
| Courtney Walker | $15/h | Full-time | Living Liberian/Content Manager |
| Beverley Daedone | $56,000/annum | Part-time | Senior Research Consultant *Has given notice of resignation, effective April 1, 2017* |
| Christopher Davis | $13/hour | Part-time | Assistant Event Producer |
| Manoj Agarwal | $13/h | Part-time | Commissions and Data Services |

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

ONETASTE NYC LLC EMPLOYEES

| Name | Remuneration | F/P Time | Title |
|---|---|---|---|
| Alison Wahl | $10.50/h | Full-time | Student Coordinator NY |
| Robert Wilms | $10.50/h | Full-time | Production Manager NY |
| Eugenia Karp | $10.50/h | Part-time | Promotions Manager NY |
| Ellie Shepley | $10.50/h | Part-time | Salesperson NY |
| Marissa Ward | $10.50/h + Commission | Full-time | Head of Sales NY |
| Kenan Wang | $42,900 | Full-time | General Manager NY |
| Austin Ayer | $17/h | Part-time | Marketing Developer |

MARISSA WARD COMMISSION STRUCTURE

| Class | Price | Commission |
|---|---|---|
| ITO | $149 | $75 |
| Local Course Combo | $544/$444 | $75 |
| Relationship Course | $499 | $75 |
| Healing | $499 | $75 |
| Desire | $499 | $75 |
| Men's/Women's Course | $499 | $75 |
| Local membership | $6,000 | $1,000 |
| Summer/Winter Retreat | $1,595 | $100 |
| ND Weekend | $6,500 | $270 |
| Ignition | $3,400 / $3,800 (PIF / plan) | $200 |
| Union | $5,200 / $5,600 (PIF / plan) | $250 |
| ACP | $9,000 / $10,000 (PIF / plan) | $270 |
| Coaching Program | $10,000 / $12,000 (early bird PIF / plan) $12,000 / $14,000 (PIF/plan) | $350 |
| Business Intensive | $9,000 | $200 |
| Men's/Women's Intensive | $18,000 | $400 |
| 7-Day Intensive | $24,000 | $500 |
| Membership | $55,000 | $1,200 |
| Coaching Circle | Varies | $100 |
| Sisterhood Path | $16,000 | $320 |
| Stroker Way (3 mth) | $1,800 | $100 |
| Stroker Way (1 yr) | $5,000/ $6,000 (PIF / plan) | $250 |
| Week on land | $5,000 | $100 |

**SCHEDULE U(b)**

| Name | Role | Total Monthly Billings |
|---|---|---|
| Alexis Ware | Intensive/Membership Coach | $ 350 |
| Ben Phillips | Intensive/Membership Coach | $ 420 |
| Brad Kammer | Head Trauma Advisor | $ 2,500 |
| Brenda Marino | Intensive/Membership Coach | $ 450 - $650 |
| Carlotta Mastrojani | Video Editing Services | $ 900 |
| Cleo DuBois | Teacher at the Intensive Courses | $ 1,500- $300 |
| Lynn Forrest | Teacher at the Intensive Courses | $ 2,400 |
| Dustin Smith | Intensive/Membership Coach | $ 420 - $1,100 |
| Esther Nicholson | Teacher at the Intensive Courses | $ 1,500 |
| Joanne Coleman | OneTaste Spiritual Director | $ 5,000 |
| Juliana Kramer | Intensive/Membership Coach | $ 300 |
| Kati Brennan | Intensive/Membership Coach | $ 420 |
| Liz McFeeters | Makes OneTaste Lube Product | $ 350 |
| Margo Fried | Intensive/Membership Coach and transcribes lectures and talks | $ 550 - $770 |
| Matthew Brand | Intensive/Membership Coach | $ 420 |
| Reese Jones | Strategic Growth Advisor *Note: Will no longer be engaged as of April 1, 2017* | $ 5,000 |
| Sarah Irani | Bookeeping and administrative assistance | $ 700 |
| Suzanna Weiss | Writer of Content and Projects | $ 1,000 - $5,000 |
| Tazima Davis | Intensive/Membership Coach | $ 650 - $770 |
| Summer Engman | Intensive/Membership Coach | $ 800- $1,100 |
| Steve Oskard | Body worker for Intensive events | $ 650 - $ 3,250 |
| Martha Gomes | Teacher at the Intensive Courses | $ 3,000 |
| Michael Wharton | Writer of Content and Projects | $ 2,000 - $ 4,000 |
| Samantha Clemmons | Graphic Designer | $ 400 |

**SCHEDULE U(c)**

No Exception

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## Section 3.17(a)

**SCHEDULE U(d)**

Loan to Angela Richardson of $2,000 to be repaid in installment of $250 per month.

## Section 3.17(b)

No Exception

## Section 3.17(c)

**Student Assistance in Courses:** Like many leading companies in the spiritual and personal development field, clients of OTI are given opportunities to further their own growth and development by assisting with courses in various capacities, for which they are not paid (and do not have an expectation of payment).

If these activities were determined to constitute ‘work’ under the Fair Labor Standards act, applicable state legislation, or other federal or state regulations, OTI may be obliged to compensate such individuals for time ‘worked’ at minimum rates of pay, as well as fees and penalties for non-compliance and lost benefits.

DocuS gn Enve ope ID: 544E475B-7FF3-430C-851B-5365C77CC20C

## – SECTION 3.18 – Taxes

No Exception

## – SECTION 3.19 – Brokers

No Exception

## – SECTION 3.20 – No Other Representations and Warranties

[redacted]

7/10/15, 7:52 AM

Hey if you need to go to another yoga class that's fine but it needs to be communicated to the team beforehand in a way we can work out if everyone can go together instead of you going off and inviting people. Does that make sense?

Yes. Makes total sense going forward. Thank you.

7/10/15, 9:48 AM

I've decided to go to yoga with team today. See you at meeting!

7/10/15, 1:06 PM

Let me know if you need anything 💖

Thanks

7/11/15, 7:11 AM

Are you clear on teacher handling?

I didn't feel like Chris's download was clear, but I am on it!!!

ONETASTE00169354

*Gov. Ex. 4513-013*

GOVERNMENT EXHIBIT
**4513-A-R**
23-CR-146 (DG)

Then talk to him about Michael

I'm in an uber.

That's on you

Ok

Send a text and stop waiting around to be told what to do and take some initiative

Got it.

Let me know when it's handled

Ok!

What would you like to drink this morning and what would you like for breakfast? ✨

I'll handle love thanks

I got the download. Breakfasts are handled. Food and drinks throughout the day and keep my full on attention on them throughout the day.

Excellent

7/11/15, 10:19 AM

Maybe a meeting

It's not punishment but you aren't clear and it effects the field

Please move quickly

I'm going to a 12 o'clock meeting

Great

let's check in after lunch

Ok

7/11/15, 11:54 AM

Meeting does not start until one o'clock. I'll reverse engineer right now.

Reverse Enginnering:

My system was not clear and grounded today in order to have principle over personality in a way that is necessary in order to be BoH. I was trying to do BoH from my personality and ego and was not taking the stroke until a meeting was suggested to me. I woke up feeling like a victim to my circumstances and blamed others for my condition. I blamed my family for making me feel weak, small, stupid, guilty, and out of control. I blamed them for demonizing the Feminine and Orgasm and not accepting me, Misha, and my purpose of being a medium for Orgasm to be in this world. I blamed them for not approving of me. I abandoned myself during dinner with my family, retracted, and became small. I stopped talking and pulled into myself for safety.

I blamed Chris for the way he asked me if I wanted to be teacher handler and not giving me a clear download. I already felt yesterday like things were not handled, and I didn't say anything. I said yes because I want to say yes anytime a bigger game is offered to me and I take myself out of range. Instead I should gradually grow into my purpose and the player that I want to be. I want to play an infinite game and when I take myself out of range by saying yes without actually checking with where my system is at, I end up playing a finite game because the voices in my head get too loud and I get stuck in the matrix. My ego was hurt and I became resentful when I admitted that being a teacher handler was out of my range. This is the first time I did BoH for ITO and did not know how to be a teacher handler. I got resentful that Jenna's system feels so much clearer than mine and that she should actually be teacher handler. In my head I noticed all the voices that said that she didn't even do CP yet and that she's more capable than me. I got resentful for being called meek because it's true that I get meek when I get knocked out and I abandon myself. I didn't take Rachel's stroke to go for a walk and get clear because my ego was trying to prove that I can handle it when in truth I couldn't because it was in my way of being in my optimal state.

I was resentful at Misha because I felt like he is better than me. He was on and I was off. My ambient attention was on him and I was co-dependent on his state in order to figure out my own. At some point instead of serving tea and being in my purpose I was watching him in his power and thinking about how much I love him and wanted to marry him (partly to

save me from myself, knowing that i was delusional thinking that marrying him will make me more powerful). Then he came over to the tea table and made a comment about his desire for other women that knocked me off and made me hate him and want to kill him. I felt self-hatred and sorry for myself.
Now I see that I was not fit to be in service to the students as we usher them into the world of Orgasm.
In order to be clear and on I need to make sure that I attend more meetings (3-4 a week), even if it means to be away from the team during that time. I need to dedicate 20 min a day to step work. I need to make it a practice to communicate my feelings and ask for help when I need it. I need to up my attention and awareness of my system and gauge where I'm at so that I don't take myself out of range all the time because my big D is to teach and serve Orgasm. I need to concentrate on my small d's and make sure that I love myself in the process.

Love yourself in the process

Thank you. Meeting is finished. I'm going to talk with a possible sponsor. I'd like to come back if that's the right stroke. I feel clear.

The meeting was on the fourth step. It was amazing. I also shared. Thank you for suggesting it. 💗

7/11/15, 3:33 PM

Can I come back?

No

We'll check in when I'm home and see about tomorrow

Ok.

Please don't pull on Misha

Yes. I won't.

Or anyone else from BOH

Ok. Got it.

I feel myself going down.

ONETASTE00169357

*Gov. Ex. 4513-016*

*Gov. Ex. 4513-A-R-004*

That's your choice

I know it is. I'll go to yoga.

I trust you to find a way to be an adult here

Yes. I want to be an adult in this spot.

Thank you for trusting me.

7/11/15, 10:03 PM



7/11/15, 11:51 PM

Prayasi and Adriana will sleep in your bed tomorrow - you guys have the top bunk free yea?

7/12/15, 7:53 AM

Yes

Great they'll move to your room tonight

For the night?

You can work it out with Aubrey but if you have a free bed people need to be sleeping in there and not with me

It's ridiculous that wasn't mentioned when they needed a place to sleep

It was mentioned. I said they could sleep with us.

They will moving forward

Sounds good.

7/12/15, 11:04 AM

Hey Rach. I feel a lot of things moving through me, especially fears about my self worth that have been inside for a long time. I feel vulnerable and raw. It's very uncomfortable.

Sounds like good excavation

My voices are really loud about being left out, jealousy, loneliness... That kinda stuff.

I hear that your voices are loud. Sounds like good place for self excavation

Yes. The things that come to mind are fear inventory and I'm going to a meeting later on. I can see myself looking for a quick fix. Something that will get me clear fast, and I know that it's not it. I've been doing the cutting the chord meditation with family members. I feel grief. I feel loss. I have surges of really strong emotions about Misha that make me feel unstable and unhinged.

So I hear that you feel like you are looking for a quick fix and feel unstable and unhinged, is that right?

Yes

Sounds intense

It is.

Where are you at in your step work?

Step 1

Powerless and unmanageability, yep😜

Lol. Yeah. That sounds about right.

7/12/15, 6:15 PM

How's it going?

It's going ok. Feeling better. Did step work and a meeting. At dinner with a friend I haven't seen in a long time.

7/12/15, 8:13 PM

😀💜

[redacted]

ONETASTE00169359

*Gov. Ex. 4513-018*

*Gov. Ex. 4513-A-R-006*

[redacted]

6/8/15, 2:02 PM

Hey lady. You feel a little out there

Hey. I'm at the airport, ready to come home. I feel excited and alive.

How's it going in ny? It feels like a lot is moving!

It's on and hopping

So good!

6/9/15, 2:37 AM

So you feel a little out there and not all the way plugged in

I am ready to do all that it takes to plug all the way in.

Ok good

6/10/15, 1:43 PM

Can I keep some of my clothes that need to be hanged in your closet? There is lots of closet space in this room.

Sure

6/10/15, 6:11 PM

I'm going to reverse engineer right now. It's better than me staying here super fucked up.

Ok good

ONETASTE00169379

*Gov. Ex. 4514-005*

GOVERNMENT EXHIBIT
**4514-A-R**
23-CR-146 (DG)

Do it fast

Yes

👀

I'm writing

Ok

8/10/15, 8:05 PM

Dharma Gate:

Right now I'm in a position that I know I'm not tapping into my real power. I'm stuck right between desire and fear and I vacillate between the two constantly. The voice of fear, doubt, and resentment for the life that I'm choosing is loud and clear. The problem is that once you have this one taste of what is possible, the new realm of relating, and orgasm that permeates everything, I'm not willing to let go or go back.
In this in-between phase, I'm asked to make choices. I'm asked to let go of my old values, old ways of relating, and choose to step into a bigger game over which I have no control. To let the feminine lead and to throw myself in with faith and devotion to God.
I'm ready to let go of my co-dependent ways and start true recovery.
Since the last ITO this is what happened:
1.I became fat and lazy about making money thinking that I can pay for rent and food with some money I had saved up and the money I was making from the NYC team.
2.I spent too much time with my family for my sister's graduation (4 days) letting them emotionally hit and abuse me for choosing to live my life for Orgasm. Our arguments were painful and draining.
3.I spent too much time processing and thinking about my new relationship with Misha. I got swept up and unconscious in this new kind of relating that I never had before. I got intoxicated on his attention and financial help. It put me to sleep and I get turned off to my surroundings.
4.I used Teacher Training and CP immersion as an excuse to not work. I had surface layer thoughts that

explained these as training for my purpose. What I didn't realize is that I actually used them as a way to opt out when the energy got high and compression in NY started.
5.I'm now using Mastery and NDI as a way to opt out of New York because I have not yet unified my purpose with my desire. I'm relying on those programs to help me figure it out, help me find my power, although I know that no program can do this for me. I need to choose to live fully now.
6.I use my stories of insecurities and fears to help keep me small. This is the story of me as a victim, as a broken person who cannot handle this life because it's too overwhelming and difficult. This story is garbage. Life is a game, and the only way to live is to play, be creative and notice all the subtle messages that God sends our way.
7.I also had an STD scare and since I was little my mother always used STD's to threaten me against the dangers of sex. The tests came out negative and since then I keep on getting yeast infections. I think this is the way of my body telling me that I'm out of alignment and out of purpose. I use these physical ailments as an excuse to opt out. Every time I concentrate on them fears come up in my mother's voice that says that sex is dangerous, that this is my fault, that I'm being irresponsible. I wallow in that voice and feel existential anxiety.

I take full responsibility over my feelings, this situation, and not making sales last month. No one is to blame but me. My addict came out this month and I found ways to get intoxicated and fell out of devotion. I'm sorry for abandoning myself. I'm sorry for opting out. From here on, I choose to see and not to be blinded and if I do, to remember. I choose to live in connection and not tittering on the edges of it or use fake mimics of what it actually means to be connected. I'm aware that this is not the easy path. I'm not going to lie to myself anymore that this is supposed to be easy. The trick is to find the joy and love in this struggle for freedom.

Michal. That's beautiful

You did it. You really saw t

Thank you. I feel so much clearer now.

Maybe tell the team if you feel comfortable

**ONETASTE00169381**

*Gov. Ex. 4514-007*

*Gov. Ex. 4514-A-R-003*

Yes. I put it on the thread now.

Let me know when is a good time to make bed.

Come on in!

6/10/15, 11:42 PM



6/11/15, 7:27 AM

So there. Next time have the subway card out 😀

Will do!

6/11/15, 6:22 PM

Can I have a role?

Yes!!

You fluff

Great. I love to fluff!!!

[redacted]

ONETASTE00169382

Gov. Ex. 4514-008

Gov. Ex. 4514-A-R-004

DEFENSE EXHIBIT
1AB
23-CR-146 (DG)

OneTaste®

# OneTaste Code of Conduct: Teachers, Coaches, Leaders and Support Staff

Version: 2.20.2014

## Overview

OneTaste teachers, coaches, leaders and support staff recognize that in a world of separation, we are about connection. We provide tools for intimacy in everyday life. Going to the root of experience, OneTaste teachings integrate the principles of mindfulness with the practice of sexuality. By nourishing and including this basic and essential part of life, we support students and clients to discover richer relationships, an embodied sense of self and the uncompromised feeling of wholeness.

As OneTaste teachers, coaches, leaders and support staff we agree to support the natural unfolding of each individual. That being said, we agree to not push clients' boundaries and encourage all individuals to participate within their comfort zone. All class and coaching exercises, homework assignments and activities are optional and students reserve the right to decline participation at any time.

Our work is intended for adults, and we mean emotional, spiritual as well as physical. This means that you are willing to take responsibility in your experiences within OneTaste. That means you overtly agree to play using "green, yellow, red" rules. These rules are explained in all our classes and programs. Essentially, they tell us where you are on a range from smooth sailing to full stop. The use of these keeps staff informed about your internal state to allow us to respond accordingly. "Red" will bring a full stop and the teachers will adjust accordingly to make sure that student has what they need to go forward. While our subject matter can be foreign to many peoples' standard conversations, we want to make sure all our students stay within a range that will leave them expanded but within their personal tolerances. OneTaste teachers and staff are well aquainted with red/yellow/green and agree to respect them in student interactions.

Understanding the training and insight required to teach OneTaste material with sensitivity, only certified OneTaste Teachers, OM Trainers and Coaches, and those in official training programs, may teach the public OneTaste content, including Orgasmic Meditation. Other leaders and representatives are not permitted to teach or coach in any capacity, whether official or unofficial.

Acknowledging the sensitivity of client/student-teacher relating, OneTaste teachers, coaches, leaders, and staff agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a student. Because several teachers and coaches in our organization have developed relationships with former students and clients, we acknowledge that such a healthy relationship can be possible, but that great care and sensitivity are needed. In such cases, the teacher and the student can consult with the Ethics Committee to determine the healthiest approach.

OneTaste maintains two Committees to provide guidance in individual circumstances and to administer an explicit *Code of Conduct* for the benefit of the community. The first is the Ethics committee, which consists of three individuals known for their integrity and fairness. The Ethics committee governs EMPLOYEE relationships with students and community members. In reviewing potential violations, the committee begins with the presumption that responsibility for honoring the code rests 100% with the teacher or coach and never with the student. Final decisions on the repercussions of violations rest with the Ethics Committee. This document is meant to educate and clarify how interactions that involve OneTaste staff members are handled, and what are the guidelines and boundaries for personal interactions between staff members and students/community members.

Additionally to the Ethics committee, we have the Ombudsman committee that exists to facilitate conversations between fellow students and community members when a personal code is felt to be violated by one or both parties. Codes of conduct around this area are covered

OneTaste

in a separate document.

**Positions**

Those holding positions of responsibility, leadership and public representation have special obligations to avoid improper relations with students. Recognizing that different levels of scrutiny are appropriate, the *Code of Conduct* distinguishes between various roles assumed by members of the community:

*Teachers* lead daylong, weekend, or weeklong courses, Coaching Programs, Mastery programs and evening series courses

*Coaches* are staff members who are actively engaged in a coaching relationship with OneTaste clients.

*Leaders* lead TurnON groups and Community nights. This category also includes staff in positions of support- such as participating in class demos, being back of house (BOH) for courses and also includes our sales staff.

**Definitions**

*Courses* Are any evening, day-long, weekend or series course up to 1 month in total duration. The end of the course in the case of a course longer than one day is defined as the very last meeting of the course, not any individual day of class.

*Programs* are any course longer than 1 month in duration. These include our Coaching Programs (CP) and Mastery programs.

*The staff/student dynamic will commence at the start of a class or program, not at the time of enrollment.*

*Preexisting Relationships* Preexisting OM, sexual or romantic relationships between teachers and leaders and students are exempt from these conditions, if they have been active in **the one year previous** to the course or event. Within the timeline specified by the *Code of Conduct*, relationships may not intensify from OM to romantic or sexual involvement without approval of the Ethics Committee. With regards to coaching, this preexisting relationship allowance is void.

*Ethics Committee Petitions* Any party (student or teacher) can contact the ethics committee to discuss or request an exemption to the Code of Conduct rules. The ethics committee will discuss with all applicable parties and respond once a decision has been reached. Submissions should be presented in email to all members of the committee. Petitioners should expect the petition process to take **one week** from the date submitted. Decisions will either be: approved; denied; responded to with a request for more information; or a notice that a specific amount of additional time will be required to investigate the request. Petitioners and involved parties should expect they might be asked to discuss the request in a telephone call with the ethics committee. The committee can be contacted at ethics@onetaste.us

*Makeout* is a broad term we use to describe any sexual activity from kissing to intercourse. The ethics board will not prescribe any specific acts and approved or not, rather simply give a blanket yes or no to proceeding with an adult mutually desired relationship.

**Grievances**

We hold central to our Code of Conduct a deep respect for our students and this learning. It is of utmost importance that our students feel they are given the respect and support they need while learning with us.

OneTaste®

At OneTaste, we discuss and deal with sexuality and subjects that are deeply personal. This may at times be difficult or confronting. While it's not unusual to feel personally challenged in this work, it is very important to us that you know you have the support of the teachers and staff. If you feel uncomfortable about the behavior of any staff member, we want to know.

Any student who has any questions or concerns to share with the ethics committee is encouraged to contact them at ethics@onetaste.us

## Regulations

*All* OneTaste staff must agree to:

1. Engage in responsible behavior when initiating any sexual relationship within the OneTaste extended community,
2. Refrain from illegal activity during their service in one of these roles

In addition, there are specific requirements and consequences governing sexual relationships between certain individuals and students. The following consequences represent the uppermost limit of repercussion. Discretion as to final discipline rests with the ethics committee.

### OM guidelines

Orgasmic Meditation is the central practice of OneTaste. We hold it within a very strong container with strict adherence to standards. Because of this, we do not limit the ability of Students to OM with teachers or leaders following a class, program, TurnON or OM circle. However, anyone a staff member OMs with must have received previous formal training and hold an OM badge.

Teachers and leaders may never OM with students during a class or workshop. There will be no exceptions to this rule.

We highly recommend that such practice partnerships begin by OMing at OM circles or other OM events. These are great ways to encourage the specific practice nature of our approach to OM.

Coaches must not engage in OM with their coaching clients until at least 30 days have passed after the dissolution of that coaching relationship.

### Makeout guidelines

With regards to makeouts, we acknowledge both that students are competent adults, and at the same time, staff in roles with a higher perception of authority can pose challenging to creating peer sexual relationships. Because of this, we offer a few specific guidelines to allow time for connections to mature away from the teacher/student dynamic.

For coaching relationships, coach and coachee may not engage in makeouts until 60 days have elapsed from the final coaching session and the coaching relationship is dissolved.

For courses, teacher and leaders may not engage in makeouts with previous students until at least 30 days have passed from the last date of class.

For students in our programs, they tend to have more peer interaction with leaders through other avenues, and so we've allowed that relationships might be different here. Once the first 90 days of a program have passed, leaders and students may engage in makeouts at their discretion.

OneTaste

If desire for a deeper relationship occurs between a student and a teacher within a program, both parties must petition the ethics board for an exemption and provide explanation of why.

If you are a pod leader for any students in programs, with students not being coached by you, or not in your pod, you are following the same rule as leaders. For any interactions with students you coach/are in your pod, your guideline is that of the teacher. Specifically for Coaches with a pre-existing OM or sexual relationship with a student who becomes their coaching client or advisee, all OM and sexual contact must be suspended for the length of your coaching relationship. You may resume your prior relationship 30 days after the coaching or advising relationship ends.

For TurnON and OM circle leaders, you must wait 14 days after a person's first appearance at TurnON or OM circle before you may engage in any makeout.

Response to Ethic code violations for a teacher or coach

*First offense:*

1. The teacher, coach or advisor must meet with peer group for discussion session.
2. During the 30 days, the teacher is required to attend 4 anonymous program meetings* and complete daily fear inventory.

*Second offense:*

1. The teacher is suspended from all teaching and coaching activities and responsibilities and the OneTaste Coach Association for 3 months.
2. During the 3 months, the teacher is required to attend 4 anonymous program meetings per month, complete daily fear inventory, and check in monthly with an ethics guide.
3. The teacher is required to attend and participate in a peer group meeting to discuss what happened and the internal state that
4. At the end of the 3 months, the teacher must appear before the Ethics Committee for a review.

*Third and final offense:*

1. The teacher will lose teaching and coaching status at OneTaste, including removal from the OneTaste Coach Association, for a minimum of 1 year.
2. During the year or more, the teacher is required to attend 4 anonymous program meetings per month, complete daily fear inventory, and check in monthly with an ethics guide.
3. At the end of the one year suspension, the teacher can petition the Ethics Committee for reinstatement of teaching and coaching duties. The Ethics Committee reserves the right to deny any request.

Reponse to ethics violation for a leader

*First offense:*

- The leader must participate in a peer discussion group.
- During the 30 days, the leader is required to attend 4 anonymous program meetings and complete daily fear inventory.
- At the end of the 30 days, the leader must appear before the Ethics Committee for a review.

*Second offense:*

- The leader is suspended from their leadership and teaching positions for 3 months.
- During the 3 months, the leader is required to attend 4 anonymous program meetings per month,

OneTaste

complete daily fear inventory, and check in monthly with an ethics guide.

- The leader is required to participate in a peer discussion group.
- At the end of the 3 months, the leader must appear before the Ethics Committee for a review.

*Third and final offense:*

- The leader is suspended for a minimum of 6 months.
- During the 6 months or more, the leader is required to attend 4 anonymous program meetings per month, complete daily fear inventory, and check in monthly with an ethics guide.
- At the end of the six month suspension, the leader can petition the Ethics Committee for reinstatement of teaching and coaching duties. The Ethics Committee reserves the right to deny any request.

*or a comparable support community as approved by the Ethics Committee

**Duration of Records:**

Ethics violations will be tracked on a year to year basis. After **one year** without any violation, someone may have past violations cleared from their record. While these violations will remain in archives, they will not be included when calculating the number of offenses.

As an OneTaste teacher, coach, or leader, I agree to abide by this Code of Conduct and understand the repercussions of noncompliance. I sign this document of my own volition and understand that if I violate these ethics I may lose position, salary, and/or my OneTaste Coach Association status.

| **Teachers/Coach/Leader** | **Witness** |
|---|---|
| Signature ______________________ | Signature ______________________ |
| Printed ______________________ | Printed ______________________ |
| Date ______________________ | Date ______________________ |

OneTaste

## Representation and Usage Agreement

Welcome to the OneTaste Coaching and OM Training Program. This agreement covers important information to consider when creating your private coaching business and/or OM Community during and after the program. As a prerequisite to your participation in the Program, please indicate that you understand and agree to the following by initialing each section and then signing and dating the bottom of this document.

OneTaste Copyrighted Material

1. I understand that "Orgasmic Meditation" and "OneTaste" are registered trademarks of OneTaste LLC.
2. I understand that OneTaste will provide certain copyrighted documents, such as one-pagers, for the sole purpose of using them with or distributing them to my clients in intern coaching or training sessions. I agree to not alter the form or content in any way and to always use the most recent version of any materials. I agree that if, for any reason, I leave the program pre-certification, or in any way do not quality for certification, I will cease use of all copyrighted OneTaste documents or materials.
3. When sharing or distributing OneTaste copyrighted material I agree to include an attribution to OneTaste.

**Representing Myself**

1. I agree to clearly convey to my clients, potential clients, and others the following: (1) that I am an Intern Trainer or Intern Coach, (2) that these are intern sessions, (3) and that these sessions are a necessary step for me to become a OneTaste-Certified Trainer or Coach.
2. Until OneTaste certifies me for my Program, I agree not to advertise, claim, or otherwise represent that I have received training from OneTaste without including language that clearly conveys that I have not completed the Program.
3. If at any time I lose my eligibility to become certified and fail to achieve Certification during the eligibility period, I agree to no longer use any title or make any claims with respect to any professional training I received at OneTaste.
4. If at any time I lose my eligibility to become Certified and fail to achieve Certification during the eligibility period, I agree not to use the phrase "Orgasmic Meditation" in connection with any training or coaching that I provide, paid or unpaid.

**Where and how I practice my skills**

1. I understand that my training in the Program prepares me to work in sessions with either (a) one person as my client; or (b) two people who wish to be coached or trained together as a pair. I may partner with with a OM training partner for the session as long as that partner is also an intern or certified graduate of this program.
2. I understand that the training provided in the Program does not prepare me for performing or hosting demonstrations of Orgasmic Meditation. I agree not to perform or conduct a live, recorded, or otherwise transmitted demonstration of Orgasmic Meditation, for any audience (including in a training session), paid or unpaid, without the express written permission from OneTaste.
3. I understand that OneTaste may permit me to host, lead, or otherwise conduct OneTaste-related events and gatherings (such as "meet-ups", Introductory presentations on OM or similar lead-generation events) of up to 2 hours in length, but not more.
4. I agree neither to attempt nor to claim to train others to become teachers, coaches, instructors, trainers, demonstrators or presenters of any OneTaste-related material.

OneTaste

**Other Conduct**

I understand that pertinent laws, statutes and customs vary greatly from location to location. I agree to research the laws, statutes and customs that apply in my local area, and to refrain from engaging in any portion of my Program training that may conflict with those. I further agree to indemnify OneTaste from any consequences resulting from my actions, where such actions are in conflict with the laws, statutes or customs of my locality.

I understand and agree to all of the terms and conditions specified in this document.

| | |
|---|---|
| Signature | |
| Program | OneTaste Coaching Program ("CP6") |
| Date | |

OneTaste

## Media / Photography Release Form

I, hereby irrevocably grant to OneTaste Incorporated, its subsidiaries, affiliates, nominees, licensees, their successors and assigns, and those acting with its authority (hereinafter collectively referred to as "OT"), with respect to the audio and visual recording of the entire contents of the 2013 Coaching Program ("CP6") (the "Works"), the unrestricted absolute, perpetual, worldwide right to:

1. Reproduce, copy, modify, create derivatives in whole or in part, or otherwise use the Pictures or any part thereof in combination with or as a composite of other matter, including, but not limited to, text, data images, photographs, illustrations, animation and graphics, video or audio segments of any nature, in any media or embodiment, whether now known or hereafter to become known, including, but not limited to such formats of computer readable electronic magnetic, digital, laser, optical-based media, and
2. Use and permit to be used the original form of the Works or in any modified form, in connection with any OT publication, and
3. Display, perform, copy, distribute, trade or broadcast the Works by any means not limited to advertisement, publicity, for profit, through electronic media, print media, other formats whether now known or to become known, and
4. There is no time-limit on the validity of the release of the Works nor is there any geographic specification or limitation of where the Works my be distributed.

**Waiver and Release**

I hereby waive the right and release OT from, and shall neither sue nor hold against OT any claim on format of use, violation of copyright whether now known or unknown, for defamation, invasion of right to privacy, publicity or personality based upon or relating to the use and exploitation of the Works.

I agree that there shall be no obligation to utilize the authorization granted by me hereunder. The terms of this authorization shall commence on the date hereof and be without limitation.

I warrant and represent that I over the age of eighteen years and that I am free to enter into this agreement.

| | |
|---|---|
| Signature | |
| Program | OneTaste Coaching Program ("CP6") |
| Date | |

DEFENSE EXHIBIT
1AN
23-CR-146 (DG)

# Release of Liability Form

Thank you for your interest in attending the ____________ Course, on ____________. This course is offered by **One Taste An Urban Retreat Center**, herein referred to as ("**Sponsors**"). Because of the nature and content of the course your agreement to the Release of Liability (hereafter "Release") and each and every provision of this Course Agreement (hereafter "Agreement") is required as a condition of your acceptance into the course. The Release is intended as a waiver of any and all liability and any right of action, whether legal, equitable or in any other form, against **Sponsors**, their respective course leaders, employers, managers, employees, staff, volunteers, officers, directors, servants, stockholders, principals, general and limited partners, agents, assigns, heirs, attorneys, representatives, and each of their respective families, heirs and executors, predecessors and successors, subsidiaries, affiliates, divisions, sureties, guarantors, insurers, and all other related entities (hereafter "Released Parties"), as a result of any action or omission connected with the content, design, planning, conduct of Released Parties, conduct of other participants and your participation in the course.

**Assumption of Risk**

**I understand, acknowledge and agree to each of the following:**

- That the content of the course is controversial.
- That not all of the activities occurring during the course are known or foreseeable.
- That any concepts, notions, ideas, suggestions and recommendations from the Sponsors and anyone acting on behalf of Sponsors that I accept and or apply to my life, I do of my own free will.
- That while Sponsors believe that the content of the course to be valuable, Sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course.
- That I may not agree with all of the content of the course and accept that possibility.
- That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different than mine.
- That certain participants may make statements or take actions that I disagree with or find offensive.
- That certain participants may disagree with or find offensive statements I make or actions I take.
- That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.
- That I have assessed my own emotional, mental and physical well being, and I have concluded that I wish to and am able to participate in the course.
- That I agree to disclose any psychological or physical health problem, condition or limitation to Sponsors at the time of application and in any event prior to the course commencing.
- That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course.
- That regardless of any disclosures or written approvals, upon acceptance into the course, I continue to bear sole responsibility for my well being.
- That there are emotional and mental risks associated with participation in the course.
- That I voluntarily and knowingly accept and assume each of the risks and other matters set forth in this paragraph.

**Participant's Representations**

I represent that I do not suffer from any psychological, physical or other condition that could pose a threat of harm to Sponsor's course leaders, course guides, employees, staff, volunteers or other course participants.

**Release of Liability**

**I hereby forever release and hold harmless Released Parties from any and all claims, causes of action, demands, obligations, breaches of duty, injuries, liabilities, losses, expenses, costs, attorney's fees, damages,**

**or actions, of every type, kind, nature, description, or character, however defined or denominated, and however claimed or asserted, of any nature, known or unknown, asserted or not asserted, contingent or absolute, matured or unmatured, direct or indirect, arising or accruing in any manner out of, or in any way directly or indirectly related to my participation in the course, any statements or acts of Released Parties, any statements or acts of the participants or third parties, the content, design and planning of course, regardless if the nature of such claims be monetary, emotional, mental, psychological or physical.**

**Psychotherapy Disclosure**
I understand and agree that the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course, I obtain via my own free will and participation. Therefore, to the extent not already covered in the above Release, **I hereby forever release Released Parties from any and all liability from any adverse, or negative reactions, or effects, that my experiences at the course may have on me.**

**Release As Defense**
I understand and agree that this Release and Agreement may be pleaded as a full and complete defense to, and the parties hereby consent that it may be used as the basis for an injunction against, any action, suit or other proceeding based on claims released by this Release.

**Participant's Right Regarding Publication**
Sponsors from time to time may wish to record and/or photograph the course for reproduction and distribution as part of its educational and promotional materials. Sponsors respect each participant's right to privacy and choice. Accordingly, you have the option by indicating below whether you agree to allow the use of your voice or image in educational and promotional materials distributed by Sponsors. If you decline to have your voice and/or image used in any educational or promotional materials, Sponsors will edit out any section of the recording containing your voice and/or image.
I consent to Sponsors' use of my voice _______, image ________.
I do not consent to Sponsors' use of my voice_______, image ________.

**I understand that if I do not indicate above whether I do or do not consent to the usage of either my voice or image, Sponsors shall be entitled to assume that I have given my consent to the use of my voice and image.**

**Confidentiality**
By signing this agreement, I specifically agree to uphold, protect and respect the right of privacy of each of my fellow participants and Released Parties. I agree to keep confidential and not to communicate in any way, at any time, without the particular person's prior written consent, any of the content, events or activities of course, or any of the statements, acts or experiences of my fellow participants and Released Parties that occur at the course, I understand that I am free to share my own experience of what value I received with anyone I choose to, while honoring the confidentiality of this Agreement.

I further agree to follow the instructions of the Sponsors' course instructors, staff, employees and volunteers. I further agree to treat my fellow participants and all connected with the course with respect and to refrain from any statements or conduct once objected to or once instructed to do so by either the course instructors, staff, employees or volunteers.

**Arbitration**

Should any dispute remain or exist that is not covered by the terms of the Release, I further agree to forfeit the right to seek legal remedy in a court of law and agree to refer such dispute to binding arbitration before the American Arbitration Association ("AAA") in San Francisco, California in accordance with the laws of the State of California and the applicable AAA Arbitration Rules to settle any and all disputes between myself and any of the Released Parties. The AAA shall appoint the Arbitrator(s) in accordance with its rules unless the parties mutually agree to another procedure. Judgment upon the award rendered by the Arbitrator(s) shall be entered in any court having jurisdiction pursuant to applicable law.

Any party may seek compliance with these provisions by petition to any court of general jurisdiction. The prevailing party in any such proceeding shall be entitled to the Court's order for payment of attorney's fees and costs.

**Severability and Effect of Partial Invalidity**

I understand and agree that the provisions of this Agreement are severable. In the event a court or other adjudicative body of competent jurisdiction should find any provision or the application of any provision to any person, place or circumstance to be wholly or partially invalid or unenforceable under the law of any jurisdiction, such finding shall not affect the validity and enforceability of the remaining provisions. The remaining provisions shall continue in full force and effect. The provision found to be invalid or unenforceable shall continue to be applicable to the extent permitted under the law of the finding jurisdiction and shall continue in full force and effect under the laws of any other jurisdiction.

**Entire Agreement**

I understand and agree that this Agreement constitutes the sole and entire agreement between the parties with respect to the matters covered in it. This Agreement supersedes any prior or contemporaneous agreements, understandings or undertakings, written or oral, by or among the parties regarding such subject matter. I understand and represent that this Agreement is made without reliance on any inducement, statement, promise or representation other than those contained within this Agreement. I also understand and agree that any statements by Released Parties regarding the course are statements of opinion and do not constitute a representation, warranty or guarantee.

**Modification and Waiver**

I understand and agree that no term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought. The waiver by any party hereto of any breach of any provision of this Agreement shall not constitute or operate as a waiver of such provision or any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver at such time, or at any future time, of such provision or any other provision hereof.

**Attorney Fees**

I understand and agree that should it become necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees, all costs, including costs of investigation, discovery, expert witnesses and consultants, and court costs in addition to all other relief to which such party may be entitled.

**Voluntary Execution of Agreement**

I acknowledge and agree that I am executing this Agreement voluntarily, knowingly, and without duress or undue influence. I have read this Agreement and understand the terms and consequences of it. I am fully aware of the legal and binding consequences of it. I have had the opportunity to consult with anyone of my choosing prior to executing this Agreement.

**I, the undersigned, certify that I have read this Agreement and agree and accept the terms as stated above.**

**Name**________________________ **Signature**______________________ **Date** __________________

DEFENSE EXHIBIT
1BG
23-CR-146 (DG)

# Welcome to 1080 Folsom!!

Here is some basic information for you as you join our community. If you have any questions, please contact Maddie Carl at 415.683.9128.

**HOUSE RULES**

1080 Folsom is an alcohol, smoke and drug-free building. You or your guests are not allowed to bring any opened alcohol or illegal drugs onto the premises. Additionally 1080 Folsom is for residential use only and residents are not allowed to operate any business from the premises without authorization. Violation of either policy will result in immediate removal from the premises.

**CHECK IN PROCEDURES**

Please fill out our check in form. We require a credit card number to hold for the length of your stay in case of damages or lost keys. We also require a picture ID and the best phone number to reach you during your stay. You will be given a front door key and a room key. Take care of your keys! There is a $50.00 fee for each lost key. We will also take your photo and send it to the other residents; this makes for a much friendlier building!

**CHECK OUT PROCEDURES**

When you check out, you must arrange to leave your room and front door keys with Maddie. Otherwise you will be charged for lost keys. Additional, we will do a final walk-through of your room and inspect for any damages; if we find any damages, we will notify you before charging your credit card.

**COMMUNICATION**

If you haven't already, please request to join the 1080 Google group. This will add you to the distribution group and is central to how we communicate and share information about what is going on.

We also have a secret Facebook page to help share information and build connection. Sasha Hood is the moderator of that page. Please contact her to be added to this group.

We have a mandatory monthly house meeting on the first Monday of the month. Please be sure to attend!

**GUESTS**

You must accompany any guests in the common areas of the building. For overnight guest, please send an e-mail to the 1080 group with a photo of your guest along with the person's name and the duration of his/her stay. Guests may stay up to a maximum of 8 days.

**YOUR ROOM**

We want you to feel as home in your room. Please let us know if there is anything you need and we will do our best to help. Food and dirty dishes are not allowed in your room or in the halls. Please help keep our building pest free!

**INTERNET/WIFI**

The WiFi network is: ResNet and the password is: c0nnect3d

**QUIET HOURS**

During certain hours, we ask that you do not make noise that can be heard outside your room. These hours are 10:30pm – 7:00am on weeknights and Midnight – 8:00am on weekends.

**COMMON AREAS**

*Chill Room* – There is a common room on the second floor for all to enjoy. Feel free to use the exercise equipment, lounge on the couches and watch a movie using the DVD player. This room is available 24 hours a day, with the exception of Juliana Kramer 's acupuncture clinic on Tuesdays from4:00 – 6:00 on Wednesdays.

*Sister Love* – We have our own mini-Goodwill closet on the third floor where you can take or donate items. If you are donating items, please make sure they are clean and use the hangers provided to help keep the clothes organized.

**WATER CLOSETS**

There are three water closets (toilets rooms) available on the second floor and two on the third floor. The toilets are designed with a sink above the water tank to conserve water. After you have used the toilet, press the button on the left for liquid waste and the button on the right for solid waste. As the toilet flushes, clean water will run into the faucet; you can use this water to wash your hands. The runoff from the sink is used to refill the toilet tank. Don't worry if the facet runs for a while; it's just running until the toilet tank is filled and will turn itself off.

**MEALS**

As part of your monthly food plan, lunch and dinner is served 5 days a week, Monday – Friday. Lunch is regularly served at 12:30pm and dinner is served at 6:30pm. If you cannot make it to dinner but would like to have a plate reserved for you, write your name on the chalkboard in the kitchen and the cooks will save a plate for you with your name on it.

For any other meals (breakfasts and on weekends) you are welcome to anything in the kitchen that is not expressly marked by the cooks for an upcoming meal. You are responsible for washing any dishes you generate. We ask that you not prepare food while the cooks are preparing and serving meals for the community. Additionally, one night a month you will be assigned a dish shift. Two people are assigned and it usually takes about two hours. The responsibilities include:

- Wrapping up any leftover food
- Washing the pots and pans
- Cleaning the dining room table and sweeping the floor
- Sweeping and mopping the kitchen floor
- Taking out the trash and compost

**ORGASMIC MEDITATION (OM)**

*Supply Closet* – For those who practice OM, there is a supply closet on the third floor where you can pick up gloves and OM towels. Please place used towels in the hamper in the closet.

*Group Practice* – We offer group practice twice a day at 47 Moss Street, Monday – Friday. There are two OMs in the morning (7:30 and 7:50) and two OMs in the evening (6:00 and 6:20). You are responsible for finding your own OM partner. Supplies are provided. Please be mindful of our neighbors on Moss Street and be quiet when arriving and departing in the mornings.

*Lube* – As a resident who OMs, you are allowed two jars of OneStroke lube. Most people keep a jar, labeled with their names in the supply closet at Moss.

**MISCELLANEOUS**

*Chores* – In addition to the monthly dish shift, every resident is assigned a chore. Ben Wheeler is the Task Master and will assign you your chore.

*Mail* – If you would like your mail delivered to 1080, notify the post office and as mail and packages are delivered, they will be delivered directly to your room.

*Bikes* – If you have a bike, there is limited bike storage at XXX Russ Street. Please contact Ben Wheeler if you are interested. Bikes are NOT to be stored on the first floor.

DEFENSE EXHIBIT
1BS
23-CR-146 (DG)

OneTaste®
Powered by Orgasm™

# EMPLOYEE HANDBOOK

October 2013

Table of Contents

[ TOC \o "1-3" \h \z \u ]

# SECTION 1: WELCOME & INTRODUCTION

## WELCOME

Welcome and thank you for joining us! We are very eager to make sure that your relationship with OneTaste will be a mutually beneficial and pleasant one. We have established an outstanding reputation, and this is to the credit of every one of our employees. We hope you will find satisfaction and take pride in your work here.

Best wishes for your success and happiness at OneTaste!

## FOREWORD

OneTaste is a unique organization dedicated to teaching about female orgasm and to spreading the practice of Orgasmic Meditation. Whether you have just joined our staff or have been at OneTaste for a while, we are confident that you will find our company a dynamic and rewarding place to work, and we look forward to a productive and successful association. We consider employees of OneTaste to be among our most valuable resources. This Employee Handbook has been written to serve as a guide to the employer/employee relationship.

There are several things to keep in mind about this Handbook. First, it contains only general information and guidelines. It is not intended to be comprehensive or to address all the possible applications of, or exceptions to, the general policies and procedures described. For that reason, if you have any questions concerning eligibility for a particular benefit or the applicability of a policy or practice to you, you should address your specific questions to Adam Jacobowitz, Robert Kandell or Joanna Van Vleck.

Nothing in this Employee Handbook or in any other personnel document, including benefit plan descriptions, creates, or is intended to create a contract, promise or representation of continued employment for any employee. Your employment is at-will and may be terminated with or without cause and without prior notice by the Company. You are also free to leave the Company and may resign for any reason at any time. No supervisor or manager has any authority to enter into a contract of employment—express or implied—with any employee for any specified period of time. Any agreements to change your at-will

employment status must be in writing and signed by the President or Chief Operating Officer of the Company..

This Handbook supersedes all prior handbooks, manuals, policies, and procedures issued by OneTaste, as well as any oral or written inconsistent policy statements. The procedures, practices, policies and benefits described here may be modified or discontinued by the Company at any time. We will try to inform you of any changes as they occur.

This Handbook and the information in it should be treated as confidential. No portion of this Handbook should be disclosed to others, except OneTaste employees.

It is our sincere hope that your employment with OneTaste will be a mutually rewarding and satisfactory one. Please take the time to carefully read this Handbook. It is a valuable reference for understanding your job and OneTaste. If you have any questions or concerns about this Handbook or any other policy or procedure, please ask your supervisor.

# SECTION 2: BASIC EMPLOYMENT POLICIES

## EQUAL EMPLOYMENT OPPORTUNITY

OneTaste is an equal opportunity employer and makes employment decisions without regard to race, color, religion, gender, sex, sexual orientation, gender identity, national origin, age, disability, medical condition, pregnancy, childbirth and related medical conditions, genetic information, marital status, amnesty, military service, or any other classification protected by federal, state and local laws. This policy applies to all terms and conditions of employment, including hiring, placement, promotion, demotion, termination, layoff, transfer, leaves of absence, recruitment advertising, training, and all forms of compensation.

The Company's commitment to equal opportunity employment applies to all persons involved in the operations of the Company and prohibits unlawful discrimination by any employee of the Company, including supervisors and coworkers, as well as outside third parties including customers and vendors.

Any violation of this policy will not be tolerated and will result in appropriate disciplinary action, up to and including termination. If an employee believes someone has violated this policy, the employee should bring the matter to the attention of Adam Jacobowitz, Robert Kandell or Joanna Van Vleck. The Company will promptly investigate the facts and circumstances of any claim this policy has been violated and take appropriate corrective measures.

No employee will be subject to, and OneTaste prohibits, any form of discipline or retaliation for reporting perceived violations of this policy, pursuing any such claim, or cooperating in any way in the investigation of such claims.

## ANTI-HARASSMENT POLICY

OneTaste is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal employment opportunities and prohibits unlawful discriminatory practices, including harassment. OneTaste does not tolerate harassment of our job applicants, contractors or employees by another employee, supervisor, vendor, customer, or any third party. Any form of harassment on the basis of race, religious creed, color, age, sex, sexual orientation, gender identity, national origin, religion, marital status, medical condition, disability, genetic characteristics, military service, pregnancy, childbirth and related medical conditions, or any other classification protected by federal, state, or local laws and ordinances is prohibited and will be treated as a disciplinary matter. The Company is committed to a workplace free of harassment.

Due to the nature of our business, topics of orgasm, sex, intimacy, connection and relationships are a regular part of the work we do here at OneTaste. Employees must understand that these topics may be central to their work and discussions on a day-to-day basis. We expect that all discussions surrounding sex will take place in a professional and non-derogatory manner.

By accepting employment at OneTaste, you are acknowledging that you are aware of and comfortable with the intimate and sexual nature of the Company's business.

OneTaste strives to create an inviting and welcoming atmosphere and encourages employees to be open and free at the workplace. However, we also have a responsibility to ensure that all of our employees are free from harassment and feel safe at the workplace. The following policy establishes guidelines and procedures for preventing harassment in the workplace.

**Harassment Defined**. Harassment as defined in this policy is unwelcome verbal, visual, or physical conduct creating an intimidating, offensive, or hostile work environment that interferes with work performance. Harassment can be verbal (including slurs, jokes, insults, epithets, derogatory comments, threats, gestures, or teasing), graphic (including offensive posters, symbols, cartoons, drawings, computer displays, or e-mails), or physical conduct (including physically threatening another, blocking someone's way, etc.) that denigrates or shows hostility or aversion towards an individual because of any protected characteristic. Such conduct violates this policy, even if it is not unlawful. Because it is difficult to define unlawful harassment, you are expected to behave in a professional and respectful manner at all times.

**Sexual Harassment Defined.** Sexual harassment can include all of the above actions, as well as other unwelcome conduct, such as unwelcome or unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities and other verbal or physical conduct of a sexual nature, where a) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; b) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such

individual; or c) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Because of the intimate nature of the work we do here at OneTaste, and our liberal attitudes towards sex, there may be sexual conversations and offers made among co-workers. There is no expectation for any employee to submit to any request that is unwelcome, nor will there be any negative action taken towards an employee who declines one of these requests. We expect all employees to act politely and professionally at all times and respect each others' wishes and preferences.

Further, as a OneTaste employee, we expect you to clearly communicate with co-workers and affiliates when requests or offers are unwanted or unwelcome. Employees and affiliates understand that the practice of Orgasmic Meditation is a central part of our culture and that the majority of employees choose to engage in the practice on a daily basis. However, if at any point an employee feels that he or she is being harassed in any manner, we have created the complaint procedures outlined below and encourage employees to utilize it. OneTaste ensures that there will be no negative repercussions for any employee who voices such concerns.

**Individuals and Conduct Covered**

These policies apply to all applicants and employees, whether related to conduct engaged in with fellow employees or someone not directly connected to OneTaste, such as an affiliate.

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business meetings, courses, and business-related social events.

**Complaint & Investigation Process**

When possible, OneTaste encourages individuals who believe they have been subject to such conduct to promptly advise the offender that his or her behavior is unwelcome and should be discontinued. Often this action alone will resolve the problem. OneTaste recognizes, however, that an individual may prefer to resolve the matter through complaint procedures.

Individuals who believe they have been the subject of conduct prohibited by this policy or who believe they have witnessed such conduct should immediately report the matter to Robert Kandell or Joanna Van Vleck. If you make a complaint under this policy and have not received a satisfactory response within five (5) business days, you should contact Adam Jacobowitz.

Any reported allegations of harassment, discrimination or retaliation will be investigated promptly. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or have other relevant knowledge. To the extent possible, the Company will endeavor to keep your

concerns confidential. The Company will then document its findings regarding the complaint and take any disciplinary action or other corrective measures as warranted.

**No Retaliation**

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action. Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

False or malicious complaints of harassment, discrimination or retaliation may also be the subject of appropriate disciplinary action.

## REASONABLE ACCOMODATION

OneTaste complies with all federal and state laws concerning the employment of persons with disabilities. OneTaste recognizes and supports its obligation to reasonably accommodate job applicants and employees with disabilities as well as those with religious beliefs and practices who are able to perform the essential functions of their positions, with or without reasonable accommodation.

The Company will provide reasonable accommodation to otherwise qualified applicants or employees with known disabilities or religious beliefs, unless doing so would impose an undue hardship on the Company or pose a direct threat of substantial harm to the employee or others. The Company may also propose an alternative accommodation.

If you believe you need a reasonable accommodation based on a disability or religious belief, you should discuss the need for possible accommodation with your supervisor or Human Resources.

## BACKGROUND CHECKS

The Company recognizes the importance of maintaining a safe workplace with employees who are honest, trustworthy, qualified, reliable, and nonviolent, and who do not present a risk of serious harm to their co-workers or others. For purposes of furthering these concerns and interests, the Company reserves the right to investigate an individual's prior employment history, personal references, and educational background, as well as other relevant information. Consistent with legal requirements, the Company also reserves the right to obtain and to review an applicant's or an employee's credit report, criminal history, and other relevant information, and to use such information when making employment decisions.

## AT-WILL EMPLOYMENT

Employment with OneTaste is "at-will." This means employees are free to resign at any time, with or without cause, and OneTaste may terminate the employment relationship at any time, with or without cause or advance notice. As an at-will employee, there is no

guarantee that you will be employed at OneTaste for any specified period of time. The Company has the right to manage its work force and direct its employees. This includes the right to hire, transfer, promote, demote, reclassify, lay off, terminate, or change any term or condition of employment at any time, with or without a reason and with or without notice unless otherwise required by law.

No one other than the President or Chief Operating Officer (COO) of the Company may enter into an agreement for employment for a specific period of time or make any agreement contrary to the policy of at-will employment. Any such agreement must be in writing signed by the President or COO of the Company and you. Unless your employment is covered by such a written employment agreement, this policy of at-will employment is the sole and entire agreement between you and the Company as to the duration of employment and the circumstances under which employment may be terminated.

## EMPLOYEE ELIGIBILITY REQUIREMENTS

As a condition of employment, you must complete the Employment Verification Form I-9 and present documentation establishing identity and employment eligibility. You may also be asked to acknowledge your ability to perform tasks as detailed in your applicable job description.

If you are authorized to work in this country for a limited time period, you will be required to submit proof of renewed employment eligibility prior to expiration of that period to remain employed by OneTaste.

## TELEPHONES AND EMERGENCY CONTACT

All employees must have an operable telephone at their place of residence or cell phone. Message phones at remote locations are unacceptable. Employees are also responsible for filling out an Emergency Contact Form, contained in the Employee Orientation Packet. This form will be provided by the Company and additional copies are available from your supervisor. Please update this form as necessary so that the Company can contact the appropriate people in case of an emergency.

## OVERTIME

As an employee of OneTaste, from time to time, you may be required to work overtime. Your supervisor will notify you when you are required to work overtime. We expect and appreciate your cooperation. We will try to provide you with advance notice of any overtime that will be required of you.

If you are a non-exempt employee, you will be paid overtime in accordance with state and federal overtime requirements. For all hours worked in excess of eight (8) hours in one (1) day or 40 hours in one (1) week, or for the first eight (8) hours on the seventh consecutive day in the same workweek, you will be paid at one and one-half times (1½) your regular rate of pay. You will be paid double-time for hours worked in excess of 12 in any workday or in

excess of eight (8) on the seventh day of the workweek. There may be exceptions to these standards where allowed by law.

Please remember you are not allowed to work overtime unless it has been authorized in advance by your supervisor in writing.

## REST BREAKS AND MEAL PERIODS

All non-exempt employees are entitled to periodic break periods during their workday. If you are a non-exempt employee, you will be paid for all such break periods and you will not clock out. Your supervisor will advise you of the time and duration of your breaks.

Generally, you will be entitled to one (1) 10-minute rest break for every four (4) hours or substantial portion thereof you work. If you work more than six (6) hours in a workday, you will receive one (1) rest break during the first half of your shift and one (1) rest break during the second half of your shift. Rest breaks are paid and considered hours worked.

If you work more than five (5) hours in a workday, you are also entitled to a meal period of at least 30 minutes. You must clock out for your meal period. Your supervisor will advise you of the scheduling of your meal period. You must not perform any work during your meal period, and you must take at least 30 minutes completely off work. You are expected to return to work promptly at the end of any meal. If for any reason you do not take the applicable rest and meal periods, you must notify your supervisor immediately. Meal periods are unpaid and not considered hours worked.

All breaks and meal periods must be taken either in the lunch room or outside the work area. You may leave the premises for your meal periods. If for any reason you do not take the applicable rest and meal periods, you must notify your supervisor immediately.

## LACTATION ACCOMMODATION

For up to one year after a child's birth, any employee who is breastfeeding her child will be provided with reasonable break times as needed to express breast milk for her baby. OneTaste will designate a private space for this purpose. Employees who work off-site or in other locations will be accommodated with a private area as necessary.

The break time, if possible, must run concurrently with rest and meal periods already provided to the employee. If the break time cannot run concurrently with rest and meal periods already provided to the employee, the break time will be unpaid. Employees must indicate all breaks taken on her time record.

## BINDING ARBITRATION OF DISPUTES

As a condition of employment, applicants and employees sign a binding contract ("Arbitration Agreement") by which the employee and the Company agree to submit to binding arbitration all disputes related to employment with the Company or the termination

of employment. Each employee is given a copy of the Arbitration Agreement once he or she has signed it. Employees should refer to the Arbitration Agreement for details concerning its provisions.

# SECTION 3: WORKPLACE EXPECTATIONS

## CONFIDENTIALITY

As part of your responsibilities at OneTaste, you may learn of or be entrusted with sensitive information of a confidential nature. During your employment, all Company information, including, but not limited to, sales figures or projections; estimates; client lists; computer processes, programs and codes; marketing methods, programs, or related data; tax records; or accounting procedures, will be considered and kept as the private and confidential records of the Company. These records may only be used in performing work for OneTaste and must not be divulged to any firm, individual, or institution except on the direct written authorization of the President.

In addition, our clients and other parties with whom we do business entrust the Company with important information relating to their personal and business affairs. It is our policy that information learned about clients through your relationship with the Company is considered confidential information and should not be disclosed to external parties or to employees without a "need to know." If an employee questions whether certain information is considered confidential, he orshe should first check with his or her immediate supervisor.

This policy is intended to alert employees to the need for discretion at all times and is not intended to inhibit normal business communications.

As a condition of your employment with the Company you are required to enter a Confidentiality Agreement with the Company. Your failure to honor your obligations under this agreement may result in disciplinary action, up to and including termination.Se

## CONFLICTS OF INTEREST

OneTaste expects its employees to devote their full work time, energies, abilities, and attention to our business. Employees must avoid any relationship or activity that might impair, or even appear to impair, their ability to make objective and fair decisions when performing their jobs. Employees are also expected to avoid situations that create an actual or potential conflict between the employee's personal interests and the interests of the Company. A conflict of interest exists when an employee's loyalties or actions are divided between the Company and a competitor, supplier, or customer. Some examples of the more common conflicts that should be avoided by all employees include, but are not limited to:

- accepting personal gifts or entertainment from competitors, customers, suppliers, or potential suppliers;

- working for a competitor, supplier, or customer while employed by the Company;
- engaging in self-employment in competition with the Company;
- using proprietary or confidential Company information for personal gain or to the Company's detriment;
- having a direct or indirect financial interest in or relationship with a competitor, customer, or supplier;
- committing the Company to give its financial or other support to any outside activity or organization without appropriate written authorization.

Before engaging in any activity, transaction or relationship that might give rise to a conflict of interest, employees must consult with their supervisor or management for clarification.

## OUTSIDE EMPLOYMENT

Employees are permitted to engage in outside work or to hold other jobs (provided that they are legal), subject to certain restrictions as outlined below. However, activities and conduct away from the job must not compete with, conflict with or compromise the Company's interests or adversely affect your job performance or the job performance of anyone employed by the Company

Employees are also prohibited from performing any services for OneTaste customers that are outside of their job responsibilities with the Company. Employees are further prohibited from soliciting any of the Company's clients or affiliates on behalf of themselves or another individual or Company.

Employees are cautioned to carefully consider the demands that outside work activities will create before accepting outside employment. Outside employment will not be considered an excuse for poor job performance, absenteeism, tardiness, or any other disciplinary issue. The Company will not accommodate an employee's request to modify his or her hours or work schedule due to outside employment. If OneTaste determines that an employee's outside work interferes with his or her job performance, the Company may ask the employee to terminate the outside employment or may take disciplinary action, up to and including termination.

## ATTENDANCE AND PUNCTUALITY

The success of our Company depends upon the cooperation and commitment of each member of our team to have regular attendance and punctuality. Please be at your work place and ready to work at your starting time. Give yourself enough time to make preparations to begin work prior to your starting time. However, we request you do not report to work or clock in more than five (5) minutes before your starting time without your supervisor's permission. We also ask that you not stay more than five (5) minutes after the end of your workday without your supervisor's permission.

We recognize there may be times when your absence or tardiness cannot be avoided. In that event, you must notify your supervisor of your absence or tardiness as soon as possible, but at least two (2) hours before your scheduled shift. You must speak with your supervisor directly and you may not simply leave a voicemail message.

Not reporting to work and not calling to report the absence is a no-call/no-show and is a serious matter. One no-call/no-show is grounds for discipline, up to and including termination. Three consecutive no call/no shows will be considered job abandonment and establish an employee's voluntary resignation of employment.

## ATTIRE AND GROOMING

It is important for our employees to project a professional image while at work by maintaining appropriate attire and proper hygiene. OneTaste maintains a business casual dress code. Employees are expected to be neat, clean and well groomed while on the job. Clothing must be consistent with the standards for OneTaste's business environment and must be appropriate to the type of work being performed.

OneTaste is confident that employees will use their best judgment regarding attire and appearance. However, management reserves the right to object to any aspect of your dress and hygiene. Any employee who is improperly dressed will be counseled and may be sent home to change into suitable clothes. Violations of this policy may result in disciplinary action, up to and including termination.

## ELECTRONIC COMMUNICATION AND INTERNET USE

OneTaste operates in a number of locations around the world, and technology is a primary way that employees stay connected. Management uses texting, the GroupMe app and e-mail to communicate and interact with employees. Employees are expected to respond to communications from management in a timely manner. Regular text response time tests will be completed by management. Staying connected via technology mediums allows for the team to stay connected in Orgasm. This is central to the success of OneTaste and OneTaste employees and affiliates.

OneTaste provides voicemail, computer, and e-mail systems to employees for business use. Access to the Internet through the Company's computer systems is also intended primarily for business use.

The following guidelines have been established for using the Internet and the Company's electronic systems in an appropriate, ethical and professional manner:

- Employees may not transmit retrieve or store any communications of a defamatory, discriminatory, or harassing nature.
- Employees may not copy, retrieve, modify or forward copyrighted materials, except with permission or as a single copy to reference only.
- Employees must not use the system in a way that disrupts its use by others. Employees must not send or receive large files that could be saved/transferred via thumb drives. Employees are prohibited from sending or receiving files that are not related to work.
- Employees should not open suspicious e-mails, pop-ups or downloads. Contact IT with any questions or concerns to reduce the release of viruses or to contain viruses immediately.
- E-mails transmitted through the Company's email system and through third-party service providers on Company computers, are not private and are subject to viewing by the Company. Be aware of this possibility when sending e-mail within and outside the Company.

OneTaste may access its electronic communications systems and obtain the communications within the systems, without notice to users of the system, in the ordinary course of business when the Company deems it appropriate to do so. The reasons for which OneTaste may obtain such access include, but are not limited to: maintaining the system, preventing or investigating allegations of system abuse or misuse, assuring compliance with software copyright laws, complying with legal and regulatory requests for information, and insuring that the Company's operations continue appropriately during an employee's absence.

Employees have no right of privacy as to any information or file maintained in or on OneTaste property or transmitted or stored through the Company's computer systems, voice mail, e-mail, internet, or other technical resources.

Employees may access only files or programs, whether computerized or not, that they have permission to enter. Employees may not load personal software onto OneTaste's computer system, and may not copy software from OneTaste for personal use.

## SOCIAL MEDIA

We understand that social media can be a fun and rewarding way to share your life and opinions with family, friends, and co-workers around the world. However, before creating online content, please keep in mind that any conduct that adversely affects your job performance, the job performance of any OneTaste employee, or otherwise adversely affects the Company's legitimate business interests may result in disciplinary action up to and including termination.

The following guidelines are intended to reduce the likelihood that your personal social networking will have an adverse effect on the Company:

**Confidential Information:** Maintain the confidentiality of the Company's trade secrets and private or confidential information. Do not post internal reports, policies, procedures or other internal business-related confidential communications. Respect financial disclosure laws as well as copyright and trademark laws. Ensure that all posts are consistent with the Confidentiality and Non-Disclosure Agreement that you signed as a condition of employment with the Company.

**Media contacts:** To protect the Company's interest in having a single spokesperson for the Company, employees should not speak to the media on the Company's behalf without contacting Joanna Van Vleck. All media inquiries should be directed to her.

**Protected activity:** OneTaste respects the rights of individuals in all countries in which it operates. None of the prohibitions contained in this policy are intended to infringe upon employees' exercise of their rights under Section 7 of the National Labor Relations Act or any other applicable law.

The Company has spent substantial time and resources building its reputation and good will. These are valuable and important corporate assets. Before you engage in any social networking that identifies yourself as an employee of the Company, or that identifies the Company, please consider whether you are damaging the Company's reputation. If you are uncertain, you are encouraged to consult with your supervisor before posting

## SOLICITATIONS, DISTRIBUTIONS AND POSTING OF MATERIALS

OneTaste prohibits the solicitation, distribution and posting of any non-Company materials on or at Company property by any employee or non-employee. The sole exceptions to this policy are postings related to charitable and community activities that are pre-authorized by OneTaste management.

OneTaste employees should abide by the following guidelines:

- Non-employees may not solicit employees or distribute literature of any kind on Company premises at any time.
- Employees may only admit non-employees to work areas with management approval or as part of a Company-sponsored program. These visits should not disrupt workflow. All non-employees must be accompanied by an employee at all times.
- Employees may not solicit other employees during work hours or on Company premises, except in connection with a Company-approved or sponsored event.
- Employees may not distribute literature of any kind during work hours or on Company premises at any time, except in connection with a Company-sponsored event

## EMPLOYEE PERSONNEL FILES

Employee personnel files are maintained by the Human Resource department. It is important your personnel records are accurate and up-to-date so you may continue to receive uninterrupted benefits. Certain information is also necessary to determine the amount of wage deductions for federal and state income tax. You should notify the Company of any change in your name, address, telephone number, marital status, number of dependents, or emergency contact telephone number as soon as possible.

The Company further understands the particularly sensitive nature of an employee's medical records, so we do not place any such records in the employee's personnel file. We keep all medical records in a separate and secure place. If you have any questions about the storage of your medical records or about inspecting your medical records, contact the Human Resources Department.

In addition, you may request a copy of your payroll records. Please make any such request in writing to Human Resources. The Company will provide the copies within 21 days of your request. You are responsible for paying the reasonable expenses incurred in copying such records for you.

You may view your personnel file. Requests to view your personnel file should be directed to your supervisor or to Human Resources.

## SEARCHES OF COMPANY AND EMPLOYEE PROPERTY

OneTaste provides property to employees for their use (e.g., Company vehicles, desks, file cabinets, etc.). Searches of Company facilities and property, including Company property in the possession of the employee, may be conducted at any time and do not have to be based upon reason to believe Company policy is being violated. Employees may not withhold permission for the Company to search Company-supplied property including desks, lockers, toolboxes, lockers, and Company vehicles.

To also protect employees and the Company from theft, and to enforce Company policy prohibiting other misconduct including the possession or use of drugs, alcohol, weapons, and stolen property, the Company reserves the right to search employees and their personal property (e.g., vehicles, clothing, packages, purses, lunch boxes, or other containers brought onto Company premises) when there is reason to believe Company policy is being violated. Employees are expected to cooperate in the conduct of such searches, and the Company will not tolerate any employee's refusal to submit to a search.

To further ensure the safety and security of employees and clients, and to protect OneTaste's legitimate business interests, OneTaste reserves the right to question and inspect or search any individual entering onto or leaving OneTaste premises. Inspections and searches may occur at any time, with or without prior notice. The individual may be requested to self-inspect his or her personal property or person by displaying the contents

of any packages and/or turning out his or her pockets, et cetera, in the presence of a representative of OneTaste, typically a management employee of the same gender.

# SECTION 4: WORK PERFORMANCE

## INTRODUCTORY PERIOD OF EMPLOYMENT

The first three (3) months of your employment are an Introductory Period. The Introductory Period is designed to give you a chance to become familiar with the Company and to learn your job. It also gives your supervisor a chance to work more closely with you while you learn about your job, and evaluate your performance. During this period, you may be placed in different tasks if needed. Your cooperation and assistance in performing such additional work is expected.

Upon completion of your Introductory Period, you will become eligible for participation in our benefit programs and establish your service date based on your date of hire. This date may be important as it will be used to compute your vacation and other benefits, if applicable.

The Introductory Period is just that—an introduction. Completion of the Introductory Period signifies our hope that you will be capable of functioning fully in your position. Completion of the Introductory Period is not in any way unqualified acceptance by the Company of your performance or an assurance of continued employment.

At any time during your employment, OneTaste reserves the right, with or without notice, to alter or change job responsibilities, reassign or transfer job positions, or assign additional job responsibilities to any employee.

## PERFORMANCE EVALUATIONS

The Company endeavors to schedule periodic performance evaluations, after completion of the Introductory Period and on the employee's anniversary date, to give you an opportunity to discuss your work performance with your supervisor. In addition, your supervisor may give you regular input regarding your performance.

During your formal performance review, your supervisor will consider the following issues, among others: attendance, initiative and effort, knowledge of your work, attitude and willingness, quality and quantity of work performed, and the conditions under which you work. The performance evaluation is designed to identify your strengths and also inform you of areas where improvement may be required. Your performance evaluation may also provide an opportunity for you to discuss performance goals and targets with your supervisor. After each evaluation, the employee will be required to sign the evaluation report simply to acknowledge that it has been presented to them and discussed with the employee by their supervisor, and that they were aware of its contents. At that time, the employee will receive a copy of the written evaluation report, and the original will be placed in the employee's personnel file.

## DISCIPLINARY POLICY

If a problem arises the Company will evaluate the situation and take appropriate action, including discipline and/or immediate discharge, in light of all the circumstances. Generally, OneTaste may use progressive discipline and the process may include counseling, a written warning, suspension, or termination. OneTaste may, at its discretion, skip steps in the procedure and immediately terminate an employee without prior warning, for example, based on its evaluation of the circumstances, including the severity of the conduct in question.

This disciplinary procedure is not evidence of a contract of employment, express or implied, or a guarantee of any kind by OneTaste, including guaranteeing employment for a definite period of time. Rather, we remind you that your employment with OneTaste is at will. This means that either you or OneTaste may terminate your employment at any time, for any reason or for no reason at all, with or without cause or prior notice.

## PROHIBITED CONDUCT

There are many of us working together here at OneTaste, and we need to guard our security, our personal safety, our welfare and Company operations. The following conduct is prohibited and will not be tolerated by OneTaste. This list of prohibited conduct is illustrative only. Other types of conduct detrimental to security, personal safety, employee welfare and the Company's interests may also be prohibited.

1. Falsification of employment records, employment information, or other Company records.
2. Recording the work time of another employee or allowing any other employee to record your work time, or allowing falsification of any time card, either your own or another's.
3. Possessing, distributing, selling, transferring, using or being under the influence of alcohol, an illegal drug, or a controlled substance during work time.
4. Theft, deliberate or careless damage of any Company property or the property of any employee or client.
5. Removing or borrowing Company property without prior authorization.
6. Unauthorized use of Company equipment, time, materials, or facilities.
7. Taking, copying, or otherwise misusing Company information, including employment records and business records.
8. Provoking a fight or fighting during working hours or on Company property.
9. Bringing firearms or any other dangerous weapons or materials onto Company property at any time.
10. Engaging in conduct resulting in a criminal conviction whether or not related to job performance.

11. Insubordination, including but not limited to failure or refusal to obey the orders or instructions of a supervisor or member of management, or the use of abusive or threatening language toward a supervisor or member of management.
12. Making false, vicious, profane or malicious statements toward or concerning the Company or any of its employees at any time during working hours or on Company property.
13. Failure to notify a supervisor when unable to report to work, unless excused by an emergency.
14. Unexcused absences and tardies.
15. Failure to obtain permission to leave work for any reason during normal working hours, with the exception of meal periods.
16. Failure to observe working schedules, including rest and lunch periods.
17. Failure to provide a physician's certificate when requested or required to do so.
18. Sleeping or malingering on the job.
19. Making or accepting personal telephone calls during working hours.
20. Working overtime without authorization or refusing to work assigned overtime.
21. Wearing extreme, unprofessional or inappropriate styles of dress or hair while working.
22. Violation of any safety, health, security or Company policy, rule, or procedure.
23. Committing a fraudulent act or a breach of trust in any circumstances.
24. Engaging in any act of unlawful harassment of another individual.
25. Engaging in any act of workplace violence.
26. Working for another employer while on a leave of absence without the prior consent of the Company.
27. Violation of the Company's equal opportunity or harassment policies.

Nothing contained herein is intended to interfere with any rights granted to employees by any federal, state or local law, including the National Labor Relations Act. To the extent any provision contained herein is inconsistent with any federal, state or local law, the Company fully intends to comply with the law and respect the rights of its employees.

This statement of prohibited conduct does not alter the Company's policy of employment at will. Either you or the Company may terminate the employment relationship at any time for any or no reason, with or without cause or notice.

## INTERNAL COMPLAINT PROCEDURE

OneTaste believes each employee should have an opportunity and a means to raise grievances the employee feels have not been resolved.

Listed below are three (3) successive levels at which you may voice your concerns. However, if you would like to discuss your grievance prior to formally beginning the

grievance process, you may always contact Human Resources. It is important for you to understand that nothing in this grievance procedure is intended to create an express or implied agreement that alters the employment at-will relationship that exists between the Company and you, as set forth in the section of this Handbook entitled "At-Will Employment."

The followings steps are provided to all employees for the settlement of a grievance:

- Step 1: Discuss your grievance or concern with your immediate supervisor. Should the results prove unsatisfactory, or if you feel you cannot discuss your concern with your immediate supervisor, take your grievance to the second step.

- Step 2: Discuss your grievance or concern with the individual who represents the second level of supervision. If the problem remains unresolved, or if you feel you cannot discuss your concern with the second level of supervision, proceed to the third step.

- Step 3: You may e-mail your grievance to Human Resources at hr@onetaste.us

The President or her designated representative will provide you with a verbal or written response within 10 working days unless she determines additional time is required under the circumstances. The decision at this step is final, conclusive, and binding on all parties.

Employees are encouraged to utilize this procedure without fear of retaliation. No employee will be discriminated or retaliated against because the employee has elected to use this procedure. Anyone, regardless of position or title, whom the Company determines has engaged in conduct that violates this policy against retaliation will be subject to discipline, up to and including termination.

This policy does not apply to claims involving perceived violations of the Company's equal employment opportunity policies. Such claims should be reported immediately and in the manner set forth in the Company's "Equal Employment Opportunity" and/or "No Harassment" policies, and will be addressed in accordance with the provisions of the applicable policy.

# SECTION 5: TIME OFF, BENEFITS, & LEAVE POLICIES

## YOUR BENEFITS PACKAGE

OneTaste offers a number of benefits to its employees. This Handbook briefly describes some of those benefits.

The official details contained in any benefits documents will govern in the event of any conflict or inconsistency with the details listed in this Handbook or with any other written or

oral statements or representations. The Company may modify or rescind any benefits provided. If you have any questions about your benefits, please consult Human Resources.

## TIME OFF

To schedule vacation time, employees should request the time off from their supervisor with as much advance notice as possible. We know that sickness will prevent you from coming to work on occasion; we expect you to contact your supervisor directly each day you plan to be out due to sickness and to leave a number where you can be reached in case we need you. Any time off will be unpaid.

**Absences of Less Than One Day.** Non-exempt employees may utilize vacation time in half-day or full-day increments only. Exempt employees' leave banks will be reduced only in full-day increments.

**Checking Voicemail and E-Mail.** We strongly believe employees should devote their vacation time to rest and relaxation. Doing so allows employees to recharge their batteries and generally makes for a more productive workforce. Accordingly, employees who are on vacation are not expected to check their voice mail or e-mail when away from the workplace.

**Payment Upon Separation.** Upon separation of employment for any reason, all employees will be paid for their accrued but unused vacation time at their regular rate of pay at the time of separation.

## SAN FRANCISCO MASS TRANSIT COMMUTER BENEFITS

All San Francisco based employees who work 10 or more hours a week within the City and County of San Francisco are eligible to receive mass transit commuter benefits. To provide these benefits, the Company has elected to provide a pre-tax election program that permits employees to exclude certain commuting costs from taxable wages. Please contact your supervisor or Human Resources for further information about the program or to sign up for benefits.

## SAN FRANCISCO HEALTH CARE SECURITY ORDINANCE

OneTaste complies with San Francisco's Health Care Security Ordinance ("HCSO"), which requires covered employers to make Health Care Expenditures for covered employees. In addition, OneTaste complies with the Employer Spending Requirement which requires covered employers to spend a minimum amount of money (set by law) on Health Care Expenditures for their covered employees.

Covered Employees. With some exceptions, an employee is covered by the HCSO if he or she works for a Covered Employer and:

- is entitled to be paid the minimum wage;

- has been employed by his or her employer for at least 90 calendar days; and
- performs at least 8 hours of work per week within the geographic boundaries of San Francisco.

For more information about the HCSO, please contact your supervisor or Human Resources.

## DISABILITY INSURANCE

California based employees are covered by California State Disability Insurance (SDI). SDI may be payable when you cannot work because of illness or injury not caused by employment at the Company or when you are entitled to temporary workers' compensation at a rate less than the daily disability benefit amount. Employees in other states are covered by similar disability insurance provisions.

## WORKERS' COMPENSATION

At no cost to you, you are protected by Workers' Compensation Insurance while an employee of OneTaste. The policy covers you in case of occupational injury or illness by providing, among other things, medical care, compensation and vocational rehabilitation.

To ensure that you receive any workers' compensation benefits to which you may be entitled, you will need to:

- Immediately report any work-related injury to your supervisor.
- Complete a written Employee's Claim Form and return it to Human Resources.
- Seek medical treatment and follow-up care if required.

The Company is required by law to notify the workers' compensation insurance company of any concerns of false or fraudulent claims. Any person who makes or causes to be made any knowingly false or fraudulent material statement or material misrepresentation for the purpose of obtaining or denying workers' compensation benefits or payments is guilty of a felony. A violation of this law is punishable by imprisonment for one to five years, or by a fine not exceeding $50,000.00 or double the value of the fraud, whichever is greater, or both. Additional civil penalties may also be assessed.

## PAID SICK LEAVE – SAN FRANCISCO EMPLOYEES

All employees who are employed in the City and County of San Francisco on February 5, 2007 or if hired after that date who have completed 90 days of employment are eligible to accrue paid sick leave.

Sick leave will accumulate at the rate of one hour of paid sick leave for every 30 hours worked, up to a maximum of 72 accrued hours of sick leave. Employees will receive sick pay in the amount of the regularly scheduled shift that was missed. For example, if you were scheduled to work a four (4) hour shift, you will receive four hours of sick pay at your normal base rate of pay.

- Accrued paid sick leave carries over from year to year, but is subject to the cap.
- Once an employee reaches the accrual cap, he or she will not accrue further paid sick leave until some paid sick time is used.
- Eligible employees will receive payment for sick time at their normal base rate of pay.
- Employees may use all or any percentage of their accrued sick leave for certain purposes.
- To be eligible to receive paid sick leave, employees must provide reasonable advance notice of a pre-scheduled or foreseeable absence from work for which paid sick leave will be used, such as a doctor's appointment or ongoing injury or illness.
- Please alert your supervisor when you need to take sick leave.

For more information on these benefits, please contact your supervisor.

## PAID FAMILY LEAVE BENEFITS

An employee who is off work to care for a child, spouse, parent, or registered domestic partner with a serious health condition, or to bond with a new child, may be eligible to receive benefits through the California "Paid Family Leave" ("PFL") program, which is administered by the Employment Development Department ("EDD").

These benefits solely are financed through employee contributions to the PFL program. That program is solely responsible for determining if an employee is eligible for such benefits.

The EDD mandates a seven (7) day waiting period before an eligible employee may receive PFL benefits. Accrued sick leave or vacation may be used during the waiting period to the extent permitted by law.

The EDD does not mandate a seven (7) day waiting period before an eligible employee receives PFL benefits for the purpose of bonding with a newborn child if the employee applies for PFL benefits immediately after recovering from a pregnancy-related disability and SDI benefits have ended. The EDD can provide additional information about any applicable waiting period.

If you need to take time off work to care for a child, spouse, parent, or registered domestic partner with a serious health condition or to bond with a new child please inform Human Resources, and you will be given information about the EDD's PFL program and how to apply for benefits. Employees also may contact their local Employment Development Department Office for further information. You should maintain regular contact with your supervisor and Human Resources during the time you are off work so we may monitor your return-to-work status. In addition, you should contact your supervisor and Human

Resources when you are ready to return to work so we may determine what positions, if any, are open to you.

When an employee applies for PFL benefits, the Human Resources Department will determine if the employee has any accrued but unused sick leave available. If the employee has accrued but unused sick leave available, then the employee will be required to use up to two (2) weeks of such time before becoming eligible for PFL benefits.

Please note, employees taking time off work to care for a child, spouse, parent, or domestic partner with a serious health condition or to bond with a new child are not guaranteed job reinstatement unless they qualify for such reinstatement under federal or state family and medical leave laws. Any time off for Paid Family Leave purposes will run concurrently with other leaves of absence.

## PREGNANCY DISABILITY LEAVE

If you are located in the state of California and are disabled by pregnancy, childbirth, or related medical conditions, you are eligible to take a pregnancy disability leave ("PDL").

- PDL is for any period(s) of actual disability caused by your pregnancy, childbirth, or related medical condition up to four (4) months per pregnancy.
- You are required to obtain a certification from your healthcare provider of your pregnancy disability or the medical advisability of a transfer as well as a certification of ability to return to work.
- PDL is unpaid by the Company.
- Generally, OneTaste will treat your pregnancy disability the same as we treat other disabilities of similarly situated employees.

For more information on these benefits, please contact your supervisor.

## PERSONAL LEAVE OF ABSENCE

All regularly scheduled employees who have completed their Introductory Period may request an unpaid personal leave of absence for a period of up to 30 days. An extension may be approved in limited circumstances.

A written request for a personal leave of absence must be presented to your supervisor at least two (2) weeks before the leave is to begin. Your request will be considered on the basis of the compelling nature of the reason given, the length of time requested, our business requirements, your length of service and your performance record.

Personal leaves may not be taken to extend the length of any other leave of absence granted by the Company. Any personal leave you are granted will run concurrently with other leaves to which you are entitled under the law.

**Holidays.** If a holiday falls within the period an employee is on personal leave, the employee will not receive holiday pay.

**Other Work.** If you have been granted a personal leave of absence, you may not accept other work during such leave without prior written approval of your supervisor or another member of management.

**Failure to Return to Work.** Failure to return to work on the expiration of your leave may be deemed a voluntary resignation of your employment with the Company.

**Reinstatement.** The Company will attempt to return you to your former position or to place you in a comparable job. However, if you job has been filled, eliminated, or no comparable job exists, you may, in the Company's discretion, be placed in an existing job for which you are qualified.

## BEREAVEMENT LEAVE

An employee who wishes to take unpaid time off due to the death of an immediate family member should notify his or her supervisor immediately. "Immediate family" includes spouse, registered domestic partner, child, parent, sister, brother, grandparents, mother-in-law, father-in-law, parent of a registered domestic partner, step-parents, step-child, child of a registered domestic partner, and other persons who are part of the employee's household.

Reasonable time off without pay will be granted by your supervisor as the location of the funeral and closeness of the relationship dictates. Employees on scheduled time-off or a leave of absence are not entitled to bereavement leave. The Company may require verification of death.

## JURY DUTY & WITNESS LEAVE

OneTaste supports your civic duty to serve as a witness or on a jury panel. Non-exempt employees will be provided with unpaid time off for these purposes. Exempt employees will receive their full weekly salary for any workweek in which they serve as a witness or juror, except where they perform no work during the workweek.

You must provide your supervisor with a copy of the jury summons or notice to serve as a witness as soon as you receive it. Of course, you are expected to report for work during hours or days your presence is not required in court.

## VOTING LEAVE

Where possible, employees should vote in statewide elections outside of working hours. However, in the event an employee does not have sufficient time outside of working hours to vote, the employee may take off up to two (2) hours of voting leave on Election Day without loss of pay. Where possible, the supervisor should be notified of the need for leave at least two (2) working days prior to the Election Day.

# SECTION 6: WORKPLACE SAFETY

## SAFETY

It is the responsibility of each employee to conduct all tasks in a safe and efficient manner complying with all local, state and federal safety and health regulations and program standards, and with any special safety concerns for use in a particular area or with a client.

Furthermore, management requires that every person in the organization assumes the responsibility of individual and organizational safety. Failure to follow company safety and health guidelines or engaging in conduct that places the employee, client or company property at risk can lead to employee disciplinary action, up to and including termination.

## ACCIDENTS ON COMPANY PREMISES

Any accident that occurs on Company premises, be it that of a guest or of an employee, should be reported immediately to your supervisor. For your own safety and the safety of our guests, please do not attempt to give medical aid to an injured guest or fellow employee unless you have been trained to do so. Seek the assistance of a supervisor and call 911 if warranted.

If an employee is injured on the job, he or she will usually be entitled to worker's compensation benefits. The Company carries workers' compensation insurance and will assist employees in obtaining all benefits to which they are legally entitled. If you are injured while working, please report it immediately to your supervisor, no matter how minor the injury may be. Failure to timely report work place injuries or illnesses may result in a denial of workers' compensation benefits.

## DRUG-FREE WORKPLACE

OneTaste is required by law to provide a safe and healthy work environment for employees and the guests we serve. In addition, the Company strives to provide the best service possible to its clients. To achieve these goals, the Company has the following rules about the use, possession, and sale of illegal substances and alcohol by its employees.

You may not be drunk while on the job. The illegal use, being under the influence of, sale, manufacture, distribution, or possession of narcotics, drugs, or controlled substances while on work premises, during working hours, or in company vehicles, will result in immediate disciplinary action, up to and including termination. Employees are further prohibited from consuming alcohol during their shifts, including during meal periods and rest breaks.

The use of controlled substances that are prescribed to you by a licensed physician or available over the counter is not prohibited by this policy. However, if a physician has prescribed medication that requires any accommodation, please notify the Human Resources to discuss what accommodations are necessary.

**Work Rules**
Whenever employees are working, are operating any company vehicle, are present on company premises, or are conducting related work off-site, they are prohibited from:

- Using possessing, buying, selling, manufacturing or dispensing an illegal drug (including possession of drug paraphernalia).
- Being under the influence of alcohol or an illegal drug as defined in this policy.
- Having any detectable amount of any illegal drug or controlled substance present in their body.

All illegal drugs or drug paraphernalia will be turned over to the appropriate law enforcement agency and may result in criminal prosecution.

## SMOKE-FREE WORKPLACE

OneTaste prohibits smoking on all Company premises in order to provide and maintain a safe and healthy work environment for all employees. The law defines smoking as the "act of lighting, smoking or carrying a lighted or smoldering cigar, cigarette or pipe of any kind."

The smoke-free workplace policy applies to:

- All areas of Company buildings.
- All Company-sponsored off-site conferences and meetings.
- All vehicles owned or leased by the Company.

Employees who violate the smoking policy will be subject to disciplinary action, up to and including termination.

## VIOLENCE IN THE WORKPLACE

All employees, customers, vendors and business associates must be treated with courtesy and respect at all times. Employees are expected to refrain from conduct that may be dangerous to others, including to fellow staff.

As part of OneTaste's service offerings, clients may occasionally enroll in an "experiential immersion." During these closely monitored and supervised immersion packages, clients may request and employees may choose to engage in some activities including (but not limited to) bondage, restraints, and light physical play. Participation is never a condition of employment, and there will be no negative action taken against an employee who refuses to participate. Clients and employees both opt in for participation in any of these types of activities. Participation is always consensual and can be stopped at any time.

Other than the consensual activity involved in occasional immersions, OneTaste does not permit any actual or threatened physical actions to be taken against any person on its premises. OneTaste takes direct and indirect threats of violence very seriously. Employees are encouraged to report threats of violence, incidents of actual violence and suspicious individuals or activities to their supervisor as soon as possible. When reporting a threat or incident of violence, the employee should be as specific and detailed as possible. Employees

should not place themselves in peril, nor should they attempt to intercede during an incident. Conduct that threatens, intimidates or coerces another employee, customer, vendor or business associate will not be tolerated. OneTaste resources may not be used to threaten, stalk or harass anyone at the workplace or outside the workplace. OneTaste treats threats coming from an abusive personal relationship as it does other forms of violence.

OneTaste will promptly and thoroughly investigate all reported threats of violence or incidents of actual violence and of suspicious individuals or activities. The identity of the individual making a report will be protected as much as possible. OneTaste will not retaliate against employees making good-faith reports of violence, threats or suspicious individuals or activities. In order to maintain workplace safety and the integrity of its investigation, OneTaste may suspend employees suspected of workplace violence or threats of violence pending investigation.

Anyone found to be responsible for threats of or actual violence or other conduct that is in violation of these guidelines will be subject to prompt disciplinary action up to and including termination.

OneTaste encourages employees to bring their disputes to the attention of their supervisors before the situation escalates. OneTaste will not discipline employees for raising such concerns.

# SECTION 7: IF YOU LEAVE US

## SEPARATION OF EMPLOYMENT

Separation of employment within an organization can occur for several different reasons.

**Resignation:** Although we hope your employment with us will be a mutually rewarding experience, we understand that varying circumstances cause employees to voluntarily resign employment. Resigning employees are encouraged to provide two weeks' notice, preferably in writing, to facilitate a smooth transition out of the organization.

**Job abandonment:** Employees who fail to report to work or contact their supervisor for three (3) consecutive workdays shall be considered to have abandoned the job without notice, effective at the end of their normal shift on the third day. The supervisor shall notify management at the expiration of the third workday and initiate the paperwork to terminate the employee. Employees who are separated due to job abandonment may be ineligible for rehire.

**Termination:** Employees of OneTaste are employed on an at-will basis, and the company retains the right to terminate an employee at any time.

**Rehire:** Former employees who left OneTaste in good standing and were classified as eligible for rehire may be considered for reemployment. An application must be submitted to management and the applicant must meet all minimum qualifications and requirements of the position.

An applicant or employee who is terminated for violating policy or who resigned in lieu of termination from employment due to a policy violation will be ineligible for rehire.

## RETURN OF COMPANY PROPERTY

All OneTaste property—including desks, storage areas, work areas, lockers, file cabinets, credenzas, computer systems, office telephones, cellular telephones, modems, facsimile machines, duplicating machines, and vehicles—must be used properly and maintained in good working order. Employees who lose, steal, or misuse OneTaste property may be subject to discipline, up to and including discharge.

Upon separation of employment, employees must return all Company property in good condition. This includes, but is not limited to, keys, security cards, credit cards, computer, tools, and equipment. Employees may be responsible for reimbursing the Company for the cost of lost, stolen, or damaged Company property.

Further, employees must return all confidential information to the Company prior to their last day of employment.

## A FEW CLOSING WORDS

This Handbook is intended to give you a broad summary of things to know about OneTaste. The information in this Handbook is general in nature. Should you have any questions, please consult your supervisor for complete details.

While we intend to continue the policies, rules, and benefits described in this Handbook, the Company may always modify or vary from the matters set forth in this Handbook at its discretion except for the right of the parties to terminate employment at will, which may only be modified by an express written agreement signed by both parties.

Please do not hesitate to speak to your supervisor if you have any questions. Again, welcome to OneTaste!

OneTaste®

DEFENSE EXHIBIT
1X
23-CR-146 (DG)

# OneTaste Coach Association Code of Conduct

Version: 04.22.2011

## Overview

OneTaste Coaches & Trainers recognize that in a world of separation, we are about connection. We provide tools for intimacy in everyday life. Going to the root of experience, OneTaste teachings integrate the principles of mindfulness with the practice of orgasm. By nourishing and including this basic and essential part of life, we support students and clients to discover richer relationships, an embodied sense of self and the uncompromised feeling of wholeness.

As OneTaste Coaches & Trainers we agree to support the natural unfolding of each individual. That being said, we agree to not push clients' boundaries and encourage all individuals to participate within their comfort zone. All coaching and training exercises, homework assignments and activities are optional and clients reserve the right to decline participation at any time.

Acknowledging the sensitivity of client-teacher relating, OneTaste coaches & trainers agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a client. Because several coaches & trainers in our organization have developed relationships with former clients, we acknowledge that such a healthy relationship can be possible, but that great care and sensitivity are needed. In such cases, the coach/trainer and the client can consult with the Ethics Committee to determine the healthiest approach.

OneTaste maintains an Ethics Committee to provide guidance in individual circumstances and to administer an explicit *Code of Conduct* for the benefit of the community. The committee consists of three individuals known for their integrity and fairness. In reviewing potential violations, the committee begins with the presumption that responsibility for honoring the code rests 100% with the coach or trainer and never with the client. Final decisions on the repercussions of violations rest with the Ethics Committee.

## Petitions

Any party (coach/trainer or client) can contact the ethics committee to discuss or request an exemption to the Code of Conduct rules. The ethics committee will discuss with all applicable parties and respond once a decision has been reached. Submissions should be presented in email to all members of the committee. Petitioners should expect the petition process to take **one week** from the date submitted. Decisions will either be: approved; denied; responded to with a request for more information; or a notice that a specific amount of additional time will be required to investigate the request. Petitioners and involved parties should expect they might be asked to discuss the request in a telephone call with the ethics committee. The committee can be contacted at **otethics@googlegroups.com**.

## Grievances

We hold central to our Code of Conduct a deep respect for our clients and this learning. It is of utmost importance that our clients feel they are given the respect and support they need while working with us.

At OneTaste, we discuss and deal with sexuality and subjects that are deeply personal. This may at times be difficult or confronting. While it's not unusual to feel personally challenged in this work, it is very important to us that clients know they have the support of the coaches, trainers and staff. If they feel uncomfortable about the behavior of any staff member, we want to know.

Any client who has any questions or concerns to share with the ethics committee is encouraged to contact them at otethics@googlegroups.com

**Copyright 2011 OneTaste inc All Rights reserved**

OneTaste®

## Regulations

*All* coaches and trainers agree to:

1. Engage in responsible behavior when initiating any sexual relationship within the OneTaste extended community,
2. Not offer illegal services or sexual entertainment in exchange for money,
3. Refrain from illegal activity during their service in one of these roles

In addition, there are specific requirements and consequences governing sexual relationships between coaches, trainers and students. The following consequences represent the uppermost limit of repercussion. Discretion as to final discipline rests with the ethics committee.

### Sexual Guidelines

A minimum of **3 months** must pass after a coaching or training relationship ends before initiation of a sexual or romantic relationship with a client. **30 days must pass before OM.**

If you have a pre-existing OM or sexual relationship with an individual who becomes your coaching or OM training client, all OM and sexual contact must be suspended for the length of your coaching relationship. You may resume your prior relationship **30 days** after the coaching relationship ends.

In order to maintain clear boundaries between our personal OM practice and training others, we also have clear guidelines on the training of OM partners. Coaches & trainers may only OM with individuals who have received OM training through official OneTaste channels. Your OM partner must have completed The OM Class or a full OM training session with a Certified Trainer before you start an OM practice with them. If you wish to be their partner for their first OM, another trainer must lead the session. The Learn to OM video is not considered sufficient training to meet this standard.

*First offense:*

1. The coach or trainer is suspended from all coaching & training activities and the OneTaste Coach Association for 30 days.
2. During the 30 days, the coach or trainer is required to attend 4 anonymous program meetings* and complete daily inventory.
3. At the end of the 30 days, the coach or trainer must appear before the Ethics Committee for a review.

*Second offense:*

1. The coach or trainer is suspended from all coaching and training activities and the OneTaste Coach Association for 3 months.
2. During the 3 months, the coach or trainer is required to attend 4 anonymous program meetings per month, complete daily inventory, and check in monthly with an ethics guide.
3. The coach or trainer is required to complete 4 hours of service per month for a program approved by the Ethics Committee.
4. At the end of the 3 months, the coach or trainer must appear before the Ethics Committee for a review.

*Third and final offense:*

1. The coach or trainer will lose coaching and training status, including removal from the OneTaste Coach Association, for a minimum of 1 year.
2. During the year or more, the coach or trainer is required to attend 4 anonymous program meetings per month, complete daily inventory, and check in monthly with an ethics guide.
3. At the end of the one year suspension, the coach or trainer can petition the Ethics Committee for reinstatement of teaching and coaching duties. The Ethics Committee reserves the right to deny any request.

**Copyright 2011 OneTaste inc All Rights reserved**

OneTaste®

**Duration of Records:**

Ethics violations will be tracked on a year to year basis. After **one year** without violation, the coach/trainer may have past violations cleared from their record. While these violations will remain in archives, they will not be included when calculating the number of offenses.

As an OneTaste coach & trainer, I agree to abide by this Code of Conduct and understand the repercussions of noncompliance. I sign this document of my own volition and understand that if I violate these ethics I may lose position, salary, and/or my OneTaste Coach Association status.

| **Coach/Trainer** | **Witness** |
| --- | --- |
| Signature ______________________ | Signature ______________________ |
| Printed ______________________ | Printed ______________________ |
| Date ______________________ | Date ______________________ |

Copyright 2011 OneTaste inc All Rights reserved

DEFENSE EXHIBIT
3AR
23-CR-146 (DG)



Aubrey Anne Fuller
March 30, 2011 ·

— with Michelle Wright.

Edit

Comment as Aubrey Anne Fuller

DEFENSE EXHIBIT
3AS
23-CR-146 (DG)



**Aubrey Anne Fuller**
July 5, 2011 · Hipstamatic · 

— with **Audrey Wright** and **Michelle Wright**.

Edit

Michelle Wright and Jason D McClain

Comment as Aubrey Anne Fuller

DEFENSE EXHIBIT
3AZ
23-CR-146 (DG)





Aubrey Anne Fuller
December 14, 2013

— with Alexis Lauren Ware and 13 others.

Edit

21

Comment as Aubrey Anne Fuller

DEFENDANT'S EXHIBIT
DX 3DK

11:34 5G

867 of 1052



**Michelle Wright**
Feb 9, 2014 •
There's a pig in this photo — with... See more
Lucas Howell + 8 5 comments
Like Comment

DEFENDANT'S EXHIBIT
DX 3DW

11:32 5G

916 of 963



**Michelle Wright**
Jan 22, 2014 •
I'm Grateful for friends and connec... See more
Mitch Aidelbaum + 55 12 comments
Like Comment

DEFENDANT'S EXHIBIT
DX 3DY

Chat Window opened on 2013-10-01 11:53:36
11:53:36 Michelle Wright: A lot of my time here in Vegas and with Sales has been this rabid fight with codependence and all the external crutches I've had for a long time.  I realize that most of my motivations for sales and Vegas in the past were for the external approval of Rachel and you and the core and i hit a wall with it, where that fuel was no longer working and i felt locked in place in terms of my growth into power with the way i was relating to the world and my responsibilities. When Maddie pulled out it was like the ultimate crutch getting pulled from beneath me and its taken everything i have to stay connected and remember who i am. You have been an unwavering light for me in this process, like no matter how lost i feel if i look up and ask you are there with so much love and understanding it almost hurts.  I've been working to hack my way through this tangled bramble of negative associations to sales and Vegas of death and loss and malnourishment of my heart and lack of self love and intense lock jaw determination that actually kept me from getting dressed or leaving my post at the computer ever, all of that has turned into a big ball of resentment and a fear that that is the only way it can be and I'm somehow being punished.  I have such an intense love for everyone and this work and you and what we are doing and i get stuck behind my fear of not being able to have it all and do it all and be truly seen in how much love and loyalty I feel.   When i get stuck there i become hard and mean and immovable.  Something very deep is cracking in me, I know a new version of me is rising through the cracks and she is generous and humble and she loves herself and she looks everyone in the eye as an equal and owns the sight and magic and power that she has to offer.   I'm sorry for making it unpleasurable to hold me, to you and the whole team, I'm sorry for any wreckage I've caused and the compensation it has taken on everyones part around me.   I'm sorry if i've hurt your feelings in any way or made you feel un-recieved. I want you to know that I'm here and I heard you and I am falling into surrender and I love you.
12:00:00 Nic Daedone: I know, love. Really really I do. You really are growing up
12:04:16 Michelle Wright: thank you for seeing me and guiding me
12:04:16 Nic Daedone: Haha I just love you
12:04:16 Michelle Wright: yea you do, i know that for real
12:06:24 Nic Daedone: 🅰🅰
12:06:24 Michelle Wright: growing up hurts man
12:10:40 Michelle Wright: ive missed you. i went away and i can feel all the space inside of me. And my head wants to fill it with guilt but i know ifs just space to fill with trust
12:12:48 Nic Daedone: That's beautiful. I'm here
12:12:48 Nic Daedone: And yep it hurts like a son of a bitch
12:12:48 Michelle Wright: 🅰🅰☺
12:14:56 Nic Daedone: But so worth it
12:14:56 Michelle Wright: indeed, in some crazy way it is

DEFENSE EXHIBIT
3EA
23-CR-146 (DG)

DEFENSE EXHIBIT
3Z
23-CR-146 (DG)



DEFENSE EXHIBIT
4A-4
23-CR-146 (DG)



# DX9FD-1 Produced in Native Format

DEFENSE EXHIBIT
9FD-1T
23-CR-146 (DG)

February 9th, 2017 – New York Nicole Daedone Coaching Circle Weekend

1h 26m 21s - 1h 27m 12s

Lyndsi (1:26:21)

Hi. I guess I'll start by thanking you. I came through that door a little over two months ago, and my life is completely different, and I feel completely different, and I'm very grateful.

Nicole

How do you feel different?

Lyndsi

I had mastered nice and appropriate and small and I was miserable. And now I'm having more fun than I can remember having. And I feel stronger and more confident and sexy.

Nicole

Yeah, yeah, yeah.

Lyndsi (1:27:07)

So yeah, things are different. I feel really good.

# DX11EP Produced in Native Format

DEFENSE EXHIBIT
11FS
23-CR-146 (DG)

2013
Coaching Program

# Sales & Business Dev.

POWERED BY ONETASTE

SENSITIVE

## 2.3 – The Sales Process

The sales process is broken into three parts. You don't have to follow the steps. It's possible that when you first meet someone they are ready to sign up and you don't have to go through the steps with them. For the most part, you will have to do an exploratory session to excavate their desire and see what's best for them.

1. Initial interest
2. Initial chat
3. Exploratory session

### Initial interest

The initial interest is the very first moment that someone expresses interest in Orgasmic Meditation. An interest comes through in different ways:

1. Referral
2. Meet in person
3. Online inquiry

The exchange tends to be quick and turned on. The most important thing during the exchange is to get the person's name, phone number, and ask if it's ok to contact them in the next few days for a chat. If the environment permits, set up the chat at this time.

### Initial chat

The initial chat happens over the phone or in person and should only lasts 15 minutes. In this conversation, you see if what they want matches the service you provide.

1. What do they want? (What would they like to achieve or resolve out of coaching/OM training with you?)
2. After listening to them, see if what you have to offer will help them achieve what they want. If you are at lest 85% sure that working with you will help them achieve what they want, tell them so!

   > *"Great! I am reasonably sure that coaching/OM training with me will help you achieve what you are looking for. Lets set up an Exploratory Session. In the Exploratory we will get a greater sense of each other, delve more deeply into what you would like to resolve or achieve through this process; I will explain how my coaching works and we will make an informed decision about how many sessions would be best."*

3. Set up time for Exploratory and send conformation email in the next 24 hours.



SENSITIVE

## Exploratory Session

The Exploratory Session formally opens the relationship. The session should only be 45 minutes long. An exploratory session IS NOT coaching. In this session you dive deeper into getting what the clients' desires are, what's blocking them from having what they want, and then making them an offer that they can say yes to.

### Asking for the Exploratory

The Exploratory begins the moment the client expresses interest in it, usually through an initial chat. If they agree to schedule it, give them different options for the time of the call and follow up with a confirmation email within 24 hours. Remember, it is a sales conversation, not a free coaching session.

### Setting Up The Space

Have a quiet space. Do not eat food. Keep any phone you are not using on silent. If the meeting is in person, face them directly. Always take the seat with the view. You do not want them looking directly out a window.

### Noticing

You are putting all your attention on the client. The goal is to match their desire with your attention. Use their language as much as possible, so they feel "seen." Every step of the way, you are noticing where they are at and asking them to go deeper in the conversation. If you make the exploratory about being their choice, they are more likely to go after what they want.

### Making Contact

Always call the client to begin the Exploratory. Be on time.

### Safeporting

You are preparing them for how the rest of the session will go. This allows them to know where the call is moving as it progresses. The numerous check-ins build a series of affirmative responses, building momentum towards the eventual close, also acting as permission for you to move forward. It is a sales conversation, not a coaching session.

> *Okay, here is how the session is going to go. First, we are going to talk about what you want – goals and desires. Does that make sense? (They should say yes. If not, ask them what part they don't understand.)*
>
> *Then we are going to talk about what the evidence will be to show you've achieved it; what you are seeing, feeling, hearing and experiencing that would indicate you've gotten the things you wanted. Does that make sense? (yes)*
>
> *And then we are going to talk about what's blocking you from having the things you said you want. Does this make sense? (yes)*



SENSITIVE

*Finally, I will go over the OneTaste method of coaching; what it is and how we do it. Then we will go over any questions you might have. After that, I will make you an offer. For example, I might recommend so many sessions over X-period of time for this amount of money. You are free to say "yes" or "no." "No" is always an acceptable answer. My only request is that you make a very clear decision at the end of our time together. Does this make sense? (yes)*

*Are you ready? (yes)*

**Stroking**
The goal here is to listen. Only talk in order to draw out more of their desire. The client should do 90% of the talking. Follow the thread of their responses. Use their own language style as much as possible so they feel "seen." You are not coaching here, you are allowing them to express their desires, sometimes in a way they have rarely been given permission, before.

*What do you want?*
Here, the client is tapping into their desires. They might find it hard to identify what they are in the beginning. There might be some silence as they unearth their answers. This is fine. Once they get going, the answers will gain momentum.

*What else?*
If they stop, prompt them by asking 'what else' and giving them space to say more and go deeper. You may repeat this question several times. Do not be afraid to sound repetitive. It works!

*Is there anything else that you want?*
Ask them to go deeper into the desires they express. Ask interested questions. Follow up. Once they have excavated most of their desires you will hear progressively less energy in their answers and they will become shorter and less detailed. This would be a good time to move onto the next part of the excavation process.

*What would the evidence be to let you know that you have achieved what you wanted? What would you be seeing, hearing, feeling and experiencing?"*
For this question let the client tap into that place where they are in the visceral experience of what they want and who they want to be. Have them say all the things that they would have and feel and be experiencing in life to indicate that they are living the life they want. Notice the sensation going up in the clients body as they describe the picture of the person they want to be and/or having the life they want to live. Match their energy.

*What else?*
If they stop and you sense there is still more in there, again, ask 'what else.'



SENSITIVE

*What do you feel is blocking you from having all the things you've said you wanted?*
Have the client list all the ways they feel blocked from living the life they want. The sensation in this part of the question might be heavier but stay with the client. If they cry or get emotional, allow them to feel the emotion. Again, refrain from coaching or making additional comments that will take them out of the experience. It's important to let the client experience and feel what is blocking them so they are more motivated to move out of that state.

*What else?*
If they stop, ask 'what else.'

**Communication**
At this point you will begin talking more. Identify, review and summarize what your client has excavated up until now and get a buy-off to move onto the recommendation. For example:

> *It sounds like you want to increasingly ask for more of what you want in your life. You would like to be able to tune in with your desire and not sabotage your own success. You would like to have more feeling and sensation in your body and make OM a regular practice. Does this sound right? (yes)*

Here, you are offering them a roadmap to live the life they want to live. You will explain the OneTaste method and how your skills will help them get to where they want to go.

> *Okay, now I am going to go over what OneTaste coaching is and how we do it. Our coaching process is made up of three components; Clearing, Education, and Integration. The three components are not necessarily linear and in every session there will be a bit of Clearing, a bit of Education and a bit of Integration. Does that make sense? (yes)*
>
> *During the "clearing" phase we will be working to "clean out the basement." This is where we acknowledge everything that we don't want to face or deal with, and then transform those fears into power. This will typically be done in three ways.*
>
> *First, how do you sabotage what you want through your own behavior when confronted by fear. Second, what are the things you do to create disconnection and isolation in your relationships, either to yourself, or with others. Third, what residue of debris to do you have between people, places, ideas and institutions? You will write these things down on paper and we will be using tools such as a "fear inventory" and "repairing connections," as well as other exercises that will help you navigate these and come back to a place of connection.*
>
> *Does this make sense? (yes)*



SENSITIVE

*The second phase of coaching is "Education." This is where we teach you how to live a "turned-on" life. You will learn to live in the world in a different way, operating from your desire instead of from fear or obligation. "Education" may include OM practice, communication exercises, and written exercises such as a "Desire Contract." A Desire Contract is a living, breathing agreement with your desire, where you get in touch with what you are here to do, discover how you will achieve it, what your boundaries are, how to ask for what you want and define how someone can "be" with you. The Desire Contract will act as a compass you can use at anytime to ask "Is this moving me closer to or further away from what I desire?"*

*Does this make sense? (yes)*

*The third phase of coaching is "Integration." This will take the form of assignments and exercises to digest and process the changes you are making in each session. These may include working on your desire contract, journaling or other such exercises. Also, towards the end of the coaching we will work on refining and deepening the new tools, skills, freedom and awareness you've begun to cultivate so that when the coaching is over you continue to create the lasting change you want in your life.*

*Does that make sense? (yes)*

**Peaking**

As you get to the point of the offer phase, beware! Your tumescent type will try to come out and it may become uncomfortable. You will feel the urge to dissipate energy. Don't! Sit within the energy and discomfort. Your client will sense if you are unable to hold this space. This is a major change of stroke within the Exploratory and you must be able to transition to it well.

The goal is to make an offer they can say "yes" to. If you think they need six sessions of coaching but they can only afford three, offer three. You want to start moving them closer to their desire and you will want to find the balance point between their desires, their coaching needs and their ability to pay. If they say "no" it is not because of anything you did wrong. If you say "yes" to a counter-offer that is less than what you sense the package is worth, you will come out of the Exploratory feeling undervalued.

*Okay, this is my recommendation, 3 coaching sessions. Sessions are 60 minutes long and can be done in person or over the phone. Sessions will happen every week or every other week, depending on our schedules. Each time you will be given homework to do. I recommend we do at least the first two sessions one week apart. The total cost of the package is $360. If you pay in installments, it begins with a deposit of $120 now and then two monthly payments of $120, which start a month from today. If you pay in full today, you receive a 10% discount, lowering the price to $324.*



SENSITIVE

And then you go silent and wait. If you are in person, do not fidget. Keep your energy focused on them. The client may be spinning, calculating their bank account balance, feeling resistance, or fear. Sit patiently and wait for them to say 'yes' or 'no'. If they have additional questions or comment about the price, don't say or do anything. For example:

Client: *Wow, that is a lot of money.*
You: (Silence)

Or

Client: *This is a big decision!*
You: (Silence)

Or

Client: *I don't know.*
You: (Silence)

Let them feel their desire, whether "yes" or "no," and wait for their answer, even if it takes minutes. If you interrupt their process, you will probably lose the sale. Wait!

Client: *Yes.*
You: *Great, how would you like to pay?*

If no, then the exploratory is over.

Client: *No.*
You: *Okay, thank you very much. I really enjoyed the conversation.*

**Grounding**
If yes, take the payment, whether in check, cash or credit card. Be prepared to take any form of payment. If you are collecting a credit card, you need to gather the following information: name, billing address, credit card number, expiration date and 3-digit code on the back of the card (four-digit on the front of the card if an AMEX.) Collecting the money is a form of commitment and to not collect it upon hearing a "yes" actually does them a disservice.

Schedule your first coaching session at the end of the exploratory. Don't wait too long for your first session to begin. 3-7 days is a reasonable amount of time to meet for your first session.



SENSITIVE

If they say "no," simply decide to share what you have with someone else. What you have is valuable! People want and need what you have. If you are taking time to share that for a living, it is because of the effect it had on your life. If they are not ready for it, that is their decision. Your value is not dependent on whether someone else accepts or does not accept your offer.



SENSITIVE

DocuSign Envelope ID: B94712C0-CDDE-441A-9B1B-3EBECAFD6B01

DEFENSE EXHIBIT
11R
23-CR-146 (DG)

# OneTaste

## Refund Policy

**FULL-REFUND GUARANTEE:**

OneTaste courses are astounding and life changing! We are so confident that you will enjoy the course that we guarantee a full refund if you come to the first day/weekend of the course and withdraw at the end of the day/weekend through an in-person conversation with the course leader.

**OTHER TERMS:**

If cancellation occurs at more than 30 days prior to beginning of the course, you get a refund of the course amount, minus a 15% cancellation fee.

If cancellation occurs within 30 days prior to the beginning of the course, there is no refund, unless we can replace you. In which case, a 15% cancellation fee applies.

After the first day/weekend, there are no refunds.

DS
MN

DocuSign Envelope ID: B94712C0-CDDE-441A-9B1B-3EBECAFD6B01

# OneTaste

## Release of Liability and Course Agreement

Welcome to your OneTaste course! Your journey is about to begin. Before we embark, we ask that you carefully read, understand, and sign the below form.

Because of the nature and content of the course your agreement to the Release of Liability ("Release") and each and every provision of this Course Agreement ("Agreement") is required as a condition of your participation in the course. The Release is a waiver of any and all liability and any right of action, whether legal, equitable or in any other form, against One Taste, Inc., OneTaste Media LLC, and each of their respective course leaders, employers, managers, employees, staff, volunteers, officers, directors, servants, stockholders, principals, general and limited partners, agents, assigns, heirs, attorneys, representatives, and each of their respective families, heirs and executors, predecessors and successors, subsidiaries, affiliates, divisions, sureties, guarantors, insurers, and all other related entities (collectively, "Sponsor" or "Released Parties"), as a result of any action or omission connected with the content, design, planning, conduct of Released Parties, conduct of other participants and your participation in the course.

**Assumption of Risk**

- I understand, acknowledge and agree to each of the following:
- I have reviewed OneTaste's OM literature and am familiar with the sexual nature of the practice of OM.
- I am (18) eighteen years of age or older.
- That any concepts, notions, ideas, suggestions and recommendations from Sponsor and anyone acting on behalf of Sponsor that I accept and or apply to my life, I do of my own free will.
- That not all of the activities occurring during the course are known or foreseeable.
- That the content of the course is controversial.
- That while Sponsor believes that the content of the course to be valuable, Sponsor does not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course.
- That I may not agree with all of the content of the course and accept that possibility.
- That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different than mine.
- That certain participants may make statements or take actions that I disagree with or find offensive.
- That certain participants may disagree with or find offensive statements I make or actions I take.
- That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.

DS
MN

DocuSign Envelope ID: B94712C0-CDDE-441A-9B1B-3EBECAFD6B01

- That I have assessed my own emotional, mental and physical well being, and I have concluded that I wish to and am able to participate in the course.
- That I agree to disclose any psychological or physical health problem, condition or limitation to Sponsor at the time of application and in any event prior to the course commencing.
- That there are emotional and mental risks associated with participation in the course.
- That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course.
- That regardless of any disclosures or written approvals, upon acceptance into the course, I continue to bear sole responsibility for my well being.
- That I voluntarily and knowingly accept and assume each of the risks and other matters set forth in this paragraph.

**Participant's Representations**

I represent that I do not suffer from any psychological, physical or other condition that could pose a threat of harm to Sponsor's course leaders, course guides, employees, staff, volunteers or other course participants.

**Release of Liability**

I hereby forever release and hold harmless Released Parties from any and all claims, causes of action, demands, obligations, breaches of duty, injuries, liabilities, losses, expenses, costs, attorney's fees, damages, or actions, of every type, kind, nature, description, or character, however defined or denominated, and however claimed or asserted, of any nature, known or unknown, asserted or not asserted, contingent or absolute, matured or unmatured, direct or indirect, arising or accruing in any manner out of, or in any way directly or indirectly related to my participation in the course, any statements or acts of Released Parties, any statements or acts of the participants or third parties, the content, design and planning of course, regardless if the nature of such claims be monetary, emotional, mental, psychological or physical.

**Psychotherapy Disclosure**

I understand and agree that the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course, I obtain via my own free will and participation. Therefore, to the extent not already covered in the above Release, I hereby forever release Released Parties from any and all liability from any adverse, or negative reactions, or effects, that my experiences at the course may have on me.

**Release As Defense**

I understand and agree that this Release and Agreement may be pleaded as a full and complete defense

DS
MN

to, and the parties hereby consent that it may be used as the basis for an injunction against, any action, suit or other proceeding based on claims released by this Release.

**Photography and Video Rights**

Sponsor may wish to record and/or photograph me during the course. ***As a condition of participating in this course I hereby irrevocably grant Sponsor unrestricted rights over any audio and visual works ("Works") captured of the course, including Works that contain my image, likeness, sound, personal information, or any other aspect of me.*** This includes rights to reproduce and distribute the Works, or include such Works as part of a derivative work. This includes but is not limited to the right to use and permit to be used the original form of the Works or in any modified form, in connection with any of Sponsor's publications, to display, perform, copy, distribute, trade or broadcast the Works by any means not limited to advertisement, publicity, for profit, through electronic media, print media, other formats whether now known or to become known.

**Confidentiality**

By signing this agreement, I specifically agree to uphold, protect and respect the right of privacy of each of my fellow participants and Released Parties. I agree to keep confidential and not to communicate in any way, at any time, without the particular person's prior written consent, any of the content, events or activities of course, or any of the statements, acts or experiences of my fellow participants and Released Parties that occur at the course. I understand that I am free to share my own experience of what value I received with anyone I choose to, while honoring the confidentiality of this Agreement.

I further agree to follow the instructions of the Sponsor's course instructors, staff, employees and volunteers. I further agree to treat my fellow participants and all connected with the course with respect and to refrain from any statements or conduct once objected to or once instructed to do so by either the course instructors, staff, employees or volunteers.

**Arbitration**

Should any dispute remain or exist that is not covered by the terms of the Release; I further agree to forfeit the right to seek legal remedy in a court of law and agree to refer such dispute to binding arbitration before the American Arbitration Association ("AAA") in San Francisco, California in accordance with the laws of the State of California and the applicable AAA

Arbitration Rules to settle any and all disputes between myself and any of the Released Parties. The AAA shall appoint the Arbitrator(s) in accordance with its rules unless the parties mutually agree to another procedure. Judgment upon the award rendered by the Arbitrator(s) shall be entered in any court having jurisdiction pursuant to applicable law.

Any party may seek compliance with these provisions by petition to any court of general jurisdiction. The prevailing party in any such proceeding shall be entitled to the Court's order for payment of attorney's fees and costs.

**Severability and Effect of Partial Invalidity**

DS
MN

DocuSign Envelope ID: B94712C0-CDDE-441A-9B1B-3EBECAFD6B01

I understand and agree that the provisions of this Agreement are severable. In the event a court or other adjudicative body of competent jurisdiction should find any provision or the application of any provision to any person, place or circumstance to be wholly or partially invalid or unenforceable under the law of any jurisdiction, such finding shall not affect the validity and enforceability of the remaining provisions. The remaining provisions shall continue in full force and effect. The provision found to be invalid or unenforceable shall continue to be applicable to the extent permitted under the law of the finding jurisdiction and shall continue in full force and effect under the laws of any other jurisdiction.

**Entire Agreement**

I understand and agree that this Agreement constitutes the sole and entire agreement between the parties with respect to the matters covered in it. This Agreement supersedes any prior or contemporaneous agreements, under- standings or undertakings, written or oral, by or among the parties regarding such subject matter. I understand and represent that this Agreement is made without reliance on any inducement, statement, promise or representation other than those contained within this Agreement. I also understand and agree that any statements by Released Parties regarding the course are statements of opinion and do not constitute a representation, warranty or guarantee.

**Modification and Waiver**

I understand and agree that no term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought. The waiver by any party hereto of any breach of any provision of this Agreement shall not constitute or operate as a waiver of such provision or any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver at such time, or at any future time, of such provision or any other provision hereof.

**Voluntary Execution of Agreement**

I acknowledge and agree that I am executing this Agreement voluntarily, knowingly, and without duress or undue influence. I have read this Agreement and understand the terms and consequences of it. I am fully aware of the legal and binding consequences of it. I have had the opportunity to consult with anyone of my choosing prior to executing this Agreement.

I, the undersigned, certify that I have read this Agreement and Refund Policy and agree and accept the terms as stated above.

Name Michal Neria    Program Coaching Program 9

Signature DocuSigned by: [signature] 59D1A5014F1C49D    Date 12/27/2014

DEFENSE EXHIBIT
12AI
23-CR-146 (DG)



Aubrey Anne Fuller
November 10, 2013

[redacted]

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste®

DEFENSE EXHIBIT
12BY
23-CR-146 (DG)

**OneTaste Coach and Trainer Association Code of Conduct**

**Teachers, Coaches, Leaders and Support Staff**
Version: 9.5.2013

OneTaste teachers, coaches, leaders and support staff recognize that in a world of separation, we are about connection. We provide tools for intimacy in everyday life. Going to the root of experience, OneTaste teachings integrate the principles of mindfulness with the practice of sexuality. By nourishing and including this basic and essential part of life, we support students and clients to discover richer relationships, an embodied sense of self and the uncompromised feeling of wholeness.

As OneTaste teachers, coaches, leaders and support staff we agree to support the natural unfolding of each individual. That being said, we agree to not push clients' boundaries and encourage all individuals to participate within their comfort zone. All class and coaching exercises, homework assignments and activities are optional and students reserve the right to decline participation at any time.

Understanding the training and insight required to teach OneTaste material with sensitivity, only certified OneTaste Teachers, OM Trainers and Coaches, and those in official training programs, may teach the public OneTaste content, including Orgasmic Meditation. Other leaders and representatives are not permitted to teach or coach in any capacity, whether official or unofficial. Acknowledging the sensitivity of client/student-teacher relating, OneTaste teachers, coaches, leaders, and staff agree to not exploit their authority and position in order to assume a sexual, romantic or OM relationship with a student. Because several teachers and coaches in our organization have developed relationships with former students and clients, we acknowledge that such a healthy relationship can be possible, but that great care and sensitivity are needed. In such cases, the teacher and the student can consult with the Ethics Committee to determine the healthiest approach.

OneTaste maintains an Ethics Committee to provide guidance in individual circumstances and to administer an explicit Code of Conduct for the benefit of the community. The committee consists of three individuals known for their integrity and fairness. In reviewing potential violations, the committee begins with the presumption that responsibility for honoring the code rests 100% with the teacher or coach and never with the student. Final decisions on the repercussions of violations rest with the Ethics Committee.

**Positions**

Those holding positions of responsibility, leadership and public representation have special obligations to avoid improper relations with students. Recognizing that different levels of scrutiny are appropriate, the Code of Conduct distinguishes between various roles assumed by members of the community:

- Teachers lead daylong, weekend, or weeklong courses, Coaching Programs and evening series courses
- Coaches are members of the OneTaste Coaching Association who are actively engaged in a coaching relationship with a OneTaste client.
- Leaders lead TurnON groups and Community nights.
- Support staff includes demo staff, back of house, and sales staff.

Note than some individuals hold multiple positions, in which case they agree to abide by the higher.

**Definitions**

*Multiple day/week/month courses*:
Some courses are ongoing for a period of time. The end of the course in these cases is defined as the very last meeting of the course, not an individual day of class. Preexisting Relationships Preexisting OM, sexual or romantic relationships between teachers, coaches and leaders and students are exempt from these conditions, if they have been active in the one year previous to the course or event. Within the timeline specified by the Code of Conduct, relationships may not intensify from OM to romantic or sexual involvement without approval of the Ethics Committee.

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste®

*Ethics Committee Petitions*
Any party (student or teacher) can contact the ethics committee to discuss or request an exemption to the Code of Conduct rules. The ethics committee will discuss with all applicable parties and respond once a decision has been reached. Submissions should be presented in email to all members of the committee. Petitioners should expect the petition process to take one week from the date submitted. Decisions will either be: approved; denied; responded to with a request for more information; or a notice that a specific amount of additional time will be required to investigate the request. Petitioners and involved parties should expect they might be asked to discuss the request in a telephone call with the ethics committee. The committee can be contacted at otethics@googlegroups.com.

**Grievances**

We hold central to our Code of Conduct a deep respect for our students and this learning. It is of utmost importance that our students feel they are given the respect and support they need while learning with us.

At OneTaste, we discuss and deal with sexuality and subjects that are deeply personal. This may at times be difficult or confronting. While it's not unusual to feel personally challenged in this work, it is very important to us that you know you have the support of the teachers and staff. If you feel uncomfortable about the behavior of any staff member, we want to know.

Any student who has any questions or concerns to share with the ethics committee is encouraged to contact them at ethics@onetaste.us

**Regulations**

All OneTaste staff must agree to:
1. Engage in responsible behavior when initiating any sexual relationship within the OneTaste extended community,
2. Not offer illegal services or sexual entertainment in exchange for money, and
3. Refrain from illegal activity during their service in one of these roles.

In addition, there are specific requirements and consequences governing sexual relationships between certain individuals and students. The following consequences represent the uppermost limit of repercussion. Discretion as to final discipline rests with the ethics committee.

**Teachers and Coaches**

A minimum of 3 months must pass after a course or coaching/advisee relationship ends before initiation of a sexual or romantic relationship with a student or client. 30 days must pass before OM Specifically for Coaching and Advising: If you have a pre-existing OM or sexual relationship with a student who becomes your coaching client or advisee, all OM and sexual contact must be suspended for the length of your coaching relationship. You may resume your prior relationship 30 days after the coaching or advising relationship ends.

**Leaders**

A minimum of 14 days must pass after an event ends before initiation of an romantic or sexual relationship or to OM with a participant.

**Support Staff**

A minimum of 14 days must pass after an event ends before initiation of a romantic or sexual relationship. No prohibitions on OM.

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7970

OneTaste

**Consequence for breaking ethics**
OneTaste is currently revising their methodology for teachers, leaders and support staff who do not follow these code of ethics. For a written description, please contact ethics@onetaste.us.

**Duration of Records**

Ethics violations will be tracked on a year to year basis. After one year without any violation, someone may have past violations cleared from their record. While these violations will remain in archives, they will not be included when calculating the number of offenses.

**Coaching Program Amendment**

Participants in our Coaching Programs are in a unique role as students. They are people taking on leadership roles within OneTaste and in training to teach OM to the broader community. Since OM is our central practice, and these students must be particularly well versed in, all restrictions regarding teachers and leaders OMing are lifted for these particular students. This means students may OM with teachers and leaders during the course series and afterwards with no waiting period. This includes all levels of OneTaste teaching and leadership staff (Restrictions on paid coaching relationships remain in effect). Advisors are also allowed to OM with their advisees. It is still advisable and expected that advisors, leaders and teachers will go on a case by case basis to determine if it is appropriate to OM with any students new to the practice at the beginning of the program. Also, the OM request should originate with the student, not the advisor or teacher.

With regards to sexual or romantic relationships, special allowances may be warranted for those in "Leader" roles, though not when there is a direct teaching, coaching or advising relationship with a particular student. Leaders are not restricted from having sexual or romantic relationships with CP students, though support staff are. At the same time, we strongly suggest that leaders have a conversation with a core staff member or a member of the ethics committee before initiating any such relationship. This will give everyone a chance to make sure they are acting knowingly and consciously.

As a OneTaste teacher, coach, coach-in-training, leader, or support staff, I agree to abide by this Code of Conduct and I understand the potential repercussions of noncompliance. I sign this document of my own volition and understand that if I violate this code I may lose position, salary, and/or my OneTaste Coaching Association status. Further, I understand that this code is subject to change at any time. I agree to abide by the newest version of the code at all times, which will be published and updated periodically at www.onetaste.us.

| | |
|---|---|
| Signature | DocuSigned by: Brooke Sheffer |
| Name | Brooke Sheffer |
| Date | 9/12/2013 |

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste®

**Representation and Usage Agreement**

Welcome to the OneTaste Coaching and OM Training Program. This agreement covers important information to consider when creating your private coaching business and/or OM Community during and after the program. As a prerequisite to your participation in the Program, please indicate that you understand and agree to the following by initialing each section and then signing and dating the bottom of this document.

OneTaste Trademark and Copyright Material

1. I understand that "Orgasmic Meditation" and "OneTaste" are registered trademarks of OneTaste Incorporated, and may not be used without permission. Further, any use of these marks will not constitute a waiver, express or implied, of OneTaste's exclusive rights of ownership.
2. I understand that OneTaste will provide certain proprietary, copyrighted documents such as one-pagers, for the sole purpose of using them with or distributing them to my personal clients in intern coaching or training sessions. I agree to not alter the form or content in any way and to always use the most recent version of any materials. I agree that if, for any reason, I leave the program pre-certification, or in any way do not quality for certification, I will cease use of all copyrighted OneTaste documents or materials.
3. When sharing or distributing OneTaste copyrighted material I agree to include an attribution to OneTaste.

**Representing Myself**

1. I agree to clearly convey to my clients, potential clients, and others the following: (1) that I am an Intern Trainer or Intern Coach, (2) that these are intern sessions, (3) and that these sessions are a necessary step for me to become a OneTaste-Certified Trainer or Coach.
2. Until OneTaste certifies me for my Program, I agree not to advertise, claim, or otherwise represent that I have received training from OneTaste without including language that clearly conveys that I have not completed the Program.
3. If at any time I lose my eligibility to become certified and fail to achieve Certification during the eligibility period, I agree to no longer use any title or make any claims with respect to any professional training I received at OneTaste.
4. If at any time I lose my eligibility to become Certified and fail to achieve Certification during the eligibility period, I agree not to use the phrase "Orgasmic Meditation" in connection with any training or coaching that I provide, paid or unpaid.

**Where and how I practice my skills**

1. I understand that my training in the Program prepares me to work in sessions with either (a) one person as my client; or (b) two people who wish to be coached or trained together as a pair. I may partner with with an OM training partner for the session as long as that partner is also an intern or certified graduate of this program.
2. I understand that the training provided in the Program does not prepare me for performing or hosting demonstrations of Orgasmic Meditation. I agree not to perform or conduct a live, recorded, or otherwise transmitted demonstration of Orgasmic Meditation for any audience (including in a training session), paid or unpaid, without the express written permission of OneTaste.
3. I understand that OneTaste may permit me to host, lead, or otherwise conduct OneTaste-related events and gatherings (such as "meet-ups", Introductory presentations on OM or similar lead-generation events) of up to 2 hours in length, but not more.
4. I agree neither to claim nor attempt to train others to become teachers, coaches, instructors, trainers, demonstrators or presenters of any OneTaste-related material.

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste®

**Other Conduct**

I understand that pertinent laws, statutes and customs vary greatly from location to location. I agree to research the laws, statutes and customs that apply in my local area, and to refrain from engaging in any portion of my Program training that may conflict with those. I further agree to indemnify OneTaste from any consequences resulting from my actions, where such actions are in conflict with the laws, statutes or customs of my locality.

I understand and agree to all of the terms and conditions specified in this document. Further, I understand that the terms and conditions governing the relationship between OneTaste and Intern Trainers or Intern Coaches is subject to change.

| | |
|---|---|
| Signature | DocuSigned by: Brooke Sheffer B9C3BF318ED9496... |
| Name | Brooke Sheffer |
| Program | OneTaste Coaching Program ("CP7") |
| Date | 9/12/2013 |

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste®

**Media / Photography Release Form**

I, ________________ hereby grant to OneTaste Incorporated, its subsidiaries, affiliates, nominees, licensees, their successors and assigns, and those acting with its authority (hereinafter collectively referred to as "OT"), with respect to the audio and visual recording of the entire contents of the 2013 'CP7' Coaching Program (the "Works"), the unrestricted, absolute, perpetual, worldwide right to:

1. Reproduce, copy, modify, create derivatives in whole or in part, or otherwise use the Works or any part thereof in combination with or as a composite of other matter, including, but not limited to, text, data images, photographs, illustrations, animation and graphics, video or audio segments of any nature, in any media or embodiment, whether now known or hereafter to become known, including, but not limited to such formats of computer readable electronic magnetic, digital, laser, optical-based media, and
2. Use and permit to be used the original form of the Works or in any modified form, in connection with any OT publication, and
3. Display, perform, copy, distribute, trade or broadcast the Works by any means not limited to advertisement, publicity, for profit, through electronic media, print media, other formats whether now known or to become known, and
4. There is no time-limit on the validity of this release of the Works nor is there any geographic specification or limitation of where the Works my be distributed.

**Waiver and Release**

I hereby waive the right and release OT from, and shall neither sue nor hold against OT any claim on format of use, violation of copyright whether now known or unknown, defamation, invasion of right to privacy, publicity or personality based upon or relating to the use and exploitation of the Works.

I agree that there shall be no obligation to utilize the authorization granted by me hereunder. The terms of this authorization shall commence on the date hereof and be without limitation.

I warrant and represent that I over the age of eighteen years and that I am free to enter into this agreement.

| | |
|---|---|
| Signature | DocuSigned by: Brooke Sheffer B9C3BF318ED9498 |
| Name | Brooke Sheffer |
| Program | OneTaste Coaching Program ("CP7") |
| Date | 9/12/2013 |

DocuSign Envelope ID: F9445D87-A71E-4B3F-A268-9374BBED7976

OneTaste

# Release of Liability Form

Thank you for your interest in attending the ____________________ Course, on __________. This course is offered by One Taste An Urban Retreat Center, herein referred to as ("Sponsors"). Because of the nature and content of the course your agreement to the Release of Liability (hereafter "Release") and each and every provision of this Course Agreement (hereafter "Agreement") is required as a condition of your acceptance into the course. The Release is intended as a waiver of any and all liability and any right of action, whether legal, equitable or in any other form, against Sponsors, their respective course leaders, employers, managers, employees, staff, volunteers, officers, directors, servants, stockholders, principals, general and limited partners, agents, assigns, heirs, attorneys, representatives, and each of their respective families, heirs and executors, predecessors and successors, subsidiaries, affiliates, divisions, sureties, guarantors, insurers, and all other related entities (hereafter "Released Parties"), as a result of any action or omission connected with the content, design, planning, conduct of Released Parties, conduct of other participants and your participation in the course.

## Assumption of Risk

I understand, acknowledge and agree to each of the following:

- That the content of the course is controversial.
- That not all of the activities occurring during the course are known or foreseeable.
- That any concepts, notions, ideas, suggestions and recommendations from the Sponsors and anyone acting on behalf of Sponsors that I accept and or apply to my life, I do of my own free will.
- That while Sponsors believe that the content of the course to be valuable, Sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course.
- That I may not agree with all of the content of the course and accept that possibility.
- That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different than mine.
- That certain participants may make statements or take actions that I disagree with or find offensive.
- That certain participants may disagree with or find offensive statements I make or actions I take.
- That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.
- That I have assessed my own emotional, mental and physical well being, and I have concluded that I wish to and am able to participate in the course.
- That I agree to disclose any psychological or physical health problem, condition or limitation to Sponsors at the time of application and in any event prior to the course commencing.
- That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course.
- That regardless of any disclosures or written approvals, upon acceptance into the course, I continue to bear sole responsibility for my well being.
- That there are emotional and mental risks associated with participation in the course.
- That I voluntarily and knowingly accept and assume each of the risks and other matters set forth in this paragraph.

## Participant's Representations

I represent that I do not suffer from any psychological, physical or other condition that could pose a threat of harm to Sponsor's course leaders, course guides, employees, staff, volunteers or other course participants.

## Release of Liability

I hereby forever release and hold harmless Released Parties from any and all claims, causes of action, demands, obligations, breaches of duty, injuries, liabilities, losses, expenses, costs, attorney's fees, damages, or actions, of every type, kind, nature, description, or character, however defined or denominated, and however claimed or asserted, of any nature, known or unknown, asserted or not asserted, contingent or absolute, matured or unmatured, direct or indirect, arising or accruing in any manner out of, or in any way directly or indirectly related to my participation in the course, any statements or acts of Released Parties, any statements or acts of the participants or third parties, the content, design and planning of course, regardless if the nature of such claims be monetary, emotional, mental, psychological or physical.

## Psychotherapy Disclosure

I understand and agree that the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course, I obtain via my own free will and participation. Therefore, to the extent not already covered in the above Release, I hereby forever release Released Parties from any and all liability from any adverse, or negative reactions, or effects, that my experiences at the course may have on me.

## Release As Defense

I understand and agree that this Release and Agreement may be pleaded as a full and complete defense to, and the parties hereby consent that it may be used as the basis for an injunction against, any action, suit or other proceeding based on claims released by this Release.

## Participant's Right Regarding Publication

Sponsors from time to time may wish to record and/or photograph the course for reproduction and distribution as part of its educational and promotional materials. Sponsors respect each participant's right to privacy and choice. Accordingly, you have the option by indicating below whether you agree to allow the use of your voice or image in educational and promotional materials distributed by Sponsors. If you decline to have your voice and/or image used in any educational or promotional materials, Sponsors will edit out any section of the recording containing your voice and/or image.

I consent to Sponsors' use of my voice ______, image ________.

I do not consent to Sponsors' use of my voice______, image ________.

I understand that if I do not indicate above whether I do or do not consent to the usage of either my voice or image, Sponsors shall be entitled to assume that I have given my consent to the use of my voice and image.

## Confidentiality

By signing this agreement, I specifically agree to uphold, protect and respect the right of privacy of each of my fellow participants and Released Parties. I agree to keep confidential and not to communicate in any way, at any time, without the particular person's prior written consent, any of the content, events or activities of course, or any of the statements, acts or experiences of my fellow participants and Released Parties that occur at the course. I understand that I am free to share my own experience of what value I received with anyone I choose to, while honoring the confidentiality of this Agreement.

I further agree to follow the instructions of the Sponsors' course instructors, staff, employees and volunteers. I further agree to treat my fellow participants and all connected with the course with respect and to refrain from any statements or conduct once objected to or once instructed to do so by either the course instructors, staff, employees or volunteers.

## Arbitration

Should any dispute remain or exist that is not covered by the terms of the Release, I further agree to forfeit the right to seek legal remedy in a court of law and agree to refer such dispute to binding arbitration before the American Arbitration Association ("AAA") in San Francisco, California in accordance with the laws of the State of California and the applicable AAA Arbitration Rules to settle any and all disputes between myself and any of the Released Parties. The AAA shall appoint the Arbitrator(s) in accordance with its rules unless the parties mutually agree to another procedure. Judgment upon the award rendered by the Arbitrator(s) shall be entered in any court having jurisdiction pursuant to applicable law.

Any party may seek compliance with these provisions by petition to any court of general jurisdiction. The prevailing party in any such proceeding shall be entitled to the Court's order for payment of attorney's fees and costs.

## Severability and Effect of Partial Invalidity

I understand and agree that the provisions of this Agreement are severable. In the event a court or other adjudicative body of competent jurisdiction should find any provision or the application of any provision to any person, place or circumstance to be wholly or partially invalid or unenforceable under the law of any jurisdiction, such finding shall not affect the validity and enforceability of the remaining provisions. The remaining provisions shall continue in full force and effect. The provision found to be invalid or unenforceable shall continue to be applicable to the extent permitted under the law of the finding jurisdiction and shall continue in full force and effect under the laws of any other jurisdiction.

## Entire Agreement

I understand and agree that this Agreement constitutes the sole and entire agreement between the parties with respect to the matters covered in it. This Agreement supersedes any prior or contemporaneous agreements, understandings or undertakings, written or oral, by or among the parties regarding such subject matter. I understand and represent that this Agreement is made without reliance on any inducement, statement, promise or representation other than those contained within this Agreement. I also understand and agree that any statements by Released Parties regarding the course are statements of opinion and do not constitute a representation, warranty or guarantee.

## Modification and Waiver

I understand and agree that no term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought. The waiver by any party hereto of any breach of any provision of this Agreement shall not constitute or operate as a waiver of such provision or any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver at such time, or at any future time, of such provision or any other provision hereof.

## Attorney Fees

I understand and agree that should it become necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees, all costs, including costs of investigation, discovery, expert witnesses and consultants, and court costs in addition to all other relief to which such party may be entitled.

## Voluntary Execution of Agreement

I acknowledge and agree that I am executing this Agreement voluntarily, knowingly, and without duress or undue influence. I have read this Agreement and understand the terms and consequences of it. I am fully aware of the legal and binding consequences of it. I have had the opportunity to consult with anyone of my choosing prior to executing this Agreement.

I, the undersigned, certify that I have read this Agreement and agree and accept the terms as stated above.

Name Brooke sheffer Signature DocuSigned by: Brooke Sheffer B9C3BF318ED9496 Date 9/12/2013

A-1666




DEFENSE EXHIBIT
12Q
23-CR-146 (DG)

DEFENSE EXHIBIT
13BA
23-CR-146 (DG)



DEFENSE EXHIBIT
13K
23-CR-146 (DG)

**Max Pixley**
September 11, 2013 · New York, NY ·

When work is play: Jet setting to San Francisco to support over one hundred people go deeper into their orgasm!



Joanna Van Vleck, Robert Kandell and 52 others    11 Comments

Like    Comment

DocuSign Envelope ID: F86D8FC4-BBEE-4908-BFFB-7C8A35648D44

OneTaste

# Release of Liability Form

Thank you for your interest in attending the Coaching Program Course, on 9/7/12 - 9/9/12. This course is offered by One Taste An Urban Retreat Center, herein referred to as ("Sponsors"). Because of the nature and content of the course your agreement to the Release of Liability (hereafter "Release") and each and every provision of this Course Agreement (hereafter "Agreement") is required as a condition of your acceptance into the course. The Release is intended as a waiver of any and all liability and any right of action, whether legal, equitable or in any other form, against Sponsors, their respective course leaders, employers, managers, employees, staff, volunteers, officers, directors, servants, stockholders, principals, general and limited partners, agents, assigns, heirs, attorneys, representatives, and each of their respective families, heirs and executors, predecessors and successors, subsidiaries, affiliates, divisions, sureties, guarantors, insurers, and all other related entities (hereafter "Released Parties"), as a result of any action or omission connected with the content, design, planning, conduct of Released Parties, conduct of other participants and your participation in the course.

## Assumption of Risk

I understand, acknowledge and agree to each of the following:

- That the content of the course is controversial.
- That not all of the activities occurring during the course are known or foreseeable.
- That any concepts, notions, ideas, suggestions and recommendations from the Sponsors and anyone acting on behalf of Sponsors that I accept and or apply to my life, I do of my own free will.
- That while Sponsors believe that the content of the course to be valuable, Sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course.
- That I may not agree with all of the content of the course and accept that possibility.
- That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different than mine.
- That certain participants may make statements or take actions that I disagree with or find offensive.
- That certain participants may disagree with or find offensive statements I make or actions I take.
- That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.
- That I have assessed my own emotional, mental and physical well being, and I have concluded that I wish to and am able to participate in the course.
- That I agree to disclose any psychological or physical health problem, condition or limitation to Sponsors at the time of application and in any event prior to the course commencing.
- That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course.
- That regardless of any disclosures or written approvals, upon acceptance into the course, I continue to bear sole responsibility for my well being.
- That there are emotional and mental risks associated with participation in the course.
- That I voluntarily and knowingly accept and assume each of the risks and other matters set forth in this paragraph.

DEFENDANT'S EXHIBIT DX 20AE

DocuSign Envelope ID: F86D8FC4-BBEE-4908-BFFB-7C8A35648D44

## Participant's Representations

I represent that I do not suffer from any psychological, physical or other condition that could pose a threat of harm to Sponsor's course leaders, course guides, employees, staff, volunteers or other course participants.

## Release of Liability

I hereby forever release and hold harmless Released Parties from any and all claims, causes of action, demands, obligations, breaches of duty, injuries, liabilities, losses, expenses, costs, attorney's fees, damages, or actions, of every type, kind, nature, description, or character, however defined or denominated, and however claimed or asserted, of any nature, known or unknown, asserted or not asserted, contingent or absolute, matured or unmatured, direct or indirect, arising or accruing in any manner out of, or in any way directly or indirectly related to my participation in the course, any statements or acts of Released Parties, any statements or acts of the participants or third parties, the content, design and planning of course, regardless if the nature of such claims be monetary, emotional, mental, psychological or physical.

## Psychotherapy Disclosure

I understand and agree that the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course I obtain via my own free will and participation. Therefore, to the extent not already covered in the above Release, I hereby forever release Released Parties from any and all liability from any adverse, or negative reactions, or effects, that my experiences at the course may have on me.

## Release As Defense

I understand and agree that this Release and Agreement may be pleaded as a full and complete defense to, and the parties hereby consent that it may be used as the basis for an injunction against, any action, suit or other proceeding based on claims released by this Release.

## Participant's Right Regarding Publication

Sponsors from time to time may wish to record and/or photograph the course for reproduction and distribution as part of its educational and promotional materials. Sponsors respect each participant's right to privacy and choice. Accordingly, you have the option by indicating below whether you agree to allow the use of your voice or image in educational and promotional materials distributed by Sponsors. If you decline to have your voice and/or image used in any educational or promotional materials, Sponsors will edit out any section of the recording containing your voice and/or image.

I consent to Sponsors' use of my voice __X__, image __X__

I do not consent to Sponsors' use of my voice______, image ______

I understand that if I do not indicate above whether I do or do not consent to the usage of either my voice or image, Sponsors shall be entitled to assume that I have given my consent to the use of my voice and image.

## Confidentiality

By signing this agreement, I specifically agree to uphold, protect and respect the right of privacy of each of my fellow participants and Released Parties. I agree to keep confidential and not to communicate in any way, at any time, without the particular person's prior written consent, any of the content, events or activities of course, or any of the statements, acts or experiences of my fellow participants and Released Parties that occur at the course. I understand that I am free to share my own experience of what value I received with anyone I choose to, while honoring the confidentiality of this Agreement.

I further agree to follow the instructions of the Sponsors' course instructors, staff, employees and volunteers. I further agree to treat my fellow participants and all connected with the course with respect and to refrain from any statements or conduct once objected to or once instructed to do so by either the course instructors, staff, employees or volunteers.

## Arbitration

Should any dispute remain or exist that is not covered by the terms of the Release, I further agree to forgo the right to seek legal remedy in a court of law and agree to refer such dispute to binding arbitration before the American Arbitration Association ("AAA") in San Francisco, California in accordance with the laws of the State of California and the applicable AAA Arbitration Rules to settle any and all disputes between myself and any of the Released Parties. The AAA shall appoint the Arbitrator(s) in accordance with its rules unless the parties mutually agree to another procedure. Judgment upon the award rendered by the Arbitrator(s) shall be entered in any court having jurisdiction pursuant to applicable law.

Any party may seek compliance with these provisions by petition to any court of general jurisdiction. The prevailing party in any such proceeding shall be entitled to the Court's order for payment of attorney's fees and costs.

## Severability and Effect of Partial Invalidity

I understand and agree that the provisions of this Agreement are severable. In the event a court or other adjudicative body of competent jurisdiction should find any provision or the application of any provision to any person, place or circumstance to be wholly or partially invalid or unenforceable under the law of any jurisdiction, such finding shall not affect the validity and enforceability of the remaining provisions. The remaining provisions shall continue in full force and effect. The provision found to be invalid or unenforceable shall continue to be applicable to the extent permitted under the law of the finding jurisdiction and shall continue in full force and effect under the laws of any other jurisdiction.

## Entire Agreement

I understand and agree that this Agreement constitutes the sole and entire agreement between the parties with respect to the matters covered in it. This Agreement supersedes any prior or contemporaneous agreements, understandings or undertakings, written or oral, by or among the parties regarding such subject matter. I understand and represent that this Agreement is made without reliance on any inducement, statement, promise or representation other than those contained within this Agreement. I also understand and agree that any statements by Released Parties regarding the course are statements of opinion and do not constitute a representation, warranty or guarantee.

## Modification and Waiver

I understand and agree that no term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought. The waiver by any party hereto of any breach of any provision of this Agreement shall not constitute or operate as a waiver of such provision or any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver at such time, or at any future time, of such provision or any other provision hereof.

## Attorney Fees

I understand and agree that should it become necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees, all costs, including costs of investigation, discovery, expert witnesses and consultants, and court costs in addition to all other relief to which such party may be entitled.

## Voluntary Execution of Agreement

I acknowledge and agree that I am executing this Agreement voluntarily, knowingly, and without duress or undue influence. I have read this Agreement and understand the terms and consequences of it. I am fully aware of the legal and binding consequences of it. I have had the opportunity to consult with anyone of my choosing prior to executing this Agreement.

I, the undersigned, certify that I have read this Agreement and agree and accept the terms as stated above.

Name Liarna lifson

Signature

Date 9/8/2012

DEFENDANT'S EXHIBIT
20AW

**Dana Gill** is with **Lianna Li**.
May 12, 2011

...



DEFENSE EXHIBIT
21AL
23-CR-146 (DG)



Rebecca Leigh
June 7, 2013 ·

— with Chelsea Hunter.

DEFENSE EXHIBIT
21AM
23-CR-146 (DG)




DefenseProd00003491

DEFENSE EXHIBIT
21AN
23-CR-146 (DG)



DEFENSE EXHIBIT
21AO-1
23-CR-146 (DG)



DEFENSE EXHIBIT
21AP
23-CR-146 (DG)



**Rebecca Leigh**
July 6, 2013 ·
Unintentional polka dot synchronicity!
— with **Chelsea Hunter** and **Max Pixley**.

[redacted]

DEFENSE EXHIBIT
21AQ
23-CR-146 (DG)



**A-1678**

DEFENSE EXHIBIT
21AS
23-CR-146 (DG)



DocuSign Envelope ID: 2EBC39B8-F5B5-4FE4-ABEF-E49C0E422325

DEFENSE EXHIBIT
21J
23-CR-146 (DG)

OneTaste

# Release of Liability Form

Thank you for your interest in attending the Coaching Program Course, on 9/7/12 - 9/9/12. This course is offered by One Taste An Urban Retreat Center, herein referred to as ("Sponsors"). Because of the nature and content of the course your agreement to the Release of Liability (hereafter "Release") and each and every provision of this Course Agreement (hereafter "Agreement") is required as a condition of your acceptance into the course. The Release is intended as a waiver of any and all liability and any right of action, whether legal, equitable or in any other form, against Sponsors, their respective course leaders, employers, managers, employees, staff, volunteers, officers, directors, servants, stockholders, principals, general and limited partners, agents, assigns, heirs, attorneys, representatives, and each of their respective families, heirs and executors, predecessors and successors, subsidiaries, affiliates, divisions, sureties, guarantors, insurers, and all other related entities (hereafter "Released Parties"), as a result of any action or omission connected with the content, design, planning, conduct of Released Parties, conduct of other participants and your participation in the course.

## Assumption of Risk

I understand, acknowledge and agree to each of the following:

- That the content of the course is controversial.
- That not all of the activities occurring during the course are known or foreseeable.
- That any concepts, notions, ideas, suggestions and recommendations from the Sponsors and anyone acting on behalf of Sponsors that I accept and or apply to my life, I do of my own free will.
- That while Sponsors believe that the content of the course to be valuable, Sponsors do not guarantee it will solve any particular issue or problem I may have. I alone will decide and accept responsibility for how and for what purpose I apply the content of this course.
- That I may not agree with all of the content of the course and accept that possibility.
- That the participants in the course may come from diverse backgrounds and hold beliefs and opinions different than mine.
- That certain participants may make statements or take actions that I disagree with or find offensive.
- That certain participants may disagree with or find offensive statements I make or actions I take.
- That I may choose not to participate in any activity offered in the course. However, if I do decide to participate, I do so of my own knowing and free will.
- That I have assessed my own emotional, mental and physical well being, and I have concluded that I wish to and am able to participate in the course.
- That I agree to disclose any psychological or physical health problem, condition or limitation to Sponsors at the time of application and in any event prior to the course commencing.
- That if my condition could result in any significant harm, the written approval of a licensed physician or therapist may be required as a condition of my acceptance into the course.
- That regardless of any disclosures or written approvals, upon acceptance into the course, I continue to bear sole responsibility for my well being.
- That there are emotional and mental risks associated with participation in the course.
- That I voluntarily and knowingly accept and assume each of the risks and other matters set forth in this paragraph.

DocuSign Envelope ID: 2EBC38B8-F5B5-4FE4-ABEF-E49C0E422325

## Participant's Representations

I represent that I do not suffer from any psychological, physical or other condition that could pose a threat of harm to Sponsor's course leaders, course guides, employees, staff, volunteers or other course participants.

## Release of Liability

I hereby forever release and hold harmless Released Parties from any and all claims, causes of action, demands, obligations, breaches of duty, injuries, liabilities, losses, expenses, costs, attorney's fees, damages, or actions, of every type, kind, nature, description, or character, however defined or denominated, and however claimed or asserted, of any nature, known or unknown, asserted or not asserted, contingent or absolute, matured or unmatured, direct or indirect, arising or accruing in any manner out of, or in any way directly or indirectly related to my participation in the course, any statements or acts of Released Parties, any statements or acts of the participants or third parties, the content, design and planning of course, regardless if the nature of such claims be monetary, emotional, mental, psychological or physical.

## Psychotherapy Disclosure

I understand and agree that the course is not, and is not promoted as, a substitute for psychotherapy and is not therapeutic in nature. I understand that any value I obtain from the course, I obtain via my own free will and participation. Therefore, to the extent not already covered in the above Release, I hereby forever release Released Parties from any and all liability from any adverse, or negative reactions, or effects, that my experiences at the course may have on me.

## Release As Defense

I understand and agree that this Release and Agreement may be pleaded as a full and complete defense to, and the parties hereby consent that it may be used as the basis for an injunction against, any action, suit or other proceeding based on claims released by this Release.

## Participant's Right Regarding Publication

Sponsors from time to time may wish to record and/or photograph the course for reproduction and distribution as part of its educational and promotional materials. Sponsors respect each participant's right to privacy and choice. Accordingly, you have the option by indicating below whether you agree to allow the use of your voice or image in educational and promotional materials distributed by Sponsors. If you decline to have your voice and/or image used in any educational or promotional materials, Sponsors will edit out any section of the recording containing your voice and/or image.

I consent to Sponsors' use of my voice X, image X.

I do not consent to Sponsors' use of my voice_______, image _______.

I understand that if I do not indicate above whether I do or do not consent to the usage of either my voice or image, Sponsors shall be entitled to assume that I have given my consent to the use of my voice and image.

## Confidentiality

By signing this agreement, I specifically agree to uphold, protect and respect the right of privacy of each of my fellow participants and Released Parties. I agree to keep confidential and not to communicate in any way, at any time, without the particular person's prior written consent, any of the content, events or activities of course, or any of the statements, acts or experiences of my fellow participants and Released Parties that occur at the course. I understand that I am free to share my own experience of what value I received with anyone I choose to, while honoring the confidentiality of this Agreement.

I further agree to follow the instructions of the Sponsors' course instructors, staff, employees and volunteers. I further agree to treat my fellow participants and all connected with the course with respect and to refrain from any statements or conduct once objected to or once instructed to do so by either the course instructors, staff, employees or volunteers.

## Arbitration

Should any dispute remain or exist that is not covered by the terms of the Release, I further agree to forfeit the right to seek legal remedy in a court of law and agree to refer such dispute to binding arbitration before the American Arbitration Association ("AAA") in San Francisco, California in accordance with the laws of the State of California and the applicable AAA Arbitration Rules to settle any and all disputes between myself and any of the Released Parties. The AAA shall appoint the Arbitrator(s) in accordance with its rules unless the parties mutually agree to another procedure. Judgment upon the award rendered by the Arbitrator(s) shall be entered in any court having jurisdiction pursuant to applicable law.

Any party may seek compliance with these provisions by petition to any court of general jurisdiction. The prevailing party in any such proceeding shall be entitled to the Court's order for payment of attorney's fees and costs.

## Severability and Effect of Partial Invalidity

I understand and agree that the provisions of this Agreement are severable. In the event a court or other adjudicative body of competent jurisdiction should find any provision or the application of any provision to any person, place or circumstance to be wholly or partially invalid or unenforceable under the law of any jurisdiction, such finding shall not affect the validity and enforceability of the remaining provisions. The remaining provisions shall continue in full force and effect. The provision found to be invalid or unenforceable shall continue to be applicable to the extent permitted under the law of the finding jurisdiction and shall continue in full force and effect under the laws of any other jurisdiction.

## Entire Agreement

I understand and agree that this Agreement constitutes the sole and entire agreement between the parties with respect to the matters covered in it. This Agreement supersedes any prior or contemporaneous agreements, understandings or undertakings, written or oral, by or among the parties regarding such subject matter. I understand and represent that this Agreement is made without reliance on any inducement, statement, promise or representation other than those contained within this Agreement. I also understand and agree that any statements by Released Parties regarding the course are statements of opinion and do not constitute a representation, warranty or guarantee.

## Modification and Waiver

I understand and agree that no term or provision of this Agreement may be varied, changed, modified, waived, discharged or terminated orally, but only by an instrument in writing, signed by the party against whom the enforcement of the variation, change, modification, waiver, discharge or termination is sought. The waiver by any party hereto of any breach of any provision of this Agreement shall not constitute or operate as a waiver of such provision or any other provision hereof, nor shall any failure to enforce any provision hereof operate as a waiver at such time, or at any future time, of such provision or any other provision hereof.

## Attorney Fees

I understand and agree that should it become necessary to enforce the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees, all costs, including costs of investigation, discovery, expert witnesses and consultants, and court costs in addition to all other relief to which such party may be entitled.

## Voluntary Execution of Agreement

I acknowledge and agree that I am executing this Agreement voluntarily, knowingly, and without duress or undue influence. I have read this Agreement and understand the terms and consequences of it. I am fully aware of the legal and binding consequences of it. I have had the opportunity to consult with anyone of my choosing prior to executing this Agreement.

I, the undersigned, certify that I have read this Agreement and agree and accept the terms as stated above.

Name Becky uma    Signature DocuSigned by: [signature]    Date 9/8/2012

DocuSign Envelope ID: 2C819622-EED2-4466-B764-FFFCA17D3FC3

DEFENSE EXHIBIT
21L
23-CR-146 (DG)

1.28.2013

Dear Becky:

Thank you for your application to the 2013 OneTaste Certified Coach Training and OM Training. Your application has been reviewed and approved. We're excited to have you on board for the program. Congratulations!

This letter details your financial arrangement with OneTaste. Please be sure to review this document and initial and sign all pertinent information.

**Your Financial Agreement**

Full Tuition: $7,625.00

Rebates received: $7375-

Received to date: $7,625.00

Additional Expenses: N/A

Payment Plan (if applicable): N/A

DS
B"W

If applicable, OneTaste reserves the right to suspend students from the Program who are more than 10 business days late on their payments without prior communication. OneTaste will communicate to the student a minimum of 5 days that a suspension is forthcoming.

OneTaste may withhold certification to students with outstanding payments and/or owed tuition.

**Cancellation Policy**

OneTaste endeavors to provide professional services. We appreciate that life-circumstances occurs that do not allow our students to attend the program that they have enrolled in. However, OneTaste retains the *right to charge and/or maintain received and/or future payments* from students that have missed or not cancelled with appropriate notice section of the coaching program as described below.

- OneTaste agrees to honor a three (3) day right of recession whereby you have the right to cancel your workshop or program outright and receive 100% of any deposits and/or payments made in full.

DocuSign Envelope ID: 2C819622-EED2-4460-B764-FFFCA17D3FC3

- Cancellations, which occur 30 days or more prior to the starting date of the program (February 22nd, 2013) are fully refundable or transferrable less the non-refundable application fee of $500.00.
- If cancellation occurs from 29 to 7 days prior to the starting date, 50% of the deposit and/or course payments received to date will be forfeited.
- Refunds or transfers of deposits and/or course payments are not possible after 7 days prior to the starting date of a workshop or program or after the program has started.

The student has the right to make a request that they wish to withdraw from the program for medical, family or personal issues. This must be done in writing via letter or email. If cause is mutually agreed upon, OneTaste will discontinue collecting present and future payments. OneTaste will not return fees for services rendered. Regardless of the circumstance, a minimum of $500.00 will be retained as a processing fee.

If you have any questions about payment, logistics or other program details, please do not hesitate to contact me at 415.606.7505. Welcome to the world of OneTaste Coaching!

This Agreement shall be construed and governed by the laws of the State of California.

I have read, understood, comprehended, and agree to the above terms, conditions and commitments, and take 100% responsibility for such.

| | |
|---|---|
| DocuSigned by: [signature] | [signature] |
| Student | Robert Kandell for OneTaste |
| 1/28/2013 | 1.13.2013 |
| Date | Date |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
United States of America

v.

Rachel Cherwitz and Nicole Daedone,

Defendants.
--------------------------------------------------------------X

**MEMORANDUM & ORDER**
23-CR-00146 (DG)

DIANE GUJARATI, United States District Judge:

Pending before the Court is the joint motion of Defendants Rachel Cherwitz and Nicole Daedone for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. *See* Defendants Cherwitz and Daedone's Memorandum of Law in Support of a Judgment of Acquittal (hereinafter, the "Motion"), ECF No. 417; *see also* ECF No. 418 (submission containing sealed exhibit). The Motion was filed following a five-week jury trial at which each Defendant was found guilty of forced labor conspiracy, in violation of 18 U.S.C. § 1594(b). *See generally* docket.[1]

The Government opposes the Motion. *See* Government's Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal (hereinafter, the "Opposition"), ECF No. 425.

For the reasons set forth below, the Motion, ECF No. 417, is DENIED.

## BACKGROUND

Familiarity with the procedural history and background of this case – including with the trial record and with the Court's prior rulings – is assumed herein.

## DISCUSSION

In light of the trial evidence and applicable legal standards, the Motion must be denied.

[1] Defendants' earlier motions brought pursuant to Rule 29 of the Federal Rules of Criminal Procedure were denied during trial.

## I. Applicable Law

As relevant here, Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29") provides that after a guilty verdict, a defendant "may move for a judgment of acquittal, or renew such a motion" and "the court may set aside the verdict and enter an acquittal." *See* Fed. R. Crim. P. 29(c)(1) & (2).

The legal standards under which a district court decides a Rule 29 motion are well settled and the parties do not appear to dispute the applicable standards. As relevant here and in summary, the United States Court of Appeals for the Second Circuit has set forth that a defendant challenging the sufficiency of the evidence at trial bears a heavy burden; that in reviewing such a challenge, a court must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence; that a court must assess the evidence as a whole and not evaluate the evidence piecemeal or in isolation; and that a court must uphold a jury verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Gahagen*, 44 F.4th 99, 108 (2d Cir. 2022); *United States v. Connolly*, 24 F.4th 821, 832 (2d Cir. 2022); *United States v. White*, 7 F.4th 90, 98 (2d Cir. 2021).

## II. The Motion and Opposition

In support of their request for a judgment of acquittal, Defendants raise three principal arguments: (1) that the forced labor statute should be narrowly construed to avoid violating the First and Fifth Amendments, *see* Motion at 2-11 (discussing, *inter alia*, vagueness and constitutional avoidance); (2) that a narrow application of the forced labor statute requires a judgment of acquittal, *see* Motion at 11-20 (discussing, *inter alia*, "by means of" and "serious

harm" language in 18 U.S.C. § 1589 and scienter); and (3) that in violation of the First Amendment, the Government asked the jury to convict Defendants because of the alleged immorality of their spiritual practices, *see* Motion at 20-21.

In the Opposition, the Government sets forth the applicable legal standards and factual background, citing extensively to the trial record, and raises a number of arguments in opposition to Defendants' request for a judgment of acquittal. *See generally* Opposition. The Government argues, *inter alia*: that the majority of Defendants' arguments are inappropriately brought under Rule 29 – because they do not address the sufficiency of the evidence – and that much of the Motion should be denied on that basis alone; that evidence about which Defendants complain was properly admissible; that Defendants' vagueness and constitutional avoidance arguments are unavailing here; that Defendants' conduct falls within the scope of the forced labor conspiracy statute; and that the Government established the requisite *mens rea* and adduced ample evidence to support Defendants' convictions. *See generally* Opposition.[2] The Government asserts that Defendants' arguments "wholly ignore the trial evidence and the relevant legal standard, and instead attempt to paint a false picture of religious persecution" and the Government urges the Court to "reject this naked attempt to launder the trial record." *See* Opposition at 1; *see also* Opposition at 10-11 (asserting: "The defendants repeatedly claim that the government criminalized their spiritual philosophy. That is false. The government prosecuted conduct – not belief. The First Amendment does not shield that conduct simply because it was carried out in spiritual garb."); Opposition at 12 (asserting: "The defendants were

[2] The Government addresses arguments raised in the Motion as well as arguments raised previously by Defendants in the Rule 29 context. *See* Opposition at 24-25 (addressing, *inter alia*, statute of limitations for forced labor conspiracy, effective date of 18 U.S.C. § 1589(b), and validity of 18 U.S.C. § 1594(b)); *see also* ECF No. 401.

convicted because the government proved they knowingly and intentionally conspired to build a financially successful business through the criminally coerced labor of certain of its workers. . . . Whether the product the company was selling – OM – is rooted in religion and spirituality, as the defendants now claim, is a non-sequitur in the face of [the trial] evidence." (quotation omitted)).

**III. The Motion is Denied**

Defendants have failed to satisfy their heavy burden.

As an initial matter, the Court notes that in the Motion, Defendants contend insufficiently with the trial evidence, opting instead largely to reiterate and/or repackage arguments previously addressed by the Court – albeit presented now in the post-trial context. *See generally* Motion. As the Government points out, certain of the arguments advanced by Defendants do not properly fall under Rule 29, notwithstanding Defendants' efforts to shoehorn those arguments into a sufficiency-of-the-evidence challenge. In any event, the Court has considered all of Defendants' arguments. To the extent that the Motion reiterates and/or repackages arguments previously rejected by the Court, the Court incorporates herein its prior rulings with respect to those arguments, including the Court's prior rulings denying Defendants' multiple motions to dismiss and the Court's prior rulings addressing the parties' various motions *in limine* with respect to issues Defendants touch on in the Motion. Defendants' reiterated and/or repackaged arguments are no more persuasive now than when previously raised.

Assessed under the well-settled legal standards governing Rule 29 motions, the trial evidence – including, *inter alia*, victim testimony and testimony from other individuals affiliated at relevant times with OneTaste (including a witness identified as a co-conspirator), OneTaste records, and other financial records – is sufficient to defeat the Motion. The trial evidence was

sufficient for a rational jury to have found beyond a reasonable doubt that each Defendant was guilty of the crime of forced labor conspiracy, in violation of 18 U.S.C. § 1594(b) – the trial evidence was sufficient for a rational jury to have found beyond a reasonable doubt that two or more persons entered into an unlawful agreement to commit forced labor and that each Defendant knowingly and intentionally became a member of the conspiracy.

The Motion, ECF No. 417, is DENIED.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: August 11, 2025
Brooklyn, New York

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/NCG/SMF
F. #2018R01401

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 10, 2025

By ECF

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Nicole Daedone
Criminal Docket No. 23-146 (DG)

Dear Judge Gujarati:

The government, pursuant to Federal Rule of Criminal Procedure 32.2, respectfully submits this letter and a proposed Preliminary Order of Forfeiture in the above-referenced case against defendant Nicole Daedone. In accordance with the jury's verdict after trial, the government seeks entry of a forfeiture money judgment in the sum of twelve million dollars ($12,000,000.00) along with two bank accounts, as set forth below.[1]

I. Background

A. The Indictment

On April 3, 2023, a grand jury sitting in the Eastern District of New York returned an indictment in the above-captioned matter charging Daedone with forced labor conspiracy, in violation of 18 U.S.C. §§ 1594(b). The indictment contained a criminal forfeiture allegation giving notice to the Defendant that, upon her conviction, the government would seek forfeiture in accordance with 18 U.S.C. § 1594(d) of: (a) any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such offense, and any property traceable to such property; and (b) any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense, or any property traceable to such property. See Indictment ¶¶ 13-14.

[1] The government intends to credit the balances of the two seized bank accounts against any outstanding money judgment the Court imposes.

B. The Seizure Warrants

On May 26, 2023, the Honorable James R. Cho, United States Magistrate Judge, issued warrants authorizing the seizure of: (i) any and all funds on deposit held in the name of Nicole Daedone in a Fidelity brokerage account ending in x9265 (the "Fidelity x9265 Account"), up to and including the sum of $782,359.00, and all proceeds traceable thereto; (ii) any and all funds on deposit held in the name of Nicole Daedone in a Fidelity brokerage account ending in x9298 (the "Fidelity x9298 Account"), up to and including the sum of $1,805,396.15, and all proceeds traceable thereto; and (iii) any and all funds on deposit held in the name of Nicole Daedone in a Wells Fargo account ending in x3986 (the "Wells Fargo x3986 Account"), up to and including the sum of $2,970,000.00, and all proceeds traceable thereto. See Case No. 23-MJ-511. The warrants were issued based upon a showing of probable cause to believe that these three accounts were subject to forfeiture, pursuant to 18 U.S.C. §§ 1594(d)(2) and (e)(1)(B), as property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 1594(b). On that same date, law enforcement agents executed those warrants, which resulted in the seizure of approximately: (i) $782,359.00 from the Fidelity x9265 Account; (ii) $1,159,656.47 from the Fidelity x9298 Account; and (iii) $122,417.52 from the Wells Fargo x3986 Account.

On September 21, 2023, United States Magistrate Judge Cho reissued the seizure warrants for those same accounts, expanding the statutory grounds for the seizure based on a showing that the funds in those accounts were, in addition to the grounds set forth in the May 26, 2023 warrants, subject to forfeiture pursuant to 18 U.S.C. §§ 1594(d)(1) and 1594(e)(1)(A) as: (i) property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of a violation of § 1594(b), or property traceable to such property, and (ii) property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 1594(b). See Case No. 23-MJ-511.

C. Daedone's Motion for the Release of Funds Subject to Seizure and the "Seized Assets"

On August 7, 2023, Daedone, through counsel, asserted that she lacked sufficient funds to retain counsel of her choice guaranteed by the Sixth Amendment to the U.S. Constitution and requested that the government release the funds subject to seizure to pay for such counsel. On August 22, 2023, Daedone, through counsel, provided a sworn financial affidavit, which was subsequently revised on August 24, 2023 and again on October 26, 2023, setting forth all assets in which she holds an interest.

On August 22, 2023, the government filed a bill of particulars for forfeiture of specific property giving notice to Daedone that the government intended to seek forfeiture, pursuant to 18 U.S.C. § 1594(d), of all right, title and interest in the following assets: (i) approximately $122,417.52 seized from the Wells Fargo x3986 Account; (ii) approximately $1,159,646.47 seized from the Fidelity x9298 Account; and (iii) approximately $782,359.00 seized from the Fidelity x9265 Account. See ECF No. 40.

On November 7, 2023, Daedone and the government reached a stipulation (the "Stipulation") by which, in full and complete satisfaction of Daedone's Sixth Amendment claim, the government released to Daedone the sum of $877,582.48 seized from the Fidelity x9298 Account and the sum of $122,417.52 seized from the Wells Fargo x3986 Account. Following the release of those funds, the specific funds remaining and subject to seizure are: (i) $782,359.00 held in the Fidelity x9265 Account; and (ii) $282,073.99 held in the Fidelity x9298 Account. Collectively, the funds in these accounts represent the "Seized Assets."

The Stipulation, which is attached hereto as Exhibit A, further provided that, "in the event that the Court imposes a forfeiture money judgment against defendant Nicole Daedone" following her conviction of any offense charged in the above-captioned indictment and for which forfeiture is statutorily authorized, Daedone consents to the forfeiture of the remaining funds, up to the amount of the forfeiture money judgment and entry of a preliminary order of forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting the remaining funds. See Stipulation ¶ 4. In other words, if the Court were to impose a forfeiture money judgment greater than the value of the Seized Assets, Daedone has consented to forfeiture of the Seized Assets to be credited towards the amount of the forfeiture money judgment.

### D. The Jury Verdict

On June 9, 2025, following a five-week jury trial, Daedone was found guilty of forced labor conspiracy. Shortly before the jury began deliberating and consistent with Federal Rule of Criminal Procedure 32.2(5), counsel for Daedone and for defendant Cherwitz elected to have Your Honor determine the forfeitability of the Seized Assets: (i) $782,359.00 held in the Fidelity x9265 Account; and (ii) $282,073.99 held in Fidelity x9298 Account. See Tr. 5261.

## II. Statutory and Procedural Framework

### A. Federal Rule of Criminal Procedure 32.2

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought by the government in this case. See, e.g., United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007) (quoting Fed. R. Crim. P. 32.2(b)(1)), aff'd after remand, 2010 WL 4942213 (summary order) (2d Cir. Dec. 7, 2010). Rule 32.2(b)(1) provides, in pertinent part:

> As soon as practicable after a verdict . . . of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay. The court's determination may be based on . . . evidence or information submitted by the parties and accepted by the court as relevant and reliable.

Fed. R. Crim. P. 32.2(b)(1). See United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783360, at *11 (E.D.N.Y. 2008) (finding that where the government seeks forfeiture of only a personal money judgment, defendant has no right to a jury and there is no need for pre-trial disclosures). Rule 32.2(b)(1)(A) requires the Court, as soon as practicable after conviction, to determine what property is subject to forfeiture.

If the government seeks forfeiture of specific property, the Court must determine whether the government has established the requisite nexus between the property and the offense. Fed. R. Crim. P. 32.2(b)(1)(A). Forfeiture is appropriate upon a court finding of nexus, or connection, between the property and the criminal violations. Id. The Court may determine whether specific property is subject to forfeiture "based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), including testimony at the earlier trial. See Capoccia, 503 F.3d at 109-10. If the forfeiture of specific property is contested, on either party's request, the court must conduct a hearing after conviction. Fed R. Crim. P. 32.2(b)(1)(B); United States v. Kenner, 443 F. Supp. 3d 354, 361 n.6 (E.D.N.Y. 2020).

Rule 32.2(b)(2)(A) requires entry of a preliminary order of forfeiture, and Rule 32.2(b)(4)(A) requires the forfeiture to be included in the oral pronouncement of sentence and written judgment. See Libretti v. United States, 516 U.S. 29, 38-39 (1995) (criminal forfeiture is part of a defendant's sentence); United States v. Bodouva, 853 F.3d 76, 78-79 (2d Cir. 2017) (noting that district courts have no discretion to reduce or eliminate mandatory forfeiture and that criminal forfeiture is distinct from restitution).

B. Section 1594's Forfeiture Provisions and Property Subject to Forfeiture

Here, the government seeks criminal forfeiture pursuant to Title 18, United States Code, Section 1594(d), which mandates that a defendant convicted of forced labor conspiracy "shall forfeit to the United States" any property (i) "involved in, used, or intended to be used to commit or facilitate the commission of such violation, and any property traceable to such property" or (ii) "constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property." Id. § 1594(d); see also United States v. Monsanto, 491 U.S. 600, 607 (1989) (statutes using "shall forfeit" are mandatory where the statutory nexus is established); see Pacheco v. Serendensky, 393 F.3d 348, 355 (2d Cir. 2004) (noting that the purposes of criminal forfeiture are "to punish, deter and disempower criminals").

Section 1594(e)(1) enumerates that (i) "any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any forced labor violation or (ii) "any property, real or personal, which constitutes or is derived from proceeds traceable to" any forced labor violation is subject to forfeiture. Courts have broadly construed the language that property or proceeds constituting or derived from an offense is subject to forfeiture. See United States v. Peters, 732 F.3d 93, 101-02 (2d Cir. 2013) (holding that forfeiture extends to "receipts" rather than simply "profits"). In general, proceeds are property that a person would not have "but for" the criminal offense. United States v. Grant, No. 04-CR-1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008); Kenner, 443 F. Supp. 3d at 363. The type of property subject to forfeiture can include specific property and/or a forfeiture money judgment.

1. Specific Property Subject to Forfeiture

Where, as here, the government has restrained specific property and seeks its forfeiture post-conviction, the Court can order the forfeiture of specific property traceable to the criminal scheme. Property is "traceable" to forfeitable property (and thus forfeitable) when the acquisition of the property is attributable to the criminal scheme rather than from money obtained from untainted sources. Kenner, 443 F. Supp. 3d at 364; see e.g., United States v. Zvi, 168 F.3d 49, 56 (2d Cir. 1999) (permitting forfeiture of funds legitimately obtained through defendants' sale of gold jewelry prior to the commission of fraud involving faked robbery of jewelry store because "the proceeds from the pre-robbery sale of gold represented the defendants' take from the scheme"); United States v. Nicolo, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) (monies paid to a defendant as a result of the scheme are "proceeds" subject to forfeiture, without regard to whether the victim received anything in return).

Strict tracing from a particular criminal act to a particular asset is not required if the totality of the circumstances establishes that the asset constitutes or is derived from proceeds. United States v. Guess, No. 10-CR-145, 2015 WL 1208882, at *2 (W.D.N.C. Mar. 17, 2015) (citing cases). For instance, proceeds from the sale of an enterprise are forfeitable in their entirety when the enterprise's value is tainted by criminal conduct. See, e.g., United States v. Milton, No. 21-CR-478 (ER), 2024 WL 779210, at *5-6 (S.D.N.Y. Feb. 26, 2024) (forfeiting entirety of defendant's ranch where defendant has invested certain untainted money in it); United States v. Bonventre, 646 F. App'x 73, 90 (2d Cir. 2016) (affirming district court's order of forfeiture based on gross proceeds where "the evidence showed that the criminal conspiracy at issue did not sell or provide 'lawful services . . . in an illegal manner' so as to require deduction of direct costs"). Similarly, forfeiture extends to the appreciation of funds acquired through illegal transactions because such funds are "derived from proceeds traceable" to the offense. United States v. Afriyie, 929 F.3d 63, 73 (2d Cir. 2019); United States v. Hatfield, 795 F. Supp. 2d 219, 227 (E.D.N.Y. 2011) ("A conspiracy's proceeds are subject to forfeiture. And a defendant incurs forfeiture liability for the proceeds of the entire conspiracy, including acts that the defendant was not personally responsible for.") (internal citations omitted).

The government has the burden of proof to establish the propriety of forfeiture by a preponderance of the evidence. See United States v. Finazzo, 682 F. App'x 6, 14-15 (2d Cir. 2017); United States v. Schlesinger, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005); Capoccia, 503 F.3d at 116 (sentencing courts determine forfeiture by a preponderance of the evidence).

2. Forfeiture Money Judgments

Importantly, forfeiture under Rule 32.2 is not limited to specific property but can include the imposition of a personal money judgment. Where, as here, the government seeks a personal money judgment, the Court must determine the amount of money that the defendant will be ordered to pay. Schlesinger, 396 F. Supp. at 271. In making a forfeiture determination, the government is not required to provide a precise calculation of the proceeds subject to forfeiture. See United States v. Lizza Indus., Inc., 775 F.2d 492, 498 (2d Cir. 1985). Instead, proceeds can be reasonably estimated. See United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("[T]he law does not demand mathematical exactitude in calculating the proceeds subject

to forfeiture."); United States v. Treacy, 639 F.3d 32, 48-49 (2d Cir. 2011) (the forfeiture money judgment can be conservatively estimated).

When deciding the appropriate forfeiture amount, the Court may rely on evidence that is "relevant and reliable," even though the same evidence would not be admissible in a proceeding governed by the Federal Rules of Evidence. See Fed. R. Crim. P. 32.2(b)(1)(B); see also United States v. Jafari, 85 F. Supp. 3d 679, 684-85 (W.D.N.Y. 2015) ("[C]ourts may consider hearsay and other inadmissible evidence so long as it is sufficiently reliable.") (citing Fed. R. Evid. 1101(d)(3); United States v. Stathakis, No. 04-CR-790, 2008 WL 413782, at *14 n.2 (E.D.N.Y. Feb. 13, 2008) ("[R]eliable hearsay is admissible."). After determining the amount of the money judgment to be forfeited, pursuant to Rule 32.2(b)(2)(A), the Court must promptly enter an order forfeiting this amount. United States v. Petrie, 302 F.3d 1280, 1284 (11th Cir. 2002).

Regardless of whether specific assets are subject to forfeiture, if a court finds that an order of forfeiture is appropriate, but the defendant lacks the assets to satisfy the order, the court can award the government a forfeiture money judgment. 21 U.S.C. § 853; Fed. R. Crim. P. 32.2(b)(1)(1); see, e.g., Kenner, 443 F. Supp. 3d at 362; United States v. Roberts, 696 F. Supp. 2d 263, 269 (E.D.N.Y. 2010) (collecting cases), vacated on other grounds, 660 F.3d 149 (2d Cir. 2011); United States v. Awad, No. 06-CR-600, 2007 WL 3120907, at *4 (S.D.N.Y. Oct. 24, 2007), aff'd, 598 F.3d 76 (2d Cir. 2010); United States v. Bermudez, 413 F.3d 304, 307 (2d Cir. 2005) (affirming a forfeiture money judgment in the money laundering context up to the amount laundered, "even if [defendant] merely handled the laundered property – i.e., even if he never retained those funds and consequently never obtained proceeds from them"); United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("[C]riminal forfeiture may take several forms . . . [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense"); Jafari, 85 F. Supp at 685 (money judgment includes gross proceeds of a fraud). "The only determination that must be made when the government seeks a money judgment is the amount that the defendant will be ordered to pay." United States v. Perkins, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014); Roberts, 696 F. Supp. 2d at 270 ("[I]f the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay."); United States v. Bourne, No. 08-CR-888 (NGG), 2012 WL 526721, at *2 (E.D.N.Y. Feb. 15, 2012) (finding that entry of money judgment is mandatory, even if defendant has no assets).

## III. The Evidence

By 2017, after more than a decade of controlling OneTaste as its founder and chief executive officer, Daedone – who owned nearly 100% of OneTaste – sold the company to a group of private buyers. See GX 4056; 5005. The sale represented the culmination of years in which Daedone oversaw the expansion of OneTaste into an international for-profit enterprise built on the very coercive practices a jury has now found constituted a forced labor conspiracy.

Daedone realized substantial personal profit by selling OneTaste, Inc. for $12 million. See, e.g., GX 4056, Tr. 4297-4304; 4315-4319. This was testified to by FBI forensic accountant Mark Lubin at trial. In short, accountant Lubin testified that, between March and May 2017, Daedone received $12 million as set forth in the OneTaste sales contract, which was

subsequently transferred into the Wells Fargo x8202 Account. Tr. 4297-4304; 4315-4319. In addition, although not testified to at the trial, trial exhibits also revealed that the proceeds of the OneTaste sale was layered through multiple financial accounts that belonged to or which were beneficially owned by Daedone. See GX 867 (attached hereto as Exhibit B); 4437; 4447; 4449; 4452; 4454; 4458. Specifically, in March 2017, Daedone transferred $7 million from the Wells Fargo x8202 Account to an account in her name at SEI Investments ending in x8067 (the "SEI x8067 Account"). In May 2018, Daedone further transferred $6.1 million from the SEI x8067 Account to an account at Fidelity in her name ending in x0331 (the "Fidelity x0331 Account"). Between June 2018 and August 2018, Daedone transferred $5.1 million from the Fidelity x0331 Account to multiple accounts at Fidelity that she beneficially owned, ultimately transferring $4.7 million in December 2018 to the Fidelity x9265 Account. Moreover, Daedone transferred approximately $900,000 between December 2018 and February 2019 from the Fidelity x0331 Account to the Fidelity x9265 Account. Finally, in January 2019, Daedone transferred $4.3 million from the Fidelity x9265 Account to the Fidelity x9298 Account. The Seized Assets were seized from the Fidelity x9265 Account and the Fidelity x9298 Account and are proceeds traceable to Daedone's sale of OneTaste.

In short, the trial record demonstrates that Daedone herself, and not merely OneTaste as a corporate entity, realized the benefit of this sale. Tr. 4319. Financial records testified to at trial confirm that following the closing of this transaction, $12 million was wired into a Wells Fargo account Daedone controlled ending in x8202 (the "Wells Fargo x8202 Account"). See GX 4468-R; 4467-R; 4465-R; 4469-R; 4466-R. Put simply, the money was not distributed but was retained by Daedone as the sole beneficiary of the sale. See Tr. 4319.

Moreover, the $12 million Daedone received was not merely incidental to her role as a shareholder or executive; it was the direct monetization of a business model sustained through coercion, forced labor and sexual exploitation. The financial windfall Daedone secured from OneTaste's sale is thus inseparable from the harm inflicted on her victims. As set forth in the victims' testimony, they were compelled to work long hours without pay, pressured to perform services under threat of psychological, economic and reputational harm and forced into a system that substituted spiritual rhetoric for fair compensation. Tr. 1691-92; 2350; 2425-26; 2107; 2137; 2164; 2419; 3289; 3964; GX 2030-D; GX 856. This coerced labor reduced OneTaste's operating costs, allowed the company to expand rapidly and gave the false appearance of financial success that directly enhanced its market value at the time of the sale. See Tr. 3417; GX 1544; 4501-D-D. Without the exploitation of her victims, OneTaste could not have secured the investment funding or projected the financial viability that made it attractive to potential buyers. As a result, the proceeds of the sale of OneTaste Daedone received is directly traceable to the offense conduct.

## IV. Daedone Must Forfeit the $12 Million Realized from the Sale of OneTaste and the Seized Assets Traceable to these Funds

As discussed above, the $12 million from the sale of OneTaste, including the Seized Assets, are proceeds of Daedone's conviction, and as a result, constitutes property subject to mandatory forfeiture under 18 U.S.C. §§ 1594(d)(1)-(2) & 1594(e)(1)(A)-(B).

In particular, Section 1594(d)(1) directs that a defendant convicted of forced labor conspiracy "shall forfeit to the United States" that defendant's "interest in any property, real or personal, that was involved in, used, or intended to be used to commit or facilitate the commission of such violation, and any property traceable to such property." Section 1594(d)(2) directs that a defendant convicted of forced labor conspiracy, "shall forfeit to the United States any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property." Section 1594(e)(1)(A) directs that "any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any violation of [Chapter 77], and any property traceable to such property" shall "be subject to forfeiture to the United States and no property right shall exist in them." Section 1594(e)(1)(B) directs that "any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of [Chapter 77]" "shall be subject to forfeiture and no property right shall exist in them."

The trial record and financial evidence establish that the $12 million Daedone received from the sale of OneTaste are proceeds inseparable from her convicted criminal conduct. The nexus between the coerced labor that underpinned OneTaste's growth and the eventual financial windfall Daedone secured by selling OneTaste is more than sufficient to establish that the proceeds she received from the sale satisfy the statutory requirements of 18 U.S.C. §§ 1594(d) & (e).

As discussed herein, a portion of the $12 million Daedone received from her sale of OneTaste is currently subject to seizure. While Daedone spent a majority of it, the government seized $1.064 million, which represents specific property subject to forfeiture. In addition to seeking forfeiture of that specific property, the government seeks an order imposing a forfeiture money judgment on Daedone for $12 million and, pursuant to the Stipulation, crediting the Seized Assets towards that judgment.

A. <u>OneTaste Itself Was Used to Facilitate the Commission of the Forced Labor Conspiracy</u>

As described above, Sections 1594(d)(1) and 1594(e)(1) subject to forfeiture property involved in, used, or intended to be used to commit or to facilitate the commission of a forced labor conspiracy, and any property traceable to such property. The scope of forfeiture is therefore not limited to the immediate proceeds of forced labor, but encompasses instrumentalities of the offense, including assets without which the criminal scheme could not have succeeded.

OneTaste itself falls squarely within this category. Daedone wholly owned OneTaste and later sold it to private investors. But, long before the sale, OneTaste functioned as the indispensable vehicle of her criminal enterprise. It provided the corporate structure, business identity, physical premises and financial infrastructure through which Daedone recruited victims, compelled and coerced their labor, and monetized their work. OneTaste was not a passive asset incidentally linked to the conspiracy; it was the instrumentality through which the forced labor scheme was executed. As such, OneTaste was "property involved in" and "used to commit or facilitate" the forced labor conspiracy. <u>See, e.g.</u>, <u>United States v. Sabhnani</u>, 599 F.3d 215, 262 (2d Cir. 2010); <u>United States v. Collado</u>, 348 F.3d 323, 325 (2d Cir. 2003) (affirming forfeiture

of a house used to facilitate distribution of controlled substances); see also United States v. Tate, No. 15-CR-265, 2017 WL 374480, at *1 (W.D.N.C. Jan. 25, 2017) (ordering forfeiture of phones pursuant to 18 U.S.C. § 1594(d)(1) used to commit sex trafficking); United States v. Luong, No. 20-CR-79, 2021 WL 10428312, at *1-2 (W.D.N.C. Mar. 16, 2021) (describing Section 1594's standard for forfeiture in forced labor case). And, when Daedone ultimately sold this asset for $12 million, the proceeds of that sale necessarily became property "traceable" to that very enterprise built on forced labor.

In short, the sale of OneTaste transformed the corporate vehicle of the offense into liquid proceeds, but it did not sever the connection between the forced labor conspiracy and the resulting funds. To the contrary, the transaction crystallized the value Daedone extracted from her criminal conduct. Accordingly, both the OneTaste asset itself and the $12 million realized from its sale fall within the plain reach of 18 U.S.C. §§ 1594(d)(1) and (e)(1); the $12 million represents property involved in, used, or intended to be used to commit or to facilitate the commission of a forced labor conspiracy, in violation of 18 U.S.C. § 1594(b) and the Seized Assets represent property traceable to such property. As such, the Court should impose a forfeiture money judgment for the $12 million representing proceeds traceable to the sale of the corporate vehicle Daedone used to facilitate the forced labor conspiracy.

B. Daedone's $12 Million Sale Proceeds Constitute Property Derived from Proceeds Traceable to the Forced Labor Conspiracy Proceeds from the OneTaste Sale

Title 18, United States Code, Section 1594(d)(2) requires forfeiture of "any property, real or personal, constituting or derived from, any proceeds that [a defendant] obtained, directly or indirectly, as a result of [a Chapter 77] violation, or any property traceable to such property." Likewise, 18 U.S.C. § 1594(e)(1)(B) subjects to forfeiture "any property, real or personal, which constitutes or is derived from proceeds traceable to any [Chapter 77] violation." Courts consistently hold that proceeds constitute or are derived from a criminal violation when they are property a defendant would not have obtained "but for" the offense of conviction. Grant, 2008 WL 4376365, at *2 n.1. In this case, these provisions reach not only the immediate profits extracted from forced labor but also any subsequent assets derived from those tainted proceeds.

Here, the record demonstrates that OneTaste's valuation and its ability to command a $12 million sale price constituted and was derived from coerced labor, uncompensated services, and sexually exploitative practices that Daedone orchestrated. Victims testified that they were compelled to act as "handlers" for an investor whose capital funded OneTaste's early expansion. See Tr. 846; 1014; 1077; 1095-97; 1270; 1294; 1297; 1299; 1301; 2318; 2402; 2404; 2407; 3271-72; 3313. These acts were coerced, not voluntary, GX 2148-D; Tr. 1300-01, and they generated investment capital that sustained OneTaste's operations. Other victims testified to performing uncompensated or grossly underpaid labor, see, e.g., Tr. 149-50; 254-56; 298; 1051-52; 1054; 1056; 1080; 1121-22; 1259; 2102; 2123; 2319; 2340-43; 2784; 3949-50; GX 856 (setting forth wages victims actually received); GX 1283-D-R; GX 1331-A-R; GX 1332-A-R; GX 2200, which slashed operating costs, bolstered revenue, and projected a false image of profitability. See Tr. 3303-04; 3310; 3314; 3321-26; 3336-37; 3347-48; 3379-80; 3413. Thus, absent this conspiracy, OneTaste would have collapsed; the $12 million sale price was itself derived from the exploitation of victims.

Put simply, the sale price constitutes or is derived from the forced labor conspiracy because the very features that the buyers paid for, including OneTaste's apparent profitability and brand strength, were the direct product of coerced labor. The conspiracy provided OneTaste with artificially cheap labor, inflated revenues and a façade of financial health. The conspiracy also allowed OneTaste to obtain the investments needed to keep it afloat. In short, absent the forced labor conspiracy, there would have been no $12 million sale at all. Every facet of OneTaste's financial success was inextricably linked to the exploitation of Daedone's victims. The $12 million sale price was, in effect, the market's valuation of a criminal enterprise.

The fact that Daedone personally received the entirety of the $12 million sale price underscores the direct nexus between the offense conduct and the sale proceeds. Because she was the sole owner of OneTaste, the tainted value of the enterprise flowed exclusively to her. And, as the Second Circuit has made clear, forfeiture is not limited to profits net of expenses or to portions of proceeds unconnected to unlawful activity; it extends to "receipts," Peters, 732 F.3d at 101–02 (gross "receipts," not net profits, are forfeitable); Afriyie, 929 F.3d at 73 (forfeiture extends to the appreciation of tainted property), and to gross proceeds where the criminal conspiracy permeated the business, Bonventre, 646 F. App'x at 90. In fact, the Second Circuit in Bonventre upheld forfeiture of gross proceeds where the conspiracy was so pervasively unlawful that "lawful services" were not being sold "in an illegal manner," but rather the conspiracy itself created the enterprise's value. Id. at 90. Because OneTaste's core operations and valuation were sustained by criminal conduct, the sale price was entirely tainted, and the full $12 million constitutes forfeitable property. As such, the $12 million Daedone received from the sale of OneTaste is property constituting or derived from proceeds Daedone obtained, directly or indirectly, as a result of her violation of 18 U.S.C. § 1594(b), and the Seized Assets, as traceable to that $12 million, represent property traceable to such property. See 18 U.S.C. §§ 1594(d)(2) & (e)(1)(B).

Finally, forfeiture here does not require a strict dollar-for-dollar tracing of specific coerced acts to specific sale proceeds. Courts have rejected such a cramped view, recognizing that strict tracing is unnecessary when the "totality of the circumstances" establishes that the property was derived from the offense. See Guess, 2015 WL 1208882, at *2. Indeed, where the entire value of an enterprise is infused with criminality, courts have upheld forfeiture of the full value of the asset. See Milton, 2024 WL 779210, at *5.

V. Conclusion

Here, the totality of the evidence demonstrates that without coerced labor and sexual exploitation, OneTaste would not have survived, much less eventually commanded a multimillion-dollar sale price. That sale price is thus "derived from" the forced labor conspiracy and as a result, is forfeitable pursuant to 18 U.S.C. §§ 1594(d)(2) and (e)(1)(B). In addition, because the OneTaste corporate asset itself was the vehicle used by Daedone to facilitate the forced labor conspiracy, the sale price is also traceable to property "involved in, used, or intended to be used to commit or facilitate" forced labor conspiracy and is forfeitable pursuant to 18 U.S.C. §§ 1594(d)(1) and (e)(1)(A).

For the reasons discussed above, the government respectfully requests that the Court enter the proposed Preliminary Order of Forfeiture, pursuant to 18 U.S.C. §§ 1594(d) & (e). As previously noted, the proposed Order requests the forfeiture of the Seized Assets, a criminal forfeiture money judgment against Daedone in the amount of $12 million and a credit to be applied to any outstanding money judgment in the amount of any forfeited Seized Assets determined by the Court. See also Stipulation ¶ 4 (Daedone consenting to the forfeiture of the Seized Assets, up to the amount of the forfeiture money judgment and entry of a preliminary order of forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (DG) (by ECF and e-mail)
Counsel of Record (by ECF and e-mail)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
United States of America

v.

Rachel Cherwitz and Nicole Daedone,

Defendants.
---------------------------------------------------------------X

**ORDER**
23-CR-00146 (DG)

DIANE GUJARATI, United States District Judge:

Familiarity with the procedural history and background of this case – including with the trial record and with the Court's prior rulings – is assumed herein. As particularly relevant here: (1) on June 9, 2025, Defendant Nicole Daedone was found guilty at trial of the crime of forced labor conspiracy, *see generally* docket; (2) on December 10, 2025 – in advance of sentencing, which is now scheduled for March 30, 2026 – the Government filed a Motion for Forfeiture as to Defendant Daedone, *see* Motion for Forfeiture, ECF No. 481; *see also* proposed Preliminary Order of Forfeiture, ECF No. 481-1; (3) on December 29, 2025, Defendant Daedone filed a response to the Motion for Forfeiture, *see* ECF No. 488; (4) on January 7, 2026, the Government filed a reply, *see* Reply, ECF No. 490; (5) on January 22, 2026, the Court issued an Order in which the Court indicated that it "intends to order forfeiture as against Defendant Daedone consistent with the requirements of 18 U.S.C. § 1594 and Rule 32.2 of the Federal Rules of Criminal Procedure" and in which the Court directed that "[t]o the extent that Defendant Daedone seeks a hearing, she shall, by January 23, 2026, file a letter identifying with specificity: (1) the aspect(s) of the requested forfeiture as to which she seeks a hearing; and (2) the evidence she would offer at a hearing," *see* January 22, 2026 Order, ECF No. 494; and (6) on January 26, 2026, Defendant Daedone filed a letter in response to the Court's January 22, 2026 Order, *see* ECF No. 497.

In the Motion for Forfeiture, the Government seeks entry of a forfeiture money judgment in the amount of $12,000,000 and forfeiture of certain specific property (balances of two seized bank accounts), with the value of the specific property to be credited against the money judgment. *See generally* Motion for Forfeiture.[1] The Government argues that forfeiture is mandatory here under 18 U.S.C. § 1594, for two independent reasons – namely, because the $12,000,000 that Defendant Daedone received from the sale of OneTaste represents both (1) property "constituting or derived from" proceeds Defendant Daedone obtained "directly or indirectly" as a result of the forced labor conspiracy; and (2) property traceable to property used "to commit or to facilitate" the forced labor conspiracy. *See generally* Motion for Forfeiture; *see also* 18 U.S.C. § 1594.

In her response to the Motion for Forfeiture, Defendant Daedone argues:

> [N]o order of forfeiture is justified where the government has failed in all respects to demonstrate a nexus between the offense of conviction and any amount of the proceeds from the $12M sale of OneTaste. The government's argument rests entirely on speculation and summary conclusions devoid of factual support. Moreover, the government's "instrumentality" theory is dead on arrival where OneTaste is not forfeitable *property* as imagined by § 1594. A $12M personal judgment award would unquestionably amount to an excessive fine in violation of the Eighth Amendment. At the very least, Ms. Daedone is entitled to understand what methodology the government proposes, and the Court intends to apply in determining whether a personal money judgment forfeiture order is justified so that she can defend against it, including through the use of expert evidence.

---

[1] Consistent with Rule 32.2 of the Federal Rules of Criminal Procedure, the Court determined prior to the start of jury deliberations that no party was requesting that the jury be retained to determine the forfeitability of specific property if the jury returned a guilty verdict. *See* Minute Entry for June 6, 2025.

Prior to trial, Defendant Daedone entered into a stipulation with the Government that provides, as relevant here, that in the event that the Court imposes a forfeiture money judgment, Defendant Daedone consents to the forfeiture of certain specified funds, up to the amount of the forfeiture money judgment, and consents to the entry of a preliminary order of forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting those funds. *See* Stipulation, ECF No. 481-2.

*See* ECF No. 488 at 7.[2]

In its reply, the Government again discusses the bases for its forfeiture request, with reference to the trial record and to applicable law, and argues that Defendant Daedone is not entitled to an evidentiary hearing or expert discovery on forfeiture nexus and that the forfeiture sought is not unconstitutionally excessive. *See generally* Reply (noting, *inter alia*, that the Government "seeks forfeiture of the discrete $12 million value Daedone realized in selling OneTaste – a value the evidence shows was obtained, directly or indirectly, as a result of the forced labor conspiracy and by liquidation of property used to commit and facilitate that conspiracy" and asserting, *inter alia*, that "Daedone's opposition rests on a fundamental mischaracterization of criminal forfeiture").

In her response to the Court's January 22, 2026 Order – which the Court accepts notwithstanding the untimeliness of the response – Defendant Daedone states as follows:

> Defendant contends that the record is insufficient to establish that the sale of OneTaste constitutes proceeds of the forced labor conspiracy and that her specific account holdings are traceable to the $12M. It is the government's burden to prove the nexus between the offense of conviction and any amount of the proceeds from the $12M sale of OneTaste. Thus, it is for the government to decide what evidence it seeks to present at a hearing to meet its burden. If the government chooses to rely on testimony from the trial, Defendant maintains that the evidence is insufficient and falls far short of explaining how it reached its determination for all the reasons raised in Defendant's letter. Depending on what evidence the government relies on, Defendant may seek to present testimony from witnesses who could speak to alternative funding sources that were available to OneTaste, as well as an expert who could shed light on the value of OneTaste and whether it can be connected in any way to the alleged forced labor conduct.
>
> That is what Defendant envisions for a hearing. But Defendant maintains that it is the government's burden and the evidence received at trial was insufficient as a matter of law to satisfy it. The government would need to present evidence of a nexus and only then will Defendant know exactly what type of evidence she

[2] Defendant Daedone also argues that a forfeiture money judgment is not authorized by 18 U.S.C. §§ 1594(d) and 1594(e)(1) but states that she "recognizes that current Circuit law forecloses this argument but preserves the issue for review." *See* ECF No. 488 at 1 & n.1.

would present to rebut it.

*See* ECF No. 497 at 1-2. In her response, Defendant Daedone does not explicitly request a hearing but, in substance, takes the position that the trial evidence is insufficient to support the Government's forfeiture request and that the Government would need to present additional evidence to meet the Government's burden.

* * *

Upon consideration of the record, the Court has determined that a hearing is not required and that entry of the proposed Preliminary Order of Forfeiture, as modified, is appropriate.[3]

The Court has determined that pursuant to 18 U.S.C. § 1594, the following are subject to forfeiture: the amount of $12,000,000.00 (the "Forfeiture Money Judgment") and all right, title, and interest in the assets defined in the proposed Preliminary Order of Forfeiture as the "Seized Assets." *See* Fed. R. Crim. P. 32.2; 18 U.S.C. § 1594(d); *see also* proposed Preliminary Order of Forfeiture at 1-2 (providing, *inter alia*, that "[t]he forfeiture of the Seized Assets shall be credited towards the Forfeiture Money Judgment").[4] The trial evidence, considered in its totality, amply supports the request for entry of the proposed Preliminary Order of Forfeiture – including amply demonstrating by a preponderance of the evidence the requisite nexus, *see* Fed. R. Crim. P.

---

[3] The modification is to the definition of "Due Date."

[4] Rule 32.2 of the Federal Rules of Criminal Procedure provides in relevant part:

> As soon as practical after a verdict or finding of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

*See* Fed. R. Crim. P. 32.2(b)(1)(A).

32.2(b)(1)(A) – substantially for the reasons set forth by the Government.

Considered together, victim testimony, testimony from other individuals affiliated at relevant times with OneTaste (including a witness identified as a co-conspirator), testimony from an FBI forensic accountant, OneTaste records, and other financial records admitted at trial amply demonstrate that the $12,000,000 that Defendant Daedone received from the sale of OneTaste represents: (1) property "traceable" to property "that was involved in, used, or intended to be used to commit or to facilitate the commission of" the forced labor conspiracy of which Defendant Daedone was convicted; and (2) property "constituting or derived from" proceeds that Defendant Daedone "obtained, directly or indirectly, as a result of" the forced labor conspiracy of which Defendant Daedone was convicted, or "property traceable to such property." *See* 18 U.S.C. § 1594(d); *see also* 18 U.S.C. § 1594(e).

The trial evidence – some of which is discussed in the Government's submissions on the instant motion, *see* Motion for Forfeiture at 7, 9; Reply at 6 – demonstrates that OneTaste itself was used to facilitate the commission of the forced labor conspiracy of which Defendant Daedone was convicted. The trial evidence also demonstrates that but for the criminal conduct for which Defendant Daedone was found guilty – a forced labor conspiracy that involved, *inter alia*, the use of coerced labor and services, including sexual services with respect to a significant investor, and the use of unpaid and/or underpaid labor – the $12,000,000 would not have been realized by Defendant Daedone.[5]

---

[5] Defendant Daedone's argument that "[a] $12M personal judgment award would unquestionably amount to an excessive fine in violation of the Eighth Amendment," *see* ECF No. 488 at 7, is unavailing on the facts of this case. Here, forfeiture in the amount of $12,000,000 is not "grossly disproportional" to the gravity of the offense of conviction and is not unconstitutionally excessive. *See United States v. Viloski*, 814 F.3d 104, 108-16 (2d Cir. 2016) (discussing factors courts consider in determining whether forfeiture runs afoul of the Eighth Amendment, including the four factors set forth in *United States v. Bajakajian*, 524

The Motion for Forfeiture, ECF No. 481, is granted and the proposed Preliminary Order of Forfeiture, ECF No. 481-1, as modified, is So Ordered.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: March 18, 2026
Brooklyn, New York

---

U.S. 321 (1998) and whether the forfeiture at issue would deprive defendant of defendant's livelihood).

Also unavailing is Defendant Daedone's suggestion that she has not been provided with sufficient information as to the methodology underlying the Government's forfeiture request, *see* ECF No. 488 at 7 – the Government clearly sets forth the methodology underlying its request, which is tethered to the applicable law governing forfeiture in this context, *see generally* Motion for Forfeiture; Reply.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

NICOLE DAEDONE,

Defendant.

– – – – – – – – – – – – – – – – – X

PRELIMINARY ORDER OF FORFEITURE

23-CR-146 (DG)

WHEREAS, on or about June 9, 2025, Nicole Daedone (the “defendant”), was convicted after a jury trial of the offense charged in the Sole Count of the above-captioned Indictment, charging a violation of 18 U.S.C. § 1594(b); and

WHEREAS, the Court has determined that, pursuant to 18 U.S.C. § 1594(d), the defendant must forfeit the amount of twelve million dollars and zero cents ($12,000,000.00) (the “Forfeiture Money Judgment”), in addition to the forfeiture of all right, title, and interest in the following assets (collectively, the “Seized Assets”):

(i) approximately seven hundred eighty-two thousand three hundred fifty-nine dollars and zero cents ($782,359.00), seized by law enforcement from Fidelity account number NBJ-019265 held in the name of Nicole Daedone, and all proceeds traceable thereto; and

(ii) approximately two hundred eighty-two thousand seventy-three dollars and ninety-nine cents ($282,073.99), seized by law enforcement from Fidelity account number NBJ-019298 held in the name of Nicole Daedone, and all proceeds traceable thereto,

as: (a) any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the defendant’s violation of 18 U.S.C. § 1594(b), and any property traceable to such property; (b) any property, real or personal, constituting, or derived from,

Case 1:23-cr-00146-DG-RML Document 481-1 Filed 12/10/25 Page 2 of 5 PageID #: 16495

any proceeds obtained, directly or indirectly, as a result of such offense, or any property traceable to such property; and/or (c) substitute assets, pursuant to 21 U.S.C. § 853(p).

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. Pursuant to 18 U.S.C. § 1594(d) and 21 U.S.C. § 853(p), the defendant shall forfeit to the United States the full amount of the Forfeiture Money Judgment and all right, title, and interest in the Seized Assets. The forfeiture of the Seized Assets shall be credited towards the Forfeiture Money Judgment.

2. All payments made towards the Forfeiture Money Judgment shall be made by a money order, or certified and/or official bank check, payable to the U.S. Marshals Service with the criminal docket number noted on the face of the instrument. The defendant shall cause said payment(s) to be sent by overnight mail delivery to the Asset Forfeiture Section, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201. The Forfeiture Money Judgment shall be paid in full by 30 days after ~~on or before~~ the date of sentencing (the "Due Date").

3. Upon entry of this Preliminary Order of Forfeiture ("Preliminary Order"), the United States Attorney General or her designee is authorized to seize the Seized Assets, to conduct any proper discovery, in accordance with Fed. R. Crim. P. 32.2(b)(3) and (c), and to commence any applicable proceedings to comply with statutes governing third-party rights, including giving notice of this Preliminary Order.

4. The United States shall publish notice of this Preliminary Order in accordance with the custom and practice in this district on the government website www.forfeiture.gov, of its intent to dispose of the Seized Assets in such a manner as the Attorney General or her designee may direct. The United States may, to the extent

Case 1:23-cr-00146-DG-RML Document 481-1 Filed 12/10/25 Page 3 of 5 PageID #: 16496

practicable, provide direct written notice to any person known or alleged to have an interest in the Seized Assets as a substitute for published notice as to those persons so notified.

5. Any person, other than the defendant, asserting a legal interest in the Seized Assets may, within thirty (30) days of the final publication of notice or receipt of notice or no later than sixty (60) days after the first day of publication on an official government website, whichever is earlier, petition the Court for a hearing without a jury to adjudicate the validity of his or her alleged interest in the Seized Assets, and for an amendment of the order of forfeiture, pursuant to 21 U.S.C. § 853(n)(6). Any petition filed in response to the notice of forfeiture of the Seized Assets must be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

6. The defendant shall not file a claim or petition seeking remission or contesting the forfeiture of the Seized Assets or any property against which the United States seeks to satisfy the Forfeiture Money Judgment in any administrative or judicial (civil or criminal) proceeding. The defendant shall fully assist the government in effectuating the surrender and forfeiture of the Seized Assets and the payment of the Forfeiture Money Judgment to the United States. The defendant shall take whatever steps are necessary to ensure that clear title to the Seized Assets passes to the United States, including, but not limited to, the execution of any and all documents necessary to effectuate the surrender and forfeiture of the Seized Assets to the United States. If the Seized Assets or Forfeiture Money Judgment, or any portion thereof, are not forfeited to the United States, the United States

Case 1:23-cr-00146-DG-RML Document 481-1 Filed 12/10/25 Page 4 of 5 PageID #: 16497

may seek to enforce this Preliminary Order against any other assets of the defendant up to the value of the Seized Assets, and the outstanding balance of the Forfeiture Money Judgment, pursuant to 21 U.S.C. § 853(p).

7. Pursuant to Fed. R. Crim. P. 32.2(b)(4)(A) and (B), this Preliminary Order shall become final as to the defendant at the time of the defendant's sentencing and shall be made part of the defendant's sentence and included in her judgment of conviction. If no third party files a timely claim, this Preliminary Order, together with Supplemental Orders of Forfeiture, if any, shall become the Final Order of Forfeiture, as provided by Fed. R. Crim. P. 32.2(c)(2). At that time, the monies and/or properties forfeited herein shall be forfeited to the United States for disposition in accordance with the law.

8. The United States alone shall hold title to the monies paid by the defendant to satisfy the Forfeiture Money Judgment following the Court's entry of the judgment of conviction. The United States alone shall hold title to the Seized Assets following the Court's disposition of all third-party interests, or, if none, following the expiration of the period provided in 21 U.S.C. § 853(n)(2).

9. The forfeiture of the Seized Assets and entry and payment of the Forfeiture Money Judgment shall not be considered a payment of a fine, penalty, restitution loss amount, or payment of any income taxes that may be due, and shall survive bankruptcy.

10. This Preliminary Order shall be binding upon the defendant and the successors, administrators, heirs, assigns and transferees of the defendant, and shall survive the bankruptcy of any of them.

11. This Preliminary Order shall be binding only upon the Court's "so ordering" of the order.

12. The Court shall retain jurisdiction over this action to enforce compliance with the terms of this Preliminary Order and to amend it as necessary, pursuant to Fed. R. Crim. P. 32.2(e).

13. The Clerk of the Court is directed to send, by inter-office mail, two (2) certified copies of this executed Order to the United States Attorney's Office, Eastern District of New York, Attn: ProMinds Paralegal Yvette Ramos, 271-A Cadman Plaza East, Brooklyn, New York 11201.

Dated: Brooklyn, New York
_________________________, 2025

SO ORDERED:

____________________________________
HONORABLE DIANE GUJARATI
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated: March 18, 2026
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

-against- : United States Courthouse
Brooklyn, New York

NICOLE DAEDONE, :
March 30, 2026
Defendant. : 10:00 o'clock a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE DIANE GUJARATI
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
United States Attorney
BY: SEAN M. FERN
KAYLA C. BENSING
NINA C. GUPTA
KAITLIN T. FARRELL
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: BONJEAN LAW GROUP, PLLC
233 Broadway, Suite 707
New York, New York

BY: JENNIFER A. BONJEAN, ESQ.

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

follow the United States sentencing guidelines because they are not mandatory, I am still required to consider the applicable guidelines in imposing sentence. To do that, it is necessary for me to accurately calculate the guidelines sentencing range.

In the PSR, the Probation Department has set forth its guidelines calculation. The Probation Department has calculated a total offense level of 38 and has set forth how it arrived at that number.

The Probation Department has determined a criminal history category of I, based on a criminal history score of zero. The Probation Department sets forth that at offense level 38, with a criminal history category of I, the advisory guidelines range of imprisonment is 235 to 293 months, however, the Probation Department also notes that the statutory maximum term of imprisonment is 20 years and, therefore, the restricted guidelines range is 235 to 240 months of imprisonment.

Have I accurately stated your position, Officer Wing?

PROBATION OFFICER WING: Yes, Your Honor.

THE COURT: The Probation Department has noted a guidelines fine range of $50,000 to $250,000 pursuant to Section 5E1.2(c)(3). The Probation Department has noted that the maximum fine is $250,000 pursuant to Title 18, United

States Code, Section 3571(b).

Can I confirm that I've accurately stated your position?

PROBATION OFFICER WING: Yes, Your Honor.

THE COURT: The Probation Department has also noted a guidelines range of supervised release of one to three years pursuant to Section 5D1.2(a)(2), however, the supervised release range appears to be based on the previous version of the guidelines.

Does the Probation Department agree that the new applicable guidelines range of supervised release is not more than three years?

PROBATION OFFICER WING: We agree, Your Honor.

THE COURT: The Probation Department has noted that because Count One is a class C felony, defendant is eligible for not less than one nor more than five years of probation, pursuant to Title 18, United States Code, Section 3561(c)(1).

The Probation Department has also noted that since the applicable guidelines range is in Zone D of the sentencing table, the defendant is ineligible for probation pursuant to sentencing guideline Section 5B1.1, Note 2.

Have I accurately stated your position, Officer Wing?

PROBATION OFFICER WING: Yes, Your Honor.

THE COURT: The parties have raised certain

category of I, the advisory guidelines range of imprisonment is 108 to 135 months.

The guidelines term of supervised release is not more than three years, pursuant to Section 5D1.2(a)(2).

The fine range is $30,000 to $250,000, pursuant to sentencing guidelines Section 5E1.2(c)(3).

Are there any objections to the guidelines calculation as I've just stated, other than what's already been raised?

Mr. Fern?

MR. FERN: No, Your Honor.

THE COURT: Ms. Bonjean?

MS. BONJEAN: No, Your Honor.

THE COURT: With respect to the PSR, I have asked about any objections to the accuracy of the factual recitations, I have asked about objections to the guidelines calculations, and I have addressed those issues.

I just ask now, out of an abundance of caution, are there any objections to any part at all of the PSR including the addendum, second addendum, third addendum, fourth addendum, fifth addendum, sixth addendum, seventh addendum and eighth addendum that either party wants to raise that have not been raised yet?

Mr. Fern?

MR. FERN: No.

# UNITED STATES DISTRICT COURT

Eastern District of New York

UNITED STATES OF AMERICA
v.
Rachel Cherwitz

## JUDGMENT IN A CRIMINAL CASE

Case Number: 1:23-cr-00146-001-DG

USM Number: 62735-510

Celia Cohen, Esq.
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☑ was found guilty on count(s) Count 1
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1594(b) | Forced Labor Conspiracy | 5/2018 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/30/2026
Date of Imposition of Judgment

*/s/ Diane Gujarati*
Signature of Judge

Diane Gujarati, United States District Judge
Name and Title of Judge

3/31/2026
Date

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Seventy-eight (78) months.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at ______ ☐ a.m. ☐ p.m. on ______ .
- ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ before 2 p.m. on ______ .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______ to ______

at ______ , with a certified copy of this judgment.

______
UNITED STATES MARSHAL

By ______
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Two (2) years.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ________________

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

## SPECIAL CONDITIONS OF SUPERVISION

1. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of her financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of her financial dealings and shall provide truthful monthly statements of her income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to her financial information and records.

2. The defendant shall comply with the restitution order.

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 887,877.64 | $ | $ | $ |

☐ The determination of restitution is deferred until ________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Michelle Wright | | $232,375.00 | |
| Michal Neria | | $181,049.14 | |
| Dana Gill | | $167,261.00 | |
| Rebecca Halpern | | $55,226.00 | |
| Anthia Gillick | | $178,730.00 | |
| Max Pixley | | $61,740.00 | |
| Lyndsi Keves | | $11,496.50 | |
| **TOTALS** | $ ________ | $ 887,877.64 | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the ☐ fine ☑ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Rachel Cherwitz
CASE NUMBER: 1:23-cr-00146-001-DG

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than ____________, or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
Special assessment in the amount of $100 to be paid to the Clerk of Court. Restitution in the amount of $887,877.64 is due immediately and payable at a rate of $25 per quarter while in custody and at a rate of 10% of gross monthly income while on supervised release. Restitution payments shall be directed to the Clerk of Court, 225 Cadman Plaza East, Brooklyn, New York 11201.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| Nicole Daedone (23-CR-00146) | 887,877.64 | 887,877.64 | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT

Eastern District of New York

UNITED STATES OF AMERICA
v.
Nicole Daedone

## JUDGMENT IN A CRIMINAL CASE

Case Number: 1:23-cr-00146-002-DG

USM Number: 63699-510

Jennifer Ann Bonjean, Esq.
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☑ was found guilty on count(s) Count 1 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1594(b) | Forced Labor Conspiracy | 5/2018 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/30/2026
Date of Imposition of Judgment

*/s/ Diane Gujarati*
Signature of Judge

Diane Gujarati, United States District Judge
Name and Title of Judge

3/31/2026
Date

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

One hundred eight (108) months.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

- ☐ at ______ ☐ a.m. ☐ p.m. on ______ .
- ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

- ☐ before 2 p.m. on ______ .
- ☐ as notified by the United States Marshal.
- ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______ to ______

at ______ , with a certified copy of this judgment.

______
UNITED STATES MARSHAL

By ______
DEPUTY UNITED STATES MARSHAL

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Two (2) years.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk to another person (including an organization), the probation officer, with prior approval of the Court, may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ________________

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

# SPECIAL CONDITIONS OF SUPERVISION

1. Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of her financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Officer in the investigation of her financial dealings and shall provide truthful monthly statements of her income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to her financial information and records.

2. The defendant shall comply with the restitution order.

3. The defendant shall cooperate with the U.S. Probation Department in the investigation and approval of any position of self-employment, including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, the defendant shall provide the U.S. Probation Department with full disclosure of her self-employment and other business records, including, but not limited to, all of the records identified in the Probation Form 48F (Request for Self-Employment Records), or as otherwise requested by the U.S. Probation Department.

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 887,877.64 | $ | $ | $ |

☐ The determination of restitution is deferred until ____________. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Michelle Wright | | $232,375.00 | |
| Michal Neria | | $181,049.14 | |
| Dana Gill | | $167,261.00 | |
| Rebecca Halpern | | $55,226.00 | |
| Anthia Gillick | | $178,730.00 | |
| Max Pixley | | $61,740.00 | |
| Lyndsi Keves | | $11,496.50 | |
| **TOTALS** | $ | $ 887,877.64 | |

☐ Restitution amount ordered pursuant to plea agreement $ ____________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the ☐ fine ☑ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Nicole Daedone
CASE NUMBER: 1:23-cr-00146-002-DG

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than ________________ , or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
Special assessment in the amount of $100 to be paid to the Clerk of Court. Restitution in the amount of $887,877.64 is due immediately and payable at a rate of $25 per quarter while in custody and at a rate of 10% of gross monthly income while on supervised release. Restitution payments shall be directed to the Clerk of Court, 225 Cadman Plaza East, Brooklyn, New York 11201.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| Rachel Cherwitz (23-CR-00146) | 887,877.64 | 887,877.64 | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
See Order of Forfeiture dated March 18, 2026 appended to, incorporated by reference, and made part of this Judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Eastern District of New York

Caption:
United States v.
Rachel Cherwitz

Docket No.: 1:23-cr-00146-DG
Hon. Diane Gujarati
(District Court Judge)

Notice is hereby given that Rachel Cherwitz appeals to the United States Court of Appeals for the Second Circuit from the judgment [✓], other [ ] ____________ (specify)
entered in this action on March 31, 2026 (date)

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✓] Other [ ]

Defendant found guilty by plea [ ] trial [✓] N/A [ ].

Offense occurred after November 1, 1987? Yes [✓] No [ ] N/A [ ]

Date of sentence: March 30, 2026 N/A [ ]

Bail/Jail Disposition: Committed [✓] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes [✓] No [ ] If yes, provide the following information:

Defendant's Counsel: Alexandra A.E. Shapiro

Counsel's Address: Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Floor, New York, NY 10036

Counsel's Phone: 212-257-4881

Assistant U.S. Attorney: Kayla C. Bensing

AUSA's Address: 271 Cadman Plaza East
Brooklyn, NY 11201

AUSA's Phone: 718-254-6279

/s/ Alexandra A.E. Shapiro
Signature

**Criminal Notice of Appeal - Form A**

# NOTICE OF APPEAL

**United States District Court**

Eastern District of New York

Caption:
United States v.

Nicole Daedone

Docket No.: 1:23-cr-00146-DG

Hon. Diane Gujarati
(District Court Judge)

Notice is hereby given that Nicole Daedone appeals to the United States Court of Appeals for the Second Circuit from the judgment [✓], other [ ] ________ (specify)

entered in this action on March 31, 2026
(date)

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✓] Other [ ]

Defendant found guilty by plea [ ] trial [✓] N/A [ ].

Offense occurred after November 1, 1987? Yes [✓] No [ ] N/A [ ]

Date of sentence: March 30, 2026 N/A [ ]

Bail/Jail Disposition: Committed [✓] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes[✓] No [ ] If yes, provide the following information:

Defendant's Counsel: Alexandra A.E. Shapiro

Counsel's Address: Shapiro Arato Bach LLP
1140 Avenue of the Americas, 17th Floor, New York, NY 10036

Counsel's Phone: 212-257-4881

Assistant U.S. Attorney: Kayla C. Bensing

AUSA's Address: 271 Cadman Plaza East
Brooklyn, NY 11201

AUSA's Phone: 718-254-6279

/s/ Alexandra A.E. Shapiro
Signature